UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                         :

UNITED STATES OF AMERICA      :    **SEALED**
                           :    **INDICTMENT**

      - v. -          :

                          :    22 Cr. ___

JAMES VELISSARIS,        :  **22 CRIM 105**

      Defendant.      :

                          :

- - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Securities Fraud)

The Grand Jury charges:

### Overview

1.    From at least in or about 2018 through at least in or about February 2021, JAMES VELISSARIS, the defendant, engaged in a scheme to defraud current and potential investors in two funds (the "Investment Funds") managed by Infinity Q Capital Management LLC ("Infinity Q"), an investment adviser majority owned by VELISSARIS.  As part of the scheme, VELISSARIS made false and misleading statements to investors and others concerning Infinity Q's process for valuing certain over-the-counter ("OTC") derivative securities that made up a substantial portion of the holdings of the Investment Funds, and in fact fraudulently mismarked those securities in ways that did not reflect their fair value.  VELISSARIS committed the mismarking scheme in order to inflate the value of the Investment Funds as

reported to investors, to attract and retain capital in the Investment Funds, and to increase his own compensation.

2.    As described in more detail below, JAMES VELLISARIS, the defendant, through Infinity Q, misled Infinity Q's current and potential investors, and Infinity Q's administrator (the "Administrator") and outside auditor (the "Auditor") that the valuation of Infinity Q's OTC derivative securities would be done using an independent third-party service, without Infinity Q's input into the models, and based on the true terms of the underlying securities.

3.    In truth and in fact, JAMES VELISSARIS, the defendant, had substantial input into the marking of the securities, including by manipulating the purportedly independent third-party models that Infinity Q used for valuation.  As part of the scheme, VELISSARIS altered valuations, including, for example, by secretly manipulating the computer code used by the third-party's valuation software.  VELISSARIS' manipulations caused the purportedly independent program to value the OTC derivative securities in ways that were inconsistent with their true terms in order to fraudulently inflate their value and the value of the Investment Funds.  In some cases, the alterations had the impact of creating valuations that were not just false but mathematically impossible.

4.     JAMES VELISSARIS, the defendant, began this scheme at
least as early as 2018.  The scheme grew, and VELISSARIS
substantially increased his mismarking in the spring of 2020 as
markets were impacted by the outbreak of the COVID-19 pandemic
and many of Infinity Q's competitor firms were forced to shut
down.  By touting the purported success of Infinity Q during
this time period, VELISSARIS was able to attract substantial
inflows to the Investment Funds, in addition to retaining
investors who were deprived of accurate information, and
therefore the opportunity to redeem their investments, as a
result of VELISSARIS' scheme to defraud.

5.     In order to avoid detection of the scheme by the
Auditor, JAMES VELISSARIS, the defendant, provided the Auditor
with falsified documents regarding the nature of the OTC
derivative securities held by Infinity Q.  Of particular note,
on multiple occasions, VELISSARIS altered documents that
counterparties had sent to Infinity Q for OTC derivative
positions so that he could provide the Auditor with fabricated
support for the fraudulently inflated values that he had
assigned to the corresponding securities.

6.     In order to further avoid detection, beginning in or
about the summer of 2020, JAMES VELISSARIS, the defendant,
obstructed an inquiry and investigation into Infinity Q by the
United States Securities and Exchange Commission ("SEC").  Among

3

other things, in response to SEC requests for original documents related to valuation, VELISSARIS altered documents that had been provided to investors before providing them to the SEC. Furthermore, when the SEC requested meeting minutes of Infinity Q's valuation committee, VELISSARIS created such minutes for the purpose of submitting them to the SEC, even though no such minutes actually existed.

7.    In or about February 2021, after the mismarking scheme by JAMES VELISSARIS, the defendant, was uncovered, Infinity Q liquidated the Investment Funds and sold their OTC derivative securities.  These positions were sold for hundreds of millions of dollars less than the purported fair values assigned to them by Infinity Q, and investors in the Investment Funds sustained substantial losses.

### James Velissaris and Infinity Q

8.    At all times relevant to this Indictment, JAMES VELISSARIS, the defendant, was the chief investment officer and majority owner of Infinity Q, an investment adviser headquartered in New York, New York.

9.    Infinity Q employed a small staff, including an individual who served as both chief compliance and risk officer ("CC-1").  Prior to March 2020, Infinity Q operated out of a location in Manhattan, New York.  After March 2020, in light of the outbreak of the COVID-19 pandemic, Infinity Q's employees

4

mostly worked remotely from various locations, including within the Southern District of New York.

10.  By in or about February 2021, Infinity Q purported to manage approximately $3 billion in assets, including a registered mutual fund which reported approximately $1.7 billion in assets (the "Mutual Fund"), and a private fund which reported approximately $1.4 billion in assets (the "Hedge Fund," and together with the Mutual Fund, the "Investment Funds").

11.  The Mutual Fund reported its net asset value ("NAV") on a daily basis and allowed investors to redeem their investments at any time based on that daily value.  The Mutual Fund also made regular filings with the SEC.  The Hedge Fund reported its NAV to investors on a monthly basis.  Both the Mutual Fund and the Hedge Fund also prepared annual audited financial statements.

12.  In investor disclosures and in the audited financial statements for the Investment Funds, Infinity Q represented that it valued the positions held in the Investment Funds at "fair value," that is the price at which a buyer and seller would agree to exchange the asset in an orderly market transaction on the valuation date.

13.  Infinity Q was compensated for its advisory services in the form of management fees from both the Mutual Fund and the Hedge Fund based on the assets under management, and Infinity Q

also received performance-based fees from the Hedge Fund based
on net profits.  As the majority owner of Infinity Q, JAMES
VELISSARIS, the defendant, earned tens of millions of dollars
from these management and performance fees during the relevant
period.

### Infinity Q's Investments in OTC Derivative Positions

14.  At all relevant times to this Indictment, Infinity Q
pursued an investment strategy that involved trading in OTC
derivative positions.  OTC derivative positions do not trade
over an exchange and are customized contracts between the
counterparties to the transaction.  In particular, Infinity Q
traded in OTC derivative positions including volatility swaps,
variance swaps, corridor variance swaps, correlation swaps, and
other related instruments.

15.  Volatility and variance swaps allow an investor to
take a position on the expected volatility, or price movement,
of an underlying asset over a particular period of time.  A
volatility or variance swap that takes account of volatility
irrespective of the value of the underlying asset is often
referred to as a "plain vanilla."  A corridor variance swap
allows an investor to take a position on the expected volatility
of an underlying asset over a particular period of time, but
only taking into account volatility when the asset's value falls
within a certain "corridor," in other words, when the asset's

value is between agreed-upon lower and upper bounds.
Correlation swaps allow an investor to take a position on the
expected correlation, or the relationship, between the
volatility of multiple underlying assets.

16.   Investment funds and financial institutions that trade
in these kinds of OTC derivative positions need to calculate the
fair value of their holdings in order to report their assets to
investors and other stakeholders.  Prior to the settlement of
these OTC derivative positions, the positions are often valued
using models that take into account both the agreed upon terms
of the deal as well as certain assumptions based on anticipated
market conditions.  The agreed upon terms of the deal typically
include, among other things, the notional amount of the swap,
the strike price which determines which party will have to pay,
the effective and expiry dates that set forth the relevant time
period for the swap, and in the case of a corridor variance
swap, the lower and upper bounds of the corridor.  Typically,
these terms are set out in written agreements, including terms
sheets and confirmations, between the parties to the deal.  The
relevant assumptions that are used to value the positions
include, in the case of volatility or variance swaps, the
implied volatility, or the amount of expected volatility of the
underlying asset for the remainder of the position, or in the
case of a correlation swap, the implied correlation.  In most

cases, these OTC derivative positions are also valued using an annualization factor of 252, corresponding to the number of trading days in a typical calendar year.

17.   At the end of the time period set forth in an OTC derivative position, the final realized value is calculated and the position can be settled.   The settlement process typically includes calculating the final value of the position, with one party paying the other based on that final value.

18.   Infinity Q regularly touted itself to investors and the investing public as an expert in these OTC derivative positions, and that it could generate profit based on trading in this area.   In fact, by at least 2020, the Investment Funds each held hundreds of millions of dollars of these OTC derivative positions in their portfolios.   Oftentimes, Infinity Q would negotiate a particular OTC derivative position with a counterparty (usually a large financial institution) and allocate a portion of that position to the Mutual Fund and a portion of the position to the Hedge Fund.

### Infinity Q Told Investors and Others that It Calculated the Fair Value of OTC Derivative Positions Using an Independent Third-Party Process

19.   In order to calculate their NAV, both the Mutual Fund and the Hedge Fund needed to calculate the present fair value of their OTC derivative positions at day and month end, respectively.   In materials and communications exchanged with

investors and other stakeholders, Infinity Q repeatedly represented that it calculated the present fair value of the Investment Funds' OTC derivative positions using an independent, third-party provider.  In particular, Infinity Q represented that it used the Bloomberg Valuation Service, also known as "BVAL," to independently value these positions.  BVAL is a service offered by the international financial services company Bloomberg L.P. that allows users to model many types of financial products, including the types of OTC derivative positions held by the Investment Funds.

20.  BVAL allows a user to model OTC derivative positions by (a) choosing a template that is appropriate for that position, (b) inputting into the template the relevant parameters for the position (such as the notional amount and strike price), (c) applying the necessary market assumptions to value a particular position (such as the implied volatility for a volatility swap), and (d) running a code-based program on those inputs in order to determine a fair market value.  The version of BVAL that Infinity Q used employed a service called "Golden Copy" that allowed the user, in this case Infinity Q, to choose from among various options for the necessary market assumptions that a model would use based on particular market snapshots, such as time and location.

21.   Some of BVAL's templates allowed users to access and
edit the underlying code that was used to value the positions
("Custom Scripts") while some of the templates were locked and
did not.   Importantly, both types of BVAL models relied upon the
user entering the terms of a deal accurately in order to
generate valuation.   Accordingly, BVAL's Custom Scripts provided
a warning to the user that "Clients must make sure that the
input parameters entered into the script faithfully represent
the term sheet that they would like to price."

22.   At all times relevant to this Indictment, Infinity Q
had a subscription to use BVAL, including Golden Copy, in order
to value the Investment Funds' OTC derivative positions.   As
chief investment officer, JAMES VELISSARIS, the defendant, was
responsible for valuing the Investment Funds' positions,
including entering those positions into BVAL for valuation.
While a number of Infinity Q's employees had access to view the
values of Infinity Q's holdings in BVAL, VELISSARIS was the only
Infinity Q employee with permission to input or edit the
positions and the templates within Infinity Q's BVAL portfolio.

23.   Infinity Q regularly represented to its investors and
the investing public as well as the Administrator and the
Auditor that Infinity Q utilized BVAL to value OTC derivative
positions, rather than valuing the positions itself, in order to
maintain an independent process for valuing OTC derivative

positions.  For example, on multiple occasions, Infinity Q told a firm engaged to assist an institutional pension fund investor with performing due diligence on Infinity Q (the "Investor Diligence Firm"), in substance, that all OTC derivative positions in the Hedge Fund were valued using BVAL, independent of Infinity Q.  Infinity Q explained to the Investor Diligence Firm that, when trades are completed, Infinity Q sends BVAL the details and BVAL models the securities independent of Infinity Q.

24.  By way of further example, when Infinity Q began using BVAL in or about 2016, JAMES VELISSARIS, the defendant, explained to the Administrator that "[w]e started working with BVAL in the spring as an independent valuation for our OTC derivatives. . . . We intentionally removed ourselves from the valuation of these securities to allow BVAL to remain independent."  Similarly, in or about December 2020, JAMES VESLISSARIS, the defendant, represented to the Auditor that "[Infinity Q] uses one of Bloomberg's services called Bloomberg Valuation Service ("BVAL") to value all swap contracts . . . . BVAL is a subscription-paid service that provides independent and transparent pricing of OTC derivatives across all asset classes."  With respect to volatility and variance swaps, VELISSARIS explained that "[Infinity Q does] not provide any unobservable inputs (ex: implied volatility) to BVAL.  Implied

volatility (or implied correlation) quotes are contributed to
Golden Copy market data by multiple major banks and brokers."
With respect to correlation swaps, VELISSARIS explained that
"[w]ith the exception of implied correlation, all other inputs
(start date, maturity date, strike %, vega notional, etc.) for
the valuation of correlation swaps come directly from the term
sheet with the counterparty."

## VELISSARIS' Scheme to Defraud

25.   From at least in or about 2018 through at least in or
about February 2021, JAMES VELISSARIS, the defendant, engaged in
a scheme to defraud current and prospective investors in the
Investment Funds by making false and misleading statements to
investors and other stakeholders concerning Infinity Q's process
for valuing OTC derivative positions and by mismarking those
securities in ways that did not reflect their fair value, in
order to artificially inflate their values and thereby inflate
the NAV of both the Mutual Fund and the Hedge Fund.

26.   The scheme carried out by JAMES VELISSARIS, the
defendant, was fraudulent in at least two ways.  First,
VELISSARIS' process for valuing Infinity Q's OTC derivative
positions was inconsistent with his representations concerning
the independence of the process for valuing those positions.  In
truth and in fact, VELISSARIS had substantial input into the
modeling of the securities by altering the BVAL models

12

themselves and by inputting terms into the model that differed from term sheets with counterparties, thereby undermining the independence of BVAL.  While VELISSARIS' use of BVAL legitimately required him to enter the terms of OTC derivative positions into BVAL's models, his repeated alteration of those models and his inputting of terms that did not accurately reflect the terms of the underlying OTC positions negated the purported independence of BVAL and its valuation process.  As further described below, these alterations included changes in the computer code that comprised the BVAL models that Infinity Q used.

27.    Furthermore, as part of his scheme to defraud, JAMES VELISSARIS, the defendant, routinely mismarked OTC derivative positions in ways that did not reflect their fair value.  As the sole Infinity Q employee with access to input and edit positions and templates in BVAL, VELISSARIS frequently and improperly altered various parameters of OTC derivative positions in order to inflate their values in BVAL.  These included causing BVAL to improperly consider and calculate certain terms of OTC derivative positions held by Infinity Q including, among other things, corridors for corridor variance swaps, the strike prices for numerous swap positions, the annualization factors for numerous swap positions, and the effective dates of numerous swap positions.  Altering each of these parameters could falsely

inflate the value of the Investment Funds' holdings by increasing the value that BVAL would generate.

28.  For example, in a corridor variance swap, volatility is only realized when the value of the underlying asset is within a particular range or "corridor."  In calculating the present value of such a position, BVAL's model was supposed to take into account, among other things, the risk that the asset would move outside of the corridor and not accrue volatility if and when it did so.  By instead programming BVAL's models in such a way that they ignored and/or expanded the corridor, JAMES VELISSARIS, the defendant, ensured that the model did not appropriately account for the risk that the asset would move outside the corridor and caused the program to accrue volatility even when the asset did in fact move outside the corridor.  This had the effect of causing the BVAL model to compute a greater value than it would have had it been properly programmed to include the corridor.  VELISSARIS made numerous such manipulations where the Investment Funds were "long" the corridor variance swap, in other words where the Investment Funds would benefit from the increased value generated by the higher volatility.  By contrast, VELISSARIS typically left the corridors in the BVAL models where the Investment Funds were "short" a corridor variance swap, in other words where the

14

Investment Funds would benefit from less volatility in the position.

29.   JAMES VELISSARIS, the defendant, effectuated these manipulations in BVAL models through numerous means and methods. One of the ways that VELISSARIS was able to manipulate the modeling of corridor variance swaps within BVAL was by changing an "and" within BVAL's Custom Scripts to an "or," such that rather than effectuating a command that, in order to realize volatility, the asset's price needed to be both above a certain lower barrier and below a certain upper barrier (i.e., within the corridor), the asset only needed to be above a certain lower barrier or below a certain upper barrier, a condition which is, by definition, always true.  VELISSARIS also manually altered other aspects of BVAL's Custom Scripts to effectuate the above-described manipulations, including adding or subtracting numbers from the agreed-upon corridors within BVAL's code, using annualization factor numbers that were different than the 252 number stated in the term sheet, and altering the agreed-upon strike price of the position.

30.   JAMES VELISSARIS, the defendant, knew that implementing these forms of manipulation, including ignoring the corridors on corridor variance swaps, would cause BVAL to model the positions in ways that were inconsistent with the true terms of the deal, would improperly inflate their values, and was

inconsistent with the purported independence of BVAL's processes.  For example, in or about April 2020, VELISSARIS and CC-1 were discussing Infinity Q's internal risk modeling. Wholly apart from valuation functions which were handled solely by VELISSARIS, Infinity Q kept track of its positions internally for risk assessment.  During that conversation, VELISSARIS noted that, in its risk models, one of Infinity Q's junior analysts had "modeled all corridor var[iance swaps] as [plain] vanilla var[iance] swaps" which, according to VELISSARIS "throws everything off."  Furthermore, Infinity Q's own internal risk analyses, which were reviewed by VELISSARIS, sometimes showed that for corridor variance swap positions where VELISSARIS caused BVAL to ignore a corridor for purposes of valuation, the underlying asset had a substantial likelihood of being outside the corridor.

31.  In addition, JAMES VELISSARIS, the defendant, falsely inflated the value of the Investment Funds' OTC derivative positions by selecting market assumptions that the BVAL model employed, including the implied volatility, that were designed to falsely inflate the value of the positions.  As explained above, BVAL employed assumptions about certain unobservable inputs through its Golden Copy program (for example implied volatility or implied correlation), and users like VELISSARIS could select from a list of options to be used as inputs for

those assumptions.  In some instances, VELISSARIS selected
implied volatility options that were not intended to achieve
fair value, but rather, for the sole purpose of inflating the
value of a position in BVAL.

32.  As a result of the above-described manipulations
within BVAL, JAMES VELISSARIS, the defendant, caused numerous
positions in the Investment Funds to have anomalous and, at
times, impossible valuations.  For example, at times, VELISSARIS
made manipulations in either the Mutual Fund and/or the Hedge
Fund that caused certain identical positions that were held by
both the Mutual Fund and the Hedge Fund (namely, positions with
the same material terms, including start date, end date, type of
swap, underlying asset, notional amount, and strike price) to
have substantially divergent values.  By way of further example,
some of VELISSARIS' manipulations caused certain positions held
by the Investment Funds to have impossible values, such as where
under the true terms of the swap, the value adopted by
VELISSARIS could only be true if volatility were negative – a
condition which is mathematically impossible.

33.  While JAMES VELISSARIS, the defendant, began making
these manipulations as early as 2018, he substantially increased
his mismarking in the spring of 2020 as markets were impacted by
the outbreak of the COVID-19 pandemic.  As VELISSARIS and others
at Infinity Q regularly discussed, a number of Infinity Q's

17

competitors were forced out of business due to the pandemic and Infinity Q had substantial financial problems.  For example, in or about March 2020, VELISSARIS and CC-1 discussed getting a loan to keep Infinity Q afloat, with CC-1 noting, "we have to save the mutual fund."  From that point forward, VELISSARIS' manipulations were crucial to the financial position of both the Mutual Fund and the Hedge Fund, including supporting their artificial valuations to investors and the public, and thereby attracting new investors.  Meanwhile, by touting the success of Infinity Q during this time period, VELISSARIS was able to attract substantial inflows to the Investment Funds.

34.  In or about February 2021, after the mismarkings by JAMES VELISSARIS, the defendant, were uncovered, Infinity Q liquidated the Investment Funds and sold its OTC derivative positions.  These positions were sold for hundreds of millions of dollars less than their purported market values in BVAL and investors in the Investment Funds sustained substantial losses.

## VELISSARIS Lies to Others in Order to Hide his Manipulations

35.  In order to conceal his mismarking scheme, JAMES VELISSARIS, the defendant, regularly lied, and caused other Infinity Q employees to lie about the nature of Infinity Q's valuation of OTC derivatives.  For example, as set forth above, VELISSARIS and others at Infinity Q often represented to

investors, the public, the Administrator, and the Auditor that BVAL was providing independent, third-party valuations for OTC derivative positions, when in fact, VELISSARIS had substantial input into the modeling of those positions, including through entering deal parameters, selecting options for model assumptions, and altering code within BVAL's Custom Scripts, and often modeled positions in ways that were inconsistent with the true terms of an OTC derivative position.

36.   Furthermore, on a number of occasions, JAMES VELISSARIS, the defendant, fabricated documents that were submitted to the Auditor in order to prevent the Auditor from uncovering his mismarking scheme in connection with both the Mutual Fund and the Hedge Fund.  For example, as part of the audit of the Mutual Fund for the fiscal year ending August 31, 2020, the Auditor hired a specialist to perform an analysis on certain OTC derivative positions, including a corridor variance swap held by the Mutual Fund which Infinity Q had valued at approximately $22 million ("Position-1").  In connection with that audit, in or about September 2020, VELISSARIS fraudulently altered a term sheet to provide to the Auditor wherein VELISSARIS lowered the terms sheet's actual lower bound of the swap's corridor so that the Auditor's valuation calculation would line up with BVAL's calculation.  Using the false information that VELISSARIS had provided, the Auditor concluded

19

that Infinity Q's valuation of Position-1 was reasonable.  But within months, and using the terms from the actual term sheet instead of the altered term sheet that VELISSARIS had provided to the Auditor, Position-1 expired with a settlement value approximately 80 percent lower than Infinity Q had earlier represented.

37.  Similarly, as part of the audit of the Hedge Fund for the fiscal year ending December 31, 2020, the Auditor hired the same specialist to perform an analysis on certain OTC derivative positions, including a corridor variance swap held by the Hedge Fund which Infinity Q had valued at approximately $13 million ("Position-2").  In fact, however, VELISSARIS had programmed a Customized Script in BVAL to ignore the lower bound of the corridor for Position-2, thereby contributing to an inflated value.  In order to justify the inflated value that VELISSARIS had caused BVAL to produce by ignoring the corridor, in or about February 2021, VELLISARIS created an altered version of the trade confirmation for Position-2 wherein he fraudulently altered the lower bound of the corridor by a substantial amount. VELISSARIS provided that falsified document to the Auditor in order to cause the Auditor to justify Infinity Q's valuation of the position.  However, that audit was not completed because Infinity Q's operations were suspended as VELISSARIS' scheme came to light in February 2021.

## VELISSARIS and CC-1 Obstruct the SEC's
## Investigation into Infinity Q's Valuation

38.  In or about May 2020, the SEC opened an inquiry into the valuation practices at Infinity Q, which later in 2020 ripened into a formal investigation.  From at least in or about May 2020 through at least in or about February 2021, JAMES VELISSARIS, the defendant, and CC-1, engaged in conduct that was intended to obstruct the SEC's inquiry and investigation, and to provide false and misleading information to the SEC.

39.  In or about May 2020, in connection with its inquiry, the SEC requested that Infinity Q provide various investor materials.  The SEC's request called for "the original Documents" that were responsive to its various requests. However, rather than provide the original investor materials that had been shared with investors, JAMES VELISSARIS, the defendant, and CC-1, altered significant portions of Infinity Q's materials, in particular materials addressing Infinity Q's valuation practices and policies, before providing them to the SEC.  For example, Infinity Q's original investor materials stated that "[a]t each month end, valuations are compared to the values provided by counterparties for reasonableness."  In fact, however, as VELISSARIS well knew, counterparty values for OTC derivative positions often differed significantly from Infinity Q's values.  This was especially true beginning in or about

21

March 2020 as the COVID-19 pandemic had a substantial effect on the market and many of Infinity Q's counterparties were valuing their OTC derivative positions at substantially different values than Infinity Q.  VELISSARIS and CC-1 removed this line from documents that were provided to the SEC.

40.  Similarly, Infinity Q's original investor materials stated that "[o]nce a price is established for a portfolio security, it shall be used for all Funds that hold the security."  As set forth above, this was untrue and on numerous occasions, manipulations in BVAL made by JAMES VELISSARIS, the defendant, caused the same positions in the Mutual Fund and the Hedge Fund to have substantially different values.  To conceal the falsity of Infinity Q's disclosures, VELISSARIS and CC-1 removed this line from investor documents that were provided to the SEC.

41.  In or about June 2020, the SEC requested that Infinity Q provide additional materials, including documents regarding Infinity Q's valuation committee and all of that committee's meeting minutes.  Infinity Q's investor materials had represented that Infinity Q had a valuation committee, including that JAMES VELISSARIS, the defendant, and CC-1, were members of that committee, that the committee met monthly or more often if needed, and that VELISSARIS was responsible for preparing minutes of such meetings to reflect what occurred.  In fact,

however, VELISSARIS had not kept notes of any such meetings. Accordingly, days before responding to the SEC, VELISSARIS made up notes purporting to be taken during or shortly after valuation committee meetings in 2019 and 2020 and submitted them to the SEC.

42.   In or about February 2021, the SEC was able to gain access to Infinity Q's BVAL portfolio and, for the first time, observed some of the above-described alterations that JAMES VELISSARIS, the defendant, had made to Infinity Q's portfolio in BVAL.   When others at Infinity Q and the board of the Mutual Fund became aware of this conduct, redemptions in the Mutual Fund were suspended and the Hedge Fund ceased operations.   Both the Mutual Fund and the Hedge Fund were subsequently liquidated, and Infinity Q's OTC derivative positions were sold for substantially less than the inflated values at which they had been marked by Infinity Q.

### Statutory Allegation

43.   From at least in or about 2018 through at least in or about February 2021, in the Southern District of New York and elsewhere, JAMES VELISSARIS, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of

securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons;  and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to wit, VELISSARIS made fraudulent misrepresentations to others, including investors in the Investment Funds, concerning the process by which the Investment Funds' OTC derivative positions were marked at fair value, and VELISSARIS mismarked the value of OTC derivative positions held by the Investment funds in order to fraudulently inflate their value.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Investment Adviser Fraud)

The Grand Jury further charges:

44.   The allegations contained in paragraphs 1 through 42 of this Indictment are repeated and realleged as if fully set forth herein.

45.   From at least in or about 2018 through at least in or about February 2021, in the Southern District of New York and elsewhere, JAMES VELISSARIS, the defendant, willfully and knowingly, acting as an investment advisor with respect to Infinity Q clients, by use of the mails and instrumentalities of interstate commerce, directly and indirectly, did (a) employ a device, scheme, and artifice to defraud clients and prospective clients; (b) engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, VELISSARIS made fraudulent misrepresentations to others, including investors in the Investment Funds, concerning the process by which the Investment Funds' OTC derivative positions were marked at fair value, and VELISSARIS mismarked the value of OTC derivative positions held by the Investment Funds in order to fraudulently inflate their value.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

46.   The allegations contained in paragraphs 1 through 42 of this Indictment are repeated and realleged as if fully set forth herein.

47.   From at least in or about 2018 through at least in or about February 2021, in the Southern District of New York and elsewhere, JAMES VELISSARIS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, VELISSARIS made fraudulent misrepresentations to others, including investors in the Investment Funds, concerning the process by which the Investment Funds' OTC derivative positions were marked at fair value, and VELISSARIS mismarked the value of OTC derivative positions held by the Investment Funds, including through the use of email and chat communications to and from the Southern District of New York, in order to fraudulently inflate their value.

(Title 18, United States Code, Sections 1343 and 2.)

26

## COUNT FOUR
### (False Statements to an Accountant)

The Grand Jury further charges:

48. The allegations contained in paragraphs 1 through 42 of this Indictment are repeated and realleged as if fully set forth herein.

49. From at least in or about August 2020 through at least in or about February 2021, in the Southern District of New York and elsewhere, JAMES VELISSARIS, the defendant, willfully and knowingly, being an officer and director of an investment adviser of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), did make and cause to be made materially false and misleading statements to an accountant, and did omit and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit, review, and examination of the financial statements of the investment company required to be made pursuant to SEC regulations, and took actions to coerce, manipulate, mislead, and fraudulently influence independent public and certified public accountants engaged in the performance of an audit and review of the financial statements of that investment company that were required to be filed with the SEC, knowing that such action, if successful, could result in

rendering the investment company's financial statements materially misleading, to wit, in or about September 2020, in connection with the Auditor's audit of the Mutual Fund, VELISSARIS, falsely submitted and caused to be submitted to the Auditor a fraudulently altered term sheet wherein he changed the lower bound of a corridor in order to deceive the Auditor into confirming the reasonableness of Infinity Q's valuation of that position.

(Title 15, United States Code, Sections 78ff, 80a-29, 7202; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Conspiracy to Obstruct an SEC Investigation)

The Grand Jury further charges:

50.   The allegations contained in paragraphs 1 through 42 of this Indictment are repeated and realleged as if fully set forth herein.

51.   From at least in or about May 2020 through at least in or about February 2021, in the Southern District of New York and elsewhere, JAMES VELISSARIS, the defendant, CC-1, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, to make false statements and writings, in violation of Title 18, United States Code, Section 1001; and to obstruct a federal investigation, in violation of Title 18, United States Code, Section 1519.

28

52.   It was a part and an object of the conspiracy that JAMES VELISSARIS, the defendant, CC-1, and others known and unknown, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, an investigation by the SEC, knowingly and willfully would and did (1) falsify, conceal, and cover up by tricks, schemes, and devices a material fact; (2) make materially false, fictitious, and fraudulent statements and representations; and (3) make and use false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in violation of Title 18, United States Code, section 1001.

53.   It was further a part and an object of the conspiracy that JAMES VELISSARIS, the defendant, CC-1, and others known and unknown, would and did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department and agency of the United States, to wit, an investigation by the SEC, in violation of Title 18, United States Code, Section 1519.

54.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

29

a.    On or about May 21, 2020, JAMES VELISSARIS, the defendant, created updated versions of Infinity Q's valuation policy that purported to be effective December 6, 2018, for submission to the SEC in response to the SEC's May 13, 2020, request for documents, including original valuation policies.

b.    On or about June 29, 2020, VELISSARIS created notes of valuation committee meeting minutes purporting to document meetings that had taken place in 2019 and 2020, for submission to the SEC in response to the SEC's June 23, 2020, request for documents, including minutes of valuation committee meetings.

(Title 18, United States Code, Section 371.)

## COUNT SIX
### (Obstruction of an SEC Investigation)

The Grand Jury further charges:

55.   The allegations contained in paragraphs 1 through 42 and paragraph 54 of this Indictment are repeated and realleged as if fully set forth herein.

56.   From at least in or about May 2020 through at least in or about February 2021, in the Southern District of New York and elsewhere, JAMES VELISSARIS, the defendant, did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects with the intent to impede, obstruct, and influence the investigation and proper

administration of any matter within the jurisdiction of any department and agency of the United States, to wit, VELISSARIS obstructed the SEC's inquiry and investigation into Infinity Q by altering and fabricating policy documents and committee meeting minutes submitted to the SEC in response to the SEC's requests for documents.

(Title 18, United States Code, Sections 1519 and 2.)

## FORFEITURE ALLEGATION

57.   As a result of committing one or more of the offenses charged in Counts One through Three of this Indictment, JAMES VELISSARIS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

### Substitute Assets Provision

58.   If any of the above-described forfeitable property, as a result of any act or omission by either of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

_____
GRAND JURY FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

JAMES VELISSARIS,

Defendant.

---

### SEALED INDICTMENT

22 Cr. _____

(Title 15, United States Code, Sections
78j(b), 78ff, 80a-29, 80b-6, 80b-17, 7202;
Title 17, Code of Federal Regulations,
Sections 240.10b-5, 240.13b2-2; Title 18,
United States Code, Sections 2, 371, 1343,
and 1519.)

_____
Foreperson

DAMIAN WILLIAMS
United States
Attorney

2/16/22    Filed Indictment - Warrant Issued

Gorenstein USMJ

33