Michael A. Battle
William R. Martin (admitted *pro hac vice*)
Michelle N. Bradford (admitted *pro hac vice*)
David S. Slovick (*Entry of Appearance* forthcoming)
Erin C. Steele (*pro hac vice* pending)
BARNES & THORNBURG LLP
555 12th Street NW, Suite 1200
Washington, DC 20004
mbattle@btlaw.com
(202) 371-6350
billy.martin@btlaw.com
(202) 371-6363
mbradford@btlaw.com
(202) 408-6922
dslovick@btlaw.com
(646) 746-2019
esteele@btlaw.com
(202) 408-6932

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAMES VELISSARIS,**<br><br>**Defendant.** | **No. 1:22-cr-00105-DLC**<br><br>**Hon. Denise L. Cote**<br><br>**SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT JAMES VELISSARIS** |

The Defendant, James Velissaris ("Mr. Velissaris" or "Defendant"), by and through his undersigned counsel, respectfully submits this Sentencing Memorandum to aid this Court in its determination of the sentence to be imposed in this matter.

## I.     PRELIMINARY STATEMENT

Mr. Velissaris is filing a motion to withdraw his guilty plea contemporaneously with this Sentencing Memorandum, as a result of a complete breakdown in communication between Mr. Velissaris and his prior counsel. Mr. Velissaris has maintained his innocence to prior counsel on

Count One of the Indictment, which alleges securities fraud. Although Mr. Velissaris did not believe he was guilty of securities fraud, he pled guilty following advice he received from prior counsel.  Mr. Velissaris pled guilty to a criminal offense he could not have committed as a matter of law.  The government alleged that Mr. Velissaris engaged in a scheme to defraud investors by making false or misleading statements concerning his company's process for valuing derivative securities held by two funds managed by Infinity Q Capital Management LLC ("Infinity Q"), and fraudulently mismarked those securities in ways that did not reflect their fair value.  (Dkt. No. 1 ¶ 1.)  However, as outlined in detail in Mr. Velissaris' motion to withdraw, a defendant cannot be guilty of securities disclosure fraud where allegedly omitted information was contained in fund disclosure documents that were made available to fund investors before they invested.[1]

Mr. Velissaris is innocent of disclosure fraud because the disclosure documents provided to investors in the funds at issue here expressly and repeatedly disclosed that the funds would depart from valuations provided by third-party pricing services when the prices did not represent fair value.  In the event the Court denies his motion to withdraw his plea, Mr. Velissaris submits this Sentencing Memorandum to permit the Court to consider relevant background information and argument in support of his request for a below-guidelines sentence at the Sentencing currently set for April 7, 2023.

For the reasons set forth below and for those that will be enumerated at the sentencing in this matter, undersigned counsel respectfully recommends that this Court sentence Mr. Velissaris

---

[1] *See, e.g.*, *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762-63 (2d Cir. 1991) (holding that plaintiff failed to state a claim for disclosure fraud under Section 10(b) where "the prospectus states exactly the 'fact' that [the plaintiff] contends has been covered up"); *La Pietra v. RREEF America LLC*, 738 F. Supp. 2d 432, 442-43 (S.D.N.Y. 2010) (denying as a matter of law Section 10(b) claim for disclosure fraud because "[m]any of the facts that the plaintiffs allege were omitted . . . were disclosed in the 2002 and 2003 common share prospectuses"); *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) (denying as a matter of law Section 10(b) claim for disclosure fraud because "it is indisputable that there can be no omission where the allegedly omitted facts are disclosed").

to a non-guidelines sentence to include home confinement.  Such a sentence would be "sufficient, but not greater than necessary," to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## II.    <u>CONSIDERATION OF THE 18 U.S.C. § 3553 FACTORS</u>

Per the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are no longer binding on district courts.  Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). It is "emphatically clear" that the "Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). A district court commits procedural error where it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the 18 U.S.C. 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Robinson*, 702 F.3d 22, 38 (2d Cir. 2012) (citing *Gall*, 552 U.S. at 51).[2]

Instead, the Court must conduct its own independent review and assess what sentence is reasonable based on all relevant factors, including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the purposes of sentencing, including the need for deterrence and to protect the public; (4) the kinds of sentences available; (5) the sentencing guidelines; and (6) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a).  "[T]he amount by which a sentence deviates from the applicable Guidelines range is not a measure of how 'reasonable' a sentence is. Reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d

---

[2] *See also Nelson v. United States*, 555 U.S. 350, 351 (2009) (reversing court of appeals judgment that affirmed defendant's conviction because district court judge's comments made clear that he applied a presumption of reasonableness to defendant's guidelines range, which constitutes error).

174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47).  For the reasons described below, the 3553(a) factors in this case support a less-than-guideline sentence to include home confinement.

    A.    **Mr. Velissaris' Background and Characteristics**.

The first factor that courts are directed to consider is the Defendant's history and characteristics. 18 U.S.C. § 3553(a)(1). "[I]f ever a [person] is to receive credit for the good he has done, and his immediate conduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).  Described in dozens of letters as a compassionate, hardworking, and humble person with much to give the world and a deep commitment to helping others, Mr. Velissaris' personal history and characteristics strongly counsel in favor of leniency.

    1.    **Mr. Velissaris aspired to become a successful businessman despite a difficult childhood, including the trauma from repetitive emotional, and physical abuse by his father and other family members.**

Mr. Velissaris is 38 years old and was born in Chicago, Illinois.  He is the youngest of his mother's five children, and her second with Mr. Velissaris' birth father. Until he was approximately eight years old, Mr. Velissaris lived with both parents, his older brother, and three half-siblings from his mother's prior marriage. This period was characterized by substantial economic insecurity, an increasingly dysfunctional marriage, and a relationship with an unreliable, untruthful, and dangerous father. His half-sister describes Mr. Velissaris' father as a "total sociopath.  Constant lying.  Building us up for a family vacation and instead we are evicted."  Ex. B, Dr. Robyn Landow Psychiatric Evaluation Report ("Landow Rpt.") at 10.

Mr. Velissaris' father was also verbally and physically abusive.  Mr. Velissaris recalls his father screaming for the most minor infractions, throwing objects at him, and punching him with

closed fists when he was still a small child.[3]  His mother's discovery of the abuse caused her "to take the children and escape." Ex. A at 6 (Rita Claerbaut Ltr.) Perhaps not surprising, Mr. Velissaris' father refused to pay child support and his mother struggled to provide for her family. Even though she often worked two jobs, there were still times when she and her children did not have enough food to eat.  As one of Mr. Velissaris' half-siblings recalls, "[w]e ate a lot of beans and rice and sometimes even ketchup sandwiches."  (*Id.* at 27) (R. Germann Ltr.).

That economic insecurity further destabilized Mr. Velissaris' childhood.  As his mother explains, "[d]uring James's early childhood there were times when we had to reside in hotels or with extended family members while we searched for housing."  (*Id.* at 6) (Rita Claerbaut Ltr.). The family moved frequently in and around Chicago, including to apartments a few blocks from the notoriously unsafe Cabrini Green and Robert Taylor housing projects.  There were even brief periods when the family was homeless. "We were nomads of sorts, living for a time with family, then moving to a hotel, then to an apartment, then back with family."  (*Id.* at 33) (M. Downs Ltr.).

When Mr. Velissaris was 13 years old, he and his brother moved back in with his father and grandmother.  The decision, which his mother strongly resisted, allowed Mr. Velissaris and his brother to attend a better school in a safer neighborhood in the Chicago suburbs.  In addition, ignoring his mother's fear and his own earlier experience, Mr. Velissaris still craved his father's love and naively hoped that he could repair their relationship.

Unfortunately, but not surprisingly, the abuse resumed, and his father resumed his physical assaults on his children.  But Mr. Velissaris' beatings were worse and more severe, and his father made clear that there was a racial component to the disparity.  Mr. Velissaris' older brother is

---

[3] Further intimate details about the abuse Mr. Velissaris suffered will be submitted under seal as Exhibit C with this memorandum to protect highly sensitive information about Mr. Velissaris and the identities of third parties.

lighter in complexion, and he looks more like their Greek father.  Mr. Velissaris, by contrast, has darker skin, and his features more resemble those of their African-American mother. Mr. Velissaris recalls that, on many mornings in his father's home, his father would wake him up by punching him hard in the arm and saying, "wake up you piece of shit."

 Nor was his father the only family member for whom Mr. Velissaris' race mattered. During his adolescence, Mr. Velissaris' Greek grandmother would belittle him and his mother with disparaging, racially-based comments.  Indeed, even though it had been his father's decision to marry an African-American woman, it was Mr. Velissaris who bore the brunt of his father's family's racist views.  As a result, Mr. Velissaris did not feel welcome at his father's extended family gatherings.  That rejection, and the feelings and trauma it engendered, have haunted him since. Ex. A, at 2 (M. Velissaris Ltr.).

When he was a freshman in high school, Mr. Velissaris began to skip class and began his predilection to turn to alcohol when facing and attempting to handle stress and trauma.  Indeed, he started to drink every day.  Ex. B, at 3 (Landow Rpt.).  By the end of the year, Mr. Velissaris had resolved to leave his father's home and move back in with his mother. However, in order to comply with his high school's residency requirements, Mr. Velissaris continued to spend two nights a week with his father, although they grew increasingly estranged. And even then, his father still attempted to physically harm him. Finally, when Mr. Velissaris was 17, and his father raised his hands yet again, Mr. Velissaris grabbed him forcefully and demanded that he stop. Even though Mr. Velissaris was simply defending himself, he recalls feeling, in that moment, a deep and profound sadness.

His father's behavior also affected Mr. Velissaris' relationship with his friends. Mr. Velissaris was an accomplished high-school athlete, and he recalls his father showing up at practice

and asking his friends and their parents for money – an experience he found profoundly humiliating. The last time Mr. Velissaris saw his father was when his father showed up, unannounced and uninvited, to Senior Day – Mr. Velissaris' final regular season high school football game.  Pretending nothing was wrong with their relationship, his father humiliated him yet again by walking onto the field and claiming credit for Mr. Velissaris' successes on the field. That was the last straw: Mr. Velissaris has not seen or heard from his father for more than 20 years. (*Id.* at 3.)

In the context of that childhood, it is not surprising that Mr. Velissaris began to experience serious depression and develop his persistent dependence on alcohol as a self-coping mechanism. For example, he remembers during the period of living with his father, having as his first thought upon waking up that he did not want to be alive – thoughts that he would attempt to escape by drinking. (*Id.* at 3.)  Although his mother arranged for treatment to address his addiction, he did not receive medical or psychological treatment. (*Id.*)  Indeed, his mother refused to entertain that option.  (*Id.*)

The hole left in his life by his abusive and emotionally absent father was partially filled by his stepfather, David Claerbaut. When Mr. Velissaris was around 14 years old, his mother began a relationship with Mr. Claerbaut; they were married two years later. Mr. Velissaris also gained a stepsister who states that, "[i]n our hearts, James and I are brother and sister . . . Always sweet and kind, James quickly became one of [her] favorite people."  Ex. A at 9 (Rochelle Claerbaut Ltr.).

Over the next several years, Mr. Velissaris grew extremely close to Mr. Claerbaut, and their bond was Mr. Velissaris' first experience with a loving father-son relationship. Once Mr. Claerbaut came into his life, Mr. Velissaris "became involved in church," and began to thrive "with the spiritual direction and stability that came during this time."  (*Id.* at 27) (R. Germann Ltr.).  Over

the next two decades, Mr. Claerbaut became the person Mr. Velissaris relied on most for advice and counsel about school, work, and relationships.  Ex. B, at 4 (Landow Rpt.).  So it was particularly devastating when Mr. Claerbaut died suddenly in December 2021 of complications associated with COVID-19 shortly before Mr. Velissaris was to see him in person for the first time in two years.  Mr. Velissaris' mother was "so distraught" after her husband's death that she was "unable to do anything at that time."  Ex. A at 7 (Rita Claerbaut Ltr.).  "James and his siblings made all arrangements for David's memorial and burial."  (*Id.*)

Despite his troubled upbringing and these tragic events, Mr. Velissaris persevered and was a studious and hard-working child.  As his brother Chris describes, "[o]ur mother is black and grew up in Civil Rights era middle America, so she was accustomed to the inherent social injustices that existed," but she encouraged her children "to work harder than everyone else so that we could achieve anything we set our minds towards doing."  (*Id.* at 13.) (C. Velissaris Ltr.). Chris recalls, for example, that he and Mr. Velissaris took a train to and from middle school, and that the other students on the train teased them for doing their homework. (*Id.*)  "[T]his type of peer pressure worked on me, the paperwork sheepishly went right back into my backpack, but not so for James. He remained steadfast in his commitment to his studies because he figured we might as well maximize our time on the train by knocking out some schoolwork." (*Id.*)

Mr. Velissaris then attended Glenbrook North High School outside of Chicago, where he played football and discovered his passion and aptitude for math and economics.  During this time, he really "lean[ed] into sports, extracurriculars and academics as an escape from" his environment and his father's toxicity. (*Id.* at 34) (M. Downs Ltr.). Mr. Velissaris was also active in his community and his church.  As a high school student, Mr. Velissaris created a program called "The Right Steps," which combined Bible study and football training for young students in the

surrounding community. (*Id.* at 6) (Rita Claerbaut Ltr.).  Mr. Velissaris graduated high school near the top of his class, was a good football player despite his smaller size, and was accepted to several top universities.

Mr. Velissaris recalls that his mother wanted him to attend the "best school" to which he was accepted, while his stepfather Mr. Claerbaut strongly preferred the Naval Academy.  Ex. B at 4 (Landow Rpt.). Mr. Claerbaut had a military background and he preached the benefits of the training and discipline of the armed forces. As a result, Mr. Velissaris remembers that his mother and stepfather fought about the choice, and he once again felt as though he was in the middle, manipulated by the adults in his life. (*Id.*) Ultimately, in order to avoid disappointing his stepfather, and feeling unable to share his misgivings, Mr. Velissaris decided to attend Annapolis so that he would not disappoint him. (*Id.*)  However, once he arrived on campus, "he couldn't shake the feeling that it was not the right place for him, and on the first day they arrived he told his mother he wanted to leave," and instead decided to attend Harvard. (*Id.*)

Mr. Claerbaut was deeply disappointed by Mr. Velissaris' decision, it seriously damaged Mr. Velissaris' relationship with the man he considered his father, and it took a number of years for them to recover.  (*Id.*)  This incident also sparked another "episode of depression the summer before his freshman year of college."  (*Id.*)  Mr. Velissaris felt "shame about how the whole thing was handled," since, "[i]f it was going to be my decision, I should have made the decision earlier." (*Id.*)

Mr. Velissaris attended Harvard with the support of financial aid and merit-based scholarships.  The terms of his financial aid package required him to hold work-study jobs, which he did throughout college.  His initial job was on a dorm cleaning crew, which involved cleaning

bathrooms.  Later, he managed to land an off-campus position as a data analyst for an organization that focused on reducing crime on college campuses, in particular, sexual assault cases. (*Id.* at 4.)

In addition to studying and working, Mr. Velissaris was a member of the varsity football team.  As a friend recalls, Mr. Velissaris "worked hard to maintain a rigorous schedule of varsity football practice, economics course work, jobs to help afford school, and social personal life including Bible study and more mundane chats with friends. To my mind, he was a man with maturity and purpose – he showed the work ethic of someone granted a special opportunity that he wanted to embrace and maximize."  Ex. A at 41 (N. Mirchandani Ltr.).

Mr. Velissaris also made several close friends in college, many of whom have written to the Court.  As one of them observes:

> [James] had an unusually diverse and eclectic group of friends.  Although outgoing himself, he had many friends like M. – a shy, astrophysics major.  Whenever M. came out with us, James would make sure he introduced M. to everyone.  And if M. was too shy to talk about his own accomplishments, that was fine; James was happy to do it for him.  James was always looking out for his friends like that.

(*Id.* at 44) (F. Goldberg Ltr.).

During the spring of his senior year, without football to keep him busy, Mr. Velissaris suffered another significant period of depression and, again, resorted to alcohol to cope.  Ex. B at 5 (Landow Rpt.). As Dr. Landow has observed, Mr. Velissaris "had never processed all that happened with his father, and the lack of football in his life gave him more time to think and to drink."  (*Id.*)  He also "experienced suicidal ideation throughout that final spring semester."  (*Id.*)

After graduating in 2007 with a degree in economics, Mr. Velissaris entered the financial services industry.  He had interned at Goldman Sachs for the two prior summers, and started as a full-time employee at the bank six days after graduation. (*Id.* at 5-6.) Fighting depression on a daily basis, he wanted to keep himself busy and was wary of idle time.

A little more than a year later, he moved to Arden Asset Management. While working full time, Mr. Velissaris also attended graduate school at Columbia University, from which he received a Master's of Science in Operations Research in 2013.  He continued to work for Arden as a senior research associate for four years before taking a job with Wildcat Capital Management, which managed the family office of the private equity executive, David Bonderman. With the backing of Mr. Bonderman and his family-office team, Mr. Velissaris founded Infinity Q in 2014 when he was only 30 years old.  He served as the Chief Investment Officer of Infinity Q from 2014 until February 2021.

**2.**      **Mr. Velissaris is also a husband, a brother and charitable member of his community.**

In addition, despite his extraordinarily difficult childhood, Mr. Velissaris has managed, as an adult, to build a life filled with friends, family, and faith. Those who know Mr. Velissaris the best describe him as "a hard-working, faith-driven man whose loyalty and support only underscores his incredibly humble and compassionate heart," Ex. A at 13 (C. Velissaris Ltr.); a "family-oriented person" who is "committed to his faith and his church," (*id.* at 46) (A. Siebert Ltr.); a "kind, loving, generous, humble, serious man," (*id.* at 9) (R. Claerbaut Ltr.); and "a giving person" who "is interested in and cares to learn about people when he meets them," (*id.* at 66.) (C. Gleysteen Ltr.). A cousin relays that, despite the "extraordinary amount of adversity" Mr. Velissaris faced growing up, and long hours at the office, Mr. Velissaris "made sure to make time for family, often hosting family get togethers at his home in New Jersey.  Although I understood James was excelling professionally, we rarely spoke about his career because James was never the type to brag about himself.  He was more interested in hearing updates from our extended family and planning the next get together." (*Id.* at 62) (P. Weston Ltr.).

"[E]ven at a young age, James showed himself to be thoughtful, caring, considerate of others, honest, humble, and intelligent.  He cared about the world around him and always put others needs ahead of his own."  (*Id.* at 33) (M. Downs Ltr.).  A close friend describes him as a "deeply loyal and supportive friend," and notes that the "world needs more people like James; his generosity and warmth are contagious and a force for good."  (*Id.* at 44) (F. Goldberg Ltr.).  To his wife Maria, he is simply "a kind, generous, empathetic and loving soul."  (*Id.* at 33) (M. Velissaris Ltr.).

Mr. Velissaris met his wife Maria in 2008, when he was 23.  By then she had earned a Bachelor of Science degree in information systems from Wake Forest University; she later obtained an MBA from NYU's Stern School of Business, and is currently the founding and managing partner of a venture capital company.  She is also the daughter of an Army veteran and public-school administrator, and a devout Christian.  Mr. Velissaris proposed to Maria 10 months after they began dating.

For more than 15 years, Mr. Velissaris and Maria have maintained a loving and committed relationship, and he is forever grateful for her honesty and willingness to love him.  Ex. B at 6 (Landow Rpt.).  As his brother Chris notes, Mr. Velissaris "met his wife Maria while still early in his career, and the two have since grown together as one while retaining their uniqueness in a wonderful way."  Ex. A at 14 (C. Velissaris Ltr.).  Maria tells the Court that Mr. Velissaris "was always overly generous to me because he wanted to be the good Christian husband his mother never had."  (*Id.* at 2) (M. Velissaris Ltr.).  His stepsister Rochelle observes that "James' choice of partner and commitment to her say quite a bit about his values."  (*Id.* at 10) (R. Claerbaut Ltr.).

Several examples of Mr. Velissaris' character traits stand out in the letters the Court has received.  One close friend recalls witnessing Mr. Velissaris receive a call from his mother that his

stepfather was having a major health challenge.  "James immediately left our home to take a last-minute flight to take care of his stepfather and provide emotional support for his mother, because family always comes first with James."  (*Id.* at 48) (S. Kane Ltr.).  His cousin recalls telling Mr. Velissaris that he "wanted to come back to Chicago for the summer break but didn't have a place to stay," and "without hesitation [Mr. Velissaris] invited me to live with him and [Mr. Velissaris' brother]."  (*Id.* at 60) (A. Weston Ltr.).  "James is a giving person. Whether it is charitable giving, teaching others, or even something as seemingly mundane as bringing my daughter a costume on Halloween.  He was always willing to help."  (*Id.* at 66) (C. Gleysteen Ltr.).

Given his childhood and the significant ways in which his father abused and took advantage of him, it would hardly be surprising if Mr. Velissaris was violent or had anger management issues. However, the letters from his friends and family tell a completely different story. While he struggles with social isolation, detachment, and anxiety as a result of his childhood trauma, and feels that he lacks close relationships, those letters universally describe him as a faithful, caring, warm and generous man who seeks opportunities to give others a leg up.

Maria describes all of the things Mr. Velissaris did to help his family, even before he had "made it."  *Id.* at 3 (M. Velissaris Ltr.).  "He would sacrifice for his family, while eating from the dollar menu at McDonalds and sleeping in the equivalent of a closet, and not think twice about it." (*Id.*)  Maria's best friend highlights "James' relationship with [her] 9-year old son, Nash."  (*Id.* at 75) (A. Ganci Ltr.).  She describes how Mr. Velissaris "spends real time with Nash" and "engages him" and how, as a result, Nash "glows around him" and is "happy and self-confident when they are together."  (*Id.*)

Many of the letters also describe how Mr. Velissaris has tried to help other young people achieve their dreams.  In particular, he has tried to provide and create the kind of opportunities for

mentor relationships and enrichment activities that were so lacking for him.  For a niece, Mr. Velissaris "found a training program in the Atlanta, GA area that would allow her to learn business computer skills," and he "made all arrangements for her to begin this short-term program and obtain a job upon completion."  (*Id.* at 7) (R. Claerbaut Ltr.).

Maria also describes how "James funds scholarships for local black students in underserved Atlanta City Public Schools and gives generously to the very scholarship programs that helped him excel."  (*Id.* at 3) (M. Velissaris Ltr.).  A cousin writes that Mr. Velissaris "has been an excellent role model for our 16-year-old son.  He always took time to talk with him and share words of encouragement and wisdom."  (*Id.* at 56) (C. Smith Ltr.). His nephew describes how he and Mr. Velissaris "have always had a special type of bond." (*Id.* at 23) (M. Taylor Ltr.).  He recalls that once, before a big test in school, Mr. Velissaris told him that "God is holding me in his hand," which helped motivate him "to perform well and has stuck with me ever since."  (*Id.*)  One of his wife's cousins, Shawn Fraser, described, in detail, the efforts Mr. Velissaris undertook to help her son.

> When our son was in high school, James invited him to spend a week at his job during summer break.  I was so appreciative that he would allow our son to shadow him for that week.  However, James went above and beyond by putting together an internship program so that our son would get exposure to the many different types of jobs in the finance profession.  James facilitated him having the opportunity to work within an actual financial services office.  He set up meetings for our son with colleagues at other financial institutions.  James put so much thought and effort into making this a meaningful internship for our son.
>
> This experience was absolutely transformational. Our son was a smart hardworking high school student at a well-respected independent K-12 school.  However, he sometimes lacked confidence.  As one of only three African American boys in his grade, he sometimes felt unsure of himself and at times unsupported in his academic environment.  James helped him to see his own gifts.  He took the time out of his busy and relentless schedule to be a mentor.  It was a powerful experience.  When our son went to college, James helped him prepare for interviews.  He coached him and gave him the practical advice that he needed to present himself well.

Thank you for taking the time to read this letter in support of James Velissaris.  It is important to me that you know about his kind heart.  We didn't ask him for anything, but he saw a need and stepped in to help lift up our child.  He helped our son to see his potential and gave him the courage to pursue his dreams.

(*Id.* at 52) (S. Fraser Ltr.).

Many of the letters also describe how Mr. Velissaris has been there for others during life's more difficult moments.

- "In 2019 James helped me through a very rough time in my life.  I was going through a divorce and he not only counseled me but lead me in prayer multiple times." (*Id.* at 60) (A. Weston Ltr.).

- "When I went through a particularly difficult breakup, James would come by my room and listen to my tales of woe with a patience and intensity uncommon among adults and vanishingly rare among college students.  Through those conversations, James helped build back my self-confidence.  Other evenings, he'd come by with his wide, warm smile and talk me into going out to make sure I'd be surrounded by friends." (*Id.* at 44) (F. Goldberg Ltr.).

- "I was particularly touched by his kindness and willingness to host a birthday weekend celebration for me when I was going through a rough patch in my life." (*Id.* at 58) (N. Johnson Ltr.).

- "During difficult times, James has been a great support to me and a loyal friend.  I spent much of the decade following 2010 dealing with a health issue that had devastating effects on me, my family, and my professional career.  James and Maria were steadfast friends throughout this period, and my husband and I were always welcome in their home without reservation or judgment.  James in particular always reached out to me and provide[d] me with sage advice, encouragement and assurances that I would get back on my feet." (*Id.* at 46) (A. Siebert Ltr.).

These letters and others demonstrate Mr. Velissaris' caring, supportive, and loving nature. Maria describes him as "the backbone of support for his family." (*Id.* at 3) (M. Velissaris Ltr.). Mr. Velissaris has consistently put others' needs before his own; indeed, the only time Mr. Velissaris traveled during the pendency of this action for reasons other than case preparation was to attend the funeral of a high school friend who committed suicide.

The letters demonstrate that Mr. Velissaris has a family who supports him and wants to see him succeed. His stepsister Rochelle has shared with the Court a letter that her father – Mr. Velissaris' stepfather – wrote to Mr. Velissaris and Maria:

> James, I am so proud of the young man you have become – doing so amid a myriad of adversities – many of them emotional in nature. I also know firsthand how difficult those can be. Many get resolved, some linger, and new ones can emerge, but your faith and humility will continue to insulate you from their negative effects. I have watched you carefully and I am so happy with what I see – your loving spirit and you making the right decisions in so many areas of your life.

(*Id.* at 2-3) (R. Claerbaut Ltr.).

Rochelle also describes how Mr. Velissaris supported her when Mr. Claerbaut died suddenly at the end of 2021. "This was a crushing blow, especially for James and me. And it tore our family apart. Without James' kindness and support, I do not know if I would still have my health or my job as I have been navigating my grief. It took tremendous strength of character for James to support me the way he has." (*Id.* at 10) (R. Claerbaut Ltr.).

Mr. Velissaris asks the Court to consider these circumstances and the words of those who know and love him when weighing the appropriate sentence, particularly with respect to the following points:

- Mr. Velissaris has built a life defined by family, friends, and faith, despite suffering terrible childhood abuse that still traumatizes him to this day.

- Mr. Velissaris is described by the people who know him best as a kind and loving person who tries to help others.

- Mr. Velissaris is the person to whom his friends and family turn when they need help through difficult times, and he has always provided such support generously and without hesitation.

- In particular, Mr. Velissaris is deeply devoted to his wife, and plays an integral and irreplaceable role in her life.

**3.     Mr. Velissaris suffers from major depressive order, PTSD, social anxiety disorder, and alcohol abuse disorder.**

Dr. Landow administered multiple diagnostic tests to and spent hours in conversation with Mr. Velissaris.  In her very thoughtful report, submitted under seal as Exhibit B, Dr. Landow has diagnosed Mr. Velissaris with major depressive disorder, severe, recurrent; PTSD; social anxiety disorder; and alcohol use disorder.   Ex. B at 14 (Landow Rpt.). While he is not currently experiencing suicidal ideation, he has had such thoughts in the past.

In survivor mode his entire life, Mr. Velissaris "never stopped to tend to his psychological issues" properly, even though he engaged in bouts of therapy over the past two decades. (*Id.* at 15.)  As a result, Mr. Velissaris is "likely to be plagued by thoughts of worthlessness, hopelessness, and personal failure" such that much of his anger "is more likely to be directed at himself than others." (*Id.* at 12.) His past trauma means he "tends to be preoccupied with fears of being abandoned or rejected by those people important to him." (*Id.*) "He has responded to crisis situations by avoiding danger, attempting to fix things himself, and all the while stay stoic and isolated.  This has led James to avoid his negative memories/emotions and forge ahead to protect and provide for himself and the numerous family members he has supported his entire adult life." (*Id.* at 15.)

It is Dr. Landow's opinion, with a reasonable degree of psychological certainty, that Mr. Velissaris' "behavior throughout his life has, to some degree, been significantly impaired by his depression, PTSD, social anxiety and alcohol abuse.   These psychological factors merit consideration as mitigating factors[.]"  (*Id.* at 15.)  In addition, Dr. Landow notes that there is also a path forward that would substantially lessen the prospect of recidivism.  Given Mr. Velissaris' "age and the extent to which he now understands and wants to engage in treatment," Dr. Landow believes "his prognosis for improving his level of psychological functioning is excellent." (*Id.*)

Of course, in order for that improvement to occur, Mr. Velissaris needs to engage in comprehensive treatment. Accordingly, Dr. Landow recommends that Mr. Velissaris receive significant psychological and psychiatric treatment from a therapist who is well-trained in working with those who suffer from PTSD and substance abuse; see a psychiatrist who could prescribe psychopharmacological treatment; and, once he stops drinking to self-medicate, attend appropriate support groups. (*Id.*)

The psychological trauma Mr. Velissaris suffered provides serious mitigating considerations. Dr. Landow has diagnosed Mr. Velissaris with several psychological conditions, which stem from his childhood abuse, including depression and PTSD.[4]

Before, during and since this alleged offense, Mr. Velissaris managed to overcome tremendous personal difficulty and trauma, and to build an enviable personal and professional life. Given the additional tools and mental health gains he will receive from sustained, comprehensive therapeutic treatment, Mr. Velissaris has an excellent prognosis to address and manage the issues that have confronted him for years. A period of incarceration will not enhance that recovery, and it is not necessary to teach him a lesson. To the contrary, an unnecessarily long prison sentence will likely be counterproductive, and keep him from becoming a fully contributing member of society upon his release. A non-custodial sentence well below the Guidelines range would be fair, appropriate and sufficient.

Mr. Velissaris' personal characteristics, which includes a life-long dedication and charity to others, supports a non-custodial sentence. Courts have exercised their discretion to impose non-Guidelines sentences based on the personal characteristics of the defendant. *See, e.g.*, *United*

---

[4] Counsel refers the Court to Dr. Landow's Report, in which she explains in intimate detail how the child abuse Mr. Velissaris suffered has impacted him.

*States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (premising downward variance, in part, on defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact"); *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity," his "generosity of spirit," and his "integrity and generosity"). These considerations also counsel in favor of leniency here pursuant to the 3553(a) factors. As his mother-in-law aptly states, "James possesses countless redeeming qualities and has much to positively contribute to mankind." Ex. A at 37 (B. Toler Ltr.).

**B.      A Guidelines Sentence is Not Necessary to Afford Adequate Deterrence or to Protect the Public.**

The second factor courts are directed to consider is the need for the sentence imposed. 18 U.S.C. § 3553(a)(2). A Guidelines sentence is not necessary "to afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." *Id.* § (a)(2)(B)-(C). Mr. Velissaris is not a danger to society. He has no prior criminal record, and he has been out of custody, with a perfect pretrial services record, for more than a year. (PSR ¶ 11.)[5] And there is no reason to believe that he would ever again commit a fraud, or that he will ever be in a position to do so since, by virtue of this conviction, he will never work in the financial industry again.

Nor would a Guidelines' sentence serve the goal of general deterrence of crime. *See* Section 3553(a)(2)(B). "[T]here is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514; *see* Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and

---

[5] In the event that the Court denies Mr. Velissaris' motion to withdraw his plea, and orders a custodial sentence, he requests that the Court recommend placement in a minimum-security facility located near his family home in Georgia. Mr. Velissaris is neither a security nor a flight risk.

modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."); Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1205 (2014) ("[D]eterrence properly informs sentencing only to the extent that it requires a hardship to be imposed for criminal offending. It does not require a particularly burdensome penalty, merely one that people would seek to avoid.").  Any rational person would seek to avoid the public shaming of a felony fraud conviction.

### C.     A Guidelines Sentence is Not Required to Promote Just Punishment and Respect for the Law.

The Guidelines calculation here places an "inordinate emphasis" on "putatively measurable quantities," like financial loss.  *Adelson*, 441 F. Supp. 2d at 509-12.  Therefore, the Court should instead focus more on the other Section 3553(a) factors to determine the fair and appropriate sentence.

As with many white-collar cases, the guidelines range in this case is driven largely by the loss amount.  The loss table "frequently produces arbitrary and unduly severe sentences for two related reasons": (1) loss is "defined so broadly that it can produce lifelong sentencing ranges for defendants who neither cause much economic harm nor derive much economic benefit from their crimes" and (2) "the loss table's enhancements are so large that, in practice, they dwarf other potentially more relevant considerations."  Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L. J. 1018, 1032-33 (2016). As result, like narcotics sentences, "[s]omewhere between 50 and 70 percent of the Sentencing Guidelines calculation . . . is based on a single factor[.]"  Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 29 Fed. Sent'g Rep. 226, 227 (2017).  "But it should be obvious that in a great many,

perhaps most, cases, . . . the amount of the loss does not fairly convey the reality of the crime or the criminal." *Id.*

These criticisms of the Guidelines are underscored in this case.  Mr. Velissaris' total offense level as contained in the PSR, is 38.  (PSR ¶ 63.) Of that total, 24 points (about 63%) derives solely from the loss amount.  (*Id.* ¶ 52.)

Mr. Velissaris' range is also vastly increased by the applicable enhancements, some of which have an outsized impact relative to the marginal increase in culpability that they are meant to capture.  For instance, the offense level here increased by four points due to Mr. Velissaris' role as an investment advisor.  (*Id.* ¶ 55.)  Although that enhancement plainly applied by its terms, its impact is grossly disproportionate.  By raising the offense level by four points, this enhancement alone increases the bottom end of the Guidelines range from 151 months to 235 months – in other words, by seven years.  Again, the fact that Mr. Velissaris was an investment advisor, standing alone, should not mean that he must go to jail for an additional seven years.

These dramatic swings in the Guidelines range illustrate the need to focus instead on the other Section 3553(a) factors, which allow the Court to engage in the "uniform and constant" exercise "in the federal judicial tradition" of "consider[ing] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). For all the reasons discussed above, the appropriate sentence upon consideration of the Section 3553(a) support a less than Guideline sentence and home confinement.

**D.    A Non-Custodial Sentence is Most Appropriate.**

The next factor that the court is the directed to consider are the kind of sentences available. 18 U.S.C. § 3553(a)(3).  While the PSR outlines various sentencing options available in this case, it does not offer any alternative to incarceration.

In this District, as an alternative to incarceration, defendants convicted of securities fraud have been sentenced to probation, home confinement, and/or community service. *See, e.g.*, *United States v. Schuster*, No. 01 CR 67, 2002 WL 310098493, at *1 (S.D.N.Y. Sept. 19, 2002) (defendant convicted of securities fraud sentenced to three years probation, six months of which were to be served in home confinement rather than incarceration, and court granted defendant's motion for early termination of probation stating "defendant ha[d] been penalized enough" given "conviction itself is a severe punishment" which resulted in debarment from practice of law, criminal fine, and payment to the SEC).

Mr. Velissaris has, we submit, many significant mitigating factors that would support a similar sentence, including the anomalous nature of these events, his youth and relative inexperience, his impressive efforts to overcome his difficult childhood, the psychological conditions caused by the abuse he suffered, his desire and motivation to seek comprehensive treatment for those psychological conditions and the positive personal characteristics described in the letters submitted to the Court.

A conviction for securities fraud, which will likely preclude Mr. Velissaris from ever working in the financial industry, is itself severe punishment. Most devastating for Mr. Velissaris is the fact that he has lost the trust of those he worked so hard to earn. The Court can fashion a sentence that does not involve incarceration. Mr. Velissaris can be sentenced to a lengthy period of home confinement, combined with community service. He can be required to maintain employment so that he can satisfy any fines that the Court may impose. In lieu of incarcerating him, the Court can require Mr. Velissaris to give back to the community whose trust he has lost. For all of these reasons, the defense believes that the careful consideration of the Section 3553(a) factors should yield a fair and just punishment would be a sentence that includes home

confinement. Mr. Velissaris should receive the comprehensive psychological and substance abuse treatment he needs and is ready to undertake.

     **E.**     **The Requested Sentence Will Avoid Unwarranted Sentence Disparities**.

Finally, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also supports our recommendation. 18 U.S.C. § 3553(a)(6). Ultimately, the touchstone of this factor is the idea of treating similarly those defendants who have committed similar crimes.

As part of this analysis, courts may consider whether the sentence is disproportionate to the sentences of any alleged co-conspirators or co-defendants. *See United States v. Ramsay*, 538 F. Supp. 3d 407, 428 (S.D.N.Y. 2021) (citing, among other factors, sentencing disparities with codefendants as a basis for sentence reduction); *see also United States v. Seabrook*, No. 1:16-cr-00467, 2023 WL 2207585, at *3-4 (S.D.N.Y. Feb. 23, 2023) (granting defendant compassionate release because of unjust disparity between defendant's 58-month sentence and co-conspirator's 13-month sentence).

Here, Mr. Velissaris' alleged co-conspirator ("CC-1") was not charged in the case (PSR ¶ 46), even though the PSR and indictment both outline his participation in the alleged scheme, his receipt of substantial financial remuneration, and the purported obstruction of the SEC's investigation. (*See, e.g.*, PSR ¶ 35) ("Velissaris and CC-1 discussed getting a loan to keep Infinity Q afloat, with CC-1 noting 'we have to save the mutual fund'" prior to the claimed manipulations); (*id.* ¶ 40) (CC-1 is alleged to have "altered significant portions of Infinity Q's materials . . . before providing them to the SEC").

A noncustodial sentence is appropriate here to avoid any sentencing disparity between Mr. Velissaris and CC-1 because, as alleged in the indictment, neither individual is more culpable than the other. Mr. Velissaris served as Infinity Q Capital Management's Chief Investment Officer,

while CC-1 served as both its Chief Compliance and Risk Officer. (PSR ¶ 13.) Yet, the government has utilized its prosecutorial discretion to grant CC-1 complete immunity and leniency while requiring Mr. Velissaris to bear the full responsibility of allegations in which, according to the government's indictment, both he and CC-1 participated.  Sentencing Mr. Velissaris to a custodial sentence (or a sentence within the guidelines) would result in an unwarranted sentencing disparity between Mr. Velissaris and CC-1, which is another factor that supports a non-custodial sentence in this case.

### III.    <u>CONCLUSION</u>

For all the reasons set forth above, we respectfully request that the Court sentence Mr. Velissaris to a period of home confinement. Such a sentence would be "sufficient, but not greater than necessary," to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).


Dated: New York, New York                    Respectfully submitted,
       March 24, 2023

                                             /s/ Michael A. Battle
                                             Michael A. Battle (SDNY Bar Code No. MB9289)
                                             William R. Martin (admitted *pro hac vice*)
                                             Michelle N. Bradford (admitted *pro hac vice*)
                                             David S. Slovick (*Entry of Appearance* forthcoming)
                                             Erin C. Steele (*pro hac vice* pending)
                                             BARNES & THORNBURG LLP
                                             555 12th Street NW, Suite 1200
                                             Washington, DC 20004
                                             mbattle@btlaw.com
                                             (202) 371-6350
                                             billy.martin@btlaw.com
                                             (202) 371-6363
                                             mbradford@btlaw.com
                                             (202) 408-6922
                                             esteele@btlaw.com
                                             (202) 408-6932

                                             *Attorneys for Defendant James Velissaris*