Michael A. Battle
William R. Martin (admitted *pro hac vice*)
Michelle N. Bradford (admitted *pro hac vice*)
David S. Slovick (*Entry of Appearance* forthcoming)
Erin C. Steele (*pro hac vice* pending)
BARNES & THORNBURG LLP
555 12th Street NW, Suite 1200
Washington, DC 20004
mbattle@btlaw.com
(202) 371-6350
billy.martin@btlaw.com
(202) 371-6363
mbradford@btlaw.com
(202) 408-6922
dslovick@btlaw.com
(646) 746-2019
esteele@btlaw.com
(202) 408-6932

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>        **v.**<br><br>**JAMES VELISSARIS,**<br><br>                          **Defendant.** | **No. 1:22-cr-00105-DLC**<br><br>**Hon. Denise L. Cote**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEA** |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................... 1

LEGAL STANDARD............................................................................................. 4

ARGUMENT ....................................................................................................... 5

   I.   MR. VELISSARIS IS INNOCENT OF DISCLOSURE FRAUD BECAUSE INFINITY Q REPEATEDLY DISCLOSED TO INVESTORS THAT THE FUNDS WOULD DEPART FROM BVAL VALUATIONS....................................................................................... 5

   II.   MR. VELISSARIS IS INNOCENT OF FRAUDULENTLY MISSTATING THE VALUE OF THE FUNDS' SECURITIES BECAUSE INFINITY Q'S VALUATION MODELS WERE AT ALL TIMES REASONABLE BASED ON CURRENT MARKET CONDITIONS. ................................................................................................... 10

   III.   THE FOUR-MONTH PERIOD BETWEEN MR. VELISSARIS' GUILTY PLEA AND THE FILING OF THIS MOTION IS REASONABLE UNDER THE CIRCUMSTANCES AND SHOULD NOT WEIGH AGAINST WITHDRAWAL.................................................. 14

   IV.   THE GOVERNMENT WILL NOT BE PREJUDICED BY THE WITHDRAWAL OF MR. VELISSARIS' PLEA. ................................................................................... 16

   V.   MR. VELISSARIS' PLEA WAS NOT VOLUNTARY............................................... 18

   VI.   MR. VELISSARIS SHOULD BE ENTITLED TO WITHDRAW HIS GUILTY PLEA DUE TO THE GOVERNMENT'S FAILURE TO DISCLOSE BRADY EVIDENCE. ......... 19

CONCLUSION.................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*Boykin v. Alabama,*
   395 U.S. 238 (1969)......................................................................................................18

*Brady v. United States,*
   397 U.S. 742 (1970)............................................................................................... *passim*

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,*
   936 F.2d 759 (2d Cir. 1991)............................................................................................5

*La Pietra v. RREEF America LLC,*
   738 F. Supp. 2d 432 (S.D.N.Y. 2010).............................................................................5

*Miller v. Angliker,*
   848 F.2d 1312 (2d Cir. 1988).........................................................................................18

*In re Progress Energy, Inc. Sec. Litig.,*
   371 F. Supp. 2d 548 (S.D.N.Y. 2005).............................................................................5

*Sec. and Exch. Comm'n v. Velissaris,*
   Case No. 1:22-cv-01346-PKC (S.D.N.Y.)....................................................................17

*United States v. Baum,*
   380 F. Supp. 2d 187 (S.D.N.Y. 2005)...........................................................................16

*United States v. Chestman,*
   947 F.2d 551 (2d Cir. 1991)............................................................................................5

*United States v. Colson,*
   230 F. Supp. 953 (S.D.N.Y. 1964) ...............................................................................18

*United States v. Desrosier,*
   431 F. App'x 36 (2d Cir. 2011) .......................................................................................4

*United States v. Doe,*
   537 F.3d 204 (2d Cir. 2008)............................................................................................4

*United States v. Fernandez,*
   734 F. Supp. 599 (S.D.N.Y. 1990) ...............................................................................16

*United States v. Finnerty,*
   533 F.3d 143 (2d Cir. 2008)............................................................................................5

*United States v. Gil,*
   297 F.3d 93 (2d Cir. 2002).............................................................................................19

*United States v. Gonzalez*,
   970 F.2d 1095 (2d Cir. 1992) ................................................................4

*United States v. Hardnett*,
   802 F. App'x 4 (2d Cir. 2020) .............................................................4

*United States v. Jaata*,
   No. 18-CR-162, 2021 WL 4225664 (S.D.N.Y. Sept. 16, 2021) .............14

*United States v. Lam Peralta*,
   792 F. App'x 68 (2d Cir. 2019) ...........................................................14

*United States v. Millan-Colon*,
   829 F. Supp. 620 (S.D.N.Y. 1993) .......................................................19

*United States v. Obiorah*,
   536 F. App'x 53 (2d Cir. 2013) ...........................................................16

*United States v. Richards*,
   764 F. App'x 35 (2d Cir. 2019) ...........................................................16

*United States v. Thomas*,
   No. 20-CR-00626-4, 2023 WL 199611 (S.D.N.Y. Jan. 17, 2023) ...........4

Pursuant to Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure, Defendant James Velissaris submits this Memorandum of Law in support of his Motion to Withdraw his Guilty Plea in the above-captioned matter. For the reasons discussed below, Mr. Velissaris respectfully requests that the Court grant him leave to withdraw his guilty plea.

## PRELIMINARY STATEMENT

James Velissaris is a Harvard and Columbia graduate and former investment adviser who founded Infinity Q Capital Management LLC ("Infinity Q") in 2014 at the age of 30. He served as the Chief Investment Officer of Infinity Q from 2014 until February 2021 and oversaw the management of its two funds, the Infinity Q Diversified Alpha Fund (the "Mutual Fund") and the Infinity Q Volatility Alpha Fund, L.P. (the "Private Fund"). On February 16, 2022, a grand jury sitting in the Southern District of New York returned a six-count indictment charging him with securities fraud, investment adviser fraud, wire fraud, false statements to an accountant, conspiracy to obstruct an SEC investigation, and obstruction of an SEC investigation (the "Indictment"). (Dkt. No. 1.)

On November 21, 2022, James Velissaris pled guilty to Count One of that Indictment, which alleged securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2). (Dkt. No. 72.) Count One alleges that between 2018 and February 2021, Mr. Velissaris engaged in a scheme to defraud current and potential investors in the two funds managed by Infinity Q. (Dkt. No. 1 ¶ 1.) According to the government, this scheme had two parts: (1) Mr. Velissaris allegedly made false and misleading statements to investors concerning Infinity Q's process for valuing certain over-the-counter ("OTC") derivative securities, and (2) Mr. Velissaris fraudulently mismarked those securities in ways that did not reflect their fair value. (*Id*.)

1

On February 9, 2023, the Court granted a joint motion to adjourn the date of Mr. Velissaris' sentencing from March 3, 2023 to March 17. (Dkt. No. 78.) On February 21, 2023, the Court granted the government's request for an additional one-week adjournment of sentencing to March 24, setting the deadline for Mr. Velissaris' sentencing submission to March 10 and the government's submission to March 17. (Dkt. No. 82.) On March 10, 2023, the Court held a conference in response to prior defense counsel Arnold & Porter LLP's letter requesting to be relieved of their role as counsel of record at the direction of Mr. Velissaris, which was attended by the government and attorneys from Barnes & Thornburg, LLP. (Dkt. No. 84; Minute Order dated March 10, 2023.) At that conference, the Court granted the substitution of counsel, adjourned sentencing until April 7, 2023, and set the deadline for Mr. Velissaris' sentencing submission to March 24. (*Id.*)

With the understanding that his sentencing submission is also due to the Court on March 24, 2023, Mr. Velissaris respectfully moves the Court to allow him to withdraw his guilty plea. Several factors support this motion, the most important of which is that Mr. Velissaris is in fact innocent of the conduct to which he pled guilty. Mr. Velissaris did not mislead investors with respect to Infinity Q's process for valuing the securities in question, as alleged in Count One, because at all times relevant to the Indictment the applicable disclosure documents for both of the funds at issue plainly disclosed that Infinity Q had the discretion to depart from prices provided by third-party pricing services when the prices did not represent fair value. Additionally, Mr. Velissaris did not fraudulently mismark or alter these assets to inflate their value; rather, he used his professional judgment and the guidance of Bloomberg engineers to ensure that the inadequate third-party valuation tool Infinity Q used ("BVAL") produced the most accurate valuations

possible during a period of unprecedented market volatility. In truth, the factual and legal bases for the plea accepted by the Court are incorrect.

Additionally, Mr. Velissaris' guilty plea was not voluntary. Mr. Velissaris suffers from major depression, PTSD, alcohol use disorder, and social anxiety disorder stemming from childhood physical, emotional, and sexual abuse by family members. In the time leading up to his plea, he felt hopeless and overwhelmed by pressure from both the government and his prior counsel to accept a plea deal for alleged conduct of which he is in fact innocent. Under the heaviest and most paralyzing stress he has experienced in his life, Mr. Velissaris' mental illness caused him to shut down and retreat inward at a time when most others would speak out and vociferously assert their innocence. His mental illness made him incapable of rationally weighing his options. Mr. Velissaris made repeated attempts to ask his prior counsel questions about whether the plea was in his best interest, given his strong defenses and actual innocence. However, he felt that his questions and concerns fell on deaf ears, and resigned himself, in spite of his firm belief that he was innocent, to enter a guilty plea in what he believed at the time was an insurmountable situation.

Mr. Velissaris spent the four months after his plea hearing repeatedly raising questions and concerns about his case and upcoming sentencing, including his desire to withdraw his guilty plea, and promptly seeking new counsel when he lost confidence in his prior attorneys' ability to zealously represent him. He did this all while fighting mental illnesses that made it difficult for him to advocate for himself and take an active role in his situation. For this reason, the time elapsed between his guilty plea and the filing of this motion should not weigh against his motion to withdraw. In addition, the equities weigh in favor of granting the motion to withdraw because it will cause little to no prejudice to the government.

The crucial reality is that Mr. Velissaris is innocent of the crime to which he pled guilty, and this fact, along with other pertinent factors, militates in favor of granting Mr. Velissaris leave to withdraw his guilty plea.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 11(d)(2)(B) provides that "a defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes the sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." This standard "implies that motions to withdraw prior to sentence should be liberally granted." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992). That said, a defendant who seeks to withdraw his plea still bears the burden of satisfying the trial judge that there are valid grounds for withdrawal. *Id.*; *see also United States v. Doe*, 537 F.3d 204, 210 (2d Cir. 2008). To assess whether a defendant has a "fair and just" reason for withdrawing his plea, "a district court should consider, inter alia: (1) the amount of time that has elapsed between the plea and motion; (2) whether the defendant has asserted a claim of legal innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea." *United States v. Desrosier*, 431 F. App'x 36, 1 (2d Cir. 2011) (citing *Doe*, 537 F.3d at 210). "The legal innocence factor requires that the Court be 'convinced that there are legally cognizable defenses to the crime charged to exculpate the defendant.'" *United States v. Thomas*, No. 20-CR-00626-4, 2023 WL 199611, at *5 (S.D.N.Y. Jan. 17, 2023) (quoting *United States v. Fernandez*, 734 F. Supp. 599, 604 (S.D.N.Y. 1990)). "Courts may also look to whether the defendant has raised a significant question about the voluntariness of the original plea." *United States v. Hardnett*, 802 F. App'x 4, 5-6 (2d Cir. 2020) (quoting *United States v. Rivernider*, 828 F.3d 91, 104 (2d Cir. 2016)).

## ARGUMENT

### I. MR. VELISSARIS IS INNOCENT OF DISCLOSURE FRAUD BECAUSE INFINITY Q REPEATEDLY DISCLOSED TO INVESTORS THAT THE FUNDS WOULD DEPART FROM BVAL VALUATIONS.

The government cannot sustain a claim for disclosure fraud under Section 10(b) of the Securities Exchange Act if the allegedly omitted information that forms the basis of the claim has been disclosed to investors. More specifically, a defendant cannot be guilty of disclosure fraud— as a matter of law—where the allegedly omitted information was contained in fund disclosure documents that were made available to fund shareholders before they invested. *See, e.g.*, *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762-63 (2d Cir. 1991) (holding that plaintiff failed to state a claim for disclosure fraud under Section 10(b) where "the prospectus states exactly the 'fact' that [the plaintiff] contends has been covered up"); *La Pietra v. RREEF America LLC*, 738 F. Supp. 2d 432, 442-43 (S.D.N.Y. 2010) (denying as a matter of law Section 10(b) claim for disclosure fraud because "[m]any of the facts that the plaintiffs allege were omitted . . . were disclosed in the 2002 and 2003 common share prospectuses"); *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) (denying as a matter of law Section 10(b) claim for disclosure fraud because "it is indisputable that there can be no omission where the allegedly omitted facts are disclosed").[1] Because Mr. Velissaris' authority to depart from BVAL valuations was expressly and repeatedly disclosed to investors in the funds' disclosure documents, he cannot be guilty of making false or misleading statements as alleged in Count One of the Indictment.

---

[1] Like other federal circuit and district courts, the Second Circuit and district courts within it look to civil case law to adjudicate claims of criminal violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5. *See, e.g.*, *United States v. Finnerty*, 533 F.3d 143, 148-50 (2d Cir. 2008); *United States v. Chestman*, 947 F.2d 551, 565-67 (2d Cir. 1991).

The disclosure documents provided to shareholders in both of the funds at issue here, the Infinity Q Mutual Fund and the Infinity Q Private Fund, clearly and repeatedly disclosed that Infinity Q could and would depart from prices provided by third-party pricing services when the prices did not represent fair value. For example, in a section of Infinity Q's Compliance Policies and Procedures titled "Valuation Considerations," Infinity Q expressly disclosed to investors that it retained broad, unilateral discretion to change prices received from third-party pricing services such as BVAL if the prices did not provide a reliable indication of fair value:

> In circumstances where an exchange, a ***pricing service***, or where one or more quotes are not available for a Position, or where such exchange, ***pricing service***, quote or quotes may not provide a reliable indication of fair value, ***Infinity Q will value each such Position based on relevant information, including, without limitation: (i) an internally or externally developed memo/model, including inputs and assumptions (e.g., comparing market values for similar companies/instruments); and/or (ii) such other factors as may be deemed appropriate.***

(*See, e.g.*, Dec. 6, 2018 Compliance Policies and Procedures at 83, a copy of which is attached hereto as Exhibit A) (emphasis added). Importantly, a copy of these Compliance Policies and Procedures were provided to all investors in both the Mutual Fund and the Private Fund prior to investment. The same disclosure was provided to all domestic and off-shore Private Fund investors in the fund's Private Placement Memorandum ("PPM") and Private Offering Memorandum ("POM"). (*See, e.g.*, Aug. 2018 Infinity Q Volatility Alpha Fund, L.P. PPM, at 30, a copy of which is attached hereto as Exhibit B, *and* July 1, 2018 Infinity Q Volatility Alpha Offshore Fund, Ltd., POM at 37, a copy of which is attached hereto as Exhibit C.)

Disclosure documents for the Infinity Q Mutual Fund, including the fund's Prospectus, likewise contained clear disclosures granting Infinity Q nearly unfettered discretion to alter prices it received from pricing services like BVAL where those prices, "in the judgement of the Adviser," did not represent fair value:

> When reliable market quotations are not readily available or the Fund's **pricing service** does not provide a valuation (or **provides a valuation that in the judgement of the Adviser** [i.e., Infinity Q] **does not represent the security's fair value**) or when, **in the judgment of the Adviser**, events have rendered the market value unreliable, a **security or other asset is valued at its fair value** as determined under procedures approved by the Board. Valuing securities at a fair value is intended to ensure that the Fund is accurate prices and **involves reliance on judgment**.

(*See, e.g.*, Dec. 31, 2018 Prospectus for Infinity Q Diversified Alpha Fund at 21, a copy of which is attached hereto as Exhibit D) (emphasis added). In turn, the "procedures approved by the Board" referenced the above Prospectus disclosure expressly granted Infinity Q unlimited discretion to price swaps for which market quotations were not readily available—in other words, for all of the swaps at issue in the Indictment. Specifically, the "Swaps" section of the Mutual Fund's Policies and Procedures for Valuing Portfolio Securities and Assets provides, "Pricing Services value swap contracts using the closing price of the underlying benchmark that the contract is tracking. If approved Pricing Services are unable to provide a price, fair value will be determined as set forth in Appendix C." (*See, e.g.*, Aug. 14, 2019 Policies and Procedures For Valuing Portfolio Securities at 6, a copy of which is attached hereto as Exhibit E.) Appendix C to the Policies and Procedures, in turn, provides that "[e]ach Fund's Adviser is **authorized to make all necessary determinations of the fair value of portfolio securities and other assets for which market quotations are unreliable or not readily available**." (*Id*. at C-1) (emphasis added).[2]

Similar disclosures concerning Infinity Q's broad discretion to establish values for swaps held in the Mutual Fund were contained in the fund's Annual Report to Shareholders, which was

---

[2] On January 23, 2023, Bloomberg entered into a $5 million settlement with the SEC for failure to accurately disclose BVAL pricing methodologies to its customers from "at least 2016 to October 2022," and voluntarily undertook remedial efforts to make improvements to its BVAL line of business. Specifically, the SEC found that "Bloomberg failed to disclose to its customers that the use of EIT could, in certain circumstances, result in a valuation based on an uncorroborated single data input. Due to this omission, Bloomberg's description of its valuation methodology was materially misleading." *Bloomberg Finance L.P.*, Sec. Act Rel. No. 11150, ¶¶ 2, 11 (Jan. 23, 2023). Accordingly, looking to BVAL as the source of the securities' "true" or "fair" value would have led to inaccurate pricing.

at all times publicly available (including to fund investors) on the Infinity Q website. In the "Securities Valuation" section of the Report's consolidated financial statements, the Mutual Fund disclosed to shareholders that the fund deemed "volatility and variance swaps" to be illiquid, and therefore classified them as "Level 3 in the fair value hierarchy." (*See, e.g.*, Aug. 31, 2019 Annual Report to Shareholders at 29, a copy of which is attached hereto as Exhibit F.) The Report further disclosed that "Level 3" securities would be priced according to "[s]ignificant unobservable inputs, ***including the Fund's own assumptions in determining fair value of investments***. (*Id.* at 28.) (emphasis added). The Report went on to make clear to investors that the Mutual Fund could use *either* a pricing service's valuations *or* Infinity Q's own "estimated" value to price such securities:

> Other financial derivative instruments, such as foreign currency contracts, options contracts, futures, ***or swap agreements***, derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. Depending on the product and the terms of the transaction, ***the value of the derivative contracts can be estimated by the Adviser or a pricing service*** using model pricing tailored to the type of security held.

(*Id.* at 29) (emphasis added).

In light of the foregoing disclosures, which appear repeatedly in fund documents provided to Infinity Q investors, the principal allegations of the securities fraud to which Mr. Velissaris has pled guilty are objectively, demonstrably false. The foundation of the government's entire case against Mr. Velissaris is that he misrepresented to investors that he would adhere to prices provided by BVAL in valuing derivative securities held by the funds. For example, in the very first paragraph of its Indictment, the government alleges that Mr. Velissaris "made false and misleading statements to investors and others concerning Infinity Q's process for valuing certain over-the-counter ('OTC') derivative securities that made up a substantial portion of the holdings of the Investment Funds . . . ." (Dkt. No. 1 ¶ 1.) The government further alleges that Mr. Velissaris "misled Infinity Q's current and potential investors . . . that the valuation of Infinity Q's OTC

derivative securities would be done using an independent third-party service, without Infinity Q's input into the models . . . ." (*Id.* ¶ 2.) In another example of the same theme, which runs throughout the securities fraud allegations, the government alleges that Mr. Velissaris' "process for valuing Infinity Q's OTC derivative positions was inconsistent with his representations concerning the independence of the process for valuing those positions" because Mr. Velissaris "had substantial input into the modeling of the securities by altering the BVAL models themselves and by inputting terms into the models . . . thereby undermining the independence of BVAL." (*Id.* ¶ 26.)

These allegations are concisely refuted by the disclosures reproduced above, which prove definitively that investors in both the Mutual Fund and the Private Fund were told repeatedly that, among other things:

> • The funds would depart from a "pricing service" valuation that, "in the judgment of the Adviser . . . does not represent the security's fair value";

> • The funds could be valued based on an "internally . . . developed . . . model" that could "include inputs and assumptions" and "such other factors as may be deemed appropriate";

> • The Infinity Q was "authorized to make all necessary determinations of the fair value of portfolio securities and other assets for which market quotations are unreliable or not readily available"; and

> • "The value of the derivative contracts can be estimated by the Adviser ***or*** a pricing service."

(*Supra* at 6-8) (emphasis added). In other words, the relevant fund documents for both the Mutual Fund and the Private Fund—which the government scrupulously avoids citing even once in its 33 page, 58 paragraph Indictment—prove the exact opposite of what the government alleges. Because Mr. Velissaris cannot be guilty of disclosure fraud for doing exactly what Infinity Q told investors

it would do in multiple fund disclosures, he is innocent of the disclosure fraud allegations in Count One of the Indictment.

## II.  MR. VELISSARIS IS INNOCENT OF FRAUDULENTLY MISSTATING THE VALUE OF THE FUNDS' SECURITIES BECAUSE INFINITY Q'S VALUATION MODELS WERE AT ALL TIMES REASONABLE BASED ON CURRENT MARKET CONDITIONS.

Mr. Velissaris is also innocent of fraudulently misstating the values of the funds' derivative securities because, as discussed further below, the securities were valued in accordance with the funds' internal risk models, which were objectively consistent with market conditions that prevailed during the relevant period. In fact, the SEC's in-house expert admitted in an internal email obtained by Mr. Velissaris' lawyers that "My main takeaway is it's believable that they [i.e., the Infinity Q volatility funds] have these returns" (*i.e.*, the returns the funds disclosed to the public), that the strategy Infinity Q was employing "could deliver this type of return, which is not exactly outlandish," and that if Infinity Q "held these [fund] positions, [it] could have seen mark to market gains of several hundred million dollars . . . ." (*See* Oct. 15, 2020 email from D. Stevens to T. Husson, a copy of which is attached hereto as Exhibit G.) All of which is consistent with the allegations to which Mr. Velissaris pled guilty: the government does not even attempt to allege that the values Mr. Velissaris assigned to the funds' derivative securities were objectively wrong, much less what the correct values should have been—or even what the correct ***method*** for valuing the funds' securities was. (*See* Dkt. No. 1 ¶ 1; *see also id.* ¶¶ 3, 27, 31.)

Instead, a close reading of the government's allegations establishes that its "fraudulent mismarking" claim is entirely dependent on the assumption that ***any*** price assigned to a security that was not taken directly from BVAL was "mismarked." Stated differently, the government has made its price manipulation allegations coterminous with its disclosure fraud theory—and the two therefore rise or fall together. If, as Mr. Velissaris has demonstrated above, Infinity Q was

authorized by the funds' public disclosure documents to depart from BVAL valuations when in Infinity Q's judgment the prices did not represent fair value, then those prices could not have been "mismarked" merely because they deviated from BVAL. In that case, the government would have to establish by some other means that the values Mr. Velissaris assigned to the funds' securities were "mismarked," but it has not even attempted to make such alternative allegations. Therefore, there is no evidence to support the allegation that Infinity Q's valuations were fraudulent. In short, because the government is wrong about its disclosure fraud claims, it cannot be right about its price mismarking claims.

Nor could the government have substantiated its mismarking allegations by some other means had it tried, because the method Mr. Velissaris employed to value the funds' illiquid securities was objectively reasonable given the market conditions during the relevant period. Dr. Atanu Saha, a Ph.D. specializing in economics and econometrics with nearly 30 years of experience in the application of economics and finance to complex business issues, analyzed the valuations Infinity Q assigned to the variance swaps in its funds and the methods it used to determine those valuations during the highly volatile markets that prevailed throughout 2020. (Decl. of Atanu Saha, a copy of which is attached hereto as Exhibit H.) Dr. Saha's analysis shows that, while "different sophisticated investors may have differing contemporaneous valuations of the same variance swap, depending on the specific valuation model they used" (*id*. ¶ 4e), Infinity Q's models and the valuations they generated were objectively consistent with market conditions:

> [Infinity Q's] risk management team created, developed, and maintained a proprietary "Risk Model" to monitor the changes in the value of its holdings of variance swaps (as well as other instruments) with changing market conditions. My analysis of the Risk Model's output shows that the model's predictions were reliably consistent with the changes in volatility measures over 90% of the time.
>
> It is my understanding that [Infinity Q] relied on its Risk Model and price quotes from various broker-dealers, among other data, to assess a reasonable range of fair

11

> values of its variance swaps. When the corresponding BVAL valuations were outside the reasonable range or inconsistent with market reality, [Infinity Q] altered the variance swap terms and inputted them into BVAL to generate valuations consistent with objective market conditions and the outputs of its own Risk Model.

(*Id*. ¶¶ 4g, 4h.) So while the government may, in hindsight, have "differing contemporaneous valuations" for the swaps at issue in this case, that does not prove that the method Mr. Velissaris used to value the swaps was fraudulent. To the contrary, because that method was objectively reasonable, the government will not be able to prove that the values Infinity Q assigned to the funds' derivative securities were knowingly "mispriced."

Finally, while the government makes much of Mr. Velissaris' alleged misstatements to the Mutual Fund's independent auditor, EisnerAmper LLP, it is critical to the Court's evaluation of Mr. Velissaris' alleged guilt for "mismarking" the fund that EisnerAmper evaluated Infinity Q's methodology for valuing the Mutual Fund's volatility and variance swaps in each of the three years at issue in this case (2018-2020), and identified no problems whatsoever with it. In a January 2018 memorandum setting forth the procedures it employed for conducting these audits, EisnerAmper noted that, rather than rely on what it was told by Infinity Q, it employed an "independent pricing vendor," Thompson Reuters Derivatives Pricing Services, to independently assess the valuation methods used by Infinity Q. (Jan. 31, 2018 EisnerAmper Memorandum at 2-3, a copy of which is attached hereto as Exhibit I.) Perhaps more important even than the independent pricing consultant EisnerAmper employed, however, was the information EisnerAmper learned when it "[i]nterviewed representatives from Bloomberg Professional Services – Pricing Data ('BVAL') an independent pricing vendor" as part of its audit. According to the EisnerAmper procedures memorandum,

> [w]e discussed with representatives from BVAL their methodologies and inputs in estimating values for the swaps and the difference between their values and inputs and the Counterparties. ***We were informed by the representative from BVAL, that***

*prior to working at BVAL she had worked at a Counterparty, and that at intermediate dates before settlement (for certain illiquid securities), the prices provided may not represent fair value under ASC 820 for various reasons.*

(*Id*. at 3) (emphasis added.) The prices provided by these "Counterparties," in turn, were part of the data BVAL incorporated into its fair value pricing tool.[3] In other words, by the admission of a former BVAL employee herself, "the prices provided" by BVAL "may not represent fair value" in some cases because some of their inputs did not themselves represent fair value.

Based on the independent opinions provided by the Thompson Reuters pricing consultant and the former BVAL employee, and with full knowledge of the fact that the BVAL tool could supply prices that were not fair value, EisnerAmper was able to conclude that

> [w]e agreed with the methodologies used by [Infinity Q] Management and considered them to be appropriate in the fair value determinations of the Investments. Based on the procedures performed with respect to the valuation analysis prepared by [Infinity Q] Management and discussions with Management, BBD LLP, BVAL and Reuters, we believe Management's fair value measurements for the Investments are reasonable as of August 31, 2017.

(EisnerAmper Memorandum at 4.) EisnerAmper performed audits according to the methodology set forth in the attached procedures memorandum at fiscal year-end in 2018, 2019 and 2020 as well, and in each year signed off on Infinity Q's fair value methodology, as is did for fiscal year-end 2017. In none of those years did EisnerAmper find any intentional inaccuracies—much less fraud—in the method used to value Infinity Q's variance or volatility swaps.

---

[3] The counterparties referenced in this excerpt are banks that trade swaps, which, according to Bloomberg's own literature, contribute market data that is incorporated into BVAL prices. (*See* Bloomberg BVAL Derivatives Introduction to Golden Copy Data Source at 2, 4, a copy of which is attached hereto as Exhibit J) (noting that "[t]he primary source of Golden Copy market data" includes estimates provided by "banks," and that "Golden Copy market data also incorporates contributor quotes" that, again, could be provided by "banks").

III. **THE FOUR-MONTH PERIOD BETWEEN MR. VELISSARIS' GUILTY PLEA AND THE FILING OF THIS MOTION IS REASONABLE UNDER THE CIRCUMSTANCES AND SHOULD NOT WEIGH AGAINST WITHDRAWAL.**

In considering a motion for leave to withdraw a guilty plea, courts have generally found that "[t]he longer the elapsed time [between the guilty plea and the filing of the motion], the less likely withdrawal would be fair and just." *United States v. Jaata*, No. 18-CR-162, 2021 WL 4225664, at *8 (S.D.N.Y. Sept. 16, 2021) (quoting *United States v. Schmidt*, 373 F.3d 100, 102 (2d Cir. 2004)). However, the Second Circuit has made clear that "timeliness is only one of several factors that a district court should consider in evaluating a motion to withdraw a guilty plea." *United States v. Lam Peralta*, 792 F. App'x 68, 70 (2d Cir. 2019) (citing *Rivernider*, 828 F.3d at 104). Mr. Velissaris is filing this motion on March 24, 2023, almost exactly four months after his guilty plea. When viewed in light of the circumstances of Mr. Velissaris' case, and specifically the efforts he made to advocate for his innocence with his former legal counsel, four months was a reasonable amount of time and should not weigh against him in the Court's analysis of his motion.

This is not a case in which the defendant suddenly decided months after he pled guilty that he changed his mind. Nor is this a situation where a defendant has been sentenced and now regrets his earlier decision to plead guilty. Rather, Mr. Velissaris has spent the last four months doing everything in his power to work with his prior and current counsel to defend himself and withdraw his guilty plea, all while battling mental illnesses that significantly impeded his ability to do so. Mr. Velissaris has been diagnosed with major depression, PTSD, alcohol use disorder, and social anxiety disorder, and he has suffered from these mental health issues for much of his life. (*See* Dr. Robyn Landow Psychiatric Evaluation Report, Exhibit B to Defendant's Sentencing Memorandum at 14.) The "survival mentality" James formed during his difficult and abusive childhood "meant withholding emotion, trusting no one, and never asking for help, a pattern that has continued in his

14

life to today." (*Id*. at 15.) Mr. Velissaris' tendency to shut down and withdraw made it exceedingly difficult for him to assert himself in conversations with his counsel.

Nevertheless, even after he pled guilty Mr. Velissaris continued to raise the issue of his innocence and potential defenses with prior counsel, and did everything within his power to advocate for himself as they prepared for his sentencing. Despite his best efforts, communication completely broke down between Mr. Velissaris and his attorneys when he felt that his questions, strategies, and arguments about his case—including his desire to withdraw his guilty plea—were not being listened to.

Mr. Velissaris discovered the extent of the disconnect between himself and prior counsel when he received their draft of his sentencing memorandum on March 4, 2023, just under one week prior to its due date. Upon completely losing confidence that his attorneys were able to zealously represent him in the way he had indicated to them, Mr. Velissaris sought out and engaged new counsel. Over the next few weeks, Mr. Velissaris worked diligently with new counsel to bring them up to speed on the voluminous, complex facts of his case to allow them to competently advise him.

Since his guilty plea, Mr. Velissaris has consistently expressed his desire to both prior and current counsel to withdraw his guilty plea, and he believed prior counsel did not support his desire to withdraw the plea. Once he reached that conclusion, he immediately retained new counsel and worked diligently with them to prepare his arguments and defenses. While it is true that a period of four months falls within the range courts in this District and the Second Circuit have found to weigh against granting a motion to withdraw, courts may also consider what, if anything, the defendant has done in that time to move forward with the motion. *See, e.g.*, *United States v. Richards*, 764 F. App'x 35, 38-39 (2d Cir. 2019) (district court did not abuse its discretion in

finding that motion to withdraw filed one year after plea did not weigh against defendant where he expressed that he wished to withdraw his plea promptly after his hearing and allowed his new counsel "an opportunity to undertake a fresh analysis of the evidence produced by the Government in his case before deciding on a course of action"); *cf United States v. Obiorah*, 536 F. App'x 53, 55 (2d Cir. 2013) (eight-month gap between plea and motion weighed against withdrawal where "the record indicate[d] that any delay due to counsel's inaction was minimal"); *United States v. Baum*, 380 F. Supp. 2d 187, 206 (S.D.N.Y. 2005) (three-and-a-half month gap weighed against withdrawal where the defendant refused to hire new counsel, apply for appointment of counsel, or proceed pro se with no legitimate reason).

Mr. Velissaris' case is similar to *Richards*, cited above, in that since his guilty plea, he has made good faith attempts to work collaboratively with prior counsel, and rigorous efforts to find, retain, and inform new counsel in order to file this motion, all the while fighting mental health issues that make it exceedingly difficult for him to confront the situation he has found himself in. Accordingly, four months is a reasonable period of time for purposes of his motion to withdraw, and should not weigh against his fair and just reason for withdrawing his plea. This, in combination with the other factors the Court may consider, favors leave to withdrawal.

## IV. THE GOVERNMENT WILL NOT BE PREJUDICED BY THE WITHDRAWAL OF MR. VELISSARIS' PLEA.

Courts in this District have held that even if a defendant fails "to demonstrate any valid grounds supporting a motion to withdraw a guilty plea, in balancing the equities, a court may still choose to allow the withdrawal if little or no prejudice to the Government would result." *United States v. Fernandez*, 734 F. Supp. 599, 604 (S.D.N.Y. 1990), *aff'd*, 932 F.2d 956 (2d Cir. 1991). This, in combination with the other factors the Court must consider—especially Mr. Velissaris' innocence of the conduct he pled guilty to—supports the motion to withdraw. While Mr. Velissaris

has demonstrated valid grounds to withdraw his plea, allowing him to do so at this stage also would not prejudice the government. Just under four months have passed since the scheduled trial date of November 28, 2023. By the time Mr. Velissaris pled guilty just a week before trial, both parties were prepared to proceed to trial. Accordingly, the government would be able to prepare its case with little difficulty. In fact, the SEC, which has been the lead agency investigating the conduct at issue in this case and in a parallel civil proceeding, has continued to investigate the matter during the pendency of this case. In a letter to the court in response to the government's motion to stay the civil case until the resolution of the criminal matter, the SEC advised that it intended to continue its investigation into the conduct underlying both the SEC complaint and the Indictment even if the civil case were to be stayed pending the outcome of this case:

> The Commission intends to continue to investigate individuals and entities other than Velissaris, arising from the same or related conduct alleged in the Complaint. Accordingly, the Commission staff may issue investigative subpoenas for documents and testimony. The stay of this Commission action would not prevent the Commission from continuing its investigation . . . *If in the course of its investigation the Commission obtains documents or sworn investigative testimony, the Commission will provide access to such documents and transcripts to the Assistant U.S. Attorneys assigned to the related criminal proceedings.*

*Sec. and Exch. Comm'n v. Velissaris*, Case No. 1:22-cv-01346-PKC (S.D.N.Y.) (Dkt. No. 8) (emphasis added).

Accordingly, the government will, and perhaps already has, received assistance from the SEC as part of its ongoing investigation in gathering evidence for this case. As the government stated in its motion to stay the civil matter, "[t]he Criminal Case and the SEC Civil Action involve *nearly identical facts and issues* . . . the Criminal Case and this case involve *the same scheme involving the same entities (Infinity Q and its investment funds), and similar facts, witnesses, and issues*." (Dkt. No. 7) (emphasis added). This fact further mitigates any prejudice to the government in preparing its case for trial.

17

## V.  MR. VELISSARIS' PLEA WAS NOT VOLUNTARY.

"In the absence of special circumstances, the validity of a plea of guilty is determined by reference to whether it was intelligent and voluntary." *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988) (citing *Brady v. United States*, 397 U.S. 742 (1970)); *Boykin v. Alabama*, 395 U.S. 238 (1969)). Assessing the voluntariness of a guilty plea "involves an evaluation of all the psychological and other factors that may reasonably be calculated to influence the human mind," which necessarily requires considering the "plea of guilty against the totality of events and circumstances which preceded its entry." *United States v. Colson*, 230 F. Supp. 953, 955 (S.D.N.Y. 1964). The Second Circuit has made clear that a plea is not voluntary if it is "the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally." *Miller*, 848 F.2d at 1320 (citing *Brady*, 397 U.S. at 750)) (internal quotations omitted).

Mr. Velissaris' mental illnesses, in combination with what he felt was immense pressure placed on him by his prior counsel to accept the government's plea deal, made him unable to weigh his options rationally. While Mr. Velissaris maintained his innocence throughout his case and shared that with prior counsel up until his plea, he believed that counsel was not listening to his concerns and did not take his desire to go forward to trial and assert his defenses seriously. In the face of this interpersonal adversity, Mr. Velissaris reverted to his pattern of "respond[ing] to crisis situations by avoiding danger, attempting to fix things by himself, and all the while stay stoic and isolated." (*See* Dr. Robyn Landow Psychiatric Evaluation Report, Exhibit B to Defendant's Sentencing Memorandum at 15.) Once he perceived his efforts to assert his innocence as futile, he took a "passive, submissive stance when dealing with" his counsel and the government, because in his mind he truly believed there was no other option. (*Id*. at 12.) Mr. Velissaris' decision to

plead guilty was not a rational one, but instead was a result of his inability to cogently weigh his options under his faulty belief that there was no choice other than to plead guilty to a crime he did not commit.

## VI. MR. VELISSARIS SHOULD BE ENTITLED TO WITHDRAW HIS GUILTY PLEA DUE TO THE GOVERNMENT'S FAILURE TO DISCLOSE BRADY EVIDENCE.

The government's failure to timely provide potential *Brady* evidence—namely, to search for and provide *Brady* evidence from the SEC's investigative file and to provide exculpatory evidence from the SEC's investigation of Bloomberg's BVAL tool—is another factor supporting Mr. Velissaris' motion to withdraw. The due process clause requires the government to "disclose to the accused all material exculpatory evidence," and "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Millan-Colon*, 829 F. Supp. 620, 635 (S.D.N.Y. 1993) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The defense is entitled to complete exculpatory evidence "in time for its effective use at trial." *United States v. Gil*, 297 F.3d 93, 105 (2d Cir. 2002) (quoting *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001)). The defense is entitled to relief based on a *Brady* violation "only if the information is 'material.'" *Millan-Colon*, 829 F.Supp. at 635 (quoting *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988)). When evaluating a motion to withdraw a plea, "evidence is material if there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Id*. (citing *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992)) (internal quotations omitted). To determine whether the defendant would have insisted on going to trial based on withheld *Brady* evidence, "the court must objectively examine the persuasiveness of the withheld information." *Id*.

19

*Brady*-related issues have plagued Mr. Velissaris' defenses throughout this case. On June 24, 2022, the defense filed a motion to compel the government to produce additional Rule 16, *Brady*, and *Giglio* materials. (*See* Dkt. No. 20 at 24.) Specifically, the defense argued that because the SEC worked hand in hand with the government during its investigation of Mr. Velissaris, "the prosecutor's duty extends to reviewing the materials in the possession of [the SEC] for *Brady* evidence." (*Id*. (citing *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012).) "Because the Government engaged in a joint investigation with the SEC, it must fulfill its discovery obligations to search for and produce discoverable information in the SEC's files." (*Id*. at 28.) The defense noted that the SEC's investigative file would likely include Rule 16, *Brady*, and *Giglio* information, "including . . . documents, memoranda, notes, or other summaries of interviews conducted by the SEC; any exculpatory valuations revealed by the SEC analysis; calls and meetings with potential witnesses or representatives for Infinity Q; and any communications between the USAO and the SEC related to the investigations of Infinity Q and Mr. Velissaris." (*Id*.) The Court denied this motion on July 3, 2023. (Dkt. No. 26.)

On November 15, 2022, the defense sought an adjournment of Mr. Velissaris' trial date in light of the government's belated production of a laptop containing three years' worth of workpapers from Infinity Q's auditor, EisnerAmper. (Dkt. No. 57.) The SEC had custody of the laptop since August 2021, over a year before the government produced it to the defense on November 7, 2022. (*Id*.) As Infinity Q's auditor, EisnerAmper had access to extensive information regarding Infinity Q's valuation procedures and practices, as well as contact with entities whose personnel the government intended to call at trial. (*Id*.) Information provided on the laptop included highly relevant and potentially exculpatory material, including but not limited to testing of realized and unrealized gains of Infinity Q's portfolios, third-party confirmations sent to Infinity

Q's counterparties, and communications exploring the internal controls and deficiencies of Infinity Q and its service providers. (*Id*.) By the time of the hearing before the Court on November 18, 2023, the defense had received 579 previously unreviewed documents (not pages) from the laptop, which they represented to the Court would take "at least a couple weeks" to review to determine whether they included any significant evidence, including *Brady* evidence. (Dkt. No. 70 at 5, lines 1-25, 6 lines 1-2.) Further, the defense represented that there was reason to believe "what is on the laptop almost certainly are communications or evidence of communications between Eisner and the entities whose employees will testify at this trial about what they did or did not know about what Mr. Velissaris is alleged to have done while at Infinity Q." (*Id*. at 10, lines 9-13.) The Court ultimately denied the adjournment and moved forward with the scheduled trial date. (*Id*. at 19, lines 14-15.)

The crux of the government's case against Mr. Velissaris is that he fraudulently misrepresented Infinity Q's procedures for valuing the OTC derivative securities in the Mutual Fund and Private Fund, and fraudulently manipulated inputs into BVAL to inflate the value of those securities. EisnerAmper's workpapers contain highly relevant, and likely exculpatory, material that would go to Mr. Velissaris' conduct in valuing the securities; in particular, the laptop almost certainly includes communications with potential trial witnesses regarding their knowledge of the allegations against Mr. Velissaris. Had Mr. Velissaris and his counsel had a meaningful opportunity to review the voluminous data contained on the laptop, there is a reasonable probability that Mr. Velissaris would have insisted on going to trial. Instead, rather than providing this potential *Brady* evidence "in time for its effective use at trial," the government notified the defense of its existence just weeks prior to trial.

Finally, the government's failure to provide exculpatory evidence relating to the SEC's settlement with Bloomberg of claims related to the BVAL tool violates its *Brady* obligations. On January 23, 2023, the SEC levied a $5 million fine against Bloomberg for serious issues with the way in which data was utilized in BVAL between 2016 and 2022, which includes the time period covered by the Indictment. Specifically, the SEC charged that BVAL was not working how it was supposed to work and could generate misleading valuations: "Bloomberg failed to disclose to its customers that the use of EIT could, in certain circumstances, result in a ***valuation based on an uncorroborated single data input.*** Due to this omission, Bloomberg's description of its valuation methodology was materially misleading because it conveyed that the prices of fixed income securities derived through the observed comparables algorithm were based on value relative to comparable securities only, when in fact certain of the prices of fixed income securities were based on a single broker quote with respect to the target security." *Bloomberg Finance L.P.*, Sec. Act Rel. No. 11150, ¶¶ 11 (Jan. 23, 2023) (emphasis added).

Since November 2020, Mr. Velissaris told the government about errors in the Bloomberg system causing large deviations between Infinity Q values and Bloomberg values. Mr. Velissaris voluntarily gave a presentation to the SEC, in which he focused on these large deviations and highlighted multiple positions in the Infinity Q portfolio where the deviations existed. He stated that the Bloomberg tool did not work correctly, and that that was causing the deviations, which required him to use another valuation model in order to reach a fair value. The SEC's settlement with Bloomberg provides significant exculpatory evidence in support of Mr. Velissaris' characterization of the Bloomberg tool, and directly substantiates his defense against the government's allegations that he was fraudulently inflating the value of Infinity Q securities.

At the same time the government was claiming BVAL was an authoritative source in this case to show that Mr. Velissaris improperly valued Infinity Q securities, the SEC had an ongoing investigation into that very same valuation tool. A significant part of Mr. Velissaris' defense includes the reasonableness of his adjustments to the BVAL inputs in order to reach fair value for Infinity Q securities because of the very deficiencies in the tool shown by the SEC settlement. Unlike the seriously belated disclosure of the EisnerAmper workpapers, information related to the SEC's investigation into BVAL was not provided to the defense at all. This exculpatory evidence is material because there is more than a reasonable probability that, had Mr. Velissaris been made aware of this investigation, he would have chosen to go to trial. Accordingly, the government's failure to timely provide exculpatory evidence in accordance with its *Brady* obligations further supports Mr. Velissaris' motion to withdraw his plea.

## **CONCLUSION**

For the foregoing reasons, Mr. Velissaris respectfully requests that the Court grant his motion to withdraw his guilty plea in its entirety.

Dated: New York, New York           Respectfully submitted,
          March 24, 2023

                                     /s/ Michael A. Battle
                                     Michael A. Battle (SDNY Bar Code No. MB9289)
                                     William R. Martin (admitted *pro hac vice*)
                                     Michelle N. Bradford (admitted *pro hac vice*)
                                     David S. Slovick (*Entry of Appearance* forthcoming)
                                     Erin C. Steele (*pro hac vice* pending)
                                     BARNES & THORNBURG LLP
                                     555 12th Street NW, Suite 1200
                                     Washington, DC 20004
                                     mbattle@btlaw.com
                                     (202) 371-6350
                                     billy.martin@btlaw.com
                                     (202) 371-6363

mbradford@btlaw.com
(202) 408-6922
dslovick@btlaw.com
(646) 746-2019
esteele@btlaw.com
(202) 408-6932

*Attorneys for Defendant James Velissaris*