# EXHIBIT A



**INFINITY Q CAPITAL MANAGEMENT, LLC**


**COMPLIANCE POLICIES AND PROCEDURES MANUAL**


Dated:  August 15, 2015


Last Revised: December 6, 2018

IQCM-SEC-00087750

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................................ 1

COMPLIANCE PROGRAM ....................................................................................................... 2

FORM ADV AND CERTAIN OTHER DISCLOSURES TO CLIENTS AND
 PROSPECTIVE CLIENTS ................................................................................................... 9

ADVISORY CONTRACT ......................................................................................................... 15

REGULATION D EXEMPTIONS AND FILINGS………………………………………………17

ELIGIBILITY OF INVESTORS………………………………………………………….....21

CASH PAYMENTS TO SOLICITORS………………………………………………………23

ADVERTISING.......................................................................................................................... 25

GIFTS .......................................................................................................................................... 30

POLITICAL CONTRIBUTIONS ............................................................................................... 32

RECORDKEEPING .................................................................................................................... 37

PROXY VOTING........................................................................................................................ 45

CUSTODY AND SAFEGUARDING OF CLIENT ASSETS .................................................... 48

PUBLICLY TRADED SECURITIES AND SOFT DOLLARS ................................................. 52

INSIDER TRADING, MATERIAL NONPUBLIC INFORMATION AND MARKET
 MANIPULATION POLICIES ........................................................................................... 59

CODE OF ETHICS...................................................................................................................... 66

VALUATION………………………………………………………………………………80

INVESTMENT ALLOCATION ................................................................................................. 87

COMPLIANCE WITH AFFILIATE TRANSACTION RESTRICTIONS ................................ 90

INVESTMENT COMPANY ACT PORTFOLIO MANAGEMENT GUIDELINES ................ 94

UPDATING MUTUAL FUND DISCLOSURE DOCUMENTS …………......…………… ..101

MONITORING FOR MARKET TIMING…………………………………… …….....102

REGULATORY FILINGS: SCHEDULE 13D/G……………………………………………103

REGULATORY FILINGS: SCHEDULE F……………………………………………...…105

REGULATORY FILINGS: SCHEDULE H……………………………………………………107

REGULATORY REPORTING – FORM N-Q AND N-CSR…………………………………109

WHISTLEBLOWER POLICY FOR REPORTING SUSPICIOUS ACTIVITIES AND
 CONCERNS …………………………………………………………………………....110

IQCM-SEC-00087750

CONFIDENTIALITY, PROTECTION OF NON-PUBLIC CLIENT INFORMATION AND
    PRIVACY POLICY……………………………………………………………..…116

BUSINESS CONTINUITY……………………………………………………………...121

IDENTITY THEFT PREVENTION POLICY……………………………………………123

INFORMATION SECURITY GOVERNANCE POLICY…………………….............……127

COMPLAINTS…………………………………………………………………………..135

ELECTRONIC COMMUNICATIONS AND SOCIAL MEDIA ………..............................136

ANTI-MONEY LAUNDERING……………………………………………………..…  140

APPENDICES A THROUGH E (CODE OF ETHICS ACKNOWLEDGEMENTS) …….....146

IQCM-SEC-00087750

# INTRODUCTION

Infinity Q Capital Management, LLC ("Infinity Q" or the "Firm") is an investment adviser registered with the U.S. Securities and Exchange Commission and has adopted this manual (the "Manual") in accordance with the requirements of the U.S. Investment Advisers Act of 1940, as amended.  The Manual:

- Establishes compliance policies that address the requirements of U.S. federal securities laws and related rules and regulations;

- Identifies the duties of Infinity Q personnel in ensuring compliance with such laws, rules and regulations; and

- Creates a culture of compliance that reflects the highest levels of integrity.

Please note that in this Manual:

- "1940 Act" refers to the U.S. Investment Company Act of 1940, as amended;

- "Advisers Act" refers to the U.S. Investment Advisers Act of 1940, as amended;

- "CCO" refers to Infinity Q's Chief Compliance Officer;

- "CFO" refers to Infinity Q's Chief Financial Officer;

- "CIO" refers to Infinity Q's Chief Investment Officer;

- "CRO" refers to Infinity Q's Chief Risk Officer;

- "Exchange Act" refers to the U.S. Securities Exchange Act of 1934, as amended;

- "Federal Securities Laws" means the U.S. Securities Act of 1933, the Exchange Act, the U.S. Sarbanes-Oxley Act of 2002, the 1940 Act, the Advisers Act, Title V of the U.S. Gramm-Leach-Bliley Act, any rules adopted by the SEC under any of these statutes, the U.S. Bank Secrecy Act as it applies to funds and investment advisers, and any rules adopted thereunder by the SEC or the Department of the Treasury;

- "Fund" and "Funds" refer to the registered investment company advised by Infinity Q, Infinity Q Diversified Alpha Fund, and any other registered investment companies advised by Infinity Q in the future; as well as the Infinity Q Volatility Alpha Fund, and any other private funds advised by Infinity Q in the future, which are exempt from registration under the Investment Company Act of 1940; and

- "SEC" refers to the U.S. Securities and Exchange Commission.

IQCM-SEC-00087750

## COMPLIANCE PROGRAM

### POLICY/REQUIREMENTS

Rule 206(4)-7 under the Advisers Act requires that a registered adviser (i) adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder by the investment adviser or any of its "supervised persons,"[1] (ii) review no less frequently than annually the adequacy of such policies and procedures and the effectiveness of their implementation and (iii) designate a chief compliance officer responsible for administering the policies and procedures of the Firm (the "Compliance Policies and Procedures").  Infinity Q has adopted and implemented such policies and procedures.  In addition, in the Firm's capacity as adviser to the Funds and with respect to the services the Firm provides to the Funds, this Manual includes policies and procedures that are reasonably designed to prevent violation of the Federal Securities Laws by the Firm with respect to the Funds, as required by Rule 38a-1 under the 1940 Act.

The purpose of this Policy is to set out procedures related to the role of the CCO in administering Infinity Q's policies and procedures and to establish a program of reviewing, testing, training and reporting to provide reasonable assurance that the policies and procedures are being followed (the "Compliance Program").

Infinity Q has a duty to supervise the activities of persons who act on its behalf.  Employees of Infinity Q who have supervisory duties share this responsibility and may incur personal liability for a failure to supervise if a subordinate violates applicable laws and regulations.  Infinity Q will be deemed to have fulfilled its duty to supervise if it:

- Has established procedures and a system for their application that would reasonably be expected to prevent and to detect, insofar as it is practical, violations of the law by a supervised person; and

- Has reasonably discharged the duties and obligations incumbent on it by reason of such procedures and system without reasonable cause to believe that they were not being complied with.

This Policy and the Compliance Program are intended to satisfy this duty to supervise.

### PROCEDURES

#### Designation of CCO

The Firm shall designate a CCO, who shall (a) be competent and knowledgeable regarding the Advisers Act; (b) be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the Firm; and (c) have sufficient seniority and authority to

---

[1] A "supervised person" under Section 203(a)(25) of the Advisers Act means an adviser's partners, officers, directors (or other persons occupying a similar status or performing similar functions) and employees, as well as any other persons who provide advice on behalf of the adviser and are subject to the adviser's supervision and control.

IQCM-SEC-00087750

compel others to adhere to the Compliance Policies and Procedures.  Scott Lindell currently serves as the CCO effective January 1, 2015.  The CCO has full responsibility and authority to implement the Compliance Policies and Procedures.  The CCO may, in his or her discretion, seek the advice and assistance of third parties, including outside counsel to the Firm, in connection with the CCO's duties under the Compliance Policies and Procedures.  The CCO may delegate any of his or her responsibilities to another person (e.g., all references to the CCO in these Compliance Policies and Procedures will include any and all delegates of the CCO).  In addition, the CCO has the authority to waive any of the requirements included in the Compliance Policies and Procedures in his or her discretion.

<u>Annual Compliance Review</u>

The CCO shall annually review the policies and procedures under Rule 206(4)-7 and determine their adequacy and the effectiveness of their implementation.  The initial annual compliance review shall be conducted no later than eighteen (18) months from the date that Infinity Q's SEC registration became effective, and then annually thereafter.  The CCO's review shall consider (but need not be limited to) the following:

- o   any material compliance matters that arose during the previous calendar year;
- o   any changes in the business activities of Infinity Q;
- o   any material changes to the Compliance Policies and Procedures; and
- o   any changes to the Advisers Act and the rules thereunder that may necessitate revisions to the Compliance Policies and Procedures.

During the development of the Compliance Policies and Procedures, certain key areas were identified where the potential for conflicts of interest exist and/or where certain compliance factors could create risk exposure for the firm.  To document this process, the Infinity Q Risk Assessment and Conflicts of Interest Matrix ("<u>Risk Assessment Matrix</u>") will be created to identify factors that contribute to and/or mitigate each identified risk area.  Based on this assessment regarding specific risk and conflict exposure areas affecting the firm, the scope of the independent compliance testing will be developed.  The risk areas and risk ratings identified in the Risk Assessment Matrix will be subject to an ongoing assessment and the risk ratings may be amended when a control environment changes in a positive or negative manner.

The Risk Assessment Matrix will be reviewed as part of the annual compliance review process to determine whether any of the risk areas and risk ratings should change due to changed circumstances.

<u>Interim Compliance Review</u>

The CCO may also conduct interim reviews to the extent the CCO determines there are significant compliance events, material changes in business arrangements or significant regulatory developments since the adoption or most recent review, as applicable, of the Compliance Policies and Procedures.

-3-

Compliance Report

The CCO's review shall be documented in a written report that will be completed prior to the end of the first quarter each year. The report shall be maintained and preserved in an easily accessible place for a period of not less than 5 years (the first 2 years in Infinity Q's offices).  The CCO shall apprise the CIO of any issues that arose in connection with any compliance review.  The written report or a summary thereof shall be made available to the Funds promptly upon request.

Training Regarding Compliance Policies and Procedures

The CCO shall be responsible for ensuring that all supervised persons receive initial training and continuing education necessary to understand and meet applicable requirements of the Compliance Policies and Procedures.  In addition, the CCO or a designee shall conduct training sessions with all supervised persons on at least an annual basis to discuss any additional or modified policies and procedures.  The CCO is not expected to conduct annual one-on-one training sessions with any supervised person unless deemed warranted in the CCO's discretion.  The CCO shall be available on an ongoing basis to answer any questions that may be raised by supervised persons in connection with the Compliance Policies and Procedures.

Monitoring and Testing of Compliance Policies and Procedures

From time to time, the CCO shall conduct independent testing of Infinity Q's policies and procedures in connection with its review of Infinity Q's policies and procedures.  Such independent testing shall be documented in the manner determined by the CCO.

Initial and Annual Acknowledgements of Compliance Policies and Procedures

Upon becoming a supervised person, the CCO shall promptly deliver to each such supervised person a copy of the Compliance Policies and Procedures.  Each new supervised person must sign and return to the CCO the Compliance Policies and Procedures Acknowledgement Form stating that such supervised person has received a copy of the Compliance Policies and Procedures, that he or she has read and understands the Compliance Policies and Procedures, and that he or she shall comply with all applicable Compliance Policies and Procedures. Infinity Q uses a third-party service provider, ComplySci, to electronically disseminate certain compliance certification through ComplySci's Personal Trading Control Center ("PTCC"). Each supervised may use the form attached to this Policy as Exhibit A or may complete this same certification electronically via PTCC.

In addition, the CCO shall deliver to each supervised person each updated copy of the Compliance Policies and Procedures.  Each supervised person must sign and return to the CCO the Compliance Policies and Procedures Acknowledgement Form stating that such supervised person has received a copy of the updated Compliance Policies and Procedures, that he or she has read and understands the updated Compliance Policies and Procedures, and that he or she shall comply with all applicable updated Compliance Policies and Procedures.  Each supervised may use the form attached to this Policy as Exhibit A or may complete this same certification electronically via PTCC.

-4-

IQCM-SEC-00087750

Upon becoming a supervised person and annually thereafter, each supervised person shall also sign, complete and return the "Conflicts Questionnaire" attached as <u>Exhibit B</u> to the CCO. Each supervised may use the form attached to this Policy as Exhibit B or may complete this same certification electronically via PTCC.

The CCO shall maintain and preserve copies of all such Compliance Policies and Procedures Acknowledgement Forms in an easily accessible place for a period of not less than five years (the first two years in the main office of the Firm).

### COMPLIANCE VIOLATIONS

The CCO, with the assistance of legal counsel as necessary, shall conduct an investigation into the facts and circumstances surrounding any violation of the Compliance Policies and Procedures. Any violation(s) of the policies and procedures set forth in the Compliance Policies and Procedures is grounds for immediate disciplinary action, which may include termination of employment. Violations are noted in the Compliance Breach Log, which includes a description of the event, personnel involved, and remedial action taken.

### RESPONSIBILITY

- The CCO and other Infinity Q personnel shall have the responsibilities set out above.

**EFFECTIVE AS OF:** October 1, 2014

**LAST UPDATED:** February 7, 2018

IQCM-SEC-00087750

## <u>Exhibit A</u>

**Compliance Policies and Procedures Acknowledgement Form**

I acknowledge that I have received the compliance policies and procedures of Infinity Q Capital Management, LLC (the "<u>Firm</u>") (the "<u>Compliance Policies and Procedures</u>"). In particular, I have read and understand the relevant portions of the Compliance Policies and Procedures applicable to my position at the Firm. In addition, I have completed, signed and dated a "Conflicts Questionnaire."

If I had any questions concerning the Compliance Policies and Procedures and my responsibilities under the Compliance Policies and Procedures, I have raised them with the Firm's Chief Compliance Officer and received satisfactory answers to my questions.

I understand that any violation(s) of the policies and procedures set forth in the Compliance Policies and Procedures is grounds for immediate disciplinary action, which may include termination of employment, and may constitute a violation of applicable federal, state and local laws and regulations. I certify that I have reported all violations of the Compliance Policies and Procedures to the Firm's Chief Compliance Office and have complied with, and affirm that I will remain informed about, and will continue to comply with, all applicable Compliance Policies and Procedures.

Signature:  _____

Print Name:  _____

Date:  _____

-6-

**Exhibit B**

**Conflicts Questionnaire**

Infinity Q Capital Management, LLC (the "Firm") is required to monitor circumstances involving Firm personnel that may pose a potential conflict with the Firm's management of the pooled investment vehicles advised by the Firm.  Please complete this questionnaire and disclose the required information.  Although we will ask for a recertification of the information contained in the questionnaire annually, you should provide promptly any changes to the information to the Firm's Chief Compliance Officer ("CCO"). Further, if you are aware of any potential conflicts of interest that you may have that are not covered by this questionnaire, please discuss such potential conflicts with the CCO.

**A.** Please disclose the requested information for any entity (including any commercial business or not-for-profit organization) other than the Firm in which, or from which, you, your spouse or any immediate family member (1) receive compensation or have a material interest (other than security holdings reported under the Firm's Code of Ethics); (2) take an active role in making management decisions; (3) serve as an officer, director or general partner (or in a similar capacity); or (4) provide any advice about investments.

| Name of Entity: | Nature of Affiliation or Title: | Public Company |
|---|---|---|
| 1. _____ | _____ | Yes/No |
| 2. _____ | _____ | Yes/No |
| 3. _____ | _____ | Yes/No |
| 4. _____ | _____ | Yes/No |
| 5. _____ | _____ | Yes/No |

Check here if your answer to "A" above is "None" or "Not Applicable": ☐

**B.** Please disclose whether your spouse or any immediate family member currently conducts business or works for an entity that conducts business with the Firm.

Describe:

-7-

IQCM-SEC-00087750

_____

_____

_____

Check here if your answer to "B" above is "None" or "Not Applicable": ☐

**C.** Please disclose whether your spouse or any immediate family member currently works for a company with publicly traded securities.

Describe:

_____

_____

_____

Check here if your answer to "C" above is "None" or "Not Applicable": ☐

**D.** Please disclose whether your spouse or any immediate family member works in a position where they may receive material non-public information about a company with publicly traded securities.

Describe:

_____

_____

_____

Check here if your answer to "D" above is "None" or "Not Applicable": ☐

Please note that these questions are intended to be broad in scope. If you have any question as to whether any particular arrangement or relationship should be disclosed on this form, please consult the CCO.

Signature: _____

Print Name: _____

Date: _____

-8-

# FORM ADV AND CERTAIN OTHER
# DISCLOSURES TO CLIENTS AND PROSPECTIVE CLIENTS

### POLICY

As a registered investment adviser, Infinity Q is required by the Advisers Act to file with the SEC, and to update from time to time, a document referred to as "Form ADV." This document consists of two parts. Part 1 solicits information about Infinity Q, its business practices, the persons who own and control it and the persons who provide investment advice on its behalf, and also requires disclosure of certain criminal and regulatory actions against Infinity Q and certain related persons. Part 2 consists of two parts. Part 2A is Infinity Q's brochure and contains narrative disclosure regarding specific topics relating to Infinity Q's services, fees, business practices, disciplinary information and conflicts of interest. Part 2B is a brochure supplement and contains information regarding the advisory personnel on whom the client relies for investment advice. Rule 204-3 under the Advisers Act requires Infinity Q to furnish Part 2A of Infinity Q's Form ADV to certain existing and prospective clients in certain circumstances.[1] Part 1A and Part 2A are filed with the SEC.

### ANNUAL FORM ADV AMENDMENTS

**Procedures**

- Infinity Q shall amend its Form ADV within 90 days after the end of each fiscal year. The annual amendment must update all of the information in Infinity Q's Form ADV.

**Responsibility**

- In the first quarter of each year, the CCO will coordinate an update of information in Infinity Q's Form ADV. The CCO has responsibility for amending Infinity Q's Form ADV, filing amendments to the Form with the SEC and maintaining a copy of Parts 2B.

### OTHER AMENDMENTS

**Procedures**

- In addition to the required annual amendment, Infinity Q is required to amend its Form ADV promptly whenever any information in the following Items of Part 1A of Infinity Q's Form ADV becomes inaccurate:

  Part 1A:

---

[1] Rule 204-3 under the Advisers Act and related SEC guidance exempts advisers that solely advise registered investment companies from the requirements to deliver and file Part 2 of Form ADV as long as the investment advisory agreement between such an adviser and registered investment company meets the requirements of Section 15(c) of the 1940 Act. Therefore, Infinity Q need not prepare and deliver Part 2 of Form ADV, and may elect to disregard the applicable requirements of this policy so long as its only clients are the Funds.

IQCM-SEC-00087750

- o    Item 1: Identifying Information (Infinity Q's name and other names under which it does business, address, telephone numbers, business hours, contact persons for information about Infinity Q's Form ADV, etc.)

- o    Item 3: Form of Organization (including jurisdiction in which Infinity Q is organized and date on which its fiscal year ends)

- o    Item 9 (except 9.A.(2), 9.B.(2) and 9(E)): Custody (whether Infinity Q or related persons maintain custody of client assets)

- o    Item 11: Disclosure Information (information about disciplinary and regulatory violations by Infinity Q, its personnel and certain affiliates)

- Prompt amendment is also required whenever any information in the following Items of Form ADV becomes <u>materially</u> inaccurate:

    Part 1A:

- o    Item 4: Succession to another registered adviser's business

- o    Item 8: Participation or interest in client transactions

- o    Item 10: Information about Infinity Q's controlling persons

- Information contained in Part 2 of Infinity Q's Form ADV must be updated promptly whenever any portion thereof (other than the amount of assets under management or the fee schedule) becomes materially inaccurate.  Infinity Q must file such updates to Part 2A electronically with the SEC.

**Responsibility**

- The CCO shall determine whether an amendment to the Form ADV may be required at any time during the year.

- The CCO will also consider whether changes in Infinity Q's business, policies or disciplinary information require amendments to Form ADV as such changes arise throughout the year.  If an amendment is required, the CCO shall be responsible for filing any such amendment.

### DELIVERY OF FORM ADV PART 2 TO CLIENTS

<u>New Clients</u>

**Policy/Procedure**

- Infinity Q must deliver the Form ADV Part 2 to a client at or before the time Infinity Q enters into an advisory contract with such client.

- In addition, Infinity Q must deliver to each prospective client an interim update to Part 2B if there are any changes to the list of supervised persons included in Part 2B.

-10-

IQCM-SEC-00087750

**Responsibility**

- CRO

<u>Existing Clients</u>

**Policy/Procedure**

- Infinity Q must deliver annually to each client either a current updated brochure including or accompanied by a summary of material changes, or a summary of material changes and an offer to provide the current brochure (with information on how a client may obtain the brochure ), in either case no later than 120 days after Infinity Q's fiscal year end.

- Infinity Q must deliver an updated Part 2A and/or Part 2B to clients when there is new disclosure of a disciplinary event, or a material change to disciplin ary information that has already been disclosed.

- Infinity Q must deliver to each client an interim update to Part 2B if there are any changes to the list of supervised persons included in Part 2B.

**Responsibility**

- CRO

**FORM PF**

Rule 204(b)-1 under the Advisers Act requires an investment adviser to file Form PF if the investment adviser (1) is registered or required to be registered with the SEC; (2) advises one or more private funds; and (3) had at least $150 million in regulatory assets under management ("RAUM") attributable to private funds as of the end of its most recently completed fiscal year. Form PF is submitted to the SEC electronically through the Form PF filing system on the IARD, but will not be publicly available.

If Infinity Q's RAUM attributable to the Private Funds is at least $150 million at the end of the fiscal year, Infinity Q will file Form PF within 120 days after each fiscal year end.

**STATE NOTICE FILINGS**

**Procedures/Responsibility**

- Certain states in which Infinity Q conducts business (for example, by advising clients located in the state) may require that Infinity Q make notice filings with, and pay related fees to, state authorities.  These requirements are complied with through the IARD system as part of Infinity Q's annual amendment to Form ADV (see Item 2B of Part 1A of Form ADV).

-11-

- As part of the process for updating Infinity Q's ADV, the CCO shall review Infinity Q's client base and, if applicable, relevant state law in order to ensure that any states that require notice filings are properly designated in Item 2B of Part 1A.

- The CCO will also determine whether any individuals will be required to register in any state as an investment adviser representative.

## DISCIPLINARY, REGULATORY AND CRIMINAL VIOLATIONS BY PERSONNEL AND AFFILIATES

### Procedures/Responsibility

- Infinity Q will hire an officer or partner (or any persons performing similar functions) and any other personnel of Infinity Q (including independent contractors who perform advisory functions on behalf of Infinity Q) (collectively, "employees") only after a background investigation has been satisfactorily completed and will not employ statutorily disqualified or automatically barred individuals.  The CCO is responsible for implementing this investigation.[2]

- Infinity Q shall require each new employee to complete a questionnaire concerning the employee's disciplinary, regulatory and criminal violations ("Legal Matters").

- On at least an annual basis, Infinity Q will request that all persons referred to in the preceding paragraphs complete such questionnaires, as appropriate (or confirm in writing that there has been no change in the information previously furnished by them).

- Any person who becomes aware of any changes or inaccuracies in the information he or she has previously furnished should promptly notify the CCO, so that he or she may determine whether disclosure or other action by Infinity Q is required.

---

[2] Section 9(a) of the 1940 Act automatically bars persons that have been found to have engaged in certain adverse conduct from serving as advisers to investment companies. The persons subject to an automatic bar under Section 9(a) include:

   1) A person who within 10 years has been convicted of any felony or misdemeanor involving the purchase or sale of any security or arising out of the person's conduct as an underwriter, broker, dealer, investment adviser, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent, or entity or person required to be registered under the Commodity Exchange Act, or as an affiliated person, salesman or employee of any investment company, bank, insurance company, or entity or person required to be registered under the Commodity Exchange Act;

   2) A person who is permanently or temporarily enjoined by order, judgment, or decree of any court of competent jurisdiction from acting in any of the positions set forth under (1) or from engaging in or continuing any conduct or practice in connection with any such activity or in connection with the purchase or sale of any security, and

   3) A company any affiliated person of which is barred by reason of paragraph (1) or (2). Section 9(b) of the 1940 Act specifies certain other adverse conduct that permits the SEC to bar, after notice and opportunity for hearing, the person who engaged in the conduct from serving as an investment adviser to an investment company or as an affiliated person of such an adviser. Conduct leading to a "discretionary bar" under Section 9(b) includes: (1) willfully including false or misleading material statements in reports filed with the SEC; (2) willfully violating, or aiding and abetting the violation of, various securities laws; or (3) having been found by a foreign regulatory authority or foreign court to have engaged in certain prohibited conduct.

IQCM-SEC-00087750

- The CCO shall monitor any Legal Matters that arise.

- If the CCO becomes aware of any relevant Legal Matter (whether through Infinity Q's employees, affiliate reporting or otherwise), he or she shall review and investigate the matter to determine whether (i) an amendment to Item 11 of Part 1, or to Part 2, of Infinity Q's Form ADV is required or (ii) it is a disqualifying event under Section 9 of the 1940 Act.

- If it is determined that an amendment to Infinity Q's Form ADV is required, the CCO shall amend the Form ADV, file the updated Form ADV with the SEC and, if required, deliver updates to Infinity Q's clients, or cause the Form ADV to be so amended, filed and delivered.

### DISCLOSURE OF FINANCIAL CONDITION

**Procedures/Responsibility**

- The CFO will monitor the financial condition of Infinity Q to determine whether disclosure in Infinity Q's Form ADV Part 2A is required.

- Disclosure generally would be required in the event of Infinity Q's insolvency or bankruptcy.  In addition (and without limitation), disclosure may be required if any financial condition is likely to impair the ability of Infinity Q to meet contractual commitments to its Funds.

- If it is determined that information regarding the financial condition of Infinity Q must be disclosed in Infinity Q's Form ADV Part 2A, the CCO shall amend the Form ADV and file the updated Form ADV with the SEC, or cause the Form ADV to be so amended and filed.

### CONFLICTS OF INTEREST

The CCO shall be responsible for coordinating the identification of material conflicts of interest to which Infinity Q is subject.  In coordinating such identification, the CCO shall take into account the responses to the Conflicts Questionnaires distributed to supervised persons, as well as other activities of Infinity Q that might give rise to a conflict between the interests of Infinity Q and its affiliates, on the one hand, and the interests of the Funds, on the other.  Once such conflicts are identified, the CCO shall oversee the consideration of appropriate disclosure and/or mitigation of the conflicts and shall escalate the matter to the appropriate firm personnel.

### RECORDKEEPING

Infinity Q's Recordkeeping policy contains certain requirements with respect to Infinity Q's Form ADV.  Employees should refer to the Recordkeeping policies for additional guidance and information.

-13-

IQCM-SEC-00087750

**EFFECTIVE AS OF:** October 1, 2014

**LAST UPDATED:** February 7, 2017

IQCM-SEC-00087750

# ADVISORY CONTRACT

## POLICY

It is the policy of Infinity Q to comply with the requirements relating to Infinity Q's advisory contracts under the Advisers Act and the 1940 Act.  The procedures below are designed to confirm that Infinity Q's advisory contracts meet the requirements of the Advisers Act and the 1940 Act.

Under Section 15 of the 1940 Act, each investment advisory agreement proposed to be entered into by an investment company is required to be approved by such investment company's board of directors, and the continuance of each such investment advisory agreement must be annually approved by such board of directors.  Approvals of advisory and sub-advisory agreements, and their annual continuance, must be made by a majority of the independent directors at an in-person meeting called for the purpose of voting on such agreements, and certain information is required to be requested and made available to the independent directors in that connection.

## PROCEDURES

- Before Infinity Q begins to serve as investment adviser with respect to any client, Infinity Q generally shall enter into a signed, written advisory contract with such client.

- Every advisory contract entered into by Infinity Q shall provide that no assignment (as defined under the Advisers Act) of the contract shall be made by Infinity Q without the consent of the other party or parties to the contract (except for contracts with respect to the Funds; see below).

- An advisory contract entered into by Infinity Q may not purport to waive compliance with the Advisers Act or its rules.

- An advisory contract entered into by Infinity Q may not contain a hedge clause (*i.e.*, a provision that is likely to lead a client to believe that it has waived rights to bring legal claims against Infinity Q).

- An investment adviser is permitted to receive performance fees only to the extent allowed in Section 205 of the Advisers Act and related SEC rules.

- All advisory agreements shall be maintained in accordance with Rule 204-2 under the Advisers Act.  (See the Recordkeeping policies and procedures.)

In addition, investment advisory and/or sub-advisory agreements entered into with respect to the Funds must:

- precisely describe all compensation to be paid under the agreement;

IQCM-SEC-00087750

- continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company;

- provide, in substance, that it may be terminated at any time, without the payment of any penalty, by the board of directors of such registered company or by vote of a majority of the outstanding voting securities of such company on not more than sixty days' written notice to the investment adviser; and

- provide, in substance, for its automatic termination in the event of its assignment.

## RESPONSIBILITY

- The CIO and CCO shall be responsible for administering this Policy.

**EFFECTIVE AS OF:**  October 1, 2014

**LAST UPDATED:**

-16-

IQCM-SEC-00087750

## REGULATION D EXEMPTIONS AND FILINGS

## BACKGROUND

### Securities Act of 1933

The interests of the Private Funds advised by Infinity Q that are not registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), are being offered in reliance on the exemption from registration provided by Section 4(2) of the Securities Act and Regulation D promulgated thereunder. Each prospective investor (whether a U.S. citizen, resident or entity) of such fund generally will be required to represent, among other customary private placement representations, that it is an "accredited investor" as defined within Regulation D and that it is acquiring the fund interests for its own account for investment purposes only and not for resale or distribution. These ownership interests in these Private Funds may not be transferred or resold except (i) as permitted under the applicable Limited Partnership Agreement or Subscription Agreement; (ii) if registered under the Securities Act; or (iii) pursuant to an exemption from such registration.

*1933 Act requirements for exemption:*

The Private Funds advised by Infinity Q rely on Regulation D of the 1933 Act ("Reg D") for their exemption from registration.  Reg D, in conjunction with Rule 506, allows for the offering of unregistered securities that:

- • are limited private offerings of securities; or
- • limited partnership interests of hedge funds, which are permitted to be sold to an unlimited number of "accredited investors" and up to 35 non-"accredited investors,
- • provided that there is no general solicitation or advertising in connection with such offerings.

Under Rule 506 of the Securities Act of 1933, the issuer of an interest in a Private Fund is required to file Form D, Notice of Sale of Securities Pursuant to Regulation D, Section 4(6) and/or Uniform Limited Offering Exemption with the SEC.

### Investment Company Act of 1940

In order to ensure that the Funds may rely upon such exemption, the Funds will obtain appropriate representations and undertakings from its underlying investors, as incorporated into the applicable Subscription Agreement for each Fund.

*1940 Act requirements for exemption:*

Certain sections of the 1940 Act exclude certain Private Funds from the definition of an investment company for which registration is required.

a.  Section 3(c)(1) excludes an issuer from the definition of an investment company if:

(i)     The issuer's outstanding securities are beneficially owned by not more that 100 persons; and

-17-

(ii)     The issuer does not make or propose to make a public offering of its securities. Private Funds that rely on Section 3(c)(1) must also comply with Section 4(2) of the 1933 Act and frequently do so by relying on the safe harbor available under Reg D. by offering their securities only to "accredited investors."

b.   Section 3(c)(7) excludes an issuer from the definition of an investment company if:

(i)     The issuer's outstanding securities are owned exclusively by persons that at the time of acquisition are "qualified purchasers"; and

(ii)     The issuer does not make or propose to make a public offering of its securities.


**Filing and Amending a Form D Notice**

Form D is a form to be used to file a notice of an exempt offering of securities with the SEC. SEC rules require the notice to be filed by companies and funds that have sold securities without registration under the Securities Act of 1933 in an offering based on a claim of exemption under Rule 504, 505 or 506 of Regulation D or Section 4(5) of that statute.

Form D must be filed within 15 days after the first sale of securities in the offering. For this purpose, the date of first sale is the date on which the first investor is irrevocably contractually committed to invest. If the due date falls on a Saturday, Sunday or holiday, it is moved to the next business day. Funds must file their Form D notices and amendments with the SEC online, through the Internet, using the SEC's EDGAR (electronic gathering, analysis and retrieval) system.

A Form D filer must file an amendment to a previously filed Form D notice:

- to correct a material mistake of fact or error in the previously filed notice, as soon as practicable after discovery of the mistake or error;
- to reflect a change in the information provided in the previously filed notice, except as provided below, as soon as practicable after the change; and,
- annually, on or before the first anniversary of the most recent previously filed notice, if the offering is continuing at that time.

A filer is not required to file an amendment to a previously filed notice to reflect a change that occurs after the offering terminates or a change that occurs solely in the following information contained in a previous Form D notice or amendment:

- the address or relationship to the issuer of a related person identified;
- an issuer's revenues or aggregate net asset value;
- the minimum investment amount, if the change is an increase, or if the change, together with all other changes in that amount since the previously filed notice, does not result in a decrease of more than 10%;
- any address or state(s) of solicitation for a person receiving sales compensation;
- the total offering amount, if the change is a decrease, or if the change, together with all other changes in that amount since the previously filed notice, does not result in an increase of more than 10%;

-18-

- the amount of securities sold in the offering or the amount remaining to be sold;

- the number of non-accredited investors who have invested in the offering, as long as the change does not increase the number to more than 35;
- the total number of investors who have invested in the offering; and
- the amount of sales commissions, finders' fees or use of proceeds for payments to executive officers, directors or promoters, if the change is a decrease, or if the change, together with all other changes in that amount since the previously filed notice, does not result in an increase of more than 10%.

## POLICY

Infinity Q provides investment advisory services to Private Funds as well as a mutual fund.  The offerings of interests in the Private Funds are exempt from registration requirements under the Securities Act and the Investment Company Act of 1940.   Infinity Q, as the investment adviser to such funds, endeavors to perform its role in a manner consistent with the requirements to allow the Private Funds, and the underlying ownership interests in these funds, to remain exempt from registration.

This policy has been adopted in order to ensure that Infinity Q fulfills the regulatory requirements that allow the Private Funds to (1) remain exempt from registration under the 1940 Act, and (2) preserve the limited partnership or limited liability company interest transfer exemption from registration under the Securities Act of 1933.

## PROCEDURES

***Procedures allowing only eligible investors and control of investment offering statements and applications:***  Investors generally must meet the definition of "qualified purchasers" or "accredited investors" to be permitted to invest in the Private Funds.  A log is maintained that records information about prospective underlying investors in the Private Funds.   See also *Eligibility of Investors* Policy.

***Public offering prohibited.***  Infinity Q will not directly or indirectly seek to make a public offering of the Private Funds advised by Infinity Q.  Infinity Q has established policies and procedures relating to any distribution of advertising materials and website content.  See also *Advertising* Policy.

***Reports and filings pursuant to Reg D and state requirements ("Blue Sky") in order to maintain exemption.***  Outside counsel will file with the SEC a notice of an exempt offering of securities within 15 days after the first sale of securities in the offering and annually file Form D amendments on behalf of the Private Funds.  The CCO will verify annually that Form D has been properly filed with the SEC and, with the assistance of outside counsel as necessary, will verify and file state registration and notification requirements. See also *Form ADV and Certain Other Disclosures to Clients and Prospective Clients* Policy.

## RESPONSIBILITY

The Chief Compliance Officer, with the assistance of outside legal counsel, shall be responsible for administering this policy.

-19-

**EFFECTIVE**:  February 7, 2017

**UPDATED:**

IQCM-SEC-00087750

## ELIGIBILITY OF INVESTORS

**BACKGROUND**

Interests in the Private Funds fall within the definition of the term "securities" but are sold in a private offering exempt from SEC registration pursuant to Regulation D.  Interests will be offered in the U.S. under Section 4(2) of the U.S. Securities Act of 1933 (the "Securities Act") and Regulation D promulgated there under.  As a result, generally only the following persons may invest in the Private Funds advised or sub-advised by Infinity Q:  such eligible persons who meet the test for an "accredited investor" as defined in Rule 501 of Regulation D under the Securities Act.

**POLICY**

Infinity Q has adopted and implemented procedures designed to ensure that the interests in the Private Funds that it advises or sub-advises are offered only to eligible investors as defined in the offering documents.  Infinity Q will comply with the Regulation D requirements and is responsible for reviewing all prospective investor subscription documents to ensuring eligibility of all prospective investors. Infinity Q will review all prospective investor subscription documents and will monitor existing investor accounts to ensure ongoing eligibility as set forth in its procedures.

Depending on the Client, either an Infinity Q employee or the relevant fund administrator will be primarily responsible for establishing new investor accounts and performing the due diligence required under these procedures.  The Infinity Q CCO will be responsible to ensure that appropriate Infinity Q employees and the applicable fund administrators are adhering to the requirements of this policy.

**PROCEDURES**

New investor inquiries for the Infinity Q Private Funds are directed to Infinity Q's Investor Relations).  During the initial correspondence with a potential investor, Investor Relations will gather as much information about the potential investor as possible to verify that the prospect is an "accredited investor" before any offering materials are mailed to such potential investors.

Each eligible person to whom a Confidential Offering Memorandum is being distributed will also receive the following materials:

1.   Limited Partnership Agreement (where applicable);

2.   Subscription Agreement; and

3.   Form ADV Part II.

Infinity Q's Head of Business Development maintains a subscription log of potential investors for each Private Fund through a customer relationship management ("CRM") system. Distribution of materials is tracked in the CRM along with the name of the person or entity to whom the information was sent, the date sent, and the materials included in the distribution.  Upon receipt of the completed subscription agreement, the fund administrator completes a review to ensure that the documents are complete and the prospect is eligible to invest.

IQCM-SEC-00087750

**TESTING AND REPORTING**

The Infinity Q CCO will review all new investor files on a quarterly basis to verify that eligibility records have been properly prepared by the appropriate responsible parties and are being properly maintained. The results of this review will be documented and retained with Infinity Q's records.

**EFFECTIVE DATE:** February 7, 2017

UPDATED: November  2018

IQCM-SEC-00087750

## CASH PAYMENTS TO SOLICITORS

### BACKGROUND

Rule 206(4)-3 under the Investment Advisers Act establishes requirements governing cash payments to solicitors. This rule permits payment of cash referral fees to individuals and companies recommending prospective clients to a registered investment adviser.

Rule 206(4)-3 requires satisfaction of the following four conditions before a cash referral fee is paid:

- The advisor must be registered

- The solicitor is not subject to statutory disqualification

- There is a written agreement between the parties

- Disclosure is made to prospective clients.

### POLICY

Infinity Q will ensure that any relationship with an individual or entity to refer advisory clients to Infinity Q (whether or not Infinity Q is obligated to pay for such referrals) is in compliance with Rule 206(4)-3 of the Advisers Act, including the additional disclosure obligations relating to unaffiliated solicitors. All such arrangements are subject to the review and approval of the CCO.

### PROCEDURES

Infinity Q does not typically engage paid solicitors. If Infinity Q decides to engage a paid solicitor, Infinity Q will seek guidance from legal counsel prior to engaging the paid solicitor.

If Infinity Q seeks to establish any paid solicitor arrangements, the CCO will ensure that the Adviser enters into a written agreement with the solicitor, and will verify the solicitor is not subject to statutory disqualification and maintains appropriate registration and licensure. The CCO will confirm that the solicitor has procedures in place to provide a Disclosure Statement to prospective investors and to properly retain records of any solicitations. Infinity Q will establish such other procedures as necessary to properly oversee the solicitor.

.

**EFFECTIVE DATE**: February 7, 2017

**UPDATED: November, 2018**

IQCM-SEC-00087750

# ADVERTISING

<u>**POLICY**</u>

All communications of Infinity Q that fall within the definition of advertising (discussed below) shall be reviewed to ensure compliance with Rule 206(4)-1 under the Advisers Act and related SEC requirements. This Policy addresses Adviser advertising as well as any advertising relating to the Private Funds managed by Infinity Q.

This Policy is not intended to address advertisements prepared and distributed for the Infinity Q Diversified Alpha Fund.  Any such advertisements will be required to comply with the advertising and marketing guidelines of the registered Fund and with applicable law.  Should Infinity Q intend to develop advertising for the registered Funds, the CCO or designee will first review the materials for compliance with the advertising and marketing guidelines of the registered Fund and thereafter the materials will be forwarded to that Fund's Distributor for review and filing with the FINRA, if necessary.  No advertising materials related to the registered Fund shall be used until such materials have been reviewed and approved for first use by that Fund's Distributor.

Accordingly, the term "clients" or "Funds" as used in this Policy does not include the Infinity Q Diversified Alpha Fund, unless otherwise stated herein, and except to the extent the Firm provides information for purposes of Infinity Q Diversified Alpha Fund advertising.

<u>**REQUIREMENTS**</u>

**Definition of Advertising**

The definition of what constitutes advertising is <u>extremely</u> broad.  Rule 206(4)-1 under the Advisers Act defines "advertisement" to include "any notice, circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television," which offers:

- any analysis, report, or publication concerning securities, or which is to be used in making any determination as to when to buy or sell any security, or which security to buy or sell;

- any graph, chart, formula or other device to be used in making any determination as to when to buy or sell any security, or which security to buy or sell; or

- any other investment advisory service with regard to securities.

This definition has been interpreted to include materials designed to attract new clients or investors as well as materials designed simply to maintain existing client or investor relationships.  For purposes of this Policy, offering documents will be regarded as advertising.  Standardized materials delivered in individual presentations to prospective and existing investors are considered to be to more than one person, and thus advertisements, if they are repeated in substantially the same form in presentations to more than one prospective or existing investor.

-24-

IQCM-SEC-00087750

**General Rule: Advertisements Must Not Be Misleading**

Advertising by investment advisers is subject to the requirements of the Federal Securities Laws, as applied and interpreted by the SEC. The most basic, general principle underlying the rules governing advertising by investment advisers is that such advertisements **must not be misleading**. Section 206(4) of the Advisers Act makes it unlawful for investment advisers, directly or indirectly, "to engage in any act, practice or course of conduct which is fraudulent, deceptive or manipulative." Rule 206(4)-l under the Advisers Act prohibits advertisements that contain any untrue statement of a material fact or that are otherwise false or misleading. Whether an advertisement is false and/or misleading will depend generally upon the facts and circumstances surrounding its use, including:

- the form as well as the content of the advertisements;
- the implications or inferences arising out of the advertisement in its total context; and
- the sophistication of the client or prospective client.

The SEC has stated that whether an advertisement is misleading depends on whether, applying the above considerations:

> "the advertisement implies, or a reader would infer from it, something about the adviser's competence or about future investment results that would not be true had the advertisement included all material facts."

In general, advertisements must be *balanced* – it is misleading to promise results or imply that future results can be predicted based upon a past record. For example, the SEC generally takes the position that flat statements about a portfolio's objective must be balanced by a reminder that the portfolio may not achieve that objective.

It is important when creating or distributing investor relations material to consider whether each statement that is being made can be substantiated. Materials should not make any representations that cannot be backed up, overstate or make overreaching claims, or make claims that are too broad or too general.

**Specific Requirements**

Section 206(4) of the Advisers Act and Rule 206(4)-1 thereunder contain the basic antifraud provisions that govern advisers and certain specific provisions and restrictions on certain advertising practices. The following specific provisions under Rule 206(4)-1 are worth highlighting:

- An advertisement may not refer to any testimonial concerning the adviser or any advice, analysis, report or other service rendered by the adviser;

- An advertisement may not refer to any past specific recommendation of the adviser that was or would have been profitable, unless it contains detailed information regarding all of the recommendations made by the adviser within the preceding period of at least one year;

IQCM-SEC-00087750

- An advertisement may not represent that any graph, chart, formula or other device being offered can be used to determine which securities to buy or sell, or when to buy or sell them, or will assist any person in making his own decisions as to which securities to buy, sell or when to buy or sell, without prominently disclosing in the advertisement the limitations and difficulties with respect to the use of such graph, chart, formula or other device;

- An advertisement may not contain any statement to the effect that any report, analysis, or service will be furnished free or without charge, unless such report, analysis, or other service actually is or will be furnished entirely free and without any condition or obligation, directly or indirectly;

- An advertisement may not contain any untrue statement of a material fact or otherwise be false or misleading.

**Performance Presentations in Adviser Advertisements**

A.    General Legal Framework

Some general guidelines concerning presentation of performance records have developed through SEC staff no-action positions and interpretations, but these have not addressed specific methods of calculating and presenting performance data.

B.    Fees and Expenses

With certain limited exceptions, advertisements showing performance results must reflect actual advisory fees and brokerage commissions (custody fees excluded).  There is an exception, however, described below, that allows the use of performance information gross of fees (without also including performance net of fees as described above) to sophisticated clients in "one on one" presentations.  (Note: if, in a particular presentation, an adviser includes performance net of fees as described above, it is not precluded from also including performance gross of fees.)

- *Types of Clients*.  Clients who receive gross performance data without also receiving net performance data may include wealthy individuals and institutions, in a private, confidential setting, who have sufficient assets to justify the cost and effort of one-on-one presentations and the ability and opportunity to ask questions and possibly negotiate fees. Gross performance information may also be provided, without also providing net performance information, to consultants if they are instructed that it may only be used subject to the same conditions as the adviser's use.  All other clients must receive net numbers.

    - *Scope of Presentation*.  What constitutes a "one-on-one" presentation is open to some interpretation.  Generally, a private presentation to one client is considered to be "one on one."  (The adviser may also provide gross performance numbers to consultants, so long as they are instructed to use such

-26-

information according to the required conditions.)  The "one client" rule does not mean that the adviser can present to only one individual.  However, it is critical that, in a presentation using gross numbers to a group that constitutes a single client, the setting be private and confidential and there is ample opportunity for questions and discussion.  A presentation to a large seminar clearly would not qualify for the exception.

- *Required Disclosures To Be Used With Gross Performance*.  Any use of gross performance information that does not also include net performance information, in accordance with the aforementioned exception, must include the following disclosures:

  o  Results do not include advisory fees;
  o  A client's return would be reduced by fees and other expenses;
  o  Fees are described in Part 2A of the adviser's Form ADV; and
  o  An example showing the compounding effect of fees over a period of years.  This may take the form of a table, chart, graph, or narrative.

C.  <u>Required Disclosures for Adviser Performance Advertising Generally</u>

An adviser must include along with performance information adequate information on the following:

- Effect of material market or economic conditions on results;

- Effect of reinvestment of dividends and gains;

- Probability of loss if potential for profit is suggested;

- A description of any index used and of all relevant differences and similarities in cases of index comparisons;

- Material investment objectives and strategies; and

- If using actual performance, a prominent disclosure that results only represent certain investors, the basis for electing the limited group, and the effect of such selection.

D.  <u>Use of Performance Information – Infinity Q Diversified Alpha Fund</u>

Infinity Q must consult with the Fund's Distributor prior to using any registered Fund performance information and may not use registered Fund performance information other than in compliance with the requirements of the 1940 Act and the FINRA.

E.  <u>Recordkeeping Requirements</u>

-27-

IQCM-SEC-00087750

- *Copies of Advertisements*.  A copy of each advertisement sent to ten or more people must be retained by Infinity Q.  Infinity Q shall be responsible for maintaining the advertising materials relating to the Funds in accordance with the requirements of the 1940 Act and, for the registered Funds, also the requirement of FINRA.

- *Performance Information*. All written communications received and copies of written communications sent relating to the performance or rate of return of any or all managed accounts or securities recommendations sent to any person, along with records to demonstrate the calculation of the performance or rate of return, shall be retained for a period of five years (the first two years onsite (see Recordkeeping Policy for additional details).

- *Back-up for Performance Information*.  A copy of the account statements for all accounts included in advertisements and the worksheets used for all related performance calculations must be kept for the same time period and in the same manner as the advertisements themselves.

### PROCEDURES

- Any activities that may constitute "advertising" by Infinity Q must be submitted to the CCO and reviewed and approved by the CCO and/or his designee prior to being undertaken/presented.
- Any changes or edits to approved Advertising must be resubmitted, except where the CCO has approved a template and the only changes are updates to the bracketed information.

### RESPONSIBILITY

- Each employee is responsible for submitting Advertising to the CCO for review prior to use.
- The CCO shall be responsible for reviewing, approving or disapproving any Advertising and is responsible for oversight of this Policy.

**EFFECTIVE AS OF:**  October 1, 2014

**LAST UPDATED:**  September 2017

-28-

IQCM-SEC-00087750

# GIFTS

This Policy applies to employees of, and certain persons engaged as independent contractors (or other persons occupying a similar status or performing similar functions), Infinity Q.

No employee of Infinity Q, independent contractor (or other persons occupying a similar status or performing similar functions) covered by this Policy may accept or receive on his or her own behalf or on behalf of Infinity Q a gift or other accommodation of more than $500 from any investment bank, vendor, broker, securities salesman, investor, Fund or prospective client (any of the foregoing, a "Business Contact") without approval of the CCO.  The CCO may, from time to time, issue guidelines as to the type and value of items that would be considered subject to this restriction.  This prohibition shall apply equally to gifts to members of the Family/Household [1] of any employee or independent contractor (or other persons occupying a similar status or performing similar functions).

In addition, no employee of Infinity Q or independent contractor (or other persons occupying a similar status or performing similar functions) covered by this Policy may give on his or her own behalf or on behalf of Infinity Q (i) a gift or other accommodation to a Business Contact that may be construed as an improper attempt to influence the recipient or (ii) any contribution or gift to a political or charitable cause at the specific request of any governmental official or candidate or any existing or prospective investor without the approval of the CCO.

Employees and independent contractors (or other persons occupying a similar status or performing similar functions) should also note that the policies of a Business Contact's organization or laws applicable to such Business Contact may prohibit the Business Contact from giving or receiving certain gifts or entertainment.  This is especially likely to be the case where the Business Contact is a representative of a governmental organization, a fiduciary (e.g., for an ERISA plan) or a union official.  Care should be taken when providing or receiving gifts or business entertainment with respect to such persons, even where such gifts and entertainment are of nominal value.  Please consult with the CCO regarding these matters.

This Policy is not intended to prohibit normal business entertainment or the receipt or giving of a gift of nominal value (such as a book).

## **Procedures**

- Any employee who receives a gift or other accommodation valued in excess of $500 from a Business Contact must seek approval from the CCO to retain the gift or accommodation.

---

[1] Members of your Family/Household include:
- Your spouse or domestic partner (unless they do not live in the same household as you and you do not contribute in a material way to their support).
- Your children under the age of 18.
- Your children who are 18 or older (unless they do not live in the same household as you and you do not contribute in a material way to their support).
- Any of these people who live in your household: your stepchildren, grandchildren, parents, stepparents, grandparents, brothers, sisters, parents-in-law, sons-in-law, daughters-in-law, brothers-in-law and sisters-in-law, including adoptive relationships.

-29-

IQCM-SEC-00087750

- Requests for pre-clearance of Gifts should be made by submitting a request online via Compliance Science's *PTCC* ("PTCC").  PTCC is accessible 24 hours a day through the following secure link: https://secure.complysci.com/.  A Covered Person should promptly notify the CCO (i) after the Gift has been made and include the date and value, as applicable, of the Gift or (ii) if the Gift is not given.

- Any employee who wishes to give a gift, contribution or accommodation of other than nominal value to a Business Contact must seek prior approval from the CCO  using PTCC before doing so.

- The CCO shall be responsible for administering this policy.

**Records Retention**

The CCO shall maintain a Gift Log containing information regarding all gift requests that were approved and denied.

EFFECTIVE AS OF:  October 1, 2014

LAST UPDATED:  November 12, 2014

IQCM-SEC-00087750

# POLITICAL CONTRIBUTIONS

## BACKGROUND

Advisers Act Rule 206(4)-5 (the "Pay-to-Play Rule") prohibits investment advisers from making greater than de minimis political contributions to elected officials who are responsible for hiring, or can influence the hiring of, investment advisers to manage the assets of a state or municipal government entity (*e.g.,* pension plans, retirement plans and tuition plans).  The consequences for political contributions to an elected official (including candidates for office) in violation of the Pay-to-Play Rule are a two-year "time out" period during which the investment adviser will be prohibited from receiving compensation for providing advisory services to the government entity. Rule 206(4)-5 does permit individuals to make aggregate contributions without triggering the two-year time out of up to $350, per election, to an elected official or candidate for whom the individual is entitled to vote, and up to $150, per election, to an elected official or candidate for whom the individual is not entitled to vote. These de minimis exceptions are available only for contributions by individual covered associates, not the investment adviser itself. Under both exceptions, primary and general elections would be considered separate elections. In order to comply with the Pay-to-Play Rule, the Firm has adopted the below policies and procedures relating to political contributions.

Except where otherwise stated, this Policy shall apply to (i) the Firm, (ii) any general partner, managing member or executive officer, or individual with a similar status or function, of the Firm, (iii) any employee of the Firm and (iv) any political action committee controlled by the Firm or any of its employees (each, a "Covered Person").  The CCO is responsible for determining whether an independent contractor acting on behalf of the Firm should be treated as a Covered Person for these purposes.

This Policy also applies to a Covered Person's Family Members.  "Family Member" includes a Covered Person's spouse or domestic partner, as well as any minor children or other dependents residing in a Covered Person's home.

Any officer, director or employee of an affiliate of the Firm that supervises, directly or indirectly, any employee of the Firm or an affiliate who solicits a Government Entity for the Firm is also a Covered Person and therefore subject to the requirements of this Policy.

## POLICY AND PROCEDURES

### Prohibited Contributions and Solicitations

No employee or other personnel of the Firm may make a Contribution for the purpose of influencing the decision by any person or entity to invest in a Fund or to otherwise hire the Firm as an investment adviser or conduct business with the Firm or the Funds.

In addition, the Firm, all Covered Persons of the Firm and any Family Members, are prohibited from:

-31-

1.  Making any Contribution to an incumbent, candidate or successful candidate for elective office of a state or municipal Government Entity.  Additionally, no Contribution should be made to any candidate for federal office if at the time of the Contribution such candidate is a state or municipal official.

2.  Coordinating or soliciting any person or political action committee to make (including, but not limited to causing the Firm or a Fund to make) (A) any Contribution to an official of a Government Entity or candidate for office of a Government Entity (including any election committee for such official or candidate) or (B) any payment (including any gift, loan, advance or anything of value) to a political party of a state or locality.  Firm employees and other personnel should note that coordinating or soliciting Contributions can include actions that can be interpreted as supporting an official or political party, including, but not limited to the use of the Firm's name or Covered Person's name on fundraising literature for a candidate, or the Firm or a Covered Person sponsoring a meeting or conference which features an official or candidate as an attendee or guest speaker and which involves fundraising for the official or candidate.

For purposes of this Policy:

"Contribution" means any gift, subscription, loan, advance or deposit of money or anything of value made for:

(i)     the purpose of influencing any election for federal, state or local office;

(ii)    payment of debt incurred in connection with any such election; or

(iii)   transition or inaugural expenses of a successful candidate for state or local office.

"Government Entity" means any state or political subdivision of a state, including: (i) any agency, authority, or instrumentality of the state or political subdivision; (ii) a pool of assets sponsored or established by the state or political subdivision or any agency, authority, or instrumentality thereof, including, but not limited to a "defined benefit plan" as defined in section 414(j) of the Internal Revenue Code (the "Code"), or a state general fund; (iii) any participant-directed investment program or plan sponsored or established by a state or political subdivision or any agency, authority or instrumentality thereof, including, but not limited to a "qualified tuition plan" authorized by section 529 of the Code, a retirement plan authorized by section 403(b) or 457 of the Code, or any similar program or plan; and (iv) officers, agents, or employees of the state or political subdivision or any agency, authority or instrumentality thereof, acting in their official capacity.

**Exceptions**

Notwithstanding the general policies stated above, and subject to the disclosure and pre-clearance procedures set forth below, the CCO may permit de minimis contributions not to exceed $350, per election, to an elected official or candidate for whom the individual is entitled to vote, and up to

IQCM-SEC-00087750

$150, per election, to an elected official or candidate for whom the individual is not entitled to vote.

**Disclosure and Pre-clearance**

Any Contributions to an incumbent, candidate or successful candidate for elective office of a government entity must be disclosed to, and pre-cleared by, the CCO in writing in advance of any Contribution being made.  The CCO may prohibit any proposed Contribution that is deemed by the CCO to raise a risk of violating the Pay-to-Play Rule, this Policy, the policies of a Fund or for any other reason as may be reasonably determined by the CCO.

Requests for pre-clearance of Contributions should be made by submitting a request online via PTCC. A Covered Person should promptly notify the CCO (i) after the Contribution has been made and include the date and value, as applicable, of the Contribution or (ii) if the Contribution is not made.

**Quarterly Certification.** Additionally, on a quarterly basis, the CCO shall obtain a certification from all Covered Persons that they are aware of this Policy and in compliance, and such Covered Persons shall verify all Contributions made in the past quarter by such Covered Persons and their Family Members, including the dates on which such Contributions were made and whether any such Contribution was the subject of the exception for certain returned Contributions pursuant to Rule 206(4)-5(b)(3) under the Advisers Act (which provides a limited means to cure certain contributions made by a Covered Person by returning such contributions).   All quarterly certifications shall be made using PTCC.

**New Infinity Q Employees**

Any potential new hire must disclose in writing to the CCO all Contributions to any official of a Government Entity or candidate for office of a Government Entity (including any election committee) made by such individual or Family Member during the two years prior to joining Infinity Q.  When starting with Infinity Q, such persons must again disclose this same information in writing.

**New Government Entity Investors**

In advance of admitting a Government Entity as an investor in a Fund, the CCO shall review records of Contributions made within two years of the date of the investor's admission or acceptance to determine whether any Contributions have been made to any official of the Government Entity.  The CCO will work with the Fund's Transfer Agent to secure information regarding government entity investors in the Fund and will maintain such information as required by law.

**Confidentiality**

The Firm respects the rights of its personnel to lawfully contribute to the political process and will keep the information provided under this Policy confidential, subject to the rights of inspection of

IQCM-SEC-00087750

all regulatory and licensing bodies or as any disclosure may become necessary or advisable in the operation of the Firm, including disclosures at the request of representatives of investors and potential investors who are government clients, pension funds, or their fiduciaries if requested to do so.

## Compliance with Other Laws

It should not be assumed that pre-clearance or approval under this Policy is confirmation that an employee or other personnel are complying with any applicable campaign finance or other applicable laws and each such person is urged to consult such advisors or counsel as appropriate on such laws.  With respect to investors and potential investors that are state or local entities, additional or different state or local rules may apply.  Before admitting an investor that is a state or local entity, the Firm's CCO shall review applicable rules and regulations applicable to that investor and determine whether additional policies or procedures are advisable.

## Violations

If any Firm personnel become aware of a violation of this Policy, they must immediately notify the CCO.  In the event a Covered Person or Family Member makes a Contribution in violation of this Policy or the Pay-to-Play Rule, the Covered Person agrees to take all reasonable efforts to prevent the triggering of a two-year time out period, including actively seeking the return of the Contribution.

## Indirect Contributions

Firm personnel should be aware that the Pay-to-Play Rule prohibits the Firm and its Covered Persons from doing anything indirectly which, if done directly, would result in a violation of the Pay-to-Play Rule and this Policy.  Firm personnel should be mindful of these provisions and should be aware that soliciting a person, such as a family member or friend, to make a Contribution may also be a violation of the Pay-to-Play Rule and this Policy.  Similarly, Contributions made to an entity that will use the funds to support a candidate for office of a Government Entity could be a violation of this Policy and the Pay-to-Play Rule.  Further, use of firm resources (such as office space, telephones, etc.) in connection with volunteer activities could be a violation of this Policy and the Pay-to-Play Rule.  In addition, a Fund may not make a payment that, if made by the Firm, would violate this Policy or the Pay-to-Play Rule.  Firm personnel should consult the CCO if they have any questions about whether a contribution, payment or activity would be prohibited or restricted by this Policy or the Pay-to-Play Rule.

## Placement Agents or Solicitors for Government Entities

Any placement agents or solicitors that are paid (including by gift, loan, advance or anything of value) by the Firm on or after the date that is nine months after the compliance date of a final rule adopted by the SEC by which municipal advisor firms must register under the Exchange Act, either directly or indirectly, to solicit a Government Entity must be either (i) an investment adviser registered with the SEC that has not, and whose Covered Persons have not, within two years of such solicitation (A) made a Contribution to an official of that Government Entity, other than as

-34-

permitted by the Pay-to-Play Rule; or (B) coordinated or solicited any person or political action committee to make any Contribution or payment described in paragraphs (a)(2)(ii)(A) and (B) of the Pay-to-Play Rule; (ii) a broker or a dealer that is registered with the SEC and is a member of a national securities association registered under section 15A of the Exchange Act, provided that the rules of the association prohibit members from engaging in distribution or solicitation activities if certain political contributions have been made; and the SEC, by order, has found that such rules impose substantially equivalent or more stringent restrictions on broker-dealers than the Pay-to-Play Rule imposes on investment advisers and that such rules are consistent with the objectives of the Pay-to-Play Rule; (iii) a municipal advisor registered with the SEC and subject to rules o f the Municipal Securities Rulemaking Board, provided, that such rules prohibit municipal advisors from engaging in distribution or solicitation activities if certain political contributions have been made; and the SEC, by order, has found that such rules impose substantially equivalent or more stringent restrictions on municipal advisors than the Pay-to-Play Rule imposes on investment advisers and that such rules are consistent with the objectives of the Pay-to-Play Rule; or (iv) an executive officer, general partner, managing member (or, in each case, a person with a similar status or function), or employee of the Firm.  The CCO is responsible for ensuring that payments to placement agents or solicitors are consistent with these requirements.

## Records Retention

The CCO will keep all required records under the Advisers Act Rule 204-2 based on the information gathered pursuant to this Policy.

## RESPONSIBILITY

The CCO shall be responsible for administering this Policy.

**EFFECTIVE AS OF:**  October 1, 2014

**LAST UPDATED:**  September 13, 2016

IQCM-SEC-00087750

# RECORDKEEPING

## POLICY

It is the policy of Infinity Q to make and keep true, accurate and current certain books and records relating to its investment advisory business as required by Rule 204-2 under the Advisers Act. The procedures set out below relate to compliance with the recordkeeping requirements of the Advisers Act.[1] Because such recordkeeping requirements are subject to change, the procedures may be amended accordingly.

## PROCEDURES

### Books and Records to be Maintained

- Infinity Q shall make and keep true, accurate and current the following books and records[2] relating to its investment advisory business:

  o    A journal or journals, including cash receipts and disbursements records, and any other records of original entry forming the basis of entries in any ledger.

  o    General and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts.

  o    A memorandum of each order given by Infinity Q for the purchase or sale of any security, of any instruction received by Infinity Q concerning the purchase, sale, receipt or delivery of a particular security, and of any modification or cancellation of any such order or instruction. Such memoranda shall, to the extent applicable for a particular transaction:

    ▪    show the terms and conditions of the order (buy or sell);
    ▪    show any instruction, modification or cancellation;
    ▪    identify the person connected with Infinity Q who recommended the transaction to the Fund;
    ▪    identify the person who placed the order;
    ▪    show the account for which the transaction was entered;
    ▪    show the date of entry;
    ▪    identify the bank, broker or dealer by or through whom such order was executed; and

---

[1] Rule 31a-1 under the 1940 Act requires that each investment adviser to a registered investment company, such as the Funds, maintain the records required by Rule 204-2 under the Advisers Act to the extent such records are necessary or appropriate to record the adviser's transactions for the fund. Rule 31a-2 under the 1940 Act, the rule specifying how long investment company records should be maintained, effectively requires that each investment adviser to a fund maintain the required records relating to the adviser's transactions for the fund for at least six years. The Firm will coordinate with the Funds to ensure that the activities of the Firm are maintained in accordance with applicable law.

[2] For purposes of this Policy, when electronic communications constitute any books or records referred to in this Policy, they should be retained in the manner and for the period prescribed by the applicable provisions of this Policy.

IQCM-SEC-00087750

- ▪ identify orders entered into pursuant to the exercise of discretionary authority.

- o All of its check books, bank statements, canceled checks and cash reconciliations.

- o All bills or statements (or copies thereof), paid or unpaid.

- o All trial balances, financial statements, and internal audit working papers.

- o Originals of all written communications received by Infinity Q, and copies of all written communications sent by Infinity Q, relating to:

  - ▪ any recommendation made or proposed to be made and any advice given or proposed to be given;
  - ▪ any receipt, disbursement or delivery of funds or securities; or
  - ▪ the placing or execution of any order to purchase or sell any security;

  *provided, however*, (i) that Infinity Q shall not be required to keep any unsolicited market letters and other similar communications of general public distribution not prepared by or for Infinity Q, and (ii) that if Infinity Q sends any notice, circular or other advertisement offering any report, analysis, publication or other investment advisory service to more than 10 persons, Infinity Q shall not be required to keep a record of the names and addresses of the persons to whom it was sent; except that if such notice, circular or advertisement is distributed to persons named on any list, Infinity Q shall retain with the copy of such notice, circular or advertisement a memorandum describing the list and the source thereof.

- o A list or other record of all accounts in which Infinity Q is vested with any discretionary power with respect to the funds, securities or transactions of any client.

- o All powers of attorney and other evidences of the granting of any discretionary authority by any client to Infinity Q, or copies thereof.

- o All written agreements (or copies thereof) entered into by Infinity Q with any client or otherwise relating to the business of Infinity Q.

- o A copy of each notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication that Infinity Q circulates or distributes, directly or indirectly, to 10 or more persons (other than persons connected with Infinity Q), and if such notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication recommends the purchase or sale of a specific security and does not state the reasons for such recommendation, a memorandum indicating the reasons therefor.  Information of this nature regarding Infinity Q Diversified Alpha Fund shall also be maintained in accordance with this policy.

-37-

- *Code of Ethics:*

  - A copy of Infinity Q's code of ethics adopted and implemented pursuant to Rule 204A-1 under the Advisers Act that is in effect, or at any time within the past five years was in effect;
  - A record of any violation of the code of ethics, and of any action taken as a result of the violation; and
  - A record of all written acknowledgments as required by Rule 204A-1(a)(5) under the Advisers Act for each person who is currently, or within the past five years was, a supervised person of Infinity Q.

- *Compliance Manual:*

  - A copy of Infinity Q's compliance policies and procedures manual adopted and implemented pursuant to Rule 206-4(7) under the Advisers Act that is in effect, or at any time within the past six years was in effect, including marked versions of each such document.

- *Access Persons:*

  - A record of each report made by an access person as required by Rule 204A-1(b) under the Advisers Act, including any information provided under paragraph (b)(3)(iii) of that rule in lieu of such reports;
  - A record of the names of persons who are currently, or within the past five years were, access persons of Infinity Q; and
  - A record of any decision, and the reasons supporting the decision, to approve the acquisition of securities by access persons under Rule 204A-1(c) under the Advisers Act, for at least five years after the end of the fiscal year in which the approval is granted.

- *Disclosure Brochures/Form ADV Part 2*:

  - A copy of each brochure and brochure supplement, and each amendment or revision to the brochure and brochure supplement, that satisfies the requirements of Part 2 of Form ADV; any summary of material changes that satisfies the requirements of Part 2 of Form ADV but is not contained in the brochure; and a record of the dates that each brochure and brochure supplement, each amendment or revision thereto, and each summary of material changes not contained in a brochure was given to any client or to any prospective client who subsequently becomes a client;
  - Documentation describing the method used to compute managed assets for purposes of Item 4.E of Part 2A of Form ADV, if the method differs from the method used to compute assets under management in Item 5.F of Part 1A of Form ADV; and
  - A memorandum describing any legal or disciplinary event listed in Item 9 of Part 2A or Item 3 of Part 2B (Disciplinary Information) and presumed to

-38-

IQCM-SEC-00087750

be material, if the event involved Infinity Q or any of its supervised persons and is not disclosed in the brochure or brochure supplement described in the first paragraph above under "Disclosure Brochures/Form ADV Part 2." The memorandum must explain Infinity Q's determination that the presumption of materiality is overcome, and must discuss the factors described in Item 9 of Part 2A of Form ADV or Item 3 of Part 2B of Form ADV.

o   All accounts, books, internal working papers, and any other records or documents that are necessary to form the basis for or demonstrate the calculation of the performance or rate of return of any or all managed accounts or securities recommendations in any notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication that Infinity Q circulates or distributes, directly or indirectly, to any person (other than persons connected with Infinity Q).

o   Originals of all written communications received and copies of written communications sent by Infinity Q relating to the performance or rate of return of any or all managed accounts or securities recommendations.

o   A copy of Infinity Q's policies and procedures formulated pursuant to Rule 206(4)-7(a) under the Advisers Act that are in effect, or at any time in the past five years were in effect, and any records documenting Infinity Q's annual reviews of those policies and procedures conducted pursuant to Rule 206(4)-7(b) under the Advisers Act.

o   *Political Contributions*[3]

   ▪   Books and records that pertain to Rule 206(4)–5 containing a list or other record of the names, titles and business and residence addresses of Covered Persons of Infinity Q;
   ▪   All Government Entities that are or were investors in any covered investment pool to which Infinity Q provides or has provided investment advisory services, which includes the Funds (collectively, the "<u>Covered Investment Pools</u>"), as applicable, in the past five years, but not prior to September 13, 2010;
   ▪   If a Government Entity is an investor in any Covered Investment Pool, all direct or indirect Contributions made by Infinity Q or any of its Covered Persons to an official of any Government Entity, or direct or indirect payments to a political party of a state or political subdivision thereof, or to a political action committee; and
   ▪   The name and business address of each regulated person to whom Infinity Q provides or agrees to provide, directly or indirectly, payment to solicit a Government Entity for investment advisory services on its behalf, in accordance with Rule 206(4)–5(a)(2) under the Advisers Act.

---

[3] See the Firm's "Political Contributions Policy" for definitions of various terms in this section.

-39-

- ▪ Records relating to the Contributions referred to above must be listed in chronological order and indicate:

  - The name and title of each contributor;
  - The name and title (including any city/county/State or other political subdivision) of each recipient of a Contribution or payment;
  - The amount and date of each Contribution or payment; and
  - Whether any such Contribution was the subject of the exception for certain returned Contributions pursuant to Rule 206(4)–5(b)(2) under the Advisers Act.

- o If Infinity Q has custody or possession of securities or funds of any client securities or funds:

  - ▪ A journal or other record showing all purchases, sales, receipts and deliveries of securities (including certificate numbers) for client accounts with respect to which Infinity Q has custody and all other debits and credits to such accounts;
  - ▪ A separate ledger account for each such client showing all purchases, sales, receipts and deliveries of securities, the date and price of each purchase and sale, and all debits and credits;
  - ▪ Copies of confirmations of all transactions effected by or for the account of any such client;
  - ▪ A record for each security in which any such client has a position, which record shall show the name of each such client having any interest in such security, the amount or interest of each such client, and the location of each such security.

- With respect to any client to which Infinity Q provides investment supervisory or management services and to the extent that the information is reasonably available to or obtainable by Infinity Q, Infinity Q must make and keep true, accurate and current:

  - o Records showing separately for each such client the securities purchased and sold, and the date, amount and price of each such purchase and sale.

  - o For each security in which any such client has a current position, information from which Infinity Q can promptly furnish the name of each such client, and the current amount or interest of such client.

- When Infinity Q exercises voting authority with respect to client securities, Infinity Q shall, with respect to those clients, make and retain the following:

  - o Copies of all policies and procedures required by Rule 206(4)-6 under the Advisers Act (Proxy Voting).[4]

---

[4] See the Proxy Voting policy for additional information about this requirement.

-40-

o A copy of each proxy statement that Infinity Q receives regarding client securities. Infinity Q may satisfy this requirement by relying on a third party to make and retain, on Infinity Q's behalf, a copy of a proxy statement (provided that Infinity Q has obtained an undertaking from the third party to provide a copy of the proxy statement promptly upon request).

o A record of each vote cast by Infinity Q on behalf of a client.  Infinity Q may satisfy this requirement by relying on a third party to make and retain, on Infinity Q's behalf, a record of the vote cast (provided that Infinity Q has obtained an undertaking from the third party to provide a copy of the record promptly upon request).

o A copy of any document created by Infinity Q that was material to making a decision how to vote proxies on behalf of a client or that memorializes the basis for that decision.

o A copy of each written client request for information on how Infinity Q voted proxies on behalf of the client, and a copy of any written response by Infinity Q to any (written or oral) client request for information on how Infinity Q voted proxies on behalf of the requesting client.

• Partnership articles and any amendments thereto, articles of incorporation, charters, minute books, and stock certificate books of Infinity Q and of any predecessor, shall be maintained in the principal office of Infinity Q and preserved until at least three years after the termination of Infinity Q.

### Retention of Records

• Infinity Q shall maintain books and records as follows:

o *Retention Period*.  All books and records required under these procedures must be maintained and preserved in an easily accessible place for a period of not less than 5 years from the end of the applicable fiscal year, the first 2 years in an appropriate office of Infinity Q.  If Infinity Q has essentially immediate access to a book or record (on the Infinity Q's proprietary system or otherwise) through a computer located at an appropriate office of Infinity Q, then that book or record will be considered to be maintained at an appropriate office of Infinity Q.  "Immediate access" to books and records includes that Infinity Q has the ability to provide promptly to the SEC examination staff hard copies of the books and records or access to the storage medium.  The party responsible for the applicable books and records as described above shall also be responsible for ensuring that those books and records for the first two years are either physically maintained in an appropriate office of Infinity Q or that Infinity Q otherwise has essentially immediate access to the required books and records for the first two years.

-41-

    o    *Regarding Performance Advertising Records*.  These records must be maintained and preserved in an easily accessible place for a period of not less than 5 years, the first 2 years in an appropriate office of Infinity Q, from the end of the fiscal year during which Infinity Q last published or otherwise disseminated, directly or indirectly, the notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication.

    o    *Cessation or Discontinuation of Advisory Business*.  Before ceasing to conduct or discontinuing business as an investment adviser, Infinity Q shall arrange for the preservation of the books and records that it is required to maintain and preserve for the remainder of the period specified herein, and shall notify the SEC in writing, at its principal office, Washington D.C. 20549, of the exact address where such books and records will be maintained during such period.

**Electronic Storage**

Infinity Q may use micrographic media (including microfilm, microfiche, or any similar medium) or electronic storage media (including any digital storage medium or system) to store records required to be maintained and preserved under these procedures, so long as the following conditions are met:

- Infinity Q arranges and indexes the records in a way that permits easy location, access, and retrieval of any particular record;

- Infinity Q provides promptly any of the following that the SEC (by its examiners or other representatives) may request:

    o    a legible, true, and complete copy of the record in the medium and format in which it is stored;
    o    a legible, true, and complete printout of the record; and
    o    a means to access, view, and print the records;

- Infinity Q separately stores, for the time required for preservation of the original record, a duplicate copy of the record on any medium allowed by these procedures.

- In the case of records maintained on electronic storage media, Infinity Q must establish and maintain procedures:

    o    to maintain and preserve the records, so as to reasonably safeguard them from loss, alteration, or destruction;
    o    to limit access to the records to properly authorized personnel and the SEC (including its examiners and other representatives); and
    o    to reasonably ensure that any reproduction of a non-electronic original record on electronic storage media is complete, true, and legible when retrieved.

IQCM-SEC-00087750

Third-party vendors may be permitted to maintain and preserve electronic records on behalf of Infinity Q, provided that certain conditions are met and provided that Infinity Q retains responsibility for the records. Those conditions include that the records be maintained at an appropriate office of Infinity Q (such records may be maintained at an appropriate office of Infinity Q electronically, as described in the "Retention of Records" section above) for the first two years after the record was created and that appropriate safeguards be in place at the third-party vendor to protect the records from loss or destruction and to ensure that they would be accessible to the SEC staff. Those safeguards generally include that (i) if Infinity Q ceases to engage the third-party vendor, the third-party vendor will provide Infinity Q within a limited period of time a hard copy of any record that the SEC staff may request in connection with an examination, inspection, or investigation of Infinity Q or such third party vendor returns all records to Infinity Q at the time the engagement ceases, (ii) in the event the third-party vendor ceases operations or ceases to offer the particular record-keeping service, the third-party vendor agrees to make reasonable arrangements to ensure the availability of the reports for the remainder of the requisite period or such third party vendor returns all records to Infinity Q at the time the third party vendor ceases operations, and (iii) the third-party vendor's internal systems for making and keeping records on behalf of Infinity Q meet all of the requirements of Rule 204-2(g) under the Advisers Act. The person responsible for the arrangement with the third-party vendor will take such steps as that person considers appropriate to ensure that the above requirements are satisfied.

### REQUIREMENT

Section 204 of the Advisers Act requires an investment adviser to keep for prescribed periods such records, furnish such copies thereof and make and disseminate such reports as the SEC by rule may prescribe. All such records are subject at any time to reasonable periodic, special or other examinations by representatives of the SEC as the SEC deems necessary or appropriate in the public interest or for the protection of investors.

Rule 204-2 under the Advisers Act sets out the books and records to be maintained by an investment adviser and the required retention periods.

### RESPONSIBILITY

The CFO shall be responsible for administering this Policy

**EFFECTIVE AS OF:** October 1, 2014

**LAST UPDATED:** September 2017

-43-

IQCM-SEC-00087750

# PROXY VOTING

## PURPOSE AND GENERAL STATEMENT

The purpose of these proxy voting policies and procedures is to set forth the principles and procedures by which Infinity Q votes or gives consents with respect to securities held on behalf of the Funds (each, a "Proxy" and collectively, the "Proxies").  These policies and procedures have been designed to help ensure that Proxies are voted in the best interests of the Funds in accordance with Infinity Q's fiduciary duties and Rule 206(4)-6 under the Advisers Act.  Infinity Q's authority to vote the Proxies is established by investment management agreements or comparable documents with its Funds.

These proxy voting policies and procedures are available to the Funds upon request, subject to the provision that these policies and procedures are subject to change at any time without notice.

## POLICY

When voting Proxies, Infinity Q votes in a manner that it believes is consistent with the best interests of the Funds.  Infinity Q does not permit Proxy voting decisions to be influenced in any manner that is contrary to, or dilutive of, this guiding principle.

It is the general policy of Infinity Q to vote or give consent on all matters presented to security holders in any Proxy, and these policies and procedures have been designed with that in mind. However, Infinity Q reserves the right to abstain on any particular vote or otherwise withhold its vote or consent on any matter if, in the judgment of the CIO, the costs associated with voting such Proxy outweigh the benefits to the Funds or if the circumstances make such an abstention or withholding otherwise advisable and in the best interests of the Funds. In particular, Infinity Q typically does not submit proxy votes for positions that are smaller than 0.25% of portfolio NAV.

## PROCEDURES

### Conflicts of Interest

The CIO has the responsibility to monitor Proxy decisions for any conflicts of interest, regardless of whether they are actual or perceived.  All Proxy decisions will require a mandatory conflicts of interest review by the CIO in accordance with these policies and procedures, which will include consideration of whether Infinity Q, any investment professional or other person recommending how to vote or Infinity Q's affiliates and their clients have an interest in how the Proxy is voted that may present a conflict of interest.  Upon completion of such review, the CIO shall provide the CCO with information regarding any actual or perceived conflicts.  All Infinity Q employees are expected to perform their tasks relating to the voting of Proxies in accordance with the principles set forth above, according the first priority to the best interest of the Funds.  If at any time any Infinity Q employee becomes aware of any potential or actual conflict of interest or perceived conflict of interest regarding any particular Proxy voting decision, he or she should contact the CIO.  The CIO will use his or her best judgment to address and resolve any such conflict of interest in a manner it believes is consistent with the best interests of the Funds and will consult with the

-44-

CCO regarding the manner in which such potential, actual or perceived conflict of interest shall be resolved.

When the CIO deems appropriate in his or her sole discretion, unaffiliated third parties may be used to help resolve conflicts.  In this regard, the CIO shall have the power to retain independent fiduciaries, consultants or professionals to assist with Proxy voting decisions and/or to delegate voting or consent powers to such fiduciaries, consultants, or professionals.

The CCO shall periodically review the firm's proxy voting records to ensure compliance with these procedures.

**Proxy Voting**

All Infinity Q personnel are responsible for promptly forwarding all proxy materials, consent or voting requests or notices or materials related thereto to the CIO.  The CIO shall be responsible for ensuring that each Proxy is voted in a timely manner and as otherwise required by the terms of such Proxy.

Infinity Q votes all Proxies in a manner that it believes is consistent with the best interests of the Funds, and ultimately all votes are cast on a case-by-case basis, taking into consideration the contractual obligations under the relevant advisory agreements or comparable documents, and all other relevant facts and circumstances at the time of the vote.

All Proxy voting decisions initially are referred to the CIO for a voting decision.  In most cases, the CIO will make the decision as to the appropriate vote for any particular Proxy. If the position is smaller than 0.25% of portfolio NAV, Infinity Q typically will abstain from voting.  In making such decision, he or she may rely on any of the information and/or research available to him or her.

**Proxy Voting Record Disclosure (Form N-PX)**

Rule 30b1-4 under the 1940 Act requires a registered investment company to file an annual report on Form N-PX no later than August 31 of each year that contains the registered investment company's proxy voting record for the most recent twelve-month period ended June 30.

The Fund's Administrator is responsible for preparing and filing the Infinity Q Diversified Alpha Fund's voting record annually on Form N-PX.  Infinity Q provides information related to the Fund's proxy voting record to the Fund's Administrator for preparation of Form N-PX and reviews the draft Form N-PX prior to filing.  The CCO provides final sign off to the Fund's Administrator on Form N-PX.

**Recordkeeping**

Infinity Q maintains records of all Proxies voted in accordance with Section 204-2 of the Advisers Act.  As required and permitted by Rule 204-2(c) under the Advisers Act, the following records are maintained by the CFO:

-45-

IQCM-SEC-00087750

- a copy of these policies and procedures;

- proxy statements or consent requests received regarding Fund securities, unless such proxy statements or consent requests are available on the SEC's EDGAR database, in which case Infinity Q relies on such electronic copies on EDGAR;

- a record of each vote cast or consent given;

- a copy of any document created by Infinity Q that was material to making a decision on how to vote Proxies; and

- each written client request for proxy voting records and Infinity Q's written response to any (written or oral) request for such records.

## RESPONSIBILITY

The CIO shall be responsible for administering these procedures and the CCO shall be responsible for ensuring compliance with these procedures

EFFECTIVE AS OF:  October 1, 2014

LAST UPDATED:  November 2, 2018

-46-

## CUSTODY AND SAFEGUARDING OF CLIENT ASSETS

.

### BACKGROUND

Registered investment advisers that have custody of funds or securities of a fund to which it acts as investment adviser or sub-adviser are subject to Rule 206(4)-2 under the Advisers Act (the "Custody Rule"), which is designed to protect fund assets from being lost, misused, misappropriated or subject to Infinity Q's financial reverses.  Under the Custody Rule, Infinity Q may be deemed to have custody of funds or securities of a client in the following four situations:

- *actual possession of client funds or securities* with the exception of checks drawn by clients  and payable to third parties or in cases where Infinity Q inadvertently receives a client's funds or securities and promptly returns them to the sender within 3 days;

- *arrangements authorizing Infinity Q to withdraw funds or securities of a client* maintained with a custodian upon Infinity Q's instructions (movement of funds and securities for authorized trading shall not constitute a withdrawal for this purpose)[1];

- *legal capacities providing Infinity Q or its supervised persons with ownership of or access to funds or securities of a client* (*e.g.*, serving as general partner of a limited partnership or managing member of a limited liability company, any comparable position for another type of pooled investment vehicle, or general power of attorney held by Infinity Q or one of its employees); and

- *A "related person"[2] of Infinity Q holding, directly or indirectly, Fund funds or securities, or having any authority to obtain possession of them*, in connection with advisory services the Firm provides to Funds.

### CUSTODY POLICY

Infinity Q presently is deemed to have custody of Fund assets because Infinity Q  acts as general partner of one or more Funds with the authority to dispose of funds and securities in the Funds' accounts. It is the policy of Infinity Q to comply with Rule 206(4)-2.

### PROCEDURES

1. **Use of Qualified Custodians**

---

[1] For example, if the Firm were authorized to deduct advisory fees or other expenses directly from a Fund's account, the Firm would be deemed to have custody of that Fund's funds and securities.

[2] A "related person" means any person, directly or indirectly, controlling or controlled by the Firm, and any person that is under common control with the Firm.

IQCM-SEC-00087750

Infinity Q is required to maintain the funds and securities over which it has custody with a "qualified custodian":  (i) in a separate account for each client (*i.e.*, for each Fund) under the client's name; or (ii) in accounts that contain only the funds and securities of the clients, under Infinity Q's name as agent or trustee for the clients.  Qualified custodians include banks, broker-dealers, futures commission merchants and certain foreign financial institutions.

### 2.    Reporting Requirements

Account statements (whether delivered by the custodian or by Infinity Q) must be sent directly to the investors in a pooled investment vehicle if the adviser to the pool also acts as its general partner, managing member or in a similar capacity (or, in some cases, if an affiliate of the adviser acts as general partner, managing member or in a similar capacity) and the adviser hence has custody of client funds or securities.  These account statements may be sent to the investors' independent representative.

Exception from Reporting Requirements for Pooled Investment Vehicles

As noted above, Rule 206(4)-2 imposes on advisers with custody of client funds or securities certain requirements concerning reports to such clients.  However, Infinity Q need not comply with the reporting requirements with respect to pooled investment vehicles (such as the Funds) if the pooled investment vehicle is audited at least annually and distributes its audited financial statements prepared in accordance with generally accepted accounting principles to all limited partners, members or other beneficial owners within 120 days of its fiscal year end.

Infinity Q intends to distribute the audited financials of each Fund to Fund investors within the 120-day time period and therefore will be exempt from the Rule 206(4)-2 reporting requirements.

### 3.    Avoiding Possession of Advisory Client Assets

Infinity Q has implemented certain procedures to ensure that it does not obtain possession of client assets that should be maintained with a qualified custodian.  While it is expected that the implementation of these procedures will insulate Infinity Q from any claim that it has possession of client funds or securities, employees have the following responsibilities:

- if an employee becomes aware that a client or investor is contemplating delivering securities to Infinity Q, to instruct such client or investor to deliver such securities to the client's custodian and not to Infinity Q;

- if an employee becomes aware that a client or investor has delivered funds or securities to Infinity Q, to notify the Chief Compliance Officer or his designee promptly;

- if an employee becomes aware that a broker-dealer, bank or other financial institution is contemplating wiring (or otherwise sending) funds to Infinity Q or delivering securities to Infinity Q for a client's account, to instruct such person to wire (or send) such funds or deliver such securities to such client's custodian and not to Infinity Q (this does not apply, however, to payment of Infinity Q's fees by a client's custodian); and

-48-

- if an employee becomes aware that a broker-dealer, bank or other financial institution has wired (or otherwise sent) funds to Infinity Q or delivered securities to Infinity Q for the account of a client, to notify the Chief Compliance Officer, or his designee, promptly.

Infinity Q will not directly maintain custody of any non-Fund client assets and will limit its powers of attorneys accordingly. All client assets will be held in accounts held by banks, brokers, futures commission merchants or other custodians (herein, "Custodian") in the name of the relevant client, and Infinity Q may only execute transactions to settle in such accounts, transfer assets away from such accounts or return assets to clients.

### 4. Custody of Private Stock Certificates

The SEC's Division of Investment Management has provided guidance for SEC registered investment advisers to private investment funds on the conditions where investment advisers are able to maintain custody of private stock certificates and not with a qualified custodian. Infinity Q typically does not receive private stock certificates. In the event that Infinity Q does receive private stock certificates, Infinity Q may not maintain custody of private stock certificates unless certain conditions apply. In the event of the receipt of any private stock certificates, the Chief Compliance Officer must be notified promptly.

### 5. Inadvertent Receipt of Advisory Client Assets

Subject to certain conditions as stated above, Infinity Q cannot accept cash, checks or any other Advisory Client Assets or private stock certificates from the sender. Any Advisory Client Assets that are inadvertently received by Infinity Q must be returned to the sender as soon as practicable, but no more than three (3) business days after receipt, by registered overnight mail to the sender, with instructions to the sender to forward such Advisory Client Assets directly to the Custodian. Such Advisory Client Assets <u>cannot</u> be sent by Infinity Q to the Custodian.

To the extent that Advisory Client Assets cannot be immediately returned, during the intervening period (a maximum of three (3) business days) between the receipt by Infinity Q of the Advisory Client Assets and its prompt return to its sender, such Advisory Client Assets will be transferred immediately upon receipt, in person, to the Chief Compliance Officer to be placed in safekeeping.

### 6. Safeguarding Controls and Procedures

Infinity Q has adopted safeguarding controls and procedures related to Custody, including the following:

- Infinity Q is required to allocate expenses to a Fund in accordance with the guidelines as disclosed in the Limited Partnership Agreement for each Fund. The Management Company (i.e., Infinity Q) generally pays the expenses on behalf of the Funds that are reimbursed to the Management Company by the Funds. On a daily basis, the Fund Administrator performs bank reconciliations for each Fund to ensure that all cash transactions of expenses to the Fund are appropriate. Infinity Q's CRO is responsible for oversight of all settlements and expenses of the Funds. For business continuity purposes, the CIO backs up the CRO in this responsibility.

-49-

IQCM-SEC-00087750

- Only Infinity Q's Management has access to the Fund Custodian's wire transfer platform.  Wire transfers for the Funds may be authorized only by Infinity Q's CRO or CIO.

- As a final check on expense allocations to a Fund, an annual audit is conducted by a third party accounting firm. The Chief Compliance Officer may also test a sample of Fund expenses and wire transfers on an annual basis.

## RESPONSIBILITY

The CRO and Infinity Q's service providers shall be responsible for administering this Policy.

**EFFECTIVE AS OF:**  October 1, 2014

**LAST UPDATED:**  February 7, 2017

-50-

IQCM-SEC-00087750

## PUBLICLY TRADED SECURITIES AND SOFT DOLLARS

<u>POLICY</u>

To meet its fiduciary duties to the Funds, Infinity Q has adopted the following policies to address issues that might arise with respect to purchasing, holding, and selling publicly traded securities.

<u>PROCEDURE</u>

**Order Placement**

<u>Best Execution</u>.  It is the obligation of Infinity Q, in placing each transaction for a Fund involving a broker-dealer, to seek "best execution" of the transaction.  "<u>Best execution</u>" means obtaining the lowest total cost (in purchasing a security) or highest total proceeds (in selling a security), subject to the circumstances of the transaction and the quality and reliability of the executing broker or dealer.

<u>Selection of Brokers or Dealers</u>.  In selecting brokers or dealers, Infinity Q may consider various factors, which may include, but are not limited to:

- the overall reputation, experience and financial stability of the broker-dealer;

- the ability to provide competitive pricing;

- the size and timing of the transaction;

- the nature of the market for the security and the difficulty of execution;

- the broker-dealer's trading expertise;

- the belief that the broker-dealer charges a fair and reasonable fee for each trade, and that Infinity Q has been treated fairly and honestly in prior trades; and

- the quality of execution, quality of the broker-dealer relationship, quality of service rendered by the broker-dealer in prior transactions, and quality of any proprietary research and investment ideas.

In order to monitor best execution, the portfolio manager(s) of a Fund, in consultation with Infinity Q's CCO, will periodically monitor broker-dealers to assess the quality of execution of brokerage transactions effected on behalf of Infinity Q and each Fund. Infinity Q's Brokerage Committee will meet periodically, but no less than semi-annually, to review the firm's approved broker list, assess the quality of the execution of brokerage transactions, and review other trading matters as set forth in the Brokerage Committee charter.

Records of all reviews of best execution must be maintained for a period of five years from the end of the fiscal year in which such records were generated.  They must be maintained for the first

-51-

two years at an appropriate office of Infinity Q and thereafter they may be maintained in an easily accessible place.

**Soft Dollars**

Many securities firms offer to provide investment managers (such as Infinity Q) with a variety of services and benefits that go beyond execution, clearance and settlement of transactions. These services and benefits include such things as (1) the securities firms' proprietary research reports and analytical products, (2) information and advice about market conditions and individual securities, investment opportunities that may be attractive for the Funds, and opportunities to confer with company management, and (3) payment of certain of the investment manager's expenses relating to research (collectively "soft dollar benefits"). Investment managers often seek to recognize brokers who provide these services or benefits by directing transactions to these brokers, or by paying higher commissions to these brokers than would otherwise be appropriate.

Infinity Q has no formal arrangements with specific brokers or dealers under which Infinity Q receives research or other services in addition to transaction execution for brokerage commissions from Fund transactions (so called "soft dollar" arrangements). However, brokers or dealers may be selected who provide research services to Infinity Q. Infinity Q intends to use soft dollars for brokerage and research services only when such payments fall within the parameters of Section 28(e) of the Exchange Act. In accordance with Section 28(e), broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services if Infinity Q determines in good faith the amount of commissions is reasonable in relation to the value of the brokerage and research services provided either in terms of the particular transaction or Infinity Q's overall responsibilities for discretionary accounts. The CCO, or his or her designee, shall determine in each instance whether the brokerage and/or research services provided by a broker-dealer are eligible for soft dollar treatment in accordance with Section 28(e).

The CCO or a designee shall proceed with the following analysis of such product or service to ascertain whether such product or service is eligible with respect to Section 28(e):

- Determine whether the product or service is eligible "research" or "brokerage" under Section 28(e);

- Determine whether the eligible product or service is used by the Firm in the performance of investment decision-making responsibilities for discretionary client accounts;

- With respect to a "mixed use" product or service, make a reasonable allocation of the costs of the product or service according to its use;

- Make a good faith determination that the amount of client commissions paid is reasonable in light of the value of the product or service provided by the broker-dealer;

- To the extent third party research is proposed to be utilized, determine whether such third party research falls within Section 28(e) as further described in "*Third Party Research and Client Commission Arrangements*" below;

-52-

IQCM-SEC-00087750

- Determine whether the client continues to receive best execution of their transactions, in accordance with the "*Execution of Portfolio Transactions for Client Accounts*";

- Maintain the appropriate books and records relating to any soft dollar payments as further described in "*Recordkeeping Requirement*" below.

Eligible "Research"

In order to be considered eligible "research," the CCO must assess whether a product or service constitutes "advice," "analyses" or "reports" that reflect the expression of reasoning or knowledge. In addition, a product or service shall be considered eligible "research" services for purposes of Section 28(e) only to the extent the person providing such product or service is:

- Furnishing **advice**, either directly or through publications or writings, as to the value of securities, the advisability of investing in, purchasing, or selling securities, and the availability of securities or purchasers or sellers of securities; or

- Furnishing **analyses** or **reports** concerning issuers, industries, securities, economic factors and trends, political factors, portfolio strategy, and the performance of accounts.

Examples of products or services that constitute eligible research include: market research (such as order management systems ("OMS"), pre-trade and post-trade analytics, software, and other products that depend on market information to generate market research, including research on optimal execution venues and trading strategies); data services (such as market data or economic data); proxy services that provide lawful and appropriate assistance in investment decision-making.[1]

For the avoidance of doubt, the following products and services are **NOT** considered eligible "research" for purposes of Section 28(e) and the Firm shall not utilize soft dollar s with respect to such items:

- Mass-marketed publications;[2] and

- Inherently tangible products and services such as: computer hardware; telephone lines; office furniture; equipment and office supplies; salaries; rent; accounting fees and software; website design; e-mail software; internet service; legal expenses; personnel management; marketing; utilities; membership dues; professional licensing fees; software to assist with administrative functions; expenses for travel; entertainment and meals associated with attending seminars; and travel and related expenses associated with arranging trips to meet corporate executives, analysts or other individuals.

---

[1] Research that merely assists an adviser in deciding how to vote proxy ballots are not considered eligible research. Proxy services may, therefore, be treated as a "mixed use" item, if appropriate.

[2] Indicia of publications that are not mass-marketed and could be eligible "research" under Section 28(e) include, among other things, that they are marketed to a narrow audience, directed to reader s with specialized interests in particular industries, products, or issuers, and have high costs.

-53-

Eligible "Brokerage"

Eligible brokerage services relate to activities from the time the Firm communicates with the broker-dealer for purposes of transmitting an order until funds or securities are delivered or credited to a client's account.

A product or service may be considered eligible "brokerage" by the CCO to the extent the broker-dealer providing such product or service is effecting securities trades and performs functions incidental thereto (*i.e.*, clearance, settlement and custody) or required by the SEC or the self-regulatory organization ("SRO") in which the broker-dealer is a participant.

Examples of products or services that constitute eligible brokerage include: post-trade services;[3] comparison services that are required by the SEC or SRO rules (such as electronic confirmation and affirmation of institutional trades required in connection with settlement processing); connectivity services between the Firm and the broker-dealer and other relevant parties such as custodians;[4] trading software used to route orders to market centers; software that provides algorithmic trading strategies; software used to transmit orders to direct market access (or "DMS") systems.

For the avoidance of doubt, the following products and services are **NOT** considered eligible "brokerage" for purposes of Section 28(e) and shall be characterized as overhead of the Firm:

- Hardware (such as telephones or computer terminals, including those used in connection with OMS and trading software);

- Software functionality used for recordkeeping or administrative purposes (such as managing portfolios, and quantitative analytical software used to test "what if" scenarios related to adjusting portfolios, asset allocation; or for portfolio modeling, whether or not provided through OMS);

- Performing compliance tests that analyze information over time in order to identify unusual patterns (including, an analysis of the quality of brokerage executions, an analysis of the portfolio turnover rate, analysis of comparative performance of similarly managed accounts);

- Creating trading parameters for compliance with regulatory requirements, prospectus disclosure or investment objectives;

- Stress-testing a portfolio under a variety of market conditions or to monitor style-drift;

---

[3] Post-trade services include: post-trade matching of trade information; other exchanges of messages among broker-dealers, custodians, and institutions related to the trade; electronic communication of allocation instructions between institutions and broker-dealers; routing settlement instructions to custodian banks and broker-dealers' clearing agents; and short-term custody related to effective particular transactions in relation to clearance and settlement of the trade.

[4] Such connectivity services may include: dedicated lines between the broker-dealer or the Firm's OMS; lines between the broker-dealer and OMS operated by a third-party vendor; dedicated lines providing direct dial-up services between the Firm and the trading desk at the broker-dealer; and message services used to transmit orders to broker-dealers for execution.

-54-

IQCM-SEC-00087750

- Trade financing (such as stock lending fees);
- Capital introduction and margin services;
- Error correction trades or related services.

Eligible Use of "Research" or "Brokerage"

The CCO shall confirm whether eligible "research" or "brokerage" is being utilized to lawfully and appropriately assist the Firm in the performance of the Firm's investment decision-making responsibilities.  For example, to the extent eligible "research" or "brokerage" is used for marketing purposes, such eligible research or brokerage may not be paid for with soft dollars.

"Mixed Use" Items

Where a product or services obtained with client commissions has a mixed use, the Firm faces an additional conflict of interest in obtaining that product or service with client commissions. Examples of potential "mixed use" products and services include trade analytical software, proxy voting services and OMS.

The CCO shall make a reasonable allocation of the cost of the product or service according to its use.  Such allocation decision shall be based upon a good faith, fact-based analysis of how employees utilize such product or service.  Relevant factors may include the amount of time the product or service is used for eligible purposes versus non-eligible purposes, the relative utility to the Firm of the eligible versus non-eligible uses and the extent to which the product is redundant with other products employed by the Firm for the same purpose.

Third Party Research and Client Commission Arrangements

The SEC has acknowledged that research produced by a third party, rather than internally ("third-party research")[5] may qualify under Section 28(e) subject to the following guidelines:

- A broker-dealer can provide research if it (i) prepares the research; (ii) is legally obligated to pay for the brokerage services or research services that are not produced internally; or (iii) is not directly legally obligated to pay for the brokerage services or research, but pays the provider directly and assures itself that the brokerage commissions directed to it are used only for eligible brokerage and research; and
- An adviser may direct trades to a broker-dealer and receive brokerage and research services from another broker-dealer who receives a portion of the commissions (a "client commission arrangement"[6]) to the extent the second broker executes, clears or settles the trade or it performs at least one of the following functions: (i) takes financial responsibility for all customer trades until the clearing broker-dealer has received payment (or securities); (ii) makes or maintains records relating to customer trades required by the SEC and SRO

---

[5] Note that research provided in third-party arrangements falls within the safe harbor even if the Firm participates in selecting the research services or products to be provided and the third-party research is delivered directly by the third party to the Firm.

[6] Also known as "step-out" transactions.

IQCM-SEC-00087750

rules, including blotters and memoranda of orders; (iii) monitors and responds to customer comments concerning the trading process; and (iv) generally monitors trades and settlements.

Prior to utilizing any third party research, the CCO shall confirm with the relevant broker-dealer that the research and/or the broker receiving soft dollars (in the case of client commission arrangements) fulfills the requirements above, as appropriate.

When selecting brokers-dealers to execute brokerage transactions, the Brokerage Committee will assess whether the broker-dealer will be providing soft dollar benefits and if so, will coordinate the review according to the requirements set forth above.

<u>Recordkeeping Requirement</u>.

Records relating to allocations of "mixed use" products and services and any documentation used in the CCO's good faith determination that a soft dollar payment was reasonable must be maintained for a period of five years from the end of the fiscal year in which such records were generated (the first two years at an appropriate office of Infinity Q).

**Trade Aggregation**

Infinity Q will generally combine orders for trades across multiple Funds and with clients of Wildcat Capital Management, LLC ("Wildcat").[7]  If Infinity Q has determined to enter into a trade at the same time for more than one Fund, or at the same time as Wildcat enters into a trade for a client, Infinity Q and, if applicable, Wildcat shall ensure that combined orders for all clients are generally placed while assigning pre-order allocations.  If an order for more than one client cannot be fully executed, Infinity Q and Wildcat shall ensure that the investments are allocated on a fair and equitable basis, as discussed in the Investment Allocation policy in this Manual.

**Trade Errors**

A trading error is a deviation from the applicable standard of care in the placement, execution or settlement of a trade of a publicly traded security for a Fund.  In general, the following would be considered trading errors for the purposes of this policy:

- purchasing or selling the wrong securities for an account or fund;
- purchasing or selling securities for the wrong account or fund;
- allocating securities to the wrong account or fund;
- failing to purchase or sell securities as intended for a particular account or fund; or
- inappropriately delaying the investment of client assets.

For purposes of this policy, the following types of errors are not deemed to be trading errors:

---

[7] Advisory personnel of Infinity Q may also provide advisory services to clients of Wildcat.

IQCM-SEC-00087750

- good faith errors in judgment in making investment decisions for clients;

- errors caught and corrected before execution;

- ticket re-writes and similar mistakes that improperly describe properly executed trades; and

- errors made by persons other than the Firm (e.g. broker-dealers).

It is a policy of Infinity Q to ensure that each trade error is corrected in a prompt and efficient manner to minimize the loss. The CCO will be responsible for determining whether a trade error has occurred.

Infinity Q performs daily portfolio monitoring to ensure prompt identification of potential trading errors. *See "Investment Allocation" Policy.*

Procedures to be followed in the event a potential trading error is identified include the following:

- Alert the CCO immediately;

- Correct the error immediately in the best interest of the Fund(s) involved;

- A trade error report describing the nature of the trade error and its resolution will be provided by the person effecting the trade to the CCO;

- Provide prompt written notice (via email) and information regarding the nature of the trade error to the Fund CCO when a trade error impacts the Funds.

No trade error shall be resolved by using another client account or by compensating for a loss by providing future commissions or soft dollars to a broker-dealer.

## RESPONSIBILITY

The CCO has oversight responsibility for Infinity Q's policies and practices with respect to the execution of transactions for the Funds.

### Records Retention

The CCO shall ensure that:
- The firm's soft dollar arrangements are properly documented;
- Trade error reports are created and maintained which document the nature of each trade error and its resolution; and
- That all trade errors impacting the registered Funds are promptly reported to the Fund's CCO in writing.

**EFFECTIVE AS OF:** October 1, 2014

**LAST UPDATED:** July 31, 2017

IQCM-SEC-00087750

## INSIDER TRADING, MATERIAL NONPUBLIC INFORMATION AND MARKET MANIPULATION POLICIES

### INSIDER TRADING AND MATERIAL NONPUBLIC INFORMATION POLICY

### Background

You and the members of your Family/Household[1] are prohibited from engaging in, or helping others engage in, insider trading.  Generally, the "insider trading" doctrine under the Federal Securities Laws prohibits any person (including investment advisers) from knowingly or recklessly breaching a duty of trust or confidence owed by that person by:

- trading while in possession of material, nonpublic information;

- communicating ("tipping") such information to others;

- recommending the purchase or sale of securities on the basis of such information; or

- providing substantial assistance to someone who is engaged in any of the above activities.

This means that, if you trade with respect to a particular security at a time when you know or should know that you are in possession of material nonpublic information about the issuer or security, you (and, by extension, Infinity Q) may be deemed to have violated the insider trading laws.

In addition, if you trade a security on behalf of the Firm at a time when any person at the Firm has material nonpublic information about the issuer – even if the person is not aware that the Firm possesses the information – the Firm may be deemed to have violated insider trading laws.

Information is considered "material" if there is a substantial likelihood that a reasonable investor would consider it important in making his or her investment decisions, or if it could reasonably be expected to affect the price of an issuer's securities.  (Note that the information need not be so important that it would have changed the investor's decision to buy or sell.)  Either positive or negative information may be material.  Information that should be considered material includes, but is not limited to, changes in dividend policies, earnings estimates, changes in previously released earnings estimates, significant merger or acquisition proposals or agreements, major litigation, changes in management, the grant or denial of significant governmental or regulatory

---

[1] The term "Family/Household" includes the following:
- Your spouse or domestic partner (unless they do not live in the same household as you and you do not contribute in a material way to their support).
- Your children under the age of 18.
- Your children who are 18 or older (unless they do not live in the same household as you and you do not contribute in a material way to their support).
- Any of these people who live in your household:  stepchildren, grandchildren, parents, stepparents, grandparents, spouses, siblings, mother-, father-, son-, daughter-, brother- or sister-in law, any person related by adoption and any individual economically dependent upon you; and
- Any unrelated individual whose investments are controlled by you.

IQCM-SEC-00087750

approvals, liquidity problems and significant new products, services or contracts.  Material information can also relate to events or circumstances affecting the market for an issuer's securities such as information that a brokerage house is about to issue a stock recommendation or that a forthcoming newspaper column will contain information that is expected to affect the market price of a security.

Information is considered nonpublic until it has been effectively disclosed to the marketplace (*e.g.*, through national business and financial news wire services) and had adequate time for the market as a whole to respond to the information.

The SEC takes the view that material nonpublic information possessed by one of a firm's employees or other personnel may be attributed to the entire firm.  As a result, where one member of Infinity Q's personnel makes a trade in an issuer's securities without personally being aware of any material nonpublic information related to that issuer, the firm may nonetheless incur liability under the securities laws if any other employee was aware of such information at the time the trade was made.  However, the securities laws provide firms with an affirmative defense to such charges, and that defense depends upon the establishment and enforcement of policies and procedures reasonably designed to control the flow of material nonpublic information within the firm.

**Liability of Tippers and Tippees**

Infinity Q personnel must be wary of material nonpublic information disclosed in breach of a corporate insider's duty of trust or confidence that the corporate insider may owe to his or her corporation and/or such corporation's shareholders.  Even when there is no expectation of confidentiality, Infinity Q personnel may become an "insider" upon receiving material nonpublic information in circumstances in which a person knows, or should know, that a corporate insider is disclosing information in breach of a duty of trust and confidence that he or she owes the corporation and its shareholders.  Whether the disclosure is an improper "tip" depends on whether the corporate insider expects to benefit personally, either directly or indirectly, from the disclosure.  Indirect personal benefits may include, for example, a reputational benefit or an expectation of a "quid pro quo."  It is also possible for a person to become an "insider" or "tippee" upon obtaining material nonpublic information inadvertently, including information derived from social situations, business gatherings, overheard conversations and misplaced documents.  If you are not sure whether information you have received is material nonpublic information, please ask CCO.  **Do not guess.**

Under U.S. securities law and subject to Rule 14e-3 under the Exchange Act, described below, a "tippee" assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the "tippee" *and the "tippee" knows or should know that there has been a breach.*

Rule 14e-3 is a special SEC rule relating to tippee liability for information relating to tender offers.  Rule 14e-3 prohibits trading (absent effective disclosures) by any person, including a tippee, who is in possession of material nonpublic information relating to a tender offer if (i) the bidder has taken a "substantial step" toward the commencement of a tender offer, and (ii) the person in

-59-

possession of the information knows or has reason to know the information was acquired from the bidder, the target or their respective agents.  Under this rule <u>a duty does not have to be breached</u> by the person providing the information for a tippee to be held liable.  However, to be liable for insider trading under this rule, the tippee must know or have reason to know that the bidder, target or one of their respective agents is the ultimate source of the information.

If you believe that you are in possession of material nonpublic information regarding an issuer, you should refrain from trading in such issuer's securities, whether on behalf of a Fund or for your own account, and contact the CCO immediately.  The CCO will update the Monitoring List (as described below) as necessary.  If you are not sure whether information in your possession is material nonpublic information, please ask the CCO.  **Do not guess**.

**Note that the prohibition on trading while in possession of material nonpublic information or tipping such information applies to the securities of all public companies, including companies with which Infinity Q neither has, nor is considering, an investment or other relationship.**

### Use of Industry Experts or Similar Consultants

The Firm has adopted policies for interactions that Firm personnel may have with industry experts or similar consultants who may have access to and who could inadvertently or otherwise communicate material nonpublic information to the Firm.  Personnel must obtain approval from the CCO to communicate with a paid industry expert or similar consultant.  Personnel should not speak with an industry expert or similar consultant about an issuer to which the expert or consultant owes a duty of confidentiality, or about information with respect to which the consultant owes a duty of confidentiality to any source.  In addition, Firm personnel should not speak with a paid expert or consultant who is currently employed by a public issuer, or has been employed within the previous six (6) months by an issuer (i) in which the Firm or any Fund is invested or (ii) the securities of which the Firm or any Fund is considering for a potential investment.

In the event Firm personnel receive information from a paid consultant that could be construed to be material, non-public information about a publicly traded security, that personnel should inform the CCO so that the CCO can make a determination as to whether to place that issuer on the Firm's Restricted List.

### Monitoring List

The Firm's Monitoring List contains the names of issuers about which Compliance has a reason to monitor Firm or personnel trading in the issuer or its related entities for potential conflicts of interest and actual or the appearance of insider trading. Issuers on the Monitoring List may include, for example, existing and former portfolio companies of affiliates of the Firm, companies where a Firm employee is a board member, and companies about which the Firm or its personnel have received or anticipate receiving material nonpublic information.

The Monitoring List is a <u>highly confidential</u> list that is maintained in the possession of the CCO, his designees and certain other limited personnel within the Firm.  Its contents generally will not

IQCM-SEC-00087750

be shared by Compliance within the Firm and otherwise must not be communicated directly or indirectly to anyone outside the Firm without the prior consent of the CCO.

To assist in ensuring that the Monitoring List is current and complete, if you are presented with the opportunity to learn nonpublic information in connection with your analysis of any security or other instrument, prior to obtaining the information or signing any confidentiality letter or agreement relating to the information, you must clear with the CCO the receipt of such information and the signing of any such confidentiality letter or agreement.  The issuer to which the information relates will be placed on the Firm's Monitoring List, as appropriate.

In addition, if you inadvertently receive or anticipate receiving information about an issuer that you believe may be material nonpublic information (including unsolicited information from an investment bank or similar source), you must immediately notify the CCO of the information.  If the CCO determines that the information constitutes material nonpublic information that might expose a Firm or any of its affiliates to liability for "insider trading," the issuer to which the information relates will be placed on the Monitoring List.

Trading in a name on the Monitoring List by any person covered by the Code either for their own account or for the account of any of the Funds is subject to prior review by Compliance and may on a case-by-case basis include a determination as to whether the Firm or any member or employee of any Firm or any person covered by the Code may be in possession of material nonpublic information.

In maintaining the Monitoring List, Compliance will apply such procedures as it deems appropriate, which may include attending Firm meetings and monitoring email and other communications, both internal and external, of Firm personnel.

Compliance will determine when an issuer may be removed from the Monitoring List after consideration of the relevant facts and circumstances. Compliance generally will not remove an issuer from the Monitoring List until the relevant material nonpublic information has been publicly disclosed or ceased to be material.

**Sanctions Specific to Insider Trading Violations**

Insider trading violations may result in severe sanctions being imposed on the individuals involved and on the Firm.  These could involve administrative sanctions by various regulatory agencies, such as being barred from employment in the securities industry, regulatory suits for disgorgement and civil penalties of, in the aggregate, up to three times the profits gained or losses avoided by the trading, private damage suits brought by persons who traded in the market at or about the same time as the person who traded on inside information, and criminal prosecution which could result in substantial fines and jail sentences.  In addition, even in the absence of legal action, violation of insider trading prohibitions or failure to comply with this Policy may result in termination of your employment and referral to the appropriate authorities.

**No Fiduciary Duty to Use Inside Information**

-61-

Although Infinity Q has fiduciary relationships with the Funds, it has no legal obligation to recommend or carry out investment transactions in the securities of any issuer while in possession of information its personnel know to be "inside" information relating to that issuer.  In fact, as noted above, such conduct often might violate the Federal Securities Laws.

If you have any doubt or uncertainty about whether any particular course of action might give rise to an insider trading or fiduciary duty issue, you should consult with the CCO.

### MARKET MANIPULATION POLICY

> **A.**    **Overview**

It is essential that no personnel of the Firm engage in any activity the purpose of which is to interfere with the integrity of the marketplace.  Among other things, intentionally manipulating the market, as discussed below, is a violation of the Federal Securities Laws and of the Firm's policies and standards of conduct.

> **B.**    **Policy**

Firm personnel may not engage in any deceptive practice intended to manipulate the market in an issuer's publicly-traded securities.  Examples of such practices are provided below under "Legal Background."

> **C.**    **Legal Background**

The term "manipulation" generally refers to any intentional or deliberate act or practice in the marketplace that is intended to mislead investors by artificially controlling or affecting the price of a security traded in such marketplace.  For example, manipulation may involve efforts to stimulate artificially the public demand for a stock or to create the false appearance of actual trading activity.  Practices that may be intended to mislead investors by artificially affecting market activity and thus may constitute manipulative acts include, but are not limited to:

- portfolio pumping (submitting orders to purchase securities held in a Fund near the close of trading on the last day of a period for which the Fund's performance will be reported (e.g., quarter-end));

- window dressing (adding or eliminating securities holdings of a Fund on or around the date for which the Fund's holdings will be reported solely in order to make the Fund's holdings appear more favorable to the Fund's investors (e.g., by eliminating a poorly performing holding or acquiring a security that has performed well));

- marking the close (executing securities transactions at or near the close with a purpose of inflating the day's price);

- wash sales (selling a security at a loss and purchasing the same or a substantially similar security soon afterwards);

-62-

IQCM-SEC-00087750

- front running (transacting in a security for one's own account while taking advantage of advance knowledge of a Fund's pending transactions);

- spreading false rumors;

- disseminating false information into the marketplace that could reasonably be expected to cause the price of a security to increase or decrease;

- matched orders (buying a security with a low turnover and subsequently placing contemporaneous buy and sell orders for the security for substantially the same number of securities at substantially the same time and at substantially the same price, with the aim of conveying an appearance of renewed interest in the security);

- runs (also known as pumping and dumping);

- corners; and

- abusive squeezes (control of a large and dominating security position in a market in order deliberately to increase the price of the security).

The rules against market manipulation do not mean that merely trying to acquire or to dispose of stock for investment purposes and incidentally affecting the price is unlawful. It is permissible for trading to have a corollary effect upon the price of a security as an ancillary consequence of buying or selling that security, so long as the investor's purpose is not to create an artificial impression about the demand for, or supply of, the security. Further, certain of the practices described above may in certain instances be made in connection with legitimate business purposes and in such instances would not constitute market manipulation. Personnel with any questions whether any transaction may constitute market manipulation should contact the CCO immediately.

The SEC and the federal courts have emphasized that manipulation, in essence, interferes with the free forces of supply and demand, and, thus, the integrity of the market. As the SEC stated in a 1977 case:

> Investors and prospective investors… are… entitled to assume that the prices that they pay and receive are determined by the unimpeded interaction of real supply and demand so that those prices are the collective marketplace judgments that they purport to be. Manipulations frustrate these expectations. They substitute fiction for fact…. The vice is that the market has been distorted and made into a stage-managed performance.

The most cited anti-manipulative provisions of the federal securities laws are Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Section 10(b) makes it unlawful to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe. The various rules promulgated by the SEC under Section 10(b) define specific activities as manipulative or deceptive acts or practices. Rule 10b-5, however, sometimes referred to as the "anti-manipulation" rule, sets forth the general prohibition on fraudulent, deceptive or manipulative devices. The prohibitions against manipulative and deceptive acts under Section 10(b) and Rule 10b-5 apply to all securities, not just those registered on a national stock exchange. The SEC and the federal

IQCM-SEC-00087750

courts have established that pure manipulation – that is, merely undertaking acts to raise or lower the price of a security – constitutes a "manipulative or deceptive device" and a "scheme to defraud."

Section 17(a) of the Securities Act of 1933, as amended, is also a general antifraud provision and applies to manipulation in the over-the-counter market.   Section 17(a) proscribes material misrepresentations or omissions, any scheme, device or artifice to defraud, or any fraudulent or deceitful transaction, practice or course of business, in the offer or sale of securities.

Section 9(a) of the Exchange Act specifically prohibits various manipulative practices.   For example, Section 9(a)(1) prohibits the use of "wash sales" and "matched orders" for the purpose of creating a false or misleading appearance of active trading in any security registered on a national exchange.   Section 9(a)(2) prohibits manipulation of prices by any person, acting alone or with others, who for the purpose of inducing others to buy or sell a particular security, effects a series of transactions in the security which creates actual or apparent active trading in the security or causes a rise or decline in the price of the security.   Section 9(a)(3) prevents brokers, dealers and others from circulating or disseminating information about a security to the effect that the price of the security will or is likely to rise or fall for the purpose of raising or lowering the price of the security.

Rule 10b-21 under the Exchange Act makes it unlawful to submit an order to sell a security if the person submitting the order deceives a broker-dealer, a participant of a registered clearing agency or a purchaser regarding his or her intention or ability to deliver the security by the settlement date and to then fail to deliver the security by the settlement date.   Among other things, Rule 10b-21 targets short sellers who deceive broker-dealers about their source of borrowable shares for purposes of complying with the "locate" requirement of Rule 203(b)(1) of Regulation SHO.   Rule 10b-21 also applies to sellers who misrepresent to their broker-dealers that they own the shares being sold.

**EFFECTIVE AS OF:**  October 1, 2014

**LAST UPDATED:**

IQCM-SEC-00087750

# CODE OF ETHICS

## INTRODUCTION

Infinity Q Capital Management, LLC ("Infinity Q") has adopted this Code of Ethics (the "Code") to guide and help us to ensure that we comply with all applicable federal laws, rules and regulations.  Our overriding goal is to comply with our fiduciary duty to the Infinity Q Diversified Alpha Fund and our other clients (the "Funds").

**We expect Infinity Q personnel to adhere to the letter and spirit of the Code.  Failure to adhere to either the letter or the spirit of the Code may result in disciplinary action, including termination of employment.**  See "Enforcement of Code" for further information on Infinity Q's sanction policies.

If you have any doubt as to the appropriateness of any activity, believe that you have violated the Code or become aware of a violation of the Code by another individual, you should promptly report such issues to the CCO.

## STANDARDS OF BUSINESS CONDUCT

Infinity Q seeks to foster and maintain a reputation for honesty, openness, trust, integrity and professionalism.   That reputation is something we value greatly and endeavor to protect and is a vital business asset.  Accordingly, Infinity Q places a high value on ethical conduct by Infinity Q and by persons working on behalf of Infinity Q.  To further promote the importance of this value, we have adopted the Code and implemented policies and procedures to prevent fraudulent, deceptive and manipulative practices and to ensure compliance, by persons to whom the Code applies, with the Federal Securities Laws and the fiduciary duties owed to the Funds.  We expect and insist that all persons subject to the Code meet the letter and spirit of the rules and also live up to the ideals of our organization.

### Federal Securities Laws

Infinity Q is committed to compliance with applicable regulations.  Each of us must also recognize our personal obligations as individuals to understand and obey the laws that apply to us in the conduct of our duties.  They include laws and regulations that apply specifically to investment advisers, as well as laws with broader applicability including prohibitions on insider trading and other forms of market abuse.  All employees must abide by the standards set forth in Rule 204A-1 under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and Rule 17j-1 under the Investment Company Act, as amended (the "1940 Act").

### General Principles and Restrictions

It is generally improper for the Firm or persons covered by the Code to:

•       employ any device, scheme or artifice to defraud a Fund;

-65-

- make to a Fund any untrue statement of a material fact or omit to state to a Fund a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading;

- engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon a Fund;

- engage in any manipulative practice with respect to a Fund;

- use your position, or any investment opportunities presented by virtue of your position, to personal advantage or to the detriment of a Fund; or

- conduct personal trading activities in contravention of this Code or applicable legal principles or in such a manner as may be inconsistent with the duties owed to the Funds as a fiduciary.

However we strive to minimize conflicts, conflicts of interest will arise.  Once a conflict of interest is identified, Infinity Q will determine whether disclosure has been made to the Funds and whether any approvals may be needed in order to proceed with a transaction.

## SCOPE OF THE CODE

In an effort to prevent any conflicts from arising and in accordance with Rule 17j-1(c)(1) under the 1940 Act and Rule 204A-1 under the Advisers Act, the Adviser has adopted the Code to address transactions that may create or appear to create conflicts of interest, and to establish reporting requirements and enforcement procedures.

### Persons Covered by Code

This Code generally applies in its entirety to all Access Persons of Infinity Q which includes:

- Every managing director, principal, partner or officer (or any person performing similar functions) or employee of Infinity Q.

- A natural person acting as an independent contractor with respect to Infinity Q who has access to nonpublic information regarding any purchase or sale of securities by Infinity Q on behalf of any of the Funds or who is involved in making securities recommendations to the Funds or who has access to such recommendations that are nonpublic.

- Any other natural person (whether or not an employee of Infinity Q and including temporary personnel and interns) who is subject to Infinity Q's supervision and control and has access to nonpublic information regarding any Funds' purchase or sale of securities or who is involved in making securities recommendations to the Funds or who has access to such recommendations that are nonpublic.

- Any other person who the CCO designates as subject to the Code.

The activities of your Family/Household (defined below) are also covered by the "Personal Trading Policies and Procedures" and "Reporting and Certification Requirements" portions of the Code.

IQCM-SEC-00087750

**Persons Not Covered by Code**

Notwithstanding the foregoing and subject to applicable law, the CCO may determine that certain individuals should not be covered by the Code or portions thereof.

**Investment Accounts to be Reported under the Code**

Investment accounts that must be reported under the Code include those with brokers, dealers, investment managers or banks in which <u>any</u> security/securities are held for your or your Family/Household's direct or indirect benefit.  Please note that not all securities and transactions in securities within these investment accounts are subject to the Code's preclearance and reporting requirements. These requirements are detailed later within the Code.

*Exceptions*

If you have an account you feel should not be subject to the above reporting requirement, you should submit a written request for clarification or an exemption to the CCO. The request should name the account, describe the nature of your interest in the account, the person or firm responsible for managing the account, and the basis upon which the exemption is being claimed. Requests will be considered on a case-by-case basis.

In all transactions involving such an account you should, however, conform to the spirit of the Code and avoid any activity which might appear to conflict with the interests of the Funds or with your duties as an employee of Infinity Q.

<u>**DEFINITIONS**</u>

### A.  "Beneficial Interest"

The term "<u>Beneficial Interest</u>" is interpreted in the same manner as it would be in determining whether a person has beneficial ownership pursuant to the provisions of Section 16 of the Exchange Act, and the rules and regulations thereunder.  Beneficial Interest is a very broad concept. This definition means that you should consider yourself to have a Beneficial Interest in any Covered Securities in which you, through any contract, arrangement, understanding, relationship or otherwise have a direct or indirect economic or pecuniary interest.[1]  In addition to any of the foregoing, you should consider yourself to have a Beneficial Interest in Covered Securities held by members of your Family/Household.  Beneficial Interest also includes any interest that arises as a result of:

- Covered Securities being held in such a person's own name, or that are held for the person's benefit in nominee, custodial or "street name" accounts;

- a partnership interest in a general or limited partnership (whether the ownership is under the name of that partner, another partner or the partnership or through a nominee, custodial or "street name" account);

---

[1] Pecuniary interest includes the opportunity, directly or indirectly, to share in any profit derived from a transaction in the securities.

IQCM-SEC-00087750

- a right to dividends that is separated or separable from the underlying Covered Security;

- a right to acquire equity securities through the exercise or conversion of any derivative on a Covered Security (whether or not presently exercisable or convertible);

- Covered Securities in a person's individual retirement account;

- Covered Securities in a person's account in a 401(k) or similar retirement plan, even if the person has chosen to give someone else investment discretion over the account;

- Covered Securities owned by a trust of which the person is (i) a beneficiary and has investment control over the assets of the trust or (ii) the trustee of a trust and his or her family members are beneficiaries of such trust;

- Covered Securities owned by a corporation, partnership or other entity that the person controls (whether the ownership is under the name of that person, under the name of the entity or through a nominee, custodial or "street name" account);

- Covered Securities owned by an investment club in which the person participates;

- Covered Securities that are being managed for a person's benefit on a discretionary basis by an investment adviser, broker, bank, trust company or other manager, unless the securities are held in (i) a "blind trust" or similar arrangement under which the person is prohibited by contract from communicating with the manager of the account and the manager is prohibited from disclosing to the person what investments are held in the account, or (ii) in an account with respect to which the person has certified to the CCO at least annually that the person has had no influence or control regarding any particular transaction made or to be made in the account and the adviser, broker, bank, trust company or other manager has made all investment decisions without informing the person as to the transaction until after the transaction has been effected (accounts meeting such requirements, a "Discretionary Account"). (Merely placing securities into an account for which a person does not exercise investment discretion is not sufficient to remove them from a person's Beneficial Interest. This is because, unless the account is of the type described above, the owner of the account can still communicate with the manager about the account and potentially influence the manager's investment decisions.) *A person wishing to take advantage of the exception described in (ii) above must also use his or her best efforts to obtain an acknowledgment from the relevant adviser, broker, bank, trust company or other manager that such person has no influence or control regarding any particular transaction made or to be made in the relevant account, which acknowledgment must be submitted to the CCO and the CCO may at any time request account agreements or written documentation evidencing the discretionary nature of a Discretionary Account and may choose to treat an account as non-discretionary pending receipt of such documentation in his sole discretion. Please note that while Discretionary Accounts that meet the Code of Ethics requirements are not subject to pre-clearance requirements they ARE subject to reporting requirements of the Code of Ethics*; and

- certain performance related advisory fees (other than an asset based fee).

Please note that you are not deemed to have a Beneficial Interest in portfolio securities held by an investment company registered under the 1940 Act or in a public utility holding company registered under the Public Utility Holding Company Act of 1935. You also are not deemed to have a Beneficial

-68-

IQCM-SEC-00087750

Interest in qualified tuition programs established pursuant to Section 529 of the Internal Revenue Code ("529 Plans") if neither the Firm nor a control affiliate of the Firm manages, distributes, markets, or underwrites the 529 Plan or the investments and strategies underlying the 529 Plan.

*This is not a complete list of the forms of ownership that could constitute a Beneficial Interest for purposes of the Code of Ethics. You should ask the CCO if you have any questions or doubts at all about whether they or any member of your Family/Household would be considered to have a Beneficial Interest in any particular situation.*

## B. "Covered Security"

The term "Covered Security" means anything that is considered a "security" under Section 202(a)(18) of the Advisers Act and Section 2(a)(36) of the 1940 Act and includes, for example, stocks, bonds, futures, or other investment contracts as well as items that you might not ordinarily think of as securities, such as:

- Options on securities, on indexes, and on currencies;
- Exchange-traded securities (including exchange-traded funds);
- Investments in all kinds of limited partnerships;
- Foreign unit trusts and foreign mutual funds;
- Private investment funds and hedge funds.

A Covered Security **does not include**, for example:

- Direct obligations of the U.S. government (or other sovereign government bonds);
- Bankers' acceptances, bank certificate of deposits, commercial paper, and high quality short-term debt obligations, including repurchase agreements;
- Shares issued by money market funds;
- Shares of open-end investment companies (other than Reportable Funds and exchange-traded funds) that are registered under the 1940 Act; and
- Shares issued by Unit Investment Trusts that are invested exclusively in one or more open-end mutual funds, none of which are Reportable Funds.

## C. "Family/Household"

The term "Family/Household" includes the following:

- Your spouse or domestic partner (unless they do not live in the same household as you and you do not contribute in a material way to their support).

- Your children under the age of 18.

- Your children who are 18 or older (unless they do not live in the same household as you and you do not contribute in a material way to their support).

-69-

IQCM-SEC-00087750

- Any of these people who live in your household:  stepchildren, grandchildren, parents, stepparents, grandparents, spouses, siblings, mother-, father-, son-, daughter-, brother- or sister-in law, any person related by adoption and any individual economically dependent upon you; and

- Any unrelated individual whose investments are controlled by you.

### D. "Initial Public Offering"

The term "Initial Public Offering" (or "IPO") means an offering of securities registered under the U.S. Securities Act of 1933, the issuer of which, immediately before the registration, was not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

### E. "Private Placement or Limited Offering"

The terms "Private Placement or Limited Offering" means an offering of securities that is exempt from registration under the U.S. Securities Act of 1933 pursuant to Sections 4(a)(2) or 4(a)(6) or pursuant to Rule 504, Rule 505, or Rule 506 under the U.S. Securities Act of 1933.

### F. "Reportable Fund"

"Reportable Fund" means (i) any fund for which the Firm serves as an investment adviser as defined in section 2(a)(20) of the 1940 Act (i.e., an adviser of a registered investment company); or (ii) any such fund whose investment adviser or principal underwriter controls the Firm, is controlled by the Firm, or is under common control with the Firm.  For purposes of this section, control has the same meaning as it does in section 2(a)(9) of the 1940 Act (see Attachment B of the policy on Compliance with Affiliate Transaction Restrictions for the complete definition).

### PERSONAL TRADING POLICIES AND PROCEDURES

**Personal Trading Policies**

Prohibition on trading in Covered Securities that are being considered for purchase or sale for a Fund

Barring a communication from the CCO or his designee otherwise, you and members of your Family/Household are prohibited from trading in a Covered Security if you have actual knowledge that such security is being considered for purchase or sale on a Fund's behalf.  This prohibition applies during the entire period that the Covered Security is being considered by Infinity Q for purchase or sale and regardless of whether the Covered Security is actually purchased or sold for any Funds.

The restrictions are designed to avoid conflicts with the Funds' interests.  However, patterns of trading that meet the letter of the restrictions but are intended to circumvent the restrictions are also prohibited.  It is expected that you will comply with the restrictions herein in good faith and conduct your personal securities transactions in keeping with the intended purpose of this Code.

IQCM-SEC-00087750

IQCM-SEC-00087750

*Exception*

The above prohibition does not apply to transactions in Discretionary Accounts or transactions in Covered Securities pursuant to an automatic dividend or investment plan.

<u>Preclearance</u>

You and members of your Family/Household are prohibited from engaging in any transaction in a Covered Security for any account in which you or a member of your Family/Household has any Beneficial Interest unless you obtain, in advance of the transaction, preclearance for that transaction. *For purposes of these preclearance requirements, you should assume that any investment transaction that you or members of your Family/Household are considering making is subject to preclearance pursuant to the Code, unless the Code specifically provides that the transaction is not subject to preclearance.*

Preclearance is obtained via ComplySci's *PTCC* ("*PTCC*"). If preclearance is obtained, the approval is valid for the day on which it is granted and the immediately following business day (except in the case of private placements, as discussed below under "Private Placements"). The CCO may revoke a preclearance at any time after it is granted and before you execute the transaction. The CCO may deny or revoke preclearance for any reason, and is not required to explain such revocation or denial to you. Preclearance requests submitted by the CCO shall be reviewed and approved by Infinity Q's Chief Executive Officer.

The preclearance requirements do not apply to the following categories of transactions:

- Transactions in Covered Securities issued or guaranteed by any national government that is a member of the Organization for Economic Cooperation and Development, or any agency or authority thereof.

- Transactions that occur by operation of law or under any other circumstance in which neither you nor any member of your Family/Household exercises any discretion to buy or to sell or makes recommendations to a person who exercises such discretion.

- Purchases of Covered Securities pursuant to an automatic investment plan. An "automatic investment plan" means a program in which regular periodic purchases (or withdrawals) are made automatically in (or from) investment accounts in accordance with a predetermined schedule and allocation. An automatic investment plan includes a dividend reinvestment plan.

- Purchases pursuant to the exercise of rights issued pro rata to all holders of any class of Covered Securities and received by you (or a Family/Household member) from the issuer.

- Transactions in Discretionary Accounts.

- Certain Exchange-Traded, NASDAQ, or OTC Options or Futures Contracts, including Currency Futures, Interest Rate Futures, Commodity Futures, and other futures and options for which preclearance is not required on the underlying security, and broad-based index options.

- Certain other transactions in securities as described in Appendix 1.

-72-

<u>Private Placement or Limited Offerings</u>

Neither you nor any member of your Family/Household may acquire directly or indirectly any Beneficial Interest in any security (not just Covered Securities) in a Private Placement or Initial Public Offering, except with the specific, advance written approval of the CCO, which the CCO may deny for any reason. If preclearance is obtained, it is valid until the private placement transaction closes.

<u>Initial Public Offerings</u>

Neither you nor any member of your Family/Household may acquire directly or indirectly any Beneficial Interest in any security (not just Covered Securities) in an Initial Public Offering, except with the specific, advance written approval of the CCO, which the CCO may deny for any reason.

**Waivers and Exemptions**

Subject to applicable law, the CCO may from time to time grant waivers or exemptions, other than or in addition to those described previously, from the trading restrictions, preclearance requirements or other provisions of the Code with respect to particular individuals and types of transactions or securities, where in the opinion of the CCO, such an exemption is appropriate in light of all the circumstances. The CCO or his designee will maintain records necessary to justify such waivers or exemptions.

## REPORTING AND CERTIFICATION REQUIREMENTS

**Personal Securities Reports and Certifications**

<u>Initial and Annual Holdings Reports</u>

You are required to disclose all Covered Securities in which you (or members of your Family/Household) have a Beneficial Interest promptly upon commencement of employment and on an <u>annual basis</u> thereafter. Please see the definition of a Covered Security above for detail on which securities would be considered Covered Securities.

You must submit initial and annual holdings reports:

a.   No later than 10 calendar days after you become covered by the Code, and the information must be current as of a date no more than 45 calendar days prior to the date you are covered by the Code, and

b.   At least once each 12-month period thereafter, and the information must be current as of a date no more than 45 calendar days prior to the date the report was submitted.

The initial and annual holdings report must contain the following information:

- The title, number of shares and principal amount of each Security;

-73-

- The name of any broker, dealer or bank with whom such person maintains an account in which Securities are held; and

- The date the report is submitted.

You will be prompted by the CCO when the information is due for submission. This information will be submitted via *PTCC* or by using **Appendix A** (Initial Holdings Report) or **Appendix B** (Annual Holdings Report) as directed by the CCO.

<u>Account Activity</u>

If you or any member of your Family/Household has an investment account with any broker, dealer or bank, you or your Family/Household member must arrange for (i) an electronic feed of account activity if the account is with an approved broker or (ii) the broker, dealer or bank to send directly to the CCO, <u>contemporaneous</u> duplicate copies of all brokerage statements and trade confirmation relating to that account if a waiver from the approved broker requirement has been granted by the CCO, in hard copy to Compliance Desk, Infinity Q Capital Management, LLC, 888 Seventh Avenue, 37th Floor, New York, New York, 10106 or to such other third party as Infinity Q Compliance shall designate.  Information regarding "approved brokers" will be provided to you by the CCO.  All electronic feeds must be sent to *PTCC.*

*Exception*

If applicable laws or regulations in the jurisdiction relevant for you or your Family/Household's purposes prohibit brokers, dealers or banks from providing duplicate brokerage statements and trade confirmations directly to the Firm, you or members of your Family/Household were unable to direct the broker, dealer or bank in which you or they had Beneficial Interest to provide such statements, or you or members of your Family/Household otherwise have transactions in Covered Securities not held by brokers, dealers or banks, you and/or your Family/Household (as relevant) instead must file a Quarterly Transaction Report as specified below.

<u>Quarterly Certification and Quarterly Transaction Reports</u>

*Quarterly Certification*

You are required to make a certification regarding your personal securities transactions each quarter via *PTCC*.  Specifically, every calendar quarter, you (on behalf of yourself and your Family/Household) must certify that you and your Family/Household have directed all brokers, dealers and banks to furnish brokerage statements and trade confirmations directly to the CCO, that no transactions that would be required to be reported were effected during the quarter except through accounts for which you and your Family/Household have directed the broker, dealer or bank to send brokerage statements and trade confirmations directly to the CCO (or that were otherwise reported on a Quarterly Transactions Report) and that, as far as you and your Family/Household know, those statements and confirmations are complete and accurate representations of all transactions during the most recent calendar quarter.

IQCM-SEC-00087750

Infinity Q Compliance will notify you of this certification requirement each quarter. This certification must be completed no later than 30 calendar days after the close of the calendar quarter.  Failure to submit within 30 calendar days contravenes applicable regulatory requirements.

*Quarterly Transaction Report*

If applicable laws or regulations in the jurisdiction(s) relevant for you or members of your Family/Household prohibit brokers, dealers or banks from providing duplicate transaction confirmation statements directly to the CCO, you or members of your Family/Household were unable to direct the broker, dealer or bank in which you or they had Beneficial Interest to provide such statements, or you or members of your Family/Household otherwise have transactions in Covered Securities not held by brokers, dealers or banks, no later than 30 calendar days after the end of March, June, September and December each year, you must use *PTCC* to submit a Quarterly Transaction Report.

In the Quarterly Transaction Report, each Access Person must report all transactions in securities in which such person had or acquired any direct or indirect beneficial ownership that contains the following information:

- The date of the transaction, the title, the interest rate and maturity date (if applicable), the number of shares and the principal amount of each security;

- The nature of the transaction (i.e., purchase, sale or any other type of acquisition or disposition);

- The price of the Security at which the transaction was effected;

- The name of the broker, dealer or bank with or through which the transaction was effected; and

- The date the report is submitted.

You will be prompted by the CCO when the information is due for submission.  This information will be submitted via *PTCC* or by using **Appendix C** (Quarterly Holdings Report) as directed by the CCO.

Following submission of the Quarterly Transaction Report, you and your Family/Household must provide to Infinity Q Compliance copies of the brokerage statements and trade confirmations sent by the broker, dealer or bank, and must certify that those statements and confirmations accurately reflect all transactions during the most recent calendar quarter in Covered Securities in which you or a member of your Family/Household has a Beneficial Interest.  You should provide these copies simultaneously with the submission of your Quarterly Transaction Report.

In the Quarterly Transaction Report, you do not need to report transactions effected pursuant to an automatic investment plan or in a Discretionary Account.  An "automatic investment plan" means a program in which regular periodic purchases (or withdrawals) are made automatically in (or from) investment accounts in accordance with a predetermined schedule and allocation.  An automatic investment plan includes a dividend reinvestment plan.

IQCM-SEC-00087750

Each Access Person must also report any account such person established in which Securities were held for such person's direct or indirect benefit (i.e., beneficial ownership) during the quarter. The report must contain the following information:

- The name of the broker, dealer or bank with whom such person established the account;

- The date the account was established; and

- The date the report is submitted.

## Initial and Annual Certifications and Questionnaires

### Code of Ethics

Upon hire and at least annually thereafter, you will receive and be required to review the current Code. You will also be asked to acknowledge receipt of the Code, your understanding of the Code and your compliance with the Code.

### Annual Written Report to the Fund Board

As it pertains to Infinity Q Diversified Alpha Fund, at least once a year, Infinity Q's CCO will provide to the Fund's Board of Trustees (the "TAP Board") a *written* report that includes the following.

- *Issues Arising Under the Code:* The report will describe any issue(s) that arose during the previous year under the Code or procedures thereto, including any material Code or procedural violation(s), and any resulting sanction(s); and

- *Certification and Adoption:* The report will certify to the Board that the Adviser has adopted measures reasonably necessary to prevent its access persons from violating the Code.

## BOARD SERVICE AND AVOIDING CONFLICTS OF INTEREST

To avoid conflicts of interest and other compliance and business issues, Infinity Q prohibits those subject to this Code from serving as officers or members of the board of any other entity, except with advance approval obtained through the CCO. Board service in place at the time of joining Infinity Q will also be evaluated for continued appropriateness of such service. Infinity Q can deny such service for any reason.

## CLIENT AND INVESTOR CONFIDENTIALITY

Any nonpublic information concerning a Fund's clients or investors that you acquire in connection with your association at Infinity Q is confidential. This includes information regarding actual and contemplated investments, financial circumstances and client and investor interests. You should not discuss client or investor business, including the existence of an investor relationship, with outsiders unless it is a necessary part of your job responsibilities.

-76-

**ENFORCEMENT OF CODE**

If the CCO determines that a breach of the Code's policies or procedures may have occurred, he/she shall review and document the issue and discuss the issue with you, as appropriate. If the CCO determines that a violation has occurred, a sanction will be imposed.

These sanctions may include, but are not limited to:

- a verbal or written warning
- imposing penalties or fines
- requiring unwinding of personal securities trades
- requiring disgorgement of trading gains or payment of losses avoided
- suspending personal trading privileges
- reducing an employee's compensation or demoting an employee
- suspending employment without pay or terminating employment
- referring an employee to the U.S. Securities and Exchange Commission or other government or self-regulatory agency

**ADMINISTRATION OF CODE**

**Code Interpretation and Administration**

The CCO is responsible for establishing policies and procedures for the administration of the Code; granting exceptions or exemptions to any provision of the Code, on an individual or a group basis, provided that such exceptions or exemptions are consistent with the spirit of the principles of the Code; appointing one or more designees and defining the scope of his or her authority and day-to-day responsibilities (in addition to those specified in the Code); considering and approving amendments to the Code; and reviewing and considering any decisions made by the designees.

**Distribution and Acknowledgement of the Code**

The CCO is required to provide you with a copy of the Code and any amendments, and require you to provide a written (or electronic) acknowledgement of your receipt of the Code and any amendments to the Code.

**Review of Personal Trading Reports and Additional Requests**

The personal trading reports filed by you or received on your behalf pursuant to the Code will be collected and maintained by the CCO or his designee. Such reports will be reviewed by the CCO or his designee. The personal trading reports filed or received on behalf of the CCO will be reviewed by the Chief Executive Officer of Infinity Q or his designee. Such review will include the reconciliation of trading activity with preclearance requests and the reconciliation of initial, quarterly (when applicable), and annual reporting via *PTCC* reports.

IQCM-SEC-00087750

**Recordkeeping Requirements**

Infinity Q shall maintain and preserve records, in an easily accessible place, relating to the Code of the type and in the manner and form and for the time period prescribed from time to time by applicable law. Currently, Infinity Q is required by law to maintain and preserve:

- in an easily accessible place, a copy of this Code (and any prior Code of Ethics that was in effect at any time during the past five years) for a period of five years;

- in an easily accessible place a record of any violation of the Code and of any action taken as a result of such violation for a period of five years following the end of the fiscal year in which the violation occurs;

- a copy of each report (or information provided in lieu of a report including any manual preclearance forms and information relied upon or used for reporting) submitted under the Code for a period of five years, provided that for the first two years such copy must be preserved in an easily accessible place;

- copies of written acknowledgments of receipt of the Code for each person who currently and within the last five years was considered subject to the Code;

- in an easily accessible place, a record of the names of all persons subject to the Code within the past five years, even if some of them are no longer subject to the Code, the holdings and transactions reports made by these individuals, and records of all such individuals' personal securities reports (and duplicate brokerage confirmations and account statements in lieu of these reports);

- a written record of any decision, and the reasons supporting any decision, to approve the purchase by a person covered by the Code in an IPO or private placement transaction or other limited offering for a period of five years following the end of the fiscal year in which the approval is granted; and

- reports presented to the TAP Board pursuant to Rule 17j-1(c)(2)(ii) of the 1940 Act that describes issues arising under the Code and certifies that procedures have been adopted to prevent access persons from violating the Code for a period of five years, provided that for the first two years such reports must be preserved in an easily accessible place.

**Prohibition on Personal Securities Trading**

Notwithstanding anything contained herein to the contrary, the CCO may prohibit or limit the personal securities trading activities of persons covered by the Code for any or no reason at any time.

**EFFECTIVE AS OF:** May 6, 2014

**LAST UPDATED:** February 7, 2017

IQCM-SEC-00087750

# VALUATION

## BACKGROUND

As a fiduciary, Infinity Q has an obligation to value the investments held by each client account in a manner that is fair, consistent and in the best interest of each client. Infinity Q calculates fees charged to clients and performance that it may use in presentations to clients and prospects based on the values of assets in client accounts.  An incorrect valuation of assets may result in overcharges of fees to clients and/or overstatement of performance information, which in each case may be a violation of the firm's fiduciary duty and the anti-fraud provisions of the Advisers Act.

Infinity Q has established valuation policies and procedures (the "Valuation Policy") in an effort to reasonably ensure portfolio holdings ("Positions") are valued in accordance with the Infinity Q Funds' offering documents and Generally Accepted Accounting Principles in the United States ("US GAAP"), specifically, ASC 820, *Fair Value Measurement*. GAAP requires the use of "fair value" in determining the value of the asset. Under these principles, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the valuation date.  These principles require that fair value measurements be determined based on the assumptions that market participants would use in pricing the asset or liability, including assumption about risk, and the effect of restrictions on the sale or use of an asset.

Set forth below is Infinity Q's Valuation Policy with respect to its Private Funds. The Board of Trustees of the TAP Trust has adopted Valuation Procedures that apply to the valuation of the shares of the Infinity Q Diversified Alpha Fund and additional considerations relating to valuation of Infinity Q Diversified Alpha are further detailed in the Investment Company Act Portfolio Management Guidelines section of this Manual. The Valuation Procedures of TAP Trust are deemed to be incorporated into this manual.

## POLICY

It is the general policy of Infinity Q that assets for which market quotations are readily available be valued at their market value. In situations where no market quotations are available, Infinity Q seeks to utilize the value of similar assets where market quotations are available or model or matrix pricing for assets when both market quotations and similar publicly traded assets are not available, or as necessary to facilitate fair value.

## PROCEDURES

The primary source of pricing information typically will be independent sources, such as brokers or pricing services, but Infinity Q's Valuation Committee is ultimately responsible for determining fair value for investments held by each client account.    The value of those positions will form an integral part of the Net Asset Value calculation. Once a price is established for a portfolio security, it shall be used for all Funds that hold the security.

 U.S. Bancorp Fund Services, LLC, the Administrator of the private funds managed by Infinity Q, calculates the Net Asset Value of the assets in client accounts and in the private funds for fee calculation and other purposes on the "Valuation Date". The Valuation Date is the last day of each month for the Infinity Q Volatility Alpha Fund.

-79-

IQCM-SEC-00087750

**Fair Value Pricing**

If market quotations or official closing prices are not readily available or do not accurately reflect fair value for an asset, or if an asset's value has been materially affected by events occurring after the close of the principal market on which the asset is traded, but before the valuation date, the asset may be valued by another method that Infinity Q believes accurately reflects fair value. Infinity Q's Valuation Committee, described further below, is responsible for fair valuation. ASC 820 provides guidance regarding appropriate valuation methodologies. ASC 820's recommended hierarchy of valuation metrics is summarized as follows, in descending order of preference:

**Level 1:**  Quoted prices in active markets for identical assets or liabilities;

**Level 2:**  a) quoted prices for similar assets or liabilities in active markets; b) quoted prices for identical or similar assets or liabilities in markets where there are few transactions, prices are not current, price quotations vary substantially over time or among market markers, or in which little information is released publicly; c) inputs other than quoted prices that are observable for the asset or liability (*e.g.* interest rates, yield curves, volatilities, prepayment speeds, loss expectations, credit risks, expected default rates, and NAVs for investment companies that can be redeemed in the "near term"); or d) inputs derived from or corroborated by observable market data by correlation or other means;

**Level 3:** Unobservable inputs for the asset or liability.

Fair valuation methodologies also may incorporate, among other things:

- Broker-dealer quotes;
- Other third-party quotation providers;
- Bids and Asks on exchanges where the asset is traded;
- Investment cost
- Prices obtained during subsequent financing events;
- Discounted expected future cash flows;
- Pricing formulas (*e.g.* Black-Scholes model);
- Prior trades; and/or
- Pricing matrices.

As soon as market quotations become available for a security being "fair valued," such market values shall be used in the calculation of the Fund's NAV without any action required by the Valuation Committee.  In addition, securities will not be valued at "fair value" whenever market quotations are readily available.

**Valuation Committee**

Infinity Q has established a Valuation Committee that is responsible for determining fair values and to ensure timely analysis and implementation of policies related to the pricing of individual securities or groups of securities that may be held by the Funds.

IQCM-SEC-00087750

The Valuation Committee is comprised of members of senior management including Infinity Q's Chief Investment Officer, Chief Executive Officer, Chief Risk Officer, and Chief Compliance Officer. In addition, other members of the investment team, Infinity Q's administrators, auditors, and third party valuation firms may be invited and participate as observers to Valuation Committee meetings.

The Valuation Committee meets monthly or more often if needed to establish pricing. A quorum is necessary for all meetings of the Valuation Committees where any action or determination by the members shall be made. A quorum shall be constituted by the presence of a majority of the members in person or by means of conference telephone or any other means of communication by which all persons participating in the meeting are able to communicate with each other. Any action or determination by the Valuation Committees shall require the approval of a majority of all members present at such meeting in quorum. In the event that any resolution or action is passed at an inquorate meeting, such resolution or action shall be deemed to have been duly passed if it is afterwards ratified by the required majority of the members at a quorate meeting of members duly convened. In lieu of a meeting, the members may also reach decisions by way of written resolution or ratification, and a decision taken by way of written resolution or ratification signed by a majority of the members entitled to vote on such matters shall have the same effect as if that decision had been duly taken by a vote at a duly convened meeting of the members.

The Valuation Committee is responsible for carrying out certain functions relating to the valuation of portfolio securities and other assets. These responsibilities include:

(a) Oversight over valuations focused on developing and/or assessing the methodologies and information/pricing sources to be used for performing Independent Price Verifications ("IPV") or price substantiations on each Position.

(b) Oversight over the price substantiation process, including third-party valuation agents and services.

(c) Approval of Position valuations at each Valuation Date.

(d) Where broker quotes/price indications or pricing service values (each, a "quote") are relied upon to value a particular type of asset, reviewing quantitative and qualitative information, such as the appropriateness of the source (*e.g.*, pricing source, broker or other source), recent trade activity and outliers and, where appropriate, quantitative support for valuations used.

(e) Where models/memos provide the basis for Position valuations, reviewing such memos/modes and any supporting documentation. From time to time the Committee may elect to have third parties provide price assurance or to value Positions outright.

(f) Ensuring that the valuation process periodically includes back-testing of a sample of valuations to the extent possible and where it is likely to provide a reasonable base of comparison, against the recent purchase or sale prices of Positions.

(g) Not less than annually, reviewing and approving this Policy.

The CIO is responsible for preparing or causing to be prepared minutes of each meeting of the Valuation Committee, which shall describe the actions taken at the meeting.

## Valuation Considerations

IQCM-SEC-00087750

As a general principle, valuations should reflect the amount that the Fund could reasonably expect to receive for the security upon its current sale.  Therefore, ascertaining fair value requires a determination of the amount that an arm's-length buyer, under the circumstances, would currently pay for the security, exclusive of blockage discounts.  Fair value <u>cannot</u> be based on what a buyer might pay at some later time, such as when the market ultimately recognizes the security's true value as currently perceived by the Adviser.  The Fund also may <u>not</u> fair value portfolio securities at prices that are not achievable on a current basis on the belief that the Fund would not currently need to sell those securities.  Thus, for example, the Fund generally may not fair value portfolio securities at par based on the expectation that the Fund will hold those securities until maturity, if the Fund could not receive par value upon the current sale of those securities.

**Exceptions To Be Considered**

- If on the valuation date, the exchange or market for a given asset is not open for business, the valuation is determined as of the last preceding date on which such exchange or market was open for business.

- If Infinity Q believes that a quoted price in an active market does not represent fair value because significant events have occurred after the close of the market but before the valuation date/time, a fair value adjustment may be required for that asset.  If Infinity Q is made aware of any news or events that they believe will have a material impact on the valuation, an appropriate adjustment should be made.  Infinity Q will determine the appropriateness and materiality of any such adjustment and will document the outcome of the review as part of its customary records, as described below.

- If an asset to be valued constitutes a block which in the judgement of Infinity Q, could not be liquidated in a reasonable time without  depressing or inflating the market, or restrictions on marketability exist with respect to such asset, the asset may be assigned a different value by Infinity Q than would otherwise be calculated in accordance with the valuation methodologies noted above; provided that, such block will not be valued at a unit value in excess of, for long positions, or below, for short positions, the quoted market price of such asset.

**Broker Pricing (Minimum # Of Bids/Asks / Averaging)**

Pricing services and broker dealers are identified based upon past experience and how active they are in the name or market.  Where prices are available from third parties, Infinity Q will attempt to obtain a minimum of two independent prices and use its best judgment in combination with relevant benchmarks and pricing models to determine the fair value of the instrument. The final price for each position is typically obtained by calculating the average of the external prices received.   Where only a single price is available, Infinity Q uses that price and may apply a discount to that price to account for the uncertainty of only having one pricing source.

When multiple independent marks are available, Infinity Q does not mark any securities higher than the average of the prices obtained.  However, Infinity Q may challenge prices with a broker dealer when such prices are considered to be "outliers" (this occurs when two or more prices are closely clustered but

-82-

IQCM-SEC-00087750

one is outside that range). If such challenges are not successful, Infinity Q may accept the price quote and consider a discount applied to account for the dispersion in pricing or may choose to eliminate that outlier prior to computing a final mark.

In circumstances where an exchange, a pricing service, or where one or more quotes are not available for a Position, or where such exchange, pricing service, quote or quotes may not provide a reliable indication of fair value, Infinity Q will value each such Position based on relevant information, including, without limitation: (i) an internally or externally developed memo/model, including inputs and assumptions (e.g., comparing market values for similar companies/instruments); and/or (ii) such other factors as may be deemed appropriate. A written valuation memo/model shall be provided for model-based prices explaining why the price used reflects fair value of the Position. Positions with nominal value may not require a written valuation memo/model.
.

**Valuation Methodology**

In valuing assets, the following general principals apply:

- **Equity Securities:** Equity Securities, including preferred stock, ETFs, and ADRs, that are listed for trading on an active recognized exchanged or market and are freely transferable are valued at the last reported sales price, as quoted by Bloomberg Valuation Services ("Bloomberg"), or other recognized pricing sources. In certain instances when it is determined that the market is not actively trading, the monthly Volume Weighted Average Price, as determined by Bloomberg will be utilized and/or a marketability adjustment will be applied.

- **Equity Total Return Swaps:** Equity swaps, including CFDs and basket swaps, are valued consistent with the methodology discussed above for the underlying equity security on which the performance of the swap is based.

- **Listed Options:** Options that are listed on a securities exchange are valued at their last sales prices as quoted on Bloomberg or other recognized pricing sources; *provided*, that if the last sales prices of such options do not fall between the last "bid" and "asked" prices for such options on that date, then the options are valued at the mean between the last "bid" and "asked" prices for such options on that date.

- **OTC Equity Options:** Over-the-counter options that have settled based on the settlement price of similar exchange-traded options are value consistent with the methodology discussed above for listed options. If no similar exchange-traded options is available, then the option is priced via a Black-Scholes model on Bloomberg. These values are compared to broker quotes for reasonableness. Any material differences are compared to the valuation obtained by the Administrator and a determination of the appropriate fair value is made.

- **Debt:** Debt Securities, including sovereign debt, corporate debt and convertibles, are value at the "*mid*" as provided by Thomson Reuters or other recognized pricing sources. If reported mids

IQCM-SEC-00087750

are not available, then prices are received from independent broker/dealers who may also be market makers in the Securities.

- **Futures:**  Futures are valued at the settle close, as quoted on Bloomberg or other recognized pricing sources.

- **Currency Contracts:**  Forward and spot foreign currencies are converted into U.S. dollars using foreign exchange rates obtained from Bloomberg at approximately 4:30 pm ET.

- **Credit Default Swaps:**  Credit default swaps are valued via Bloomberg utilizing the ISDA Standard Upfront Model on a daily basis.  At each month end, valuations are compared to the values provided by counterparties for reasonableness.

- **OTC Derivatives:**  Reliable quotes from certain OTC derivatives, including variance swaps, volatility swaps, fx options, and swaptions, may not be available from data providers, either because the transactions are "one of a kind" or not actively trades.  Infinity Q utilizes Bloomberg, Broker Quotes, and Counterparty Valuations to provide a fair value for these securities. At each month end, valuations are compared to the values provided by counterparties for reasonableness.

- **Investment Funds:**  Investments in other investment funds (hedge funds, private equity or other private funds)("Portfolio Funds") are valued at the latest month-end or quarter-end unaudited or audited net asset value.  However, if Infinity Q reasonably believes that the valuations furnished do not reflect the fair value of the underlying assets, adjustments may be made to such values.

  In addition, the Private Fund may invest in Portfolio Funds that provide NAVs on a quarterly, semi-annual or annual basis, rather than on a monthly basis, and, therefore, Infinity Q may be required to rely on a monthly approximation of the NAVs of certain portfolio funds provided to it by such Portfolio Funds' fund manager.

## RECORDKEEPING

Fair value documentation shall include (1) the identity of the affected portfolio(s); (2) a copy of any materials considered in making the fair value determination; (3) a brief summary of the relevant factors considered; and (4) any follow-up information to close out a prior fair value determination.  All valuation determinations, and documentation related thereto, shall be retained for a period of not less than six years after the close of the applicable Fund's fiscal year, the first two years in an easily accessible place.

## REVISIONS TO POLICY

All Policy revisions require approval by each Valuation Committee and will be documented accordingly, including any action taken and dates associated therewith.  These policies will be reviewed by each Valuation Committee for adequacy and effectiveness at least annually and more frequently as needed. The CCO is responsible for drafting the policy revisions and ensuring they are incorporated into Infinity Q Compliance Manual.

**EFFECTIVE**: January 18, 2017

IQCM-SEC-00087750

**Last Updated:**

IQCM-SEC-00087750

# INVESTMENT ALLOCATION

## INTRODUCTION

Registered investment advisers are, among other things, obligated to allocate investment opportunities in good faith among clients. Infinity Q has a fiduciary obligation to use its best efforts to ensure that no client is treated unfairly in relation to any other client in the allocation of securities or the order of security recommendations and execution of transactions.   The procedures set out below, therefore, are designed to ensure that Infinity Q allocates investment opportunities among the Funds in good faith and using its best judgment.

Accordingly, it is the policy of Infinity Q to make such allocation determinations in accordance with the procedures specified below.

## GENERAL POLICIES AND PROCEDURES

Infinity Q shall recommend, purchase or sell securities on behalf of the Funds based on their strategy and investment mandate, as well as risks.  Each transaction should be suitable for each Fund in light of the characteristics of the specific security and the overall portfolio composition of the Funds and in accordance with the terms of the governing documents for the Funds.

Infinity Q conducts a pre-trade analysis of a contemplated security to be bought or sold against the Funds' portfolio levels and investment guidelines prior to a trade allocation.

As a fiduciary, Infinity Q cannot arbitrarily distinguish among its clients and Infinity Q cannot internally, disproportionately allocate promising positions to underperforming clients to boost performance or vice versa.  However, Infinity Q may, in good faith, determine that certain investments should be allocated only to specific clients.

## ALLOCATION OF INVESTMENTS PROCEDURES

Infinity Q will seek to allocate investment opportunities in a fair and equitable manner that is believed to be appropriate and in the best interests of all the entities involved, including but not limited to the Funds.  Further, Infinity Q will not allocate investment opportunities based, in whole or in part, on the relative fee structure or amount of fees paid by any client or the profitability of any client.  Allocations among Funds and clients of Wildcat with similar strategies generally will be made on a pro rata basis in proportion to the relative equity of each and based on the beta, delta, gamma, vega and theta of each.[1]

Allocating securities among accounts involves some element of judgment, however, and at times it may be appropriate to deviate from the usual allocation procedures.  Certain factors may justify an allocation that deviates from the general rule, including but not limited to the nature of the investment opportunity taken in the context of the other investments at the time, the liquidity of the investment relative to the needs of the particular client, the investment or regulatory limitations on the particular client, the transaction costs involved, the amount of capital available for investment by a client as well as each client's projected future capacity for investment, and cash flow considerations.  In such circumstances,

---

[1] Advisory personnel of Infinity Q may also provide advisory services to clients of Wildcat.

IQCM-SEC-00087750

the Chief Compliance Officer, in consultation with outside counsel (if appropriate), shall determine the appropriate action which, in his reasonable judgment, will serve the best interests of, and will be fair and equitable to, all clients.

## BLOCK ORDERS

Infinity Q will generally combine orders for trades across multiple Funds and with clients of Wildcat.  If Infinity Q has determined to enter into a trade at the same time for more than one Fund, or at the same time as Wildcat enters into a trade for a client, Infinity Q and, if applicable, Wildcat shall ensure that combined orders for all clients are generally placed while assigning pre-order allocations.  If an order for more than one client cannot be fully executed, Infinity Q and Wildcat shall ensure that the investments are allocated on a fair and equitable basis; generally, Infinity Q will allocate the partial fill across strategies and accounts in the same proportion as the overall original trade order allocation, i.e., pro rata basis.

Regardless of the number of accounts, if any, or strategies participating in a given block trade order, all participants in such block trade order should receive the average price for all transactions executed for that unique order during such trading day, and all participants should share in the commissions and other transactional costs on a pro rata basis.  The pro rata basis for these costs shall be determined in the same manner as the block trade order allocation.

If Infinity Q aggregates orders for the purchase and sale of privately placed securities among its proprietary accounts and/or private account clients and the Funds, Infinity Q must comply with Section 17(d) and Rule 17d-1 under the 1940 Act and related SEC guidance, which place certain restrictions on aggregated transactions involving registered investment companies.  Such requirements may, among other things, prohibit Infinity Q from, for example, negotiating terms of the transaction other than price and/or having a material pecuniary interest in the transaction.  See the policy on Investment Company Act Portfolio Management Guidelines for a discussion of Section 17(d) and Rule 17d-1 more generally.

## MONITORING

Infinity Q performs daily portfolio monitoring to ensure the accuracy of trade allocations and to promptly identify potential trading errors. The Risk Data Day/Day Check Report identifies large portfolio shifts day over day. The Chief Risk Officer, or his designee, reviews this report and investigates the portfolio changes to determine if the changes are valid or if an unintended issue is causing the portfolio shifts.  The CRO or his designee also reviews the Position Difference Daily Check Report each day. Infinity Q compares the results of this report each morning to the counterparty confirms and/or term sheets provided for all trades made the night before to ensure all allocations, assets, quantities, terms and conditions are correct. The entire quantitative investment team receives these reports for review in addition to the CRO's reviews.

*In the event of a Trade Error, see "Trade Errors" in the "Publicly Traded Securities and Soft Dollars" policy.*

IQCM-SEC-00087750

**DOCUMENTATION AND RECORDKEEPING**

Final allocations of investment opportunities shall be documented on Infinity Q's trade blotter or equivalent. The blotter shall include, among other things, the date of a transaction, description, the Funds acquiring or selling an investment, dollar value involved and percentage of total acquisition acquired by each Fund. Within the trade blotter, there shall be included all relevant details that contributed to the allocation amounts or percentages. The CIO shall also document in Infinity Q's trade blotter information with respect to any exceptions to the allocation process and the reason for the exceptions.

**RESPONSIBILTY**

- The CCO or designee shall periodically review Infinity Q's trade blotter or equivalent on a sample basis to ensure that final allocations of investment opportunities are effected and documented in accordance with these procedures.
- The CCO or designee shall periodically review the performance for all client accounts (including the Funds) that participate in block trades to confirm that any performance dispersion among accounts is appropriate and not indicative of an inequitable allocation of one or more investment opportunities.

**EFFECTIVE AS OF:** October 1, 2014

**LAST UPDATED:**

-88-

IQCM-SEC-00087750

## COMPLIANCE WITH AFFILIATE TRANSACTION RESTRICTIONS

### A.     Introduction

To prevent self-dealing and overreaching by persons in a position to take advantage of the Funds managed by the Firm, the 1940 Act prohibits or limits the Funds from entering into certain transactions with "affiliated persons" (as such term is defined under Section 2(a)(3) of the 1940 Act) of the Funds ("first-tier affiliates") and "affiliated persons" of such "affiliated persons" of the Funds ("second-tier affiliates").  The 1940 Act also prohibits a Fund from entering into certain transactions with the Funds' principal underwriters and their affiliated persons.  The penalties for violating these rules are severe, and therefore it is important that first- and second-tier affiliates are identified so that steps may be taken to prevent the Funds from engaging in prohibited transactions with them.  See **Attachment A** for a simplified graphical illustration of the first- and second-tier affiliates of a Fund.  See **Attachment B** for the 1940 Act's definitions of "affiliated person" and certain related terms.

These procedures are intended to represent a good-faith, reasonable effort to identify first- and second-tier affiliates of the Funds, and thereby to facilitate the Firm's compliance with the various restrictions under the 1940 Act on transactions with such affiliates.  These procedures are not, however, intended to directly address compliance with such restrictions, and the Funds have adopted separate compliance policies and procedures to address such restrictions.  Please refer to the policy on Investment Company Act Portfolio Management Guidelines of this Manual for a discussion of certain of such policies.

### B.     Procedures for Identifying Restricted Affiliates

These procedures are intended to help identify individuals and entities that may be first- or second-tier affiliates of a Fund (each, a "Restricted Affiliate").  The Firm maintains a list of Restricted Affiliates so that transactions subject to the affiliated transaction rules under the 1940 Act can be identified.  The following is a non-exhaustive sample list of persons or entities that may be Restricted Affiliates of one or more Funds (see Attachment B for the complete definitions):

- The Firm.
- All Firm discretionary separately managed accounts.
- Each investment adviser that is part of the Firm's control group.
- Each Fund.
- Each unregistered Fund and separately managed account managed by the Firm.
- All officers, directors/trustees and employees of the Firm.
- Each other third-party fund or other investment vehicle advised or subadvised by the Firm or certain of its affiliates.
- Any entity controlled by individuals who control the Firm.
- All officers, directors/trustees and employees of the Funds.
- Any sub-adviser to any Fund.
- All affiliates of any sub-adviser to any Fund.

The Firm shall, no less frequently than annually, identify any Restricted Affiliates that are Restricted Affiliates of the Funds due to the Firm and shall provide each Fund's compliance department with a list of such Restricted Affiliates.  Each such list should clearly indicate which of the listed

IQCM-SEC-00087750

Restricted Affiliates is a broker-dealer or a public company. The list should include any fund for which the Firm or its affiliated persons serves as investment manager, general partner, or manager (in the case of a limited liability company), even if such entity may not be a Restricted Affiliate.

Compliance will be responsible for monitoring legal entities and outside business activities and affiliations of Firm employees in order to identify and maintain the list of Restricted Affiliates. Compliance monitors the outside business activities of its employees through periodic reporting required under this Manual. Such reports are monitored and reviewed by Compliance, and any conflicts or potential Restricted Affiliates are identified through the review of such reports. Compliance shall also monitor and restrict transactions between the Funds and Restricted Affiliates.

A designation of a person as being a Restricted Affiliate listed above may only be changed (i) by a member of Compliance after a determination that the facts that caused the person to be designated as a Restricted Affiliate no longer apply (e.g., because the person no longer owns the specified percentage of shares of an entity) or (ii) by the CCO after a determination that although designated as a Restricted Affiliate hereunder the person is not in fact a person that, under applicable law, must be restricted from trading with the applicable Fund or Funds (a "false positive"). Any determination described in the previous sentence will be documented and retained by Compliance.[1]

Please note that because of the complexity of the applicable affiliation concepts and the vast number of factual permutations that may lead to deemed affiliations, it is possible that not all first- and second-tier affiliates will be designated as Restricted Affiliates under these procedures – **if you believe that a person may be a first- or second-tier affiliate even though not a Restricted Affiliate hereunder, or have any other questions on these procedures, please contact the CCO.** In addition, because these procedures are intended to be prophylactic, there may be a certain number of "false positives" – please contact the CCO if you believe that a person should not be considered a Restricted Affiliate even though designated as such under these Procedures.

**Because these procedures may, in certain circumstances, yield "false positives," for purposes of each Fund and/or Firm compliance policy or procedure that places restrictions on transactions with Fund first- and second-tier affiliates (collectively, "Affiliation Policies"), no violation of such policy shall be deemed to result from a transaction with a person identified herein as a Restricted Affiliate unless the transaction with such person is, in fact, not permitted under the applicable Affiliation Policy.**

EFFECTIVE AS OF: October 1, 2014

LAST UPDATED:

---

[1] Note that, with respect to any proposed transaction between a Fund and any Restricted Affiliate, please contact the CCO prior to effecting any such transaction.

IQCM-SEC-00087750

**Attachment A**

**Restricted Affiliates**



IQCM-SEC-00087750

## Attachment B

## Certain Definitions

Section 2(a)(3) of the 1940 Act defines "affiliated person" as follows:

> "Affiliated person" of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof.

Section 2(a)(3) of the 1940 Act defines "control" as follows:

> "Control" means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.

> Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. A natural person shall be presumed not to be a controlled person within the meaning of this title. Any such presumption may be rebutted by evidence, but except as hereinafter provided, shall continue until a determination to the contrary made by the [Securities and Exchange] Commission by order either on its own motion or on application by an interested person. If an application filed hereunder is not granted or denied by the Commission within sixty days after filing thereof, the determination sought by the application shall be deemed to have been temporarily granted pending final determination of the Commission thereon. The Commission, upon its own motion or upon application, may by order revoke or modify any order issued under this paragraph whenever it shall find that the determination embraced in such original order is no longer consistent with the facts.

IQCM-SEC-00087750

**INVESTMENT COMPANY ACT PORTFOLIO MANAGEMENT GUIDELINES**

The Infinity Q Diversified Alpha Fund is subject to the requirements under the 1940 Act, which, among other things, impose a number of trading and portfolio management restrictions on registered investment companies (collectively, the "1940 Act Investment Restrictions"). The Investment Company Act Portfolio Management Guidelines described in this section apply to the Infinity Q Diversified Alpha Fund only and not the Private Funds managed by Infinity Q unless specifically stated.

The Infinity Q Diversified Alpha Fund, as part of the TAP Trust, and/or their investment advisers have adopted a number of policies and procedures to ensure compliance with the 1940 Act Investment Restrictions (the "Fund Policies"). See **Attachment C** for a listing of the applicable TAP Trust Fund Policies which are deemed to be incorporated into this manual as part of the firm's Compliance Policies and Procedures. In addition, each Fund has investment objectives, policies and restrictions as disclosed from time to time in its prospectus and statement of additional information ("SAI") included in its registration statement filed with the SEC ("Investment Guidelines"). The Firm and the Funds' portfolio managers will adhere to such TAP Trust Fund Policies and Investment Guidelines when managing the applicable Fund. [1]

Application of the 1940 Act Investment Restrictions to the use of derivatives is complicated, and portfolio management personnel shall consult with the CCO before initially engaging in a new type of derivatives transaction or strategy with respect to the Fund.

Many of the 1940 Act Investment Restrictions prohibit or limit transactions with Restricted Affiliates. The Firm will attempt to identify all Restricted Affiliates for each Fund it advises, either through its own procedures or coordination with the Fund's investment adviser (in instances where the Firm is acting as a Fund's sub-adviser), to ensure such Funds do not transact with Restricted Affiliates in violation of the 1940 Act Investment Restrictions or the related Fund Policies. See the Compliance with Affiliate Transaction Restrictions policy of this Manual.

The Firm's CCO will implement procedures to monitor compliance by the Firm with the applicable Fund Policies and Investment Guidelines.

The following is a summary of applicable 1940 Act Investment Restrictions and Investment Guidelines. The applicable 1940 Act Investment Restrictions and Investment Guidelines are complex and there may be nuances not addressed by these summaries. If you have any doubt as to whether an activity might result in violations of the applicable 1940 Act Investment Restrictions and Investment Guidelines, please consult with the CCO. In all cases the Firm will endeavor to manage the Funds in accordance with the 1940 Act and with any Fund Policies relating to the 1940 Act Investment Restrictions discussed below. To the extent a Fund does not have a policy or procedure in place addressing a particular 1940 Act Investment Restriction, the Firm will consult with counsel to the Fund or the Firm to ensure compliance with such Investment Restriction.

---

[1] Please note that the Fund Policies may contain policies and procedures to be followed by the Firm unrelated to portfolio management, such as portfolio holdings disclosure requirements.

IQCM-SEC-00087750

- **Investment Guidelines.**  The 1940 Act and Form N-1A require the Funds to disclose, among other things, their investment objectives, strategies and restrictions in the Fund's prospectus and SAI, including policies relating to concentration, diversification, the use of derivatives and asset classes and security types in which the Fund may invest, among others.  The Firm and each Fund's portfolio managers will comply with the investment objectives and policies of the relevant Fund, and the portfolio holdings of each Fund must comply with its objectives, strategies and restrictions.  Unless a security or investment practice is described in the prospectus or the SAI, the Firm and the Fund's portfolio managers will assume that it is not an authorized investment or practice for the Fund.  If the Fund's prospectus or SAI states that the Fund does not "presently intend" to engage in a particular type of transaction, the transaction may not be effected without consulting with outside counsel.

- **Principal Transactions.**  Section 17(a) of the 1940 Act prohibits a Restricted Affiliate or principal underwriter (or affiliate thereof) of a Fund, acting as principal, from selling to or purchasing from the Fund any security or other property.  Principal transactions with Restricted Affiliates are not permitted under any circumstances for the Funds.

- **Cross Trades.**  Rule 17a-7 under the 1940 Act specifies the conditions under which a Fund can participate in a cross trade.  Among these conditions are provisions that seek to ensure that the cross trade is fair to both parties and that require reporting of cross trades to the Fund's board.  A Fund will typically have a Fund Policy addressing Rule 17a-7 transactions. Infinity Q will comply with the Rule 17a-7 Procedures (Affiliated Transactions) adopted by the Fund.

- **Joint Transactions.**  Section 17(d) of the 1940 Act prohibits a Restricted Affiliate, acting as principal, from effecting any transaction in which a Fund is a joint or joint and several participant with the Restricted Affiliate in contravention of any SEC rules.  The provision is intended to prohibit or limit abuses arising from conflicts of interest.

  Rule 17d-1 under the 1940 Act makes it unlawful for a Restricted Affiliate or principal underwriter (or affiliate thereof) of a Fund acting as principal, to participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any Fund is a participant unless an application regarding such joint enterprise, arrangement or profit-sharing plan has been specifically approved by order of the SEC.

- **Section 17(e) and Rule 17e-1.**  Section 17(e) of the 1940 Act generally prohibits any Restricted Affiliate of a Fund from receiving compensation or consideration from the Fund, as follows:

  - (i) acting as agent, from receiving any compensation (other than a regular salary or wages from the Fund) for the purchase or sale of any property to or for the Fund, except in the course of that person's business as an underwriter or broker, or

IQCM-SEC-00087750

     ○  (ii) acting as broker, in connection with the sale of securities by or to the Fund, to receive any consideration except in accordance with certain limitations.

Section 17(e) is designed to prohibit situations in which a Restricted Affiliate operates on behalf of the Fund while under a conflict of interest, such as by receiving compensation for effecting certain transactions for the Fund.

Rule 17e-1 under the 1940 Act provides a safe harbor for affiliated brokers to receive a "usual and customary broker's commission" in connection with transactions effected on an exchange. Rule 17e-1 defines a "usual and customary broker's commission" as one that is reasonable and fair compared to the commission received by other brokers in connection with comparable transactions involving similar securities being purchased or sold on an exchange during a comparable period of time. A Fund will typically have a Fund Policy addressing Rule 17e-1 transactions.

- **Section 10(f) and Rule 10f-3.** Section 10(f) of the 1940 Act prohibits Funds from purchasing or otherwise acquiring, during the existence of any underwriting or selling syndicate, any security (except a security of which the Fund is the issuer) a principal underwriter of which is an officer, director, member of an advisory board, investment adviser, or employee of such Fund, or is a person of which any such officer, director, member of an advisory board, investment adviser, or employee is an affiliated person, unless in acquiring such security such Fund is itself acting as a principal underwriter for the issuer.

  Rule 10f-3 under the 1940 Act provides a limited exemption to this prohibition subject to certain conditions. Rule 10f-3's conditions are designed to prevent an underwriter from "dumping" unmarketable securities on affiliated funds, or from earning excessive underwriting fees. A Fund will typically have a Fund Policy addressing Rule 10f-3 transactions. Infinity Q will comply with the Rule 10f-3 Procedures (Affiliated Underwritings) adopted by the Fund.

- **Section 12(d)(1).** Section 12(d)(1) of the 1940 Act significantly restricts the ability of Funds to invest in securities of other funds, a practice referred to as "pyramiding," except in limited circumstances. Section 12(d)(1) limits the amount a Fund can invest in another fund, including shares of ETFs. Similarly, Funds are limited in the amount of their own shares they can knowingly sell to other investment companies. Section 12(d)(1) is designed to prevent the concentration of control of funds, which could lead to duplication of advisory, administrative, and sales expenses without a corresponding benefit. Infinity Q will comply with the Section 12(d)(1) Procedures adopted by the Fund.

- **Section 12(d)(3) and Rule 12d3-1**. Section 12(d)(3) of the 1940 Act prohibits Funds from purchasing or otherwise acquiring any security issued by, or other interest in, companies engaged in a securities related business (e.g., a broker-dealer; an

IQCM-SEC-00087750

underwriter; an adviser to the Funds; or an investment adviser registered under the Advisers Act).  Section 12(d)(3) is designed to prevent funds from being organized and operating in the interests of brokers, dealers, underwriters, and investment advisers. Derivatives counterparties may be "issuers" for purposes of Section 12(d)(3).

Rule 12d3-1 under the 1940 Act provides a blanket and a conditional exemption from the Section 12(d)(3) prohibition, as follows: (i) the blanket exemption is for acquisitions of securities of issuers that derive 15% or less of their gross revenues from "securities-related activities," i.e., one of the prohibited businesses; and (ii) the conditional exemption applies when securities are acquired from an issuer that derives more than 15% of its gross revenues from prohibited businesses, in which case a Fund can buy up to 5% of an issuer's equity securities and up to 10% of an issuer's debt securities.  However, the conditional exemption is available only if, among other things, immediately after any acquisition of equity or debt securities, the funds have not invested more than 5% of their total assets in securities (whether equity or debt) of the issuer.  Rule 12d3-1 may not be available for purchases of securities issued by a Restricted Affiliate.  Also, even if a Fund's holdings of an issuer are not limited by Section 12(d)(3), other limitations on the extent of a Funds' exposure to particular issuers (such as limitations under the Internal Revenue Code or the Funds' prospectus or investment restrictions) will still apply.

- **Cross Ownership and Circular Ownership.**  Section 20(c) of the 1940 Act prohibits the purchase of securities knowingly resulting in cross-ownership or circular ownership.  A Fund may not purchase any voting security if, to its knowledge, cross-ownership or circular ownership exists, or after such acquisition will exist, between the Fund and the issuer of such security.  "Cross-ownership" is deemed to exist between two companies when each company beneficially owns more than 3% of the outstanding voting securities of the other company.  "Circular ownership" is deemed to exist between two companies if such companies are included within a group of three or more companies, each of which (1) beneficially owns more than 3% of the outstanding voting securities of one or more other companies of the group; and (2) has more than 3% of its own outstanding voting securities beneficially owned by another company, or by each of two or more other companies, of the group.

  If cross-ownership or circular ownership between a Fund and any other company or companies comes into existence upon the purchase by the Fund of the securities of another company, the Fund shall, within one year after it first knows of the existence of such cross ownership or circular ownership, take such steps as are necessary to eliminate the same.

- **Valuation.**  Section 2(a)(41) of the 1940 Act and related regulations provide that with respect to Fund assets, "value" shall mean "…with respect to securities for which market quotations are readily available, the market value of such securities…and …with respect to other securities and assets, fair value as determined in good faith by the board of directors."

IQCM-SEC-00087750

In an effort to price portfolio securities belonging to the Infinity Q Diversified Alpha Fund in compliance with the requirements of the 1940 Act, the Board of Trustees of the TAP Trust (the "Board") has adopted procedures that apply to the valuation of the shares of the Fund ("Valuation Procedures"). The Valuation Procedures include the process for determining market value for the Fund's portfolio securities. The Valuation Procedures also address determining fair value of securities for which current market quotations are not readily available. The Board has delegated responsibility for determining the fair value methodology to be used to value assets held by the Fund to Infinity Q, subject to the Board's supervision and direction. The Valuation Procedures detail the manner in which Infinity Q shall undertake such fair valuations.

The Fund's Custodian is responsible for obtaining and posting the daily prices of the Fund's portfolio securities with values supplied by an independent pricing service. The pricing service is selected and approved by the Board from the list of vendors provided by the Custodian. In accordance with the Valuation Procedures, Infinity Q may override prices obtained from the approved pricing service only when there is a reasonable basis to believe that the price does not accurately reflect the current market value of the portfolio security. All price overrides are reported to the Board quarterly.

Infinity Q is also charged with monitoring for significant events that may call into question the reliability of market quotations obtained from a pricing service and thereafter with determining the appropriate fair value of the portfolio security. A summary of all fair value determinations are submitted to the Board quarterly for review and ratification.

Infinity Q will comply with the Valuation Procedures adopted by the Fund as they relate to the firm's role in determining the fair value methodologies of the Fund's portfolio securities.

- **Liquidity.** A Fund may not invest more than 15% of its net assets (taken at market value at the time of purchase) in illiquid securities (i.e., securities that cannot be disposed of within seven days and in the usual course of business at approximately the value at which the security is valued). The Firm will comply with the Fund's liquidity policies and procedures when determining whether a security is illiquid.

- **Borrowings and Senior Securities.** Section 18(f) of the 1940 Act prohibits mutual funds from issuing senior securities, subject to a limited exception for certain bank borrowings. The SEC and its staff have provided guidance regarding the steps mutual funds must take (i.e., segregating liquid assets and/or covering obligations) when engaging in trading practices that involve future contractual obligations and/or leverage in order to avoid raising issues under Section 18(f). The SEC staff has taken the position that derivatives that involve future contractual obligations are subject to Section 18.

- **Repurchase Agreements**. A number of provisions under the 1940 Act may apply when funds invest in repurchase agreements or refunded securities, including Section

-97-

IQCM-SEC-00087750

12(d)(3) (discussed above) and Section 5(b)(1) (i.e., limiting the amount of securities of any one issuer (other than U.S. Government securities) in which diversified funds may invest). Rule 5b-3 under the 1940 Act permits funds, under certain circumstances, to avoid these issues by "looking through" repurchase agreements or refunded securities to the underlying collateral for the purposes of portfolio compliance.

- **Performance of the Fund's Investments.** Infinity Q conducts daily reviews of the performance of each of the Fund's investments. As part of this review, Infinity Q performs daily Fund pricing reviews by independently pricing all swap positions and direct Fund investments and aggregating all prices (and associated liabilities) to determine the Fund's net asset value ("NAV") per share for the day on a rounded and unrounded basis. Infinity Q then compares the rounded NAV that has been calculated to the rounded NAV provided to it by the Fund's fund accounting agent. For deviations that are greater than $.01, Infinity Q investigates the discrepancy by contacting the fund accounting agent.

- **Fund Directed Brokerage.** Rule 12b-1(h) under the 1940 Act prohibits investment companies from compensating broker-dealers for the promotion or sale of shares of funds by directing to the broker-dealer portfolio securities transactions or remuneration received from such portfolio securities transactions. In addition, the rule also prohibits investment companies from directing portfolio securities transactions to a broker-dealer that promotes or sells shares of a fund unless the investment company complies with the prohibition above and implements policies and procedures reasonably designed to prevent (i) persons responsible for selecting broker-dealers to execute portfolio securities transactions from taking into account the broker-dealer's promotion or sales of fund shares or shares of any other registered investment company, and (ii) the fund, its investment adviser and principal underwriter from entering into any agreement or arrangement under which the investment company directs portfolio securities transactions to a broker-dealer in consideration for the promotion or sale of fund shares or shares of any other registered investment company.

  Infinity Q will comply with the Directed Brokerage Procedures adopted by the Fund. The procedures prohibit the Fund from compensating a selling broker for the promotion or sale of Fund shares by directing portfolio securities transactions or remuneration to the broker. The prohibition includes the consideration of sales of Fund shares as a factor when selecting executing broker-dealers and the indirect compensation of selling brokers by participation in step-out or similar arrangements in which the selling broker receives a portion of a commission.

EFFECTIVE AS OF: October 1, 2014

LAST UPDATED: February 7, 2017

IQCM-SEC-00087750

**Attachment C**

**Listing of TAP Trust Policies and Procedures**

The following TAP Trust Policies are deemed to be incorporated into this manual as part of the firm's Compliance Policies and Procedures:

Procedure

Valuation Procedures

Privacy Policy

Directed Brokerage Procedures

In-Kind Procedures

Leverage and Segregation Policy

Liquidity Procedures

Portfolio Holdings Disclosure Policy

Proxy Voting Policy

Rule 10f-3 Procedures (Affiliated Underwritings)

Rule 17a-7 Procedures (Affiliated Transactions)

Rules 17f-5 and 17f-7 Procedures and Guidelines

Rule 17e-1 Procedures (Affiliated Brokerage)

Securities Lending Procedures

Website Advertising Policy and Procedures

Section 12(d)(1) Procedures (Investments in RICs)

Rule 22c- and Market Timing Policy

IQCM-SEC-00087750

## UPDATING MUTUAL FUND DISCLOSURE DOCUMENTS

### POLICY/REQUIREMENT

Section 8(b) of the 1940 Act requires every registered investment company (such as the Infinity Q Diversified Alpha Fund) to file with the SEC a registration statement containing certain specified information using Form N-1A.  The registration statement includes, among other documents, a Prospectus, Summary Prospectus and Statement of Additional Information.  Thereafter, a fund is required to update the financial information contained in the registration statement at least once a year, and must supplement the registration statement whenever material changes to its disclosure is required.

Rule 30e-1 of the 1940 Act requires every registered investment company to deliver to each shareholder of record, at least semi-annually, a report containing the information required to be included in these reports by the investment company's registration statement form under the 1940 Act.  Each shareholder report must be mailed within 60 days after the close of the period for which such report is being made.

### PROCEDURES/RESPONSIBILITIES

The Fund's Administrator is responsible for preparing updates to the Fund's Prospectus, Summary Prospectus, Statement of Additional Information and each semi-annual shareholder report (collectively, "Disclosure Documents").   Infinity Q's CIO is responsible for reviewing the information contained in the Fund's Disclosure Documents to ensure that they accurately reflect the description of the investment policies of the Fund and the risks associated with such investment policies, and that all other information presented in the Disclosure Documents is presented accurately.

Upon request of the Fund's Administrator, the CIO shall review the updates to the Disclosure Documents as compiled by the Fund's Administrator for accuracy and completeness.

The CCO shall ensure that the Disclosure Documents are reviewed by the CIO at that comments derived from the review are provided to the Fund's Administrator in a timely manner.

**Effective As Of:  August 15, 2015**

**Last Updated:**

IQCM-SEC-00087750

## MONITORING FOR MARKET TIMING (MUTUAL FUNDS ONLY)

### POLICY/ REQUIREMENT

Amendments to Form N-1A require registered investment companies to disclose specified information in the Fund's registration statement related to market timing.

Infinity Q seeks to deter and to prevent market timing in the Fund through several methods. These methods include the use of broad authority to take discretionary action against timers and against particular trades, selective monitoring of trade activity, imposition of redemption fees and fair value pricing. Many of these methods involve judgments that are inherently subjective, however, Infinity Q seeks to make judgments that are consistent and in the best interests of their long-term shareholders.

Infinity Q and the Distributor will use their best efforts to ensure that agreements with financial intermediaries and broker/dealers contain language that indicate that they have either adopted procedures and safeguards to monitor timing activity or at the very least will cooperate with the Fund to suppress shareholders from future trading in Fund shares should market timing be detected. Infinity Q will also use its best efforts to identify special arrangements with customers or intermediaries which could result in violations of the Fund's market timing policy.

The section entitled "*Tools to Combat Frequent Transactions*" in the Fund's Prospectus contains additional information regarding the use of redemption fees, the monitoring of trading activity and the use of fair value pricing.

***Direct/Individual Accounts.*** Redemption fees are assessed within direct accounts as applicable through an automated process. The Fund's Transfer Agent builds two share buckets, one which segregates share purchases into those that are eligible for the redemption fee assessment and another which segregates those shares that are not eligible for the assessment of a redemption fee. Thereafter, share groups are built based on redemption and purchase activity. When a redemption order is processed, the share grouping that is not eligible for a redemption fee assessment is used before the share grouping that would have a redemption fee assessed (i.e. FIFO method).

***Omnibus Accounts.*** The Fund's Transfer Agent is not able to monitor market timing in the underlying accounts that comprise the omnibus accounts held on the Transfer Agent's records. Infinity Q will periodically review cap stock activity in omnibus accounts for potential market timing in the Fund and will contact either the Fund's Transfer Agent or the applicable broker dealer if high volume activity is detected in certain dealer accounts to receive assurances that the underlying account holders are not engaging in market timing or to instruct the broker/dealer to curtail trading activity by those suspected of market timing.

**Effective As Of:** August 15, 2015

**Last Updated:**

-101-

IQCM-SEC-00087750

# REGULATORY FILINGS: SCHEDULE 13D/G

## BACKGROUND

Rule 13d-1 of the Exchange Act requires any person within 10 days after acquiring directly or indirectly the beneficial ownership of 5% or more of a class of any domestic equity security to file Schedule 13D with the SEC.   The Rule also allows registered investment advisers who have acquired the securities in the ordinary course of business and not with the purpose nor with the effect of changing or influencing the control of the issuer to file a short form Schedule 13G.

For purposes of this regulation, the term "equity security" means any equity security of a class which is registered pursuant to Section 12 of the Exchange Act, or any equity security of any insurance company which would have been required to be so registered except for the exemption contained in Section 12(g)(2)(G) of the Act, and any equity security issued by a closed end investment company registered under the 1940 Act; provided, however, that such term shall not include securities of a class of non-voting securities.

If Schedule 13G applies under Rule 13d-1 for any advisor, such advisor may generally file this Schedule within 45 days after the end of the calendar year in which the adviser became obligated to report the adviser's beneficial ownership as of the last day of the calendar year.

## POLICY

It is the policy of Infinity Q to file accurate Schedules 13G and 13D when required with the SEC and within the time requirements of the rule.

If Infinity Q or any Covered Person, for the purposes of acquiring, holding, or disposing of securities of an issuer is deemed to be part of a "group" as defined in Section 13(d) of the Securities Exchange Act (the "Exchange Act") they will be considered a "person" required to separately file a Schedule 13D pursuant to Rule 13d-1 promulgated under the Exchange Act.

## PROCEDURES

The CIO or his designee will prepare and distribute a holdings report, known as the Delta File, on a daily basis which includes the total shares owned by Infinity Q and the related parties and the sum of the total percentage of outstanding shares owned.

The Delta File shall be distributed to the CRO, CEO, and CCO; if preparation of the report was delegated, it shall also be distributed to the CIO. Each of the CRO, CEO, CCO and CIO shall be

-102-

responsible for reviewing the Delta File and identifying any triggering events which may necessitate filing an initial or amended Schedule D or G, and notifying outside counsel of the applicable circumstance. Such circumstances include:

- Holdings in an issuer exceed 5% and Infinity Q is currently not filing Schedule G or D
- Holdings in an issuer fall below 5% when Infinity Q is currently filing Schedule G or D
- Holdings in an issuer change (increase or decrease) by 1% or more when Infinity Q is currently filings Schedule D
- Holdings in an issuer change by more than 5%
- Holdings in an issuer exceed 10%

The CEO and CIO shall be responsible for promptly alerting outside counsel of any circumstances in which Infinity Q acquires securities for purposes of changing or influencing the control of the issuer, as well as when Infinity Q currently reports holdings in an issuer on Schedule G and undertakes actions to change or influence the control of the issuer. Additionally, if Infinity Q currently files Schedule D, the CEO and CIO shall promptly notify outside counsel of material actions the firm may undertake as an activist which may require filing an amended Schedule D.

Infinity Q relies upon outside counsel to make a final determination as to whether a 13 D or G filing is necessary and to prepare and submit the filing timely.

**RESPONSIBILITY**

The CIO is responsible for implementing this policy.

**EFFECTIVE**: February 7, 2017

**UPDATED:**

IQCM-SEC-00087750

## REGULATORY FILINGS: SCHEDULE 13F

### BACKGROUND

An investment adviser may be subject to disclosure obligations not only under the Advisers Act, but also under other federal statutes, including the Exchange Act. Section 13(f) of the Exchange Act, and Rule 13f-1 thereunder, generally require an investment adviser exercising or sharing investment discretion over domestic equity securities (including convertible debt and options) with an aggregate fair market value of at least $100 million to file Form 13F on a quarterly basis, disclosing these holdings that it manages on its own behalf and on behalf of clients.

The official list of Section 13(f) securities published by the SEC (the "13F List") generally includes exchange-traded (e.g., NYSE, AMEX) or NASDAQ-quoted stocks, equity options and warrants, shares of closed-end investment companies, and certain convertible debt securities.  Shares of open-end investment companies, i.e., mutual funds, are not included and, therefore, should not be listed on Form 13F.  Shares of exchange-traded funds ("ETFs"), however, should be reported.

All Form 13F filings and amendments thereto are filed electronically via EDGAR. The Form 13F filing deadline is 45 calendar days after the end of the March, June, September and December quarters.

### POLICY

In the event that Infinity Q exercises or shares investment discretion over domestic equity securities (including convertible debt and options) with an aggregate fair market value of at least $100 million, it is the policy of Infinity Q to file an accurate Form 13F with the SEC within 45 days after the last day of each calendar quarter.

### PROCEDURES

Whenever the quarter end total market value of securities in all Funds which appear on the 13F List exceeds $100 million, the CRO shall notify outside counsel and provide the relevant information so that outside counsel may complete Form 13F and submit it electronically to the SEC.

The following information must be included on the form for each 13F List security:

1. the name of the issuer;
2. the title, class, and CUSIP number of the issuer's securities held;
3. the number of or principal amount held of each issuer's security; and
4. the aggregate fair market value (or cost or amortized cost) of each security (other than an exempted security) held on the last day of the reporting period by all relevant Funds.

### RESPONSIBILITY

The CRO is responsible for implementing this policy.

-104-

IQCM-SEC-00087750

**EFFECTIVE**: February 7, 2017

**UPDATED:**

IQCM-SEC-00087750

## REGULATORY FILINGS: SCHEDULE 13H

**BACKGROUND**

INITIAL FILING REQUIREMENT

The SEC adopted Rule 13h-1 and Form 13H under Section 13(h) of the Exchange Act to assist it in identifying and obtaining trading information on market participants that conduct a substantial amount of trading activity, as measured by volume or market value, in the U.S. securities markets.

Rule 13h-1 defines a "large trader" as a person who "directly or indirectly, including through other persons controlled by such person, exercises investment discretion over one or more accounts and effects transactions for the purchase or sale of any NMS security (i.e., U.S.-listed stocks and options) for or on behalf of such accounts, by or through one or more registered broker-dealers", in an aggregate amount equal to or greater than:

> (a) 2 million shares or $20 million during any calendar day; or
> (b) 20 million shares or $200 million during any calendar month.

Purchases and sales of NMS securities are required to be aggregated, without offsetting or netting transactions among or within accounts (including for hedged positions). The value of all transactions in NMS securities for or on behalf of accounts over which it and its controlled persons exercise investment discretion must be aggregated in order to determine if it meets the activity levels set forth above.

Large Traders are required by the Large Trader Rule to identify themselves to the SEC and make required disclosures to the SEC on Form 13H. Upon receipt of Form 13H, the SEC will assign to each large trader an identification number that will uniquely and uniformly identify the trader, which the large trader must then provide to its registered broker-dealers.

Those registered broker-dealers will then be required to maintain records of in connection with transactions effected through accounts of such large traders: (a) the large trader identification number, and (b) the time transactions in the account are executed. Those broker-dealers are also required to report large trader transaction information to the SEC upon request through the Electronic Blue Sheets systems currently used by broker-dealers for reporting trade information. Certain registered broker-dealers subject to the Large Trader Rule will be required to perform limited monitoring of their customers' accounts for activity that may trigger the large trader identification requirements of Rule 13h-1.

IQCM-SEC-00087750

TIMING AND UPDATING REQUIREMENTS

Large traders must register with the SEC by filing Form 13H via EDGAR "promptly" after reaching the threshold trading level described above. "Promptly" depends on the facts and circumstances, but if an initial registration or reactivation is filed within ten days after the threshold trading level is met, the SEC will deem such filing prompt.

Large Traders must update their Form 13H on an annual basis. Large Traders must also amend their Form 13H on at least a quarterly basis, if doing so becomes necessary to correct information that becomes inaccurate.

## POLICY

Infinity Q is a Large Trader under Rule 13h-1 and will file or cause to be filed Form 13H using the online filing functionality through the EDGAR system.

## RESPONSIBILITY

The CRO will, on a quarterly basis, review the previously filed Form 13H and notify outside counsel of any changes that may necessitate an amendment. Infinity Q relies upon outside counsel to affirmatively determine when a filing is required and to complete filing of Form 13H through EDGAR.

**EFFECTIVE:** February 7, 2017

**UPDATED:**

IQCM-SEC-00087750

## REGULATORY REPORTING – FORM N-Q AND N-CSR

**Background**

Rule 30b1-5 under the 1940 Act requires mutual funds to file a quarterly report with the SEC on Form N-Q including each fund's complete schedule of portfolio investments, no more than 60 days after the close of the first and third quarters of its fiscal year. In addition, Rule 30b-2 under the 1940 Act requires mutual funds to file with the SEC a report on Form N-CSR no later than 10 days after each fund's annual and semi-annual reports are transmitted to shareholders.

The Infinity Q Diversified Alpha Fund's ("IQDAF") Form N-Q, quarterly Schedule of portfolio holdings of management investment companies, must be filed by January 29 (1st quarter holdings) and July 31 (3rd quarter holdings) each year. IQDAF must file Form N-CSR no later than 10 days after October 31 and April 30 each year, following distribution of the annual and semi-annual shareholder report.

**Policy**

Infinity Q is committed to supporting the Fund in meeting its Form N-Q and N-CSR filing obligations in a timely manner.

**Procedure**

The Fund is responsible for filing Form N-Q and Form N-CSR timely. To assist the Fund in meeting these obligations, on a quarterly basis, Infinity Q will prepare a memo to the Fund Board highlighting all new investment instrument types not previously traded in the Fund that were added to the portfolio that quarter. The CIO will be available to the Fund's Board and auditor, if requested, to discuss the new instruments to facilitate the Fund in meeting its regulatory form filing and disclosure obligations.

Each quarter, Infinity Q will review IQDAF's Form N-CSR or Form N-Q filing on the SEC website to ascertain that the filings were made timely.

Effective: June 29, 2018

IQCM-SEC-00087750

## WHISTLEBLOWER POLICY
## FOR REPORTING SUSPICIOUS ACTIVITIES AND CONCERNS

**Requirements**.  Section 922 of the Dodd-Frank Act established a whistleblower program at the SEC that offers rewards to all qualified "whistleblowers" who voluntarily provide original information to the SEC that leads to the successful enforcement of an action or related action in any judicial or administrative action brought by the SEC under the Federal Securities Laws that results in monetary sanctions of more than $1 million.  The whistleblower is entitled to between 10% and 30% of collected monetary sanctions.  The Dodd-Frank Act also expanded existing protections for whistleblowers by providing to whistleblowers who report to the SEC a private right of action against employers that retaliate against the employee.  The private right of action provides for double back-pay (plus reinstatement, attorneys' fees, litigation costs, and expert witness fees) and a statute of limitations of 6 years from the date of the violation or 3 years after employee should reasonably have known of the violation.  The Dodd-Frank Act also prohibits any form of retaliation by an employer against a whistleblower because of any lawful act done by the whistleblower in providing information to the SEC in accordance with the statute.  In May 2011, the SEC adopted final rules implementing its whistleblower program.  Although the new whistleblower statutory provisions and related rules have been adopted under the 1934 Act, the whistleblower rules apply broadly to all possible Federal Securities Laws violations.

*Whistleblower Reward Program.*  The SEC's whistleblower rules provide several important definitions that underscore the scope of the rules.

Whistleblower:  An individual who, alone or jointly with others, provides the SEC with "original information" relating to a possible violation of the Federal Securities Laws that has occurred, is ongoing, or is about to occur.

Certain individuals generally are excluded from being whistleblowers.  For example, individuals with an existing legal or contractual duty to report information to the SEC are excluded as are persons who receive information through a communication subject to the attorney-client privilege, if information was obtained in connection with the legal representation of a client, or if the information was obtained by someone because they are an officer, director, trustee, or partner of a company and another person informed them of allegations of misconduct, or they learned the information in connection with the entity's processes for identifying, reporting, and addressing possible violations of law.  However, if a company fails to disclose the information to the SEC within 120 days or acts in bad faith, compliance personnel can become whistleblowers.  In addition, individuals who are criminally convicted in connection with the misconduct or with obtaining the information will not be eligible for an award, thereby preventing wrongdoers from benefiting by blowing the whistle on themselves.

Original Information:  In order to be a whistleblower the information must be based on the whistleblower's independent knowledge or independent analysis, and must not be already known to SEC from another source.  Original information includes only that information that

-109-

IQCM-SEC-00087750

is provided to the SEC (or to another regulator or Congress and ultimately provided to the SEC).

A whistleblower is not required to report possible violations of law through an internal compliance process as a condition of eligibility for an award. However, if the individual offers information to a company and within 120 days provides the same information to the SEC, that whistleblower will be deemed to have reported such information to the SEC on the date on which it was reported to the company. The result is the information will still be considered "original."

The SEC's whistleblower rules also provide factors that may increase or decrease the amount of a whistleblower's award:

Increasing Factors:
- Significance of information provided;
- Degree of assistance provided;
- Programmatic interest of SEC in deterring securities law violations; and
- Whether the whistleblower participated in internal compliance systems and reported any possible violation internally, or assisted in any internal investigation;

Decreasing Factors:
- Personal culpability of whistleblower;
- An unreasonable delay in reporting; and
- Whether whistleblower interfered with internal compliance and reporting systems.

*Anti-Retaliation Protections.* The SEC's rules prohibit any person from taking any action to impede an individual from communicating directly with the SEC staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement with respect to such communications. In addition, the SEC's rules authorize the SEC staff to communicate *directly* with whistleblowers who are directors, officers, members, agents, or employees of a company, *without* first seeking consent of the company's counsel.

As a result of the SEC's whistleblower reward and retaliation program, investment advisers have a strong risk-mitigating incentive to quickly investigate reports of potential Federal Securities Laws violations involving the Firm while also ensuring compliance with the anti-retaliation protections (which apply *irrespective* of whether the whistleblower is entitled to an award).

**Policy.** Infinity Q requires all employees and other personnel of the Firm to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. Employees and other personnel of the Firm must practice honesty and integrity in fulfilling their responsibilities and comply with all applicable laws and regulations.

Furthermore, the Firm is committed to achieving compliance with all applicable securities and other laws, rules and regulations, accounting standards, accounting controls and audit practices. Any employee or other personnel of the Firm may submit a good faith complaint regarding violations of the Advisers Act, accounting or auditing matters or any other applicable

-110-

IQCM-SEC-00087750

law to the management of the Firm without fear of dismissal or retaliation of any kind for making the good faith complaint. (Human resources-related complaints from employees are outside the scope of this Manual and are addressed elsewhere.) The Firm is committed to fostering a workplace conducive to the open communication of any concerns regarding unethical, fraudulent or illegal activities. Feedback from employees and other Firm personnel on matters related to their employment or the Firm's operations including its financial statements, accounting, internal accounting controls or auditing matters is greatly appreciated and helps build a stronger organization.

Some of the policies and procedures below address:

- The submission, receipt, retention and treatment of concerns regarding questionable accounting, internal controls, auditing matters, disclosure or fraudulent business practices as well as any violations of the Advisers Act.

- Protection from retaliation when reporting legitimate concerns and guidance for providing a means to make reports in a confidential and anonymous manner.

*Reporting Responsibility*. Each employee and other personnel of the Firm has an obligation to report: (a) questionable or improper accounting, internal controls, auditing matters, disclosure, or fraudulent business practices and (b) violations and suspected violations of the Advisers Act or other Federal Securities Laws (hereinafter, collectively referred to as "Concerns").

*No Retaliation*. This policy is intended to encourage and enable employees and other personnel to raise Concerns within the Firm for investigation and appropriate action. With this goal in mind, no employee or other personnel of the Firm who, in good faith, reports a Concern shall be subject to retaliation or adverse employment consequences.

*Reporting Concerns:*

Employees and other Firm personnel should submit Concerns in writing directly to the CCO by:

1) Email to:            scott@InfinityQ.com, or

2)  US Mail to:         Infinity Q Capital Management, LLC.
                        Attn: Chief Compliance Officer
                        888 7th Avenue, 37th Floor
                        New York, NY 10106

*Handling of Reported Violations: CCO.* The Firm's CCO is responsible for investigating and ensuring resolution of all reported Concerns. The CCO may delegate, either to an officer of the Firm or appropriate outside professional advisors, the actual conduct of the investigation into the Concern, subject to her overall supervision. The CCO (or other person conducting the investigation) has the authority to utilize all resources reasonably available to her to assist in such

-111-

investigation. With the approval of the CCO, outside legal, accounting and other professional advisors or consultants may also be used in connection with any such investigation.

After completion of her review and investigation, the CCO will report the findings of the review and investigation, including any recommendations or determinations, to the CEO. Upon receipt of such report, the CEO may, among other things, determine that corrective action is appropriate, that further review is required or that the reported Concern is not founded.

*Acting in Good Faith.* Anyone reporting a Concern must act in good faith and have reasonable grounds for believing the information disclosed indicates an improper or fraudulent practice, or a violation of the Advisers Act or other Federal Securities Laws.

*Confidentiality*. Reports of Concerns, and investigations pertaining thereto, shall be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation. Disclosure of reports of Concerns to individuals not involved in the investigation will be viewed as a serious disciplinary offense.

*Compliance and Disciplinary Action.* The Firm may take disciplinary action against any employee or other Firm personnel who willfully violates or circumvents this policy, or in other appropriate circumstances.

Disciplinary action may be taken against:

- Any Firm personnel or employee who directs, authorizes or participates (directly or indirectly) in conduct that violates this policy;

- Any Firm personnel or employee who knowingly fails to report suspected improper activity as described in this policy:

- Any Firm personnel or employee who knowingly fails to report a violation or knowingly withholds relevant and material information concerning a violation or this policy;

- A violator's supervisor(s), to the extent that the circumstances of the violation reflect inadequate supervision or a lack of diligence; or

- Any Firm personnel or employee who attempts to retaliate, directly or indirectly, or encourages others to do so, against anyone who reports a Concern or a violation of this policy or a suspected improper activity.

Disciplinary action may include reprimand, demotion, suspension, termination, referral for criminal prosecution, and reimbursement to the Firm or the government for any losses or damages.

*This Document is Not a Contract.* This policy does not constitute a contract of any kind, nor does it limit the Firm's right to take disciplinary action in other circumstances. Employment at the Firm is "at will" and may be terminated at any time by the Firm or the employee/personnel,

-112-

with or without any previous notice, unless a formal written agreement between the Firm and the employee/personnel provides otherwise.

*Reporting and Retention of Non-Human Resources-Related ("Non-HR") Complaints and Investigations.* The CCO will periodically report to the CEO on the status of all pending reported Concerns.

The CCO will maintain all documentation with respect to reported Concerns and the investigation thereof for a minimum of five years from the end of the fiscal year during which the record or the last entry on the record was made, the first two years in an appropriate office of the Firm or as otherwise appropriate.

*Alternative Reporting:* In the event the Concern involves conduct relating to the CCO, employees and other personnel of the Firm are should report the Concern directly to the CEO. Additionally, no Infinity Q employee or other Firm personnel shall be restricted contractually from reporting to the SEC Office of the Whistleblower, and no person may take any action to impede an individual from communicating directly with SEC staff about a possible securities law violation.

**Procedures:** Infinity Q has implemented the following procedures:

| INTERNAL COMPLAINT PROCEDURES | |
|---|---|
| Who | CCO or designee |
| What | • Investigate and review non-human resources-related complaints and Concerns received <br><br> • Report to the CEO on the status of all pending non-human resources-related complaints and ensure proper resolution of Concerns and complaints <br><br> • Implement and maintain whistleblower policy for the Firm in consultation with managers and ensure all elements are in operation (*e.g.*, telephone hotline, *etc.*) <br><br> • Report on implementation of, and recommend changes to, the whistleblower policy to CEO <br><br> • Consult with outside counsel concerning legal requirements for whistleblower policy <br><br> • Ensure periodic training on elements of whistleblower policy |

IQCM-SEC-00087750

| **INTERNAL COMPLAINT PROCEDURES** | |
|---|---|
| When | <ul><li>Review non-human resources-related complaints and Concerns as received</li><li>Review other matters periodically</li></ul> |
| How Evidenced | <ul><li>Notes, letters, and internal written communications, including e-mails, memoranda or notes on periodic reviews</li><li>This policy and changes thereto</li><li>Training materials, evidence of training conducted and attendance of recipients</li></ul> |
| Where Maintained | Compliance File |
| Retention Period | In an easily accessible place for not less than six (6) years from the end of the fiscal year during which the last entry on such record was made, the first two years (2) in an appropriate office of the Firm |
| If Irregularities Are Found | Report to CEO |
| Review Procedure | <ul><li>Review Compliance Files annually</li><li>If a Concern or non-human resources-related complaint is provided, verify that appropriate corrective action has been taken</li></ul> |

Effective Date: October 1, 2014

Updated: February 7, 2017

-114-

IQCM-SEC-00087750

## <u>CONFIDENTIALITY, PROTECTION OF NON-PUBLIC CLIENT INFORMATION AND PRIVACY POLICY</u>

### <u>Confidentiality as a Condition of Employment / Confidentiality Agreements</u>

All employees have written employment or other agreements with Infinity Q that contain confidentiality provisions, which shall govern an employee's use of confidential information (as defined in such agreements). All employees are expected and required to protect Infinity Q's trade secrets and other confidential information.

If an Infinity Q employee receives a confidentiality agreement from a third party, he or she must submit it to Infinity Q's Management for approval before it is executed or put into effect and provide a copy of the final version of the confidentiality agreement sent to the Chief Compliance Officer.

### <u>Protection of Non-Public Personal Client and Investor Information</u>

Employees may not disclose any nonpublic personal information about current or former investors or clients to anyone other than Infinity Q's attorneys, accountants, administrators, auditors or another Infinity Q employee or persons who need access to that information in order to permit the client and Infinity Q to conduct their affairs without the written authorization of the Chief Compliance Officer.

Such information includes, but is not limited to, any information relating to client securities holdings; transactions executed for any client; client trading decisions; investment strategies or trading techniques; any information regarding the counterparties to any client transaction; non-public personal data furnished to Infinity Q by any current or former client or investor, agent or contractor; current or former investor lists, files or other investor information; vendor names; Infinity Q business records, employee information, financial information, leases, software, licenses, agreements, computer files and business plans; and the analyses and other proprietary data or information of Infinity Q.

All disclosure of nonpublic personal information about current or former investors or clients should be limited to the extent necessary or appropriate in connection with employees' job responsibilities or as may be required by law. Employees also must not contravene the provisions of any confidentiality agreement to which Infinity Q or the employee is a party.

Such "nonpublic personal information" may be obtained from Fund subscription agreements, transactions with Funds and accounts (such as additional investments and withdrawals) and other sources. Infinity Q restricts access to such information internally to those employees who need the information in order to conduct Infinity Q's business. Infinity Q obtains contractual assurances from third-party service providers to protect the confidentiality of clients' and investors' nonpublic personal information when it is appropriate to do so.

-115-

IQCM-SEC-00087750

Any Infinity Q employee must promptly inform the Chief Compliance Officer or Infinity Q's Management if he or she discovers that someone else is making or threatening to make unauthorized use or disclosure of confidential or proprietary information.

**Privacy Policy and Notice**

Infinity Q provides administrative, technical and physical safeguards for the protection of client's Non-Public Personal Information (*i.e.*, personally identifiable financial information about a client, as defined below) pursuant to Regulation S-P adopted by the SEC under the Gramm-Leach-Bliley Act of 1999.  Infinity Q is committed to maintaining the confidentiality, integrity and security of investors' and clients' personal information.  It is the policy of Infinity Q to respect the privacy of its current and former investors and clients and to protect the personal information entrusted to Infinity Q**.**

In addition to these policies and procedures, Infinity Q Diversified Alpha Fund has adopted the TAP Trust Privacy Policy (which apply to the Diversified Alpha Fund and not the Private Funds), and the Firm will comply with such policies.

Prospective clients and investors must indicate their understanding in a Fund subscription agreement that,  although Infinity Q will use its best reasonable efforts to keep their personal information confidential, (1) there may be circumstances in which applicable law or regulation relating to combating terrorism or money laundering may require the release of information provided to Infinity Q to law enforcement or regulatory officials; (2) Infinity Q may present such information to any service providers of Infinity Q or the Funds or to such regulatory bodies or other parties as may be appropriate to establish the availability of exemptions from certain securities and similar laws or the compliance of the client, its directors, if any, and/or Infinity Q with applicable laws; (3) Infinity Q may disclose such information or other information relating to a client's or investor's accounts or investments when required by judicial process or, to the extent permitted under applicable privacy laws, to the extent Infinity Q considers that information relevant to any issue in any action, suit or proceeding to which Infinity Q is a party or by which it is or may be bound; and (4) where such disclosure is required by any law or order of any court or pursuant to any direction, request or requirement (whether or not having the force of law) of any central bank or governmental or regulatory or taxation authority.  Any client that instructs Infinity Q to send duplicate reports to any third party may revoke such instructions at any time by sending a written notice to Infinity Q indicating that a previously authorized third party is no longer authorized to receive such reports.

**Privacy Notice to Clients and Investors**

SEC Regulation S-P requires Infinity Q to provide an initial and annual notice to each client or investor who is a natural person describing its privacy policies and practices (a "Privacy Notice").  Infinity Q's Privacy Notice covers the following: (1) a description of the non-public personal information collected by Infinity Q; (2) whether or not such information will be disclosed to non-affiliated third parties and, if so, which information and to whom; and (3) a description of Infinity Q's policies and procedures designed to protect the confidentiality and security of the information.  ***A sample of Infinity Q's Privacy Notice for one Client is attached hereto as Exhibit C.***

-116-

IQCM-SEC-00087750

In accordance with Regulation S-P, Infinity Q (1) provides each client or investor who is a natural person Infinity Q's Privacy Notice not later than at the time the client's or investor's relationship with Infinity Q is established (*e.g.*, not later than the time the investor's subscription agreement is established); and, (2) provides the Privacy Notice annually to each client or investor who is a natural person by April 30th of each calendar year.  For investors, this initial delivery requirement is satisfied by each Fund's subscription document, which contains a copy of the Privacy Notice.

The Chief Compliance Officer is responsible for ensuring that Infinity Q's Privacy Notice is up-to-date and has been delivered to each client and investor who is a natural person both initially and annually.

**Information Security Plan**

Regulation S-P requires Infinity Q to implement a written information security plan designed to safeguard the personal information of investors who are natural persons.  To meet this requirement, Infinity Q has adopted into this Compliance Manual an Information Security Governance Policy.
.
**Proper Disposal of Consumer Information**

Infinity Q is required by the Advisers Act to take reasonable measures to protect any non-public information or sensitive consumer information that is discarded.  The following procedures are utilized to prevent this discarded information from unauthorized access or use:

- extraneous paper documents containing any such information (including documents designated for recycling) that are to be discarded must be burned, shredded or otherwise destroyed so that the information cannot be read or reconstructed;
- any such information saved in a storage medium that is being sold or disposed of (*e.g.*, a Infinity Q-owned laptop computer that is sold or externally recycled) must be removed from the medium; and,
- any such information contained in an electronic medium must be destroyed or erased so that the information cannot be read or reconstructed.

Any contracts with service providers for services involving the disposal or destruction of non-public consumer information must explicitly require the "proper" disposal of documents containing such information.

EFFECTIVE AS OF:  October 1, 2014

LAST UPDATED:  February 1, 2017

-117-

*Exhibit C*

## INFINITY Q PRIVACY NOTICE

**Confidential Investor Information.** In the course of its business activities, the Fund and the General Partner gains access to non-public information about the Limited Partners. Such information may include personal financial and account information, information relating to a Limited Partner's investment in the Fund or services performed for or transactions entered into on behalf of such Limited Partner, information provided in subscription documents or other documents furnished by such Limited Partner and data or analyses derived from such information (collectively referred to as "**Confidential Information**"). All Confidential Information, whether relating to the Fund's current or former Limited Partners, is subject to this Privacy Policy and Procedures. Any doubts about the confidentiality of information will be resolved in favor of confidentiality.

**Non-Disclosure of Confidential Information.** The Fund does not share Confidential Information with any third parties except in the following circumstances:

a.      as necessary to conduct the business of the Fund or to maintain and service a Limited Partner's account. The Fund will request that any financial intermediary, agent or sub-contractor utilized by the Fund comply with substantially similar standards for non-disclosure and protection of Confidential Information and use the information provided by the Fund only for the performance of the specific service requested by the Fund;

b.      as required by regulatory authorities or law enforcement officials who have jurisdiction over the Fund or as otherwise required by any applicable law. In the event that the Fund is compelled to disclose Confidential Information, the Fund shall, if reasonably practicable and permitted by applicable law and regulations, provide prompt notice to the affected Limited Partners so that such Limited Partners may seek a protective order or other appropriate remedy. If no protective order or other appropriate remedy is obtained, then the Fund shall disclose information in compliance with applicable laws and regulations; or

c.      to the extent reasonably necessary to prevent fraud, unauthorized transactions or liability.

Employees of the Fund, the General Partner and their affiliates are permitted to disclose Confidential Information only to such other employees of the Fund the General Partner or their affiliates who need to have access to such information to conduct the business of the Fund. Employees of the Fund and its affiliates are prohibited, both during and after termination of their employment, from (a) disclosing Confidential Information to any person or entity outside the Fund, including family members, except under the circumstances described above, and (b) making unauthorized copies of any documents or files containing Confidential Information and, upon termination of their employment, must return all such documents to the Fund. Any employee of the Fund or any of its affiliates who violates the non-disclosure policy described above will be subject to disciplinary action, including possible discharge, whether or not he or she benefited from the disclosed information.

**Security of Confidential Personal Information.** The Fund restricts access to Confidential Information to those employees of the Fund or its affiliates who need to know such information to conduct the business of the Fund. Any conversations involving Confidential Information, if appropriate, will be

-118-

conducted by the Fund's employees with care to avoid any unauthorized persons overhearing or intercepting such conversations.

**Enforcement and Review of Privacy Policy and Procedures.** The General Partner is responsible for reviewing, maintaining and enforcing this Privacy Policy and Procedures. The General Partner may take any disciplinary or other action as it may deem appropriate. The General Partner is also responsible for conducting appropriate employee training to ensure employee adherence to this Privacy Policy and Procedures.

IQCM-SEC-00087750

# BUSINESS CONTINUITY

<u>**POLICY**</u>

It is the policy of Infinity Q to comply with the requirements of Rule 206(4)-7 under the Advisers Act, as amended.  For measures to preserve business continuity and protect against destruction, loss or damage of customer information due to a significant business disruption ("<u>SBD</u>") such as storm, fire and water damage or technological failures, Infinity Q has in place a business continuity plan and testing ("BCP"), which is summarized below. Infinity Q, jointly with its affiliate, Wildcat, also maintains a detailed, operational BCP which is incorporated to this Policy by reference.

<u>**PLAN**</u>

Infinity Q maintains its hard copy books and records and its electronic records at its office and those of its service providers, as applicable. The CIO and Infinity Q's service providers, as applicable, are responsible for the maintenance of these books and records.  Infinity Q's electronic records are mirrored to an off-site server on at least a daily basis.

In the event of an internal or external SBD that causes the loss of Infinity Q's electronic records on its local servers, Infinity Q will recover the storage media from its off-site back-up server.  In the event of an internal or external SBD that limits or prevents the ability of Infinity Q personnel to utilize its office space, the team will work remotely.  If an SBD is of such a nature that one or more of Infinity Q's systems are unavailable, the CRO or his or her designee will contact applicable systems vendors to repair the systems, giving priority to repairing systems used by essential personnel.  The CRO or his or her designee will ensure that Infinity Q personnel are informed of the status of Infinity Q's systems as they are repaired.

Infinity Q has established a Call Tree which outlines the responsibilities of each employee in notifying other essential personnel of any SBD.   In connection with this policy, a list of the current home and mobile phone numbers of the Chief Executive Officer, the CIO, the CFO, the CRO, the CCO and each key investment professional is kept off-site (and updated as necessary) by the CRO or his or her designee.  Infinity Q will seek to ensure that key investment professionals can access their desktops remotely via an internet connection in order to manage client accounts and to remain in close contact with the CRO or his or her designee.  Although the nature of the SBD will influence the means of alternative communication, the communications options Infinity Q may employ include, without limitation, mobile phones, portable electronic e-mail, voicemail and secure e-mail through a VPN connection, via Outlook Web Access or through Citrix.

In the event that normal telephone service is not available, all essential Infinity Q personnel have mobile phones and maintain contact information for other Infinity Q personnel on their laptops or home computer systems.

The CRO or his or her designee shall notify any affected vendors, counterparties and/or other persons with whom Infinity Q has ongoing business arrangements of any SBD and shall make arrangements with such vendors, counterparties and/or other persons to continue the provision of

IQCM-SEC-00087750

services, if possible, or, if not possible, shall make alternative arrangements for such services during the period of the SBD.

The CRO or his or her designee shall determine whether communications with any regulators and/or any required regulatory reporting are affected by any SBD and, if so, shall make alternative arrangements for such communications and/or reporting and shall communicate such alternative arrangements to all applicable regulators.

Infinity Q will ensure that its service providers have appropriate business continuity plans in place in the event a SBD takes place.

## TESTING

The CCO will review the BCP and will ensure testing of the BCP occurs at least annually.

## RESPONSIBILITY

The CRO shall be responsible for administering this Policy.

**EFFECTIVE AS OF:** October 1, 2014

**LAST UPDATED:** February 7. 2017

IQCM-SEC-00087750

## IDENTITY THEFT PREVENTION POLICY

### Policy

This policy has been adopted by the Firm in accordance with the "Red Flags Rules" promulgated by the Securities and Exchange Commission ("SEC").  The Red Flags Rules require certain organizations to implement a written Identity Theft Prevention Policy to detect warning signs—or possible "Red Flags"—of Identity Theft and to respond to real or potential Identity Theft warning signs.  The Firm is adopting this policy as a means of mitigating reasonably foreseeable risks identity theft may present to a Fund's investors or the safety and soundness of the Firm.

 The purpose of an Identity Theft Prevention Policy is to help detect and prevent an imposter from using an investor's (or someone else's) identity to fraudulently obtain money, information, or some other benefit from the Firm, the Funds or their investors, and to help mitigate any damages if such a crime should occur.

### Definitions

Capitalized terms used in this policy have the meanings given to them in this policy.

"Identifying Information" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific person, including any: (i) name, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number; (ii) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation; (iii) unique electronic identification number, address, or routing code, such as bank or other financial account information; or (iv) telecommunication identifying information or access device, such as telephone numbers, device ids, ip addresses, and email addresses.

"Identity Theft" means fraud committed or attempted using Identifying Information of another person without authority.

"Red Flag" means a pattern, practice, or specific activity that indicates the possible existence of Identity Theft.

### Policy and Controls

The Firm has in place certain policies, procedures and controls intended to augment the Firm's ability to detect, prevent and mitigate Identity Theft, including, without limitation, policies, procedures and controls related to passwords and encryption, acceptable use of firm information systems, and security of firm offices and access to them.

### Relevant Red Flags

Infinity Q has identified the following Red Flags as relevant to its business.

-122-

*Suspicious Documents:*

- Identification that looks altered or forged.

- A subscription agreement, investor questionnaire, or other similar document executed by an investor (the "<u>Subscription Documents</u>") that looks like it has been altered, forged, or torn up and reassembled.

*Suspicious Personal Identifying Information:*

- Any inconsistencies or other suspicious Identifying Information provided by the subscriber, either in the Subscription Documents or elsewhere.

- A person who omits required information on the Subscription Documents and does not respond to notices that such Subscription Documents are incomplete.

*Suspicious Account Activity:*

- Soon after the Firm is notified of a change of address (physical address or electronic address, such as email) of an investor, the Firm is asked to add new individuals as contacts.

- There is an aberration or inconsistency with respect to an investor's typical behavior with respect to its investment in a Fund – for example, multiple changes to the investor's address or to an address not associated with the investor, multiple changes to the trustee on an account, changes in bank account information with respect to distributions, or other similar information relating to directing cash flows by the investor.

- Mail sent to the investor is returned repeatedly as undeliverable but the investor continues to communicate with the Firm.

- The Firm is requested to send information to a new address that is suspicious or not easily recognized as belonging to the investor or, in the case of entity investors, is a personal address.

- The Firm receives a request to change authorized personnel on an account without sufficient backup documentation and/or the investor refuses to provide adequate backup documentation.

- In the process of transferring an account, the Firm receives information indicating inconsistency, aberration, or suspicion regarding the account holder.

- Account requests are received from persons other than the regularly identifiable contact and/or a person who is not authorized on the account.

- The Firm receives information that the investor is not receiving account statements, reports, or other correspondence from the Firm in the mail.

-123-

IQCM-SEC-00087750

*Note: Infinity Q delegates the monitoring of suspicious account activity to the Fund's administrator, US Bank.*

*Notice from Other Sources:*

- Notice from an investor, a victim of Identity Theft, a law enforcement agency, or someone else that an instance of Identity Theft has occurred.

## **Detecting Red Flags**

As appropriate to their role with the Firm, personnel should follow these steps to detect the above or any other potential Red Flags:

- Take seriously all indicia, alerts, notifications, or other warnings of actual, suspected, or potential Identity Theft or compromise of investor Identifying Information from any source.

- Stay alert for Red Flags in all investor relationships.

- Be alert for any actual, suspected, or potential unauthorized access to the Firm's electronic or physical records.

- Know and follow this policy, as well as the Firm's other applicable policies and procedures, in particular the Firm's Policies and Controls described above.

## **Responding To Red Flags**

All personnel shall, as soon as is practical, alert Infinity Q's CCO of any Red Flags identified. The CCO will instruct Firm personnel how to proceed and take the appropriate steps to prevent and mitigate harm that a Red Flag may indicate.

In responding to a Red Flag, the CCO will consider aggravating circumstances that may heighten the risk of Identity Theft. After assessing the risk, the CCO will determine the Firm's response to the Red Flag in an appropriate manner, which may include:

- Refraining from paying proceeds while the Red Flag is investigated;

- Contacting or notifying the investor by phone or a secure method;

- Not performing any instructions or providing the money or information being requested by the purported investor until the request can be reliably authenticated;

- Changing any passwords, security codes, or other security devices that permit access to an investor account or investor information;

-124-

- Not permitting a potential investor to make an investment in a Fund;

- Monitoring an investor's account and investment in a Fund for additional indicia or evidence of possible Identity Theft;

- Notifying law enforcement; or

- Determining that no response is warranted under the particular circumstances.

**Service Providers**

In order to exercise appropriate and effective oversight of any service provider arrangements where the service provider manages investor accounts or is likely to be in a position to detect Red Flags, such as US Bank, Infinity Q will assess whether a service provider's activities are conducted in accordance with reasonable policies and procedures designed to detect, prevent, and mitigate the risk of Identity Theft.

**Administration of the Program**

The CCO or CCO's delegate will provide training for investor-facing, legal/compliance and accounting/tax personnel and their supervisors, focusing on the types of Red Flags that they may encounter and the actions to take in response to such Red Flags.

The CCO will re-evaluate this policy at least annually and update this policy as needed, typically as part of the CCO's regular annual compliance review, or more or less frequently as deemed appropriate by the CCO, for example if the Firm becomes aware of an incident of Identity Theft with respect to the Firm or Funds, or if the Firm's internal processes or business experiences a change that would impact the Firm's assessment regarding its risk of experiencing Identity Theft.

The CCO has the authority to waive and interpret any of the provisions set forth in this policy.

**EFFECTIVE:  JUNE 6, 2017**

IQCM-SEC-00087750

## INFORMATION SECURITY GOVERNANCE POLICY

**Policy/Requirement**

The purpose of this Information Security Governance Policy (the "Policy") is (i) to comply with the Firm's statutory, regulatory, and contractual obligations to safeguard the security and confidentiality of Sensitive Information (as defined below) in a manner consistent with industry standards; (ii) to protect against anticipated threats or hazards to the security or integrity of such information; and (iii) to protect against unauthorized access to, or use of, Sensitive Information ina manner that creates substantial risk of financial loss, identity theft, fraud or reputational harm. Infinity Q is committed to protecting the confidentiality of all non-public information regarding its clients, investors, prospects and supervised persons. Infinity Q will continually analyze, monitor and enhance its systems and policies and procedures in order to reasonably protect against anticipated threats or hazards to the security and integrity of client records and information as well as the non-client records and information of Infinity Q.

Infinity Q relies upon a third-party IT provider, InfoHedge Technologies, LLC, ("InfoHedge") to implement its technology hardware and systems. InfoHedge provides Private Cloud IT services and Application Hosting Services and utilizes a full spectrum of cloud security practices.

**Responsible Party**

Infinity Q's CCO is responsible for oversight of this policy. Michael Curry, Managing Director of Client Services at InfoHedge, serves as Infinity Q's IT Manager. The CCO/CRO, CEO and IT Manager are responsible for implementation of Infinity Q's information security program.

All Supervised Persons are responsible for complying with the requirements set forth herein and reporting any suspected violation or information security breach to the CCO. Should you have any questions, please contact the CCO.

**Definitions**

- "Applicable Data Security Law" means any law applicable to the Firm and to the means the Firm deploys to protect Sensitive Information collected, processed, transmitted or stored by the Firm or on its behalf, including but not limited to the Safeguard Rule, Record-Keeping Rule, State Data Security Laws, and any other applicable federal or state laws.

- "Breach of Security" means the loss or unauthorized access, acquisition or use of Sensitive Information or of a confidential process or key that is capable of compromising the security, confidentiality or integrity of Sensitive Information that creates a substantial risk of financial loss, identity theft, fraud, or reputational harm.

IQCM-SEC-00087750

- "<u>Encrypted</u>" or "<u>Encryption</u>" means the transformation of data through the use of an algorithmic process, or an alternative method at least as secure, into a form in which data's meaning cannot be determined without the use of a confidential process or key.

- "<u>Financial Information</u>" includes any "nonpublic personal information," as defined under the Gramm-Leach-Bliley Act, 15 U.S.C. 6809, including whether an individual is or has received financial services from the Firm, account information, account application and servicing information, as well as information regarding completed transactions, incomplete transactions, offers, and analyses thereof.[1]

- "<u>Personal Information</u>" includes an individual's first name and last name or first initial and last name in combination with any one or more of the following data elements that relate to such individual: (i) Social Security number, (ii) driver's license or state-issued identification card number, (iii) financial account number, or credit or debit card number; (iv) any other information that relates to and can be used to identify or attempt to perform identity theft on an individual living person, including a user name or email address, in combination with a password or security question and answer that would permit access to an online account.

- "<u>Record</u>" or "<u>Records</u>" means any material upon which written, drawn, spoken, visual, or electromagnetic information or images are recorded or preserved, regardless of physical form or characteristics.

- "<u>Record-Keeping Rule</u>" means Rule 204-2 promulgated under the Investment Advisers Act of 1940, as amended.

- "<u>Safeguard Rule</u>" means Rule 30 of Regulation S-P, Procedures to Safeguard Customer Records and Information, 12 CFR § 248.30.[2]

- "<u>State Data Security Laws</u>" means any state statute or regulation applicable to the Firm and to the means the Firm deploys to protect Sensitive Information collected, processed, transmitted or stored by the Firm, including, if applicable, but not limited to, the Massachusetts regulations found at 201 C.M.R. 17.00 et seq. and California Civil Code Section 1798.81.5.

- "<u>Sensitive Information</u>" means Personal Information, Financial Information, trade secrets or other valuable proprietary information of the Firm and Infinity Q Diversified Alpha Fund (the "Fund"), its investments and potential investments, and its investors or potential investors collected, generated or used by the Firm, where such Sensitive Information is owned, licensed, stored or maintained by the Firm or on the Firm's behalf and regardless of the form in which such information is contained.

---

[1] The Safeguard Rule requires organizations to protect certain specific customer information, such as customer status and account information, as well as 'customer information and records'.

[2] This Rule does not apply to private funds, which are governed by the FTC's implementation of the Safeguard Rule, 16 CFR § 314.

IQCM-SEC-00087750

**Procedures**

1. **Identification of Sensitive Information Storage Locations**

- The CCO will identify, on an ongoing basis, the location of Records that contain Sensitive Information in written and electronic form, including Records stored on paper, computing systems, laptops, portable devices, and other media. The CCO or his designee will maintain a listing of these records and their location.

2. **Risk Assessment**

- <u>Internal and External Risks</u>: The CRO, with the assistance of the IT Manager, will identify and assess, on an ongoing basis, reasonably foreseeable internal and external threats to the security, confidentiality, and integrity of Records containing Sensitive Information.

- <u>Evaluation and Implementation of Safeguards</u>: Based on its assessment of internal and external risks, the CRO will evaluate and oversee the implementation of the safeguards for limiting such risks, including but not limited to, employee training and awareness, employee compliance, and detection and prevention mechanisms.

- <u>Disaster Recovery</u>:  Based on its risk assessment and identification of Records with Sensitive Information, the Firm will evaluate and oversee the implementation of its Business Continuity policy to account for catastrophic failure of Firm systems, including those caused by natural disasters or cyber attacks.

3. **Third-Party Service Provider Access and Safeguards**

- <u>Selection and Retention</u>:  When engaging third party service providers, the Firm will determine whether a particular service provider will have access to Sensitive Information ("Applicable Service Providers").  The Firm will take reasonable steps to engage Applicable Service Providers that demonstrate they have adequate policies and procedures to comply with this Policy and Applicable Data Security Laws with respect to the Firm's Sensitive Information.

- <u>Written Certification</u>:  The President or CRO shall review each agreement with an Applicable Service Provider.  If reasonably possible, a service contract between the Firm and an Applicable Service Provider should include provisions requiring the service provider to implement and maintain appropriate security measures for Sensitive Information consistent with Applicable Data Security Laws; otherwise, reasonable efforts should be made to obtain from the Applicable Service Provider a statement of compliance with Applicable Data Security Laws and/or a signed certificate of compliance.

- <u>Regular Oversight</u>:  The CCO or his designee will review, as appropriate, its contracts and relationships with third party Applicable Service Providers regarding the

-128-

Applicable Service Providers' policies and procedures or undertakings in place for complying with Applicable Data Security Laws.

### 4. Employee Access and Use of Data

- <u>Access Limited</u>.  Except as is consistent with the scope of their duties, Firm employees and contractors shall not collect, access, use or transmit Records containing Sensitive Information without written approval from the CRO.

- <u>Training</u>.  Firm employees will receive appropriate training regarding the proper use of the Firm's computer security systems and the importance of Sensitive Information security.

- <u>Enforcement and Disciplinary Measures</u>: The CCO will monitor compliance with the Policy. Employees who violate the Policy may be subject to disciplinary action up to and possibly including termination of employment.

### 5. Encryption

- <u>Transmissions</u>: Any Sensitive Information transmitted wirelessly or across public electronic networks shall be sent via encrypted means, whether through portals, email, VPNs or facsimile.

- <u>Portable Devices</u>: In general, Sensitive Information may not be stored on laptops or other portable devices unless in Encrypted form.

- <u>Personal Computers</u>: Under no circumstances may Sensitive Information be saved to personal devices, such as non-work computers, external hard drives (including iPods or thumb drives) or phones.

### 6. Administrative Safeguards

- <u>Data Collection</u>: The Firm will use reasonable efforts to collect only that Sensitive Information that the Firm determines to be reasonably necessary to accomplish its legitimate business purposes, or to comply with legal requirements.

- <u>Data Retention and Disposal</u>: The Firm will use reasonable efforts to retain Sensitive Information no longer than the time it determines to be reasonably necessary to accomplish a legitimate business purpose or to comply with the requirements of the Record-Keeping Rules or other applicable law. Any Sensitive Information the Firm determines it no longer will retain is to be securely destroyed, purged or erased.[3] Where approved by the CRO, the Firm may permit a third party service provider to keep a copy of the Records provided to such service provider, provided the service provider

---

[3] The Record-Keeping Rules require specific data collection and retention periods.  Reasonable care needs to be exercised with respect to disposal of Sensitive Information as well, to avoid inadvertent exposure of Sensitive Information.  Cf. Safeguard Rule 30(b) regarding destruction of information subject to the Fair Credit Reporting Act.

IQCM-SEC-00087750

may only use such copy for its own internal compliance purposes with respect to its relationship with the Firm.

- <u>Limitations on Access to Data</u>: Access to Sensitive Information shall be limited to only those authorized employees and other individuals who the Firm determines reasonably require access to Sensitive Information to accomplish a legitimate business purpose or to comply with legal requirements.

- <u>Termination of Access to Data</u>: An employee or contractor's physical or electronic access to all Firm systems, including Sensitive Information, shall end immediately upon termination of that individual's relationship with the Firm.

## 7. Technical Safeguards

- <u>Authentication Protocols</u>: The Firm's computer system safeguards will include at least the following authentication protocols: (i) control of user IDs and other identifiers; (ii) a reasonably secure method of assigning and selecting passwords; (iii) control of data security passwords to ensure that such passwords are kept in a location that does not compromise the security of the data they protect; (iv) a requirement that user passwords have a minimum of 10 characters, with a reset at least once every six (6) months; (v) restricted access to active users and active user accounts only; and (vi) blocked access to user identification after multiple unsuccessful attempts to gain access.

- <u>Access Control</u>: The Firm's computer system safeguards will provide for secure access control measures that: (i) restrict access to Records containing Sensitive Information to those authorized employees and other individuals who the Firm determines reasonably require such access to perform their job duties or otherwise to accomplish a legitimate business purpose or to comply with legal requirements; and (ii) enforce unique identifications plus passwords, which are not vendor supplied default passwords, to each person with computer access, that are reasonably designed to maintain the integrity of the security of the access controls.

- <u>Firewalls</u>: The Firm will establish and oversee the use of a firewall and other technologies intended to protect Firm systems, including those connected to public communication networks, and will set up systems to protect all Records containing Sensitive Information maintained on Firm systems, and will regularly apply up-to-date security patches to those systems.

- <u>Anti-Virus Software</u>: The Firm will maintain reasonably up-to-date system security agent software on the Firm server, including "malware" protection and reasonably up-to-date patches and virus definitions.

## 8. Physical Safeguards

- The Firm will place reasonable restrictions on accessing physical Records containing Sensitive Information and will keep such Records in locked file cabinets or other secure depositories.

IQCM-SEC-00087750

9. **System Monitoring**

- The Firm will monitor the Firm's systems for suspected, attempted or actual Breaches of Security. The Firm will update information safeguards as necessary to identify and limit reasonably foreseeable internal and external risks to the security, confidentiality or integrity of any Records containing Sensitive Information.

- Any Firm employee who becomes aware of a suspected, attempted or actual Breach of Security involving Sensitive information should promptly report such breaches to the CCO. The Firm must promptly investigate any such breaches.

10. **Incident Response Plan**

- <u>Establishment of Response Plan</u>:  The CRO will establish a Breach of Security Response Plan for evaluating, managing and resolving any potential Breach of Security of Sensitive Information, and will coordinate with the IT Manager in the event of any Breach.

- <u>Documentation of Responsive Actions</u>: In the event of an actual Breach of Security of Sensitive Information, the CRO will document responsive actions taken in response to such a Breach of Security and undertake a post-incident review to ascertain whether to implement changes to Firm practices, procedures or policies.

11. **Cyber-Security Controls Implemented by Information Technology Professionals**

- <u>Cybersecurity Controls</u>: The CCO, with the assistance of the IT Manager, oversees the development and implementation of Infinity Q's cyber-security controls. Infohedge will refer to the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity to help guide the development of the Company's information security program.

- <u>Annual Assessment:</u> On at least an annual basis, Infohedge will conduct a cyber-security risk assessment. The IT Manager will prepare a summary of any moderate or high risk vulnerabilities that are identified, as well as a plan to remediate such risks.

- <u>Certification:</u>  On an annual basis, the IT Manager or his designee shall certify to the CCO that it has:
  - Inventoried its computers, system hardware, and other IT devices such as smart phones;
  - Inventoried its software applications, and ensured that software patches are being applied in a timely manner;
  - Evaluated likely types of attack, including through penetration testing and vulnerability scans, where appropriate;

IQCM-SEC-00087750

- Implemented appropriate protections, such as anti-malware software, firewalls and data loss prevention software;
- Tested the ability to restore critical data and software in a timely manner;
- Implemented standardized secure configurations for user hardware, software, operating systems, and network infrastructure;
- Periodically tested to confirm that hardware, software, operating systems and network infrastructure continue to operate according to their standardized secure configurations;
- Appropriately tested software applications prior to implementation;
- Encrypted wireless e-mail, remote server access, and all Firm system data transmissions in the Firm's offices that could contain sensitive data;
- Mapped its network resources, and ensured that Infinity Q has appropriately limited access to drives applications and data libraries (SharePoint) that host sensitive data;
- Mapped external access points to the Firm's network;
- Required relatively strong user passwords;
- Promptly disabled access for any terminated Supervised Persons; and
- Permanently erased or destroyed any electronic storage media that is being discarded.

### 12. Policy Oversight

- The CCO will establish, implement and improve, where necessary, periodic testing of the Firm's practices and procedures under this Policy.

- <u>Regular Monitoring and Upgrading</u>: The Firm will regularly monitor Firm security to ensure that the Policy is operating in a manner reasonably calculated to prevent unauthorized access to or unauthorized use of Sensitive Information. The Firm will update information safeguards as necessary to identify and limit reasonably foreseeable internal and external risks to the security, confidentiality or integrity of any Records containing Sensitive Information.

- <u>Formal Evaluation</u>: The Policy will be reviewed annually and as needed, whenever material changes may implicate the security or integrity of Records containing Sensitive Information.

### 13. Effectiveness and Modification of Policy

- This Policy is effective as of the date adopted. The Firm may modify this Policy from time to time.

### <u>Responsibility</u>

-132-

The CCO is responsible for administering this Policy.

**EFFECTIVE AS OF:**  October 1, 2014

**LAST UPDATED:**  February 7, 2018

IQCM-SEC-00087750

# COMPLAINTS

## POLICY/REQUIREMENT

In general, any statement by a client or investor transmitted verbally, in a letter, by fax, by e-mail, or otherwise, that alleges specific inappropriate conduct by the Firm should be considered a complaint.  Examples of complaints by clients and investors include, but are not limited to: (i) allegations of false or misleading statements, claims, comparisons or omissions of material facts; (ii) lack of suitability; and (iii) failure to follow instructions.

From time-to-time, despite its greatest efforts, the Firm may receive complaints from clients and investors regarding the Firm's investment management or other matters.  The Firm will strive to respond promptly and appropriately to all such complaints, and will consider whether corrective actions should be taken in order to prevent additional problems.

While observations about market conditions or an account's performance may not be complaints, you should consult with the CCO if there is any question as to whether a communication is a complaint.

## REPORTING

You must promptly report any complaints to the CCO, and furnish any related written documentation that is received.  Failure to report a complaint will be cause for corrective action, up to and including dismissal.  Anyone who receives a verbal complaint, should work with the CCO to prepare a brief memorandum describing the complaint.

All complaints involving the Funds shall also be forwarded to the Fund's transfer agent and to the Fund's CCO.

## RESPONSIBILITIES

The CCO will investigate and respond to all client and investor complaints in a timely manner. The CCO will coordinate the responses relating to complaints involving the Infinity Q Diversified Alpha Fund with the Fund's transfer agent and the Fund's CCO.

## RECORDKEEPING

The CCO will maintain all documentation pertaining to all client and investor complaints for the time period required by law.

UPDATED: February 7, 2017

IQCM-SEC-00087750

## ELECTRONIC COMMUNICATIONS AND SOCIAL MEDIA

**1.     Electronic Communications**

E-mail and instant messaging communications ("Electronic Communications") conducted on the Firm's systems, equipment or software should be used primarily for the conduct of the Firm's business and not be used in any illegal, offensive, or unethical manner. The Firm prohibits using these tools for conducting non-Firm related business, and for excessive personal use.

All business-related communications must be conducted through employees' company-assigned email addresses. Employees may only use instant messaging ("IM") to communicate regarding business matters if the IM system is approved by Wildcat's information technology provider who has confirmed the retention of such IM.  The use of text, SMS or any other forms of electronic communications for business purposes is currently prohibited.

The Firm reserves the right to access any employee's Electronic Communications for any business purpose, including legal, regulatory, compliance or otherwise. All Electronic Communications, whether business related or personal, are subject to review by the Firm's CCO or by his designee. As the property of the Firm, you should not expect that the Electronic Communications message that you create using the Firm's property will be or will remain private. Additionally, employees are prohibited from using their personal e-mail or instant messaging accounts for business purposes.

You should note that any Electronic Communications message may be read by a regulator, your supervisor, the CCO or a civil plaintiff. Therefore, keep in mind and ask yourself the following when drafting such message:

"Would it be okay if the text of this Electronic Communication were on the front page of the *Wall Street Journal* tomorrow?"

Please note that tone, meaning and innuendo is often lost in electronic communications, therefore a joke that may have been funny between you and the recipient may not be funny to a regulator or a plaintiff's attorney.

Therefore, in Electronic Communications employees must refrain from:

- using foul or offensive language;

- attaching or forwarding inappropriate or offensive attachments or pictures;

- discussing inappropriate subject matter; or

- violating regulatory or Firm advertising restrictions as discussed in this compliance manual.

-135-

**Procedures for Reviewing and Retaining E-Mail**

Electronic Communications may be periodically reviewed by the CCO or his designee to determine whether the information relates to one of the categories below:

- discussion of confidential information relating to the Firm or any of its investors, Clients, principals or employees;

- promises of specific results or guarantees of profits;

- making an illegal agreement;

- unauthorized forwarding of confidential materials related to the Firm; or

- disseminating fraudulent or misleading communications, including rumors.

Reviews shall be conducted using either random sampling or key word searches and record of such reviews shall be retained through the use of a review log or documented within the review software utilized.

All employee electronic communications shall be retained indefinitely.

**2.     Internet Usage Generally**

Employees are prohibited from accessing or attempting to access, view, download, distribute or send illegal, vulgar, disparaging, harassing, obscene, pornographic, disruptive or offensive materials via the Internet.

The Firm reserves the right to monitor all Internet activity on its systems and equipment and to block Internet access to certain websites on its equipment.

**3.     Social Media**

The Firm acknowledges its employees' right to host and post blogs and use social networking sites (e.g. *LinkedIn, Facebook, and Twitter* etc); however, use of social networking sites is prohibited for use as a means of conducting business on behalf of the Firm. The information posted on blogs and social networking sites is in the public domain and may reflect on the Firm's business or may cause the Firm to be in violation of the SEC's advertising rules. To avoid misrepresentation of the Firm and to avoid any violation of the SEC's advertising rules the Firm has adopted the following guidelines for employees who choose to participate in social networking or become involved with other forms of online publishing or discussions. Additionally, the Firm will keep abreast of any upgrades or modifications to the functionality of social media sites as they relate to compliance or informational security risks.

<u>When involved with social media, employees should adhere to the following guidelines:</u>

- Conduct all personal Internet social networking on personal equipment during non-working hours so as not to interfere with primary job responsibilities.

-136-

- **Do not use the email or messaging function on any social media network site to communicate business-related information.** In the event that an employee identifies a business-related reason to post material through a business-related social networking site, any such material must be pre-approved by the CCO or designee.

- Do not host or maintain a blog or website regarding the financial industry.

- The content of any Fund-related blogs must be reviewed by the Fund's Distributor prior to posting to any blog or site.

- Professional biographies listed on social networking sites must be truthful and accurate. They may contain name, title, contact information and background.

- The use of testimonials or recommendations regarding the Firm on social networking sites is prohibited. This type of content posted by a third party or by an employee must be removed as soon as possible. Additionally, employees may not link or refer to testimonials on third party sites over which they do not have control. *LinkedIn* has a "recommendations" feature that allows users to post recommendations and endorsements on the public profile page of other users. *LinkedIn* also contains a "request recommendations" feature that allows users to solicit recommendations for posting on their public profile page. These may be deleted by following instructions from *LinkedIn*.

- Consult the CCO prior to providing a "recommendation" for former co-workers of the Firm on those social networking sites that provide a mechanism that allows connections to "recommend" a user.

## Monitoring

The CCO or his designee may periodically, and without prior notification, document the review of social networking sites and blogs used by Firm employees (such as Facebook and LinkedIn) for compliance with this policy and will document violations of this policy through screen prints, pdfs or third parties.   Documentation shall take the form of a review log.

**4.    General Procedures for Electronic Communications and Social Media**

## Training

Employee training on the use of electronic communications and social media policies and procedures will be covered in the routine compliance training.

## Information Security

The Firm's privacy policy governs client personal information. Any disclosure of personal information should be in compliance with the privacy policy. The Firm is aware of the information security risks and will create appropriate firewalls between client sensitive information, as well as the Firm's own proprietary information, and the Internet and social media sites.

-137-

## Certification

The Firm may request Employees to certify that they understand and will comply with these procedures.

## Violations

Violations of the Electronic Communications and Social Media Policy are considered serious matters by the Firm and may result in the imposition of sanctions, including termination of employment.

If you have any questions, please contact the Firm's CCO.

**Effective As Of:**  August 15, 2015

**Last Updated:**  June 30, 2017

IQCM-SEC-00087750

## ANTI-MONEY LAUNDERING POLICY ("AML POLICY")

**Background**

Money laundering is the process by which the direct or indirect proceeds of criminal conduct are channeled through financial institutions or other organizations in a way which is intended to conceal the true origin and ownership.  If money laundering is carried out successfully, the money or other assets concerned can appear to be legitimate.

The intention of the money launderer in general terms is to:

(a)   Conceal the true ownership and origin of criminal proceeds;
(b)  Keep control over these proceeds;
(c)  Change the original form; and
(d)  Remain anonymous.

This is done by using the three stages of money laundering, which can occur in sequence but may overlap. These stages (including examples) are:

(a)  Placement – to place the proceeds of criminal conduct into financial institutions or other organizations without causing suspicion (e.g., breaking up large amounts into smaller sums (e.g., under CI$10,000 or US$10,000) and depositing them into a bank account ("smurfing"));
(b)  Layering – to move the money around, often in a series of complex transactions and sometimes
     crossing several jurisdictions, so that it becomes very difficult to trace the original source of the money
     (e.g., transferring electronically deposited cash from one account into another); and
(c)  Integration – to then place money in financial institutions or other organizations where it now appears to be legitimate and can be used for legitimate purposes (e.g., re-investing the funds in real estate, luxury
     assets (e.g., boats, cars, etc.) or business ventures).

Terrorist financing is the process by which terrorists fund their operations in order to perform terrorist acts. There are two primary sources of financing for terrorist activities: (i) financial support from countries, organizations or individuals; and (ii) a variety of revenue-generating activities and certain illicit activities, including smuggling and credit card fraud.

A primary difference between terrorist financing and money laundering involves the origin of the funds in question.  Terrorist financing uses funds for an illegal political purpose where the money itself is not necessarily derived illegally.   Money laundering, on the other hand, involves, by definition, the proceeds of criminal conduct.  The purpose of money laundering is to enable the money to be used legally and without detection of its criminal origins.

**AML Regulations**

<u>Domestic</u>:

-139-

IQCM-SEC-00087750

The **USA Patriot Act,** effective October 24, 2001, amended the **Bank Secrecy Act** ("BSA") and other AML laws to require all financial institutions to establish AML compliance programs. The BSA generally requires financial institutions to develop an anti-money laundering compliance program containing the following four components:

1. written policies, procedures and controls reasonably designed to detect and prevent money laundering;
2. the designation of a compliance person within the firm to be responsible for implementing and monitoring the firm's anti-money laundering program;
3. training programs for employees; and
4. an independent audit function.

The BSA defines financial institutions to include certain entities, including registered investment companies. The BSA does not presently apply to registered investment advisers such as Infinity Q or to the private funds managed by Infinity Q.

Cayman Islands:
**Proceeds of Crime Law, as amended (the "Law")**

The Law is the primary piece of legislation in the Cayman Islands dealing with AML and terrorist financing and is modeled on United Kingdom legislation, namely the Proceeds of Crime Act, 2002 and the Serious Organized Crime and Police Act, 2005. It is supported by the Regulations and the Guidance Notes and contains five main money laundering and other criminal conduct offenses, each of which can result in imprisonment and fines. These include:

- concealing, disguising, converting, or transferring criminal property or removing such property from the Cayman Islands (§133);
- entering into or otherwise being concerned in any arrangement knowing or suspecting that it assists with the acquisition, retention, use or control of criminal property by or on behalf of another person (§134); and
- acquiring, using or possessing criminal property (§135).

In addition, there are criminal failure to disclose and "tipping off" offenses:

- failing to disclose to an MLRO (in the case of an employee) or the FRA (in the case of an MLRO) knowledge or suspicion of criminal conduct obtained in the course of one's employment (§§136 and 137); and
- when knowing or suspecting that criminal activity has occurred, is occurring or is about to occur (regardless of whether disclosure has been made), notifying ("tipping off") anyone that is likely to prejudice any investigation that might follow disclosure (§139).

There are also "whistle-blower" protections providing that no person may be subject to legal, administrative or employment-related sanction for providing information regarding violations of the Law (§140).

**Anti-Money Laundering Regulations, as amended (the "Regulations")**

-140-

IQCM-SEC-00087750

The Regulations supplement the Law and are supported by the Guidance Notes. The Regulations require "gatekeepers" to have adequate systems in place to detect money laundering and terrorist financing and must include sufficient training to ensure that staff are aware of their personal obligations to report suspicious activity. The Regulations require these gatekeepers to adopt procedures addressing the following:

- internal reporting;
- client identification and verification;
- conducting sanction and FATF non-compliant territory checks;
- record keeping;
- a risk-based approach to monitoring financial activities;
- screening employees to ensure high standards in hiring;
- ongoing monitoring;
- employee training; and,
- appointment of MLCO and internal audit of AML procedures

**Guidance Notes on the Prevention and Detection of Money Laundering and Terrorist Financing in the Cayman Islands, as amended from time to time (the "Guidance Notes")**

The Guidance Notes are issued by CIMA. The courts, in determining whether the Regulations have been complied with, will take the Guidance Notes into account. The Guidance Notes explain what is expected in complying with the Regulations (namely the detection and prevention of money laundering).

The Guidance Notes detail requirements regarding their internal AML procedures, including:

- having adequate client identification and verification procedures;
- monitoring client conduct and activity for consistency with stated business purposes;
- having record keeping procedures which typically require the retention of specific records for a minimum of five years;
- maintaining internal reporting procedures through appointment of an MLRO;
- implementing internal control procedures through the designation of an MLCO; and
- performing employee screening and providing education and periodic training to assist employees in recognizing and dealing with suspicious transactions

**Infinity Q AML Policy Statement**

Infinity Q is firmly committed to preventing money laundering and the financing of terrorist or other illegal activities.

Infinity Q is the investment manager to the Infinity Q Diversified Alpha Fund, a registered investment company, as well as the Infinity Q Private Funds. Neither the Adviser nor the Private Funds are deemed Financial Institutions subject to Section 352 of the USA PATRIOT Act, and the mutual fund has adopted an AML Compliance Program through the TAP Trust. The policies and procedures set forth herein are established to meet the general requirements of Section 352 pursuant to industry best practices applicable to investment advisers and domestic Private Funds.

-141-

Infinity Q also currently manages the Infinity Q Volatility Alpha Offshore Fund Ltd. (the "Volatility Offshore Fund"), a Cayman Islands Exempted Company, and may in the future manage other offshore funds. The Volality Offshore Fund is subject to the regulations outlined above under "Cayman Islands".

The Funds and Infinity Q do not engage in transactions involving cash or equivalent bearer instruments such as money orders, cashier's checks or traveler's checks. Infinity Q's counterparties, including banks and broker-dealers, are subject to the anti-money laundering compliance program requirements of 31 U.S.C. 5318(h) and are regulated by a Federal functional regulator. In establishing its AML program, Infinity Q relies upon their efforts to mitigate the risk of money laundering through the Funds.

**AML Program**

In response to increased regulatory concerns with respect to the identification of sources of funds used to make an investment in the Funds amd to comply with applicable Cayman Islands regulations, Infinity Q has implemented an AML Program designed to guard against and identify money laundering activities. Infinity Q has designated its CCO with responsibility for developing and administering the AML compliance program and has delegated the day-to-day implementation of the AML controls to the Funds' administrator, US Bancorp Fund Services, LLC ("USBFS" or "US Bank").

For purposes of complying with the Cayman Islands Proceeds of Crime Law Anti-Money Laundering Regulations (the "Cayman AML Regs"), as applicable to Infinity Q's funds, the adviser has designated its CCO as the Anti-Money Laundering Compliance Officer ("AMLCO") and as the Money Laundering Reporting Officer ("MLRO"). Infinity Q has designated its CIO as the Deputy Money Laundering Reporting Officer ("DMLRO") for purposes of the Cayman AML Regs.

The AML Program includes the following procedures outlined below.

**AML Procedures**

In order to facilitate the determination and confirmation of the identity of prospective and existing investors in the Funds and take reasonable steps to identify potential money laundering, Infinity Q must assess the money laundering risks presented by each Investor and determine the corresponding level of supporting information that is required. Minimally, Infinity Q will conduct the following AML procedures:

1. Investor Identification and Representations:

Prior to accepting an Investor into a Fund, Infinity Q will verify the identity of the Investor by obtaining investor information sufficient to reasonably confirm the Investor's identity. In addition, Infinity Q must obtain and document the Investor's investment sophistication and determine the source of the funds to be given to the Fund. The information that is obtained to support the source-of-funds determination must be sufficiently reliable in light of the money laundering risks presented by the Investor. Infinity Q will require all Investors in the Funds to affirmatively make certain representations in a Subscription Agreement for the Funds or similar document.

-142-

The verification of Investor identity and source of funds determination processes are delegated to the Fund administrator, USBFS.

## 2.    Monitoring Government Watch Lists

Infinity Q, through USBFS, will check investor names against the Specially Designated Nationals and Blocked Persons lists published periodically by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury (the "Blocked Persons List").[4]  Upon an investor's initial fund investment, and on a periodic basis thereafter, USBFS will screen investors against appropriate sanction lists including, without limitation, those of FATF, the EU and UN. USBFS utilizes the World-Check and Bridger databases to assist with these reviews.

After initial investment, these checks are periodically run, typically not less frequently than quarterly, as well as at the time of any additional contribution or redemption.

## 3.    Enhanced Due Diligence

Infinity Q will undertake enhanced due diligence procedures where necessary prior to accepting investors that Infinity Q believes present high risk factors with respect to money laundering activities.  Infinity Q may decline to accept a subscription based upon this information or if the information is not provided. Factors to consider in making such risk assessments include:

- The nature of the Investor's business (including nature of customers, business partners and transactions) and the level or regulation applicable to the business;

- Whether the Investor is acting as an agent for or on behalf of another, and if so, obtaining information regarding the capacity in which and on whose behalf the Investor is acting;

- Whether the Investor is a trustee and any persons or entities that have control over the funds or have the power to remove trustees;

- The countries in which the Investor resides or conducts business;

- Whether the Investor is a legal entity that is not publicly traded in the United States, such as an unincorporated association, a private investment company, trust or foundation;

---

[4] The Office of Foreign Assets Control ("OFAC") of the US Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries, terrorists, international narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction.  In addition, OFAC publishes a list of Specially Designated Nationals and Blocked Persons which includes over 3,500 names of companies and individuals who are connected with the sanctions targets and are located throughout the world.  A number of the named individuals and entities are known to move from country to country and may end up in locations where they would be least expected.  U.S. persons are prohibited from dealing with SDNs wherever they are located and all SDN assets are blocked.

IQCM-SEC-00087750

- Whether the Investor (and, if a firm, any of the Investor's controlling persons) or any person acting on the Investor's behalf is a "public figure" or "related individual"[5];

- Whether the Investor funds or intends to fund its investment from a financial institution that is regulated by a government agency of a country that is a member of the Financial Action Task Force (FATF);

- Whether the Investor seeks to use a P.O. Box address, place unusual restrictions on contact or requests unusual secrecy; and

- Whether the Investor is "Senior Foreign Political Figure."

USBFS will administer the Enhanced Due Diligence Procedures.

### 4.   Investors Who Refuse to Provide Information / Failure to Verify Identity

If a potential or existing Investor either refuses to provide the information  described above when requested, or appears to have intentionally provided misleading information, Infinity Q will not accept a new Investor and, after considering the risks involved, consider removing any existing Investor from a Fund.

Furthermore, if Infinity Q cannot form a reasonable belief of the true identity of an Investor, Infinity Q will not accept an Investor's subscription or eliminate an Investor from a Fund after attempts to verify the Investor's identity fail.

### 5.   Redemption Procedures

Prior to making a distribution of funds to Investors, Infinity Q will check investor  names  against OFAC's Specially Designated Nationals and Blocked Persons List. This task is delegated to USBFS.

### 6.   Recordkeeping

Infinity Q, through USBFS, will document verifications, including all identifying information provided by an Investor, the methods used and results of verification, and the resolution of any discrepancy in the identifying information. The records of all identification information will be retained for five years after the Investor ceased being an investor in a Fund and those records relating to verification of the Investor's identity will be retained for five years after the record is made.

---

[5] A "public figure" is any individual who occupies, has recently occupied, is actively seeking, or is being considered for, a s enior position in a government (e.g., legislative, administrative, military or judicial branches) or political party of a non-U.S. country, state, or municipality or any department (including the military), agency, or instrumentality (e.g., a government-owned corporation) thereof.  A "related individual" is any person who is (i) a senior adviser who is closely associated with a public figure, or (ii) a member of a public figure's immediate family (*i.e.*, spouse, parent, sibling, child or in-laws).

IQCM-SEC-00087750

**Reasonable Reliance on Third Parties**

Infinity Q may accept and delegate all or a portion of these identity verifications and monitoring procedures as conducted by other third parties in lieu of conducting in-house verification and monitoring, provided that such third parties have adopted and enforce acceptable AML policies procedures from the third party to verify that the internal policies and procedures are appropriate in light of the policies and procedures administered by third parties.

Infinity Q currently delegates the performance of the AML-related tasks to USBFS. In making this delegation, Infinity Q reviewed the USBFS AML Compliance Manual and, in connection with ongoing due diligence, may periodically re-evaluate such policies and procedures and review the results of the independent testing of the USBFS AML compliance program.

**Training**

Infinity Q will communicate its anti-money laundering efforts and policies and procedures to all supervised persons during compliance trainings or otherwise.

**EFFECTIVE**: February 7, 2017

**UPDATED: December 6, 2018**

IQCM-SEC-00087750

APPENDIX A

**Infinity Q Capital Management, LLC**

**Code of Ethics**

**Initial Acknowledgement Form**

I acknowledge that I have received the Code of Ethics of Infinity Q Capital Management, LLC (the "Firm") (the "Code").  In particular, I have read and understand the relevant portions of the Code applicable to my position at the Firm and to m y and my Family/Household's personal securities holdings.

I have also (or will shortly) completed, signed and dated the **Initial Holdings Report and Disclosure of Brokerage Accounts** form required by the Firm's Code.

If I had any questions concerning the Code and my responsibilities under the Code, I have raised them with the Firm's Chief Compliance Officer and received satisfact ory answers to my questions.

I understand that any violation(s) of the Code is grounds for immediate disciplinary action, which may include termination of employment, and may constitute a violation of applicable federal, state and local laws and regulations.  I certify that I have complied with, and affirm that I will remain informed about, and will continue to comply with, all applicable provisions of the Code.

Signature:  _____

Print Name:  _____

Date:  _____

-146-

IQCM-SEC-00087750

**APPENDIX B**

**Infinity Q Capital Management, LLC**

**Code of Ethics**

**Annual Acknowledgement Form**

I acknowledge that I have received the current Code of Ethics of Infinity Q Capital Management, LLC (the "Firm") (the "Code").  In particular, I have read and understand the relevant portions of the Code applicable to my position at the Firm and to me and my Family/Household's personal securities holdings.

I have also (or will shortly) completed, signed and dated the **Annual Holdings Report and Disclosure of Brokerage Accounts** form required by the Firm's Code.

If I had any questions concerning the Code and my responsibilities under the Code, I have raised them with the Firm's Chief Compliance Officer and received satisfactory answers to my questions.

I understand that any violation(s) of the Code is grounds for immediate disciplinary action, which may include termination of employment, and may constitute a violation of applicable federal, state and local laws and regulations.  I certify that I have complied with, and affirm that I will remain informed about, and will continue to comply with, all applicable provisions of the Code.

Signature: _____

Print Name: _____

Date: _____

IQCM-SEC-00087750

APPENDIX C

**Infinity Q Capital Management, LLC**
**Code of Ethics - Appendix A**
**Initial Holdings Report and Disclosure of Brokerage Accounts**

*Please note that this report must be submitted within 10 days of: (i) your first day of employment; or (ii) the date you are covered by the Code of Ethics ("Code")[6].*

**Name:** _____     **Date:** _____

As of the date appearing above, the following are each and every Investment Account containing "Covered Securities" as defined in the Code of Infinity Q Capital Management, LLC (the "Firm") in which I have a Beneficial Interest.

> **SECTION I** — Indicate by marketing an "X" below if you have no Investment Accounts and no Covered Securities
> _____ I have no Investment Accounts and no Covered Securities.

**SECTION II** — Complete this section only if you have Investment Accounts and/or Covered Securities.

**Disclosure of Brokerage Accounts** *Please list all Brokerage Accounts in your name or in the name(s) of a member of your Family/Household.*

| Account Name and Number | Brokerage Firm | Month/Year Account Opened | Discretionary Account (Y/N) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*Attach extra sheet if needed.*

**Disclosure of Holdings** *Please attach the most recent brokerage statements for your accounts where you have discretion and for the accounts belonging to members of your Family/Household. For private placements, please enter information below and attach the executed page of our subscription agreement(s) or other documentation.   You need not include your investment in any of the Firm's funds.*

---

[6] Capitalized terms are defined in the Code.

-148-

IQCM-SEC-00087750

| Title of Security | Type of Security (ex: *private placement, hedge fund, IPO*) | # of Shares | Principal Amount (*including uncalled capital*) | Name of Brokerage Firm |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

I certify that the Covered Securities and Brokerage Accounts listed above are the <u>only</u> Covered Securities and Brokerage Accounts in which I or my Family/Household have a direct or indirect beneficial ownership interest.  I further certify that to the best of my knowledge no Covered Securities reported here violate any provision of the Code or any applicable federal securities law or regulation.

_____
Signature

-149-

IQCM-SEC-00087750

APPENDIX D

**Infinity Q Capital Management, LLC**
**Code of Ethics - Appendix C**
**Quarterly Certification and Transaction Reports**[7]

*Please note that this report must be submitted no later than 30 calendar days after the close of the calendar quarter.*

**Name:** _____       **Date:** _____

As of the date appearing above, the following are complete and accurate representations of all my transactions in "Covered Securities" as defined in the Code of Ethics ("Code") of Infinity Q Capital Management, LLC (the "Firm") which occurred during the most recent calendar quarter.

> **SECTION I** — Indicate by marketing an "X" below if you have no Investment Accounts and no Covered Securities, and thus no transactions to report for the quarter.
> _____ I have no Investment Accounts and no Covered Securities.

**SECTION II** — Complete this section <u>only</u> if you have establish **new Investment Accounts** during the most recent calendar quarter.

**Disclosure of New Brokerage Accounts**  *Please list all **newly established Brokerage Accounts** in your name or in the name(s) of a member of your Family/Household.*

| Account Name and Number | Brokerage Firm | Month/Year Account Opened | Discretionary Account (Y/N) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Attach extra sheet if needed.*

**Disclosure of Holdings**  *Please attach the most recent brokerage statements for your accounts where you have discretion and for the accounts belonging to members of your Family/Household. For private placements, please enter information below and attach the executed page of our subscription agreement(s) or other documentation.   You need not include your investment in any of the Firm's funds.*

---

[7] Capitalized terms are defined in the Code.

-150-

IQCM-SEC-00087750

| Date of Transaction | Title | Interest Rate and Maturity Date (if applicable) | # of Shares | Principal Amount (*including uncalled capital*) | Purchase or Sale | Price | Name of Brokerage Firm |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

*Attach extra sheet if needed.*

I certify as applicable that:

    (i)     I (and my Family/Household) have directed all brokers, dealers and banks to furnish brokerage statements and trade confirmations directly to the CCO;

    (ii)    no transactions that would be required to be reported were effected during the quarter except through accounts for which I and my Family/Household have directed the broker, dealer or bank to send brokerage statements and trade confirmations directly to the CCO (or that are reported on this Quarterly Certification and Transactions Report); and

    (iii)   as far as I and my Family/Household know, the statements and confirmations provided are complete and accurate representations of all transactions during the most recent calendar quarter.

I further certify that to the best of my knowledge no Covered Securities reported here violate any provision of the Code or any applicable federal securities law or regulation.

_____
Signature

-151-

IQCM-SEC-00087750

APPENDIX E

**Infinity Q Capital Management, LLC**
**Code of Ethics - Appendix B**
**Annual Holdings Report and Disclosure of Brokerage Accounts**[8]

**Name:** _____     **Date:** _____

As of the date appearing above, the following are each and every Investment Account containing "Covered Securities" as defined in the Code of Infinity Q Capital Management, LLC (the "Firm") in which I have a Beneficial Interest.

---

**SECTION I** — Indicate by marketing an "X" below if you have no Investment Accounts and no Covered Securities

_____ I have no Investment Accounts and no Covered Securities.

---

**SECTION II** — Complete this section <u>only</u> if you have Investment Accounts and/or Covered Securities.

**Disclosure of Brokerage Accounts**  *Please list all Brokerage Accounts in your name or in the name(s) of a member of your Family/Household.*

| Account Name and Number | Brokerage Firm | Month/Year Account Opened | Discretionary Account (Y/N) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*Attach extra sheet if needed.*

**Disclosure of Holdings**  *Please attach the most recent brokerage statements for your accounts where you have discretion and for the accounts belonging to members of your Family/Household. For private placements, please enter information below and attach the executed page of our subscription agreement(s) or other documentation.   You need not include your investment in any of the Firm's funds.*

---

[8] Capitalized terms are defined in the Code.

IQCM-SEC-00087750

| Title of Security | Type of Security (ex: *private placement, hedge fund, IPO)* | # of Shares | Principal Amount (*including uncalled capital)* | Name of Brokerage Firm |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

I certify that the Covered Securities and Brokerage Accounts listed above are the <u>only</u> Covered Securities and Brokerage Accounts in which I or my Family/Household have a direct or indirect beneficial ownership interest.  I further certify that to the best of my knowledge no Covered Securities reported here violate any provision of the Code or any applicable federal securities law or regulation.

_____
Signature

-153-

IQCM-SEC-00087750