# EXHIBIT B

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# INFINITY Q VOLATILITY ALPHA FUND, L.P.

(A Delaware Limited Partnership)

LIMITED PARTNERSHIP INTERESTS

August 2018

GENERAL PARTNER AND INVESTMENT ADVISER:
Infinity Q Capital Management, LLC
888 7th Avenue, 37th Floor
New York, NY 10106

*Confidential*

*Do Not Copy or Circulate*

**INFINITY Q VOLATILITY ALPHA FUND, L.P.**
**CONFIDENTIAL**
**PRIVATE PLACEMENT MEMORANDUM**

### IMPORTANT NOTICES

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF LIMITED PARTNERSHIP INTERESTS BY INFINITY Q VOLATILITY ALPHA FUND, L.P.

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH POOLS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PERSONS, A PRIVATE PLACEMENT MEMORANDUM FOR THIS POOL IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMODITY FUTURES TRADING COMMISSION. THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A POOL OR UPON THE ADEQUACY OR ACCURACY OF A PRIVATE PLACEMENT MEMORANDUM. CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY PRIVATE PLACEMENT MEMORANDUM FOR THIS POOL.

THE AVAILABILITY OF EXEMPTIONS FROM APPLICABLE SECURITIES LAWS FOR THIS OFFER AND SALE OF LIMITED PARTNERSHIP INTERESTS DEPENDS IN PART ON THE QUALIFICATIONS AND INVESTMENT INTENT OF THE INVESTOR. AMONG OTHER THINGS, THE INVESTOR WILL BE REQUIRED TO REPRESENT THAT THE INVESTOR IS AN ACCREDITED INVESTOR, AS DEFINED BY THE APPLICABLE SECURITIES LAWS, AND THAT THE INVESTOR IS ACQUIRING INTERESTS FOR THE INVESTOR'S OWN ACCOUNT FOR INVESTMENT PURPOSES ONLY AND NOT WITH A VIEW TO ANY RESALE OR DISTRIBUTION OF THE INTERESTS.

THE FUND INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED OR TO ANY INDIVIDUAL OR ENTITY NOT POSSESSING THE QUALIFICATIONS DESCRIBED IN THIS MEMORANDUM.

THE INTERESTS OFFERED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS. SINCE THERE ARE SUBSTANTIAL

i

RESTRICTIONS ON THE TRANSFERABILITY OF THE SECURITIES OFFERED HEREBY, EACH OFFEREE SHOULD PROCEED ON THE ASSUMPTION THAT IT MUST BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN EXTENDED PERIOD. THE FUND INTERESTS MAY NOT BE TRANSFERRED WITHOUT THE CONSENT OF THE GENERAL PARTNER. IN ADDITION, THE FUND INTERESTS ARE NOT REGISTERED FOR SALE TO THE PUBLIC UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

PROSPECTIVE PURCHASERS OF FUND INTERESTS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR MUST RELY UPON ITS OWN REPRESENTATIVES, INCLUDING ITS OWN LEGAL COUNSEL AND ACCOUNTANT, AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE FUND.

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077235

## SUMMARY OF FUND STRUCTURE AND INFORMATION REGARDING OFFERING

This Confidential Private Placement Memorandum (the "**Memorandum**") relates to an offering (the "**Offering**") of limited partnership interests ("**Interests**") in Infinity Q Volatility Alpha Fund, L.P., a Delaware limited partnership (the "**Fund**"). The general partner and investment adviser to the Fund is Infinity Q Capital Management, LLC, a Delaware limited liability company ("**Infinity Q,**" the "**General Partner**" or "**Adviser**"). The General Partner is an investment adviser registered with the U.S. Securities and Exchange Commission (the "**SEC**") under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), and is registered as a commodity pool operator ("**CPO**") with the National Futures Association (the "**NFA**") under the Commodity Exchange Act, as amended (the "**Commodity Exchange Act**"), pursuant to which it is regulated by the Commodity Futures Trading Commission ("**CFTC**"). The principal office of the Fund and of the General Partner is located at 888 7th Avenue, 37th Floor, New York, NY 10106.

The Fund is offering Interests only to persons who are (i) "accredited investors," as defined in Rule 501(a) promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"); (ii) "qualified clients," as defined in Rule 205-3 under the Advisers Act; and (iii) "qualified eligible persons" within the meaning of Rule 4.7 under the Commodity Exchange Act. The General Partner may, however, in its sole discretion admit as limited partners in the Fund persons who are not "accredited investors" provided that such persons must also be "qualified clients" and "qualified eligible persons," subject to compliance with applicable laws and any other terms and conditions as may be established by the General Partner. The Fund will not register as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), in reliance upon the exemption contained in Section 3(c)(1) of the Investment Company Act for private investment companies whose outstanding securities are beneficially owned by not more than 100 persons.

The minimum capital commitment to the Fund is $5,000,000, subject to the discretion of the General Partner to reduce or waive the minimum amount. The General Partner is currently seeking to raise approximately $300 million, although the General Partner will have the right to accept a greater or lesser amount. While no minimum amount of subscriptions is required for the Offering, no closing will occur unless the amount subscribed is sufficient, as determined in the sole discretion of the General Partner, to support the operation of the Fund. Purchasers of Interests will become limited partners of the Fund upon the acceptance of their subscriptions and the funding of their subscription commitments for the purchase of Interests. The General Partner has the absolute right in its sole discretion to accept or reject any prospective investor's subscription, in whole or in part.

All persons receiving this Memorandum (each, a "**Recipient**") must treat this Memorandum as confidential and may not distribute it to any persons other than their legal and financial personnel or general partners as needed to evaluate the Fund and the Interests. In accepting this Memorandum, the Recipient agrees:

      a.     not to reproduce this Memorandum for distribution to any person, nor to discuss its contents with any person, other than the Recipient's professional advisors;

      b.     to return this Memorandum upon receipt of a written request from the General Partner, or any of its authorized agents or representatives;

Confidential Treatment Requested by Infinity Q Capital Management, LLC          IQCM-SEC-00077236

    c.     not to consider receipt of this Memorandum as an offer to sell or the solicitation of an offer to buy in any jurisdiction where such offer or solicitation is unlawful; and

    d.     not to rely on any information concerning the Fund or its business other than information contained in this Memorandum and other information provided in writing by the Fund or the General Partner.

The distribution of this Memorandum and the offer and sale of the Interests in certain jurisdictions may be restricted by law. This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy any Interests in any jurisdiction in which such offer, solicitation or sale would be unlawful or to any person to whom it is unlawful to make such offer in such jurisdiction. No action has been or will be taken to permit a public offering in any jurisdiction where action would be required for that purpose. Accordingly, the Interests may not be offered or sold, directly or indirectly, and this Memorandum may not be distributed, in any jurisdiction except in accordance with the legal requirements applicable in such jurisdiction. Interests that are acquired by persons not entitled to hold them will be compulsorily redeemed.

The Fund is a master fund in a "master-feeder" structure. Pursuant to this structure, a Cayman Islands exempted company, for which the General Partner serves as the Investment Manager, is a feeder fund which invests substantially all or all of its assets in the Fund. The General Partner may permit additional feeder funds to invest in the Fund. Additional information regarding the master-feeder structure of the Fund may be obtained from the General Partner upon request.

Each prospective investor is invited to meet with a representative of the General Partner to discuss with, ask questions of and receive answers from such representative concerning the Fund, the Interests and the terms and conditions of this Offering. Inquiries should be directed to James Velissaris, Infinity Q Investor Relations, at (212) 468-5110.

Confidential Treatment Requested by Infinity Q Capital Management, LLC    IQCM-SEC-00077237

TABLE OF CONTENTS

SUMMARY OF PRINCIPAL TERMS ................................................................1

INVESTMENT PROGRAM AND POLICIES OF THE FUND ..............................14

PRINCIPAL RISKS OF INVESTING IN THE FUND ......................................15

MANAGEMENT OF THE FUND ................................................................22

CONFLICTS OF INTEREST ....................................................................24

VALUATION ........................................................................................26

CERTAIN TAX CONSIDERATIONS ..........................................................33

REGULATORY CONSIDERATIONS ..........................................................45

PRIVACY POLICY AND PROCEDURES .....................................................49

GLOSSARY OF DEFINED TERMS ............................................................51

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077238

## INFINITY Q VOLATILITY ALPHA FUND, L.P.

### SUMMARY OF PRINCIPAL TERMS

The following is a summary of certain facts about the Fund and this Offering. It is qualified in its entirety by, and should be read in conjunction with, the full text of this Memorandum and the limited partnership agreement of the Fund attached as Appendix A (the "**Partnership Agreement**"). Prospective investors should carefully consider the information referenced below under the heading "Risk Factors." Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Partnership Agreement.

*This Memorandum does not purport to be and should not be construed as a complete description of the Partnership Agreement. Any potential investor in the Fund is encouraged to review the Partnership Agreement carefully, in addition to consulting appropriate legal and tax counselors.*

| | |
|---|---|
| **The Fund** | The Fund is a limited partnership formed under the laws of the State of Delaware. The Fund will commence operations upon its first sale of Interests. The General Partner is currently seeking to raise approximately $300 million, but may accept a greater or lesser amount. While no minimum amount of subscriptions is required for the Offering, no closing will occur unless the amount subscribed is sufficient, as determined in the sole discretion of the General Partner, to support the operation of the Fund. Purchasers of Interests will become limited partners of the Fund (a "**Limited Partner**" and, together with the General Partner, the "**Partners**") upon acceptance by the General Partner of payment for the Interests being purchased. The General Partner has the absolute right in its sole discretion to accept or reject any prospective investor's subscription, in whole or in part. Upon commencement of operations, the Fund will conduct a continuous offering and will accept additional subscriptions on the first day of each calendar month as set forth in the Partnership Agreement. |
| **Investment Strategy** | The Fund seeks to gain exposure to volatility-based strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates and commodities markets. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time in both positive and negative environments for equities, fixed income and credit markets. The General Partner may, in its sole discretion, allocate capital to additional strategies not mentioned |

1

in this Memorandum. See "*Investment Program of the Fund*." The Fund's investment program is speculative and entails substantial risks. There can be no assurance that the investment objective of the fund will be achieved, and results may vary substantially over time. Further, the practices of short selling, use of derivatives and other leveraged positions and limited diversification can, in certain circumstances, substantially magnify the impact of adverse market conditions on the Fund's net asset value and performance.

**General Partner and Adviser**

The General Partner and Adviser (Infinity Q Capital Management, LLC), which acts as the investment manager of the Fund in its capacity as the Fund's general partner, is registered with the SEC as an investment adviser under the Advisers Act and is registered as a CPO with the National Futures Association under the Commodity Exchange Act. The General Partner also acts as the investment manager for Infinity Q Diversified Alpha Fund ("**Infinity Q Diversified Alpha Fund**"), a series of Trust for Advised Portfolios, a Delaware statutory trust that is a registered with the SEC as an open-end investment company under the Investment Company Act. Infinity Q Diversified Alpha Fund employs certain of the investment strategies and approaches to be employed by the Fund and will be engaging in these strategies at the same time as the Fund under the direction of the same investment professionals. See "*Conflicts of Interest*."

**Minimum Investment**

The minimum investment is generally $5,000,000, although the General Partner may in its discretion accept investments in lesser amounts. The normal minimum additional investment in the Interests by a Limited Partner is $500,000, although the General Partner reserves the right to accept additional investments of lesser amounts.

**Closings**

The General Partner may accept, in its sole discretion, investments in the Interests from existing Limited Partners or from new Limited Partners at any time. Once an investment is accepted, the investment date for such investment will be the first business day of the applicable calendar month (or at any other time as determined by the General Partner in its sole discretion). At the time of any investment in any Interests (i.e., upon receipt by the Fund of an executed Subscription Agreement and payment of the subscription amount (each, a "**Closing**")), the General Partner will determine the net fair market value of all of the Fund's assets (in accordance with the valuation guidelines set forth in the Partnership Agreement) immediately prior to the effective time of such Closing, and the Partner making such new

2

investment will receive an interest in the Partnership (in addition to any other interests held by such Partner) equal to the ratio of such new investment in the Fund over the aggregate value of the Fund's total assets (including the value of such new investment).

The Fund will establish and maintain a capital account ("**Capital Account**") for each contribution made by any Partner. Partners that have made multiple contributions to the Fund will have multiple Capital Accounts, and any such amounts contributed to the Fund will be credited to the appropriate Capital Account.

**Classes of Interests**

The Fund is offering one class of Interests. The General Partner, however, reserves the right to enter into agreements with selected investors that may provide such investors with materially different investment terms (e.g., management fees, promote terms, liquidity rights, etc.) than provided to investors generally. The Fund may in the future offer other classes of Interests subject to different fees or other terms in the discretion of the General Partner.

**Management Fee**

At the beginning of each month, the Fund will pay the General Partner a management fee (the "**Management Fee**") equal to twelve and one-half (12.5) basis points (or 1.5% on an annual basis) multiplied by the aggregate balances of all Capital Accounts of the Fund (excluding, for the purposes of determining the Management Fee, any portion of the Capital Accounts representing the General Partner's general partner interests in the Fund) at the beginning of the first business day of such month (after taking into account any contributions to, and withdrawals or distributions from, and any allocations made to, such Capital Accounts as of such time). The General Partner will not be charged any part of the Management Fee with respect to its general partner interests in the Fund.

The Management Fee with respect to any Limited Partner may be waived or reduced by the General Partner in its sole discretion with the agreement of that Limited Partner.

**Incentive Allocation**

Pursuant to the terms of the Partnership Agreement, at the end of each Fiscal Year (as defined below), the Fund shall allocate to the General Partner an amount (the "**Performance Allocation**") equal to 15% of the excess, if any, of each Limited Partner's share, by Partnership Percentage, of Year to Date Net Capital Appreciation of the Fund for such Fiscal Year over such Limited Partner's share, by Partnership Percentage, of any Year to Date Net Capital Depreciation of the Fund for previous Fiscal Years

3

that has not been offset as described below under "*Capital Appreciation (Depreciation) and High Water Mark.*" The General Partner has no obligation to restore to the Fund any Performance Allocation previously allocated to the General Partner, notwithstanding a loss in a subsequent period. In the event a Limited Partner with Year to Date Net Capital Depreciation that has not yet been offset withdraws any portion of its investment in the Fund, the amount of such Year to Date Net Capital Depreciation will be reduced on a pro rata basis to reflect the reduction in invested capital of such Limited Partner. The provisions in the Partnership Agreement relating to the Performance Allocation may be amended so that they conform to any applicable requirements of the SEC, the CFTC, the U.S. Internal Revenue Service (the "**IRS**") or any other regulatory authority, so long as any such amendment does not increase the Performance Allocation allocable from the Capital Accounts as set forth herein.

The Performance Allocation with respect to any Limited Partner may be waived or altered by the General Partner in its sole discretion with the agreement of that Limited Partner.

**Capital Appreciation (Depreciation) and High Water Mark**

On a monthly basis (and at any other interval determined by the General Partner in accordance with the Partnership Agreement, each period an "**Accounting Period**"), the Fund will allocate to each partner's Capital Account its share, by Fund Percentage, of the Net Capital Appreciation (or Net Capital Depreciation) for such Accounting Period. Subject to the definitions set forth in the Partnership Agreement, the term "**Net Capital Appreciation (Depreciation)**" is the increase (decrease) in value of the Fund's net assets (including unrealized gains (losses)) for an Accounting Period (taking into account any accrued Management Fees and Operating Expenses for such Accounting Period). The term "**Year to Date Net Capital Appreciation (Depreciation)**" is the net amount of all Net Capital Appreciation (Depreciation) for a Fiscal Year (through the date of calculation). At the end of each Fiscal Year, the General Partner will determine each Partner's share of Year to Date Net Capital Appreciation (Depreciation). In the event a Partner has Year to Date Net Capital Depreciation for any Fiscal Year, such Year to Date Net Capital Depreciation will carry over to each subsequent Fiscal Year until such Year to Date Net Capital Depreciation has been offset with a like amount of Year to Date Net Capital Appreciation for subsequent Fiscal Years.

4

Confidential Treatment Requested by Infinity Q Capital Management, LLC

| | |
|---|---|
| **Side Agreements** | The General Partner may, from time to time, amend, vary, waive, or modify terms of the Partnership Agreement as the same pertain solely to a particular Limited Partner, and no such amendment, variation, waiver or modification will require the consent of any other Limited Partner; provided, however, under no circumstances may the General Partner and a particular Limited Partner make any amendment, variation, waiver or modification that would reasonably be expected to have a material adverse effect upon any other Limited Partner. |
| **Eligible Investors** | Each investor must be (i) an "accredited investor," as defined in Rule 501(a) promulgated under the Securities Act; (ii) a "qualified client," as defined in Rule 205-3 under the Advisers Act; and (iii) a "qualified eligible person" within the meaning of Rule 4.7 under the Commodity Exchange Act. |
| **Withdrawals** | Generally, subject to the creation of "Designated Illiquid Investments" and the other limitations as described below, a Limited Partner may withdraw all or any portion of such Limited Partner's Capital Account effective as of the last business day of each month (a "**Withdrawal Date**") upon at least 60 days' prior written notice to the General Partner (subject to the discretion of the General Partner to waive such notice in its sole discretion and without regard to any independent standard of duty or reasonableness and consistency of treatment as between Limited Partners). |

Any Interest to be withdrawn will remain invested in the Fund and subject to the provisions of the Partnership Agreement, including participating in the profits and losses of the Fund and being subject to all applicable fees and allocations, until the effective date of its withdrawal. The value of the Interest to be withdrawn as of the relevant effective date of such withdrawal may differ substantially from the value of such Interest on the date on which the notice of withdrawal is given.

It may be necessary that investment positions of the Fund be liquidated to the extent necessary to effect Limited Partner withdrawals. Certain investment positions of the Fund may be illiquid and the Fund may not be readily able to dispose of such positions or assets, and in some cases may be contractually prohibited from disposing of such positions for a specified period of time. In addition, no market may exist for certain of the Fund's investments, or it may not be possible for the General Partner to obtain market quotations for such securities or investments. For any period in which it is not reasonably practicable for the Fund

5

 IQCM-SEC-00077243

dispose of or value securities held by it for the reasons described above or if the liquidation of Fund assets may have adverse consequences to the other Partners, the General Partner may suspend payments to a withdrawing Limited Partner. The General Partner and the Fund will take all reasonable steps to bring the suspension period to an end as soon as possible. All withdrawals will be subject to any laws, rules or regulations imposed on the General Partner and the Fund by any governmental agency or other governing body to which they are subject. The General Partner will use its reasonable best efforts to make distributions to the Partners in cash. In the event the General Partner is unable to do so, the Fund may make distributions in-kind if, in the General Partner's sole discretion, such distributions would not prejudice the interests of other Partners.

The maximum amount that may be collectively withdrawn by all withdrawing Limited Partners effective as of any applicable Withdrawal Date will be an amount equal to 1/12th (one-twelfth) of the net asset value of the Fund as of such Withdrawal Date (such amount, the "**Ceiling Amount**"). To the extent that the amount of the collective withdrawal requests from withdrawing Limited Partners exceeds the Ceiling Amount, the amount of each Limited Partner's withdrawal request shall be reduced on a pro rata basis among the Limited Partners based on the ratio of their initial withdrawal requests so that the collective withdrawal requests equal the Ceiling Amount. The remainder of the amount of the collective withdrawal requests over the Ceiling Amount shall be the "**Excess Amount**." In the event a withdrawing Limited Partner's request is reduced as provided for in the preceding sentence, the Excess Amount from such request shall automatically be carried over as a request to withdraw to be effective as of the next Withdrawal Date, unless such request is cancelled by the Limited Partner.

Unless otherwise agreed to by the General Partner, 90% of the amount due to a withdrawing Limited Partner will be paid as soon as practicable after the relevant Withdrawal Date (and based on unaudited data), but in any case within 15 Business Days after the relevant Withdrawal Date, with the remaining 10% (adjusted in accordance with the year-end audit), together with all interest earned thereon as described below, to be paid promptly following completion of the audit for that fiscal year.  Amounts subject to such 10% hold-back will not be considered invested in the Fund and will bear interest as provided for in the Partnership Agreement.

6

In connection with any partial withdrawal of capital by a Limited Partner, the General Partner may require, in its sole discretion, the withdrawing Limited Partner to withdraw its entire Interest.

**Required Withdrawals**

The General Partner may require, in its sole discretion, a Limited Partner to withdraw all or any portion of its Interest on 30 days' notice; provided, however, that such notice period may be shortened to 5 days' notice if such Limited Partner's continued ownership of any Interest could, in the General Partner's sole discretion, give rise to regulatory, pecuniary, legal, tax or material administrative disadvantage for the Fund or the Partners.

**Distributions**

In light of the withdrawal rights granted to Limited Partners, the Fund generally does not intend to make current distributions to Limited Partners. All earnings of the Fund will normally be reinvested and the Fund will not ordinarily make distributions to its Limited Partners.

**Designated Illiquid Investments**

The General Partner may, in its discretion, classify certain of the Fund's investments which are deemed by the General Partner to be illiquid or the value of which is not readily or reliably ascertainable or which may have a relatively long-term investment horizon as "**Designated Illiquid Investments**"; provided, however, that such Designated Illiquid Investments will not represent more than 25% of the net asset value of Fund's portfolio as of the date of creation or classification of the Designated Illiquid Investment. Once so classified, Designated Illiquid Investments shall be represented by a "**Designated Reserve Account**" which, unless otherwise determined by the General Partner, shall be allotted only to those Limited Partners who are Limited Partners at the time of such designation. The gains and losses attributable to a Designated Reserve Account shall be segregated and separately calculated and attributed amongst Limited Partners holding an interest in the relevant Designated Reserve Account in such manner as the General Partner, in its sole and absolute discretion, considers fair and equitable. Interests relating to a Designated Reserve Account will not, unless the General Partner otherwise determines, be redeemable at the option of the Limited Partner holding those interests.

**Operating Expenses**

The Fund will bear all investment-related expenses (including, but not limited to, expenses of acquiring, managing, carrying and disposing of investments); professional fees and expenses (including legal, auditing and tax preparation expenses and

7

expenses related to investment research) incurred in connection with the ongoing operations of the Fund and any fees and expenses incurred in connection with any regulatory audit or investigation and complying with applicable law (collectively, the "**Operating Expenses**"). The cost of third-party service providers will be borne by the Fund to the extent the services provided relate to and support the Fund's investment program and as permitted by applicable law and regulations. The General Partner will bear general administrative expenses as set forth in the Partnership Agreement.

**Placement Fees**

No sales fees, placement fees, commissions or similar charges will be payable by any investor, in the Fund in connection with the offering of the Interests. The General Partner and/or its affiliates may become parties to arrangements with placement agents that call for payments by the General Partner or its affiliates to such placement agents based upon a percentage of the capital invested in any Interests by a Limited Partner referred to the Partnership by such placement agents.

**Fund Percentages**

The Interest of each Limited Partner in the Fund will be its "**Fund Percentage**," which will be determined at the beginning of each Accounting Period, and will be the ratio, expressed as a percentage, of (i) the value of such Limited Partner's Capital Account balance over (ii) the value of the Capital Accounts of all Partners.

**Fiscal Year; Reports**

The fiscal year of the Fund will end on December 31 of each year (the "**Fiscal Year**").   An unaudited balance sheet, income statement and general status report of the Fund's investments and activities during the applicable period will be provided to Partners within 60 days after the end of each of the first three quarters of any Fiscal Year. An audited balance sheet, statement of operations, statement of cash flows, statement of partners' capital, statement of each Partner's Schedule of Partner's Capital (Net Assets), and audited financial statements of the Fund prepared in accordance with Generally Accepted Accounting Principles will be provided to Partners within 90 days after the end of each Fiscal Year.  In addition, each Partner will also receive a Schedule K-1 and any other necessary information for preparation of such Partner's federal and state income tax returns. The General Partner will use reasonable efforts to ensure that such Schedule K-1 reports are issued to Partners as soon as practicable after each Fiscal Year end (or as otherwise required by law).

8

IQCM-SEC-00077246

| | |
|---|---|
| **Valuation** | The valuation of the Fund's assets is the responsibility of the General Partner, acting through the Valuation Committee pursuant to the General Partner's Valuation Policy. See "*Valuation*." |
| **Amendments** | The Partnership Agreement may be modified or amended at any time with the written consent of the General Partner and the Limited Partners having at least two-thirds of the Fund Percentages of all Limited Partners. Without the approval of any other Partner, however, the General Partner may amend the Partnership Agreement (i) to comply with applicable laws and regulations (provided that such amendment is made in a manner intended to minimize adverse effects on the Limited Partners), (ii) to make changes authorized by the Partnership Agreement or that do not adversely affect the rights or obligations of any Limited Partner and that cure any ambiguity or correct or supplement any provision in the Partnership Agreement, (iii) to reflect changes in the membership of the Fund, the capital contributions of the Partners or the Fund Percentages made in accordance with the Partnership Agreement, (iv) to reflect a change in the name of the Fund, (v) to make changes in connection with the admission of one or more new investors (so long as such amendment is not, in the reasonable opinion of the General Partner, materially adverse to the Limited Partners), (vi) to make a change which, in the judgment of the General Partner, is necessary or advisable to qualify the Fund as a limited partnership for U.S. federal income tax purposes, (vii) to remove any obligation that action be taken by or on behalf of the General Partner or the Fund pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Delaware Code, Chapter 17, as may be amended from time to time, if the applicable provisions of such law are amended, modified or revoked so that the taking of such action is no longer required, or (viii) to prevent the Fund from being deemed an "investment company" under the Investment Company Act. In no event will the General Partner be permitted to amend the Partnership Agreement to affect a Partner's Capital Account(s) or rights of withdrawal without such Partner's consent or increase the Incentive Allocation or Management Fees allocable from any Capital Account, in each case without the written consent of the affected Limited Partner. |
| **Transfers** | Interests in the Fund may only be assigned or pledged with the consent of the General Partner, which may be granted or withheld in the General Partner's sole discretion. |
| **Exculpation; Indemnification** | Neither the General Partner, its affiliates, nor any of their respective officers, directors, shareholders, members, partners, |

Confidential Treatment Requested by Infinity Q Capital Management, LLC   IQCM-SEC-00077247

employees, representatives or agents, will be liable to the Fund or to any Limited Partner, and the Fund will indemnify and defend each such person for any act or omission (including negligence) on its part, except for any act or omission that results in a loss arising from the fraud, willful misconduct or gross negligence on the part of such indemnitee, in connection with the business of the Fund. The Fund will also provide the General Partner and its affiliates and their respective, officers, directors, stockholders, members, partners, employees, representatives and agents, and any other person who serves at the request of such entities or persons on behalf of the Fund as an officer, director, employee, representative or agent of any other entity, including specified persons from time to time named by the General Partner as entitled to exculpation and indemnification by the Fund, against claims or lawsuits arising out of the Fund's activities that are broader than the protections that would apply in the absence of such provisions. In general, those persons and entities are to be held harmless and defended from any claims, losses, damages and other types of liabilities ("**Losses**") arising out of their activities involving the Fund and the General Partner to the extent of the General Partner's activities related to the Fund, except to the extent those Losses are found to have resulted from their fraud, gross negligence or willful misconduct. The Fund will also advance expenses, including legal fees, incurred by any indemnitee in connection with the defense of any claim, demand, action, suit or proceeding prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the indemnitee to repay such amount if it is determined that the indemnitee is not entitled to be indemnified. The General Partner may elect to have the Fund purchase, at the expense of the Fund, insurance to insure any indemnitee against liability for any breach or alleged breach of its fiduciary responsibilities. See "*Investment Program of the Fund – Principal Risks of Investing in the Fund.*"

| | |
|---|---|
| **Risk Factors; Conflicts of Interest** | An investment in the Fund is speculative and involves substantial risks. An investment in the Fund should be considered illiquid. The Fund's returns, if any, may be volatile. Investment in securities outside the United States involves additional risks, and investment in emerging markets involves even greater risks. Prospective investors should review carefully the discussion under the caption "*Risk Factors*" contained herein. The General Partner and the Investment Professionals (as identified below), in addition to advising the Fund, also advise Infinity Q Diversified Alpha Fund. Generally, investments in which both the Fund and Infinity Q Diversified Alpha Fund participate will be allocated between the Fund and Infinity Q Diversified Alpha Fund pro rata according to |

10

available capital. In managing the assets of the Fund and Infinity Q Diversified Alpha Fund, however, the Investment Professionals and those persons who comprise the Management Committee have discretion in the allocation of investments between the Fund and Infinity Q Diversified Alpha Fund. The Investment Professionals are not required to split opportunities between the Fund and Infinity Q Diversified Alpha Fund in any manner. In determining the allocation of investments between the Fund and Infinity Q Diversified Alpha Fund, certain conflicts of interest may arise. In addition, certain inherent conflicts of interest arise from the fact that the Investment Professionals are also associated with Wildcat Capital Management, LLC ("**Wildcat**"), an SEC-registered investment adviser that carries on investment advisory activities for other clients (including a number of ultra-high net worth clients) in which the Fund will have no interest. Future investment activities by the General Partner or its affiliates, including the establishment of other investment funds, may give rise to additional conflicts of interest. See "*Conflicts of Interest.*"

**Tax Considerations**

The Fund intends to be treated as a partnership for U.S. federal income tax purposes. Each investor otherwise subject to U.S. federal income tax will be required to include in such investor's taxable income such investor's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such investor's share of the Fund's losses and deductions. Such an investor may realize some combination of ordinary income or loss, short-term capital gains or losses and long-term capital gains or losses, depending on the results of the Fund's activities. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results. The deductibility of an investor's share of any Fund losses or deductions may be limited. Each prospective investor is urged to consult with such investor's own tax adviser in order to fully understand the tax consequences and risks of an investment in the Fund.

**Term of the Partnership**

The Fund will continue until terminated pursuant to the Partnership Agreement. The General Partner has the right at any time to liquidate and dissolve the Fund for any reason or no reason. Written notice must be given to the Limited Partners at least 30 days prior to the effective date of any such liquidation and dissolution.

11

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077249

| | |
|---|---|
| **New Issues Trading** | The Fund may at times participate in an initial public offering of equity securities (a "**New Issue**"). Because member firms of the Financial Industry Regulatory Authority ("**FINRA**") are not permitted to sell a New Issue to certain persons ("**Restricted Persons**"), the Fund has established a special securities trading account (the "**New Issue Account**") that is authorized to participate in a New Issue in which only Capital Accounts established for Limited Partners of the Fund that are not Restricted Persons may participate (as compared to investments held in the Fund's regular accounts, in which all Capital Accounts will have an interest). Interest will be charged on Fund monies used to purchase a New Issue, and each Capital Account participating in New Issue profits and losses will be charged its proportionate share of such interest in accordance with its Fund Percentage. Each Limited Partner must certify to the satisfaction of the General Partner that it is not a Restricted Person prior to participating in any New Issue profits and losses. Any Limited Partner who fails to provide the General Partner with such certification and/or opinion shall be deemed a Restricted Person and shall not be permitted to participate in New Issue profits and losses. |

In addition to the prohibition on the sale of New Issues to Restricted Persons, the FINRA "spinning" rule prohibits FINRA member firms from "spinning" or allocating New Issues to an account if the beneficial interests of certain persons ("**Covered Persons**") from a particular company exceed 25% of such account. In light of this rule, each Limited Partner must also certify to the satisfaction of the General Partner as to whether it is a Covered Person (and, if so, certify as to certain additional information) prior to participating in any New Issue profits and losses.

Each Limited Partner that participates in New Issue profits and losses will be requested by the General Partner from time to time (but in all cases at least once every 12 months) to update such Limited Partner's certification that it is not a Restricted Person and its certification as to whether it is a Covered Person. In the event that a Limited Partner is unable to provide the General Partner an update to such certifications, such Limited Partner will be prohibited from future participation in New Issue profits and losses.

| | |
|---|---|
| **Fund Administrator** | The Fund has entered into an administration agreement with US Bank Fund Services, LLC (the "**Administrator**"). The |

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077250

Administrator is responsible for the calculation of the net asset value of the Fund based on information provided by personnel of the General Partner. The Administrator will prepare and issue periodic statements for individual investors based upon the calculation of Net Asset Value of the Fund performed by the Administrator.

The General Partner has also engaged the Administrator to perform certain investor services functions for the Fund, including processing requests for subscriptions to and withdrawals from the Fund, handling administrative inquiries about the Fund and providing certain anti-money laundering services to the Fund.

**Auditor**                         KPMG

**Consultant**                  The General Partner has retained Alaric Compliance Services as a consultant with respect to regulatory and general compliance matters.

**Legal Counsel**           Kelly Hart & Hallman LLP, Fort Worth, Texas, has acted as legal counsel to the General Partner and the Fund.

13

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077251

## INVESTMENT PROGRAM AND POLICIES OF THE FUND

**Principal Investment Strategies of the Fund**

The Fund seeks to gain exposure to volatility-based strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates and commodities markets. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time in both positive and negative environments for equities, fixed income and credit markets. The General Partner may, in its sole discretion, allocate capital to additional strategies not mentioned in this Memorandum.

The Fund implements these strategies by investing globally (including in emerging markets) either directly in, or through total return swaps on, a broad range of instruments, including, but not limited to, equities, bonds (including but not limited to high-yield or "junk" bonds), currencies, credit derivatives, convertible securities, futures, forwards, options, including complex options such as barrier options, and swaps. The Fund has no limits with respect to the credit rating, maturity or duration of the debt securities in which it may invest.

The Adviser relies heavily on proprietary quantitative models and information as well as data supplied by third parties ("**Models and Data**"). Models and Data are used to construct sets of transactions and investments, to provide risk management insights and to assist in hedging the Fund's investments. In most cases, the Fund's quantitative models are the determinative factor in making investment decisions. In some cases, at the portfolio manager's discretion, market risk exposure may be reduced through hedging.

The Fund is generally intended to have a low average correlation and beta to the equity, fixed income and credit markets. Beta is a measure of the systematic risk of a security or portfolio in comparison to the market as a whole. The excess return generated by the Fund beyond the return attributable to equity, fixed income and credit markets is alpha. The Fund generally intends to generate the majority of its performance through alpha. The Adviser will attempt to mitigate risk through diversification of holdings and through active monitoring of volatility, counterparties and other risk measures. There is no assurance, however, that the Fund will achieve its investment objective.

As discussed above, the Fund provides exposure to volatility strategies through a single portfolio approach. The Fund currently intends to have exposure to these strategies; however, it may vary its level of allocation among these strategies depending on market conditions, including reducing the exposure to any strategy to zero. The Fund may add additional strategies from time to time, but currently pursues its investment objective by the primary strategies discussed in greater detail below:

The fund makes investments in volatility strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, credit, interest rates and FX markets. The main types of volatility strategies the Fund will employ include: volatility long/short, volatility surface arbitrage, mean reversion and correlation. The Fund invests long positions in derivatives it expects to increase in value and short sells derivatives it expects to decrease in value. Derivatives are instruments that derive their value from the performance of an underlying security or index. These instruments include options, variance swaps, correlation swaps, dispersion swaps, credit default swaps, swaptions and total return swaps.

14

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                    IQCM-SEC-00077252

## PRINCIPAL RISKS OF INVESTING IN THE FUND

Losing all or a portion of your investment is a risk of investing in the Fund. The following discussion of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Interests. Prospective investors should read this entire Memorandum and the Partnership Agreement and consult with their own legal, tax and financial advisers before deciding whether to invest in the Interests.

The following risks could affect the value of your investment:

- **Alternative Strategies Risk.** Employing alternative strategies raises the risk that anticipated opportunities do not play out as planned, resulting in potentially reduced returns or losses to the Fund.

- **Barrier Options Risk.** Barrier options are similar to standard options except that they become activated or are extinguished when the underlying asset reaches a predetermined level or barrier. This type of option allows the buyer of the option to set the position of the barrier, the length of time until expiration and the payout to be received once the barrier is broken. If the General Partner sets too high or too low a barrier, and the option is either extinguished or the options are never activated the benefits to the Fund of using a barrier option strategy may be limited and the costs associated with a barrier option strategy could be detrimental to the Fund's performance.

- **Volatility Risk.** The Fund may have investments that appreciate or depreciate significantly in value over short periods of time. This may cause the Fund's net asset value to experience significant increases or declines in value over short periods of time.

- **Common Stock Risk.** Common stocks are subject to greater fluctuations in market value than certain other asset classes as a result of such factors as an issuer's business performance, investor perceptions, stock market trends and general economic conditions.

- **Counterparty Risk.** In general, a derivative contract typically involves leverage, i.e., it provides exposure to potential gain or loss from a change in the level of the market price of a security, currency or commodity (or a basket or index) in a notional amount that exceeds the amount of cash or assets required to establish or maintain the derivative contract. Many of these derivative contracts, including options and swaps, will be privately negotiated in the over-the-counter market. Fund transactions involving a counterparty are subject to the risk that the counterparty or a third party will not fulfill its obligation to the Fund. Counterparty risk may arise because of the counterparty's financial condition (i.e., financial difficulties, bankruptcy or insolvency), market activities and developments or other reasons, whether foreseen or not. A counterparty's inability to fulfill its obligation may result in significant financial loss to the Fund.

15

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077253

- **Credit Default Swap Agreement Risk.** The Fund may enter into credit default swap agreements as a "buyer" or "seller" of credit protection on liquid credit indices. In instances where the Fund is a protection seller (receives a periodic fee over the life of the contract in return for the obligation to compensate the protection buyer for loss), the Fund will assume the risks associated with credit deterioration (spread widening) as well as default risk. In the event of default, the Fund is obligated to pay the buyer of credit protection the notional value of the swap less the recovery rate on the reference asset. Credit default swaps may be illiquid and difficult to value, and they increase credit risk as the Fund has exposure to both the issuer whose credit is the subject of the swap and the counterparty to the swap.

- **Credit Risk.** Credit risk refers to the possibility that the issuer of a security or the issuer of the reference asset of a derivative instrument will not be able to make principal and interest payments when due. Changes in an issuer's credit rating or the market's perception of an issuer's creditworthiness may also affect the value of the Fund's investment in that issuer. Securities rated in the four highest categories by the rating agencies are considered investment grade but they may also have some speculative characteristics. Investment grade ratings do not guarantee that bonds will not lose value.

- **Currency Risk.** Currency risk is the risk that changes in currency exchange rates will negatively affect securities denominated in, and/or receiving revenues in, foreign currencies. The liquidity and trading value of foreign currencies could be affected by global economic factors, such as inflation, interest rate levels and trade balances among countries, as well as the actions of sovereign governments and central banks. Adverse changes in currency exchange rates (relative to the U.S. dollar) may erode or reverse any potential gains from the Fund's investments in securities denominated in a foreign currency or may widen existing losses. The Fund's net currency positions may expose it to risks independent of its securities positions.

- **Derivatives Risk.** The General Partner may make use of futures, forwards, options, swaps and other forms of derivative instruments. The use of derivative instruments exposes the Fund to additional risks and transaction costs. These instruments come in many varieties and have a wide range of potential risks and rewards, and may include futures contracts, options (both written and purchased), swaps and forward currency exchange contracts. A risk of the Fund's use of derivatives is that the fluctuations in their values may not correlate perfectly with the overall securities markets. Additionally, to the extent the Fund is required to segregate or "set aside" (often referred to as "asset segregation") liquid assets or otherwise cover open positions with respect to certain derivative instruments, the Fund may be required to sell portfolio investments to meet these asset segregation requirements. There is a possibility that segregation involving a large percentage of the Fund's assets could impede portfolio management or the Fund's ability to meet redemption requests or other current obligations.

- **Emerging Market Risk.** The Fund intends to have exposure to emerging markets. Emerging markets are riskier than more developed markets because they tend to develop unevenly and may never fully develop. Investments in emerging markets may be considered speculative. Emerging markets are more likely to experience hyperinflation and currency devaluations, which adversely affect returns to U.S. investors. In addition, many emerging securities markets have far lower trading volumes and less liquidity than developed markets.

Confidential Treatment Requested by Infinity Q Capital Management, LLC    IQCM-SEC-00077254

- **Foreign Investments Risk.** Foreign investments often involve special risks not present in U.S. investments that can increase the chances that the Fund will lose money. These risks include:

  o The Fund generally holds its foreign securities and cash in foreign banks and securities depositories, which may be recently organized or new to the foreign custody business and may be subject to only limited or no regulatory oversight.

  o Changes in foreign currency exchange rates can affect the value of the Fund's portfolio.

  o The economies of certain foreign markets may not compare favorably with the economy of the United States with respect to such issues as growth of gross national product, reinvestment of capital, resources and balance of payments position.

  o The governments of certain countries may prohibit or impose substantial restrictions on foreign investments in their capital markets or in certain industries.

  o Many foreign governments do not supervise and regulate stock exchanges, brokers and the sale of securities to the same extent as the United States and may not have laws to protect investors that are comparable to U.S. securities laws.

  o Settlement and clearance procedures in certain foreign markets may result in delays in payment for, or delivery of, securities not typically associated with settlement and clearance of U.S. investments.

- **Forward and Futures Contract Risk.** The successful use of forward and futures contracts draws upon the General Partner's skill and experience with respect to such instruments and is subject to special risk considerations. The primary risks associated with the use of futures contracts are (i) the imperfect correlation between the change in market value of the instruments held by the Fund and the price of the forward or futures contract; (ii) possible lack of a liquid secondary market for a forward or futures contract and the resulting inability to close a forward or futures contract when desired; (iii) losses caused by unanticipated market movements, which are potentially unlimited; (iv) the General Partner's inability to predict correctly the direction of securities prices, interest rates, currency exchange rates and other economic factors; (v) the possibility that the counterparty will default in the performance of its obligations; and (vi) if the Fund has insufficient cash, it may have to sell securities from its portfolio to meet daily variation margin requirements, and the Fund may have to sell securities at a time when it may be disadvantageous to do so.

- **High-Yield Securities Risk.** Fixed income securities that are rated below investment grade (i.e., "junk bonds") are subject to additional risk factors due to the speculative nature of these securities, such as increased possibility of default liquidation of the security, and changes in value based on public perception of the issuer.

- **Interest Rate Risk.** Interest rate risk is the risk that prices of fixed income securities generally increase when interest rates decline and decrease when interest rates increase. The Fund may lose money if short term or long term interest rates rise sharply or otherwise change in a manner not anticipated by the General Partner.

- **Investment in Other Investment Companies Risk.** As with other investments, investments in other investment companies are subject to market and selection risk. In addition, if the Fund acquires shares of investment companies, shareholders bear both their proportionate share of expenses in the Fund (including management and advisory fees) and, indirectly, the expenses of the investment companies.

17

- **Leverage Risk.** As part of the Fund's principal investment strategy, the Fund will make investments in futures contracts, forward contracts, options, swaps and other derivative instruments. These derivatives instruments provide the economic effect of financial leverage by creating additional investment exposure as well as the potential for greater loss. If the Fund uses leverage through entering into short sales or purchasing derivative instruments, the Fund has the risk of losing more than its original investment. The net asset value of a fund employing leverage will be more volatile and sensitive to market movements. Leverage may involve the creation of a liability that requires the Fund to pay interest.

- **Manager Risk.** If the Fund's portfolio managers make poor investment decisions, it will negatively affect the Fund's investment performance.

- **Market Risk.** Market risk is the risk that the markets on which the Fund's investments trade will increase or decrease in value. Prices may fluctuate widely over short or extended periods in response to issuer, market or economic news. Markets also tend to move in cycles, with periods of rising and falling prices. If there is a general decline in the securities and other markets, your investment in the Fund may lose value, regardless of the individual results of the securities and other instruments in which the Fund invests.

- **Models and Data Risk.** When Models and Data prove to be incorrect or incomplete, any decisions made in reliance thereon expose the Fund to potential loss.

- **New Fund Risk**. The Fund is new with no operating history, and there can be no assurance that the Fund will grow to maintain an economically viable size, in which case the General Partner may determine to liquidate the Fund.

- **Withdrawal Restrictions**. There are restrictions on withdrawals from the Fund (which may be settled in securities rather than cash) and on transfers of Interests. The prior written consent of the General Partner is required for a transfer of the Interest of any Limited Partner. Because of the restrictions on withdrawals and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. A subscription for Interests should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

- **Short Sale Risk.** The Fund enters into a short sale by selling a security it has borrowed (typically from a broker or other institution). If the market price of a security increases after the Fund borrows the security, the Fund will suffer a (potentially unlimited) loss when it replaces the borrowed security at the higher price. In certain cases, purchasing a security to cover a short position can itself cause the price of the security to rise further, thereby exacerbating the loss. In addition, the Fund may not always be able to borrow the security at a particular time or at an acceptable price. The Fund may also take a short position in a derivative instrument, such as a future, forward or swap. A short position on a derivative instrument involves the risk of a theoretically unlimited increase in the value of the underlying security or instrument. Short sales also involve transaction and other costs that will reduce potential Fund gains and increase potential Fund losses.

18

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                   IQCM-SEC-00077256

- **High Portfolio Turnover Risk.** To the extent that the Fund makes investments on a shorter-term basis (including in derivative instruments and instruments with remaining maturities of one year or less) the Fund may as a result trade more frequently and incur higher levels of brokerage fees and commissions, and cause higher levels of current tax liability to Limited Partners.

- **Imposition of Tax Regardless of Cash Distributions**. Limited Partners must recognize for certain tax purposes their pro rata share of the taxable net income of the Fund, regardless of whether the Limited Partners requested a partial withdrawal from the Fund to cover their tax liabilities. The Fund may generate taxable income for a Limited Partner even though the value of the Limited Partner's Interest in the Fund has declined. A Limited Partner may have to use personal funds to pay tax owed on the income or gain allocated to the Limited Partner. Sufficient information may not be available in time for the Limited Partner to determine accurately an amount to withdraw to pay taxes for a given Fiscal Year.

- **Uncertainty of Certain Tax Positions; Risk of Audit**. The Fund will be required to file tax returns with the IRS, and may be required to file tax returns or make other filings in other jurisdictions. The Fund may take positions with respect to certain tax issues that may be challenged by the IRS or other tax authorities. Certain positions taken by the Fund may depend on legal conclusions not yet resolved by the relevant tax authorities or courts. The tax returns or other filings made by the Fund may be audited, and adjustments may be made to such returns as a result of such an audit. If an audit results in an adjustment, Limited Partners may be required to file amended returns (which may themselves be audited) and to pay back taxes with respect to prior periods. In addition, interest and penalties, which are non-deductible, may be asserted and imposed on tax deficiencies as the result of an audit. An audit of the tax returns of the Fund could also result in an audit of the returns of individual Limited Partners. Any audit of a Limited Partner's return could result in adjustments of non-Fund, as well as Fund, income and deductions.

  - Generally, under current law, upon an IRS audit, the tax treatment of Fund items will be determined at the Fund level, and such treatment generally will be binding on the Limited Partners. For tax years beginning after December 31, 2017, an audit adjustment at the Fund level generally may result in the imposition of a tax (plus interest and penalties, as applicable) on the Fund, unless the Fund makes a timely election for each of its Partners to take into account its respective share of such adjustments on its own tax return. If this election is made, interest on any deficiency will be at a rate that is 2% higher than the interest rate otherwise applicable to tax underpayments. The Fund has not yet determined whether it will make such election. In addition, the tax liability imposed on the Fund generally, in the course of an audit, is determined using the highest applicable U.S. federal tax rates applicable to U.S. taxpayers, with the result that such tax liability may, unless adjusted, be at higher rates than would otherwise apply to investors. The Fund may be able to reduce the amount owed in certain cases based on the status of its investors, among other factors, but there is no assurance the Fund will be able to obtain any such reduction. Further guidance is expected which may significantly impact the application of these rules.

  - Any examination or other proceeding under Subchapter C of Chapter 63 of the Internal Revenue Code of 1986, as amended (the "**Code**") (including any audit of the Fund by the IRS) or any examination or proceeding conducted by another taxing authority could result in adjustments to the tax consequences initially reported by the Fund.  The legal and accounting costs incurred in

19

connection with any audit of the Fund's tax returns, which as the case may be, may be significant, will be borne by, and treated as expenses of, the Fund (which can be ratably borne by the Partners, pursuant to the Partnership Agreement).

- Current investors in the Fund may bear the economic effect of taxes, interest and penalties imposed on the Fund by taxing authorities in other countries (and for tax years beginning after December 31, 2017, by the IRS with respect to income received by the Fund in earlier periods, even if such investors were not investors in the Fund during the tax year under audit.)

- Only Infinity Q, as the "partnership representative" (as such term is defined in Section 6223 of Code, the "**Partnership Representative**" ") of the Fund, may request an administrative adjustment in the amount of one or more items of income, gain, loss, deduction, or credit of the Fund for any taxable year, and such an adjustment must be approved by the IRS. Limited Partners will not be able to request such an administrative adjustment.

- Unless otherwise determined by applicable law or regulations promulgated under Subchapter C of Chapter 63 of the Code, and unless otherwise set forth in the Partnership Agreement, the General Partner, as the Partnership Representative of the Fund, has the sole authority to act on behalf of the Fund in any examination or other proceeding under Subchapter C of Chapter 63 of the Code involving the Fund and to bind the Fund for all purposes under Subchapter C of Chapter 63 of the Code. Unless otherwise determined by applicable law or regulations promulgated under Subchapter C of Chapter 63 of the Code, no Limited Partner who is not the Partnership Representative may participate in or contest the results of any such examination or other proceeding.

Prospective investors are urged to review carefully the section entitled "*Certain Tax Considerations*" below and to consult their own tax advisers about the tax-related risks inherent in an investment in the Fund.

- **Systemic Risk**. All asset classes (including derivative instruments) may be subject to systemic risk. Systemic risk is the risk of broad financial system stress or collapse triggered by the default of one or more financial institutions that results in a series of defaults by other interdependent institutions. Systemic risk may adversely affect financial intermediaries, such as central counterparties, futures commission merchants, banks, securities firms and exchanges, with which the Fund interacts on a daily basis.

- **Business Dependent upon Key Individuals.** The Limited Partners have no authority to make decisions or to exercise business discretion on behalf of the Fund. The authority for all such decisions is delegated to the General Partner. The success of the Fund is expected to depend upon the expertise of each of the individuals named in the section below entitled "*Management of the Fund.*" Any withdrawal or other cessation of investment activities on behalf of the Fund by any of these individuals could result in losses for, or early liquidation of, the Fund.

- **Conflicts of Interest**. Advisory personnel of the General Partner will, in addition to providing advisory services to Infinity Q Diversified Alpha Fund, also provide advisory services to clients of Wildcat, and officers of the General Partner may also be officers of Wildcat, which may result in certain conflicts of

20

interest. See *"Conflicts of Interest – Other Clients: Infinity Q Diversified Alpha Fund and the Wildcat Clients."* Another source of potential conflict of interest is the 15% "promote" or Performance Allocation to be received by the General Partner that is based upon the Net Capital Appreciation of the Fund. This allocation provides incentive for the General Partner to achieve successful investment returns for the Fund, but it may also create an incentive for the General Partner to make investments that are riskier or more speculative than would otherwise be the case.

21

## MANAGEMENT OF THE FUND

The Fund's General Partner, Infinity Q Capital Management, LLC, is located at 888 7th Avenue, Suite 3800, New York, NY 10106. The General Partner is an SEC-registered investment advisory firm formed in 2014. The General Partner provides investment management services to institutions, individuals, high net worth individuals and other pooled investment vehicles, including Infinity Q Diversified Alpha Fund.

The General Partner is responsible for the day-to-day management of the Fund in accordance with the Fund's investment objective and policies. The General Partner also furnishes the Fund with office space and certain administrative services and provides most of the personnel needed to fulfill its obligations under the Partnership Agreement.

### Investment Professionals

**Leonard Potter** is the Chief Executive Officer of Infinity Q, the General Partner. Mr. Potter also serves as the President and Chief Investment Officer of Wildcat, which is an advisor to a number of ultra-high net worth clients. From 2009 until joining Wildcat, Mr. Potter served as a consultant to Soros Fund Management LLC ("**SFM**") and as the Chief Investment Officer of Salt Creek Hospitality, a private acquirer and owner of hospitality related assets that was sponsored by an affiliate of SFM. From 2002 through 2009, Mr. Potter was Managing Director - Soros Private Equity at SFM where, from May 2005 through July 2009, Mr. Potter served as co-head of the Private Equity group and a member of the Private Equity Investment Committee. From September 1998 until joining SFM, Mr. Potter was a Managing Director of Alpine Consolidated LLC, a private merchant bank, and from April 1996 through September 1998, Mr. Potter founded and served as a Managing Director of Capstone Partners LLC, a private merchant bank. Prior to founding Capstone Partners, Mr. Potter was an attorney specializing in mergers, acquisitions and corporate finance at Morgan, Lewis & Bockius and Willkie Farr & Gallagher. Mr. Potter has served on a number of public and private boards of directors and is currently a member of the boards of Solar Senior Capital, Ltd., Solar Capital Ltd., GSV Capital Corp. and Hilton Grand Vacations Inc. Mr. Potter has a Bachelor of Arts degree from Brandeis University and a Juris Doctor degree from Fordham University School of Law.

**James Velissaris** is the Chief Investment Officer of Infinity Q, and launched the firm to offer innovative investment solutions for both retail and institutional investors. James also serves as the portfolio manager for the Public Investments Portfolio of Wildcat, which is an advisor to a number of ultra-high net worth clients. James joined Wildcat in 2012, and manages a team of 5 quantitative researchers in the U.S. and India focused on developing next generation forecasting models. From 2008 until joining Wildcat, Mr. Velissaris managed the quantitative investment strategies and conducted analysis on portfolio construction and asset allocation for Arden Asset Management. He began his career as an analyst at Goldman Sachs. Mr. Velissaris earned his Bachelor of Arts degree in Economics from Harvard University and his Master of Science degree in Operations Research with a concentration in Financial Engineering from Columbia University.

**Scott Lindell** is the Chief Risk Officer of Infinity Q, and joined the firm in 2014. He is responsible for monitoring portfolio risk exposures, enhancing the firm's risk analytics and ensuring compliance with regulatory guidelines. From 2010 to 2014, Mr. Lindell built out the infrastructure for the reporting and risk

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077260

management of Arden Asset Management's private funds and liquid alternatives initiatives including the crafting and monitoring of investment guidelines, and eventually became a Managing Director and the Head of Risk Management. From 2006 to 2010, Mr. Lindell was a Vice President at JP Morgan Measurisk, a provider of risk-transparency and risk-measurement solutions for institutional investors and asset managers, where he oversaw the firm's largest institutional clients. Mr. Lindell began his career as an equities trader for Shonfeld Securities in 2001. He received his B.S. in Finance from the University of Buffalo in 2001 and an M.B.A. in Finance from Baruch College, Zicklin School of Business in 2005. He is a Chartered Alternative Investment Analyst (CAIA) and a Certified Financial Risk Manager (FRM).

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                          IQCM-SEC-00077261

## CONFLICTS OF INTEREST

**The following discussion of conflicts of interest does not purport to be a complete enumeration or explanation of the conflicts facing the General Partner and the Investment Professionals in operating the Fund. Other present and future activities of the General Partner and the Investment Professionals may give rise to additional conflicts of interest.**

### Other Clients: Infinity Q Diversified Alpha Fund and the Wildcat Clients

Advisory personnel of the General Partner will, in addition to providing advisory services to Infinity Q Diversified Alpha Fund, also provide advisory services to clients of Wildcat, and officers of the General Partner may also be officers of Wildcat, which may result in certain conflicts of interest. Wildcat is a registered investment adviser that provides investment advisory services to a variety of different clients, including ultra-high net worth individuals, limited partnerships, limited liability companies, trusts, charitable organizations and other entities and accounts ("**Wildcat Clients**"). The General Partner and the Investment Professionals at times will have potential and actual conflicts of interest with respect to the Fund and the services provided to Infinity Q Diversified Alpha Fund and the Wildcat Clients.

In some cases, the Fund, Infinity Q Diversified Alpha Fund and the Wildcat Clients will have similar investment objectives and strategies. From time to time, there may be situations that give rise to other conflicts of interest. For example, conflicts may arise when the Fund makes investments in conjunction with an investment being made by Infinity Q Diversified Alpha Fund or a Wildcat Client, or in a transaction where Infinity Q Diversified Alpha Fund or a Wildcat Client has already made an investment.

While the General Partner, acting through its Investment Professionals, has complete discretion in the allocation of investments among the Fund, Infinity Q Diversified Alpha Fund and the Wildcat Clients, participation in specific investment acquisition or disposition opportunities will often be appropriate for the Fund, Infinity Q Diversified Alpha Fund and the Wildcat Clients and generally will be allocated among the Fund, Infinity Q Diversified Alpha Fund and the Wildcat Clients pro rata according to available capital, taking into account the risk allocation profiles and portfolio concentration objectives established by the Investment Professionals for the various accounts.

The Fund, Infinity Q Diversified Alpha Fund and the Wildcat Clients will not, however, always trade on a purely pro rata side-by-side basis, and, in determining the allocation of investments between and among the Fund, Infinity Q Diversified Alpha Fund and the Wildcat Clients, certain conflicts of interest may arise. To address and manage these potential conflicts of interest, the General Partner has adopted compliance policies and procedures to allocate investment opportunities and to ensure that each of its clients is treated on a fair and equitable basis in view of its investment objectives. Such policies and procedures include, but are not limited to, investment and trade aggregation and allocation policies and oversight by the General Partner's compliance team.

### Brokerage Relationships

The General Partner and the Investment Professionals may direct the execution of the Fund's portfolio transactions to brokerage firms and dealers that in turn provide the General Partner and Investment Professionals with investment research information or other related services or consideration that the conflicted party would otherwise have to purchase with its own funds. Thus, the General Partner may have

24

a conflict between its interest in reducing the amounts it expends on research and related services and its duties to the Fund. The General Partner has broad discretion under the Partnership Agreement with regard to the brokers and dealers to which it directs the Fund's transactions and the commission rates and dealer spreads that the Fund pays to those firms. The General Partner expects to use any research or other benefits that it receives from the Fund's brokers and dealers to trade assets held by the Fund, although those benefits may also be used by the General Partner and Investment Professionals for their own accounts or the account of Infinity Q Diversified Alpha Fund or the Wildcat Clients.

The General Partner has the option to use "soft dollars" generated by the Fund to pay for certain expenses. The General Partner intends to use soft dollars generated by the Fund to pay only for expenses that fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended. The Fund, and thus the Limited Partners, will bear the cost of these items to the benefit of the General Partner.

**Valuations of Distributions**
The General Partner may perform valuations of distributions of securities and other property and no independent appraisal of such securities and other property will be obtained. In addition, the General Partner will determine the value of the securities and other investments held by the Fund. The General Partner's valuation authority may lead to potential conflicts of interest because its Management Fee and Performance Allocation from the Fund will increase as the value of the Fund's investments increase. See "*Valuation*."

Confidential Treatment Requested by Infinity Q Capital Management, LLC      IQCM-SEC-00077263

## VALUATION

### Background

Infinity Q, as a fiduciary of the Fund, has an obligation to value the investments held by each client account in a manner that is fair, consistent and in the best interest of each client. Infinity Q calculates fees charged to clients and performance that it may use in presentations to clients and prospects based on the values of assets in client accounts.  An incorrect valuation of assets may result in overcharges of fees to clients and/or overstatement of performance information, which in each case may be a violation of Infinity Q's fiduciary duty and the anti-fraud provisions of the Advisers Act.

Infinity Q has established valuation policies and procedures (the "**Valuation Policy**" ) in an effort to reasonably ensure portfolio holdings ("**Positions**" ) are valued in accordance with the offering documents of the investment funds managed by Infinity Q (the "**Infinity Q Funds**" ) and GAAP, specifically, U.S. FASB Accounting Standards Codification ("**ASC**" ) 820, *Fair Value Measurement*. GAAP requires the use of "fair value" in determining the value of the asset. Under these principles, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the valuation date.  These principles require that fair value measurements be determined based on the assumptions that market participants would use in pricing the asset or liability, including assumption about risk, and the effect of restrictions on the sale or use of an asset.

Set forth below is Infinity Q's Valuation Policy with respect to the Infinity Q Funds.

### Policy

It is the general policy of Infinity Q that assets for which market quotations are readily available be valued at their market value.  In situations where no market quotations are available, Infinity Q seeks to utilize the value of similar assets where market quotations are available or model or matrix pricing for assets when both market quotations and similar publicly traded assets are not available, or as necessary to facilitate fair value.

### Procedures

The primary source of pricing information typically will be independent sources, such as brokers or pricing services, but Infinity Q's Valuation Committee (as defined below) is ultimately responsible for determining fair value for investments held by each client account. The value of those positions will form an integral part of each net asset value calculation. Once a price is established for a portfolio security, it shall be used for all Infinity Q Funds that hold the security.

U.S. Bancorp Fund Services, LLC and its affiliates, the administrator(s) of the Infinity Q Funds, calculates the net asset values of the assets in client accounts and in the Infinity Q Funds for fee calculation and other purposes on the "**Valuation Date**" . The Valuation Date is the last day of each month for each Infinity Q Fund.

### Fair Value Pricing

Confidential Treatment Requested by Infinity Q Capital Management, LLC

If market quotations or official closing prices are not readily available or do not accurately reflect fair value for an asset, or if an asset's value has been materially affected by events occurring after the close of the principal market on which the asset is traded, but before the Valuation Date, the asset may be valued by another method that Infinity Q believes accurately reflects fair value. Infinity Q's Valuation Committee, described further below, is responsible for fair valuation. ASC 820 provides guidance regarding appropriate valuation methodologies. ASC 820's recommended hierarchy of valuation metrics is summarized as follows, in descending order of preference:

**Level 1:**  Quoted prices in active markets for identical assets or liabilities;

**Level 2:**  (a) quoted prices for similar assets or liabilities in active markets; (b) quoted prices for identical or similar assets or liabilities in markets where there are few transactions, prices are not current, price quotations vary substantially over time or among market markers, or in which little information is released publicly; (c) inputs other than quoted prices that are observable for the asset or liability (*e.g.* interest rates, yield curves, volatilities, prepayment speeds, loss expectations, credit risks, expected default rates, and net asset values for investment companies that can be redeemed in the "near term"); or (d) inputs derived from or corroborated by observable market data by correlation or other means;

**Level 3:** Unobservable inputs for the asset or liability.

Fair valuation methodologies also may incorporate, among other things:

- Broker-dealer quotes;
- Other third-party quotation providers;
- Bids and Asks on exchanges where the asset is traded;
- Investment cost
- Prices obtained during subsequent financing events;
- Discounted expected future cash flows;
- Pricing formulas (*e.g.* Black-Scholes model);
- Prior trades; and/or
- Pricing matrices.

As soon as market quotations become available for a security being "fair valued," such market values shall be used in the calculation of an Infinity Q Fund's net asset value without any action required by the Valuation Committee.  In addition, securities will not be valued at "fair value" whenever market quotations are readily available.

**Valuation Committee**

Infinity Q has established a valuation committee (the "**Valuation Committee**" ) that is responsible for determining fair values and to ensure timely analysis and implementation of policies related to the pricing of individual securities or groups of securities that may be held by Infinity Q Funds.

27

The Valuation Committee is comprised of members of senior management including Infinity Q's Chief Investment Officer, Chief Executive Officer, Chief Risk Officer, and Chief Compliance Officer. In addition, other members of the investment team, Infinity Q's administrators, auditors, and third party valuation firms may be invited and participate as observers to Valuation Committee meetings.

The Valuation Committee meets monthly or more often if needed to establish pricing. A quorum is necessary for all meetings of the Valuation Committee where any action or determination by the members shall be made.  A quorum shall be constituted by the presence of a majority of the members in person or by means of conference telephone or any other means of communication by which all persons participating in the meeting are able to communicate with each other.  Any action or determination by the Valuation Committee shall require the approval of a majority of all members present at such meeting in quorum.  In the event that any resolution or action is passed at an inquorate meeting, such resolution or action shall be deemed to have been duly passed if it is afterwards ratified by the required majority of the members at a quorate meeting of members duly convened. In lieu of a meeting, the members may also reach decisions by way of written resolution or ratification, and a decision taken by way of written resolution or ratification signed by a majority of the members entitled to vote on such matters shall have the same effect as if that decision had been duly taken by a vote at a duly convened meeting of the members.

The Valuation Committee is responsible for carrying out certain functions relating to the valuation of portfolio securities and other assets.  These responsibilities include:

(a)  Oversight over valuations focused on developing and/or assessing the methodologies and information/pricing sources to be used for performing independent price verifications or price substantiations on each Position.

(b)  Oversight over the price substantiation process, including third-party valuation agents and services.

(c)  Approval of Position valuations at each Valuation Date.

(d)  Where broker quotes/price indications or pricing service values (each, a "quote") are relied upon to value a particular type of asset, reviewing quantitative and qualitative information, such as the appropriateness of the source (*e.g.*, pricing source, broker or other source), recent trade activity and outliers and, where appropriate, quantitative support for valuations used.

(e)  Where models/memos provide the basis for Position valuations, reviewing such models/memos and any supporting documentation.  From time to time the Valuation Committee may elect to have third parties provide price assurance or to value Positions outright.

(f)  Ensuring that the valuation process periodically includes back-testing of a sample of valuations to the extent possible and where it is likely to provide a reasonable base of comparison, against the recent purchase or sale prices of Positions.

(g)  Not less than annually, reviewing and approving this Policy.

28

Infinity Q's Chief Investment Officer is responsible for preparing or causing to be prepared minutes of each meeting of the Valuation Committee, which shall describe the actions taken at the meeting.

**Valuation Considerations**

As a general principle, valuations should reflect the amount that an Infinity Q Fund could reasonably expect to receive for the security upon its current sale.  Therefore, ascertaining fair value requires a determination of the amount that an arm's-length buyer, under the circumstances, would currently pay for the security, exclusive of blockage discounts.  Fair value cannot be based on what a buyer might pay at some later time, such as when the market ultimately recognizes the security's true value as currently perceived by Infinity Q. An Infinity Q Fund also may not fair value portfolio securities at prices that are not achievable on a current basis on the belief that it would not currently need to sell those securities.  Thus, for example, an Infinity Q Fund generally may not fair value portfolio securities at par based on the expectation that it will hold those securities until maturity, if it could not receive par value upon the current sale of those securities.

**Exceptions To Be Considered**

- If on the Valuation Date, the exchange or market for a given asset is not open for business, the valuation is determined as of the last preceding date on which such exchange or market was open for business.

- If Infinity Q believes that a quoted price in an active market does not represent fair value because significant events have occurred after the close of the market but before the Valuation Date/time, a fair value adjustment may be required for that asset.  If Infinity Q is made aware of any news or events that it believes will have a material impact on the valuation, an appropriate adjustment should be made.   Infinity Q will determine the appropriateness and materiality of any such adjustment and will document the outcome of the review as part of its customary records, as described below.

- If an asset to be valued constitutes a block which in the judgment of Infinity Q, could not be liquidated in a reasonable time without  depressing or inflating the market, or restrictions on marketability exist with respect to such asset, the asset may be assigned a different value by Infinity Q than would otherwise be calculated in accordance with the valuation methodologies noted above; provided that, such block will not be valued at a unit value in excess of, for long positions, or below, for short positions, the quoted market price of such asset.

**Broker Pricing (Minimum # Of Bids/Asks / Averaging)**

Pricing services and broker dealers are identified based upon past experience and how active they are in the name or market.  Where prices are available from third parties, Infinity Q will attempt to obtain a minimum of two independent prices and use its best judgment in combination with relevant benchmarks and pricing models to determine the fair value of the instrument. The final price for each position is typically obtained by calculating the average of the external prices received.   Where only a single price is available, Infinity

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077267

Q uses that price and may apply a discount to that price to account for the uncertainty of only having one pricing source.

When multiple independent marks are available, Infinity Q does not mark any securities higher than the average of the prices obtained. However, Infinity Q may challenge prices with a broker dealer when such prices are considered to be "outliers" (this occurs when two or more prices are closely clustered but one is outside that range). If such challenges are not successful, Infinity Q may accept the price quote and consider a discount applied to account for the dispersion in pricing or may choose to eliminate that outlier prior to computing a final mark.

In circumstances where an exchange, a pricing service, or where one or more quotes are not available for a Position, or where such exchange, pricing service, quote or quotes may not provide a reliable indication of fair value, Infinity Q will value each such Position based on relevant information, including, without limitation: (i) an internally or externally developed memo/model, including inputs and assumptions (e.g., comparing market values for similar companies/instruments); and/or (ii) such other factors as may be deemed appropriate. A written valuation memo/model shall be provided for model-based prices explaining why the price used reflects fair value of the Position. Positions with nominal value may not require a written valuation memo/model.

## Valuation Methodology

In valuing assets, the following general principals apply:

- **Equity Securities:** Equity securities, including preferred stock, ETFs, and ADRs, that are listed for trading on an active recognized exchange or market and are freely transferable are valued at the last reported sales price, as quoted by Bloomberg Valuation Services ("**Bloomberg**"), or other recognized pricing sources. In certain instances when it is determined that the market is not actively trading, the monthly Volume Weighted Average Price, as determined by Bloomberg will be utilized and/or a marketability adjustment will be applied.

- **Equity Total Return Swaps:** Equity swaps, including CFDs and basket swaps, are valued consistent with the methodology discussed above for the underlying equity security on which the performance of the swap is based.

- **Listed Options:** Options that are listed on a securities exchange are valued at their last sales prices as quoted on Bloomberg or other recognized pricing sources; *provided*, that if the last sales prices of such options do not fall between the last "bid" and "asked" prices for such options on that date, then the options are valued at the mean between the last "bid" and "asked" prices for such options on that date.

- **OTC Equity Options:** Over-the-counter options that have settled based on the settlement price of similar exchange-traded options are value consistent with the methodology discussed above for listed options. If no similar exchange-traded options are available, then the option is priced via a Black-Scholes model on Bloomberg. These values are compared to broker quotes for

30

reasonableness.   Any material differences are compared to the valuation obtained by the Administrator and a determination of the appropriate fair value is made.

- **Debt:**  Debt securities, including sovereign debt, corporate debt and convertibles, are valued at the "*mid*" as provided by Thomson Reuters or other recognized pricing sources.  If reported mids are not available, then prices are received from independent broker/dealers who may also be market makers in the securities.

- **Futures:**  Futures are valued at the settle close, as quoted on Bloomberg or other recognized pricing sources.

- **Currency Contracts:**  Forward and spot non-U.S. currencies are converted into U.S. dollars using foreign exchange rates obtained from Bloomberg at approximately 4:30 p.m. EST.

- **Credit Default Swaps:**  Credit default swaps are valued via Bloomberg utilizing the ISDA Standard Upfront Model on a daily basis.  At each month end, valuations are compared to the values provided by counterparties for reasonableness.

- **OTC Derivatives:**  Reliable quotes for certain OTC derivatives, including variance swaps, volatility swaps, fx options, and swaptions, may not be available from data providers, either because the transactions are "one of a kind" or not actively traded.  Infinity Q utilizes Bloomberg, broker quotes, and counterparty valuations to provide a fair value for these securities. At each month end, valuations are compared to the values provided by counterparties for reasonableness.

- **Investment Funds:**  Investments in other investment funds (hedge funds, private equity or other private funds) ("Portfolio Funds") are valued at the latest month-end or quarter-end unaudited or audited net asset value.  However, if Infinity Q reasonably believes that the valuations furnished do not reflect the fair value of the underlying assets, adjustments may be made to such values.

In addition, an Infinity Q Fund may invest in Portfolio Funds that provide net asset values on a quarterly, semi-annual or annual basis, rather than on a monthly basis, and, therefore, Infinity Q may be required to rely on a monthly approximation of the net asset values of certain portfolio funds provided to it by such Portfolio Funds' fund manager.

## Recordkeeping

Fair value documentation shall include (1) the identity of the affected portfolio(s); (2) a copy of any materials considered in making the fair value determination; (3) a brief summary of the relevant factors considered; and (4) any follow-up information to close out a prior fair value determination.  All valuation determinations, and documentation related thereto, shall be retained for a period of not less than six years after the close of the applicable Infinity Q Fund's fiscal year, and for the first two years in an easily accessible place.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                                    IQCM-SEC-00077269

**Revisions to the Valuation Policy**

All Policy revisions require approval by each Valuation Committee and will be documented accordingly, including any action taken and dates associated therewith.   These policies will be reviewed by each Valuation Committee for adequacy and effectiveness at least annually and more frequently as needed. Infinity Q's Chief Compliance Officer is responsible for drafting the policy revisions and ensuring they are incorporated into Infinity Q Compliance Manual.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077270

## CERTAIN TAX CONSIDERATIONS

The following discussion is a brief summary of some of the U.S. federal tax considerations relevant to an investment in the Fund based upon the Code, the U.S. federal Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), published rulings, decisions and guidance from the IRS, court decisions and legislative acts, all as in effect on the date of this Memorandum. All of the above authorities and any others referenced herein are subject to change (possibly retroactively) by legislative or administrative action.

**THIS SUMMARY DOES NOT DISCUSS ALL OF THE U.S. FEDERAL TAX CONSIDERATIONS THAT MAY BE RELEVANT TO A PARTICULAR INVESTOR OR TO INVESTORS SUBJECT TO SPECIAL TREATMENT AND DOES NOT CONSTITUTE LEGAL OR TAX ADVICE. ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE SPECIFIC FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF INVESTING IN THE PARTNERSHIP.**

**THE FUND HAS NOT SOUGHT A RULING FROM THE IRS OR ANY OTHER U.S. FEDERAL, STATE OR LOCAL AGENCY WITH RESPECT TO ANY OF THE TAX ISSUES AFFECTING THE FUND.**

**ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS MEMORANDUM IS NOT INTENDED OR WRITTEN BY US TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY INVESTORS, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON INVESTORS UNDER THE CODE. EACH INVESTOR SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.**

This summary addresses only the treatment of Limited Partners of the Fund that are (i) U.S. persons (as defined below) that hold their interests as capital assets or (ii) non-U.S. persons and, in the case of individuals, do not spend 183 days or more in the United States within a taxable year ("**Non-U.S. Partners**"). This summary also briefly addresses the treatment of U.S. Limited Partners that are exempt from U.S. federal income tax under Section 501(a) of the Code, including U.S. employee benefit plans ("**Tax-Exempt Partners**"). This summary does not address the treatment of Limited Partners that are taxed under special rules, such as regulated investment companies, personal holding companies, brokers or dealers in securities, financial institutions and life insurance companies, nor does it address any state, local, estate, non-U.S. or other tax consequences of an investment in the Fund, except as otherwise provided herein.

For purposes of this section, a "U.S. person" is a person that, for U.S. federal income tax purposes, is (i) an individual who is a citizen or resident of the United States; (ii) a corporation (or an entity taxable as a corporation), or partnership (or an entity taxable as a partnership) created or organized in or under the laws of the United States or of any state or political subdivision thereof or therein, including the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income tax regardless of the source thereof; or (iv) a trust with respect to which a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of its substantial decisions, or a trust that has a valid election in effect under applicable Regulations to be treated as a U.S. person.

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077271

**Classification of the Fund**

Under the provisions of the Code and the Treasury Regulations promulgated under the Code, the Fund intends to be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain publicly traded partnerships are treated as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The Fund may not qualify for any of those safe harbors. If the Fund were taxed as a corporation, its earnings would be subject to U.S. federal income taxation, and any distributions to the Limited Partners would be taxable as dividends to them to the extent of the earnings and profits of the Fund. However, if the IRS were to assert that Interests in the Fund were treated as readily tradable on a secondary market (or the substantial equivalent thereof), the Fund expects to be exempt from classification as a publicly traded partnership taxable as a corporation under an exemption that would apply if 90% or more of its gross income consisted of "qualifying income" within the meaning of Section 7704(d) of the Code and the Treasury Regulations thereunder. "Qualifying income" includes interest (excluding certain amounts contingent on the income or profits of any person and certain amounts derived in the conduct of a financial or insurance business), dividends, gain from the sale or other disposition of stocks, securities, or foreign currencies and other income derived from investments in stocks, securities or currencies.

**Taxation of U.S. Limited Partners (Other than Tax-Exempt Partners)**

As a partnership for U.S. federal income tax purposes, the Fund is not itself subject to U.S. federal income tax. The Fund will distribute annually to each Limited Partner a form showing such Limited Partner's distributive share of each Fund item of income, gain, loss, deduction or credit. Each Limited Partner is required to report separately on such Limited Partner's U.S. federal income tax return the Limited Partner's distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income, and deductions and credits. Each Limited Partner will be liable for any taxes owed upon the Limited Partner's distributive share of the income or gains realized by the Fund, and may claim deductions for the Limited Partner's distributive share of the Fund's losses and deductions and credits for the Limited Partner's distributive share of the Fund's credits, to the extent allowed under the Code and except as noted below.

Each Limited Partner is taxed on the Limited Partner's distributive share of the Fund's taxable income or gain regardless of whether the Limited Partner has received or will receive any distribution of cash from the Fund. Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Fund (and, thus, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner receives or is entitled to withdraw from the Fund, and could be significantly greater or less than such Limited Partner's share of the net economic gain or loss of the Fund during the same period.

The Code and the Treasury Regulations permit allocations of income and loss to be made among partners in accordance with a partnership agreement, provided that such allocations have "substantial economic

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                                     IQCM-SEC-00077272

effect." Although it is believed that the allocations pursuant to the Partnership Agreement should be respected for U.S. federal income tax purposes, the IRS may assert that the Fund's income and loss must be allocated pursuant to some other method, in which event a Limited Partner's share of income and loss of the Fund for U.S. federal income tax purposes might be other than as provided for in the Partnership Agreement.

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in the Limited Partner's Interest in the Fund, will not result in taxable income to that Limited Partner, but will reduce the Limited Partner's tax basis in the Limited Partner's Interest in the Fund by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of the Limited Partner's Interest in the Fund is generally taxable either as capital gain or ordinary income, depending on the circumstances. A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables). Distributions of marketable securities will be treated as distributions of cash for purposes of determining gain (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless an exception applies.

Under the Partnership Agreement, the General Partner has the discretion to specially allocate an amount of the Fund's capital gain (including short-term capital gain), ordinary income, deduction, capital loss and ordinary loss for U.S. federal income tax purposes to a withdrawing Limited Partner to the extent such Limited Partner's Capital Account would otherwise exceed or be less than, as the case may be, its adjusted tax basis in its Interest. There can be no assurance that, if the General Partner makes such a special allocation, the IRS will accept such allocation. If such allocation is successfully challenged by the IRS, the Fund's gains or losses allocable to the remaining Limited Partners may be adjusted.

The Fund may utilize investment strategies that produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss).

Pursuant to various "anti-deferral" provisions of the Code (the "Subpart F" and "passive foreign investment company" ("**PFIC**") provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred and/or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain. In particular, although the Fund will attempt to monitor its investments in order to determine whether or not it has invested in any PFICs, it is not always possible to determine whether or not a particular non- U.S. company is a PFIC. In general, a foreign corporation will be classified as a PFIC for a given taxable year if either (x) 75% or more of its gross income in such year is passive income or (y) 50% or more of its assets in such year are held for the production of or produce passive income.

If the Fund invests in a PFIC, the Fund may be able to make an election to have the PFIC treated as a qualified electing fund ("**QEF**"), in which event each Limited Partner will avoid certain of the potential adverse consequences referred to above, and instead will be taxed currently on such Limited Partner's proportionate share of the ordinary earnings and net long term capital gains of the PFIC whether or not the earnings or gains are distributed. If the PFIC realizes a net loss in a particular year, under the QEF rules, that loss will not pass through to the Limited Partners nor will it be netted against the income of any other

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077273

PFIC with respect to which a QEF election has been made. There is no assurance that the Fund will be able to obtain from any company that is a PFIC the necessary information, on an annual basis, in order to permit the Fund to make an election to treat any such PFIC as a QEF. The Fund also may have the option to elect to mark stock in a PFIC to market at the end of every year, provided the PFIC stock is considered "marketable" under applicable Treasury Regulations. All such mark to market gains and losses (to the extent allowed) will be considered ordinary income. However, this election may not be available for certain types of investments made by the Fund.

A Limited Partner's distributive share of profits or losses realized by the Fund on the conversion of U.S. dollars into non-U.S. currency, and of non-U.S. currency into U.S. dollars, generally will be treated as ordinary income or loss rather than capital gain or loss. Limited Partners should consult with their individual tax advisers with respect to the tax treatment of non-U.S. currency gain or loss.

All securities held by the Fund are marked to market at the end of each fiscal period for financial statement presentation and Capital Account maintenance purposes. This treatment is inconsistent with the general tax rule applicable to many securities transactions that a transaction does not result in a gain or loss until it is closed by an actual sale or other disposition. The divergence between such accounting and tax treatment frequently will result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Fund.

Under Section 7701(o) of the Code, which codifies long-standing common law doctrine, the IRS may impose penalties on taxpayers who engage in certain transactions that reduce U.S. federal income tax but that lack "economic substance." Although the General Partner does not intend for the Fund to engage in these types of transactions, it is possible that the IRS could assert that certain transactions in respect of the Fund, either directly or through flow-through entities treated as transparent for U.S. federal income tax purposes, lack economic substance.

A 3.8% surtax will be imposed on the "net investment income" of certain Limited Partners who are U.S. citizens and resident aliens, and the undistributed "net investment income" of certain estates and trusts. "Net investment income" is generally defined as the sum of (i) gross income from interest, dividends, annuities, royalties and rents, (ii) gross income derived from (x) a passive trade or business or (y) a trade or business of trading in financial instruments or commodities and (iii) net gain from the disposition of investment property, less (in the case of each of (i), (ii) and (iii)) allowable deductions properly allocated to such gross income or net gain. Under applicable Treasury Regulations, "financial instruments" are defined to include equity, debt, options, forwards, futures, notional principal contracts and any other derivatives. The applicable Treasury Regulations include special rules for determining net investment income with respect to investments in PFICs and controlled foreign corporations ("**CFCs**"). It is anticipated that a Limited Partner's allocable share of the Fund's gross income and/or net gain (whether or not the Fund is engaged in the trade or business of trading in financial instruments or commodities), as well as any net gain from the withdrawal or sale of an Interest in the Fund, generally will be included in the Limited Partner's "net investment income" subject to this 3.8% surtax. Limited Partners should consult their tax advisers regarding the effect, if any, of this surtax on their ownership and disposition of an interest in the Fund.

Confidential Treatment Requested by Infinity Q Capital Management, LLC    IQCM-SEC-00077274

**Limitations on Losses and Deductions**

The Code provides certain limitations on a partner's ability to deduct the partner's share of partnership losses and deductions. For non-corporate partners, Section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest or short sale expenses for "indebtedness properly allocable to property held for investment"). Investment interest is not deductible in the current year to the extent that it exceeds the taxpayer's "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any qualified dividend income and long-term capital gain are excluded from net investment income unless the taxpayer elects to pay tax on such amounts at ordinary income tax rates. Each partner generally would be entitled to carry any such excess amounts forward to future years, when the same limitation would again apply.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a U.S. taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment," and that securities such as Interests in the Fund will be regarded as a "portfolio investment." Therefore, in the case of a Limited Partner owning tax-exempt obligations, the IRS might take the position that all or a portion of the interest paid, or deemed paid, by such Limited Partner in connection with the purchase of an Interest in the Fund should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

Under current U.S. federal income tax law, as modified in 2017 by legislation commonly referred to as the Tax Cuts and Jobs Act of 2017, most miscellaneous itemized deductions are disallowed for non-corporate taxpayers. Such disallowed deductions generally include a non-corporate Partner's share of the Management Fee and most other expenses of the Fund. Corporate partners of the Fund are not affected by limitations on miscellaneous itemized deductions, but such limitations do apply to individual shareholders of S corporation Partners of the Fund. It is possible that the IRS would seek to recharacterize certain income allocations to the General Partner as fees subject to these limitations on deductibility. The IRS could also assert that all or a portion of the Management Fees is/are not deductible, but rather must be capitalized and treated as part of the cost of the Fund's investments. These limitations on deductibility should, generally, not apply to a non-corporate Fund Partner's share of the investment expenses of the Fund to the extent that the Fund is considered a trader in securities rather than an investor for U.S. federal income tax purposes and to the extent that such investment expenses are not required to be capitalized. The Fund will each year make a determination as to whether it will take the position for U.S. federal income tax purposes that it is a trader in securities or, alternatively, an investor in securities. This determination will be made separately each year based primarily on the level of the Fund's securities activities during the particular year. Accordingly, the Fund's status as a trader or an investor may vary from year to year and is difficult to predict in advance.

Under the Code, capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of capital losses per year against ordinary income without regard to capital gains. Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may carry forward unused capital losses indefinitely.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077275

The General Partner may in its sole discretion elect to amortize on a straight-line basis over fifteen years any amounts paid or incurred to organize the Fund.

No deduction is allowed for any origination or placement fees paid or borne by a U.S. Partner to acquire an interest in the Fund, and no deduction is allowed for other expenditures attributable to placement services. Instead the amount of any such fees will be included in the U.S. Partner's adjusted tax basis for its interest in the Fund.

Under the passive activity loss rules, individuals, estates, trusts, personal service corporations and certain closely held corporations may not use losses from a "passive activity" to offset certain income that is not derived from a passive activity. In general, income or loss from the Fund's securities trading activities should not constitute income or loss from a passive activity. Therefore, passive losses from other sources generally should not be deductible against a Limited Partner's share of income and gain from the Fund.

Under the at-risk rules, individuals and personal holding companies are only entitled to offset their income with losses arising from a partnership to the extent they are "at risk." The amount a Limited Partner is considered to have "at risk" in the Fund will generally equal such Limited Partner's capital contributions to the Fund and share of Fund income and gain, reduced by such Limited Partner's share of Fund distributions and loss deductions allowed. A Limited Partner will not be considered "at risk" with respect to any indebtedness of the Fund because no Limited Partner is obligated to make additional capital contributions to the Fund.

Deductions disallowed as a result of the at-risk limitations will carry forward and may be deducted in subsequent years subject to these same general limitations. If the amount of a Limited Partner's at-risk amount is reduced below zero, then such Limited Partner will recognize income to the extent that his, her or its at-risk amount is so reduced.

**POTENTIAL INVESTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THESE DEDUCTIBILITY ISSUES, WHICH INCLUDE MATTERS OF UNCERTAINTY AND COULD HAVE A MATERIAL IMPACT ON AN INVESTMENT IN THE FUND.**

**Basis Adjustments**. Upon the distribution of property to a Limited Partner or upon the transfer of an Interest in the Fund by sale or exchange or upon the death of a Partner, the General Partner may, but is not obligated to, cause the adjusted basis of the Fund's property to be adjusted as provided under Sections 743 and 734 of the Code pursuant to an election under Section 754 of the Code. Under certain circumstances (generally described in the following paragraph), the adjustments referenced to herein (i.e., adjustments under Section 743 and 734 of the Code) may be required and the General Partner may be obligated to make them.

The Fund is generally required to adjust its tax basis in its assets in respect of all Partners in the case of distributions that result in a "substantial basis reduction" (i.e., in excess of $250,000) in respect of the Fund's property. The Fund is also required to adjust its tax basis in its assets in respect of a transferee Limited Partner in the case of a sale or exchange of an Interest, or a transfer upon death, when there exists a "substantial built in loss" (i.e., in excess of $250,000) in respect of Fund property immediately after the transfer. For this reason, the Fund will require (i) a Limited Partner who receives a distribution from the

Confidential Treatment Requested by Infinity Q Capital Management, LLC   IQCM-SEC-00077276

Fund in connection with a complete withdrawal, (ii) a transferee of an Interest (including a transferee in case of death) and (iii) any other Limited Partner in appropriate circumstances to provide the Fund with any information necessary to allow the Fund to comply with its obligations to make basis adjustments.

**Section 475(f) Mark to Market Election**

Although the Fund does not intend to make such an election at this time, the Fund may elect pursuant to Section 475(f) of the Code to mark to market its positions in securities and commodities for U.S. federal income tax purposes. In general, if the Fund were to make such an election, for U.S. federal income tax purposes the Fund would then be treated as selling its securities and commodities positions (other than certain Section 1256 contracts) at the end of each taxable period for an amount equal to their fair market value on the last business day of such taxable period, and the resulting gain or loss would be taken into account for such period. If the Fund were to make a Section 475(f) election, then certain contracts that would otherwise qualify as Section 1256 contracts would be subject to the Section 475 mark to market rules rather than the Section 1256 mark to market rules. In addition, if the Fund were to make such an election, then it is expected that substantially all of the income of the Fund would be characterized as ordinary income. Because the Fund anticipates that it may otherwise recognize amounts of long-term capital gain, the Fund does not intend to make a Section 475(f) election at this time, although it may do so in the future if it determines that such an election would be advantageous.

**Tax-Exempt Partners**

If the Fund derives income which would be considered "unrelated business taxable income" ("**UBTI**") as defined in Section 512 of the Code if derived directly by a Tax-Exempt Partner, such Tax-Exempt Partner's allocable share of the Fund's income would be subject to U.S. federal income tax. A charitable remainder trust, however, is not subject to federal income tax with respect to UBTI, but is subject to an excise tax equal to 100% of any UBTI it recognizes. A Tax-Exempt Partner subject to U.S. federal income tax on its allocable share of the Fund's UBTI may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by an exempt organization (or by a partnership of which the exempt organization is a partner) over the deductions attributable to such trade or business. UBTI generally does not include dividends, interest, annuities, royalties and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the trade or business.

A tax-exempt organization under Section 501(a) of the Code is also subject to U.S. federal income tax with respect to its "unrelated debt-financed income" ("**UDFI**") (and its allocable share of the Fund's UDFI) pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the 12 month period ending with the date of such disposition. The law is not entirely clear, however, as to the proper way to determine what portion of a tax-exempt investor's share of the Fund's profits is attributable to the use of leverage and, therefore, UDFI. Accordingly, there can be no assurance that the IRS will accept the method of

39

computation used by a Tax-Exempt Partner in computing its share of "unrelated-debt financed income." To the extent a Tax-Exempt Partner borrows money to finance its investment in the Fund, such Tax-Exempt Partner would be subject to tax on the portion of its income which is UDFI even though such income may constitute an item otherwise excludable from UBTI, such as dividends.

The General Partner intends to manage the portfolio of the Fund in a manner that will not generate UBTI for any Tax-Exempt Partner and that does not borrow money or otherwise utilize leverage to acquire its Interest in the Fund. However, the General Partner cannot make any assurances that the Fund will not generate UBTI for any Tax-Exempt Partner. The General Partner will use reasonable efforts to give investors 120 days' notice of any transaction that could reasonably be expected to generate UBTI.

**PROSPECTIVE TAX-EXEMPT U.S. INVESTORS THAT ARE SENSITIVE TO UBTI OR UDFI SHOULD CONSULT THEIR TAX ADVISORS AS TO THE TAX CONSEQUENCES OF INVESTING IN THE FUND.**

### Tax Return Disclosure and Investor List Requirements

The IRS has issued Treasury Regulations that are aimed at obtaining disclosure by certain taxpayers, including partnerships and partners, that engage in so-called "tax shelter" transactions. Because of the broad wording of these Treasury Regulations, even when a hedge fund or other ordinary pooled investment vehicle, such as the Fund, has not been organized or operated to provide "tax shelter" benefits to its partners, the partnership and its partners may be required to make disclosure to the IRS if the partnership or its partners participate in certain transactions identified in these Treasury Regulations. Significant monetary penalties apply to a failure to comply with these disclosure requirements. Certain states (including New York, California and Illinois) may also have similar disclosure requirements.

A partnership or partner that is required to disclose its participation in a transaction to the IRS does so by completing IRS Form 8886 (Reportable Transaction Disclosure Statement) and filing it with its U.S. federal income tax return and a copy of the form with the IRS Office of Tax Shelter Analysis. At this time the Fund cannot predict whether any of its investments will require it or any of the Limited Partners to file Form 8886. If the General Partner later determines that one or more investments require the filing by Limited Partners of Form 8886, the General Partner will provide each Limited Partner with the information required to complete and file the form.

In addition, if a partnership participates in a transaction that requires disclosure to the IRS, the general partner and other material advisors to the partnership may each be required to file information returns with the IRS, and it may be necessary to maintain a list of its partners and a detailed description of the partnership, its activities and the expected U.S. federal income tax consequences to its partners, in addition to certain other information. If such lists and information must be maintained under the Treasury Regulations, it must be available to the IRS for inspection upon its written request. It is not possible for the Fund to determine now whether such returns will have to be filed or such lists and information will have to be maintained.

Under the above rules, a Limited Partner's recognition of a loss upon its disposition of an Interest in the Fund could also constitute a transaction that requires disclosure to the IRS for such Limited Partner.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077278

Potential investors should consult their own advisors concerning the application of these reporting obligations to their specific situations.

## Reporting Requirements

Limited Partners may also be required to make various filings with the IRS due to the Fund's direct or indirect investment in non-U.S. corporations. For example, if the Fund invests directly or indirectly in a company that is a PFIC, a Limited Partner may be required to file IRS Form 8621 (Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund) on an annual basis to report its indirect investment in such PFIC regardless of whether the Fund or such U.S. shareholder has received a distribution from, disposed of an interest in, or made an election in respect of such PFIC. Under temporary Treasury Regulations (the "**PFIC Reporting Regulations**"), such PFIC reporting is generally not required of Tax-Exempt Partners.

In certain circumstances, these rules may require Limited Partners to file reports annually. Limited Partners are advised to consult their own tax advisers regarding their U.S. tax filing requirements with respect to an investment in the Fund.

## Non-U.S. Partners, Withholding, and FATCA

Except to the extent of any "effectively connected" income (as discussed below), and subject to the FATCA discussion below, a Non-U.S. Partner's distributive share of the capital gains, dividend income and interest income of the Fund will not be subject to U.S. federal income tax other than a 30% withholding tax (which may be reduced or eliminated under applicable tax treaties) that applies to (i) U.S.-source interest income that does not qualify as "portfolio interest" income, interest on bank deposits or original issue discount on certain short-term indebtedness or (ii) U.S.-source dividends.

In general, a non-U.S. partner of a partnership that is engaged in a trade or business in the United States is itself considered to be so engaged in a U.S. trade or business. Thus, if a partnership is engaged in a trade or business in the United States and derives income effectively connected with the conduct of such trade or business, each non-U.S. partner will be considered to be engaged in a trade or business in the United States and consequently, will be subject to U.S. federal income tax on its distributive share of such partnership's effectively connected income ("**ECI**") (but not its non-ECI) at the same rate that applies to U.S. partners.

While the Fund does not anticipate that it will make investments or engage in activities that will cause it to be engaged in a U.S. trade or business for U.S. federal income tax purposes, and accordingly does not expect that it will produce income that is ECI, there can be no assurance that the Fund will not derive ECI. If the Fund is treated as engaged in a U.S. trade or business, the Fund generally will be required to withhold tax on such Non-U.S. Partner's distributive share of ECI at the highest corporate or individual rate. In those circumstances, Non-U.S. Partners also would be required to file U.S. federal income tax returns, on which all U.S. source income must be disclosed, and pay U.S. federal income tax in respect of their distributive shares of ECI (and would be allowed a credit against their tax liability for amounts withheld by the Fund). The failure by a Non-U.S. Partner to file U.S. federal income tax returns on a timely basis will result in the disallowance of otherwise allowable deductions and credits that are effectively connected with the conduct of such U.S. trade or business. Furthermore, any such Non-U.S. Partner also would be subject to U.S. federal income tax on any gain from the sale or other taxable disposition of its Interests to the extent such

Confidential Treatment Requested by Infinity Q Capital Management, LLC

gain would be attributable to such Limited Partner's distributive share, if any, of the Fund's assets giving rise to ECI.

In addition, a Non-U.S. Partner that is a corporation could be subject to a branch profits tax of 30% (unless reduced or eliminated by an applicable tax treaty) on a taxable base that would include its distributive share of the Fund's ECI, reduced by U.S. federal income taxes imposed thereon, with such base being further adjusted for increases (and decreases) of investments in certain U.S. assets.

Sections 1471 through 1474 of the Code (referred to as "**FATCA**") generally imposes a withholding tax of 30% on certain gross amounts of income not effectively connected with a U.S. trade or business paid to certain non-U.S. entities, unless various information reporting requirements are satisfied. Amounts subject to withholding under these rules generally include gross U.S.-source dividend and interest income, gross proceeds from the sale of property that produces U.S.-source dividend or interest income paid on or after January 1, 2019 and certain other payments made by "participating foreign financial institutions" to "recalcitrant account holders" on or after January 1, 2019 (so called "foreign pass thru payments").

Treasury Regulations under FATCA provide a detailed set of due diligence, information reporting and disclosure requirements in order for entities to avoid the withholding tax. Pursuant to the rules set forth in these Treasury Regulations, a Non-U.S. Partner may be required to comply with these due diligence, information reporting and disclosure requirements that include, among other things, entering into an agreement with the IRS and requesting additional information from its beneficial owners that may be disclosed to the IRS unless such Non-U.S. Partner establishes that an exemption applies or it is required to comply with FATCA under an applicable intergovernmental agreement. If a Non-U.S. Partner fails to provide such information or enter into such an agreement with the IRS as required under FATCA (or establish that an exemption applies or comply with FATCA under an applicable intergovernmental agreement), the Fund may be required to impose a withholding tax of 30% on certain payments made to such Non-U.S. Partner and also may be required to terminate such Non-U.S. Partner's investment in the Fund. Prospective investors are encouraged to consult their own advisors regarding the possible application of FATCA and its impact on their investment in the Fund.

Any withholding or transfer taxes imposed on the Fund or any of its Limited Partners as a result of its or their earnings, investments or withdrawals will be assessed, where applicable to particular Limited Partners, directly against the Capital Accounts of such Limited Partners.

**THIS WITHHOLDING AND FATCA SUMMARY IS BASED ON GUIDANCE ISSUED BY THE IRS. FUTURE IRS GUIDANCE AND/OR LEGISLATIVE DEVELOPMENTS MAY AFFECT WITHHOLDING THE APPLICATION OF FATCA TO INVESTMENTS IN THE FUND.**

**Foreign Taxes**

The Fund may invest in instruments of non-U.S. issuers. Interest and dividend income from non-U.S. sources may be subject to foreign withholding taxes. The rate of withholding on such income is sometimes reduced under an applicable income tax treaty. However, in the case of income received by an entity treated as a partnership for U.S. federal income tax purposes, such as the Fund, the procedure for achieving such tax treaty benefits is sometimes uncertain. It is possible that a foreign jurisdiction may impose tax on certain gains derived from the disposition of investments in that jurisdiction. Any withholding taxes

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077280

imposed will be treated as distributions to the appropriate Limited Partners in the period in which such taxes are withheld. A U.S. Partner's share of such foreign taxes will not necessarily be fully creditable against such Limited Partner's U.S. federal income tax liability.

**EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO ITS FOREIGN TAX CONSEQUENCES AND FILING OBLIGATIONS AS A RESULT OF AN INVESTMENT IN THE FUND.**

### State, Local, and Other Taxes

The Fund and its Partners may be subject to other taxes, including without limitation the alternative minimum tax, state and local income taxes, estate taxes, inheritance taxes, intangible property taxes, franchise taxes, capital gain taxes, withholding taxes, and/or tax payment obligations and filing requirements that may be imposed by various jurisdictions.

State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Limited Partner's distributive share of the Partnership's tax items generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Credits for taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Partnership, as applicable, are residents. In addition, Limited Partners in certain states may be subject to substantial limitations on the deductibility of items of deduction or loss.

**EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO ITS TAX CONSEQUENCES AND FILING OBLIGATIONS WITH RESPECT TO STATE, LOCAL AND OTHER TAXES AS A RESULT OF AN INVESTMENT IN THE FUND.**

**Fund Tax Returns; Audits**. The Fund's tax returns are subject to review by the IRS and other taxing authorities. There can be no assurance that these authorities will not make adjustments in the tax figures reported on the Fund's returns.

If the income tax returns of the Fund are audited by the IRS, the tax treatment of the Fund's tax items will generally be determined at the Fund level in a single proceeding rather than by individual audits of the Partners. If the tax treatment of any of the Fund's activities or tax items becomes subject to an audit, the Fund may incur significant costs and expenses (including but not limited to accounting and legal expenses) responding to such audit and potentially defending against any proposed alternative to such tax treatment, even if the Fund's original tax treatment that was the subject of the audit is ultimately determined to be correct. In this regard, Infinity Q, as the Partnership Representative, has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners.

The Partnership Representative's actions, including the Partnership Representative's agreement to adjustments of the Fund's income in settlement of an IRS audit of the Fund, as applicable, will bind all Partners.

43

Confidential Treatment Requested by Infinity Q Capital Management, LLC

U.S. federal income taxes (and any related interest and penalties) attributable to an adjustment to the Fund's income following an IRS audit or judicial proceeding will, absent an election by the Fund to the contrary, have to be paid by the Fund in the year during which the audit or other proceeding is resolved, if such adjustment results in an increase in U.S. federal income tax liability (as determined under tax rules applicable to audits of partnerships). If an adjustment to the Fund's income following an IRS audit or judicial proceeding results in an adjustment in U.S. federal income tax liability (as determined under tax rules applicable to audits of partnerships), the adjustment will flow-through to the Partners based on their interests for the year in which the audit or other proceeding is resolved. This could cause the economic burden of U.S. federal income tax liability (or the economic benefit of a favorable adjustment) arising on audit of the Fund to be borne by (or, in the case of a favorable adjustment, to benefit) Partners based on their interests in the Fund in the year during which the audit or other proceeding is resolved, even though such tax liability (or benefit) is attributable to an earlier taxable year in which the interests or identity of some or all of the Partners was different. The partnership tax audit rules also can cause the Fund's U.S. federal income tax liability arising on audit to be computed in less advantageous ways than the tax liability of the Partners would be computed if the Fund had not been audited (for example, absent an adjustment, by applying the highest marginal federal income tax rates and potentially ignoring the tax-exempt status of certain Partners). In calculating taxes imposed on the Fund with respect to audit adjustments, the Fund may be able to take into account certain applicable lower tax rates and the tax-exempt status of certain Partners.

In addition, if elected by the Partnership Representative, alternative procedures may allow the Fund to avoid such entity-level U.S. federal income tax liability in some cases if certain conditions are satisfied. These alternative procedures may require Partners to (i) file amended returns (and pay any tax that would be due) for the prior tax year under audit, (ii) adjust the tax liability reported on their income tax returns for the year in which the audit is resolved, and/or (iii) provide certain information to the Fund (possibly including information about the owners of Partners classified as flow-through entities).

The foregoing partnership audit rules may also apply to audits of any holding partnership or portfolio company that is treated as a partnership for federal income tax purposes. Any U.S. federal income taxes (and any related interest and penalties) paid by the Fund, a holding partnership or by a portfolio company treated as a partnership, in respect of IRS audit adjustments at the Fund, the holding partnership or portfolio company level will be allocated by the General Partner and will be borne by Partners pursuant to the terms of the Partnership Agreement. The cost of any audit of a Partner will be borne solely by that Partner.

**THE FOREGOING IS A SUMMARY OF SOME OF THE IMPORTANT TAX RULES AND CONSIDERATIONS AFFECTING THE LIMITED PARTNERS, THE FUND AND THE FUND'S OPERATIONS AND DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OF ALL RELEVANT TAX RULES AND CONSIDERATIONS, NOR DOES IT PURPORT TO BE A COMPLETE LISTING OF ALL POTENTIAL TAX RISKS INHERENT IN PURCHASING OR HOLDING AN INTEREST IN THE FUND. THE FOREGOING IS ALSO NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX AND REGULATORY PLANNING. PROSPECTIVE INVESTORS IN THE FUND ARE URGED TO CONSULT THEIR OWN TAX AND REGULATORY ADVISERS WITH RESPECT TO AN INVESTMENT IN THE FUND AND IN ORDER TO FULLY UNDERSTAND THE U.S. FEDERAL, STATE AND LOCAL INCOME TAX CONSEQUENCES, THE FOREIGN TAX CONSEQUENCES, AND OTHER TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.**

44

Confidential Treatment Requested by Infinity Q Capital Management, LLC

## REGULATORY CONSIDERATIONS

### ERISA Plans

The Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities (such as collective investment funds and insurance company separate accounts, and, in certain circumstances, insurance company general accounts) whose underlying assets include the assets of such plans (collectively, "**ERISA Plans**") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirements of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "*Principal Risks of Investing in the Fund*" and the fact that in the future there may be no market in which the ERISA Plan will be able to sell or otherwise dispose of any Interest it may purchase.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts and plans covering only self-employed individuals, and entities whose underlying assets include the assets of such plans (together with ERISA Plans, "**Plans**")) and certain persons (referred to as "parties in interest" under ERISA or "disqualified persons" under the Code) having certain relationships to such Plans, unless a statutory or administrative exception or exemption is applicable to the transaction. A party in interest or disqualified person that engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code.

The U.S. Department of Labor ("**DOL**") has promulgated a regulation, 29 C.F.R. Section 2510.3-101, describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Code. Under those regulations as modified by Section 3(42) of ERISA (the "**Plan Asset Rules**"), if a Plan invests in an "equity interest" of an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, then the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets unless it is established that the entity is an "operating company" or that equity participation in the entity by Benefit Plan Investors is not "significant." The term "**Benefit Plan Investor**" is defined in Section 3(42) of ERISA as (i) any employee benefit plan (as defined in Section 3(3) of ERISA) subject to the provisions of Part 4 of Subtitle B of Title I of ERISA, (ii) any plan to which Code Section 4975 applies and (iii) any entity whose underlying assets include Plan Assets by reason of a Plan's investment in the entity. Governmental plans, foreign plans and certain church plans are not subject to Title I of ERISA or Section 4975 of the Code and, therefore, are not considered Benefit Plan Investors.

The Interests will constitute "equity interests" in the Fund for purposes of the Plan Asset Rules, and such Interests will not constitute "publicly-offered securities" for purposes of the Plan Asset Rules. In addition, the Fund will not be registered under the Investment Company Act, and it is not likely that it will qualify as an "operating company" for purposes of the Plan Asset Rules. Therefore, if equity participation in the Fund by Benefit Plan Investors is "significant" within the meaning of the Plan Asset Rules, then the assets of the

45

IQCM-SEC-00077283

Fund would be considered to be the assets of any Plans that purchase or hold the Interests. In such circumstances, in addition to considering the applicability of ERISA and the Code to the Interests, a Plan fiduciary considering an investment in the Fund should consider the applicability of ERISA and the Code to transactions involving the Fund, the General Partner and their respective assets, including whether such transactions might constitute prohibited transactions under ERISA or Section 4975 of the Code or otherwise may result in a breach of fiduciary duty under ERISA.

The DOL has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("**Plan Assets**"). Under Section 3(42) of ERISA, equity participation in an entity by Benefit Plan Investors is "significant" -- and thus the assets of the entity are considered Plan Assets -- on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity is held by Benefit Plan Investors. For purposes of this determination, (i) the value of equity interests held by a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the entity or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any affiliate of such a person) is disregarded and (ii) an entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors.

In order to prevent the assets of the Fund from being considered Plan Assets under ERISA, it is the intention of the Fund to monitor the investments in the Fund and prohibit the acquisition, withdrawal or transfer of any Interests by any Limited Partner, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of Interests of any class owned by Benefit Plan Investors would be less than 25% of the aggregate value of the class of Interests (determined by excluding certain Interests held by the General Partner, other fiduciaries and affiliates). Without limiting the generality of the foregoing, in order to limit equity participation by Benefit Plan Investors to less than 25% of the value of all outstanding Interests, the Fund may require the compulsory withdrawal of Interests.

The General Partner has determined that Benefit Plan Investors and other benefit plans (including governmental, foreign and church plans) and entities that would be considered benefit plan investors under the law in effect prior to the enactment of the U.S. Pension Protection Act of 2006 (collectively, "**Global Plan Investors**") may not acquire an Interest. In order to effect this prohibition, each prospective purchaser of an Interest will be required to represent that it is not a Global Plan Investor. No Interest will be sold or transferred to any party that has represented that such party is a Global Plan Investor. Additionally, any subsequent purchase or proposed sale, assignment, pledge or transfer of any Interest by or to a Global Plan Investor is prohibited, and the General Partner may require any Limited Partner to immediately redeem all or any of its Interests if such Limited Partner's continued investment in such Interests would result in equity participation in the Fund by a Global Plan Investor. While the General Partner intends to comply with the provisions described above, there can be no assurance that Global Plan Investor participation in the Fund will in fact be so limited. **Notwithstanding the foregoing, the General Partner, in its sole and absolute discretion, may permit participation in the Fund by a Global Plan Investor.**

If the General Partner permits participation by a Plan, then any Plan fiduciary that proposes to cause a Plan to purchase an Interest should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment and to confirm that such investment will not constitute or result in a prohibited transaction or

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077284

any other violation of an applicable requirement of ERISA or the Code. The sale of any Interest to a Plan is in no respect a representation by the General Partner that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan or that such an investment is appropriate for Plans generally or any particular Plan.

### Governmental, Foreign and Certain Church Plans

Governmental plans, foreign plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state, other federal or foreign laws that are substantially similar to the foregoing provisions of ERISA and the Code. If the General Partner permits participation by such a plan, the investment manager of any such plan proposing to invest in the Fund will be required to represent that it has been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest in the Fund is consistent with the applicable provisions of federal, state and local, and foreign law and with the plan documents.

In addition, if the General Partner permits participation by a governmental plan, foreign plan and/or church plan, each such plan proposing to invest in the Fund may be required to provide an opinion of counsel to the plan stating that the Fund's investment objectives, policies and strategies are permissible under the terms of the plan and applicable law with respect to such plan.

### Other Regulatory Matters

### Securities Act of 1933

Interests are not registered under the Securities Act or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of the Securities Act or rules and regulations of the SEC applicable to transactions not involving a public offering. Each investor is required, in the Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D and "private placement" representations.

### Investment Company Act of 1940

The Fund is not registered under the Investment Company Act in reliance upon Section 3(c)(1) thereunder, which excludes from the definition of "investment company" collective investment vehicles whose outstanding securities are owned by not more than 100 persons. Each investor will be required to complete the Subscription Documents to enable the Fund to determine the status of the investor for purposes of this exclusion.

### Investment Adviser Registration

The General Partner is registered as an investment adviser with the SEC under the Advisers Act.

### Commodity Exchange Act

The General Partner is a member of the National Futures Association ("**NFA**") and is registered with the NFA as a CPO. The General Partner will operate the Fund as a commodity pool under Rule 4.7 and is

Confidential Treatment Requested by Infinity Q Capital Management, LLC
IQCM-SEC-00077285

exempted thereunder from certain substantive regulatory obligations to which it would otherwise be subject. Rule 4.7 exempts CPOs from extensive disclosure, reporting and recordkeeping requirements in connection with the offering of interests in and operation of commodity pools that are offered to "qualified eligible persons."

The General Partner is not registered with the NFA as a commodity trading advisor in reliance on Section 4m(1) of the Commodity Exchange Act, which provides an exemption from registration for a person who, in the preceding twelve months, has not furnished commodity trading advice to more than 15 persons and who does not hold himself out generally to the public as a commodity trading advisor.

Each investor in the Fund will be required to represent that it is a qualified eligible person. Additionally, each investor will be required to represent that it is not a "pool" within the meaning of Section 4.10(d)(1) of Part 4 of the Commodity Future Trading Commission Regulations promulgated under the Commodity Exchange Act, or, if it is unable to do so, to provide the Fund and the General Partner with the NFA ID assigned to its CPO or evidence acceptable to the General Partner of an exemption from CPO registration.

In accordance with the procedures established by the NFA, any compliance inquiries may be directed to Scott Lindell (telephone number: (212) 601-4790).

**Anti-Money Laundering Regulations**

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the General Partner, the Administrator or their delegate requires verification of identity from all prospective investors. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The General Partner and the Administrator reserve the right to request such information as is necessary to verify the identity of a prospective investor. The General Partner and the Administrator also reserve the right to request such identification evidence in respect of a transferee of Interests. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the General Partner and the Administrator may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The General Partner and the Administrator also reserve the right to refuse to make any withdrawal payment or distribution to a Limited Partner if they suspect or are advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the General Partner or the Administrator with any such laws or regulations in any relevant jurisdiction.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00077286

## PRIVACY POLICY AND PROCEDURES

**Confidential Investor Information.** In the course of its business activities, the Fund and the General Partner gain access to non-public information about the Limited Partners. Such information may include personal financial and account information, information relating to a Limited Partner's investment in the Fund or services performed for or transactions entered into on behalf of such Limited Partner, information provided in subscription documents or other documents furnished by such Limited Partner and data or analyses derived from such information (collectively referred to as "**Confidential Information**"). All Confidential Information, whether relating to the Fund's current or former Limited Partners, is subject to this Privacy Policy and Procedures. Any doubts about the confidentiality of information will be resolved in favor of confidentiality.

**Non-Disclosure of Confidential Information.** The Fund and the General Partner do not share Confidential Information with any third parties except in the following circumstances:

(i)    as necessary to conduct the business of the Fund or to maintain and service a Limited Partner's account. The Fund will request that any financial intermediary, agent or sub-contractor utilized by the Fund comply with substantially similar standards for non-disclosure and protection of Confidential Information and use the information provided by the Fund only for the performance of the specific service requested by the Fund;

(ii)    as required by regulatory authorities or law enforcement officials who have jurisdiction over the Fund or as otherwise required by any applicable law. In the event that the Fund is compelled to disclose Confidential Information, the Fund shall, if reasonably practicable and permitted by applicable law and regulations, provide prompt notice to the affected Limited Partners so that such Limited Partners may seek a protective order or other appropriate remedy. If no protective order or other appropriate remedy is obtained, then the Fund or the General Partner, as applicable, shall disclose information in compliance with applicable laws and regulations; or

(iii)    to the extent reasonably necessary to prevent fraud, unauthorized transactions or liability.

Employees of the Fund, the General Partner and their affiliates are permitted to disclose Confidential Information only to such other employees of the Fund, the General Partner or their affiliates who need to have access to such information to conduct the business of the Fund. Employees of the Fund, the General Partner and their affiliates are prohibited, both during and after termination of their employment, from (i) disclosing Confidential Information to any person or entity outside the Fund, including family members, except under the circumstances described above, and (ii) making unauthorized copies of any documents or files containing Confidential Information and, upon termination of their employment, must return all such documents to the Fund. Any employee of the Fund, the General Partner and their affiliates who violates the non-disclosure policy described above will be subject to disciplinary action, including possible discharge, whether or not he or she benefited from the disclosed information.

**Security of Confidential Personal Information.** The Fund restricts access to Confidential Information to those employees of the Fund, the General Partner and their affiliates who need to know such information to conduct the business of the Fund. Any conversations involving Confidential Information, if appropriate,

49

will be conducted by the General Partner's employees with care to avoid any unauthorized persons overhearing or intercepting such conversations.

**Enforcement and Review of Privacy Policy and Procedures.** The General Partner is responsible for reviewing, maintaining and enforcing this Privacy Policy and Procedures. The General Partner may take any disciplinary or other action as it may deem appropriate. The General Partner is also responsible for conducting appropriate employee training to ensure employee adherence to this Privacy Policy and Procedures.

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00077288

# GLOSSARY OF DEFINED TERMS

Accounting Period.................................4
Administrator ................................12
Adviser .......................................iii
Advisers Act .................................iii
ASC ...........................................26
Benefit Plan Investor(s)....................45
Bloomberg....................................30
Capital Account................................3
Ceiling Amount.................................6
CFCs..........................................36
CFTC .........................................iii
Closing(s) .....................................2
Code ..........................................19
Commodity Exchange Act..................iii
Confidential Information....................49
Covered Person(s) ..........................12
CPO ..........................................iii
Designated Illiquid Investments............7
Designated Reserve Account ...............7
DOL...........................................45
ECI ...........................................41
ERISA ........................................45
ERISA Plans.................................45
Excess Amount................................6
FATCA .......................................42
FINRA .......................................12
Fiscal Year ....................................8
Fund ..........................................iii
Fund Percentage ..............................8
General Partner ..............................iii
Global Plan Investor(s) ....................46
Infinity Q....................................iii
Infinity Q Diversified Alpha Fund ........2
Infinity Q Funds ............................26
Interests .....................................iii
Investment Company Act ..................iii
IRS.............................................4
Limited Partner...............................1
Losses........................................10

Management Fee ..............................3
Memorandum.................................iii
Models and Data ............................14
Net Capital Appreciation Depreciation....4
New Issue ....................................12
New Issue Account .........................12
NFA .....................................iii, 47
Non-U.S. Partners ..........................33
Offering......................................iii
Operating Expenses..........................8
Partners........................................1
Partnership Agreement.......................1
Partnership Representative..................20
Performance Allocation .....................3
PFIC ..........................................35
PFIC Reporting Regulations ...............41
Plan Asset Rules.............................45
Plan Assets...................................46
Plans..........................................45
Positions .....................................26
QEF ..........................................35
Recipient .....................................iii
Restricted Person(s) ........................12
SEC ...........................................iii
Securities Act ................................iii
SFM...........................................22
Tax-Exempt Partners........................33
Treasury Regulations .......................33
UBTI .........................................39
UDFI .........................................39
Valuation Committee .......................27
Valuation Date ..............................26
Valuation Policy.............................26
Wildcat ......................................11
Wildcat Clients..............................24
Withdrawal Date ..............................5
Year to Date Net Capital Appreciation
   (Depreciation) ..............................4

Confidential Treatment Requested by Infinity Q Capital Management, LLC          IQCM-SEC-00077289

**INFINITY Q VOLATILITY ALPHA FUND, L.P.**

**GENERAL PARTNER OF THE FUND AND INVESTMENT ADVISER**

**Infinity Q Capital Management, LLC**
888 7th Avenue, 37th Floor
New York, NY 10106

**ADMINISTRATOR OF THE FUND**

**US Bancorp Fund Services, LLC**
777 E Wisconsin Ave.
Milwaukee, WI 53202
Phone: (800) 300-3863

**LEGAL COUNSEL TO THE GENERAL PARTNER AND THE FUND**

**Kelly Hart & Hallman LLP**
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telephone: (817) 878-3535
Facsimile: (817) 878-9735

**AUDITOR**

**KPMG**
345 Park Ave.
New York, NY 10154
(212) 758-9700

**PRIME BROKER**

Citibank, N.A.
111 Wall Street
New York, New York 10005

**COMPLIANCE CONSULTANT**
Alaric Compliance Services

Confidential Treatment Requested by Infinity Q Capital Management, LLC