# EXHIBIT C

# CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

## Infinity Q Volatility Alpha Offshore Fund, Ltd.

(A Cayman Islands Exempted Company)

*Offering of Participating Shares*

July 1, 2018

INVESTMENT MANAGER:
Infinity Q Capital Management, LLC
888 7th Avenue, 37th Floor
New York, NY 10106

**PURSUANT TO AN EXEMPTION FROM THE U.S. COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH POOLS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PARTICIPANTS, AN OFFERING MEMORANDUM FOR THIS POOL IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE CFTC. THE CFTC DOES NOT PASS UPON THE MERITS OF PARTICIPATION IN A POOL OR UPON THE ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM. CONSEQUENTLY, THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY OFFERING MEMORANDUM FOR THIS POOL.**

2690089_1

**INFINITY Q VOLATILITY ALPHA OFFSHORE FUND, LTD.**
**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

## IMPORTANT NOTICES

This Confidential Private Offering Memorandum (this "<u>Memorandum</u>") is intended solely for the use of the person to whom it has been delivered by Infinity Q Volatility Alpha Offshore Fund, Ltd., a Cayman Islands exempted company (the "<u>Fund</u>"), for the purpose of enabling the recipient to evaluate an investment in the Fund, and it is not to be reproduced or distributed to any other persons (except to a prospective investor's professional advisors, managers, or authorized agents or representatives). Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Notwithstanding the foregoing, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax strategy, the tax treatment and the tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax strategy, tax treatment, or tax structure. For this purpose, tax strategy, tax treatment, and tax structure shall not include (i) the identity of the Fund, Infinity Q Capital Management, LLC ("<u>Infinity Q</u>"), the investment manager of the Fund (the "<u>Investment Manager</u>"), or any investor (or, in each case, any affiliate thereof), (ii) any specific pricing information or (iii) other nonpublic business or financial information (including, without limitation, the amount of any fees, expense, rates or payments) that is not relevant to an understanding of the tax strategy, tax treatment, or tax structure of the transactions contemplated by this Memorandum.

Prospective investors should not construe the contents of this document as legal, tax, ERISA (as defined below) or financial advice. Each prospective investor should consult its own professional advisors as to the legal, tax, financial, ERISA or other matters which may be relevant to the suitability and propriety of an investment in the Fund for such investor.

No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum. Prospective investors should not rely on any information not contained in this Memorandum.

This Memorandum supersedes all prior versions thereof (and all information prospective investors may have previously received from Infinity Q) and should be reviewed prior to making an investment decision.

Neither this Memorandum nor the shares of the Fund described herein for which prospective investors may subscribe (the "<u>Participating Shares</u>") have been qualified for offer, sale, or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities, and this Memorandum shall not constitute an offer to sell or a solicitation of an offer to buy nor shall there be any sale of such Participating Shares in any jurisdiction in which such offer, solicitation, or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation, or sale.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                IQCM-SEC-00072208

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Participating Shares have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

In each member state of the European Economic Area (each, a "Relevant Member State") that has implemented EU Directive 2011/61/EU on Alternative Investment Fund Managers (the "AIFM Directive"), the Fund may only be offered to investors in accordance with local measures implementing the AIFM Directive. Investors in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing the AIFM Directive may invest in the Fund, but only in circumstances where they do so at their own initiative.

Except as otherwise noted, all monetary amounts set forth herein are expressed in U.S. currency. All references herein to "$" refer to U.S. dollars.

The Participating Shares described in this Memorandum have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any of the states of the U.S., and the Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of such Participating Shares by U.S. Persons (within the meaning of Regulation S of the Securities Act) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited.

The Participating Shares are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Participating Shares is further restricted by the terms of this Memorandum and the Articles of the Fund (as defined below). Investors should be aware that they will be required to bear the financial risks of an investment in the Participating Shares for an extended period of time. The Participating Shares are offered subject to the right of the Board of Directors of the Fund (the "Board of Directors") or the Investment Manager, to reject any subscription in whole or in part.

The fund is a regulated mutual fund for the purposes of the Mutual Funds Law (2015 Revision) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to Section 4(3) of that Law and the prescribed details in respect of, and a copy of this Memorandum have been filed with the Cayman Islands Monetary Authority. Such registration does not imply that the Cayman Islands Monetary Authority or any other regulatory authority in the Cayman Islands has commented upon or approved the terms of this Memorandum or the offering of Participating Shares hereunder. For a summary of the continuing regulatory obligations of the Fund and a description of the regulatory power of the Cayman Islands Monetary Authority, see "General Comments" below.

Any information forwarded to the Fund by any prospective investor will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund in the normal course of business of the Fund or as required by the relevant regulatory authorities who have jurisdiction over the Fund or the Master Fund or as otherwise required by any applicable law (in particular, The

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                    IQCM-SEC-00072209

Confidential Information Disclosure Law, 2016 of the Cayman Islands), or to the extent reasonably necessary to prevent fraud, unauthorized transactions or liability, and each Shareholder, on subscribing for Participating Shares, shall be deemed to have consented to such release of such confidential information pursuant to the terms of The Confidential Information Disclosure Law, 2016 of the Cayman Islands. See "Privacy Policy and Procedures" below.

An investment in the Fund involves significant risks. Prospective investors should pay particular attention to the information in "*Principal Risks of Investing in the Fund*" and "*Conflicts of Interest*" below. Investment in the Participating Shares is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund. An investment in the Fund does not constitute a complete investment program, and is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or loss of their investment in the Fund. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital. Investors risk the loss of their entire investment in the Fund.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those described in "*Principal Risks of Investing in the Fund*" and "*Conflicts of Interest*" below, actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

All the information in this Memorandum is given as of the date of this Memorandum. No representation or warranty is made as to its accuracy after such date.

**FOR CAYMAN ISLANDS PROSPECTIVE INVESTORS:**

THE FUND MAY NOT MAKE AN INVITATION TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE PARTICIPATING SHARES UNLESS THE FUND IS LISTED ON THE CAYMAN ISLANDS STOCK EXCHANGE. "PUBLIC" FOR THESE PURPOSES SHALL HAVE THE SAME MEANING AS "PUBLIC IN THE ISLANDS," AS DEFINED IN THE MUTUAL FUNDS LAW (REVISED). HOWEVER, PARTICIPATING SHARES MAY BE BENEFICIALLY OWNED BY PERSONS RESIDENT, DOMICILED, ESTABLISHED, INCORPORATED OR REGISTERED PURSUANT TO THE LAWS OF THE CAYMAN ISLANDS. THE FUND, HOWEVER, WILL NOT UNDERTAKE BUSINESS WITH THE PUBLIC IN THE CAYMAN ISLANDS OTHER THAN SO FAR AS MAY BE NECESSARY FOR THE CARRYING ON OF THE BUSINESS OF THE COMPANY EXTERIOR TO THE ISLANDS.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072210

## SUMMARY OF FUND STRUCTURE AND INFORMATION REGARDING THE OFFERING

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE RISKS AND CONFLICTS OF INTEREST SET FORTH UNDER THE CAPTIONS "PRINCIPAL RISKS OF INVESTING IN THE FUND" AND "CONFLICTS OF INTEREST," ALONG WITH THE MORE DETAILED INFORMATION APPEARING ELSEWHERE IN THIS CONFIDENTIAL PRIVATE OFFERING MEMORANDUM (AS THE SAME MAY BE AMENDED, RESTATED, AND/OR SUPPLEMENTED FROM TIME TO TIME, THE "MEMORANDUM").**

Infinity Q Volatility Alpha Offshore Fund, Ltd., a Cayman Islands exempted company (the "Fund"), through an investment in Infinity Q Volatility Alpha Fund, L.P., a Delaware limited partnership (the "Master Fund"), seeks to gain exposure to volatility-based strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates and commodities markets. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time in both positive and negative environments for equities, fixed income and credit markets.

The Fund was formed on June 8, 2018. Infinity Q Capital Management, LLC, a Delaware limited liability company ("Infinity Q"), serves as the investment manager to the Fund (the "Investment Manager"), and it also acts as the investment manager of the Master Fund in its capacity as the Master Fund's general partner (the "Master Fund General Partner"). Infinity Q is an investment adviser registered with the U.S. Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended, and is registered as a commodity pool operator with the U.S. National Futures Association under the U.S. Commodity Exchange Act, as amended, pursuant to which it is regulated by the U.S. Commodity Futures Trading Commission.

The Fund expects to invest all or substantially all of its assets in the Master Fund. In doing so, the Fund will become a limited partner of the Master Fund (each limited partner of the Master Fund is a "Master Fund Limited Partner").

For purposes of this Memorandum, references to the Fund's investment objective and strategy, the Fund's risk factors, and conflicts of interest associated with an investment in the Fund generally will apply to any direct investments made by the Fund and to investments made by the Fund indirectly through the Master Fund or any other special purpose vehicle formed for the purpose of such investment. Except as otherwise provided herein or as the context requires, references to the "Fund" are deemed for purposes of this Memorandum to refer to the Fund and the Master Fund.

The minimum capital commitment to the Fund is $5,000,000, although the Board of Directors, subject to any requirements of the Cayman Islands Mutual Funds Law (as amended), may in its discretion accept investments in lesser amounts.

Infinity Q, as the Master Fund General Partner, is currently seeking to raise approximately $300 million for investments in the Master Fund, although Infinity Q, as the Master Fund General Partner, will have the right to accept a greater or lesser amount.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072211

While no minimum amount of subscriptions is required for this offering, no closing will occur unless the amount subscribed is sufficient, as determined in the sole discretion of the Board of Directors, in consultation with the Investment Manager, to support the operation of the Fund. The Board of Directors, in consultation with the Investment Manager, has the absolute right in its sole discretion to accept or reject any prospective investor's subscription, in whole or in part.

The Fund will accept subscriptions for participating shares ("Participating Shares") on the first day of each month. A shareholder of the Fund holding Participating Shares is referred to as a "Participating Shareholder", and a shareholder of the Fund holding Participating Shares or Management Shares (as defined below) is a "Shareholder."

For accounting purposes only, the Master Fund will maintain notional capital accounts with respect to each class and series of Participating Shares and actual capital accounts with respect to each class of interests in the Master Fund (each, a "Tracking Account").  Any changes in the value of a Tracking Account maintained with respect to any class and series of Participating Shares of the Fund will result in a corresponding adjustment to the net asset value of such class and series of Participating Shares.

Infinity Q, for its services as investment manager to the Master Fund, is entitled to management fees (the "Management Fee") equal to twelve and one-half (12.5) basis points (or 1.5% on an annual basis) multiplied by the aggregate balances of all Tracking Accounts of the Master Fund (excluding, for the purposes of determining the Management Fee, any portion of the Tracking Accounts of the Master Fund representing Infinity Q's (or any of its affiliates') general partner interests in the Master Fund) at the beginning of the first business day of each month (after taking into account any contributions to, and withdrawals or distributions from, and any allocations made to, such Tracking Accounts as of such time). The Management Fee with respect to any Master Fund Limited Partner or any Shareholder may be waived or reduced by Infinity Q, as the Master Fund General Partner, in its sole discretion with the agreement of the applicable Master Fund Limited Partner or Shareholder. In addition, as of the close of each fiscal year of the Master Fund and subject to the limitations described below, a performance allocation (a "Performance Allocation") is debited against each Tracking Account and simultaneously credited to the capital account of Infinity Q, as the Master Fund General Partner.  For a Master Fund Limited Partner or a Shareholder, the Performance Allocation shall mean, with respect to a fiscal year of the Master Fund, 15% of such Master Fund Limited Partner's or Shareholder's allocable share of the positive Year to Date Net Capital Appreciation (Depreciation) (as defined below) in the Master Fund, if any, that has not been offset as described below under "*Net Profit or Net Loss*."

Generally, subject to the Fund's creation of a "Designated Reserve Account" (as defined below) and the other limitations as described below, a Participating Shareholder is permitted to make redemptions from the Fund upon at least sixty (60) days' prior written notice to the Fund (subject to the discretion of the Board of Directors, in consultation with the Investment Manager, to waive such notice in its sole discretion). Any Participating Shares to be redeemed will remain invested in the Fund and subject to (i) the provisions of the Articles of Association of the Fund (the "Articles"); and (ii) as a result of the Fund's investment in the Master Fund, the provisions of the limited partnership agreement of the Master Fund (the "Partnership Agreement"), including, participating in the profits and losses of the Master Fund and being subject to all applicable fees and allocations of the Master Fund, until the effective date of the Fund's withdrawal from the Master Fund. The value of the Participating Shares to be redeemed as of the relevant

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072212

effective date of such redemption may differ substantially from the value of such Participating Shares on the date on which the notice of redemption is given.

The Board of Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Shareholder to waive or modify the terms applicable to such Shareholder's subscription for Participating Shares (including those relating to the Management Fee, the Performance Allocation, and redemption terms) without obtaining the consent of any other Shareholder; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Shareholders.

All persons receiving this Memorandum and the Confidential Private Placement Memorandum of the Master Fund (together, the "Memoranda," and each person receiving the Memoranda is a "Recipient") must treat the Memoranda as confidential and may not distribute them to any persons other than their professional advisors, managers, or authorized agents or representatives as needed to evaluate the Fund, the Master Fund, the interests in the Master Fund, and the Participating Shares. In accepting the Memoranda, the Recipient agrees:

      a.     Not to reproduce the Memoranda for distribution to any person, nor to discuss its contents with any person, other than the Recipient's professional advisors, managers, or authorized agents or representatives;

      b.     Not to consider receipt of the Memoranda as an offer to sell or the solicitation of an offer to buy in any jurisdiction where such offer or solicitation is unlawful; and

      c.     Not to rely on any information concerning the Fund or the Master Fund, or their respective businesses other than information contained in the Memoranda, the Partnership Agreement, the Articles, the Fund's Memorandum of Association, and other information provided in writing by the Fund, the Master Fund, or Infinity Q.

The distribution of this Memorandum and the offer and sale of the Participating Shares in certain jurisdictions may be restricted by law. This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy any Participating Shares in any jurisdiction in which such offer, solicitation or sale would be unlawful or to any person to whom it is unlawful to make such offer in such jurisdiction. No action has been or will be taken to permit a public offering in any jurisdiction where action would be required for that purpose. Accordingly, the Participating Shares may not be offered or sold, directly or indirectly, and this Memorandum may not be distributed, in any jurisdiction except in accordance with the legal requirements applicable in such jurisdiction. Participating Shares that are acquired by persons not entitled to hold them will be compulsorily redeemed.

Each prospective Participating Shareholder is invited to meet with a representative of Infinity Q to discuss with, ask questions of and receive answers from such representative concerning the Fund, the Participating Shares, the Master Fund, the interests in the Master Fund, and the terms and conditions of this offering. Inquiries should be directed to James Velissaris, Infinity Q Investor Relations, at (212) 468-5110.

Confidential Treatment Requested by Infinity Q Capital Management, LLC       IQCM-SEC-00072213

## **TABLE OF CONTENTS**

SUMMARY OF PRINCIPAL TERMS ................................................................................1

INVESTMENT PROGRAM AND POLICIES OF THE FUND.................................................22

PRINCIPAL RISKS OF INVESTING IN THE FUND.........................................................23

MANAGEMENT OF THE FUND ..................................................................................29

CONFLICTS OF INTEREST .......................................................................................31

VALUATION ............................................................................................................33

BROKERAGE AND CUSTODY ...................................................................................43

ADMINISTRATOR ...................................................................................................43

CERTAIN TAX CONSIDERATIONS.............................................................................44

ERISA AND RETIREMENT PLAN CONSIDERATIONS ..................................................51

EUROPEAN UNION SAVINGS DIRECTIVE .................................................................52

FISCAL YEAR AND FISCAL PERIODS; FINANCIAL STATEMENTS; AUDITORS ..................52

GENERAL COMMENTS............................................................................................53

PRIVACY POLICY AND PROCEDURES .......................................................................56

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00072214

## INFINITY Q VOLATILITY ALPHA OFFSHORE FUND, LTD.

---

### SUMMARY OF PRINCIPAL TERMS

---

The following is a summary of certain facts about Infinity Q Volatility Alpha Offshore Fund, Ltd., a Cayman Island exempted company (the "Fund"), and this offering (the "Offering"). It is qualified in its entirety by, and should be read in conjunction with, the full text of this Memorandum, the Articles of Association of the Fund (as the same may be amended, restated, and/or supplemented from time to time, the "Articles"), the Confidential Private Placement Memorandum of Infinity Q Volatility Alpha Fund, L.P., a Delaware limited partnership (the "Master Fund", and such Memorandum is the "Master Fund Memorandum"), and the limited partnership agreement of the Master Fund, attached as Appendix A to the Master Fund Memorandum (the "Partnership Agreement", and together with the Articles, the "Agreements")). Prospective investors should carefully consider the information referenced below under the headings "*Principal Risks of Investing in the Fund*" and "*Conflicts of Interest.*" Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreements. In the event of any discrepancy between this Memorandum and the Agreements, the Agreements will control.

**THIS MEMORANDUM DOES NOT PURPORT TO BE AND SHOULD NOT BE CONSTRUED AS A COMPLETE DESCRIPTION OF THE ARTICLES OR THE PARTNERSHIP AGREEMENT. ANY POTENTIAL INVESTOR IN THE FUND IS ENCOURAGED TO REVIEW THE ARTICLES, THE PARTNERSHIP AGREEMENT, AND THE MASTER FUND MEMORANDUM CAREFULLY, IN ADDITION TO CONSULTING APPROPRIATE LEGAL AND TAX COUNSELORS.**

| | |
|---|---|
| **The Fund** | The Fund is an exempted company incorporated with limited liability under the laws of the Cayman Islands. The Fund operates as a "feeder" fund in a master-feeder structure. Under the master-feeder structure, the Fund seeks to achieve its investment objective by investing all, or substantially all, of its assets in the Master Fund. |
| **The Master Fund** | The Master Fund is the master fund in the master-feeder structure in which the Fund is participating. For purposes of this Memorandum, references to the Fund's investment objective and strategy, risks, and conflicts of interest associated with an investment in the Fund generally will apply to any direct investments made by the Fund and to investments made indirectly by the Fund through the Master Fund or any other special purpose vehicle formed for the purpose of such investment, and except as otherwise provided herein, or as the context requires, references to the "Fund" are deemed to refer to the Fund and the Master Fund. |
| **Management of the Fund** | The board of directors of the Fund (the "Board of Directors"), currently consisting of three members (each, a "Director"), supervises the conduct of the Fund's affairs and has delegated the investment advisory activities of the Fund and the authority to |

1

Confidential Treatment Requested by Infinity Q Capital Management, LLC

make all investment decisions for the Fund to Infinity Q Capital Management, LLC, a Delaware limited liability company ("Infinity Q"), as the investment manager to the Fund (the "Investment Manager") pursuant to that certain Investment Management Agreement between the Fund, the Master Fund, and Infinity Q effective as of July 1, 2018 (the "Investment Management Agreement"). See "*Principal Risks of Investing in the Fund*" and "*Conflicts of Interest*" below. The Fund's Directors are subject to removal or replacement in accordance with Cayman Islands law and the Articles.

**Master Fund General Partner and Investment Manager of the Master Fund**

Infinity Q is the general partner of the Master Fund (the "Master Fund General Partner"), and it acts as the investment manager of the Master Fund in its capacity as the Master Fund General Partner. It is registered with the U.S. Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940, as amended, and is registered as a commodity pool operator with the National Futures Association under the Commodity Exchange Act, as amended, pursuant to which it is regulated by the Commodity Futures Trading Commission (the "CFTC"). It also acts as the investment adviser for Infinity Q Diversified Alpha Fund ("Infinity Q Diversified Alpha Fund"), a series of Trust for Advised Portfolios, a Delaware statutory trust that is a registered with the SEC as an open-end investment company under the Investment Company Act of 1940, as amended (the "Company Act"). Infinity Q Diversified Alpha Fund employs certain of the investment strategies and approaches to be employed by the Master Fund and will be engaging in these strategies at the same time as the Master Fund under the direction of the same investment professionals. See "*Conflicts of Interest*" below.

The Board of Directors may elect to modify the Fund's current master-feeder stricture or, in the future, utilize an alternative master-feeder structure similar to or different from the current structure; provided, however, that no such modification will be made unless the prior consent in writing of the holders of not less than two-thirds net asset value of the Participating Shares (as defined below) or with the approval of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares.

**Investment Strategy**

The Fund, through its investment in the Master Fund, seeks to gain exposure to volatility-based strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates and commodities markets. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time in both positive

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072216

and negative environments for equities, fixed income and credit markets. Infinity Q, as the Master Fund General Partner, may, in its sole discretion, allocate capital to additional strategies not mentioned in this Memorandum. See "*Investment Program and Policies of the Fund*" below. The Fund's investment program is speculative and entails substantial risks. There can be no assurance that the investment objective of the fund will be achieved, and results may vary substantially over time. Further, the practices of short selling, use of derivatives and other leveraged positions and limited diversification can, in certain circumstances, substantially magnify the impact of adverse market conditions on the Master Fund's (and, accordingly the Fund's) net asset value and performance.

**Authorized Share Capital**

The Fund has an authorized share capital of U.S. $50,000 divided into 4,990,000 redeemable, participating, non-voting shares of U.S. $0.01 par value each (the "Participating Shares", and a shareholder holding Participating Shares is a "Participating Shareholder") and 100 voting, non-participating management shares of U.S. $1.00 par value each (the "Management Shares", and together with the Participating Shares, the "Shares", and a shareholder holding Shares is a "Shareholder"). The Management Shares will be held by the Investment Manager. The Management Shares have the exclusive right to vote at general meetings of the Fund, but do not otherwise participate in the profits or assets of the Fund and, upon winding-up of the Fund, will be entitled only to a return of the par value of such Management Shares.

**Minimum Investment**

The minimum investment in the Fund is generally $5,000,000, although the Board of Directors, in consultation with the Investment Manager and subject to any restrictions pursuant to the Cayman Islands Mutual Funds Law (as amended), may in its discretion accept investments in lesser amounts. The normal minimum additional investment in the Participating Shares (as defined below) by a Participating Shareholder in the Fund is $500,000, although the Board of Directors reserves the right to accept additional investments of lesser amounts. The Board of Directors has not established any maximum amount of subscriptions that may be accepted.

No escrow account is used in processing subscriptions.

No interest is payable on monies received for subscriptions.

Where a subscription for Participating Shares is accepted, the Participating Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Participating Shares may not be entered in the Fund's register of Shareholders until after the relevant subscription date. The subscription monies paid by a subscriber

2690089_1

3

Confidential Treatment Requested by Infinity Q Capital Management, LLC

IQCM-SEC-00072217

for Participating Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

**Closings**

The Board of Directors, in consultation with the Investment Manager, may accept investments in the Participating Shares from existing Shareholders or from new Shareholders at any time. Once an investment is accepted, the investment date for such investment will be the first business day of the applicable calendar month (or at any other time as determined by, the Board of Directors, in consultation with the Investment Manager, in its sole discretion). At the time of any investment in any Participating Shares (i.e., upon receipt by the Fund of an executed subscription agreement (the "<u>Subscription Agreement</u>") and payment of the subscription amount (each, a "<u>Closing</u>")), the Board of Directors, in consultation with the Investment Manager, shall on behalf of the Board of Directors, determine the net fair market value of all of the Fund's assets in accordance with the valuation guidelines set forth in "*Valuation*" below immediately prior to the effective time of such Closing, and the Shareholder making such new investment will receive Participating Shares in the Fund (in addition to any other Participating Shares held by such Shareholder) equal to the ratio of such new investment in the Fund over the aggregate value of the Fund's total assets (including the value of such new investment).

The Participating Shares are offered subject to the right of the Board of Directors, in consultation with the Investment Manager, to reject any subscription in whole or in part.

**Classes of Interests**

The Fund is currently offering one class of Participating Shares pursuant to this Memorandum: Class A Participating Shares. The Board of Directors, in consultation with the Investment Manager, may in the future, without the consent of the Participating Shareholders, create new classes of Participating Shares which are subject to different terms (including, but not limited to, with respect to redemptions, management fees, and performance allocations). In addition, the Fund may issue sub-classes of each class, for example a sub-class of Participating Shares that generally do not participate or participate to a limited extent in investments by the Fund (through the Master Fund) in "New Issues" ("<u>New Issues</u>") as defined under the rules of the Financial Industry Regulatory Authority, Inc. ("<u>FINRA</u>").

Shares are offered in a separate series to each Shareholder on each subscription date (each, a "<u>Series</u>"). The Fund issues Participating Shares as a separate Series for the purposes, among others, of accounting for any profits and losses attributable to each individual Shareholder and of permitting the Performance Allocation (as defined below) at the Master Fund level to be calculated separately with respect to each Shareholder to reflect different returns achieved as a result of subscriptions received

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072218

from Shareholders at different times. Each separate Series of Participating Shares will be identified and referable to each Shareholder. The Fund may consolidate different Series or sub-Series of a Shareholder's Participating Shares with the same economic terms into a single Series or sub-Series, as applicable.

To comply with requirements under the U.S. Patriot Act or any other applicable laws, rules, or regulations, the Board of Directors, the Investment Manager, and/or the Administrator (as defined below) may require additional information as necessary (as provided in the subscription application materials, or as otherwise required.)

**Tracking Accounts**

For accounting purposes only, the Master Fund will maintain notional capital accounts with respect to each class and/or Series of Participating Shares of the Fund and actual capital accounts with respect to each class of interests in the Master Fund (each, a "Tracking Account").  Any changes in the value of a Tracking Account maintained with respect to any Series of Participating Shares of the Fund will result in a corresponding adjustment to the net asset value of such Series of Participating Shares.  Any direct income or expenses of the Fund are treated as if realized or borne by the Tracking Account maintained with respect to the Participating Shares to which such income or expenses correspond. Any additional expenses relating to the maintenance of Tracking Accounts on the Master Fund Level for Shareholders shall be borne by the Fund.

**Management Fee**

At the beginning of each month, the Master Fund will pay Infinity Q, for its services as investment manager to the Master Fund, a management fee (the "Management Fee") equal to twelve and one-half (12.5) basis points (or 1.5% on an annual basis) multiplied by the aggregate balances of all Tracking Accounts of the Master Fund, (excluding, for the purposes of determining the Management Fee, any portion of the Tracking Accounts of the Master Fund representing Infinity Q's (or any of its affiliates') general partner interests in the Master Fund), at the beginning of the first business day of such month (after taking into account any contributions to, and withdrawals or distributions from, and any allocations made to, such Tracking Accounts as of such time).

Subscription proceeds received after the first day of a month will incur Management Fees as if the subscription had been received on the first day of the month.

The Management Fee with respect to any Master Fund Limited Partner or any Shareholder may be waived or reduced by Infinity Q in its sole discretion with the agreement of the applicable Master Fund Limited Partner or Shareholder.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072219

| | |
|---|---|
| **Fiscal Year** | The fiscal year of each of the Fund and the Master Fund will end on December 31 of each year (the "Fiscal Year"). |
| **Performance Allocation** | As of the close of each Fiscal Year and subject to the limitations described below, a performance allocation (the "Performance Allocation", as defined below) is debited against each Tracking Account and simultaneously credited to the capital account of the Master Fund General Partner. The "Performance Allocation" shall mean, with respect to a Fiscal Year, 15% of a Master Fund Limited Partner's or a Shareholder's allocable share of the positive Year to Date Net Capital Appreciation (Depreciation) (as defined below) in the Master Fund, if any, that has not been offset as described below under "*Net Profit or Net Loss.*" |

Infinity Q, as the Master Fund General Partner, has no obligation to restore to the Master Fund any Performance Allocation previously allocated to it, notwithstanding a loss in a subsequent period. In the event a Shareholder, through a Tracking Account, with Year to Date Net Capital Depreciation that has not yet been offset redeems any portion of its Shares, the amount of such Year to Date Net Capital Depreciation will be reduced on a pro rata basis to reflect the reduction in the funds invested by such Shareholder.

The provisions in the Partnership Agreement relating to the Performance Allocation may be amended so that they conform to any applicable requirements of the SEC, the CFTC, the U.S. Internal Revenue Service (the "IRS") or any other regulatory authority, so long as any such amendment does not increase the Performance Allocation allocable from the Tracking Accounts as set forth herein.

The Performance Allocation with respect to any Master Fund Limited Partner or any Shareholder may be waived or altered by Infinity Q, as the Master Fund General Partner, in its sole discretion with the agreement of that Master Fund Limited Partner or that Shareholder, as applicable.

| | |
|---|---|
| **Affiliated Investors** | Infinity Q, as the Master Fund General Partner, and its affiliates made an initial commitment to the Fund's investment program through an investment in the Master Fund. Neither Infinity Q nor its affiliates bear a Management Fee or a Performance Allocation in connection with such investment but do share *pro rata* in all other applicable expenses. |
| **Net Profit or Net Loss** | Net profit or net loss (including realized and unrealized profit and loss) is allocated *pro rata* among the Shareholders, in accordance with the net asset value of each class or Series of Participating Shares as of the beginning of the applicable accounting period (after giving effect to contributions made and Management Fees payable as of such date), at the close of each month, at any other |

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072220

time when the Fund receives an additional capital contribution or effects a redemption or distribution, or at such other times as the Investment Manager may determine. Appreciation or depreciation in the net asset value of a Series of Participating Shares is based upon appreciation or depreciation in the Master Fund's portfolio, with appropriate adjustments for liabilities, the Fund's pro rata share of the Master Fund expenses, and any direct income or expenses of the Fund.

Profit and loss attributable to any Restricted New Issues (as described below) are determined and allocated among the Shareholders in accordance with rules of FINRA, as described further below.

The net profit or net loss for any month or other valuation period will reflect, with respect to all positions other than Restricted New Issues, (1) the dividends and interest accrued during the period, (2) the net realized gains or losses from the sale or other disposition of investments during the period, (3) the net change in the unrealized appreciation or depreciation of investments during the period (*i.e.*, the difference between the fair market value of each investment at the end of the period compared with either the fair market value at the commencement of the period or, in the case of any investment made after the commencement of the period, the cost), and (4) the expenses of the Master Fund and the Fund incurred or accrued during the period.

The calculations in (1)-(4) immediately above will reflect, to the extent applicable, activity in the Master Fund.

With respect to the Master Fund, on a monthly basis (and at any other interval determined by Infinity Q, as the Master Fund General Partner, in accordance with the Partnership Agreement, each period an "Accounting Period"), the Master Fund will allocate to the Tracking Account of each Master Fund Limited Partner and each Shareholder its share, by reference to Tracking Account Percentage (as defined below), of the Net Capital Appreciation (or Net Capital Depreciation) for such Accounting Period. Subject to the definitions set forth in the Partnership Agreement, the term "Net Capital Appreciation (Depreciation)" is the increase (decrease) in value of the Master Fund's net assets (including unrealized gains (losses)) for an Accounting Period (taking into account any accrued Management Fees and operating expenses for such Accounting Period). The term "Year to Date Net Capital Appreciation (Depreciation)" is the net amount of all Net Capital Appreciation (Depreciation) for a Fiscal Year (through the date of calculation). At the end of each Fiscal Year, Infinity Q, as the Master Fund General Partner, will determine each Master Fund Limited Partner's and each Shareholder's share of Year to Date Net Capital Appreciation (Depreciation). In the event a Master Fund Limited Partner or a Shareholder has Year to

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072221

Date Net Capital Depreciation for any Fiscal Year, such Year to Date Net Capital Depreciation will carry over to each subsequent Fiscal Year until such Year to Date Net Capital Depreciation has been offset with a like amount of Year to Date Net Capital Appreciation for subsequent Fiscal Years.

The term "<u>Tracking Account Percentage</u>" shall mean for each Master Fund Limited Partner and each Shareholder, a percentage which will be determined at the beginning of each Accounting Period, and will be the ratio, expressed as a percentage, of (i) the value of such Master Fund Limited Partner's capital account balance in the Master Fund or such Shareholder's Tracking Account balance in the Master Fund, as applicable, over (ii) the value of the capital accounts of all Master Fund Limited Partners (including the Fund).

|                     |                     |
|---------------------|---------------------|
| **Side Agreements** | The Fund may enter into side agreements with certain shareholders (i.e., agreements and arrangements with certain shareholders pursuant to which, among other things, the Fund would agree to waive or modify the terms applicable to such Shareholder's subscription for Participating Shares (including those relating to Management Fee, the Performance Allocation and redemption terms)). |
| **Eligible Investors** | Shares of the Fund are being offered to investors satisfying the following criteria: (i) It, he, or she is not a "U.S. Person" (within the meaning of Regulation S of the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>")); or (ii) it is a tax-exempt organization that is also (i) an "accredited investor," as defined in Rule 501(a) promulgated under the Securities Act; (ii) a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Company Act; and (iii) a "qualified eligible person" within the meaning of CFTC Rule 4.7. |
| | Shares of the Fund will not be registered under the Securities Act, any U.S. state "blue sky" laws, or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the U.S. (including its territories or possessions, and areas subject to its jurisdictions), or to or for the benefit of an investor that is not a U.S. Person, only in accordance with relevant laws of the jurisdiction where the offer is made, or (ii) within the U.S. or to a U.S. Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws. |
| **Distributions** | Subject to the redemption privilege described below, all earnings of the Fund are ordinarily retained for investment (other than in respect of redemptions or in the event of dissolution of the Fund.) |
| **Redemptions** | Generally, subject to the Fund's creation of a "Designated Reserve Account" (defined below) and the other limitations as |

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072222

described below, a Participating Shareholder may redeem all or any portion of their Participating Shares effective as of the last business day of each month (a "<u>Redemption Date</u>") upon at least sixty (60) days' prior written notice to the Board of Directors, in consultation with the Investment Manager, subject to the discretion of the Board of Directors to waive such notice in its sole discretion.

Any Participating Shares to be redeemed will remain invested in the Fund and subject to the provisions of the Articles (and, as applicable, through the Fund's investment in the Master Fund, subject to the Partnership Agreement), including participating in the profits and losses of the Fund and the Master Fund and being subject to all applicable fees and allocations, until the effective date of its, his, or her redemption. The value of the Participating Shares to be redeemed as of the relevant effective date of such redemption may differ substantially from the value of such Participating Shares on the date on which the notice of redemption is given.

It may be necessary that investment positions of the Fund or the Master Fund be liquidated to the extent necessary to effect Shareholder redemptions. Certain investment positions of the Fund or the Master Fund may be illiquid and the Fund or the Master Fund may not be readily able to dispose of such positions or assets, and in some cases may be contractually prohibited from disposing of such positions for a specified period of time. In addition, no market may exist for certain of the Fund's or the Master Fund's investments, or it may not be possible for Infinity Q, as the Master Fund General Partner (with respect to the Master Fund) or as the Investment Manager (with respect to the Fund) to obtain market quotations for such securities or investments. For any period in which it is not reasonably practicable for the Fund or the Master Fund to dispose of or value securities held by it for the reasons described above or if the liquidation of Fund assets or Master Fund assets may have adverse consequences to the other Shareholders or to other Master Fund Limited Partners, respectively, then (i) in the case of the Fund, the Board of Directors, may in such instances as set forth in the Fund's Articles and as set out herein suspend payments to a redeeming Shareholder; and (ii) in the case of the Master Fund, Infinity Q, as the Master Fund General Partner, may suspend payments to a withdrawing Master Fund Limited Partner. With respect to the Fund, the Board of Directors will take all reasonable steps to bring the suspension period, as applicable, to an end as soon as possible. With respect to the Master Fund, Infinity Q, as the Master Fund General Partner, will take all reasonable steps to bring the suspension period, as applicable, to an end as soon as possible.

All redemptions from the Fund will be subject to any laws, rules

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072223

or regulations imposed on the Fund, the Board of Directors, and the Investment Manager by any governmental or regulatory agency or other governing body to which they are subject. Payment of the redemption price to a Shareholder on redemption will be made in cash or, in the discretion of the Board of Directors, in securities (which may include short positions, as well as long positions) selected by the Board of Directors, in consultation with the Investment Manager, or partly in cash and partly in securities (which may include short positions, as well as long positions) selected by the Board of Directors.

The maximum amount that may be collectively redeemed by all Participating Shareholders and all Master Fund Limited Partners (excluding, for the purpose of this paragraph, the Fund) effective as of any applicable Redemption Date will be an amount equal to 1/12th (one-twelfth) of the net asset value of the Master Fund as of such Redemption Date (such amount, the "Ceiling Amount"). To the extent that the amount of the collective redemption and withdrawal requests from redeeming Participating Shareholders and the withdrawing Master Fund Limited Partners exceeds the Ceiling Amount, the amount of each redemption and withdrawal request shall be reduced on a pro rata basis among the Participating Shareholders and the Master Fund Limited Partners based on the ratio of their initial redemption and withdrawal requests so that the collective redemption and withdrawal requests equal the Ceiling Amount. The remainder of the amount of the collective redemption and withdrawal requests over the Ceiling Amount shall be the "Excess Amount." In the event a redeeming Participating Shareholder's and/or a withdrawing Master Fund Limited Partner's request is reduced as provided for in the preceding sentence, the Excess Amount from such request shall automatically be carried over as a request to redeem or to withdraw to be effective as of the next Redemption Date, unless such request is cancelled by the Participating Shareholder and/or the Master Fund Limited Partner, as applicable.

Unless otherwise agreed to by the Board of Directors, 90% of the amount due to a redeeming Shareholder will be paid as soon as practicable after the relevant Redemption Date (and based on unaudited data), but in any case within 15 Business Days (as defined below) after the relevant Redemption Date, with the remaining 10% (adjusted in accordance with the year-end audit), together with all interest earned thereon as described below, to be paid promptly following completion of the audit for that Fiscal Year. Amounts subject to such 10% hold-back will not be considered invested in the Fund and will bear interest at the rate applicable to direct investors in the Master Fund (as provided in the Partnership Agreement.)

A "Business Day" is any day on which the New York Stock Exchange is open for business.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072224

In connection with any partial redemption by a Participating Shareholder, the Board of Directors, in consultation with the Investment Manager, may require, in its sole discretion, the redeeming Participating Shareholder to redeem all of its Participating Shares in the Fund.

**Required Redemptions**

The Board of Directors may require, in its sole discretion, a Participating Shareholder to redeem all or any portion of its Participating Shares on 30 days' notice; provided, however, that such notice period may be shortened to 5 days' notice if such Participating Shareholder's continued ownership of any Participating Shares could, in the sole discretion of the Board of Directors give rise to regulatory, pecuniary, legal, tax or material administrative disadvantage for the Fund, its Shareholders, the Master Fund, or the Master Fund Limited Partners. In addition, the Board of Directors may cause a compulsory redemption during any period for which a suspension on the redemption of Shares has been declared.

**Distributions**

The Fund generally does not intend to make current distributions to Shareholders. All earnings of the Fund will normally be reinvested and the Fund will not ordinarily make distributions to its Shareholders.

**Designated Illiquid Investments**

Infinity Q, as the Master Fund General Partner, may, in its discretion, classify certain of the Master Fund's investments which are deemed by Infinity Q to be illiquid or the value of which is not readily or reliably ascertainable or which may have a relatively long-term investment horizon as "Master Fund Designated Illiquid Investments"; provided, however, that such Designated Illiquid Investments will not represent more than 25% of the net asset value of Master Fund's portfolio as of the date of creation or classification of the Master Fund Designated Illiquid Investments.

On the Fund level, the Board of Directors may, in their sole discretion, classify certain of the Fund's investments which are deemed by the Board of Directors or the Investment Manager to be illiquid or the value of which is not readily or reliably ascertainable or which may have a relatively long-term investment horizon (including without limitation investments through the Fund and the Master Fund in Master Fund Designated Illiquid Investments) as "Designated Illiquid Investments". Once so classified, Designated Illiquid Investments shall be represented by a separate class and/or Series of Participating Shares which, unless otherwise determined by the Board of Directors, shall be allotted only to those Shareholders who are holders of Participating Shares at the time of such designation. The gains and losses attributable to Designated Illiquid Investments shall be segregated and separately calculated

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072225

and attributed amongst Shareholders holding Shares of the relevant class or Series in such manner as is consistent with the relevant provisions of the this Memorandum. Participating Shares of any such separate class and/or Series may be issued by way of bonus or by way of conversion or exchange of all or part of a Shareholder's holding of Participating Shares of another class and/or Series. Similarly, Shares of a Designated Illiquid Investment class and/or Series may be converted or exchanged back into Participating Shares of the original class and/or Series upon the Board of Directors making a determination that the relevant investment no longer qualifies as a Designated Illiquid Investment. The power to convert or exchange Participating Shares of one class and/or Series into Participating Shares of another class and/or Series may be effected by the Board of Directors in any manner permitted by the Companies Law (2018 Revision) of the Cayman Islands and the Articles, including the compulsory redemption of Participating Shares of one class and/or Series and the application of the proceeds of redemption in subscribing for Participating Shares of the other class and/or Series or by redesignating a portion of the Participating Shares of any existing class and/or Series as thereafter belonging to a new class and/or Series. Shares of a class or Series of Shares which represent Designated Illiquid Investments shall not, unless the Board of Directors otherwise determines, be redeemable at the option of the Shareholders holding such Participating Shares. Where investments are classified as Designated Illiquid Investments and Participating Shares of a separate class and/or Series are issued by way of bonus, the requirement of these Articles to ensure proper value is transferred to the Separate Account of the Participating Shares of the original class and/or Series to which such investments were originally allocated shall not apply.

**Operating Expenses**

The Master Fund will bear all investment-related expenses (including, but not limited to, expenses of acquiring, managing, carrying and disposing of investments); professional fees and expenses (including legal, auditing and tax preparation expenses and expenses related to investment research) incurred in connection with the ongoing operations of the Master Fund, and any fees and expenses incurred in connection with any regulatory audit or investigation of the Master Fund and complying with applicable law. The cost of third-party service providers will be borne by the Master Fund to the extent the services provided relate to and support the Master Fund investment program and as permitted by applicable law and regulations. The Fund, as an investor in the Master Fund will bear its *pro rata* portion of the Master Fund's costs and expenses. Infinity Q will bear general administrative expenses as set forth in the Partnership Agreement.

The Fund will bear all investment-related expenses (including, but not limited to, expenses of acquiring, managing, carrying and

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072226

disposing of investments) of the Fund, as applicable; professional fees and expenses (including legal, auditing and tax preparation expenses and expenses related to investment research) incurred in connection with the ongoing operations of the Fund, as applicable, and any fees and expenses incurred in connection with any regulatory audit or investigation of the Fund, as applicable, and complying with applicable law. The cost of third-party service providers will be borne by the Fund to the extent the services provided relate to and support the Fund investment program, as applicable, and as permitted by applicable law and regulations. The Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

To the extent that expenses to be borne by the Master Fund are paid by Infinity Q, as the Master Fund General Partner, or to the extent that expenses to be borne by the Fund are paid by the Investment Manager, the Master Fund and the Fund, as applicable, will reimburse Infinity Q for such expenses.

The Fund does not have its own separate employees or office, and it does not reimburse the Investment Manager for salaries, office rent and other general overhead costs of the Investment Manager.

**Placement Fees**

No sales fees, placement fees, commissions or similar charges will be payable by any Participating Shareholder in the Fund in connection with the offering of the Participating Shares. The Investment Manager and/or its affiliates may become parties to arrangements with placement agents that call for payments by the Investment Manager and/or its affiliates to such placement agents based upon a percentage of the funds used to purchase Participating Shares by a Participating Shareholder referred to the Fund by such placement agents.

**Reports**

An unaudited balance sheet, income statement and general status report of the Master Fund's investments and activities during the applicable period will be provided to Shareholders within 60 days after the end of each of the first three quarters of any Fiscal Year. An audited balance sheet, statement of operations, statement of cash flows, statement of Shareholders' capital, statement of each Shareholder's Schedule of Shareholder's Capital (Net Assets), and audited financial statements of the Master Fund and the Fund prepared in accordance with GAAP will be provided to Shareholders within 90 days after the end of each Fiscal Year.

**Valuation**

The valuation of the Fund's assets is the responsibility of the Board of Directors, in consultation with the Investment Manager acting through the Valuation Committee (defined below) pursuant to the valuation policy of Infinity Q. See "*Valuation*" below.

To reflect the Master Fund's establishment of any designated

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072227

reserve accounts, appropriate reserves may be accrued and charged proportionately against the Participating Shares for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Investment Manager deems necessary or appropriate. The Investment Manager, may determine the amount of any such reserve (or any increase or decrease therein) that may be charged or credited, as appropriate, to the Participating Shares of those parties who are Shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties who were Shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the Investment Manager determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those parties who were Shareholders during any such prior period.

**Amendments**

The Articles may be amended by a special resolution of the holder of the Management Shares.  However, where a change to be made to the rights attached to any Class or Series of Shares is deemed to have a materially adverse effect on the holder of such Shares, the prior written consent in writing of the holders of not less than two-thirds Net Asset Value of such Shares, or with the approval of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares.

The Partnership Agreement may be modified or amended at any time with the written consent of Infinity Q, as the Master Fund General Partner, and the Master Fund Limited Partners having at least two-thirds of the partnership percentages of all Master Fund Limited Partners. Without the approval of any other Master Fund Limited Partner, however, Infinity Q, as the Master Fund General Partner, may amend the Partnership Agreement (i) to comply with applicable laws and regulations (provided that such amendment is made in a manner intended to minimize adverse effects on the Master Fund Limited Partners), (ii) to make changes authorized by the Partnership Agreement or  that do not adversely affect the rights or obligations of any Master Fund Limited Partner and that cure any ambiguity or correct or supplement any provision in the Partnership Agreement, (iii) to reflect changes in the membership of the Master Fund, the capital contributions of the Master Fund Limited Partners or the partnership percentages made in accordance with the Partnership Agreement, (iv) to reflect a change in the name of the Master Fund, (v) to make changes in connection with the admission of one or more new investors in the Master Fund (so long as such amendment is not, in the reasonable opinion of the Master Fund

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072228

General Partner, materially adverse to the Master Fund Limited Partners), (vi) to make a change which, in the judgment of Infinity Q, as the Master Fund General Partner, is necessary or advisable to qualify the Master Fund as a limited partnership for U.S. federal income tax purposes, (vii) to remove any obligation that action be taken by or on behalf of Infinity Q, as the Master Fund General Partner, or the Master Fund pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Delaware Code, Chapter 17, as may be amended from time to time, if the applicable provisions of such law are amended, modified or revoked so that the taking of such action is no longer required, or (viii) to prevent the Master Fund from being deemed an "investment company" under the Company Act. In no event will Infinity Q, as the Master Fund General Partner, be permitted to amend the Partnership Agreement to affect a Master Fund Limited Partner's capital account(s) in the Master Fund or rights of withdrawal without such Master Fund Limited Partner's consent or increase the Performance Allocation or Management Fees allocable from any capital account in the Master Fund, in each case without the written consent of the affected Master Fund Limited Partner.

**Transfers**

Participating Shares are not transferable except with the prior written consent of the Board of Directors, which consent may be withheld in their sole discretion.  The Board of Directors, in their sole discretion may require any transferee or assignee of any Shareholder to agree in writing in accordance with the Articles.

**Exculpation; Indemnification**

Pursuant to the Partnership Agreement, neither Infinity Q, as the Master Fund General Partner, its affiliates, nor any of their respective officers, directors, shareholders, members, partners, employees, representatives or agents, will be liable to the Master Fund or to any Master Fund Limited Partner, and the Master Fund will indemnify and defend each such person for any act or omission (including negligence) on its part, except for any act or omission that results in a loss arising from the fraud, willful misconduct or gross negligence on the part of such indemnitee, in connection with the business of the Master Fund. The Master Fund will also provide the Master Fund General Partner and its affiliates and their respective, officers, directors, stockholders, members, partners, employees, representatives and agents, and any other person who serves at the request of such entities or persons on behalf of the Master Fund as an officer, director, employee, representative or agent of any other entity, including specified persons from time to time named by the Master Fund General Partner as entitled to exculpation and indemnification by the Master Fund, against claims or lawsuits arising out of the Master Fund's activities that are broader than the protections that would apply in the absence of such provisions. In general, those persons and entities are to be held harmless and defended from any claims, losses, damages and other types of liabilities

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072229

("Losses") arising out of their activities involving the Fund and the Master Fund General Partner to the extent of the Master Fund General Partner's activities related to the Master Fund, except to the extent those Losses are found to have resulted from their fraud, gross negligence or willful misconduct. The Master Fund will also advance expenses, including legal fees, incurred by any indemnitee in connection with the defense of any claim, demand, action, suit or proceeding thereof prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the indemnitee to repay such amount if it is determined that the indemnitee is not entitled to be indemnified. The Master Fund General Partner may elect to have the Master Fund purchase, at the expense of the Master Fund, insurance to insure any indemnitee against liability for any breach or alleged breach of its fiduciary responsibilities. See "Investment Program of the Fund – Principal Risks of Investing in the Fund."

Infinity Q and its affiliates, including its partners, shareholders, members, managers, officers, directors, and controlling persons, as well as their employees and agents, have the benefit of the exculpation and indemnification provisions contained in the Investment Management Agreement.

In addition, Every Director and officer of the Fund (which for the avoidance of doubt, shall not include any auditor of the Fund), together with every former Director and former officer of the Fund (each a "Director and Officer-Related Indemnified Person") shall be indemnified out of the assets of the Fund against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud, willful default or Gross Negligence (as defined below). No Director and Officer-Related Indemnified Person shall be liable to the Fund for any loss or damage incurred by the Fund as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud, willful default or Gross Negligence of such Director and Officer-Related Indemnified Person. No person shall be found to have committed actual fraud, willful default or Gross Negligence under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

For this purpose, "Gross Negligence" in relation to a person means a standard of conduct beyond negligence whereby that person acts with reckless disregard for the consequences of a breach of a duty of care owed to another.

The Fund shall advance to each Director and Officer-Related Indemnified Person reasonable attorneys' fees and other costs and

Confidential Treatment Requested by Infinity Q Capital Management, LLC    IQCM-SEC-00072230

expenses incurred in connection with the defense of any action, suit, proceeding or investigation involving such Director and Officer-Related Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Director and Officer-Related Indemnified Person shall execute an undertaking to repay the advanced amount to the Fund if it shall be determined by final judgment or other final adjudication that such Director and Officer-Related Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Director and Officer-Related Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Fund (without interest) by the Director and Officer-Related Indemnified Person.

The Board of Directors, on behalf of the Fund, may purchase and maintain insurance for the benefit of any Director or other officer of the Fund against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Fund.

Pursuant to the foregoing provisions, the Fund may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Fund to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Board of Directors shall, in its absolute discretion, determine. Any such indemnification and exculpation provisions may be specified to a standard equal to or more favorable (but not less favorable) to the Fund than any standard specified in the Articles.

**Risk Factors; Conflicts of Interest**

An investment in the Fund is speculative and involves substantial risks. An investment in the Fund should be considered illiquid. The Fund's returns, if any, may be volatile. Investment in securities outside the U.S. involves certain risks which do not apply to investment in securities in the U.S., and investment in emerging markets involves even greater risks. Prospective investors should review carefully the discussion under the caption "*Principal Risks of Investing in the Fund*" contained herein. Infinity Q and the Investment Professionals (as defined below), in addition to advising the Master Fund and the Fund, also advise Infinity Q Diversified Alpha Fund. Generally, investments in which both the Master Fund (and, accordingly, the Fund) and Infinity Q Diversified Alpha Fund participate will be allocated between the Master Fund and Infinity Q Diversified Alpha Fund pro rata according to available capital. In managing the assets of the Master Fund and Infinity Q Diversified Alpha Fund, however, the Investment Professionals have discretion in the allocation of

Confidential Treatment Requested by Infinity Q Capital Management, LLC                               IQCM-SEC-00072231

investments between the Master Fund and Infinity Q Diversified Alpha Fund. The Investment Professionals are not required to split opportunities between the Master Fund and Infinity Q Diversified Alpha Fund in any manner. In determining the allocation of investments between the Master Fund and Infinity Q Diversified Alpha Fund, certain conflicts of interest may arise. In addition, certain inherent conflicts of interest arise from the fact that the Investment Professionals are also associated with Wildcat Capital Management, LLC ("Wildcat"), an SEC-registered investment adviser that carries on investment advisory activities for other clients to a variety of different clients, including ultra-high net worth individuals, limited partnerships, limited liability companies, trusts, charitable organizations and other entities and accounts in which the Master Fund (or the Fund) will have no interest. Future investment activities by Infinity Q or its affiliates, including the establishment of other investment funds, may give rise to additional conflicts of interest. See "*Conflicts of Interest*" below.

**Dissolution of the Fund**

Dissolution of the Fund may occur on the passage of a resolution by the Board of Directors, in consultation with the Investment Manager. Upon the occurrence of such event, the Investment Manager (or the Board of Directors or such other person as may be appointed by the Board of Directors, if the Investment Manager is unable to perform this function) is charged with winding up the affairs of the Fund, liquidating its assets to the extent feasible and making liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with the net asset value of each Shareholder's Participating Shares.

**New Issues Trading**

The Master Fund may at times participate in an initial public offering of a New Issue. Because member firms of FINRA are not permitted to sell a New Issue to certain persons ("Restricted Persons"), the Fund has established a special securities trading account (the "New Issue Account") that is authorized to participate in a New Issue in which only Tracking Accounts established for Master Fund Limited Partners or Shareholders that are not Restricted Persons may participate (as compared to investments held in the Master Fund's regular accounts, in which all Tracking Accounts will have an interest). Interest will be charged on monies of the Master Fund used to purchase a New Issue, and each Tracking Account participating in New Issue profits and losses will be charged its proportionate share of such interest in accordance with its Tracking Account Percentage. Each Master Fund Limited Partner and each Shareholder must certify to the satisfaction of Infinity Q that it is not a Restricted Person prior to participating in any New Issue profits and losses. Any Master Fund Limited Partner and any Shareholder who fails to provide Infinity Q with such certification and/or opinion shall be deemed a Restricted Person and shall not be permitted to

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072232

participate in New Issue profits and losses.

In addition to the prohibition on the sale of New Issues to Restricted Persons, FINRA's "spinning" rule prohibits FINRA member firms from "spinning" or allocating New Issues to an account if the beneficial interests of certain persons ("Covered Persons") from a particular company exceed 25% of such account. In light of this rule, each Master Fund Limited Partner and each Shareholder must also certify to the satisfaction of Infinity Q as to whether it is a Covered Person (and, if so, certify as to certain additional information) prior to participating in any New Issue profits and losses.

Each Master Fund Limited Partner and each Shareholder that participates in New Issue profits and losses will be requested by Infinity Q from time to time (but in all cases at least once every 12 months) to update its certification that it is not a Restricted Person and its certification as to whether it is a Covered Person. In the event that it is unable to provide Infinity Q with an update to such certifications, it will be prohibited from future participation in New Issue profits and losses.

| | |
|---|---|
| **Tax Status** | See "CERTAIN TAX CONSIDERATIONS" below |
| **ERISA** | Infinity Q intends to limit the amount of investments by employee benefit plans so that the assets of the Master Fund and the Fund (collectively or individually) will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). (See "ERISA AND RETIREMENT PLAN CONSIDERATIONS" below.) |
| **Fund Administrator** | The Fund has entered into an administration agreement with US Bancorp Fund Services, Ltd. (the "Administrator"). The Administrator is responsible for, among other things, the calculation of the net asset value of the Fund based on information provided by Infinity Q. The Administrator will prepare and issue periodic statements for individual investors based upon the calculation of the net asset value of the Fund performed by the Administrator. |
| | The Fund has also engaged the Administrator to perform certain investor services functions for the Fund, including processing requests for subscriptions to and redemptions from the Fund, handling administrative inquiries about the Fund and providing certain anti-money laundering services to the Fund. |
| | The Fund may replace such administrator in the Board of Directors' sole discretion without prior notice to the Shareholders. |
| **Auditor** | EisnerAmper serves as auditor to the Fund.   The Fund may |

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072233

replace such auditor in the Board of Directors' sole discretion without prior notice to the Shareholders.

**Legal Counsel**

Kelly Hart & Hallman LLP ("Kelly Hart") serves as U.S. counsel to the Fund, the Master Fund, Infinity Q (including without limitation as the Master Fund General Partner and the Investment Manager), and the Investment Professionals, and with respect to all of the foregoing, certain of their affiliates (the "Clients") in connection with the operations of the Fund, the Master Fund, and certain other Clients, the offering of interests in the Master Fund, the offering of Participating Shares, as well as certain other matters for which the Clients may engage Kelly Hart from time to time. Kelly Hart disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or their governing documents. In acting as counsel to the Clients, Kelly Hart has not represented and will not represent any Master Fund Limited Partners or Participating Shareholders who are not Clients, nor does it purport to represent their interests. No independent counsel has been retained to represent the Participating Shareholders. In assisting in the preparation of this Memorandum, Kelly Hart has relied on information provided by the Clients and certain of the Fund's and the Master Fund's service providers (including, without limitation, the Investment Professionals' biographical data, and the investment strategy of the Master Fund and the Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund. In connection with the Fund's offering of Shares and subsequent advice to the Fund, Maples and Calder will not be representing Shareholders. No independent legal counsel has been retained to represent the Shareholders. Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of Shareholders may differ from those of the Fund. Maples and Calder does not represent the Shareholders' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon

Confidential Treatment Requested by Infinity Q Capital Management, LLC                          IQCM-SEC-00072234

information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072235

**CAPITALIZED TERMS USED BUT NOT DEFINED BELOW SHALL HAVE THE MEANINGS ASCRIBED TO SUCH TERMS IN THE "SUMMARY OF PRINCIPAL TERMS" ABOVE.**

## INVESTMENT PROGRAM AND POLICIES OF THE FUND

**Principal Investment Strategies of the Fund**

The Fund, through its investment in the Master Fund, seeks to gain exposure to volatility-based strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates and commodities markets. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time in both positive and negative environments for equities, fixed income and credit markets. Infinity Q, as the Master Fund General Partner, in its capacity as the investment adviser of the Master Fund, may, in its sole discretion, allocate capital to additional strategies not mentioned in this Memorandum.

The Master Fund implements these strategies by investing globally (including in emerging markets) either directly in, or through total return swaps on, a broad range of instruments, including, but not limited to, equities, bonds (including but not limited to high-yield or "junk" bonds), currencies, credit derivatives, convertible securities, futures, forwards, options, including complex options such as barrier options, and swaps. The Master Fund has no limits with respect to the credit rating, maturity or duration of the debt securities in which it may invest.

Infinity Q, as the Master Fund General Partner, relies heavily on proprietary quantitative models and information as well as data supplied by third parties ("Models and Data"). Models and Data are used to construct sets of transactions and investments, to provide risk management insights and to assist in hedging the Master Fund's investments. In most cases, the Master Fund's quantitative models are the determinative factor in making investment decisions. In some cases, at the portfolio manager's discretion, market risk exposure may be reduced through hedging.

The Master Fund is generally intended to have a low average correlation and beta to the equity, fixed income and credit markets. Beta is a measure of the systematic risk of a security or portfolio in comparison to the market as a whole. The excess return generated by the Master Fund beyond the return attributable to equity, fixed income and credit markets is alpha. The Master Fund generally intends to generate the majority of its performance through alpha. Infinity Q, as the Master Fund General Partner, will attempt to mitigate risk associated with an investment in the Master Fund through diversification of the Master Fund's holdings and through active monitoring of volatility, counterparties and other risk measures of the Master Fund. There is no assurance, however, that the Master Fund or the Fund will achieve its investment objective.

As discussed above, the Master Fund (and the Fund, through its investment in the Master Fund) provides exposure to volatility strategies through a single portfolio approach. The Master Fund currently intends to have exposure to these strategies; however, the Master Fund may vary its level of allocation (and, accordingly, the Fund's level of allocation) among these strategies depending on market conditions, including reducing its (and, accordingly, the Fund's) exposure to any strategy to zero. The Master Fund may add additional strategies from time to time, but currently pursues its investment objective by the primary strategies discussed in greater detail below:

The Master Fund makes investments in volatility strategies that provide long and short exposure to a diversified portfolio of derivatives across equities, currencies, credit, interest rates and FX markets. The main types of volatility strategies the Master Fund will employ include: volatility long/short, volatility surface arbitrage, mean reversion and correlation. The Master Fund invests long positions in derivatives it

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072236

expects to increase in value and short sells derivatives it expects to decrease in value. Derivatives are instruments that derive their value from the performance of an underlying security or index. These instruments include options, variance swaps, correlation swaps, dispersion swaps, credit default swaps, swaptions and total return swaps.

## PRINCIPAL RISKS OF INVESTING IN THE FUND

Losing all or a portion of your investment is a risk of investing in the Fund. The following discussion of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Participating Shares. Prospective investors should read this entire Memorandum and the Partnership Agreement and consult with their own legal, tax and financial advisers before deciding whether to invest in the Participating Shares.

The following risks could affect the value of your investment:

- **Alternative Strategies Risk.** The Master Fund's employing of alternative strategies raises the risk that anticipated opportunities do not play out as planned, resulting in potentially reduced returns or losses to the Master Fund (and, accordingly, the Fund.)

- **Barrier Options Risk.** Barrier options are similar to standard options except that they become activated or are extinguished when the underlying asset reaches a predetermined level or barrier. This type of option allows the buyer of the option to set the position of the barrier, the length of time until expiration and the payout to be received once the barrier is broken. If Infinity Q, as the Master Fund General Partner, sets too high or too low a barrier, and the option is either extinguished or the options are never activated the benefits to the Master Fund (and, accordingly, the Fund) of using a barrier option strategy may be limited and the costs associated with a barrier option strategy could be detrimental to the Master Fund's (and, accordingly, the Fund's) performance.

- **Volatility Risk.** The Master Fund may have investments that appreciate or depreciate significantly in value over short periods of time. This may cause the Master Fund's net asset value (and, accordingly, the Fund's net asset value) to experience significant increases or declines in value over short periods of time.

- **Common Stock Risk.** Common stocks are subject to greater fluctuations in market value than certain other asset classes as a result of such factors as an issuer's business performance, investor perceptions, stock market trends and general economic conditions.

- **Counterparty Risk.** In general, a derivative contract typically involves leverage, i.e., it provides exposure to potential gain or loss from a change in the level of the market price of a security, currency or commodity (or a basket or index) in a notional amount that exceeds the amount of cash or assets required to establish or maintain the derivative contract. Many of these derivative contracts, including options and swaps, will be privately negotiated in the over-the-counter market. Transactions by the Master Fund involving a counterparty are subject to the risk that the counterparty or a third party will not fulfill its obligation to the Master Fund. Counterparty risk may arise because of the counterparty's financial condition (i.e., financial difficulties, bankruptcy or insolvency), market activities and developments or other reasons, whether foreseen or not. A counterparty's inability to fulfill its obligation may result in significant financial loss to the Master Fund (and, accordingly, the Fund).

- **Credit Default Swap Agreement Risk.** The Master Fund may enter into credit default swap agreements as a "buyer" or "seller" of credit protection on liquid credit indices. In instances where the

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                          IQCM-SEC-00072237

Master Fund is a protection seller (receives a periodic fee over the life of the contract in return for the obligation to compensate the protection buyer for loss), the Master Fund (and, accordingly, the Fund) will assume the risks associated with credit deterioration (spread widening) as well as default risk. In the event of default, the Master Fund is obligated to pay the buyer of credit protection the notional value of the swap less the recovery rate on the reference asset. Credit default swaps may be illiquid and difficult to value, and they increase credit risk as the Master Fund (and, accordingly, the Fund) has exposure to both the issuer whose credit is the subject of the swap and the counterparty to the swap.

- **Credit Risk.** Credit risk refers to the possibility that the issuer of a security or the issuer of the reference asset of a derivative instrument will not be able to make principal and interest payments when due. Changes in an issuer's credit rating or the market's perception of an issuer's creditworthiness may also affect the value of the Master Fund's investment in that issuer. Securities rated in the four highest categories by the rating agencies are considered investment grade but they may also have some speculative characteristics. Investment grade ratings do not guarantee that bonds will not lose value.

- **Currency Risk.** Currency risk is the risk that changes in currency exchange rates will negatively affect securities denominated in, and/or receiving revenues in, non-U.S. currencies. The liquidity and trading value of non-U.S. currencies could be affected by global economic factors, such as inflation, interest rate levels and trade balances among countries, as well as the actions of sovereign governments and central banks. Adverse changes in currency exchange rates (relative to the U.S. dollar) may erode or reverse any potential gains from the Master Fund's investments in securities denominated in a non-U.S. currency or may widen existing losses. The Master Fund's net currency positions may expose it (and, accordingly, the Fund) to risks independent of its securities positions.

- **Derivatives Risk.** Infinity Q, as the Master Fund General Partner, may make use of futures, forwards, options, swaps and other forms of derivative instruments. The use of derivative instruments exposes the Master Fund (and, accordingly, the Fund) to additional risks and transaction costs. These instruments come in many varieties and have a wide range of potential risks and rewards, and may include futures contracts, options (both written and purchased), swaps and forward currency exchange contracts. A risk of the Master Fund's use of derivatives is that the fluctuations in their values may not correlate perfectly with the overall securities markets. Additionally, to the extent the Master Fund is required to segregate or "set aside" (often referred to as "asset segregation") liquid assets or otherwise cover open positions with respect to certain derivative instruments, the Master Fund may be required to sell portfolio investments to meet these asset segregation requirements. There is a possibility that segregation involving a large percentage of the Master Fund's assets could impede portfolio management or the Master Fund's ability (and, accordingly, the Fund's ability) to meet redemption requests or other current obligations.

- **Emerging Market Risk.** The Fund, through its investment in the Master Fund, intends to have exposure to emerging markets. Emerging markets are riskier than more developed markets because they tend to develop unevenly and may never fully develop. Investments in emerging markets may be considered speculative. Emerging markets are more likely to experience hyperinflation and currency devaluations, which adversely affect returns to U.S. investors. In addition, many emerging securities markets have far lower trading volumes and less liquidity than developed markets.

- **Non-U.S. Investments Risk.** Non-U.S. investments often involve special risks not present in U.S. investments that can increase the chances that the Master Fund (and, accordingly, the Fund) will lose money. These risks include:

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072238

o The Master Fund generally holds its non-U.S. securities and non USD cash in non-U.S. banks and securities depositories, which may be recently organized or new to the non-U.S. custody business and may be subject to only limited or no regulatory oversight.

o Changes in non-U.S. currency exchange rates can affect the value of the Master Fund's (and, accordingly, the Fund's) portfolio.

o The economies of certain non-U.S. markets may not compare favorably with the economy of the U.S. with respect to such issues as growth of gross national product, reinvestment of capital, resources and balance of payments position.

o The governments of certain countries may prohibit or impose substantial restrictions on non-U.S. investments in their capital markets or in certain industries.

o Many non-U.S. governments do not supervise and regulate stock exchanges, brokers and the sale of securities to the same extent as the U.S. and may not have laws to protect investors that are comparable to U.S. securities laws.

o Settlement and clearance procedures in certain non-U.S. markets may result in delays in payment for, or delivery of, securities not typically associated with settlement and clearance of U.S. investments.

- **Forward and Futures Contract Risk.** The successful use of forward and futures contracts draws upon the skill and experience of Infinity Q, as the Master Fund General Partner, with respect to such instruments and is subject to special risk considerations. The primary risks associated with the use of futures contracts are (i) the imperfect correlation between the change in market value of the instruments held by the Master Fund and the price of the forward or futures contract; (ii) possible lack of a liquid secondary market for a forward or futures contract and the resulting inability to close a forward or futures contract when desired; (iii) losses caused by unanticipated market movements, which are potentially unlimited; (iv) the inability of Infinity Q, as the Master Fund General Partner, to predict correctly the direction of securities prices, interest rates, currency exchange rates and other economic factors; (v) the possibility that the counterparty will default in the performance of its obligations; and (vi) if the Master Fund has insufficient cash, it may have to sell securities from its portfolio to meet daily variation margin requirements, and the Master Fund may have to sell securities at a time when it may be disadvantageous to do so.

- **High-Yield Securities Risk.** Fixed income securities that are rated below investment grade (i.e., "junk bonds") are subject to additional risk factors due to the speculative nature of these securities, such as increased possibility of default liquidation of the security, and changes in value based on public perception of the issuer.

- **Interest Rate Risk.** Interest rate risk is the risk that prices of fixed income securities generally increase when interest rates decline and decrease when interest rates increase. The Master Fund (and, accordingly, the Fund) may lose money if short term or long term interest rates rise sharply or otherwise change in a manner not anticipated by Infinity Q, as the Master Fund General Partner.

- **Investment in Other Investment Companies Risk.** As with other investments, investments in other investment companies are subject to market and selection risk. In addition, if the Master Fund acquires shares of investment companies, Master Fund Limited Partners (including the Fund) bear both their

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                     IQCM-SEC-00072239

proportionate share of expenses in the Master Fund (including management and advisory fees) and, indirectly, the expenses of the investment companies.

- **Leverage Risk.** As part of the Master Fund's principal investment strategy, the Master Fund will make investments in futures contracts, forward contracts, options, swaps and other derivative instruments. These derivatives instruments provide the economic effect of financial leverage by creating additional investment exposure as well as the potential for greater loss. If the Master Fund uses leverage through entering into short sales or purchasing derivative instruments, the Master Fund (and, accordingly, the Fund) has the risk of losing more than its original investment. The net asset value of a fund employing leverage will be more volatile and sensitive to market movements. Leverage may involve the creation of a liability that requires the Master Fund to pay interest.

- **Manager Risk.** If Infinity Q, as the Master Fund General Partner, in its capacity as the investment manager of the Master Fund, makes poor investment decisions, it will negatively affect the Master Fund's (and, accordingly, the Fund's) investment performance. In addition, if the managers of portfolio companies in which the Master Fund invests make poor investment decisions, it will negatively affect the Master Fund's (and, accordingly, the Fund's) investment performance.

- **Market Risk.** Market risk is the risk that the markets on which the Master Fund's investments trade will increase or decrease in value. Prices may fluctuate widely over short or extended periods in response to issuer, market or economic news. Markets also tend to move in cycles, with periods of rising and falling prices. If there is a general decline in the securities and other markets, your investment in the Fund may lose value, regardless of the individual results of the securities and other instruments in which the Master Fund invests.

- **Models and Data Risk.** When Models and Data prove to be incorrect or incomplete, any decisions made in reliance thereon expose the Master Fund (and, accordingly, the Fund) to potential loss.

- **New Fund Risk**. The Master Fund is relatively new with a short operating history, and the Fund has no operating history. There can be no assurance that the Master Fund and/or the Fund will grow to maintain an economically viable size, in which case Infinity Q, as the Master Fund General Partner, may determine to liquidate the Master Fund; and/or the Board of Directors, in consultation with the Investment Manager may determine to liquidate the Fund.

- **Redemption Restrictions**. There are restrictions on redemptions from the Fund (which may be settled in securities rather than cash) and on transfers of Participating Shares. Participating Shares are not transferable except with the prior written consent of the Board of Directors, which consent may be withheld in their sole discretion. Because of the restrictions on redemptions and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. A subscription for Participating Shares should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

- **Short Sale Risk.** The Master Fund enters into a short sale by selling a security it has borrowed (typically from a broker or other institution). If the market price of a security increases after the Master Fund borrows the security, the Master Fund (and, accordingly, the Fund) will suffer a (potentially unlimited) loss when it replaces the borrowed security at the higher price. In certain cases, purchasing a security to cover a short position can itself cause the price of the security to rise further, thereby exacerbating the loss. In addition, the Master Fund may not always be able to borrow the security at a particular time or at an acceptable price. The Master Fund may also take a short position in a derivative instrument, such as a future, forward or swap. A short position on a derivative instrument involves the

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                   IQCM-SEC-00072240

risk of a theoretically unlimited increase in the value of the underlying security or instrument. Short sales also involve transaction and other costs that will reduce potential Master Fund (and, accordingly, Fund) gains and increase potential Master Fund (and, accordingly, Fund) losses.

- **High Portfolio Turnover Risk**. To the extent that the Master Fund makes investments on a shorter-term basis (including in derivative instruments and instruments with remaining maturities of one year or less) the Master Fund may as a result trade more frequently and incur higher levels of brokerage fees and commissions, and cause higher levels of current tax liability to the Master Fund Limited Partners, as applicable.

- **U.S. Tax Considerations.** Neither the Master Fund, the Fund, Infinity Q, nor the Board of Directors has sought, or expects to seek, a ruling from the U.S. Internal Revenue Service (the "IRS") or any similar U.S. state, or U.S. local authority with respect to any of the tax issues affecting Shareholders or the Fund, nor has any of them obtained an opinion of counsel with respect to any U.S. federal, U.S. state, or U.S. local or non-U.S. tax issues.  No representation or warranty of any kind is made by the Master Fund, the Fund, Infinity Q, or the Board of Directors with respect to the U.S. federal income tax consequences relating to an investment in the Fund.

  The Fund intends to conduct its activities in a manner such that it should be considered to be trading securities in the U.S. for its own account and, therefore, it should be treated as engaged in a trade or business within the U.S. Accordingly, and assuming that the Fund is not considered engaged in a trade or business in the U.S., the Fund should not be subject to U.S. income tax or withholding taxes in respect of capital gain (except to the extent, if any, that such gains are attributable to investments in securities that constitute U.S. real property interests or otherwise are attributable to income or gain that is treated as effectively connected with the conduct of a trade or business in the U.S.)  However, there can be no assurance that all of the Fund's activities will not constitute a U.S. trade or business. Accordingly, certain of the Fund's activities may be determined to constitute a U.S. trade or business, in which case the Fund could be subject to U.S. income and branch profits tax on its share of the income and gain from those activities and related activities, if any.  The Master Fund and/or the Fund may be subject to U.S. withholding taxes in respect of U.S. source dividends, substitute dividends, dividend equivalents and, in certain circumstances, interest or other income (e.g., under the Foreign Account Tax Compliance Act (including, without limitation, all relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Treasury Regulations promulgated thereunder, and as amended from time to time, "FATCA"), which was enacted in 2010 as part of the Hiring Incentives to Restore Employment Act (as amended from time to time, the "HIRE Act"), or other parts of the HIRE Act and/or other prevailing laws, rules and/or regulations). In particular, the Master Fund is subject to U.S. withholding taxes in respect of U.S. source dividends and interest allocable to the Fund, and the Fund's capital account in the Master Fund (and the Participating Shareholders' Tracking Accounts in the Master Fund) will be debited (as allowable) in the amount of such withholding taxes.

- **Uncertainty of Certain Tax Positions; Risk of Audit; Determination of Master Fund Items as the Master Fund Level**. The Master Fund will be required to file tax returns with the IRS, and may be required to file tax returns or make other filings in other jurisdictions. The Fund may take positions with respect to certain tax issues that may be challenged by the IRS or other tax authorities. Certain positions taken by the Master Fund may depend on legal conclusions not yet resolved by the relevant tax authorities or courts. The tax returns or other filings made by the Master Fund may be audited, and adjustments may be made to such returns as a result of such an audit.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072241

- Generally, under current law, upon an IRS audit, the tax treatment of Fund items will be determined at the Master Fund level, and such treatment generally will be binding on the Master Fund Limited Partners (including the Fund). For tax years beginning after December 31, 2017, an audit adjustment at the Master Fund level generally may result in the imposition of a tax (plus interest and penalties, as applicable) on the Master Fund, unless the Master Fund makes a timely election for each of its Partners to take into account its, his, her, respective share of such adjustments on its, his, her respective tax return. If this election is made, interest on any deficiency will be at a rate that is 2% higher than the interest rate otherwise applicable to tax underpayments. The Fund has not yet determined whether it will make such election. In addition, the tax liability imposed on the Master Fund generally, in the course of an audit, is determined using the highest applicable U.S. federal tax rates applicable to U.S. taxpayers, with the result that such tax liability may, unless adjusted, be at higher rates than would otherwise apply to investors. The Master Fund may be able to reduce the amount owed in certain cases based on the status of its investors, among other factors, but there is no assurance the Master Fund will be able to obtain any such reduction. Further guidance is expected which may significantly impact the application of these rules.

- Any examination or other proceeding under Subchapter C of Chapter 63 of the Code (including any audit of the Master Fund by the IRS) or any examination or proceeding conducted by another taxing authority could result in adjustments to the tax consequences initially reported by the Master Fund. The legal and accounting costs incurred in connection with any audit of the Master Fund's tax returns, which as the case may be, may be significant, will be borne by, and treated as expenses of, the Master Fund (which can be ratably borne by the Fund and the Participating Shareholders).

- Current investors in the Master Fund and/or the Fund may bear the economic effect of taxes, interest and penalties imposed on the Master Fund and/or the Fund by taxing authorities in other countries (and for tax years beginning after December 31, 2017, by the IRS with respect to income received by the Master Fund in earlier periods, even if such investors were not investors in the Master Fund or the Fund during the tax year under audit.)

- Only Infinity Q, as the "partnership representative" (as such term is defined in Section 6223 of Code, the "Partnership Representative") of the Master Fund, may request an administrative adjustment in the amount of one or more items of income, gain, loss, deduction, or credit of the Master Fund for any taxable year, and such an adjustment must be approved by the IRS. Master Fund Limited Partners (including the Fund) and Participating Shareholders will not be able to request such an administrative adjustment.

- Unless otherwise determined by applicable law or regulations promulgated under Subchapter C of Chapter 63 of the Code, and unless otherwise set forth in the Partnership Agreement, the Master Fund General Partner, as the Partnership Representative of the Master Fund, has the sole authority to act on behalf of the Master Fund in any examination or other proceeding under Subchapter C of Chapter 63 of the Code involving the Master Fund and to bind the Master Fund for all purposes under Subchapter C of Chapter 63 of the Code. Unless otherwise determined by applicable law or regulations promulgated under Subchapter C of Chapter 63 of the Code, neither the Fund, as a Master Fund Limited Partner, nor any Participating Shareholder who is not the Partnership Representative may participate in or contest the results of any such examination or other proceeding.

Prospective investors are urged to review carefully the section entitled "*Certain Tax Considerations*" below and to consult their own tax advisers about the tax-related risks inherent in an investment in the Fund.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072242

- **Systemic Risk**. All asset classes (including derivative instruments) may be subject to systemic risk. Systemic risk is the risk of broad financial system stress or collapse triggered by the default of one or more financial institutions that results in a series of defaults by other interdependent institutions. Systemic risk may adversely affect financial intermediaries, such as central counterparties, futures commission merchants, banks, securities firms and exchanges, with which the Fund interacts on a daily basis.

- **Business Dependent upon Key Individuals.** The Shareholders who do not hold Management Shares have no authority to make decisions or to exercise business discretion on behalf of the Fund. The authority for all such decisions is delegated to the Investment Manager. The success of the Fund is expected to depend upon the expertise of each of the individuals named in the section below entitled *"Management of the Master Fund and the Fund."* Any withdrawal or other cessation of investment activities on behalf of the Master Fund or the Fund by any of these individuals could result in losses for, or early liquidation of, the Master Fund or the Fund.

- **Conflicts of Interest**. Advisory personnel of Infinity Q will, in addition to providing advisory services to Master Fund and the Fund also provide advisory services to clients of Wildcat, and officers of Infinity Q may also be officers of Wildcat, which may result in certain conflicts of interest. See *"Conflicts of Interest – Other Clients: Infinity Q Diversified Alpha Fund and the Wildcat Clients."* Another source of potential conflict of interest is the 15% "promote" or Performance Allocation to be received by Infinity Q, as the Master Fund General Partner, that is generally based upon the Year to Date Net Capital Appreciation (Depreciation) of the Master Fund. This allocation provides an incentive for Infinity Q, as the Master Fund General Partner, to achieve successful investment returns for the Master Fund (and, accordingly, the Fund), but it may also create an incentive for Infinity Q, as the Master Fund General Partner, to make investments that are riskier or more speculative than would otherwise be the case.

- **Handling of mail.** Mail addressed to the Fund and received at its registered office will be forwarded unopened to the forwarding address supplied by the Investment Manager to be dealt with.  None of the Fund, its directors, officers, advisors or service providers (including the organisation which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the forwarding address.  In particular the Directors will only receive, open or deal directly with mail which is addressed to them personally (as opposed to mail which is addressed just to the Fund).

MANAGEMENT OF THE FUND

The Fund's Board of Directors has delegated certain operations of the Fund to the Investment Manager pursuant to the Investment Management Agreement.

Infinity Q is located at 888 7th Avenue, Suite 3800, New York, NY 10106. Infinity Q is an SEC-registered investment advisory firm formed in 2014. Infinity Q provides investment management services to institutions, individuals, high net worth individuals and other pooled investment vehicles, including Infinity Q Diversified Alpha Fund.

**Investment Professionals Associated With Infinity Q** (collectively, the "Investment Professionals")

**Leonard Potter** is the Chief Executive Officer of Infinity Q. Mr. Potter also serves as the President and Chief Investment Officer of Wildcat, which is an advisor to a number of ultra-high net worth clients.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072243

From 2009 until joining Wildcat, Mr. Potter served as a consultant to Soros Fund Management LLC ("SFM") and as the Chief Investment Officer of Salt Creek Hospitality, a private acquirer and owner of hospitality related assets that was sponsored by an affiliate of SFM. From 2002 through 2009, Mr. Potter was Managing Director - Soros Private Equity at SFM where, from May 2005 through July 2009, Mr. Potter served as co-head of the Private Equity group and a member of the Private Equity Investment Committee. From September 1998 until joining SFM, Mr. Potter was a Managing Director of Alpine Consolidated LLC, a private merchant bank, and from April 1996 through September 1998, Mr. Potter founded and served as a Managing Director of Capstone Partners LLC, a private merchant bank. Prior to founding Capstone Partners, Mr. Potter was an attorney specializing in mergers, acquisitions and corporate finance at Morgan, Lewis & Bockius and Willkie Farr & Gallagher. Mr. Potter has served on a number of public and private boards of directors and is currently a member of the boards of Solar Senior Capital, Ltd., Solar Capital Ltd., GSV Capital Corp. and Hilton Grand Vacations Inc. Mr. Potter has a Bachelor of Arts degree from Brandeis University and a Juris Doctor degree from Fordham University School of Law.

**James Velissaris** is the Chief Investment Officer of Infinity Q, and launched the firm to offer innovative investment solutions for both retail and institutional investors. James also serves as the portfolio manager for the Public Investments Portfolio of Wildcat, which is an advisor to a number of ultra-high net worth clients. James joined Wildcat in 2012, and manages a team of 5 quantitative researchers in the U.S. and India focused on developing next generation forecasting models. From 2008 until joining Wildcat, Mr. Velissaris managed the quantitative investment strategies and conducted analysis on portfolio construction and asset allocation for Arden Asset Management. He began his career as an analyst at Goldman Sachs. Mr. Velissaris earned his Bachelor of Arts degree in Economics from Harvard University and his Master of Science degree in Operations Research with a concentration in Financial Engineering from Columbia University.

**Scott Lindell** is the Chief Risk Officer of Infinity Q, and joined the firm in 2014. He is responsible for monitoring portfolio risk exposures, enhancing the firm's risk analytics and ensuring compliance with regulatory guidelines. From 2010 to 2014, Mr. Lindell built out the infrastructure for the reporting and risk management of Arden Asset Management's private funds and liquid alternatives initiatives including the crafting and monitoring of investment guidelines, and eventually became a Managing Director and the Head of Risk Management. From 2006 to 2010, Mr. Lindell was a Vice President at JP Morgan Measurisk, a provider of risk-transparency and risk-measurement solutions for institutional investors and asset managers, where he oversaw the firm's largest institutional clients. Mr. Lindell began his career as an equities trader for Shonfeld Securities in 2001. He received his B.S. in Finance from the University of Buffalo in 2001 and an M.B.A. in Finance from Baruch College, Zicklin School of Business in 2005. He is a Chartered Alternative Investment Analyst (CAIA) and a Certified Financial Risk Manager (FRM).

**Board of Directors**

The Board of Directors of the Fund consists of three individuals: Leonard Potter, James Velissaris, and Scott Lindell. Each Director is an Investment Professional associated with Infinity Q. The Board of Directors meets at least once a year to review and assess the investment policy and performance of the Fund and generally to supervise the conduct of its affairs. The remuneration of the Directors shall be U.S. $1,000 per annum per Director, or as they may from time to time determine, except that any Director holding office for less than a year or other period for which remuneration is paid shall only be entitled to that portion of such remuneration reflecting the fraction of the year or other period during which he held office.

The Board of Directors are responsible for the overall management and control of the Fund in accordance with its Memorandum of Association and Articles of Association. However, the Board of Directors have delegated certain operations of the Fund to the Investment Manager. In particular, the Board

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072244

of Directors are not responsible for making or approving any investment decisions, having delegated such responsibilities to the Investment Manager, pursuant to the Investment Management Agreement and certain of the day to day administrative functions to the Administrator pursuant to the Administration Agreement in accordance with its powers of delegation as set out in the Articles of Association. The Board of Directors will review the performance of the Fund, the Investment Manager, and the Administrator on a periodic basis.

The Directors may also be paid all reasonable travel, hotel and other related expenses properly incurred by them in attending meetings of the Board of Directors or any committee of the Board of Directors or any general meeting or any meeting held in connection with the business of the Fund. In addition, a Director who, at the request of the Board of Directors, performs special services may receive such extra remuneration by way of salary, commission or participation in profits, or a combination thereof, as the Board of Directors may determine.

A Director shall be at liberty to vote in respect of any contract or transaction in which he has an interest and shall be counted in a quorum at any meeting of the Board of Directors dealing with any such contract or transaction. Notwithstanding the foregoing, however, the nature of the interest of any Director in any such contract or transaction shall be disclosed by him, either generally or specifically, at or prior to its consideration and any vote thereon.

The Articles of Association do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation. There is no shareholding qualification for the Directors. In addition, the Articles of Association provide certain rights of indemnification in favor of Directors and officers of the Fund, as generally described below in *"Summary of the Memorandum of Association and Articles of Association of the Fund"*

The Directors may change any of the Fund's service providers, including the Fund's auditor or the Fund's administrator, without the consent of the Shareholders. The Directors are subject to removal or replacement in accordance with the Articles.

## CONFLICTS OF INTEREST

**THE FOLLOWING DISCUSSION OF CONFLICTS OF INTEREST DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE CONFLICTS FACING INFINITY Q AND THE INVESTMENT PROFESSIONALS IN OPERATING THE FUND AND THE MASTER FUND. OTHER PRESENT AND FUTURE ACTIVITIES OF INFINITY Q AND THE INVESTMENT PROFESSIONALS MAY GIVE RISE TO ADDITIONAL CONFLICTS OF INTEREST.**

### Other Clients: Infinity Q Diversified Alpha Fund and the Wildcat Clients

The Investment Professionals will, in addition to providing advisory services to Infinity Q Diversified Alpha Fund, a series of Trust for Advised Portfolios, a Delaware statutory trust that is a registered with the SEC as an open-end investment company under the Company Act, also provide advisory services to clients of Wildcat, and officers of Infinity Q may also be officers of Wildcat, which may result in certain conflicts of interest. Wildcat is a SEC-registered investment adviser that provides investment advisory services to a variety of different clients, including ultra-high net worth individuals, limited partnerships, limited liability companies, trusts, charitable organizations and other entities and accounts in which the Master Fund (or the Fund) will have no interest ("Wildcat Clients"). Infinity Q at times will have potential and actual conflicts of interest with respect to Master Fund and the Fund and the services provided to Infinity Q Diversified Alpha Fund and the Wildcat Clients.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072245

In some cases, the Master Fund (and, accordingly, the Fund), Infinity Q Diversified Alpha Fund and the Wildcat Clients will have similar investment objectives and strategies. From time to time, there may be situations that give rise to other conflicts of interest. For example, conflicts may arise when the Master Fund makes investments in conjunction with an investment being made by Infinity Q Diversified Alpha Fund or a Wildcat Client, or in a transaction where Infinity Q Diversified Alpha Fund or a Wildcat Client has already made an investment.

While Infinity Q, acting through its Investment Professionals, has complete discretion in the allocation of investments among the Master Fund, Infinity Q Diversified Alpha Fund, and the Wildcat Clients, participation in specific investment acquisition or disposition opportunities will often be appropriate for the Master Fund, Infinity Q Diversified Alpha Fund, and the Wildcat Clients, and generally will be allocated among the Master Fund, Infinity Q Diversified Alpha Fund, and the Wildcat Clients pro rata according to available capital, taking into account the risk allocation profiles and portfolio concentration objectives established by the Investment Professionals for the various accounts.

The Master Fund, Infinity Q Diversified Alpha Fund, and the Wildcat Clients will not, however, always trade on a purely pro rata side-by-side basis, and, in determining the allocation of investments between and among the Master Fund, Infinity Q Diversified Alpha Fund, and the Wildcat Clients, certain conflicts of interest may arise. To address and manage these potential conflicts of interest, Infinity Q has adopted compliance policies and procedures to allocate investment opportunities and to ensure that each of its clients is treated on a fair and equitable basis in view of its investment objectives. Such policies and procedures include, but are not limited to, investment and trade aggregation and allocation policies and oversight by Infinity Q's compliance team.

**Brokerage Relationships**

Infinity Q and the Investment Professionals may direct the execution of the Master Fund's portfolio transactions to brokerage firms and dealers that in turn provide Infinity Q and the Investment Professionals with investment research information or other related services or consideration that the conflicted party would otherwise have to purchase with its own funds. Thus, Infinity Q may have a conflict between its interest in reducing the amounts it expends on research and related services and its duties to the Master Fund (and the Fund). Infinity Q, as the Master Fund General Partner, has broad discretion under the Partnership Agreement with regard to the brokers and dealers to which it directs the Master Fund's transactions and the commission rates and dealer spreads that the Master Fund pays to those firms. Infinity Q expects to use any research or other benefits that it receives from the Master Fund's brokers and dealers to trade assets held by the Master Fund, although those benefits may also be used by Infinity Q and Investment Professionals for their own accounts or the account of Infinity Q Diversified Alpha Fund or the Wildcat Clients.

Infinity Q has the option to use "soft dollars" generated by the Master Fund to pay for certain expenses of the Master Fund. Infinity Q intends to use soft dollars generated by the Master Fund to pay only for expenses that fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended. The Master Fund, and thus the Master Fund Limited Partners and the Shareholders, will bear the cost of these items to the benefit of Infinity Q.

**Valuations of Distributions**

Infinity Q may perform valuations of distributions of securities and other property and no independent appraisal of such securities and other property will be obtained. In addition, Infinity Q will determine the value of the securities and other investments held by the Master Fund and the Fund. Infinity Q's valuation

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072246

authority may lead to potential conflicts of interest because its Management Fee and Performance Allocation from the Master Fund will increase as the value of the Master Fund's investments increase. See "*Valuation*" below.

**No Independent Directors**

Each Director is an Investment Professional associated with Infinity Q. As a result, no Director who is independent of Infinity Q will review and assess the investment policy and performance of the Fund and generally supervise the conduct of its affairs.

**Legal Counsel**

Kelly Hart & Hallman LLP ("Kelly Hart") serves as U.S. counsel to the Fund, the Master Fund, Infinity Q (including without limitation as the Master Fund General Partner and the Investment Manager), and the Investment Professionals, and with respect to all of the foregoing, certain of their affiliates (the "Clients") in connection with the operations of the Fund, the Master Fund, and certain other Clients, the offering of interests in the Master Fund, the offering of Participating Shares, as well as certain other matters for which the Clients may engage Kelly Hart from time to time. Kelly Hart disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or their governing documents.  In acting as counsel to the Clients, Kelly Hart has not represented and will not represent any Master Fund Limited Partners or Participating Shareholders who are not Clients, nor does it purport to represent their interests.  No independent counsel has been retained to represent the Participating Shareholders.  In assisting in the preparation of this Memorandum, Kelly Hart has relied on information provided by the Clients and certain of the Fund's and the Master Fund's service providers (including, without limitation, the Investment Professionals' biographical data and the investment strategy of the Master Fund and the Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund.  In connection with the Fund's offering of Shares and subsequent advice to the Fund, Maples and Calder will not be representing Shareholders.  No independent legal counsel has been retained to represent the Shareholders.  Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund.  There may exist other matters that could have a bearing on the Fund as to which Maples and Calder has not been consulted.  In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of Shareholders may differ from those of the Fund.  Maples and Calder does not represent the Shareholders' interests in resolving these issues.  In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

VALUATION

The valuation policies set forth below amend and restate the valuation policies set forth in the Master Fund Memorandum, and apply to the Master Fund, the Fund, the Master Fund Limited Partners, and the Shareholders.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072247

**Background**

Infinity Q, as a fiduciary of the Master Fund as the Investment Manager of the Fund, has an obligation to value the investments held by each client account in a manner that is fair, consistent and in the best interest of each client. Infinity Q calculates fees charged to clients and performance that it may use in presentations to clients and prospects based on the values of assets in client accounts.  An incorrect valuation of assets may result in overcharges of fees to clients and/or overstatement of performance information, which in each case may be a violation of Infinity Q's fiduciary duty and the anti-fraud provisions of the Advisers Act.

Infinity Q has established valuation policies and procedures (the "Valuation Policy") in an effort to reasonably ensure portfolio holdings ("Positions") are valued in accordance with the offering documents of the investment funds managed by Infinity Q (the "Infinity Q Funds") and GAAP, specifically, U.S. FASB Accounting Standards Codification ("ASC") 820, *Fair Value Measurement*. GAAP requires the use of "fair value" in determining the value of the asset. Under these principles, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the valuation date.  These principles require that fair value measurements be determined based on the assumptions that market participants would use in pricing the asset or liability, including assumption about risk, and the effect of restrictions on the sale or use of an asset.

Set forth below is Infinity Q's Valuation Policy with respect to the Infinity Q Funds.

The Fund has retained Infinity Q, pursuant to the Investment Management Agreement, to, among other things, determine the value of the Fund's assets in accordance with the principles set out below and has also retained the Administrator, pursuant to the Administration Agreement (as defined below), to, among other things, compute the net asset value of the Participating Shares and to disseminate that information to the Fund and its Shareholders.

**Policy**

It is the general policy of Infinity Q that assets for which market quotations are readily available be valued at their market value.  In situations where no market quotations are available, Infinity Q seeks to utilize the value of similar assets where market quotations are available or model or matrix pricing for assets when both market quotations and similar publicly traded assets are not available, or as necessary to facilitate fair value.

**Procedures**

The primary source of pricing information typically will be independent sources, such as brokers or pricing services, but Infinity Q's Valuation Committee (as defined below) is ultimately responsible for determining fair value for investments held by each client account. The value of those positions will form an integral part of each net asset value calculation. Once a price is established for a portfolio security, it shall be used for all Infinity Q Funds that hold the security.

U.S. Bancorp Fund Services, LLC and its affiliates, the administrator(s) of the Infinity Q Funds, calculates the net asset values of the assets in client accounts and in the Infinity Q Funds for fee calculation and other purposes on the "Valuation Date". The Valuation Date is the last day of each month for each Infinity Q Fund.

**Fair Value Pricing**

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                    IQCM-SEC-00072248

If market quotations or official closing prices are not readily available or do not accurately reflect fair value for an asset, or if an asset's value has been materially affected by events occurring after the close of the principal market on which the asset is traded, but before the Valuation Date, the asset may be valued by another method that Infinity Q believes accurately reflects fair value. Infinity Q's Valuation Committee, described further below, is responsible for fair valuation. ASC 820 provides guidance regarding appropriate valuation methodologies. ASC 820's recommended hierarchy of valuation metrics is summarized as follows, in descending order of preference:

**Level 1:**  Quoted prices in active markets for identical assets or liabilities;

**Level 2:**  (a) quoted prices for similar assets or liabilities in active markets; (b) quoted prices for identical or similar assets or liabilities in markets where there are few transactions, prices are not current, price quotations vary substantially over time or among market markers, or in which little information is released publicly; (c) inputs other than quoted prices that are observable for the asset or liability (*e.g.* interest rates, yield curves, volatilities, prepayment speeds, loss expectations, credit risks, expected default rates, and net asset values for investment companies that can be redeemed in the "near term"); or (d) inputs derived from or corroborated by observable market data by correlation or other means;

**Level 3:**  Unobservable inputs for the asset or liability.

Fair valuation methodologies also may incorporate, among other things:

- Broker-dealer quotes;
- Other third-party quotation providers;
- Bids and Asks on exchanges where the asset is traded;
- Investment cost
- Prices obtained during subsequent financing events;
- Discounted expected future cash flows;
- Pricing formulas (*e.g.* Black-Scholes model);
- Prior trades; and/or
- Pricing matrices.

As soon as market quotations become available for a security being "fair valued," such market values shall be used in the calculation of an Infinity Q Fund's net asset value without any action required by the Valuation Committee.  In addition, securities will not be valued at "fair value" whenever market quotations are readily available.

**Valuation Committee**

Infinity Q has established a valuation committee (the "Valuation Committee") that is responsible for determining fair values and to ensure timely analysis and implementation of policies related to the pricing of individual securities or groups of securities that may be held by Infinity Q Funds.

The Valuation Committee is comprised of members of senior management including Infinity Q's Chief Investment Officer, Chief Executive Officer, Chief Risk Officer, and Chief Compliance Officer. In addition, other members of the investment team, Infinity Q's administrators, auditors, and third party valuation firms may be invited and participate as observers to Valuation Committee meetings.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072249

The Valuation Committee meets monthly or more often if needed to establish pricing. A quorum is necessary for all meetings of the Valuation Committee where any action or determination by the members shall be made. A quorum shall be constituted by the presence of a majority of the members in person or by means of conference telephone or any other means of communication by which all persons participating in the meeting are able to communicate with each other. Any action or determination by the Valuation Committee shall require the approval of a majority of all members present at such meeting in quorum. In the event that any resolution or action is passed at an inquorate meeting, such resolution or action shall be deemed to have been duly passed if it is afterwards ratified by the required majority of the members at a quorate meeting of members duly convened. In lieu of a meeting, the members may also reach decisions by way of written resolution or ratification, and a decision taken by way of written resolution or ratification signed by a majority of the members entitled to vote on such matters shall have the same effect as if that decision had been duly taken by a vote at a duly convened meeting of the members.

The Valuation Committee is responsible for carrying out certain functions relating to the valuation of portfolio securities and other assets. These responsibilities include:

(a) Oversight over valuations focused on developing and/or assessing the methodologies and information/pricing sources to be used for performing independent price verifications or price substantiations on each Position.

(b) Oversight over the price substantiation process, including third-party valuation agents and services.

(c) Approval of Position valuations at each Valuation Date.

(d) Where broker quotes/price indications or pricing service values (each, a "quote") are relied upon to value a particular type of asset, reviewing quantitative and qualitative information, such as the appropriateness of the source (*e.g.*, pricing source, broker or other source), recent trade activity and outliers and, where appropriate, quantitative support for valuations used.

(e) Where models/memos provide the basis for Position valuations, reviewing such models/memos and any supporting documentation. From time to time the Valuation Committee may elect to have third parties provide price assurance or to value Positions outright.

(f) Ensuring that the valuation process periodically includes back-testing of a sample of valuations to the extent possible and where it is likely to provide a reasonable base of comparison, against the recent purchase or sale prices of Positions.

(g) Not less than annually, reviewing and approving this Policy.

Infinity Q's Chief Investment Officer is responsible for preparing or causing to be prepared minutes of each meeting of the Valuation Committee, which shall describe the actions taken at the meeting.

**Valuation Considerations**

As a general principle, valuations should reflect the amount that an Infinity Q Fund could reasonably expect to receive for the security upon its current sale. Therefore, ascertaining fair value requires a determination of the amount that an arm's-length buyer, under the circumstances, would currently pay for the security, exclusive of blockage discounts. Fair value <u>cannot</u> be based on what a buyer might pay at

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                                IQCM-SEC-00072250

some later time, such as when the market ultimately recognizes the security's true value as currently perceived by Infinity Q. An Infinity Q Fund also may not fair value portfolio securities at prices that are not achievable on a current basis on the belief that it would not currently need to sell those securities. Thus, for example, an Infinity Q Fund generally may not fair value portfolio securities at par based on the expectation that it will hold those securities until maturity, if it could not receive par value upon the current sale of those securities.

**Exceptions To Be Considered**

- If on the Valuation Date, the exchange or market for a given asset is not open for business, the valuation is determined as of the last preceding date on which such exchange or market was open for business.

- If Infinity Q believes that a quoted price in an active market does not represent fair value because significant events have occurred after the close of the market but before the Valuation Date/time, a fair value adjustment may be required for that asset. If Infinity Q is made aware of any news or events that it believes will have a material impact on the valuation, an appropriate adjustment should be made. Infinity Q will determine the appropriateness and materiality of any such adjustment and will document the outcome of the review as part of its customary records, as described below.

- If an asset to be valued constitutes a block which in the judgement of Infinity Q, could not be liquidated in a reasonable time without depressing or inflating the market, or restrictions on marketability exist with respect to such asset, the asset may be assigned a different value by Infinity Q than would otherwise be calculated in accordance with the valuation methodologies noted above; provided that, such block will not be valued at a unit value in excess of, for long positions, or below, for short positions, the quoted market price of such asset.

**Broker Pricing (Minimum # Of Bids/Asks / Averaging)**

Pricing services and broker dealers are identified based upon past experience and how active they are in the name or market. Where prices are available from third parties, Infinity Q will attempt to obtain a minimum of two independent prices and use its best judgment in combination with relevant benchmarks and pricing models to determine the fair value of the instrument. The final price for each position is typically obtained by calculating the average of the external prices received. Where only a single price is available, Infinity Q uses that price and may apply a discount to that price to account for the uncertainty of only having one pricing source.

When multiple independent marks are available, Infinity Q does not mark any securities higher than the average of the prices obtained. However, Infinity Q may challenge prices with a broker dealer when such prices are considered to be "outliers" (this occurs when two or more prices are closely clustered but one is outside that range). If such challenges are not successful, Infinity Q may accept the price quote and consider a discount applied to account for the dispersion in pricing or may choose to eliminate that outlier prior to computing a final mark.

In circumstances where an exchange, a pricing service, or where one or more quotes are not available for a Position, or where such exchange, pricing service, quote or quotes may not provide a reliable indication of fair value, Infinity Q will value each such Position based on relevant information, including, without limitation: (i) an internally or externally developed memo/model, including inputs and assumptions (e.g., comparing market values for similar companies/instruments); and/or (ii) such other factors as may be deemed appropriate. A written valuation memo/model shall be provided for model-based prices explaining

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072251

why the price used reflects fair value of the Position. Positions with nominal value may not require a written valuation memo/model.

**Valuation Methodology**

In valuing assets, the following general principals apply:

- **Equity Securities:**  Equity securities, including preferred stock, ETFs, and ADRs, that are listed for trading on an active recognized exchange or market and are freely transferable are valued at the last reported sales price, as quoted by Bloomberg Valuation Services ("Bloomberg"), or other recognized pricing sources.  In certain instances when it is determined that the market is not actively trading, the monthly Volume Weighted Average Price, as determined by Bloomberg will be utilized and/or a marketability adjustment will be applied.

- **Equity Total Return Swaps:**  Equity swaps, including CFDs and basket swaps, are valued consistent with the methodology discussed above for the underlying equity security on which the performance of the swap is based.

- **Listed Options:**  Options that are listed on a securities exchange are valued at their last sales prices as quoted on Bloomberg or other recognized pricing sources; *provided*, that if the last sales prices of such options do not fall between the last "bid" and "asked" prices for such options on that date, then the options are valued at the mean between the last "bid" and "asked" prices for such options on that date.

- **OTC Equity Options:**  Over-the-counter options that have settled based on the settlement price of similar exchange-traded options are value consistent with the methodology discussed above for listed options.  If no similar exchange-traded options are available, then the option is priced via a Black-Scholes model on Bloomberg.   These values are compared to broker quotes for reasonableness.   Any material differences are compared to the valuation obtained by the Administrator and a determination of the appropriate fair value is made.

- **Debt:**  Debt securities, including sovereign debt, corporate debt and convertibles, are valued at the "*mid*" as provided by Thomson Reuters or other recognized pricing sources.  If reported mids are not available, then prices are received from independent broker/dealers who may also be market makers in the securities.

- **Futures:**  Futures are valued at the settle close, as quoted on Bloomberg or other recognized pricing sources.

- **Currency Contracts:**  Forward and spot non-U.S. currencies are converted into U.S. dollars using foreign exchange rates obtained from Bloomberg at approximately 4:30 p.m. EST.

- **Credit Default Swaps:**  Credit default swaps are valued via Bloomberg utilizing the ISDA Standard Upfront Model on a daily basis.  At each month end, valuations are compared to the values provided by counterparties for reasonableness.

- **OTC Derivatives:**   Reliable quotes for certain OTC derivatives, including variance swaps, volatility swaps, fx options, and swaptions, may not be available from data providers, either because

Confidential Treatment Requested by Infinity Q Capital Management, LLC

the transactions are "one of a kind" or not actively traded. Infinity Q utilizes Bloomberg, broker quotes, and counterparty valuations to provide a fair value for these securities. At each month end, valuations are compared to the values provided by counterparties for reasonableness.

- **Investment Funds:** Investments in other investment funds (hedge funds, private equity or other private funds) ("Portfolio Funds") are valued at the latest month-end or quarter-end unaudited or audited net asset value. However, if Infinity Q reasonably believes that the valuations furnished do not reflect the fair value of the underlying assets, adjustments may be made to such values.

In addition, an Infinity Q Fund may invest in Portfolio Funds that provide net asset values on a quarterly, semi-annual or annual basis, rather than on a monthly basis, and, therefore, Infinity Q may be required to rely on a monthly approximation of the net asset values of certain portfolio funds provided to it by such Portfolio Funds' fund manager.

## Recordkeeping

Fair value documentation shall include (1) the identity of the affected portfolio(s); (2) a copy of any materials considered in making the fair value determination; (3) a brief summary of the relevant factors considered; and (4) any follow-up information to close out a prior fair value determination. All valuation determinations, and documentation related thereto, shall be retained for a period of not less than six years after the close of the applicable Infinity Q Fund's fiscal year, and for the first two years in an easily accessible place.

## Revisions to the Valuation Policy

All Policy revisions require approval by each Valuation Committee and will be documented accordingly, including any action taken and dates associated therewith. These policies will be reviewed by each Valuation Committee for adequacy and effectiveness at least annually and more frequently as needed. Infinity Q's Chief Compliance Officer is responsible for drafting the policy revisions and ensuring they are incorporated into Infinity Q Compliance Manual.

## SUMMARY OF THE MEMORANDUM OF ASSOCIATION AND ARTICLES OF ASSOCIATION OF THE FUND

The Articles comprise the constitution of the Fund. Set forth below is a summary of certain provisions of the Articles. This summary is qualified in its entirety by the provisions of the Articles.

## Memorandum of Association

The Memorandum of Association of the Fund provides, *inter alia*, that the Fund's objects are unrestricted and that the liability of each Shareholder of the Fund is limited to the amount unpaid on such Shareholder's Shares.

The authorized share capital of the Fund is U.S. $50,000 divided into 4,990,000 redeemable, participating, non-voting shares of U.S. $0.01 par value per share and 100 voting, non-participating management shares of U.S. $1.00 par value per share.

## Articles of Association

The Articles provide, *inter alia*, as follows:

Confidential Treatment Requested by Infinity Q Capital Management, LLC     IQCM-SEC-00072253

*Share Capital.*  The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend at and to vote as a Shareholder at any general meeting of the Fund. In the event of a winding-up or dissolution of the Fund, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, holders of Management Shares shall be entitled, *pari passu* with the holders of Participating Shares, to an amount equal to the capital paid up on such Management Shares. Management Shares confer no other right to participate in the profits or assets of the Fund.

Participating Shares shall confer upon a Participating Shareholder no right to receive notice of, to attend at and to vote as a Shareholder at general meetings of the Fund but shall confer upon the Participating Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Fund in accordance with the Articles.

No share or loan capital of the Fund has been issued or has been agreed conditionally or unconditionally to be issued or put under option.

Prospective investors should note that there are no provisions under the laws of the Cayman Islands or under the Articles conferring preemption rights on Shareholders. The Articles provide that the unissued Participating Shares are at the disposal of the Directors who may offer, allot, issue, grant options over or otherwise dispose of them to such persons, at such times, for such consideration and on such terms and conditions as the Directors think fit.

The Fund may by ordinary resolution of the holder of the Management Shares increase its share capital, consolidate the Participating Shares, or subdivide any of them into shares of a smaller amount or cancel authorized but unissued shares.

The Fund may by special resolution of the holder of the Management Shares reduce its share capital and any capital redemption reserve in any manner authorised by law.

*Modification of Class Rights.*  Whenever the capital of the Fund is divided into different classes the rights attached to any such class may, subject to any rights or restrictions for the time being attached to any class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds by Net Asset Value of the issued Participating Shares of the relevant class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such class by a majority of at least two-thirds of the votes cast at such a meeting in person or by proxy at a separate meeting of the holders of such Participating Shares, but not otherwise. To every such separate meeting all the provisions of the Articles relating to general meetings of the Fund or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that class, every Shareholder of the class shall on a poll have one vote for each Participating Share of the class held by him. For the purposes of convening and holding a meeting pursuant hereto, the Directors may treat all the classes or any two or more classes as forming one class if they consider that the variation or abrogation of the rights attached to such classes proposed for consideration at such meeting is the same variation or abrogation for all such relevant classes, but in any other case shall treat them as separate classes.

The rights conferred upon the holders of the Participating Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072254

Shares of that class, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Participating Shares, or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to a class of Participating Shares or any modification of the fees including early redemption, Management Fees or Performance Allocation.

*Winding Up*.  If the Fund shall be wound up the liquidator shall apply the assets of the Fund in such manner and order as he thinks fit in satisfaction of creditors' claims.

Subject to any rights and restrictions for the time being attributed to any class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(i)      in the payment to the holders of Participating Shares and Management Shares of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(ii)      in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the net asset value per Participating Share of the relevant class and Series held.

*Quorum and Voting Rights*.  No business shall be transacted at any general meeting unless a quorum of the holders of the Management Shares is present at the time when the meeting proceeds to business. Save as otherwise provided by the Articles, one or more holders of the Management Shares holding at least ten percent of the paid up voting share capital of the Fund present in person or by proxy and entitled to vote at that meeting shall form a quorum.

On a show of hands every holder of the Management Shares present in person and every person representing a holder of the Management Shares by proxy shall, at a general meeting of the Fund, each have one vote and on a poll every holder of the Management Shares and every person representing a holder of the Management Shares by proxy shall have one vote for each Participating Share of which he or the person represented by proxy is the holder.

*Amendments*.  Subject to the Law (as defined below) and the rights attaching to the various classes, the Fund may at any time and from time to time by special resolution of the holder of the Management Shares alter or amend the Articles in whole or in part.

*Dividends*.  No dividend or distribution shall be paid except out of the realized or unrealized profits of the Fund, or out of the share premium account attributable to Participating Shares of the class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by law.

*Directors*.  The remuneration to be paid to the Directors, if any, shall be such remuneration as the Board of Directors shall determine. The Directors shall also be entitled to be paid all traveling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of the Board of Directors or committees of the Board of Directors, or general meetings of the Fund, or separate meetings of the holders of any class of Shares of the Fund, or otherwise in connection with the business of the Fund, or to receive a fixed allowance in respect thereof as may be determined by the Board of Directors, or a combination partly of one such method and partly the other.

A Director may hold any other office or place of profit under the Fund (other than the office of auditor) in conjunction with his office of Director, or may act in a professional capacity to the Fund, on such terms as to remuneration and otherwise as the Board of Directors may determine.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                                                 IQCM-SEC-00072255

No Director or intending Director shall be disqualified from his office by contracting with the Fund either as vendor, purchaser or otherwise, nor shall any such contract or any contract or arrangement entered into by or on behalf of the Fund in which any Director is in any way interested be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Fund for any profit realized by any such contract or arrangement by reason of such Director holding that office, or of the fiduciary relation thereby established.  A Director shall be at liberty to vote in respect of any contract or transaction in which he is interested provided that the nature of the interest in any such contract or transaction shall be disclosed by him at or prior to its consideration and any vote thereon.

The chairman of a Director's meeting shall have a casting vote at any meetings of the Directors. The Directors may exercise the Fund's powers to borrow and to charge its assets.

Every Director and officer of the Fund (which for the avoidance of doubt, shall not include any auditor of the Fund), together with every former Director and former officer of the Fund (each a "Director and Officer-Related Indemnified Person") shall be indemnified out of the assets of the Fund against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud, willful default or Gross Negligence (as defined below). No Director and Officer-Related Indemnified Person shall be liable to the Fund for any loss or damage incurred by the Fund as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud, willful default or Gross Negligence of such Director and Officer-Related Indemnified Person. No person shall be found to have committed actual fraud, willful default or Gross Negligence under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

For this purpose, "Gross Negligence" in relation to a person means a standard of conduct beyond negligence whereby that person acts with reckless disregard for the consequences of a breach of a duty of care owed to another.

The Fund shall advance to each Director and Officer-Related Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit, proceeding or investigation involving such Director and Officer-Related Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Director and Officer-Related Indemnified Person shall execute an undertaking to repay the advanced amount to the Fund if it shall be determined by final judgment or other final adjudication that such Director and Officer-Related Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Director and Officer-Related Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Fund (without interest) by the Director and Officer-Related Indemnified Person.

The Board of Directors, on behalf of the Fund, may purchase and maintain insurance for the benefit of any Director or other officer of the Fund against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Fund.

Pursuant to the foregoing provisions, the Fund may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Fund to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Board of Directors shall, in its absolute

Confidential Treatment Requested by Infinity Q Capital Management, LLC                IQCM-SEC-00072256

discretion, determine. Any such indemnification and exculpation provisions may be specified to a standard equal to or more favorable (but not less favorable) to the Fund than any standard specified in the Articles.

**Payments in Cash or in Kind**

Payment of the redemption price to a Shareholder on redemption will be made in cash or, in the discretion of the Board of Directors, in consultation with the Investment Manager, in securities (which may include short positions, as well as long positions) selected by the Board of Directors, or partly in cash and partly in securities (which may include short positions, as well as long positions) selected by the Board of Directors, each in consultation with the Investment Manager. In-kind distributions may be made directly to the redeeming Shareholder or, alternatively, in certain limited circumstances, distributed into a liquidating account and sold for the benefit of such redeeming Shareholder, in which case (i) payment to such Shareholder of that portion of his redemption attributable to such securities will be delayed until such time as such securities can be liquidated and (ii) the amount otherwise due such Shareholder will be increased or decreased to reflect the performance of such securities through the date on which the liquidation of such securities is effected.

## BROKERAGE AND CUSTODY

Infinity Q, as the Master Fund General Partner, is authorized to determine the broker or dealer to be used for each securities transaction for the Master Fund. In selecting brokers or dealers to execute transactions for the Master Fund, Infinity Q need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost. It is not the practice of Infinity Q to negotiate "execution only" commission rates, thus the Master Fund may be deemed to be paying for research, brokerage or other services provided by the broker that are included in the commission rate.

The Master Fund will maintain accounts at Citibank, N.A., its prime broker, through which the Master Fund may execute trades, borrow securities and maintain custody of its securities.

The Master Fund reserves the right, in its sole discretion, to change the brokerage and custodial arrangements described above without further notice to the Master Fund Limited Partners.

With respect to the Fund, the Board Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any class and/or Series of Shares) and may entrust to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Fund) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

## ADMINISTRATOR

The Fund and the Administrator have entered into an agreement effective as of July 1, 2018 (the "Administration Agreement") pursuant to which the Administrator provides the Fund with certain transfer agency and accounting services including, without limitation, computation of the Fund's net asset value, in exchange for a fee based upon the Fund's assets under administration.

The Administrator bases its computations on the assets and liabilities reported to the Administrator by the Fund, custodians and Infinity Q. The Administrator will assume that these assets and liabilities represent a complete record of the Fund's investments as of the date of the Fund's reports as prepared by the Administrator.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072257

The Administrator in computing the net asset value of the Fund will use prices that are determined by the Fund in its sole discretion, and described in the Administration Agreement.

In particular, the Directors may specify pricing methodologies that the Administrator shall rely upon (such as the prices of listed, liquid securities reported on exchanges and quoted by third-party vendors) or, alternatively, they shall require the Administrator to accept valuations provided by the Investment Manager.

The prices of assets and liabilities used by the Administrator in computing the net asset value of the Fund may vary from prices that the Administrator accepts from its other clients and from prices that affiliates of the Administrator may use in connection with their customer or proprietary business. The Administrator does not assume any duty with respect to the accuracy of any information supplied to it by the Fund's agents.

The Administrator is a service provider to the Fund and is not responsible for the information in, or preparation of, this Memorandum or the activities of the Fund. The Administrator is not an auditor and does not provide tax, accounting or auditing advice, nor is it a fiduciary to the Master Fund, the Fund, the Master Fund Limited Partners, the Shareholders, or Infinity Q. The Administrator is not responsible for monitoring the Fund's portfolio to determine whether the Fund is in compliance with the investment guidelines and restrictions set forth in this Memorandum.

The Fund has agreed to indemnify the Administrator for any claim, liability, cost or expense asserted against the Administrator in connection with the conduct of the business of the Fund under the Administration Agreement, except to the extent of the Administrator's gross negligence, willful misconduct, or fraud. The Administration Agreement may be terminated by either party on not less than sixty (60) days' prior written notice, although it may be terminated on shorter notice in certain circumstances as described in the Administration Agreement.

## CERTAIN TAX CONSIDERATIONS

**THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF CERTAIN POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO INVESTORS. PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN PROFESSIONAL TAX ADVISORS WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR STATUS OF AN INVESTOR. THE DISCUSSION HEREIN IS NOT A FULL DESCRIPTION OF THE COMPLEX TAX RULES INVOLVED AND IS BASED UPON EXISTING LAWS, JUDICIAL DECISIONS AND ADMINISTRATIVE REGULATIONS, RULINGS AND PRACTICES, ALL OF WHICH ARE SUBJECT TO CHANGE, RETROACTIVELY AS WELL AS PROSPECTIVELY. A DECISION TO INVEST IN THE FUND SHOULD BE BASED UPON AN EVALUATION OF THE MERITS OF THE TRADING PROGRAM AND NOT UPON ANY ANTICIPATED TAX BENEFITS.**

**ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS MEMORANDUM IS NOT INTENDED OR WRITTEN BY US TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY INVESTORS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON INVESTORS UNDER THE CODE.**

**NEITHER THE FUND, THE MASTER FUND, INFINITY Q, NOR THE BOARD OF DIRECTORS HAS SOUGHT, OR EXPECTS TO SEEK, A RULING FROM THE IRS OR ANY**

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072258

**SIMILAR U.S. STATE, OR U.S. LOCAL AUTHORITY WITH RESPECT TO ANY OF THE TAX ISSUES AFFECTING SHAREHOLDERS, THE MASTER FUND, AND/OR THE FUND, NOR HAS ANY OF THEM OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO ANY U.S. FEDERAL, U.S. STATE, OR U.S. LOCAL OR NON-U.S. TAX ISSUES. NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE BY THE FUND, THE MASTER FUND, INFINITY Q, OR THE BOARD OF DIRECTORS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES RELATING TO AN INVESTMENT IN THE FUND OR THE MASTER FUND.**

This summary is based upon interpretations of existing laws in effect on the date of this Memorandum. There can be no assurance that (i) changes in such authorities or their application or interpretation will not be made in the future, possibly with retroactive effect, or (ii) the U.S. or Cayman Islands taxing authorities will agree with the interpretation described below as applied to the Fund and/or the Master Fund.

### Cayman Islands Taxes

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the Shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has applied for and can expect to receive an undertaking from the Financial Secretary of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2018 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

### United States Taxes

<u>Fund Level - Capital Gains</u>. Section 864(b)(2) of the Code provides a safe harbor pursuant to which a foreign corporation that engages in the U.S. in trading securities for its own account will not be deemed to be engaged in a U.S. trade or business. The Fund intends to conduct its activities in a manner so as to satisfy the requirements of this safe harbor. Thus, the Fund's securities trading activities should not constitute a U.S. trade or business, and the Fund generally should not be subject to U.S. Federal income tax relating to capital gains on its trading profits. However, if certain of the activities of the Fund were determined to be outside the scope of this safe harbor, the Fund may be considered to be engaged in a U.S. trade or business. If the Fund were considered to be engaged in a U.S. trade or business, the Fund would be subject to U.S. Federal income tax and branch profits tax on some or all of its income and profits. Assuming that the Fund qualifies for this safe harbor, the Fund will not be subject to any U.S. Federal income tax on its capital gains from the sale of securities to the extent that such securities are not classified as "United States real property interests" ("<u>USRPIs</u>") within the meaning of Code Section 897 or are otherwise not treated as giving rise to income or gain that is treated as effectively connected with the conduct of a trade or business in the U.S. The Fund will be subject to U.S. Federal income tax on any gain realized from the sale of a USRPI, which term generally includes, among other things, stock of a "United States real property holding corporation."

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072259

Fund Level - Dividend and Interest Income. Assuming that the Fund qualifies for the safe harbor discussed above, the only U.S. Federal income taxes which will be payable by the Fund on its income from dividends and interest is the 30% withholding tax applicable to dividends and certain interest income considered to be from sources within the U.S. This tax will apply even if the Fund complies with its obligations under the HIRE Act.

Shareholder Level. Shareholders, as long as they are neither citizens nor residents of the U.S. nor engaged in a trade or business in the U.S., are not subject to any U.S. Federal income, withholding, capital gains, estate or inheritance taxes with respect to the Participating Shares owned by them or dividends received on such Participating Shares. Shareholders may be required to make certain certifications as to the beneficial ownership of the Participating Shares and the non-U.S. status of such beneficial owner in order to be exempt from U.S. information reporting and backup withholding tax.

FATCA Provisions of the HIRE Act. The FATCA provisions of the HIRE Act provide that the Fund must disclose the name, address and taxpayer identification number of certain U.S. persons that own, directly or indirectly, an interest in the Fund, as well as certain other information relating to any such interest, pursuant to the terms of the Cayman IGA and implementing legislation and regulations adopted by the Cayman Islands. If the Fund fails to comply with these requirements, then a 30% withholding tax will be imposed on payments to the Fund of U.S. source income and proceeds from the sale of property that could give rise to U.S. source interest or dividends. The withholding tax provisions of the HIRE Act became effective July 1, 2014. Although the Fund will attempt to satisfy any obligations imposed on it to avoid the imposition of this withholding tax, no assurance can be given that the Fund will be able to satisfy these obligations. In this regard, the Fund may require investors to provide any documentation or other information regarding the investor and its beneficial owners that the Fund determines is necessary or desirable in order for the Fund to avoid the withholding tax and otherwise comply with the HIRE Act. If the Fund becomes subject to a withholding tax as a result of the HIRE Act, the value of Participating Shares held by all Shareholders may be materially affected, although the Fund generally expects to charge the amounts to relevant investors, as applicable.

The Cayman Islands legislation requires the Fund to make an annual report to the Cayman Islands Tax Information Exchange Authority (the Cayman TIA). Any information provided by the Fund to the Cayman TIA will be shared with the IRS.

IRS Audits of the Master Fund: If the income tax returns of the Master Fund are audited by the IRS, the tax treatment of the Master Fund's tax items will generally be determined at the Master Fund level in a single proceeding rather than by individual audits of the partners of the Master Fund (collectively, the "Master Fund Partners.") If the tax treatment of any of the Master Fund's activities or tax items becomes subject to an audit, the Master Fund may incur significant costs and expenses (including but not limited to accounting and legal expenses) responding to such audit and potentially defending against any proposed alternative to such tax treatment, even if the Master Fund's original tax treatment that was the subject of the audit is ultimately determined to be correct.  In this regard, Infinity Q, as the Partnership Representative, has considerable authority to make decisions affecting the tax treatment and procedural rights of all Master Fund Partners (including the Fund, thereby affecting the Shareholders.)

The Partnership Representative's actions, including the Partnership Representative's agreement to adjustments of the Master Fund's income in settlement of an IRS audit of the Master Fund, as applicable, will bind all Master Fund Partners.

U.S. federal income taxes (and any related interest and penalties) attributable to an adjustment to the Master Fund's income following an IRS audit or judicial proceeding will, absent an election by the Master Fund to the contrary, have to be paid by the Master Fund in the year during which the audit or other

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072260

proceeding is resolved, if such adjustment results in an increase in U.S. federal income tax liability (as determined under tax rules applicable to audits of partnerships). If an adjustment to the Master Fund income following an IRS audit or judicial proceeding results in an adjustment in U.S. federal income tax liability (as determined under tax rules applicable to audits of partnerships), the adjustment will flow-through to the Master Fund Partners based on their interests for the year in which the audit or other proceeding is resolved. This could cause the economic burden of U.S. federal income tax liability (or the economic benefit of a favorable adjustment) arising on audit of the Master Fund to be borne by (or, in the case of a favorable adjustment, to benefit) Master Fund Partners based on their interests in the Master Fund in the year during which the audit or other proceeding is resolved, even though such tax liability (or benefit) is attributable to an earlier taxable year in which the interests or identity of some or all of the Master Fund Partners was different. The partnership tax audit rules also can cause the Master Fund's U.S. federal income tax liability arising on audit to be computed in less advantageous ways than the tax liability of the Partners would be computed if the Fund had not been audited (for example, absent an adjustment, by applying the highest marginal federal income tax rates and potentially ignoring the tax-exempt status of certain Master Fund Partners). In calculating taxes imposed on the Master Fund with respect to audit adjustments, the Master Fund may be able to take into account certain applicable lower tax rates and the tax-exempt status of certain Master Fund Partners.

In addition, if elected by the Partnership Representative, alternative procedures may allow the Master Fund to avoid such entity-level U.S. federal income tax liability in some cases if certain conditions are satisfied. These alternative procedures may require Master Fund Partners to (i) file amended returns (and pay any tax that would be due) for the prior tax year under audit, (ii) adjust the tax liability reported on their income tax returns for the year in which the audit is resolved, and/or (iii) provide certain information to the Master Fund (possibly including information about the owners of Master Partners classified as partnerships).

The foregoing partnership audit rules may also apply to audits of any holding partnership or portfolio company that is treated as a partnership for federal income tax purposes. Any U.S. federal income taxes (and any related interest and penalties) paid by the Master Fund, a holding partnership or by a portfolio company treated as a partnership, in respect of IRS audit adjustments at the Master Fund, the holding partnership or portfolio company level will be allocated by Infinity Q, as the Master Fund General Partner, to, and will be borne by, the Master Fund (and, accordingly, the Master Fund Limited Partners, including the Fund (and the Participating Shareholders indirectly, through the Fund) pursuant to the terms of the Partnership Agreement. The cost of any audit of a Master Fund Partner will be borne solely by that Master Fund Partner.

_Consistency in Reporting_. In certain cases, the Master Fund may be required to file a statement with the IRS disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Master Fund Partners are required under the Partnership Agreement and the Code to treat the Master Fund's tax items consistently on their own returns. Given the uncertainty and complexity of the tax laws, it is possible that the IRS may not agree with the manner in which the Master Fund's items have been reported. As noted above, if the income tax returns of the Master Fund are audited by the IRS, the tax treatment of the Master Fund's tax items will generally be determined at the Master Fund level in a single proceeding rather than by individual audits of the Master Fund Partners.

_No Assurance That the Fund Will Not Be Subject to U.S. State and Local Tax_. The Fund intends to conduct its activities so as not to result in any U.S. state and local tax liabilities for the Fund or the Shareholders. However, the Master Fund General Partner and the Investment Manager conduct the Master Fund and the Fund's activities from an office in in the U.S. Consequently, no assurance can be given that the Fund's activities will not be subject to U.S. state and local tax, which taxation may arise due to future changes in law.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072261

Prospective investors in the Fund are urged to consult with their own tax advisors regarding the possible implications of the foregoing with respect to an investment in the Fund.

**Other Intergovernmental Agreements**

The Cayman Islands has also signed with the United Kingdom a separate inter-governmental agreement (the "UK IGA"). The UK IGA imposes similar requirements to the United States inter-governmental agreement (the "US IGA"), so that the Fund will be required to identify accounts held directly or indirectly by "Specified United Kingdom Persons" and report information on such Specified United Kingdom Persons to the Cayman Islands Tax Information Authority ("Cayman TIA"), which will exchange such information annually with HM Revenue & Customs ("HMRC"), the United Kingdom tax authority.

The Cayman Islands has signed two inter-governmental agreements to improve international tax compliance and the exchange of information - one with the United States and one with the United Kingdom (the "US IGA" and the "UK IGA", respectively). The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard ("CRS" and together with the US IGA and the UK IGA, "AEOI").

Cayman Islands regulations have been issued to give effect to the US IGA, the UK IGA and CRS (collectively, the "AEOI Regulations").  Pursuant to the AEOI Regulations, the Cayman Islands Tax Information Authority (the "TIA") has published guidance notes on the application of the US and UK IGAs and CRS. It is anticipated that the UK IGA, related regulations and relevant provisions of the guidance notes will be phased out and replaced with CRS.

All Cayman Islands "Financial Institutions" are required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, unless they are able to rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes, in which case only the registration requirement would apply under CRS. The Fund does not propose to rely on any Non-Reporting Financial Institution exemption and therefore intends to comply with all of the requirements of the AEOI Regulations.

The AEOI Regulations require the Fund to, amongst other things (i) register with the IRS to obtain a GIIN / Global Intermediary Identification Number (in the context of the US IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution", (iii) adopt and implement written policies and procedures setting out how it will address its obligations under CRS, (iv) conduct due diligence on its accounts to identify whether any such accounts are considered "Reportable Accounts", and (v) report information on such Reportable Accounts to the TIA.  The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (e.g. the IRS in the case of a US Reportable Account) annually on an automatic basis.

By investing in the Fund and/or continuing to invest in the Fund, investors shall be deemed to acknowledge that further information may need to be provided to the Fund, the Fund's compliance with the AEOI Regulations may result in the disclosure of investor information, and investor information may be exchanged with overseas fiscal authorities.  Where an investor fails to provide any requested information (regardless of the consequences), the Fund may be obliged, and/or reserves the right, to take any action and/or pursue all remedies at its disposal including, without limitation, compulsory redemption of the investor concerned and/or closure of the investor's account.  In accordance with TIA issued guidance, the

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072262

Fund is required to close an investor's account if a self-certification is not obtained within 90 days of account opening.

By investing (or continuing to invest) in the Fund, Shareholders shall be deemed to acknowledge that: (i) the Fund (or its agent) may be required to disclose to the Cayman TIA certain confidential information in relation to the Shareholder, including, but not limited to, the Shareholder's name, address, tax identification number (if any), social security number (if any) and certain information relating to the Shareholder's investment; (ii) the Cayman TIA may be required to automatically exchange information as outlined above with the IRS, HMRC and other foreign fiscal authorities; (iii) the Fund (or its agent) may be required to disclose to the IRS, HMRC and other foreign fiscal authorities certain confidential information when registering with such authorities and if such authorities contact the Fund (or its agent directly) with further inquiries; (iv) the Fund may require the Shareholder to provide additional information and/or documentation which the Fund may be required to disclose to the Cayman TIA; (v) in the event a Shareholder does not provide the requested information and/or documentation and/or has not itself complied with the applicable requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund's or its Shareholders being subject to withholding tax under the relevant legislative or inter-governmental regime, the Fund reserves the right to take any action and/or pursue all remedies at its disposal, including, without limitation, compulsory redemption of the Shareholder concerned; and (vi) no Shareholder affected by any such action or remedy shall have any claim against the Fund (or its agent) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with any of the AEOI, the AEOI Regulations, any future IGAs, or any of the relevant underlying legislation.

**THIS AEOI SUMMARY IS BASED ON GUIDANCE ISSUED BY THE IRS, THE CAYMAN TIA, AND OTHER APPLICABLE GOVERNMENTAL BODIES. FUTURE GUIDANCE AND/OR LEGISLATIVE DEVELOPMENTS MAY AFFECT THE APPLICATION OF AEOI TO INVESTMENTS IN THE FUND.**

**Other Taxes**

The Master Fund or the Fund may be subject to income taxes or withholding taxes imposed by the various non-U.S. jurisdictions in which the Master Fund or the Fund invests. The Fund will use its best efforts to avoid causing any Shareholder (or beneficial owner thereof) to, as a result of an investment in the Fund, be subject directly to any non-US taxes or tax-filing obligations, although there can be no assurance that the Fund will be able to do so. Prospective investors should consult their own counsel regarding tax laws and regulations of any other jurisdiction which may be applicable to them.

**U.S. Shareholders - Special Considerations**

PFIC Status. As noted above, Participating Shares may be sold to U.S. investors who are pension and profit sharing trusts or other tax-exempt organizations ("U.S. Exempt Shareholders"). The Fund is a "passive foreign investment company" ("PFIC") as defined in Code Section 1297. The Fund is not obligated to furnish information necessary for a U.S. person to treat the Fund as a "qualified electing fund" in the event that a U.S. person that is not a U.S. Exempt Shareholder is considered to own Participating Shares under the constructive ownership rules of Code Section 1298.

Unrelated Business Taxable Income. While the Master Fund may purchase securities on margin, borrow money and otherwise utilize leverage in connection with its investments, under present law that leverage should not be attributed to U.S. Exempt Shareholders in the Fund. Accordingly, assuming a U.S. Exempt Shareholder does not borrow money or otherwise utilize leverage to purchase its Participating Shares, the U.S. Exempt Shareholder generally should not realize "unrelated debt-financed income" as

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072263

defined in Code Section 514 or "unrelated business taxable income" as defined in Code Section 512 with respect to its investment in the Fund and generally should not be subject to U.S. Federal income tax under the PFIC provisions of the Code with respect to its investment in the Fund.

Controlled Foreign Corporation Status. The Investment Manager will monitor the Fund's Shareholders in an attempt to ensure that at all times the ownership of the Fund by U.S. Exempt Shareholders is below the threshold amounts set forth in Code Section 957 and therefore that the Fund will not be classified as a "controlled foreign corporation" as defined in Code Section 957, although there can be no assurance that the Investment Manager will be able to do so.

Information Reporting. U.S. Exempt Shareholders may be subject to certain IRS filing requirements. For example, pursuant to Code Section 6038B, a U.S. person who transfers property (including cash) to a foreign corporation in exchange for stock in the corporation is in some cases required to file an information return with the IRS with respect to such transfer. Accordingly, a U.S. Exempt Shareholder may be required to file an information return with respect to its investment in the Fund. Additional reporting requirements may be imposed on a U.S. Exempt Shareholder that acquires Participating Shares with a value equal to at least 10% of the aggregate value of all the Participating Shares. U.S. Exempt Shareholders also may be required to file other information returns with the U.S. Treasury Department or the IRS with respect to their investment in the Fund. Shareholders should consult their own tax advisers with respect to any applicable filing requirements. A U.S. person may have certain reporting requirements based on such U.S. person's direct or indirect ownership interest in the Fund (e.g., as applicable, by filing Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts (FBAR)) or may be required to file certain disclosure statements if the Fund engages in certain "reportable transactions" within the meaning of U.S. Treasury Regulations. Prospective investors that are U.S. persons should consult their own advisers regarding such reporting requirements.

**Future Tax Legislation**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings, decisions or guidance by the IRS, or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively.

**Future Changes in Applicable Law**

The foregoing description of U.S. and Cayman Islands income tax consequences of an investment in and the operations of the Fund and the Master Fund is based on laws and regulations which are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund or the Master Fund to income taxes or subject investors to increased income taxes.

**THE FOREGOING SUMMARY IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX AND REGULATORY PLANNING. PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN TAX AND REGULATORY ADVISERS WITH RESPECT TO AN INVESTMENT IN THE FUND AND THE MASTER FUND.**

**THE FOREGOING IS A SUMMARY OF SOME OF THE IMPORTANT TAX RULES AND CONSIDERATIONS AFFECTING THE SHAREHOLDERS, THE FUND AND THE FUND'S OPERATIONS AND DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OF ALL RELEVANT TAX RULES AND CONSIDERATIONS, NOR DOES IT PURPORT TO BE A COMPLETE LISTING OF ALL POTENTIAL TAX RISKS INHERENT IN PURCHASING OR HOLDING AN INTEREST IN THE FUND. THE FOREGOING IS ALSO NOT INTENDED AS A**

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072264

**SUBSTITUTE FOR CAREFUL TAX AND REGULATORY PLANNING. PROSPECTIVE INVESTORS IN THE FUND ARE URGED TO CONSULT THEIR OWN TAX AND REGULATORY ADVISERS WITH RESPECT TO AN INVESTMENT IN THE FUND AND IN ORDER TO FULLY UNDERSTAND THE U.S. FEDERAL, STATE AND LOCAL INCOME TAX CONSEQUENCES, THE NON-U.S. TAX CONSEQUENCES, AND OTHER TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND AND THE MASTER FUND.**

## ERISA AND RETIREMENT PLAN CONSIDERATIONS

The following is a summary of certain aspects of laws and regulations applicable to retirement plan investments as in existence on the date hereof, all of which are subject to change. This summary is general in nature and does not address every issue that may be applicable to the Fund, the Master Fund, or a particular investor.

The Fund may accept subscriptions from pension and profit-sharing plans maintained by U.S. corporations and/or unions, individual retirement accounts and Keogh plans, entities that invest the assets of such accounts or plans and other entities investing plan assets (all such entities are herein referred to as "Benefit Plan Investors") as well as subscriptions from plans maintained by governmental entities, churches and non-U.S. companies. Infinity Q does not anticipate that the Fund's or the Master Fund's assets (individually or collectively) will be subject to ERISA or the prohibited transaction provisions of Code because Infinity Q intends to limit the investments in the Fund and the Master Fund by Benefit Plan Investors. It is further anticipated that the assets of the Fund and the Master Fund will not be subject to any other law or regulation specifically applicable to governmental, church or non-U.S. plans ("Similar Law"). Under ERISA and the regulations thereunder, the Fund's and the Master Fund's assets will not be deemed to be plan assets subject to Title I of ERISA or Section 4975 of the Code if less than 25% of the value of the applicable interests are held by Benefit Plan Investors, excluding from this calculation any non-Benefit Plan Investor interests held by Infinity Q, and certain affiliated persons or entities. The Fund will not knowingly accept subscriptions for Participating Shares or permit transfers of Participating Shares to the extent that such investment or transfer would subject the Fund's or the Master Fund's assets to Title I of ERISA or Section 4975 of the Code. In addition, the Fund has the authority to require the redemption of all or some of the Participating Shares held by any Benefit Plan Investor or other plan investor if the continued holding of such Participating Shares, in the opinion of the Directors, could result in the Fund or the Master Fund being subject to Title I of ERISA, Section 4975 of the Code or Similar Law.

Similarly, under ERISA and the regulations thereunder, interests in a Designated Reserve Account (a "Special Investment") will not be deemed to be plan assets subject to Title I of ERISA or Section 4975 of the Code if, in accordance with ERISA, less than 25% of the value of the applicable interests in the underlying Designated Illiquid Investments are held by Benefit Plan Investors, excluding from this calculation any non-Benefit Plan Investor interests held by Infinity Q, and certain affiliated persons or entities. The Fund will not knowingly accept subscriptions for Shares having an interest in a Special Investment or permit transfers of Shares having an interest in a Special Investment to the extent that such investment or transfer would subject the Fund's or the Master Fund's assets to Title I of ERISA or Code Section 4975.

Certain duties, obligations and responsibilities are generally imposed on persons who serve as fiduciaries with respect to employee benefit plans or accounts ("Plans"); for example, ERISA and the Code prohibit acts of fiduciary self-dealing and certain transactions between Plans and "parties-in-interest" or "disqualified persons" (as such terms are defined in ERISA and the Code). In the Fund's Subscription Agreement, each Plan investor will be required to make certain representations, including that the person who is making the decision to invest in the Fund is independent and has not relied on any advice from the Fund, Infinity Q, any placement agent associated with the Fund, or any of their affiliates with respect to the

Confidential Treatment Requested by Infinity Q Capital Management, LLC     IQCM-SEC-00072265

investment in the Fund. Accordingly, Plan fiduciaries should consult their own investment advisors and their own legal counsel regarding the investment in the Fund (and, indirectly, the Master Fund) and its consequences under applicable law, including ERISA, the Code and any Similar Law.

All Plans subject to Title I of ERISA ("ERISA Plans") are required to file annual reports (Form 5500) with the U.S. Department of Labor setting forth the fair market value of all ERISA Plan assets. Under ERISA's general reporting and disclosure rules, ERISA Plans are required to include information regarding their assets, expenses and liabilities. To facilitate an ERISA Plan administrator's compliance with these requirements, it is noted that the descriptions of the fees and expenses contained in this Memorandum, including but not limited to the Management Fee and Performance Allocation as supplemented annually by the Fund's audited financial statements and the notes thereto, are intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of Form 5500.

## EUROPEAN UNION SAVINGS DIRECTIVE

Dividends and other distributions of income made by the Administrator on behalf of the Fund, together with payment of the proceeds of sale and/or redemption of Shares ("Payments") are not subject to any reporting or withholding requirements that may arise as a result of the applicable legislation which implements the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "EUSD") as the Administrator is not located in the European Union (or a country that has implemented measures similar or equivalent to the EUSD).

If an investor in the Fund is based in the European Union or certain states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) and is making investments on behalf of other underlying investors who are individuals or certain unincorporated entities resident in the European Union or certain of the states which have similar equivalent measures to the EUSD, then the provisions of the EUSD or similar or equivalent measures may apply. In such circumstances such an investor may become a "paying agent" and may be required to obtain all relevant documentation relating to its underlying investors and make returns to the appropriate tax authorities or withhold tax at applicable rates from any redemption proceeds in accordance with the applicable legislation that implements the EUSD or similar or equivalent measures.

On November 10, 2015, the European Council repealed the EUSD with effect from January 1, 2016 (January 1, 2017 in the case of Austria) in order to avoid overlap with the requirements of the CRS and other tax information reporting regimes. It is anticipated that the Cayman Islands, together with those other jurisdictions which have adopted EUSD-equivalent legislation, will also give consideration in due course to the repeal of their EUSD-equivalent legislation in the light of the introduction of the CRS regime. The Cayman Islands government has recently issued an industry advisory, which confirms that Reporting of Savings Income Information for EUSD purposes is not required from 2017 onwards because this information will be covered by reporting under the CRS.

## FISCAL YEAR AND FISCAL PERIODS; FINANCIAL STATEMENTS; AUDITORS

The Fiscal Year of the Fund will end on December 31 of each year.

Since Participating Shares may be issued and redeemed by the Fund and dividends declared on Participating Shares during the course of a Fiscal Year, the Fund's Articles of Association provide for fiscal periods, which are portions of a Fiscal Year, for the purpose of allocating net profits and net losses to the records maintained for each series of Participating Shares. A new fiscal period will commence on each of the first day of each Fiscal Year, the date next following the date of any redemption of Participating Shares, the date of any issuance of Participating Shares and the date established by the Directors for determining the record ownership of Participating Shares for the payment of dividends, and the prior fiscal

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072266

period will terminate on the date immediately preceding the first day of a new fiscal period.

The books and records of the Fund will be audited at the end of each Fiscal Year by an auditor selected by the Investment Manager. Each Shareholder will receive unaudited reports of the performance of the Fund monthly, and the Fund will seek to furnish the Shareholders with audited year-end financial statements as soon as practicable after the year-end, including a statement of profit or loss for such Fiscal Year and of an unaudited status of such Shareholder's holdings in the Fund at such time. The Fund's financial statements will be prepared using GAAP as a guideline.

As a regulated mutual fund under Cayman Islands law, the Fund is required to file its audited financial statements with the Cayman Islands Monetary Authority within six (6) months of the end of its Fiscal Year.

EisnerAmper is the auditor for the Fund. The Board of Directors may change the Fund's auditors without prior notice to the Shareholders.

## GENERAL COMMENTS

**THE SUMMARY SET FORTH IN THIS MEMORANDUM DOES NOT PURPORT TO BE AND SHOULD NOT BE CONSTRUED AS A COMPLETE DESCRIPTION OF THE MEMORANDUM OF ASSOCIATION AND ARTICLES OF ASSOCIATION OF THE FUND, THE ADMINISTRATION AGREEMENT, THE PARTNERSHIP AGREEMENT, THE SUBSCRIPTION AGREEMENT, OR THE INVESTMENT MANAGEMENT AGREEMENT. ADDITIONALLY, PROSPECTIVE INVESTORS SHOULD BE AWARE OF CERTAIN ANTI-MONEY LAUNDERING REQUIREMENTS AND REGULATORY ISSUES.**

### Prevention of Money Laundering

United States: To ensure compliance with statutory and other generally accepted principles relating to anti-money laundering regulations and policies, including the Fund's and Infinity Q's obligations under the USA Patriot Act, the Fund requires verification of identity and source of funds from all prospective investors in the Fund. Pending the provision of evidence satisfactory to the Fund, admission of an investor may be delayed in the sole discretion of Infinity Q or the Board of Directors. If Infinity Q or the Administrator has not received satisfactory evidence of an investor's identity within a reasonable period of time following a request for such evidence, Infinity Q may refuse to admit the investor, in which event any subscription proceeds received by the Fund from such investor will be returned to the account of such investor. If Infinity Q has suspicion that a payment to the Fund (by way of subscription or otherwise) contains the proceeds from criminal conduct, it may be required under applicable anti-money laundering laws and regulations to report its suspicions to one or more enforcement or regulatory agencies, including various U.S. governmental agencies. In addition, in accordance with the USA Patriot Act and certain interpretations thereunder, certain U.S. financial institutions, such as SEC-registered broker-dealers, may seek to rely on customer identification procedures undertaken by Infinity Q in order to discharge certain of their own anti-money laundering obligations. In such situations, Infinity Q may elect to undertake such procedures or to permit such reliance, which may involve sharing of customer identification information between Infinity Q and the relying financial institution.

Cayman Islands Cayman Islands. In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity, the identity of their beneficial owners/controllers (where applicable), and source of funds. Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072267

(including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a Shareholder (i.e. a subscriber or a transferee) and the identity of their beneficial owners/controllers (where applicable). Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required at subscription where an exemption applies under the Anti-Money Laundering Regulations (2018 Revision) of the Cayman Islands, as amended and revised from time to time (the "AML Regulations") or any other applicable law. However, detailed verification information may be required prior to the payment of any proceeds from or any transfer of an interest in Shares.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, or if the application has already occurred, may suspend or redeem the interest, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a Shareholder if the Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such Shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or money laundering or is involved with terrorism or terrorist financing and property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority ("FRA") of the Cayman Islands, pursuant to the Proceeds of Crime Law (2018 Revision) of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the FRA, pursuant to the Terrorism Law (2018 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

The Fund is subject to laws that restrict it from dealing with entities, individuals, organisations and/or investments which are subject to applicable sanctions regimes.

Accordingly, the Fund will require the subscriber to represent and warrant, on a continuing basis, that it is not, and that to the best of its knowledge or belief its beneficial owners, controllers or authorised persons ("Related Persons") (if any) are not; (i) named on any list of sanctioned entities or individuals maintained by the US Treasury Department's Office of Foreign Assets Control ("OFAC") or pursuant to European Union ("EU") and/or United Kingdom ("UK") Regulations (as the latter are extended to the Cayman Islands by Statutory Instrument), (ii) operationally based or domiciled in a country or territory in relation to which sanctions imposed by the United Nations, OFAC, the EU and/or the UK apply, or (iii) otherwise subject to sanctions imposed by the United Nations, OFAC, the EU or the UK (including as the latter are extended to the Cayman Islands by Statutory Instrument) (collectively, a "Sanctions Subject").

Where the subscriber or a Related Person is or becomes a Sanctions Subject, the Fund may be required immediately and without notice to the subscriber to cease any further dealings with the subscriber and/or the subscriber's interest in the Fund until the subscriber ceases to be a Sanctions Subject, or a

Confidential Treatment Requested by Infinity Q Capital Management, LLC          IQCM-SEC-00072268

licence is obtained under applicable law to continue such dealings (a "Sanctioned Persons Event").  The Fund, the directors, the Administrator and the Investment Manager shall have no liability whatsoever for any liabilities, costs, expenses, damages and/or losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of revenue, loss of reputation and all interest, penalties and legal costs and all other professional costs and expenses) incurred by the subscriber as a result of a Sanctioned Persons Event.

In addition, should any investment made on behalf of the Fund subsequently become subject to applicable sanctions, the Fund may immediately and without notice to the subscriber cease any further dealings with that investment until the applicable sanctions are lifted or a licence is obtained under applicable law to continue such dealings (a "Sanctioned Investment Event").

**Anti-Money Laundering Officers.**  In conformity with the AML Regulations, the Directors have designated (i) Scott Lindell to act as the Anti-Money Laundering Compliance Officer of the Fund and the Money Laundering Reporting Officer of the Fund; and (ii) James Velissaris to act as the Deputy Money Laundering Reporting Officer of the Fund. The biography of each of Scott Lindell and James Velissaris is provided above in "MANAGEMENT OF THE FUND – Investment Professionals Associated With Infinity Q."

**Regulation.**  The Fund is regulated as a mutual fund under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("Mutual Funds Law").  The Cayman Islands Monetary Authority (the "Authority") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law.  Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority.  As a regulated mutual fund, the Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Authority within such time as the Authority specifies.  Failure to comply with these requests by the Authority may result in substantial fines on the part of the Directors and may result in the Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund in certain circumstances.  Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  The powers of the Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.  There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Fund, or any directors or agents domiciled in the Cayman Islands, may be compelled to provide information, including, but not limited to, information relating to the Subscriber, and where applicable the Subscriber's beneficial owners and controllers, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2018 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income Information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential

Confidential Treatment Requested by Infinity Q Capital Management, LLC
IQCM-SEC-00072269

information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, director or agent, may be prohibited from disclosing that the request has been made.

**Beneficial Ownership Regime.** The Fund is regulated as a mutual fund under the Mutual Funds Law and, accordingly, does not fall within the scope of the primary obligations under Part XVIIA of the Companies Law (the "Beneficial Ownership Regime"). The Fund is therefore not required to maintain a beneficial ownership register. The Fund may, however, be required from time to time to provide, on request, certain particulars to other Cayman Islands entities which are within the scope of the Beneficial Ownership Regime and which are therefore required to maintain beneficial ownership registers under the Beneficial Ownership Regime. It is anticipated that such particulars will generally be limited to the identity and certain related particulars of (i) any person holding (or controlling through a joint arrangement) a majority of the voting rights in respect of the Fund; (ii) any person who is a member of the Fund and who has the right to appoint and remove a majority of the board of directors of the Fund; and (iii) any person who has the right to exercise, or actually exercises, dominant direct influence or control over the Fund.

### Electronic Communication Consent

The Fund, Infinity Q, the Administrator or any agent of the foregoing may communicate with Shareholders (e.g. financial statements, performance reports, manager letters) by using a variety of means including, but not limited to, by telephone, e-mail, password protected Internet website, regular mail and facsimile. A Shareholder may, at any time, notify the Fund that it does not wish to receive electronic communication and receive paper communication instead.

### Data Protection/Confidentiality

Each Shareholder will be requested to acknowledge and consent that the Fund, the Administrator and/or Infinity Q may disclose to each other, to any regulatory body, to a delegate, agent or any other service provider in any jurisdiction, including those outside of the U.S., the Cayman Islands, or the European Economic Area, copies of the Shareholder's subscription application and any information concerning the Shareholder provided by the Shareholder to the Fund, the Administrator and/or Infinity Q. Any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on such person by law or otherwise.

## PRIVACY POLICY AND PROCEDURES

**Confidential Investor Information.** In the course of its business activities, the Fund, the Master Fund, and Infinity Q gain access to non-public information about the Shareholders. Such information may include personal financial and account information, information relating to a Shareholder's investment in the Fund or services performed for or transactions entered into on behalf of such Shareholder, information provided in subscription documents or other documents furnished by such Shareholder and data or analyses derived from such information (collectively referred to as "Confidential Information"). All Confidential Information, whether relating to the Fund's current or former Shareholders, is subject to this Privacy Policy and Procedures. Any doubts about the confidentiality of information will be resolved in favor of confidentiality.

**Non-Disclosure of Confidential Information.** The Fund, the Master Fund, and Infinity Q do not share Confidential Information with any third parties except in the following circumstances:

(i)     as necessary to conduct the business of the Fund or to maintain and service a Shareholder's account. The Fund and the Master Fund will request that any financial intermediary, agent or sub-contractor

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072270

utilized by the Fund and the Master Fund comply with substantially similar standards for non-disclosure and protection of Confidential Information and use the information provided by the Fund and the Master Fund only for the performance of the specific service requested by the Fund and the Master Fund;

(ii) as required by regulatory authorities or law enforcement officials who have jurisdiction over the Fund or the Master Fund or as otherwise required by any applicable law. In the event that the Fund or the Master Fund is compelled to disclose Confidential Information, the Fund or the Master Fund shall, if reasonably practicable and permitted by applicable law and regulations, provide prompt notice to the affected Shareholders so that such Shareholders may seek a protective order or other appropriate remedy. If no protective order or other appropriate remedy is obtained, then the Fund, the Master Fund, or Infinity Q, as applicable, shall disclose information in compliance with applicable laws and regulations; or

(iii) to the extent reasonably necessary to prevent fraud, unauthorized transactions or liability.

Each Shareholder, on subscribing for Shares, shall be deemed to have consented to such release of such confidential information pursuant to the terms of The Confidential Information Disclosure Law, 2016 of the Cayman Islands.

Employees of the Fund (as applicable), the Master Fund, Infinity Q, and their affiliates are permitted to disclose Confidential Information only to such other employees of the Fund (as applicable), the Master Fund, Infinity Q, or their affiliates who need to have access to such information to conduct the business of the Fund or the Master Fund. Employees of the Fund (as applicable), the Master Fund, Infinity Q, and their affiliates are prohibited, both during and after termination of their employment, from (i) disclosing Confidential Information to any person or entity outside the Fund or the Master Fund, including family members, except under the circumstances described above, and (ii) making unauthorized copies of any documents or files containing Confidential Information and, upon termination of their employment, must return all such documents to the Fund. Any employee of the Fund, the Master Fund, Infinity Q, and their affiliates who violates the non-disclosure policy described above will be subject to disciplinary action, including possible discharge, whether or not he or she benefited from the disclosed information.

**Security of Confidential Personal Information.** The Fund and the Master Fund restrict access to Confidential Information to those employees of the Fund (as applicable), the Master Fund, Infinity Q, and their affiliates who need to know such information to conduct the businesses of the Fund and the Master Fund. Any conversations involving Confidential Information, if appropriate, will be conducted by Infinity Q's employees with care to avoid any unauthorized persons overhearing or intercepting such conversations.

**Enforcement and Review of Privacy Policy and Procedures.** Infinity Q is responsible for reviewing, maintaining and enforcing this Privacy Policy and Procedures. Infinity Q may take any disciplinary or other action as it may deem appropriate. Infinity Q is also responsible for conducting appropriate employee training to ensure employee adherence to this Privacy Policy and Procedures.

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072271

# INFINITY Q VOLATILITY ALPHA OFFSHORE FUND, LTD.

## INVESTMENT ADVISER

**Infinity Q Capital Management, LLC**
888 7th Avenue, 37th Floor
New York, NY 10106

## ADMINISTRATOR OF THE FUND

**US Bancorp Fund Services, Ltd.**
Governors Square, P.O. Box 10555
23 Lime Tree Bay Avenue West Bay
Grand Cayman, KY1-1005, Cayman Islands

## LEGAL COUNSEL TO THE INVESTMENT ADVISER AND THE FUND

### U.S. LEGAL COUNSEL

**Kelly Hart & Hallman LLP**
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telephone: (817) 878-3535
Facsimile: (817) 878-9735

### CAYMAN ISLANDS LEGAL COUNSEL

**Maples and Calder**
PO Box 309, Ugland House
Grand Cayman, KY1-1104, Cayman Islands
Telephone: +1 (345) 814-5180
Facsimile: +1 (345) 949-8080

## AUDITOR

EisnerAmper
171 Elgin Avenue, Century Yard, Cricket Square
George Town, KY1-1109, Cayman Islands

## MASTER FUND PRIME BROKER

Citibank, N.A.
111 Wall Street
New York, New York 10005

Confidential Treatment Requested by Infinity Q Capital Management, LLC                    IQCM-SEC-00072272