# EXHIBIT D

485BPOS 1 tap-infinityq_485b.htm POST EFFECTIVE AMENDMENT - RULE 485B

Filed with the U.S. Securities and Exchange Commission on December 21, 2018

1933 Act Registration File No. 333-108394
1940 Act File No. 811-21422

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.  20549

FORM N-1A

REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933 ☒
    Pre-Effective Amendment No. _____ ☐
    Post-Effective Amendment No. <u>147</u> ☒
and
REGISTRATION STATEMENT UNDER THE INVESTMENT COMPANY ACT OF 1940 ☒
    Amendment No. <u>148</u> ☒

(Check appropriate box or boxes.)

## <u>Trust for Advised Portfolios</u>

(Exact Name of Registrant as Specified in Charter)

615 East Michigan Street
Milwaukee, Wisconsin 53202
(Address of Principal Executive Offices) (Zip Code)

(Registrant's Telephone Numbers, Including Area Code) (626) 914-7385

Christopher E. Kashmerick, President
Trust for Advised Portfolios
c/o U.S. Bank Global Fund Services
777 East Wisconsin Avenue, 10th Floor
Milwaukee, Wisconsin 53202
(Name and Address of Agent for Service)

Copies to:

Christopher D. Menconi, Esquire
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004

It is proposed that this filing will become effective

[  ]    immediately upon filing pursuant to paragraph (b)
[x]    on December 31, 2018 pursuant to paragraph (b)
[  ]    60 days after filing pursuant to paragraph (a)(1)
[  ]    on (date) pursuant to paragraph (a)(1)
[  ]    75 days after filing pursuant to paragraph (a)(2)
[  ]    on (date) pursuant to paragraph (a)(2) of Rule 485.

If appropriate, check the following box

[   ]      this post-effective amendment designates a new effective date for a previously filed post-effective amendment.



# Infinity Q Diversified Alpha Fund

| | |
|---|---|
| **Investor Class** | **IQDAX** |
| **Institutional Class** | **IQDNX** |

## PROSPECTUS

## December 31, 2018

A series of Trust for Advised Portfolios (the "Trust")

Beginning on January 1, 2021, as permitted by regulations adopted by the U.S. Securities and Exchange Commission, paper copies of the Fund's shareholder reports will no longer be sent by mail, unless you specifically request paper copies of the reports from the Fund or from your financial intermediary, such as a broker-dealer or bank. Instead, the reports will be made available on the Fund's website, www.infinityqfunds.com/fund-documents-downloads, and you will be notified by mail each time a report is posted and provided with a website link to access the report.

If you already elected to receive shareholder reports electronically, you will not be affected by this change and you need not take any action. You may elect to receive shareholder reports and other communications from the Fund electronically by contacting your financial intermediary, such as a broker-dealer or bank, or, if you are a direct investor, by calling the Fund toll-free at 1-844-IQFUND1 (473-8631) or by sending an e-mail request to ir@infinityq.com.

You may elect to receive all future reports in paper free of charge. If you invest through a financial intermediary, you can contact your financial intermediary to request that you continue to receive paper copies of your shareholder reports. If you invest directly with the Fund, you can call the Fund toll-free at 1-844-IQFUND1 (473-8631) or send an e-mail request to ir@infinityq.com to let the Fund know you wish to continue receiving paper copies of your shareholder reports. Your election to receive reports in paper will apply to all Funds held in your account if you invest through your financial intermediary.

**Neither the U.S. Securities and Exchange Commission nor the U.S. Commodity Futures Trading Commission has approved or disapproved these securities or determined if this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**TABLE OF CONTENTS**

Summary Section                                                                                                          1

Investment Objective, Principal Investment Strategies and Related Risks                                9

Disclosure of Portfolio Holdings                                                                                        19

Management of the Fund                                                                                                  19

Shareholder Information                                                                                                  21

Dividends and Distributions                                                                                              27

Tools To Combat Frequent Transactions                                                                           27

Tax Consequences                                                                                                          28

Share Class Information and Distribution Arrangements                                                   30

Additional Information                                                                                                    31

Financial Highlights                                                                                                        33

Privacy Notice                                                                                                              PN-1

*Table of Contents - Prospectus*

**SUMMARY SECTION**

**Investment Objective**

The Infinity Q Diversified Alpha Fund (the "Fund") seeks to generate positive absolute returns.

**Fees and Expenses of the Fund**

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund.

| SHAREHOLDER FEES *(fees paid directly from your investment)* | | Investor Class | | Institutional Class |
|---|---|---|---|---|
| Redemption Fee (as a percentage of amount redeemed on shares held for 60 days or less) | | 1.00% | | 1.00% |

| ANNUAL FUND OPERATING EXPENSES *(expenses that you pay each year as a percentage of the value of your investment)* | | Investor Class | | Institutional Class |
|---|---|---|---|---|
| Management Fees | | 1.70% | | 1.70% |
| Distribution (Rule 12b-1) Fees | | 0.25% | | None |
| Other Expenses [1] | | 0.63% | | 0.55% |
| Dividends on short sales, interest and broker fees | 0.20% | | 0.20% | |
| Remaining other expenses | 0.43% | | 0.35% | |
| Acquired Fund Fees and Expenses | | 0.08% | | 0.08% |
| Total Annual Fund Operating Expenses [2] | | 2.66% | | 2.33% |
| Less: Fee Waiver and Expense Reimbursement [3], [4] | | -0.18% | | -0.10% |
| Net Annual Fund Operating Expenses | | 2.48% | | 2.23% |

[1] Other Expenses include expenses of the Subsidiary (defined below) which were less than 0.01% for the most recent fiscal year.

[2] Total Annual Fund Operating Expenses do not correlate to the Ratio of Expenses to Average Net Assets Before Advisory Fee Waiver provided in the Financial Highlights section of the statutory prospectus, which reflects the operating expenses of the Fund and does not include 0.08% that is attributed to acquired fund fees and expenses ("AFFE").

[3] Infinity Q Capital Management, LLC (the "Adviser") has contractually agreed to waive a portion or all of its management fees and pay Fund expenses (excluding AFFE, taxes, interest expense, dividends on securities sold short and extraordinary expenses) in order to limit the Net Annual Fund Operating Expenses to 2.20% and 1.95% of average daily net assets of the Fund's Investor Class and Institutional Class shares, respectively (the "Expense Caps"). The Expense Caps will remain in effect through at least December 31, 2019, and may be terminated only by the Trust's Board of Trustees (the "Board"). The Adviser may request recoupment of previously waived fees and paid expenses from the Fund for three years from the date they were waived or paid, subject to, if different, the Expense Cap at the time of waiver/payment or the Expense Cap at the time of recoupment, whichever is lower.

[4] The Adviser has contractually agreed to waive the management fee it receives from the Fund in an amount equal to the management fee paid to the Adviser by the Subsidiary. This undertaking will continue in effect for so long as the Fund invests in the Subsidiary and may be terminated only with the approval of the Board.

*Example*

This Example is intended to help you compare the cost of investing in the Fund with the cost of investing in other mutual funds. The Example assumes that you invest $10,000 in the Fund for the time periods indicated and then redeem all of your shares at the end of those periods. The Example also assumes that your investment has a 5% return each year and that the Fund's operating expenses remain the same (taking into account the Expense Caps only in the first year). Although your actual costs may be higher or lower, based on these assumptions, your costs would be:

| | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| **Investor Class** | $251 | $809 | $1,394 | $2,980 |
| **Institutional Class** | $226 | $718 | $1,236 | $2,658 |

*Table of Contents - Prospectus*

*Portfolio Turnover*

The Fund pays transaction costs, such as commissions, when it buys and sells securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when Fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the Example, affect the Fund's performance. As discussed below, the Fund's investment strategies, including the use of derivative instruments, require frequent transactions that generate a portfolio turnover rate that is significantly higher than most equity funds. During the fiscal year ended August 31, 2018, the Fund's portfolio turnover rate was 8% of the average value of its portfolio, including cash and long-term derivative positions. This portfolio turnover rate calculation excludes derivatives and cash transactions. If such transactions were included, the Fund's portfolio turnover rate would be significantly higher.

## Principal Investment Strategies of the Fund

The Fund pursues its investment objective by aiming to provide exposure to several strategies often referred to as "alternative" or "absolute return" strategies. Absolute return strategies seek to produce positive performance in both positive and negative environments for equities, fixed income, and credit markets. Utilizing a diversified portfolio of instruments, the Fund seeks exposure to the following strategies: Volatility, Equity Long/Short, Relative Value and Global Macro. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time.

The Fund implements these strategies by investing globally (including in emerging markets) either directly in, or through total return swaps on a broad range of instruments, including, but not limited to, equities, bonds (including but not limited to high-yield or "junk" bonds), currencies, commodities, MLPs, credit derivatives, convertible securities, futures, forwards, options, including complex options such as barrier options. The Fund may also invest up to 25% of its assets in a subsidiary that is invested in these types of derivative instruments (the "Subsidiary") as described further below. The Fund has no limits with respect to the credit rating, maturity or duration of the debt securities in which it may invest.

The Adviser relies heavily on proprietary quantitative models and information as well as data supplied by third parties ("Models and Data"). Models and Data are used to construct sets of transactions and investments, to provide risk management insights, and to assist in hedging the Fund's investments. In most cases, the Fund's quantitative models are the determinative factor in making investment decisions. In some cases, at the portfolio manager's discretion, market risk exposure may be reduced through hedging.

The Fund is generally intended to have a low average correlation and beta to the equity, fixed income, and credit markets. Beta is a measure of the systematic risk of a security or portfolio in comparison to the market as a whole. The excess return generated by the Fund beyond the return attributable to equity, fixed income, and credit markets is alpha. The Fund generally intends to generate the majority of its performance through alpha. The Adviser will attempt to mitigate risk through diversification of holdings and through active monitoring of volatility, counterparties and other risk measures. There is no assurance, however, that the Fund will achieve its investment objective.

As discussed above, the Fund provides exposure to several absolute return strategies through a single registered investment company. The Fund currently intends to have exposure to each of these strategies; however, it may vary its level of allocation among these strategies depending on market conditions, including reducing the exposure to any strategy to zero. The Adviser believes that, based on a comprehensive analysis of the key drivers of return from these strategies (which are traditionally made available through hedge funds), it can capture a meaningful portion of the return that these strategies can be expected to provide. The Fund is generally intended to have a low correlation to the equity, fixed income, and credit markets. The Fund may add additional strategies from time to time, but currently pursues its investment objective by following the four primary strategies discussed in greater detail below:

*Table of Contents - Prospectus*

2

**Volatility**: The Volatility Strategy provides long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates, and commodities markets. The Fund invests long positions in derivatives it expects to increase in value and short sells derivatives it expects to decrease in value. Derivatives are instruments that derive their value from the performance of an underlying security or index. These instruments include index options (vanilla and exotic), volatility and variance swaps, correlation swaps, credit default swaps, swaptions, and total return swaps.

**Equity Long/Short**: The Equity Long/Short Strategy provides long and short exposure to a diversified portfolio of equities which involves investing long in equities the Adviser expects to increase in value and short selling equities the Adviser expects to decrease in value. When taking a "short" position, the Fund may sell an instrument that it does not own and would then borrow an instrument to meet its settlement obligations. The Fund may also take long and short positions in options, futures, forwards or swaps.

**Relative Value**: The Relative Value Strategy seeks to generate profit by simultaneously investing directly in and taking short positions (*i.e.,* going long and short) in highly correlated securities (*e.g.*, long front-month WTI oil futures and short third-month WTI oil futures). The Fund takes long and short positions in securities across equities, currencies, bonds, interest rates, and commodities markets. The Strategy typically has a short-term holding period, which causes high portfolio turnover.

**Global Macro**: The Global Macro Strategy seeks to profit by forecasting price movements based on changing macroeconomic conditions and the impact of economic events across a broad spectrum of assets. This Strategy provides long and short exposure to equities, currencies, bonds, interest rates, and commodities markets.

The Fund's strategies may result in frequent portfolio trading and high portfolio turnover (greater than 100%). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when shares are held in a taxable account. Higher portfolio turnover rates generate capital gains that must be distributed to shareholders and could increase brokerage commission costs. To the extent that the Fund experiences an increase in brokerage commissions due to a higher portfolio turnover rate, the performance of the Fund could be negatively impacted by the increased expenses incurred by the Fund. These costs, which are not reflected in annual Fund operating expenses or in the Example, affect the Fund's performance.

The Adviser is a "commodity pool operator" ("CPO") with respect to the Fund and is registered with and regulated by the Commodity Futures Trading Commission ("CFTC").

As discussed above, the Fund may invest up to 25% of its total assets in the Subsidiary which is wholly-owned by the Fund and is organized under the laws of the Cayman Islands. The Subsidiary pursues the same investment objective as the Fund. The Subsidiary invests primarily in commodity index swaps and other commodity-linked derivative instruments, and it may also invest in financial futures, option and swap contracts, fixed income securities, pooled investment vehicles, including those that are not registered pursuant to the Investment Company Act of 1940, as amended (the "1940 Act"), as well as other investments intended to serve as margin or collateral for the Subsidiary's derivative positions. The Fund invests in the Subsidiary with the intent of gaining exposure to the commodities markets while meeting the requirements applicable to "regulated investment companies" under U.S. federal income tax laws. Unlike the Fund, the Subsidiary may invest without limitation in commodity-linked derivatives; however, the Subsidiary complies with the same 1940 Act asset coverage requirements with respect to its investments in commodity-linked derivatives that are applicable to the Fund's transactions in derivatives.

*Table of Contents - Prospectus*

**Principal Risks of Investing in the Fund**

Losing all or a portion of your investment is a risk of investing in the Fund. An investment in the Fund is not a deposit with a bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The following risks could affect the value of your investment:

- **Alternative Strategies Risk.** Employing alternative strategies raises the risk that anticipated opportunities do not play out as planned, resulting in potentially reduced returns or losses to the Fund as it unwinds failed trades.

- **Barrier Options Risk.** Barrier options are similar to standard options except that they become activated or are extinguished when the underlying asset reaches a predetermined level or barrier. This type of option allows the buyer of the option to set the position of the barrier, the length of time until expiration and the payout to be received once the barrier is broken. If the Adviser sets too high or too low a barrier, and the option is either extinguished or the options are never activated, the benefits to the Fund using a barrier option strategy may be limited and the costs associated with a barrier option strategy could be detrimental to the Fund's performance.

- **Commodities Risk.** Exposure to the commodities markets may subject the Fund to greater volatility than investments in traditional securities. The value of commodity-linked derivative investments may be affected by changes in overall market movements, commodity index volatility, changes in interest rates, or sectors affecting a particular industry or commodity, such as drought, floods, weather, embargoes, tariffs and international economic, political and regulatory developments.

- **Common Stock Risk.** Common stocks are subject to greater fluctuations in market value than certain other asset classes as a result of such factors as the underlying company's business performance, investor perceptions, stock market trends and general economic conditions.

- **Convertible Securities Risk.** The market value of a convertible security performs like that of a regular debt security; that is, if market interest rates rise, the value of a convertible security usually falls. In addition, convertible securities are subject to the risk that the issuer will not be able to pay interest or dividends when due, and their market value may change based on changes in the issuer's credit rating or the market's perception of the issuer's creditworthiness. Since it derives a portion of its value from the common stock into which it may be converted, a convertible security is also subject to the same types of market and issuer risks that apply to the underlying common stock.

- **Counterparty Risk.** Typically, a derivative contract involves leverage, *i.e.*, it provides exposure to potential gain or loss from a change in the level of the market price of a security, currency or commodity (or a basket or index) in a notional amount that exceeds the amount of cash or assets required to establish or maintain the derivative contract. Many of these derivative contracts, including options and swaps, will be privately negotiated in the over-the-counter market. Fund transactions involving a counterparty are subject to the risk that the counterparty or a third party will not fulfill its obligation to the Fund. Counterparty risk may arise because of the counterparty's financial condition (*i.e.*, financial difficulties, bankruptcy, or insolvency), market activities and developments, or other reasons, whether foreseen or not. A counterparty's inability to fulfill its obligation may result in significant financial loss to the Fund.

- **Credit Default Swap Agreement Risk.** The Fund may enter into credit default swap agreements as a "buyer" or "seller" of credit protection on liquid credit indices. In instances where the Fund is a protection seller (receives a periodic fee over the life of the contract in return for the obligation to compensate the protection buyer for loss), the Fund will assume the risks associated with credit deterioration (spread widening) as well as default risk. In the event of default, the Fund is obligated to pay the buyer of credit protection the notional value of the swap less the recovery rate on the reference asset. Credit default swaps may be illiquid and difficult to value, and they increase credit risk since the Fund has exposure to both the issuer whose credit is the subject of the swap and the counterparty to the swap.

- **Credit Risk.** Credit risk refers to the possibility that the issuer of a security or the issuer of the reference asset of a derivative instrument will not be able to make principal and interest payments when due. Changes in an issuer's credit rating or the market's perception of an issuer's creditworthiness may also affect the value of the Fund's investment in that issuer. Securities rated in the four highest categories by the rating agencies are considered investment grade but they may also have some speculative characteristics. Investment grade ratings do not guarantee that bonds will not lose value.

- **Currency Risk.** The risk that changes in currency exchange rates will negatively affect securities denominated in, and/or receiving revenues in, foreign currencies. The liquidity and trading value of foreign currencies could be affected by global economic factors, such as inflation, interest rate levels, and trade balances among countries, as well as the actions of sovereign governments and central banks. Adverse changes in currency exchange rates (relative to the U.S. dollar) may erode or reverse any potential gains from the Fund's investments in securities denominated in a foreign currency or may widen existing losses. The Fund's net currency positions may expose it to risks independent of its securities positions.

- **Derivatives Risk.** The Adviser may make use of futures, forwards, options, swaps and other forms of derivative instruments. The use of derivative instruments exposes the Fund to additional risks and transaction costs. These instruments come in many varieties and have a wide range of potential risks and rewards, and may include futures contracts, options (both written and purchased), swaps and forward currency exchange contracts. A risk of the Fund's use of derivatives is that the fluctuations in their values may not correlate perfectly with the overall securities markets. Additionally, to the extent the Fund is required to segregate or "set aside" (often referred to as "asset segregation") liquid assets or otherwise cover open positions with respect to certain derivative instruments, the Fund may be required to sell portfolio instruments to meet these asset segregation requirements. There is a possibility that segregation involving a large percentage of the Fund's assets could impede portfolio management or the Fund's ability to meet redemption requests or other current obligations.

- **Emerging Markets Risk.** The Fund intends to have exposure to emerging markets. Emerging markets are riskier than more developed markets because they tend to develop unevenly and may never fully develop. Investments in emerging markets may be considered speculative. Emerging markets are more likely to experience hyperinflation and currency devaluations, which adversely affect returns to U.S. investors. In addition, many emerging securities markets have far lower trading volumes and less liquidity than developed markets.

- **Foreign Investments Risk.** Foreign investments often involve special risks not present in U.S. investments that can increase the chances that the Fund will lose money. These risks include:
  - o   The Fund generally holds its foreign securities and cash in foreign banks and securities depositories, which may be recently organized or new to the foreign custody business and may be subject to only limited or no regulatory oversight.
  - o   Changes in foreign currency exchange rates can affect the value of the Fund's portfolio.
  - o   The economies of certain foreign markets may not compare favorably with the economy of the United States with respect to such issues as growth of gross national product, reinvestment of capital, resources and balance of payments position.
  - o   The governments of certain countries may prohibit or impose substantial restrictions on foreign investments in their capital markets or in certain industries.
  - o   Many foreign governments do not supervise and regulate stock exchanges, brokers and the sale of securities to the same extent as does the United States and may not have laws to protect investors that are comparable to U.S. securities laws.
  - o   Settlement and clearance procedures in certain foreign markets may result in delays in payment for or delivery of securities not typically associated with settlement and clearance of U.S. investments.

*Table of Contents - Prospectus*

5

- **Forward and Futures Contract Risk.** The successful use of forward and futures contracts draws upon the Adviser's skill and experience with respect to such instruments and are subject to special risk considerations. The primary risks associated with the use of futures contracts are (a) the imperfect correlation between the change in market value of the instruments held by the Fund and the price of the forward or futures contract; (b) possible lack of a liquid secondary market for a forward or futures contract and the resulting inability to close a forward or futures contract when desired; (c) losses caused by unanticipated market movements, which are potentially unlimited; (d) the Adviser's inability to predict correctly the direction of securities prices, interest rates, currency exchange rates and other economic factors; (e) the possibility that the counterparty will default in the performance of its obligations; and (f) if the Fund has insufficient cash, it may have to sell securities from its portfolio to meet daily variation margin requirements, and the Fund may have to sell securities at a time when it may be disadvantageous to do so.

- **High Portfolio Turnover Risk.** To the extent that the Fund makes investments on a shorter-term basis (including in derivative instruments and instruments with remaining maturities of one year or less) the Fund may as a result trade more frequently and incur higher levels of brokerage fees and commissions, and cause higher levels of current tax liability to shareholders in the Fund.

- **High-Yield Securities Risk.** Fixed income securities that are rated below investment grade (*i.e.*, "junk bonds") are subject to additional risk factors due to the speculative nature of these securities, such as increased possibility of default liquidation of the security, and changes in value based on public perception of the issuer.

- **Interest Rate Risk.** Interest rate risk is the risk that prices of fixed income securities generally increase when interest rates decline and decrease when interest rates increase. The Fund may lose money if short term or long term interest rates rise sharply or otherwise change in a manner not anticipated by the Adviser.

- **Investment in Other Investment Companies Risk.** As with other investments, investments in other investment companies are subject to market and selection risk. In addition, if the Fund acquires shares of investment companies, shareholders bear both their proportionate share of expenses in the Fund (including management and advisory fees) and, indirectly, the expenses of the investment companies.

- **Leverage Risk.** As part of the Fund's principal investment strategy, the Fund will make investments in futures contracts, forward contracts, options, swaps and other derivative instruments. These derivatives instruments provide the economic effect of financial leverage by creating additional investment exposure, as well as the potential for greater loss. If the Fund uses leverage through entering into short sales or purchasing derivative instruments, the Fund has the risk of losing more than its original investment. The net asset value of the Fund employing leverage will be more volatile and sensitive to market movements. Leverage may involve the creation of a liability that requires the Fund to pay interest.

- **Manager Risk.** If the Fund's portfolio managers make poor investment decisions, it will negatively affect the Fund's investment performance.

- **Market Risk.** Market risk is the risk that the markets on which the Fund's investments trade will increase or decrease in value. Prices may fluctuate widely over short or extended periods in response to company, market or economic news. Markets also tend to move in cycles, with periods of rising and falling prices. If there is a general decline in the securities and other markets, your investment in the Fund may lose value, regardless of the individual results of the securities and other instruments in which the Fund invests.

- **Models and Data Risk.** When Models and Data prove to be incorrect or incomplete, any decisions made in reliance thereon expose the Fund to potential loss.

- **Short Sale Risk.** The Fund enters into a short sale by selling a security it has borrowed (typically from a broker or other institution). If the market price of a security increases after the Fund borrows the security, the Fund will suffer a (potentially unlimited) loss when it replaces the borrowed security at the higher price. In certain cases, purchasing a security to cover a short position can itself cause the price of the security to rise further, thereby exacerbating the loss. In addition, the Fund may not always be able to borrow the security at a particular time or at an acceptable price. The Fund may also take a short position in a derivative instrument, such as a future, forward or swap. A short position on a derivative instrument involves the risk of a theoretically unlimited increase in the value of the underlying security or instrument. Short sales also involve transaction and other costs that will reduce potential Fund gains and increase potential Fund losses.

- **Subsidiary Risk.** By investing in the Subsidiary, the Fund is indirectly exposed to the risks associated with the Subsidiary's investments. The commodity-related instruments held by the Subsidiary are generally similar to those that are permitted to be held by the Fund and are subject to the same risks that apply to similar investments if held directly by the Fund (see "Commodities Risk" above). There can be no assurance that the investment objective of the Subsidiary will be achieved. The Subsidiary is not registered under the 1940 Act, and, unless otherwise noted in this Prospectus, is not subject to all the investor protections of the 1940 Act. However, the Fund wholly owns and controls the Subsidiary, and the Fund and the Subsidiary are both managed by the Adviser, making it unlikely that the Subsidiary will take action contrary to the interests of the Fund and its shareholders. The Board has oversight responsibility for the investment activities of the Fund, including its investment in the Subsidiary, and the Fund's role as sole shareholder of the Subsidiary. To the extent applicable to the investment activities of the Subsidiary, the Subsidiary will be subject to the same investment restrictions and limitations, and follow the same compliance policies and procedures, as the Fund.

- **Tax Risk.** In order to qualify for the favorable U.S. federal income tax treatment generally available to "regulated investment companies," the Fund must, among other requirements detailed in the SAI, derive at least 90% of its gross income in each taxable year from certain categories of income ("qualifying income"). Certain of the Fund's investments (including commodity-related investments and certain other non-security based derivatives) may generate income that is not qualifying income. The Fund intends to hold certain commodity-related investments indirectly, through the Subsidiary. The Fund believes that income from the Subsidiary will be qualifying income, because it expects that the Subsidiary will make annual distributions of its earnings and profits. However, there can be no certainty in this regard, as the Fund has not sought or received an opinion of counsel, confirming that the Subsidiary's operations and resulting distributions would produce qualifying income for the Fund.

  The Fund might not be able to determine the percentage of qualifying income it has derived for a taxable year until after year-end. The Fund might generate more non-qualifying income than anticipated or might not be able to generate qualifying income in a particular taxable year at levels sufficient to limit its non-qualifying income to 10% of the Fund's gross income. If the Fund were to fail to meet the qualifying income test, it would be taxed in the same manner as an ordinary corporation, and distributions to its shareholders would not be deductible by the Fund in computing its taxable income, unless certain relief provisions are available (which would generally require the Fund to pay certain Fund-level taxes). In addition, the Fund may determine not to make an investment that it otherwise would have made, or may dispose of an investment it otherwise would have retained, in an effort to meet the qualifying income test.

- **Valuation Risk.** The sales price the Fund could receive for any particular portfolio investment may differ from the Fund's valuation of the investment, particularly for securities or other investments that trade in thin or volatile markets or that are valued using a fair value methodology. Investors who purchase or redeem Fund shares on days when the Fund is holding fair-valued securities may receive fewer or more shares or lower or higher redemption proceeds than they would have received if the Fund had not fair-valued securities or had used a different valuation methodology. Valuation may be more difficult in times of market turmoil since many investors and market makers may be reluctant to purchase complex instruments or quote prices for them. The Fund's ability to value its investments may be impacted by technological issues and/or errors by pricing services or other third party service providers.

- **Value Style Risk.** Investing in or having exposure to "value" stocks presents the risk that the stocks may never reach what the Adviser believes are their full market values, either because the market fails to recognize what the Adviser considers to be the companies' true business values or because the Adviser misjudged.

- **Volatility Risk.** The Fund may have investments that appreciate or depreciate significantly in value over short periods of time. This may cause the Fund's net asset value per share to experience significant increases or declines in value over short periods of time.

**Performance**

The following performance information indicates some of the risks of investing in the Fund. The bar chart shows the Fund's Institutional Class performance for the calendar year ended December 31, 2017. The table illustrates how the Fund's average annual returns for the 1-year and since inception periods compare with those of a broad measure of market performance. The Fund's past performance, before and after taxes, does not necessarily indicate how it will perform in the future. Updated performance information, is posted on the Fund's website at www.infinityqfunds.com or by calling the Fund toll-free at 1-844-IQFUND1 (473-8631).



During the period of time shown in the bar chart, the Fund's highest quarterly return was 4.36% for the quarter ended March 31, 2017 and the lowest quarterly return was -0.50% for the quarter ended September 30, 2016.

For the calendar year-to-date period ended September 30, 2018, the Fund's total return was 9.44%.

**Average Annual Total Returns**
**For the Calendar Year Ended December 31, 2017**

|  | **1 Year** | **Since Inception (9/30/2014)** |
|---|---|---|
| **Institutional Class** | | |
| Return Before Taxes | 7.29% | 3.63% |
| Return After Taxes on Distributions | 7.29% | 3.03% |
| Return After Taxes on Distributions and Sale of Fund Shares | 4.13% | 2.60% |
| **Investor Class** | | |
| Return Before Taxes | 7.01% | 3.38% |
| **Credit Suisse Hedge Fund Index** | | |
| (reflects no deduction for fees, expenses, or taxes) | 7.12% | 2.52% |

*Table of Contents - Prospectus*

After-tax returns are calculated using the historical highest individual federal marginal income tax rates and do not reflect the impact of state and local taxes.  Actual after-tax returns depend on your situation and may differ from those shown.  Furthermore, the after-tax returns shown are not relevant to those who hold their shares through tax-deferred arrangements such as 401(k) plans or individual retirement accounts ("IRAs").

**Management**
*Investment Adviser:*  Infinity Q Capital Management, LLC is the Fund's investment adviser.

*Portfolio Managers:*
Leonard A. Potter, Chief Executive Officer, James Velissaris, Chief Investment Officer, and Scott Lindell, Chief Risk Officer, are the portfolio managers primarily responsible for the day-to-day management of the Fund and each has managed the Fund since its inception in 2014.

**Purchase and Sale of Fund Shares**
You may purchase or redeem Fund shares on any business day by written request via mail to Infinity Q Diversified Alpha Fund, c/o U.S. Bank Global Fund Services, P.O. Box 701, Milwaukee, Wisconsin 53201-0701), by telephone at 1-844-IQFUND1 (473-8631), by wire transfer, or through a financial intermediary. Investors who wish to purchase or redeem Fund shares through a financial intermediary should contact the financial intermediary directly. The minimum initial and subsequent investment amounts are shown below.

|  | Investor Class | Institutional Class |
| --- | --- | --- |
| Minimum Initial Investment | $100,000 | $1,000,000 |
| Minimum Subsequent Investment | $100 | $10,000 |

**Tax Information**
The Fund's distributions are taxable, and will be taxed as ordinary income, qualified dividend income or capital gains, unless you invest though a tax-advantaged arrangement, such as a 401(k) plan or an individual retirement account ("IRA"). Distributions on investments made through tax-advantaged arrangements may be taxed later upon withdrawal of assets from those accounts.

**Payments to Broker-Dealers and Other Financial Intermediaries**
If you purchase the Fund through a broker-dealer or other financial intermediary, the Fund and/or the Adviser may pay the intermediary for the sale of Fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your salesperson to recommend the Fund over another investment. Ask your salesperson or visit your financial intermediary's website for more information.

## INVESTMENT OBJECTIVE, PRINCIPAL INVESTMENT STRATEGIES

## AND RELATED RISKS

**Investment Objective**
The Fund seeks to generate positive absolute returns. The Fund's objective is not fundamental, and may be changed without shareholder approval.

**Principal Investment Strategies**
The Fund is generally intended to provide exposure to several strategies often referred to as "alternative" or "absolute return" strategies. Absolute return strategies seek to produce positive performance in both positive and negative environments for equities, fixed income, and credit markets. Utilizing a diversified portfolio of instruments, the Fund seeks exposure to the following strategies: Volatility, Equity Long/Short, Relative Value and Global Macro. Through exposure to these strategies, the Fund attempts to generate positive absolute returns over time.

The Fund implements these strategies by investing globally (including in emerging markets) either directly in, or through total return swaps on, a broad range of instruments, including, but not limited to, equities, bonds (including but not limited to high-yield or "junk" bonds), currencies, commodities, MLPs, credit derivatives, convertible securities, futures, forwards, options, including complex options such as barrier options, and swaps. The Fund may also invest up to 25% of its assets in a subsidiary that is invested in these types of derivative instruments (the "Subsidiary") as described further below. The Fund has no limits with respect to the credit rating, maturity or duration of the debt securities in which it may invest.

The Adviser relies heavily on proprietary quantitative models as well as information and data supplied by third parties ("Models and Data"). Models and Data are used to construct sets of transactions and investments, to provide risk management insights, and to assist in hedging the Fund's investments. In most cases, the Fund's quantitative models are the determinative factor in making investment decisions. In some cases, at the portfolio manager's discretion, market risk exposure may be reduced through hedging.

The Fund's returns are expected to be volatile; however, the Adviser, on average, targets an annualized volatility level for the Fund of 10%, which compares to a historical volatility level of approximately 4% for the Barclays Capital U.S. Aggregate Bond Index and a historical volatility level of approximately 18% for the S&P 500® Index of U.S. large cap stocks over the past five years. The actual or realized volatility level of the Fund can and will be materially higher or lower than its target volatility depending on market conditions.

The Fund is generally intended to have a low average correlation and beta to the equity, fixed income, and credit markets. Beta is a measure of the systematic risk of a security or portfolio in comparison to the market as a whole. The excess return generated by the Fund beyond the return attributable to equity, fixed income, and credit markets is alpha. The Fund generally intends to generate the majority of its performance through alpha. The Adviser utilizes proprietary trading algorithms in order to minimize market impact and reduce trading costs. The Adviser attempts to mitigate risk through diversification of holdings and through active monitoring of volatility, counterparties and other risk measures. There is no assurance, however, that the Fund will achieve its investment objective.

As discussed above, the Fund provides exposure to several absolute return strategies through a single registered investment company. The Fund currently intends to have exposure to each of these strategies; however, it may vary its level of allocation among these strategies depending on market conditions, including reducing the exposure to any strategy to zero. The Adviser believes that, based on a comprehensive analysis of the key drivers of return from these strategies (which are traditionally made available through hedge funds), it can capture a meaningful portion of the return that these strategies can be expected to provide. The Fund is generally intended to have a low correlation to the equity, fixed income, and credit markets. The Fund may add additional strategies from time to time but currently pursues its investment objective by following the four primary strategies discussed in greater detail below:

**Volatility**: The Volatility Strategy provides long and short exposure to a diversified portfolio of derivatives across equities, currencies, bonds, interest rates, and commodities markets. The Fund invests long positions in derivatives it expects to increase in value and short sells derivatives it expects to decrease in value. Derivatives are instruments that derive their value from the performance of an underlying security or index. These instruments include index options (vanilla and exotic), volatility and variance swaps, correlation swaps, credit default swaps, swaptions and total return swaps.

**Equity Long/Short**: The Equity Long/Short Strategy provides long and short exposure to a diversified portfolio of equities which involves investing long in equities the Adviser expects to increase in value and short selling equities the Adviser expects to decrease in value. When taking a "short" position, the Fund may sell an instrument that it does not own and would then borrow an instrument to meet its settlement obligations. The Fund may also take long and "short" positions in options, futures, forwards or swaps. Long positions will profit if the value of the equity security increases and short positions will profit if the value of the equity security declines and the borrowed shares can be replaced at lower cost. A "short" position will benefit from a decrease in price of the underlying instrument and will lose value if the price of the underlying instrument increases. Simultaneously engaging in long investing and short selling reduces the net exposure of the overall portfolio to general market movements. The Adviser intends to invest in equities, including equities of small and mid-cap companies which it defines as follows: small cap companies are those with between $300 million and $2 billion in market capitalization at the time of investment and mid cap companies are those with between $2 and $10 billion in market capitalization at the time of investment.

**Relative Value**: The Relative Value Strategy seeks to generate profits by investing long and short in a pair or basket of highly correlated securities, meaning that the expectation is that they will move in the same direction over the same period of time. The Strategy seeks to identify points in time when the prices of the pair or basket of securities diverge materially. The Strategy then invests long in securities that have relatively underperformed and takes short positions in securities that have relatively outperformed. The Fund may invest long and short across the equities, currencies, bonds, interest rates, and commodities markets. The Strategy typically has a short-term holding period, which causes high portfolio turnover.

**Global Macro**: The Global Macro Strategy seeks to profit by forecasting price movements based on changing macroeconomic conditions and the impact of economic events across a broad spectrum of assets. The Strategy provides long and short exposure to equities, currencies, bonds, interest rates, and commodities markets.

The Fund pays transaction costs, such as commissions, when it buys and sells securities (or "turns over" its portfolio). The Fund's strategies may result in frequent portfolio trading and high portfolio turnover (typically greater than 100%). A higher portfolio turnover may indicate higher transaction costs and may result in higher taxes when shares are held in a taxable account. Higher portfolio turnover rates generate capital gains that must be distributed to shareholders and could increase brokerage commission costs. To the extent that the Fund experiences an increase in brokerage commissions due to a higher portfolio turnover rate, the performance of the Fund could be negatively impacted by the increased expenses incurred by the Fund. These costs, which are not reflected in annual Fund operating expenses or in the Example, affect the Fund's performance.

As discussed above, the Fund may invest up to 25% of its total assets in the Subsidiary, which is organized under the laws of the Cayman Islands as an "exempted" company. The Subsidiary pursues the same investment objective as the Fund. The Subsidiary invests primarily in commodity index swaps and other commodity-linked derivative instruments, and it may also invest in financial futures, option and swap contracts, fixed income securities, pooled investment vehicles, including those that are not registered pursuant to the 1940 Act, as well as other investments intended to serve as margin or collateral for the Subsidiary's derivative commission costs. The Fund invests in the Subsidiary with the intent of gaining exposure to the commodities markets while meeting the requirements applicable to "regulated investment companies" under U.S. federal income tax laws. Unlike the Fund, the Subsidiary may invest without limitation in commodity-linked derivatives; however, the Subsidiary will comply with the same 1940 Act asset coverage requirements with respect to its investments in commodity-linked derivatives that are applicable to the Fund's transactions in derivatives. In addition, to the extent applicable to the investment activities of the Subsidiary, the Subsidiary will be subject to the same fundamental investment restrictions and will follow the same compliance policies and procedures as the Fund. Unlike the Fund, the Subsidiary will not seek to qualify as a regulated investment company under Subchapter M of the Internal Revenue Code of 1986, as amended (the "Code"). The Fund is the sole shareholder of the Subsidiary and does not expect shares of the Subsidiary to be offered or sold to other investors.

**Principal Risks**

The principal risks of investing in the Fund that may adversely affect the Fund's net asset value ("NAV") or total return were previously summarized and are discussed in more detail below. There can be no assurance that the Fund will achieve its investment objective.

- **Alternative Strategies Risk.** Employing alternative strategies raises the risk that anticipated opportunities do not play out as planned, resulting in potentially reduced returns or losses to the Fund as it unwinds failed trades. For example, with respect to credit strategies, an issuer may default or may be unable to make interest and dividend payments when due.

- **Barrier Options Risk.** Barrier options are similar to standard options except that they become activated or are extinguished when the underlying asset reaches a predetermined level or barrier. This type of option allows the buyer of the option to set the position of the barrier, the length of time until expiration and the payout to be received once the barrier is broken. If the Adviser sets too high or too low a barrier, and the option is either extinguished or the options are never activated the benefits to the Fund using a barrier option strategy may be limited and the costs associated with a barrier option strategy could be detrimental to the Fund's performance.

- **Commodities Risk.** Exposure to the commodities markets may subject the Fund to greater volatility than investments in traditional securities. The value of commodity-linked derivative investments may be affected by changes in overall market movements, commodity index volatility, changes in interest rates, or sectors affecting a particular industry or commodity, such as drought, floods, weather, embargoes, tariffs and international economic, political and regulatory developments.

- **Common Stock Risk.** The Fund invests in, or has exposure to, common stocks, which are a type of equity security that represents an ownership interest in a corporation. Common stocks are subject to greater fluctuations in market value than certain other asset classes as a result of such factors as a company's business performance, investor perceptions, stock market trends and general economic conditions. The rights of common stockholders are subordinate to all other claims on a company's assets, including debt holders and preferred stockholders. Therefore, the Fund could lose money if a company in which it invests becomes financially distressed.

- **Convertible Securities Risk.** The market value of a convertible security performs like that of a regular debt security; that is, if market interest rates rise, the value of a convertible security usually falls. In addition, convertible securities are subject to the risk that the issuer will not be able to pay interest or dividends when due, and their market value may change based on changes in the issuer's credit rating or the market's perception of the issuer's creditworthiness. Since it derives a portion of its value from the common stock into which it may be converted, a convertible security is also subject to the same types of market and issuer risks that apply to the underlying common stock.

- **Counterparty Risk.** The Fund may enter into various types of derivative contracts as described below under "Derivatives Risk". Many of these derivative contracts, including options and swaps, may be privately negotiated in the over-the-counter market. These contracts involve exposure to credit risk, since contract performance depends in part on the financial condition of the counterparty. If a privately negotiated over-the-counter contract calls for payments by the Fund, the Fund must be prepared to make such payments when due. In addition, if a counterparty's creditworthiness declines, the Fund may not receive payments owed under the contract, or such payments may be delayed under such circumstances and the value of agreements with such counterparty can be expected to decline, potentially resulting in losses by the Fund.

  The Fund will be subject to credit risk with respect to the counterparties to the derivative contracts (whether a clearing corporation in the case of exchange-traded instruments or another third party in the case of over-the-counter instruments) and other instruments entered into directly by the Fund or held by special purpose or structured vehicles in which the Fund invests. If a counterparty becomes bankrupt or insolvent or otherwise fails to perform its obligations to the Fund due to financial difficulties, the Fund may experience significant losses or delays in obtaining any recovery (including recovery of any collateral it has provided to the counterparty) in a dissolution, assignment for the benefit of creditors, liquidation, winding-up, bankruptcy or other analogous proceeding. In addition, in the event of the bankruptcy or insolvency of a counterparty to a derivative transaction, the derivative transaction would typically be terminated at its fair market value. If the Fund is owed this fair market value in the termination of the derivative transaction and its claim is unsecured, the Fund will likely be treated as a general creditor of such counterparty, and may not have any claim with respect to any underlying security or asset. The Fund may obtain only a limited recovery, or no recovery, in such circumstances. Counterparty risk with respect to certain exchange-traded and over-the-counter derivatives may be further complicated by U.S. financial reform legislation.

- **Credit Default Swap Agreement Risk.** The Fund may enter into credit default swap agreements, credit default index swap agreements and similar agreements as a protection "seller" or as a "buyer" of credit protection. The credit default swap agreement or similar instruments may have as reference obligations one or more securities that are not then held by the Fund. The protection "buyer" in a credit default swap agreement is generally obligated to pay the protection "seller" a periodic stream of payments over the term of the agreement, provided generally that no credit event on a reference obligation has occurred. In addition, at the inception of the agreement, the protection "buyer" may receive or be obligated to pay an additional up-front amount depending on the current market value of the contract. With respect to credit default swap agreements whereby the Fund is a "buyer" of credit protection and that are contractually required to cash settle, the Fund sets aside liquid assets in an amount equal to the Fund's daily marked-to-market net obligations under the contracts. For credit default swap agreements whereby the Fund is a "buyer" of credit protection and that are contractually required to physically settle, or for credit default swap agreements whereby the Fund is deemed to be a "seller" of credit protection, the Fund sets aside the full notional value of such contracts. If a credit event occurs, an auction process is used to determine the "recovery value" of the contract. The seller then must pay the buyer the "par value" (full notional value) of the swap contract minus the "recovery value" as determined by the auction process. The Fund may be either the buyer or seller in the transaction. If the Fund is a buyer and no credit event occurs, the Fund's net cash flows over the life of the contract will be the initial up-front amount paid or received minus the sum of the periodic payments made over the life of the contract. However, if a credit event occurs, the Fund may elect to receive a cash amount equal to the "par value" (full notional value) of the swap contract minus the "recovery value" as determined by the auction process. As a seller of protection, the Fund generally receives a fixed rate of income throughout the term of the swap provided that there is no credit event. In addition, at the inception of the agreement, the Fund may receive or be obligated to pay an additional up-front amount depending on the current market value of the contract. If a credit event occurs, the Fund will be generally obligated to pay the buyer the "par value" (full notional value) of the swap contract minus the "recovery value" as determined by the auction process. Credit default swaps could result in losses if the Adviser does not correctly evaluate the creditworthiness of the underlying instrument on which the credit default swap is based. Additionally, if the Fund is a seller of a credit default swap and a credit event occurs, the Fund could suffer significant losses.

- **Credit Risk.** Credit risk refers to the possibility that the issuer of a security or the issuer of the reference asset of a derivative instrument will not be able to make principal and interest payments when due. Changes in an issuer's credit rating or the market's perception of an issuer's creditworthiness may also affect the value of the Fund's investment in that issuer. The degree of credit risk depends on both the financial condition of the issuer and the terms of the obligation. Securities rated in the four highest categories (Standard & Poor's ("S&P") (AAA, AA, A and BBB), Fitch Ratings ("Fitch") (AAA, AA, A and BBB) or Moody's Investors Service, Inc. ("Moody's") (Aaa, Aa, A and Baa)) by the rating agencies are considered investment grade but they may also have some speculative characteristics, meaning that they carry more risk than higher rated securities and may have problems making principal and interest payments in difficult economic climates. Investment grade ratings do not guarantee that bonds will not lose value.

- **Currency Risk.** The risk that changes in currency exchange rates will negatively affect securities denominated in, and/or receiving revenues in, foreign currencies. Adverse changes in currency exchange rates (relative to the U.S. dollar) may erode or reverse any potential gains from the Fund's investments in securities denominated in a foreign currency or may widen existing losses. The Fund's net currency positions may expose it to risks independent of its securities positions.

  Currency exchange rates may be particularly affected by the relative rates of inflation, interest rate levels, the balance of payments and the extent of governmental surpluses or deficits in such foreign countries and in the United States, all of which are in turn sensitive to the monetary, fiscal and trade policies pursued by the governments of such foreign countries, the United States and other countries important to international trade and finance. Governments may use a variety of techniques, such as intervention by their central bank or imposition of regulatory controls or taxes, to affect the exchange rates of their respective currencies. They may also issue a new currency to replace an existing currency or alter the exchange rate or relative exchange characteristics by devaluation or revaluation of a currency. The liquidity and trading value of these foreign currencies could be affected by the actions of sovereign governments and central banks, which could change or interfere with theretofore freely determined currency valuation, fluctuations in response to other market forces and the movement of currencies across borders.

- **Derivatives Risk.** The Adviser may make use of futures, forwards, options, swaps and other forms of derivative instruments. In general, a derivative instrument (including options, as described below) typically involves leverage, *i.e.*, it provides exposure to potential gain or loss from a change in the level of the market price of the underlying security, currency or commodity (or a basket or index) in a notional amount that exceeds the amount of cash or assets required to establish or maintain the derivative instrument. Adverse changes in the value or level of the underlying asset or index can result in a loss to the Fund substantially greater than the amount invested in the derivative itself. Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. The use of derivative instruments also exposes the Fund to additional risks and transaction costs. These instruments come in many varieties and have a wide range of potential risks and rewards, and may include futures contracts, options (both written and purchased), swaps, and forward currency contracts. Risks of these instruments include:

  - that interest rates, securities prices and currency markets will not move in the direction that the portfolio managers anticipate;
  - that prices of the instruments and the prices of underlying securities, interest rates or currencies they are designed to reflect do not move together as expected;
  - that the skills needed to use these strategies are different than those needed to select portfolio securities;
  - the possible absence of a liquid secondary market for any particular instrument and, for exchange-traded instruments, possible exchange-imposed price fluctuation limits, either of which may make it difficult or impossible to close out a position when desired;
  - that adverse price movements in an instrument can result in a loss substantially greater than the Fund's initial investment in that instrument (in some cases, the potential loss is unlimited);
  - particularly in the case of privately-negotiated instruments, that the counterparty will not perform its obligations, which could leave the Fund worse off than if it had not entered into the position;
  - the inability to close out certain hedged positions to avoid adverse tax consequences, and the fact that some of these instruments may have uncertain tax implications for the Fund;
  - the fact that "speculative position limits" imposed by the CFTC and certain futures exchanges on net long and short positions may require the Fund to limit or unravel positions in certain types of instruments; the CFTC has proposed new rules that, if adopted in substantially the same form, will impose speculative position limits on additional derivative instruments, which may further limit the Fund's ability to trade futures contracts and swaps; and
  - the high levels of volatility some of these instruments may exhibit, in some cases due to the high levels of leverage an investor may achieve with them.

*Table of Contents - Prospectus*

14

Additionally, to the extent the Fund is required to segregate or "set aside" (often referred to as "asset segregation") liquid assets or otherwise cover open positions with respect to certain derivative instruments, the Fund may be required to sell portfolio instruments to meet these asset segregation requirements. There is a possibility that segregation involving a large percentage of the Fund's assets could impede portfolio management or the Fund's ability to meet redemption requests or other current obligations.

- **Emerging Markets Risk.** The Fund may have exposure to emerging markets. Investing in emerging markets will, among other things, expose the Fund to all the risks described below in the "Foreign Investments Risk" section. However, there are greater risks involved in investing in emerging market countries and/or their securities markets than there are in more developed countries and/or markets. Generally, economic structures in these countries are less diverse and mature than those in developed countries, and their political systems are less stable. Investments in emerging market countries may be affected by national policies that restrict foreign investment in certain issuers or industries. Sanctions and other intergovernmental actions may be undertaken against an emerging market country, which may result in the devaluation of the country's currency, a downgrade in the country's credit rating, and a decline in the value and liquidity of the country's securities. Sanctions could result in the immediate freeze of securities issued by an emerging market company or government, impairing the ability of the Fund to buy, sell, receive or deliver these securities. The small size of their securities markets and low trading volumes can make emerging market investments illiquid and more volatile than investments in developed countries and such securities may be subject to abrupt and severe price declines. The Fund may be required to establish special custody or other arrangements before investing. In addition, because the securities settlement procedures are less developed in these countries, the Fund may be required to deliver securities before receiving payment and may also be unable to complete transactions during market disruptions. The possible establishment of exchange controls or freezes on the convertibility of currency might adversely affect an investment in foreign securities.

- **Foreign Investments Risk.** The Fund's investments in foreign instruments, including depositary receipts, involve risks not associated with investing in U.S. instruments. Foreign markets may be less liquid, more volatile and subject to less government supervision than domestic markets. There may be difficulties enforcing contractual obligations, and it may take more time for trades to clear and settle. The specific risks of investing in foreign instruments, among others, include:
  - Counterparty Risk: The Fund may enter into foreign investment instruments with a counterparty, which will subject the Fund to counterparty risk (see "Counterparty Risk" above).
  - Currency Risk: The risk that changes in currency exchange rates will negatively affect instruments denominated in, and/or receiving revenues in, foreign currencies. Adverse changes in currency exchange rates (relative to the U.S. dollar) may erode or reverse any potential gains from the Fund's investments in instruments denominated in a foreign currency or may widen existing losses. To the extent that the Fund is invested in foreign instruments while also maintaining currency positions, it may be exposed to greater combined risk. The Fund's net currency positions may expose it to risks independent of its securities positions.
  - Geographic Risk: If the Fund concentrates its investments in issuers located or doing business in any country or region, factors adversely affecting that country or region will affect the Fund's net asset value more than would be the case if the Fund had made more geographically diverse investments. The economies and financial markets of certain regions, such as Latin America or Asia, can be highly interdependent and decline all at the same time.
  - Political/Economic Risk: Changes in economic and tax policies, government instability, war or other political or economic actions or factors may have an adverse effect on the Fund's foreign investments, potentially including expropriation and nationalization, confiscatory taxation, and the potential difficulty of repatriating funds to the United States.

- Regulatory Risk: Issuers of foreign instruments and foreign instruments markets are generally not subject to the same degree of regulation as are U.S. issuers and U.S. securities markets. The reporting, accounting and auditing standards of foreign countries may differ, in some cases significantly, from U.S. standards.
- Transaction Costs Risk: The costs of buying and selling foreign instruments, including tax, brokerage and custody costs, generally are higher than those involving domestic transactions.
- Use of Foreign Currency Forward Agreements: Foreign currency forward prices are influenced by, among other things, changes in balances of payments and trade, domestic and international rates of inflation, international trade restrictions and currency devaluations and revaluations. Investments in currency forward contracts may cause the Fund to maintain net short positions in any currency, including home country currency. In other words, the total value of short exposure to such currency (such as short spot and forward positions in such currency) may exceed the total value of long exposure to such currency (such as long individual equity positions, long spot and forward positions in such currency).

- **Forward and Futures Contract Risk.** The successful use of forward and futures contracts draws upon the Adviser's skill and experience with respect to such instruments and are subject to special risk considerations. The primary risks associated with the use of futures contracts are (a) the imperfect correlation between the change in market value of the instruments held by the Fund and the price of the forward or futures contract; (b) possible lack of a liquid secondary market for a forward or futures contract and the resulting inability to close a forward or futures contract when desired; (c) losses caused by unanticipated market movements, which are potentially unlimited; (d) the Adviser's inability to predict correctly the direction of securities prices, interest rates, currency exchange rates and other economic factors; (e) the possibility that the counterparty will default in the performance of its obligations; and (f) if the Fund has insufficient cash, it may have to sell securities from its portfolio to meet daily variation margin requirements, and the Fund may have to sell securities at a time when it may be disadvantageous to do so.

- **High Portfolio Turnover Risk.** The investment techniques and strategies utilized by the Fund, including investments made on a shorter-term basis or in derivative instruments or instruments with a maturity of one year or less at the time of acquisition, will result in frequent portfolio trading and high portfolio turnover. High portfolio turnover rates will cause the Fund to incur higher levels of brokerage fees and commissions, which may reduce performance, and may cause higher levels of current tax liability to shareholders in the Fund.

- **High-Yield Securities Risk.** Fixed income securities receiving below investment grade ratings (*i.e.*, "junk bonds") may have speculative characteristics, and, compared to higher-grade securities, may have a weakened capacity to make principal and interest payments in economic conditions or other circumstances. High-yield, high risk, and lower-rated securities are subject to additional risk factors due to the speculative nature of these securities, such as increased possibility of default, decreased liquidity, and fluctuations in value due to public perception of the issuer of such securities. These bonds are almost always uncollateralized and subordinate to other debt that an issuer may have outstanding. In addition, both individual high-yield securities and the entire high-yield bond market can experience sharp price swings due to a variety of factors, including changes in economic forecasts, stock market activity, large sustained sales by major investors or a higher profile default.

- **Interest Rate Risk.** Interest rate risk is the risk that prices of fixed income securities generally increase when interest rates decline and decrease when interest rates increase. Prices of longer term securities generally change more in response to interest rate changes than prices of shorter term securities. The Fund may lose money if short term or long term interest rates rise sharply or otherwise change in a manner not anticipated by the Adviser.

- **Investment in Other Investment Companies Risk.** As with other investments, investments in other investment companies are subject to market and selection risk. In addition, if the Fund acquires shares of investment companies, shareholders bear both their proportionate share of expenses in the Fund (including management and advisory fees) and, indirectly, the expenses of the investment companies. The Fund may invest in money market mutual funds. An investment in a money market mutual fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. Although such funds seek to preserve the value of the Fund's investment at $1.00 per share, it is possible to lose money by investing in a money market mutual fund.

*Table of Contents - Prospectus*

- **Leverage Risk.** If the Fund makes investments in futures contracts, forward contracts, options, swaps and other derivative instruments, these derivative instruments provide the economic effect of financial leverage by creating additional investment exposure, as well as the potential for greater loss. If the Fund uses leverage through activities such as entering into short sales or purchasing derivative instruments, the Fund has the risk of losing more than its original investment. The net asset value of the Fund employing leverage will be more volatile and sensitive to market movements. Leverage may involve the creation of a liability that requires the Fund to pay interest.

- **Manager Risk.** The skill of the Adviser will play a significant role in the Fund's ability to achieve its investment objective. The Fund's ability to achieve its investment objective depends on the ability of the Adviser to correctly identify economic trends, especially with regard to accurately forecasting inflationary and deflationary periods. In addition, the Fund's ability to achieve its investment objective depends on the Adviser's ability to select securities, particularly in volatile stock markets. The Adviser could be incorrect in its analysis of industries, companies and the relative attractiveness of growth and value stocks and other matters. The Fund's Adviser has not previously managed a mutual fund.

- **Market Risk.** The Fund is subject to market risk, which is the risk that the markets on which the Fund's investments trade will increase or decrease in value. Market risk applies to every Fund investment. Prices may fluctuate widely over short or extended periods in response to company, market or economic news. Markets also tend to move in cycles, with periods of rising and falling prices. If there is a general decline in the securities and other markets, your investment in the Fund may lose value, regardless of the individual results of the securities and other instruments in which the Fund invests.

- **Models and Data Risk.** When Models and Data prove to be incorrect or incomplete, any decisions made in reliance thereon expose the Fund to potential risks. For example, by relying on Models and Data, the Adviser may be induced to buy certain investments at prices that are too high, to sell certain other investments at prices that are too low, or to miss favorable opportunities altogether. Similarly, any hedging based on faulty Models and Data may prove to be unsuccessful.

  Some of the models used by the Adviser for the Fund are predictive in nature. The use of predictive models has inherent risks. For example, such models may incorrectly forecast future behavior, leading to potential losses on a cash flow and/or a mark-to-market basis. In addition, in unforeseen or certain low-probability scenarios (often involving a market disruption of some kind), such models may produce unexpected results, which can result in losses for the Fund. Furthermore, because predictive models are usually constructed based on historical data supplied by third parties, the success of relying on such models may depend heavily on the accuracy and reliability of the supplied historical data.

  All models rely on correct market data inputs. If incorrect market data is entered into even a well-founded model, the resulting information will be incorrect. However, even if market data is input correctly, "model prices" will often differ substantially from market prices, especially for instruments with complex characteristics, such as derivative instruments.

- **Short Sale Risk.** The Fund enters into a short sale by selling a security it has borrowed (typically from a broker or other institution). If the market price of a security increases after the Fund borrows the security, the Fund will suffer a (potentially unlimited) loss when it replaces the borrowed security at the higher price. In certain cases, purchasing a security to cover a short position can itself cause the price of the security to rise further, thereby exacerbating the loss. In addition, the Fund may not always be able to borrow the security at a particular time or at an acceptable price. Before the Fund replaces a borrowed security, it is required to designate on its books cash or liquid assets as collateral to cover the Fund's short position, marking the collateral to market daily. This obligation limits the Fund's investment flexibility, as well as its ability to meet redemption requests or other current obligations. The Fund may also take a short position in a derivative instrument, such as a future, forward or swap. A short position in a derivative instrument involves the risk of a theoretically unlimited increase in the value of the underlying instrument. Short sales also involve transaction and other costs that will reduce potential Fund gains and increase potential Fund losses.

- **Subsidiary Risk.** By investing in the Subsidiary, the Fund is indirectly exposed to the risks associated with the Subsidiary's investments. The commodity-related instruments held by the Subsidiary are generally similar to those that are permitted to be held by the Fund and are subject to the same risks that apply to similar investments if held directly by the Fund (see "Commodities Risk" above). There can be no assurance that the investment objective of the Subsidiary will be achieved. The Subsidiary is not registered under the 1940 Act, and, unless otherwise noted in this Prospectus, is not subject to all the investor protections of the 1940 Act. However, the Fund wholly owns the Subsidiary, and the Fund and the Subsidiary are both managed by the Adviser, making it unlikely that the Subsidiary will take action contrary to the interests of the Fund and its shareholders. The Board has oversight responsibility for the investment activities of the Fund, including its investment in the Subsidiary, and the Fund's role as sole shareholder of the Subsidiary. To the extent applicable to the investment activities of the Subsidiary, the Subsidiary will be subject to the same investment restrictions and limitations, and follow the same compliance policies and procedures, as the Fund. Unlike the Fund, the Subsidiary will not seek to qualify as a regulated investment company under Subchapter M of the Code. Changes in the laws of the United States and/or the Cayman Islands could result in the inability of the Fund and/or the Subsidiary to operate as described in this prospectus and the SAI and could adversely affect the Fund.

  As a CPO with respect to the Fund, the Adviser is registered with the National Futures Association ("NFA") and regulated by the CFTC. As a result, the Fund is subject to regulation by the U.S. Securities and Exchange Commission ("SEC"), the CFTC and the NFA, which could increase compliance costs of the Fund.

- **Tax Risk.** In order for the Fund to qualify for the favorable U.S. federal income tax treatment generally available to "regulated investment companies," the Fund must derive at least 90 percent of its gross income each taxable year from qualifying income, which is described in more detail in the SAI. Certain of the Fund's investments (including commodity-related investments and certain other non-securities based derivatives) may generate income that is not qualifying income. The Fund intends to restrict its income from direct investments that do not generate qualifying income, such as commodity-linked swaps, to a maximum of 10 percent of its gross income. The Fund may hold certain commodity-related investments indirectly, through the Subsidiary. The Fund's investment in the Subsidiary is intended to provide the Fund with exposure to the commodities markets while allowing the Fund to meet the requirements applicable to "regulated investment companies" under U.S. federal income tax law. The Fund believes that income from the Subsidiary will be qualifying income, because it expects that the Subsidiary will make annual distributions of its earnings and profits. However, there can be no certainty in this regard, as the Fund has not sought or received an opinion of counsel confirming that the Subsidiary's operations and resulting distributions would produce qualifying income for the Fund.

  The Fund might not be able to determine the percentage of qualifying income it has derived for a taxable year until after year-end. The Fund might generate more non-qualifying income than anticipated or might not be able to generate qualifying income in a particular taxable year at levels sufficient to limit its non-qualifying income to 10 percent of the Fund's gross income. If the Fund were to fail to meet the qualifying income test, it would be taxed in the same manner as an ordinary corporation, and distributions to its shareholders would not be deductible by the Fund in computing its taxable income, unless certain relief provisions are available (which would generally require the Fund to pay certain Fund-level taxes that would reduce (and could eliminate) the Fund's investment returns). In addition, the Fund may determine not to make an investment that it otherwise would have made, or may dispose of an investment it otherwise would have retained, in an effort to meet the qualifying income test.

- **Valuation Risk.** The sales price the Fund could receive for any particular portfolio investment may differ from the Fund's valuation of the investment, particularly for securities or other investments that trade in thin or volatile markets or that are valued using a fair value methodology. Investors who purchase or redeem Fund shares on days when the Fund is holding fair-valued securities may receive fewer or more shares or lower or higher redemption proceeds than they would have received if the Fund had not fair-valued securities or had used a different valuation methodology. Valuation may be more difficult in times of market turmoil since many investors and market makers may be reluctant to purchase complex instruments or quote prices for them. The Fund's ability to value its investments may be impacted by technological issues and/or errors by pricing services or other third party service providers.

- **Value Style Risk.** Investing in or having exposure to "value" stocks presents the risk that the stocks may never reach what the Adviser believes are their full market values, either because the market fails to recognize what the Adviser considers to be the companies' true business values or because the Adviser misjudged those values. In addition, value stocks may fall out of favor with investors and underperform growth stocks during given periods.

- **Volatility Risk.** The Fund may have investments that appreciate or decrease significantly in value over short periods of time. This may cause the Fund's net asset value per share to experience significant increases or declines in value over short periods of time.

## DISCLOSURE OF PORTFOLIO HOLDINGS

A description of the Fund's policies and procedures with respect to the disclosure of the Fund's portfolio securities is available in the Fund's SAI. Currently, disclosure of the Fund's holdings is required to be made quarterly within 60 days of the end of each fiscal quarter in the annual report and semi-annual report to Fund shareholders and in the quarterly holdings report on Form N-Q. The annual and semi-annual reports are available by contacting the Infinity Q Diversified Alpha Fund, c/o U.S. Bank Global Fund Services, P.O. Box 701, Milwaukee, Wisconsin 53201-0701, or calling 1-844-IQFUND1 (473-8631) and on the SEC's website at www.sec.gov. A complete description of the Fund's policies and procedures with respect to the disclosure of the Fund's portfolio holdings is available in the SAI.

## MANAGEMENT OF THE FUND

**Investment Adviser**

The Fund's investment adviser, Infinity Q Capital Management, LLC, is located at 888 7th Avenue, Suite 3700, New York, NY 10106. The Adviser is an SEC-registered investment advisory firm formed in 2014. The Adviser provides investment management services to institutions, individuals, high net worth individuals and other pooled investment vehicles.

The Adviser is responsible for the day-to-day management of the Fund in accordance with the Fund's investment objective and policies. The Adviser also furnishes the Fund with office space and certain administrative services and provides most of the personnel needed to fulfill its obligations under its advisory agreement. For its services, the Fund pays the Adviser a monthly management fee that is calculated at the annual rate of 1.70% of the Fund's average daily net assets. For the fiscal year ended August 31, 2018, the Adviser received an aggregate fee of 1.59% of average net assets, after fee waivers.

*Table of Contents - Prospectus*

A discussion regarding the basis of the Board's approval of the Investment Advisory Agreement is available in the Fund's annual report to shareholders for the reporting period ended August 31, 2018.

**Portfolio Managers**

Leonard Potter is the Chief Executive Officer of Infinity Q Capital Management, and launched the firm to offer retail investors access to the top tier investment strategies typically reserved for elite high net worth clients. Mr. Potter also serves as the President and Chief Investment Officer of Wildcat Capital Management, LLC, which is an advisor to a number of ultra-high net worth clients, and serves as a Co-Founder of Vida Ventures, LLC, a biotech-focused venture capital firm. From 2009 until joining Wildcat, Mr. Potter served as a consultant to Soros Fund Management LLC ("SFM") and as the Chief Investment Officer of Salt Creek Hospitality, a private acquirer and owner of hospitality related assets that was sponsored by an affiliate of SFM. From 2002 through 2009, Mr. Potter was Managing Director - Soros Private Equity at SFM where, from May 2005 through July 2009, Mr. Potter served as co-head of the Private Equity group and a member of the Private Equity Investment Committee. From September 1998 until joining SFM, Mr. Potter was a Managing Director of Alpine Consolidated LLC, a private merchant bank, and from April 1996 through September 1998, Mr. Potter founded and served as a Managing Director of Capstone Partners LLC, a private merchant bank. Prior to founding Capstone Partners, Mr. Potter was an attorney specializing in mergers, acquisitions and corporate finance at Morgan, Lewis & Bockius and Willkie Farr & Gallagher. Mr. Potter has served on a number of public and private boards of directors and is currently a member of several boards, including, among others, the boards of Hilton Grand Vacations Inc., Vision Path. (d/b/a Hubble Contacts), Solar Senior Capital, Ltd. ("SUNS"), Solar Capital Ltd. ("SLRC"), GSV Capital Corp. ("GSVC"), Neuro Vision Imaging, Inc., Vicapsys, Inc., Aperisys, Inc. and Auto Europe Group, LLC. Mr. Potter has a Bachelor of Arts degree from Brandeis University and a Juris Doctor degree from Fordham University School of Law.

James Velissaris is the Chief Investment Officer of Infinity Q, and launched the firm to offer innovative investment solutions for institutional investors. James also serves as the portfolio manager for the Public Investments Portfolio of Wildcat Capital Management, which is an advisor to a number of ultra-high net worth clients. James joined Wildcat in 2012, and manages a team of quantitative researchers focused on developing next generation forecasting models. From 2008 until joining Wildcat, James managed the quantitative investment strategies and conducted analysis on portfolio construction and asset allocation for Arden Asset Management. He began his career as an analyst at Goldman Sachs in 2007. Mr. Velissaris earned his Bachelor of Arts degree in Economics from Harvard University and his Master of Science degree in Operations Research with a concentration in Financial Engineering from Columbia University.

Scott Lindell is the Chief Risk Officer of Infinity Q, and joined the firm in 2014. He is responsible for monitoring portfolio risk exposures, enhancing the firm's risk analytics, and ensuring compliance with regulatory guidelines. From 2010 to 2014, Scott built out the infrastructure for the reporting and risk management of Arden Asset Management's private funds and liquid alternatives initiatives including the crafting and monitoring of investment guidelines, and eventually became a Managing Director and the Head of Risk Management. From 2006 to 2010, Scott was a Vice President at JP Morgan Measurisk, a provider of risk-transparency and risk-measurement solutions for institutional investors and asset managers, where he oversaw the firm's largest institutional clients. Scott began his career as an equities trader for Shonfeld Securities in 2001. He received his B.S. in Finance from the University of Buffalo in 2001 and an M.B.A. in Finance from Baruch College, Zicklin School of Business in 2005. He is a Chartered Alternative Investment Analyst (CAIA) and a Certified Financial Risk Manager (FRM).

The SAI provides additional information about the portfolio managers' compensation, other accounts managed by the portfolio managers and their ownership of securities in the Fund.

*Table of Contents - Prospectus*

20

**SHAREHOLDER INFORMATION**

**Pricing of Fund Shares**

Shares of the Fund are sold at NAV per share which is calculated as of the close of regular trading (generally, 4:00 p.m., Eastern Time) on each day that the New York Stock Exchange ("NYSE") is open for unrestricted business. However, the Fund's NAV may be calculated earlier if trading on the NYSE is restricted or as permitted by the SEC. The NYSE is closed on weekends and most national holidays, including New Year's Day, Martin Luther King, Jr. Day, Washington's Birthday/Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. The NAV will not be calculated on days when the NYSE is closed for trading.

Purchase and redemption requests are priced based on the next NAV per share calculated after receipt of such requests. The NAV is the value of the Fund's securities, cash and other assets, minus all expenses and liabilities (assets – liabilities = NAV). NAV per share is determined by dividing NAV by the number of shares outstanding (NAV/ # of shares = NAV per share). The NAV takes into account the expenses and fees of the Fund, including management and administration fees, which are accrued daily.

In calculating the NAV, portfolio securities are valued using current market values or official closing prices, if available. Each security owned by the Fund that is listed on a securities exchange is valued at its last sale price on that exchange on the date as of which assets are valued. Where the security is listed on more than one exchange, the Fund will use the price of the exchange that the Fund generally considers to be the principal exchange on which the security is traded.

When reliable market quotations are not readily available or the Fund's pricing service does not provide a valuation (or provides a valuation that in the judgment of the Adviser does not represent the security's fair value) or when, in the judgment of the Adviser, events have rendered the market value unreliable, a security or other asset is valued at its fair value as determined under procedures approved by the Board. Valuing securities at fair value is intended to ensure that the Fund is accurately priced and involves reliance on judgment. Fair value determinations are made in good faith in accordance with the procedures adopted by the Board. The Board will regularly evaluate whether the Fund's fair valuation pricing procedures continue to be appropriate in light of the specific circumstances of the Fund and the quality of prices obtained through their application by the Trust's valuation committee. There can be no assurance that the Fund will obtain the fair value assigned to a security if it were to sell the security at approximately the time at which the Fund determines its NAV per share.

Fair value pricing may be applied to non-U.S. securities. The trading hours for most non-U.S. securities end prior to the close of the NYSE, the time that the Fund's NAV is calculated. The occurrence of certain events after the close of non-U.S. markets, but prior to the close of the NYSE (such as a significant surge or decline in the U.S. market) often will result in an adjustment to the trading prices of non-U.S. securities when non-U.S. markets open on the following business day. If such events occur, the Fund may value non-U.S. securities at fair value, taking into account such events, when it calculates its NAV. In such cases, use of fair valuation can reduce an investor's ability to seek to profit by estimating the Fund's NAV per share in advance of the time the NAV per share is calculated. The Adviser anticipates that the Fund's portfolio holdings will be fair valued when market quotations for those holdings are considered unreliable.

Other types of securities that the Fund may hold for which fair value pricing might be required include, but are not limited to: (a) investments which are not frequently traded and/or the market price of which the Adviser believes may be stale; (b) illiquid securities, including "restricted" securities and private placements for which there is no public market; (c) securities of an issuer that has entered into a restructuring; (d) securities whose trading has been halted or suspended; and (e) fixed income securities that have gone into default and for which there is not a current market value quotation.

*Table of Contents - Prospectus*

**How to Buy Shares**

All purchase requests must be received in "good order." "Good order" generally means that your purchase request includes the name of the Fund and share class; the dollar amount of shares to be purchased; your account application or investment stub; and a check payable to the name of the Fund. The minimum initial investment amount for the Investor Class shares is $100,000 and the minimum subsequent investment amount is $100. The minimum initial investment amount for the Institutional Class shares is $1,000,000 and the minimum subsequent investment amount is $10,000.

Although not limited to the list below, the Fund's minimum investment requirements may be waived from time to time by the Adviser, and for the following types of shareholders:

- current and retired employees, directors/trustees and officers of the Trust, the Adviser and its affiliates and certain family members of each of them (*i.e.*, spouse, domestic partner, child, parent, sibling, grandchild and grandparent, in each case including in-law, step and adoptive relationships);
- any shareholder with an aggregate investment of $100,000 or more in the Fund;
- any trust, pension, profit sharing or other benefit plan for current and retired employees, directors/trustees and officers of the Adviser and its affiliates;
- current employees of U.S. Bancorp Fund Services, LLC, doing business as U.S. Bank Global Fund Services, (the "Transfer Agent"), broker-dealers who act as selling agents for the Fund, intermediaries that have marketing agreements in place with the Adviser and the immediate family members of any of them;
- existing clients of the Adviser, their employees and immediate family members of such employees;
- registered investment advisers who buy through a broker-dealer or service agent who has entered into an agreement with the Fund's distributor; and
- qualified broker-dealers who have entered into an agreement with the Fund's distributor.

You may purchase shares of the Fund by check, by wire transfer, via electronic funds transfer through the Automated Clearing House ("ACH") network through an authorized bank or through one or more brokers authorized by the Fund to receive purchase orders. If you have any questions or need further information about how to purchase shares of the Fund, you may call a customer service representative of the Fund toll-free at 1-844-IQFUND1 (473-8631). The Fund reserves the right to reject any purchase order. For example, a purchase order may be refused if, in the Adviser's opinion, it is so large that it would disrupt the management of the Fund. Orders may also be rejected from persons believed by the Fund to be "market timers."

All checks must be in U.S. dollars drawn on a domestic U.S. bank. The Fund will not accept payment in cash or money orders. The Fund does not accept post-dated checks or any conditional order or payment. To prevent check fraud, the Fund will not accept third party checks, Treasury checks, credit card checks, traveler's checks or starter checks for the purchase of shares.

To buy shares of the Fund, complete an account application and send it together with your check for the amount you wish to invest in the Fund to the address below. To make additional investments once you have opened your account, write your account number on the check and send it together with the Invest by Mail form from your most recent confirmation statement received from the Transfer Agent. If you do not have the Invest by Mail form include the Fund name, your name, address, and account number on a separate piece of paper along with your check. If your payment is returned for any reason, your purchase will be canceled and a $25 fee will be assessed against your account by the Transfer Agent. You may also be responsible for any loss sustained by the Fund.

In addition to cash purchases, Fund shares may be purchased by tendering payment in-kind in the form of shares of stock, bonds or other securities. Any securities used to buy Fund shares must be readily marketable, their acquisition consistent with the Fund's objective and otherwise acceptable to the Adviser and the Board. For further information, you may call a customer service representative of the Fund toll-free at 1-844-IQFUND1 (473-8631).

*Table of Contents - Prospectus*

22

In compliance with the USA PATRIOT Act of 2001, please note that the Transfer Agent will verify certain information on your account application as part of the Trust's Anti-Money Laundering Program. As requested on the account application, you must supply your full name, date of birth, social security number and permanent street address. If you are opening the account in the name of a legal entity (*e.g.*, partnership, limited liability company, business trust, corporation, etc.), you must also supply the identity of the beneficial owners. Mailing addresses containing only a P. O. Box will not be accepted. Please contact the Transfer Agent at 1-844-IQFUND1 (473-8631) if you need additional assistance when completing your account application.

If the Transfer Agent does not have a reasonable belief of the identity of an investor, the account application will be rejected or the investor will not be allowed to perform a transaction on the account until such information is received. The Fund may also reserve the right to close the account within five business days if clarifying information/documentation is not received.

Shares of the Fund have not been registered for sale outside of the United States. The Adviser generally does not sell shares to investors residing outside of the United States, even if they are United States citizens or lawful permanent residents, except to investors with United States military APO or FPO addresses.

**Purchasing Shares by Mail**

Please complete the account application and mail it with your check, payable to the Infinity Q Diversified Alpha Fund, to the Transfer Agent at the following address:

> Infinity Q Diversified Alpha Fund
> c/o U.S. Bank Global Fund Services
> P.O. Box 701
> Milwaukee, Wisconsin 53201-0701

You may not send an account application via overnight delivery to a United States Postal Service post office box. If you wish to use an overnight delivery service, send your account application and check to the Transfer Agent at the following address:

> Infinity Q Diversified Alpha Fund
> c/o U.S. Bank Global Fund Services
> 615 East Michigan Street, 3rd Floor
> Milwaukee, Wisconsin 53202

**Note:** The Fund does not consider the U.S. Postal Service or other independent delivery services to be its agent. Therefore, a deposit in the mail or with such services, or receipt at U.S. Bancorp Fund Services, LLC's post office box, of purchase orders or redemption requests does not constitute receipt by the Transfer Agent. Receipt constitutes physical possession of the purchase order or redemption request by the transfer agent.

**Purchasing Shares by Telephone**

If you have accepted telephone options on your account application or by subsequent arrangement in writing with the Fund and your account has been open for 15 calendar days, you may purchase additional shares by calling the Fund toll-free at 1-844-IQFUND1 (473-8631). You may not make your initial purchase of the Fund shares by telephone. Telephone orders will be accepted via electronic funds transfer from your pre-designated bank account through the ACH network. You must have banking information established on your account prior to making a telephone purchase. Only bank accounts held at domestic institutions that are ACH members may be used for telephone transactions. If your order is received prior to 4:00 p.m., Eastern Time, shares will be purchased at the appropriate share price next calculated. For security reasons, requests by telephone may be recorded. Once a telephone transaction has been placed, it cannot be cancelled or modified after the close of regular trading on the NYSE (generally, 4:00 p.m. Eastern time).

**Purchasing Shares by Wire**

If you are making your initial investment in the Fund, before wiring funds, the Transfer Agent must have a completed account application. You can mail or overnight deliver your account application to the Transfer Agent at the above address. Upon receipt of your completed account application your account will be established and a service representative will contact you to provide your new account number and wiring instructions. If you do not receive this information within one business day, contact the Transfer Agent. You may then instruct your bank to send the wire. Prior to sending the wire, please call the Fund at 1-844-IQFUND1 (473-8631) to advise them of the wire and to ensure proper credit upon receipt. Your bank must include the name of the Fund, your name and your account number so that monies can be correctly applied. Your bank should transmit immediately available funds by wire to:

> U.S. Bank National Association
> 777 East Wisconsin Avenue
> Milwaukee, Wisconsin 53202
> ABA No. 075000022
> Credit: U.S. Bancorp Fund Services, LLC
> Account No. 112-952-137
>> Further Credit: Infinity Q Diversified Alpha Fund
>> Shareholder Registration
>> Shareholder Account Number

If you are making a subsequent purchase, your bank should wire funds as indicated above. Before each wire purchase, you should be sure to notify the Transfer Agent. *It is essential that your bank include complete information about your account in all wire transactions.* If you have questions about how to invest by wire, you may call the Transfer Agent at 1-844-IQFUND1 (473-8631). Your bank may charge you a fee for sending a wire payment to the Fund.

Wired funds must be received prior to 4:00 p.m. Eastern Time to be eligible for same day pricing. Neither the Fund nor U.S. Bank N.A. are responsible for the consequences of delays resulting from the banking or Federal Reserve wire system or from incomplete wiring instructions.

**Retirement Accounts**

The Fund offers prototype documents for a variety of retirement accounts for individuals and small businesses. Please call 1-844-IQFUND1 (473-8631) for information on:

•   Individual Retirement Plans, including Traditional IRAs and Roth IRAs.
•   Small Business Retirement Plans, including Simple IRAs and SEP IRAs.

There may be special distribution requirements for a retirement account, such as required distributions or mandatory federal income tax withholdings. For more information, call the number listed above. Direct shareholder accounts may be charged a $15 annual account maintenance fee for each retirement account up to a maximum of $30 annually and a $25 fee for transferring assets to another custodian or for closing a retirement account. Fees charged by other institutions may vary.

**Purchasing and Selling Shares through a Broker**

You may buy and sell shares of the Fund through certain brokers and financial intermediaries (and their agents) (collectively, "Brokers") that have made arrangements with the Fund to sell its shares. Brokers may have different investment minimum requirements than those outlined in this prospectus. Additionally, Brokers may aggregate several customer accounts to accumulate the requisite initial investment minimum of the Fund. Please consult your Broker for their account policies. When you place your order with such a Broker, your order is treated as if you had placed it directly with the Transfer Agent, and you will pay or receive the next applicable price calculated by the Fund. The Fund will be deemed to have received a purchase or redemption order when an authorized broker, or, if applicable, a broker's designee receives the order. The Broker holds your shares in an omnibus account in the Broker's name, and the Broker maintains your individual ownership records. The Adviser may pay the Broker for maintaining these records as well as providing other shareholder services. The Broker may charge you a fee for handling your order. The Broker is responsible for processing your order correctly and promptly, keeping you advised regarding the status of your individual account, confirming your transactions and ensuring that you receive copies of the Fund's Prospectus.

**How to Sell Shares**

You may sell (redeem) your Fund shares on any day the Fund and the NYSE are open for business either directly to the Fund or through your financial intermediary.

**In Writing**

You may redeem your shares by simply sending a written request to the Transfer Agent. You should provide your account number and state whether you want all or some of your shares redeemed. If you have an IRA or other retirement plan, you must indicate on your written redemption request whether or not to withhold federal income tax. Redemption requests failing to indicate an election to have tax withheld will be subject to 10% withholding. The letter should be signed by all of the shareholders whose names appear on the account registration and include a signature guarantee(s), if necessary. You should send your redemption request to:

| **Regular Mail** | **Overnight Express Mail** |
|---|---|
| Infinity Q Diversified Alpha Fund | Infinity Q Diversified Alpha Fund |
| c/o U.S. Bank Global Fund Services | c/o U.S. Bank Global Fund Services |
| P.O. Box 701 | 615 East Michigan Street, 3rd Floor |
| Milwaukee, Wisconsin 53201-0701 | Milwaukee, Wisconsin 53202 |

**NOTE:**   The Fund does not consider the U.S. Postal Service or other independent delivery services to be its agents. Therefore, a deposit in the mail or with such services, or receipt at U.S. Bancorp Fund Services, LLC's post office box, of purchase orders or redemption requests does not constitute receipt by the Transfer Agent. Receipt constitutes physical possession of the purchase order or redemption request by the transfer agent.

**By Telephone**

If you accepted telephone options on your account application, you may redeem all or some of your shares, up to $50,000, by calling the Transfer Agent at 1-844-IQFUND1 (473-8631)   before the close of trading on the NYSE. This is normally 4:00 p.m., Eastern Time. Redemption proceeds will be processed on the next business day and sent to the address that appears on the Transfer Agent's records or via ACH to a previously established bank account. If you request, redemption proceeds will be wired on the next business day to the bank account you designated on the account application. The minimum amount that may be wired is $1,000. A wire fee of $15 will be deducted from your redemption proceeds for complete redemption and any redemption to redeem a specific number of shares. In the case of a partial redemption, the fee will be deducted from the remaining account balance. Telephone redemptions cannot be made if you notified the Transfer Agent of a change of address within 15 calendar days before the redemption request.

Shares held in IRA or other retirement accounts may be redeemed by telephone at 1-844-IQFUND1 (473-8631). Investors will be asked whether or not to withhold taxes from any distribution.

You may request telephone redemption privileges after your account is opened by calling the Transfer Agent at 1-844-IQFUND1 (473-8631) for instructions.

You may encounter higher than usual call wait times during periods of high market activity. Please allow sufficient time to ensure that you will be able to complete your telephone transaction prior to market close. If you are unable to contact the Fund by telephone, you may mail your redemption request in writing to the address noted above. Once a telephone transaction has been accepted, it may not be canceled or modified after the close of regular trading on the NYSE (generally, 4:00 p.m. Eastern time).

*Table of Contents - Prospectus*

**Payment of Redemption Proceeds**

The Fund typically sends the redemption proceeds on the next business day (a day when the NYSE is open for normal business) after the redemption request is received in good order and prior to market close, regardless of whether the redemption proceeds are sent via check, wire, or ACH transfer. While not expected, payment of redemption proceeds may take up to seven days. If you did not purchase your shares with a wire payment, before selling recently purchased shares, please note that if the Transfer Agent has not yet collected payment for the shares you are selling, it may delay sending the proceeds until the payment is collected, which may take up to 15 calendar days from the purchase date.

**Redemption "In-Kind"**

The Fund typically expects to meet redemption requests by paying out proceeds from cash or cash equivalent portfolio holdings, or by selling portfolio holdings. In stressed market conditions, redemption methods may include paying redemption proceeds to you in whole or in part by a distribution of securities from the Fund's portfolio (a "redemption in-kind").

**Signature Guarantees**

Signature guarantees will generally be accepted from domestic banks, brokers, dealers, credit unions, national securities exchanges, registered securities associations, clearing agencies and savings associations, as well as from participants in the New York Stock Exchange Medallion Signature Program and the Securities Transfer Agents Medallion Program. *A notary public is not an acceptable signature guarantor.*

A signature guarantee from either a Medallion program member or a non-Medallion program member is required in the following situations:

- If ownership is changed on your account;
- When redemption proceeds are payable or sent to any person, address or bank account not on record;
- When a redemption is received by the Transfer Agent and the account address has changed within the last 15 calendar days; and
- For all redemptions in excess of $50,000 from any shareholder account, including IRAs.

The Fund may waive any of the above requirements in certain instances. In addition to the situations described above, the Fund and /or the Transfer Agent reserve the right to require a signature guarantee in other instances based on the circumstances relative to the particular situation.

Non-financial transactions, including establishing or modifying certain services on an account, may require a signature guarantee, signature verification from a Signature Validation Program member, or other acceptable form of authentication from a financial institution source.

**Other Information about Redemptions**

The Fund may redeem the shares in your account if the value of your account is less than $500 as a result of redemptions you have made. This does not apply to retirement plan or Uniform Gifts or Transfers to Minors Act accounts. You will be notified that the value of your account is less than $500 before the Fund makes an involuntary redemption. You will then have 30 days in which to make an additional investment to bring the value of your account to at least $500 before the Fund takes any action.

*Table of Contents - Prospectus*

## DIVIDENDS AND DISTRIBUTIONS

The Fund will generally make distributions of dividends and capital gains, if any, at least annually, typically in December. The Fund may make an additional payment of dividends or distributions of capital gains if it deems it necessary for federal income tax purposes or otherwise desirable at any other time of the year.

All distributions will be reinvested in Fund shares unless you choose one of the following options: (1) receive dividends in cash while reinvesting capital gain distributions in additional Fund shares; (2) reinvest dividends in additional Fund shares and receive capital gains in cash; or (3) receive all distributions in cash.

If you elect to receive distributions in cash and the U.S. Postal Service cannot deliver the check, or if a check remains outstanding for six months, the Fund reserves the right to reinvest the distribution check in your account, at the Fund's current NAV per share, and to reinvest all subsequent distributions. If you wish to change your distribution option, notify the Transfer Agent in writing or by telephone at least 5 days prior to the payment date for the distribution.

## TOOLS TO COMBAT FREQUENT TRANSACTIONS

The Board has adopted policies and procedures to prevent frequent transactions in the Fund. The Fund discourages excessive, short-term trading and other abusive trading practices that may disrupt portfolio management strategies and harm the Fund's performance. The Fund takes steps to reduce the frequency and effect of these activities in the Fund. These steps include imposing a redemption fee, monitoring trading practices and using fair value pricing. Although these efforts are designed to discourage abusive trading practices, these tools cannot eliminate the possibility that such activity may occur. Further, while the Fund makes efforts to identify and restrict frequent trading, the Fund receives purchase and sale orders through financial intermediaries and cannot always know or detect frequent trading that may be facilitated by the use of intermediaries or the use of group or omnibus accounts by those intermediaries. The Fund seeks to exercise its judgment in implementing these tools to the best of its abilities in a manner that the Fund believes is consistent with shareholder interests.

The Fund charges a 1.00% redemption fee on the redemption of Fund shares held for 60 days or less. This fee (which is paid into the Fund) is imposed in order to help offset the transaction costs and administrative expenses associated with the activities of short-term "market timers" that engage in the frequent purchase and sale of Fund shares. The "first in, first out" ("FIFO") method is used to determine the holding period; this means that if you bought shares on different days, the shares purchased first will be redeemed first for the purpose of determining whether the redemption fee applies. The redemption fee is deducted from your proceeds and is retained by the Fund for the benefit of its long-term shareholders. Redemption fees will not apply to shares acquired through the reinvestment of dividends. Although the Fund has the goal of applying the redemption fee to most redemptions, the redemption fee may not be assessed in certain circumstances where it is not currently practicable for the Fund to impose the fee, such as redemptions of shares held in certain omnibus accounts or retirement plans.

The Fund monitors selected trades in an effort to detect excessive short-term trading activities. If, as a result of this monitoring, the Fund believes that a shareholder has engaged in excessive short-term trading, it may, in its discretion, ask the shareholder to stop such activities or refuse to process purchases in the shareholder's accounts. In making such judgments, the Fund seeks to act in a manner that it believes is consistent with the best interests of shareholders. Due to the complexity and subjectivity involved in identifying abusive trading activity and the volume of shareholder transactions the Fund handles, there can be no assurance that the Fund's efforts will identify all trades or trading practices that may be considered abusive. In addition, the Fund's ability to monitor trades that are placed by individual shareholders within group or omnibus accounts maintained by financial intermediaries is limited because the Fund does not have simultaneous access to the underlying shareholder account information.

*Table of Contents - Prospectus*

In compliance with Rule 22c-2 of the Investment Company Act of 1940, as amended, the Fund's Distributor, on behalf of the Fund, has entered into written agreements with each of the Fund's financial intermediaries, under which the intermediary must, upon request, provide the Fund with certain shareholder and identity trading information so that the Fund can enforce its market timing policies.

The Fund employs fair value pricing selectively, as discussed above, to ensure greater accuracy in its daily NAV and to prevent dilution by frequent traders or market timers who seek to take advantage of temporary market anomalies.

## TAX CONSEQUENCES

Below the Fund has summarized some important tax issues that affect the Fund and its shareholders. The summary is based on current tax law, which may be changed by legislative, judicial or administrative action.

The Tax Cuts and Jobs Act (the "Tax Act") makes significant changes to the U.S. federal income tax rules for taxation of individuals and corporations, generally effective for taxable years beginning after December 31, 2017. Many of the changes applicable to individuals are temporary and would apply only to taxable years beginning after December 31, 2017 and before January 1, 2026. There are only minor changes with respect to the specific rules only applicable to a regulated investment company, such as the Fund. The Tax Act, however, makes numerous other changes to the tax rules that may affect shareholders and the Fund. You are urged to consult with your own tax advisor regarding how the Tax Act affects your investment in the Fund.

The Fund will typically make any distributions of net investment income and capital gains annually. Dividends of net investment income and distributions from the Fund's net short-term capital gains are taxable to you as ordinary income or qualified dividend income. Distributions from the Fund's net capital gain (the excess of its net long-term capital gains over its net short-term capital losses) are generally taxable to non-corporate shareholders at rates of up to 20%, regardless of how long the shareholders held their respective shares in the Fund. You will be taxed in the same manner whether you receive your dividends and capital gain distributions in cash or reinvest them in additional Fund shares.

Distributions that the Fund reports as "qualified dividend income" may be eligible to be taxed to non-corporate shareholders at rates of up to 20% if requirements, including holding period requirements, are satisfied. In general, the Fund may report its dividends as qualified dividend income to the extent derived from dividends paid to the Fund by U.S. corporations or certain foreign corporations that are either incorporated in a U.S. possession or eligible for tax benefits under certain U.S. income tax treaties. In addition, dividends that the Fund receives in respect of stock of certain foreign corporations may be qualified dividend income if that stock is readily tradable on an established U.S. securities market. A portion of the dividends received from the Fund (but none of its capital gain distributions) may qualify for the dividends-received deduction for corporations.

The Fund expects to invest up to 25% of its total assets in its Subsidiary, which the Fund expects to be treated as a controlled foreign corporation under the Code. The Fund expects its Subsidiary will make actual annual distributions in an amount at least equal to the subpart F income attributed to the Fund. To the extent the Subsidiary makes such distributions out of earnings and profits, the Fund expects such distributions to be treated as "qualifying income" for the purpose of determining the Fund's qualification as a regulated investment company under the Code. The Fund will carefully monitor its investments in its Subsidiary to ensure that no more than 25% of the Fund's assets are invested in the Subsidiary.

A Medicare contribution tax of 3.8% applies to all or a portion of net investment income of U.S. individuals with income exceeding specified thresholds, and to all or a portion of undistributed net investment income of certain estates and trusts. Net investment income generally includes for this purpose dividends and capital gain distributions paid by the Fund and gain on the redemption of Fund shares.

Any dividend or capital gain distribution paid by the Fund has the effect of reducing the NAV per share on the ex-dividend date by the amount of the dividend or capital gain distribution. You should note that a dividend or capital gain distribution paid on shares that you purchased shortly before that dividend or capital gain distribution was declared will be subject to income taxes even though the dividend or capital gain distribution represents, in substance, a partial return of capital to you. This is known as "buying a dividend" and should be avoided by taxable investors.

Although distributions are generally taxable when received, certain distributions declared in October, November, or December to shareholders of record on a specified date in such a month but paid the following January are taxable as if received in December of the year in which the dividend is declared.

The Fund will send you a report annually summarizing the amount and tax aspects of your distributions. The Fund will be required to report to the Internal Revenue Service ("IRS") all distributions of taxable income and capital gains as well as gross proceeds from the redemption of Fund shares, except in the case of exempt shareholders, which includes most corporations. The Fund will also be required to report tax basis information for such shares and indicate whether these shares had a short-term or long-term holding period. If a shareholder has a different basis for different shares of the Fund in the same account (e.g., if a shareholder purchased shares in the same account at different times for different prices), the Fund calculates the basis of the shares sold using its default method unless the shareholder has properly elected to use a different method. The Fund's default method for calculating basis is first-in, first-out ("FIFO"). A shareholder may elect, on an account-by-account basis, to use a method other than FIFO by following procedures established by the Fund or its administrative agent. If such an election is made on or prior to the date of the first exchange or redemption of shares in the account and on or prior to the date that is one year after the shareholder receives notice of the Fund's default method, the new election will generally apply as if the FIFO method had never been in effect for such account. Shareholders should consult their tax advisers concerning the tax consequences of applying the Fund's default method or electing another method of basis calculation. Shareholders also should carefully review any cost basis information provided to them and make any additional basis, holding period or other adjustments that are required when reporting these amounts on their federal income tax returns.

By law, the Fund must withhold as backup withholding a percentage of your taxable distributions and redemption proceeds if you (1) have provided the Fund either an incorrect tax identification number or no number at all, (2) are subject to backup withholding by the IRS for failure to properly report payments of interest or dividends, (3) have failed to certify to the Fund that you are not subject to backup withholding, or (4) have not certified to the Fund that you are a U.S. person (including a U.S. resident alien). The backup withholding rate is 24% for taxable years beginning after December 31, 2017 and before January 1, 2026. Backup withholding will not, however, be applied to payments that have been subject to the 30% withholding tax applicable to shareholders who are neither citizens nor residents of the United States.

Each sale of shares of the Fund may be a taxable event. A sale may result in a capital gain or loss to you. The gain or loss generally will be treated as short term if you held the shares 12 months or less, long term if you held the shares for longer.

If you redeem your Fund shares, it is considered a taxable event for you. Depending on the purchase price and the redemption price of the shares you redeem, you may have a gain or a loss on the transaction. You are responsible for any tax liabilities generated by your transaction. The Code limits the deductibility of capital losses in certain circumstances.

To the extent the Fund invests in foreign securities, it may be subject to foreign withholding taxes with respect to dividends or interest the Fund received from sources in foreign countries. If more than 50% of the total assets of the Fund consist of foreign securities, the Fund will be eligible to elect to treat some of those taxes as a distribution to shareholders, which would allow shareholders to offset some of their U.S. federal income tax. The Fund (or its administrative agent) will notify you if it makes such an election and provide you with the information necessary to reflect foreign taxes paid on your income tax return.

*Table of Contents - Prospectus*

29

Additional information concerning taxation of the Fund and its shareholders is contained in the SAI. Tax consequences are not the primary consideration of the Fund in making its investment decisions. If you have a tax-advantaged retirement account, you will generally not be subject to federal taxation on any dividends and capital gain distributions until you begin receiving your distributions from your retirement account. **You should consult your own tax adviser concerning federal, foreign, state and local taxation of distributions from the Fund.**

## SHARE CLASS INFORMATION AND DISTRIBUTION ARRANGEMENTS

**Description of Classes**

The Trust has adopted a multiple class plan that allows the Fund to offer one or more classes of shares. The Fund offers two classes of shares – Investor Class and Institutional Class. The different classes of shares represent investments in the same portfolio of securities, but the classes are subject to different expenses as discussed below.

**Investor Class Shares**

Investor Class shares are subject to Rule 12b-1 fees (or distribution and service fees) described below of 0.25% of average daily net assets, which are assessed against the shares of the Fund.

**Institutional Class Shares**

If you purchase Institutional Class shares of the Fund you will pay the NAV per share next determined after your order is received. Institutional Class shares of the Fund are not subject to Rule 12b-1 fees.

The following persons are eligible to invest in Institutional Class shares:

1. Institutional investors including banks, savings institutions, credit unions and other financial institutions, pension, profit sharing and employee benefit plans and trusts, insurance companies, investment companies, investment advisers, broker-dealers and financial advisers acting for their own accounts or for the accounts of their clients;

2. Full-time employees, agents, employees of agents, retirees and directors (trustees), and members of their families (*i.e.*, parent, child, spouse, domestic partner, sibling, set or adopted relationships, grandparent, grandchild and UTMA accounts naming qualifying persons) of the Adviser and its affiliated companies; and

3. Shareholders investing through accounts at approved broker-dealers who act as selling agents for the Fund.

**Distribution Plan (Rule 12b-1 Plan)**

The Trust has adopted a plan pursuant to Rule 12b-1 for the Fund's Investor Class shares that allows the Fund to pay fees for the sale, distribution and servicing of its Investor Class shares. The plan provides for a distribution and servicing fee of up to 0.25% of the Investor Class shares' average daily net assets. Because these fees are paid out over the life of the Fund's Investor Class shares, over time, these fees (to the extent they are accrued and paid) will increase the cost of your investment and may cost you more than paying other types of sales charges.

The Fund has policies and procedures in place for the monitoring of payments to broker-dealers and other financial intermediaries for distribution-related activities and the following non-distribution activities: sub-transfer agent, administrative, and other shareholder servicing services.

*Table of Contents - Prospectus*

**Additional Payments to Dealers**

If you purchase shares of the Fund through a broker-dealer or other financial intermediary (such as a bank), the Fund and its related companies may pay the intermediary for the sale of Fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your salesperson to recommend the Fund over another investment. Ask your salesperson or visit your financial intermediary's website for more information.

**Distributor**

Quasar Distributors, LLC ("Quasar" or "Distributor"), an affiliate of the Fund's transfer agent, U.S. Bancorp Fund Services, LLC, is located at 777 East Wisconsin Avenue, 6th Floor, Milwaukee, Wisconsin 53202, and is the distributor for the shares of the Fund. Quasar is a registered broker-dealer and a member of the Financial Industry Regulatory Authority. Shares of the Fund are offered on a continuous basis.

**Service Fees – Other Payments to Third Parties**

The Adviser, out of its own resources, and without additional cost to the Fund or its shareholders, may provide additional cash payments or non-cash compensation to intermediaries who sell shares of the Fund. These additional cash payments are generally made to intermediaries that provide shareholder servicing, marketing support and/or access to sales meetings, sales representatives and management representatives of the intermediary. Cash compensation may also be paid to intermediaries for inclusion of the Fund on a sales list, in other sales programs or as an expense reimbursement in cases where the intermediary provides shareholder services to the Fund's shareholders. The Adviser may also pay cash compensation in the form of finder's fees that vary depending on the Fund and the dollar amount of the shares sold.

**ADDITIONAL INFORMATION**

**Inactive Accounts**

The Fund is legally obligated to escheat (or transfer) abandoned property to the appropriate state's unclaimed property administrator in accordance with statutory requirements. The investor's last known address of record determines which state has jurisdiction. Your mutual fund account may be transferred to your state of residence if no activity occurs within your account during the "inactivity period" specified in your state's abandoned property laws. Investors with a state of residence in Texas have the ability to designate a representative to receive legislatively required unclaimed property due diligence notifications. Please contact the Texas Comptroller of Public Accounts for further information.

**Fund Mailings**

Statements and reports that the Fund sends to you include the following:

- Confirmation statements (after every transaction that affects your account balance or your accountregistration);
- Annual and semi-annual shareholder reports (every six months); and
- Quarterly account statements.

It is important that the Fund maintain a correct address for each investor. An incorrect address may cause an investor's account statements and other mailings to be returned to the Fund.

**Householding**

In an effort to decrease costs, the Fund intends to reduce the number of duplicate prospectuses, annual and semi-annual reports, proxy statements and other similar documents you receive by sending only one copy of each to those addresses shared by two or more accounts and to shareholders the Transfer Agent reasonably believes are from the same family or household. Once implemented, if you would like to discontinue householding for your accounts, please call toll-free at 1-844-IQFUND1 (473-8631) to request individual copies of these documents. Once the Fund receives notice to stop householding, the Transfer Agent will begin sending individual copies thirty days after receiving your request. This policy does not apply to account statements.

*Table of Contents - Prospectus*

**General Policies**

Some of the following policies are mentioned above. In general, the Fund reserves the right to:

- Refuse, change, discontinue, or temporarily suspend account services, including purchase, or telephone redemption privileges, for any reason;
- Reject any purchase request for any reason. Generally, the Fund will do this if the purchase is disruptive to the efficient management of the Fund (due to the timing of the investment or an investor's history of excessive trading);
- Redeem all shares in your account if your balance falls below $500 due to redemption activity. If, within 30 days of the Fund's written request, you have not increased your account balance, you may be required to redeem your shares. The Fund will not require you to redeem shares if the value of your account drops below the investment minimum due to fluctuations of NAV;
- Delay paying redemption proceeds for more than seven calendar days after receiving a request, under the circumstances described below; and
- Reject any purchase or redemption request that does not contain all required documentation.

Before redeeming recently purchased shares, please note that if the Transfer Agent has not yet collected payment for the shares you are redeeming, it may delay sending the proceeds until the payment is collected, which may take up to 15 calendar days from the purchase date. Furthermore, there are certain times when you may be unable to redeem the Fund's shares or receive proceeds. Specifically, the Fund may suspend the right to redeem shares or postpone the date of payment upon redemption for more than seven calendar days for:

1. any period during which the NYSE is closed (other than customary week-end or holiday closings) or trading on the NYSE is restricted;
2. any period during which an emergency exists as a result of which disposal by the Fund of securities it owns by them is not reasonably practicable or it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or
3. such other periods as the SEC may permit for the protection of the Fund's shareholders.

If you elect telephone privileges on the account application or in a letter to the Fund, you may be responsible for any fraudulent telephone orders as long as the Fund has taken reasonable precautions to verify your identity. Before executing an instruction received by telephone, the Transfer Agent will use reasonable procedures to confirm that the telephone instructions are genuine. The telephone call may be recorded and the caller may be asked to verify certain personal identification information. If the Fund or its agents follow these procedures, they cannot be held liable for any loss, expense or cost arising out of any telephone redemption request that is reasonably believed to be genuine. This includes fraudulent or unauthorized requests. If an account has more than one owner or authorized person, the Fund will accept telephone instructions from any one owner or authorized person. In addition, once you place a telephone transaction request, it cannot be canceled or modified after the close of regular trading on the NYSE (generally, 4:00 p.m. Eastern time).

*Table of Contents - Prospectus*

32

**FINANCIAL HIGHLIGHTS**

The financial highlights tables are intended to help you understand the Fund's financial performance for the fiscal periods shown. Certain information reflects financial results for a single share. The total returns in each table represent the rate that an investor would have earned or lost on an investment in the Fund (assuming reinvestment of all dividends and distributions). The information for the fiscal period September 30, 2014 through August 31, 2015, fiscal year ended August 31, 2016, and fiscal year ended August 31, 2017, have been audited by a previous auditor. The information for the fiscal year ended August 31, 2018, has been audited by EisnerAmper LLP, whose report, along with the Fund's financial statements, are included in the Fund's annual report, which is available upon request.

**Investor Class Shares**
**For a share outstanding throughout each period presented**

| | Year Ended August 31, 2018 | Year Ended August 31, 2017 | Year Ended August 31, 2016 | Period September 30, 2014* to August 31, 2015 |
|---|---|---|---|---|
| Net asset value, beginning of period | $ 10.37 | $ 9.86 | $ 10.11 | $ 10.00 |
| Income/(loss) from investment operations: | | | | |
| Net investment loss [1] | (0.18) | (0.23) | (0.22) | (0.21) |
| Net realized and unrealized gain on investments | 1.35 | 0.96 | 0.16 | 0.46 |
| Total from investment operations | 1.17 | 0.73 | (0.06) | 0.25 |
| Less distributions: | | | | |
| From net investment income | — | (0.22) | — | — |
| From net realized gains | — | — | (0.19) | (0.14) |
| Total distributions | — | (0.22) | (0.19) | (0.14) |
| Redemption fee proceeds [1] | 0.00[2] | 0.00[2] | 0.00[2] | — |
| Net asset value, end of period | $ 11.54 | $ 10.37 | $ 9.86 | $ 10.11 |
| Total Return [3] | 11.28% | 7.56% | -0.59% | 2.62% [4] |
| Net assets, end of period (in thousands) | $ 25,588 | $ 15,658 | $ 9,189 | $ 185 |
| Ratio of expenses to average net assets: | | | | |
| Before fees waived [6] | 2.58% | 2.78% [6] | 2.66% [6] | 2.76% [5] |
| After fees waived [6] | 2.40% | 2.61% [6] | 2.43% [6] | 2.38% [5] |
| Ratio of net investment loss to average net assets: | | | | |
| Before fees waived [7] | -1.80% | -2.38% [8] | -2.49% [8] | -2.71% [5] |
| After fees waived [7] | -1.62% | -2.22% [8] | -2.25% [8] | -2.33% [5] |
| Portfolio turnover rate [8] | 8% | 65% | 62% | 195% [4] |

*Table of Contents - Prospectus*

33

\* Commencement of operations

(1) Calculated using average shares method

(2) Amount represents less than $0.01 per share

(3) Performance reported does not reflect sales charges. Effective December 31, 2015, the class no longer has an initial sales charge.

(4) Not annualized

(5) Annualized

(6) The ratio of expenses to average net assets includes dividends and interest on short positions and brokerage expenses. For the periods ended August 31, 2015, August 31, 2016, August 31, 2017, and August 31, 2018, excluding dividends and interest on short positions and brokerage expenses, the ratios of expenses to average net assets, before fees waived/reimbursed by the Adviser, were 2.63%, 2.43%, 2.37% and 2.39%, respectively. Excluding dividends and interest on short positions and brokerage expenses, the ratio of expenses to average net assets, after fees waived/reimbursed by the Adviser, were 2.25%, 2.20%, 2.20%, and 2.20% respectively.

(7) The ratios of net investment loss to average net assets include dividends and interest on short positions and brokerage expenses. For the periods ended August 31, 2015, August 31, 2016, August 31, 2017 and August 31, 2018, excluding dividends and interest on short positions and brokerage expenses, the ratios of net investment loss to average net assets, before fees waived/reimbursed by the Adviser, were -2.58%, -2.26%, -1.97% and -1.60% respectively. Excluding dividends and interest on short positions and brokerage expenses, the ratios of net investment loss to average net assets, after fees waived/reimbursed by the Adviser, were -2.20%, -2.02%, -1.81% and -1.42%, respectively.

(8) Portfolio turnover is calculated on the basis of the Fund as a whole without distinguishing between the classes of shares issued

*Table of Contents - Prospectus*

**Institutional Class Shares**
**For a share outstanding throughout each period presented**

| | Year Ended August 31, 2018 | Year Ended August 31, 2017 | Year Ended August 31, 2016 | Period September 30, 2014* to August 31, 2015 |
|---|---|---|---|---|
| Net asset value, beginning of period | $ 10.42 | $ 9.90 | $ 10.14 | $ 10.00 |
| Income/(loss) from investment operations: | | | | |
| Net investment loss [1] | (0.15) | (0.20) | (0.20) | (0.19) |
| Net realized and unrealized gain on investments | 1.35 | 0.96 | 0.15 | 0.47 |
| Total from investment operations | 1.20 | 0.76 | (0.05) | 0.28 |
| Less distributions: | | | | |
| From net investment income | — | (0.24) | — | — |
| From net realized gains | — | — | (0.19) | (0.14) |
| Total distributions | — | (0.24) | (0.19) | (0.14) |
| Redemption fee proceeds [1] | 0.00[2] | 0.00[2] | 0.00[2] | — |
| Net asset value, end of period | $ 11.62 | $ 10.42 | $ 9.90 | $ 10.14 |
| Total Return | 11.52% | 7.88% | -0.48% | 2.93% [3] |
| Net assets, end of period (in thousands) | $ 276,901 | $ 147,449 | $ 132,462 | $ 60,328 |
| Ratio of expenses to average net assets: | | | | |
| Before fees waived [5] | 2.25% | 2.42% | 2.30% | 2.49%[4] |
| After fees waived [5] | 2.15% | 2.34% | 2.14% | 2.17% [4] |
| Ratio of net investment loss to average net assets: | | | | |
| Before fees waived [6] | -1.46% | -2.02% | -2.13% | -2.45% [4] |
| After fees waived [6] | -1.36% | -1.95% | -1.97% | -2.13% [4] |
| Portfolio turnover rate [7] | 8% | 65% | 62% | 195%[3] |

\*   Commencement of operations

(1)  Calculated using average shares method

(2)  Amount represents less than $0.01 per share

(3)  Not annualized

(4)  Annualized

(5)  The ratios of expenses to average net assets include dividends and interest on short positions and brokerage expenses. For the periods ended August 31, 2015, August 31, 2016, August 31, 2017 and August 31, 2018, excluding dividends and interest on short positions and brokerage expenses, the ratios of expenses to average net assets, before fees waived/reimbursed by the Adviser, were 2.34%, 2.10%, 2.03% and 2.05%, respectively. Excluding dividends and interest on short positions and brokerage expenses, the ratios of expenses to average net assets, after fees waived/reimbursed by the Adviser, were 2.02%, 1.95%, 1.95% and 1.95%, respectively.

35

(6)   The ratios of net investment loss to average net assets include dividends and interest on short positions and brokerage expenses. For the periods ended August 31, 2015, August 31, 2016, August 31, 2017 and August 31, 2018, excluding dividends and interest on short positions and brokerage expenses, the ratios of net investment loss to average net assets, before fees waived/reimbursed by the Adviser, were -2.30%, -1.94%, -1.63%, and -1.26%, respectively.  Excluding dividends and interest on short positions and brokerage expenses, the ratios of net investment loss to average net assets, after fees waived/reimbursed by the Adviser, were -1.98%, -1.79%, -1.56% and -1.16%, respectively.

(7)   Portfolio turnover is calculated on the basis of the Fund as a whole without distinguishing between the classes of shares issued.

*Table of Contents - Prospectus*

36

**PRIVACY NOTICE**

The Fund collects non-public information about you from the following sources:

- Information we receive about you on applications or other forms;
- Information you give us orally; and/or
- Information about your transactions with us or others

We do not disclose any non-public personal information about our customers or former customers without the customer's authorization, except as permitted by law or in response to inquiries from governmental authorities. We may share information with affiliated and unaffiliated third parties with whom we have contracts for servicing the Fund. We will provide unaffiliated third parties with only the information necessary to carry out their assigned responsibilities. We maintain physical, electronic and procedural safeguards to guard your personal information and require third parties to treat your personal information with the same high degree of confidentiality.

In the event that you hold shares of the Fund through a financial intermediary, including, but not limited to, a broker-dealer, bank, or trust company, the privacy policy of your financial intermediary would govern how your non-public personal information would be shared with unaffiliated third parties.

_Table of Contents - Prospectus_

PN-1

**Investment Adviser**
Infinity Q Capital Management, LLC
888 7th Avenue, Suite 3700
New York, New York 10106

**Distributor**
Quasar Distributors, LLC
777 East Wisconsin Avenue, 6th Floor
Milwaukee, Wisconsin 53202

**Custodian**
U.S. Bank National Association
Custody Operations
1555 North River Center Drive, Suite 302
Milwaukee, Wisconsin 53212

**Transfer Agent**
U.S. Bancorp Fund Services, LLC
615 East Michigan Street
Milwaukee, Wisconsin 53202

**Independent Registered Public Accounting Firm**
EisnerAmper LLP
750 Third Avenue
New York, New York 10017

**Legal Counsel**
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004

*Table of Contents - Prospectus*

**Infinity Q Diversified Alpha Fund**

You can find more information about the Fund in the following documents:

**Statement of Additional Information**
The SAI provides additional details about the investments and techniques of the Fund and certain other additional information. A current SAI is on file with the SEC and is incorporated into this Prospectus by reference. This means that the SAI is legally considered a part of this Prospectus even though it is not physically within this Prospectus.

**Annual and Semi-Annual Reports**
The Fund's annual and semi-annual reports (collectively, the "Shareholder Reports") provide the most recent financial reports and portfolio listings. The annual report contains a discussion of the market conditions and investment strategies that affected the Fund's performance during the Fund's last fiscal period.

The SAI and the Shareholder Reports are available free of charge on the Fund's website at www.infinityqfunds.com. You can obtain a free copy of the SAI and Shareholder Reports (when available), request other information, or make general inquiries about the Fund by calling the Fund (toll-free) at 1-844-IQFUND1 (473-8631) or by writing to:

> Infinity Q Diversified Alpha Fund
> c/o U.S. Bank Global Fund Services
> P.O. Box 701
> Milwaukee, Wisconsin 53201-0701
> www.infinityqfunds.com

You may review and copy information including the Shareholder Reports and SAI at the Public Reference Room of the Securities and Exchange Commission in Washington, D.C. You can obtain information on the operation of the Public Reference Room by calling (202) 551-8090. Reports and other information about the Fund are also available:

- Free of charge from the SEC's EDGAR database on the SEC's website at http://www.sec.gov;
- For a fee, by writing to the Public Reference Section of the SEC, Washington, D.C. 20549-1520; or
- For a fee, by electronic request at the following e-mail address: publicinfo@sec.gov.

(The Trust's SEC Investment Company Act file number is 811-21422.)

*Table of Contents - Prospectus*



## Infinity Q Diversified Alpha Fund

| | |
|---|---|
| **Investor Class** | **IQDAX** |
| **Institutional Class** | **IQDNX** |

# STATEMENT OF ADDITIONAL INFORMATION

**December 31, 2018**

A series of Trust for Advised Portfolios

**c/o U.S. Bank Global Fund Services**
**P.O. Box 701**
**Milwaukee, Wisconsin 53201-0701**

**1-844-IQFUND1 (473-8631)**

This Statement of Additional Information ("SAI") is not a prospectus and it should be read in conjunction with the Prospectus dated December 31, 2018, as may be revised, for the Infinity Q Diversified Alpha Fund (the "Fund"), a series of Trust for Advised Portfolios (the "Trust"). Infinity Q Capital Management, LLC (the "Adviser") is the Fund's investment adviser. A copy of the Prospectus may be obtained by contacting the Fund at the address or telephone number above or by visiting the Fund's website at www.infinityqfunds.com. The Fund's financial statements for the fiscal year ended August 31, 2018, are incorporated herein by reference to the Fund's annual report. A copy of the annual report may be obtained without charge on the Fund's website, www.infinityqfunds.com, or by calling or writing the Fund as shown above.

**TABLE OF CONTENTS**

THE TRUST                                                                          1

INVESTMENT POLICIES                                                                1

INVESTMENT RESTRICTIONS                                                            21

PORTFOLIO TURNOVER                                                                 22

PORTFOLIO HOLDINGS POLICY                                                          22

MANAGEMENT                                                                         24

CODES OF ETHICS                                                                    28

PROXY VOTING POLICIES AND PROCEDURES                                              28

CONTROL PERSONS AND PRINCIPAL SHAREHOLDERS                                        29

THE FUND'S INVESTMENT ADVISER                                                     29

PORTFOLIO MANAGERS                                                                 31

OTHER SERVICE PROVIDERS                                                           32

EXECUTION OF PORTFOLIO TRANSACTIONS                                               33

GENERAL INFORMATION                                                               35

ADDITIONAL PURCHASE AND REDEMPTION INFORMATION                                    36

DETERMINATION OF SHARE PRICE                                                      37

DISTRIBUTIONS AND TAX INFORMATION                                                 39

DISTRIBUTION AGREEMENT                                                            47

RULE 12b-1 DISTRIBUTION AND SERVICE PLAN                                          48

MARKETING AND SUPPORT PAYMENTS                                                    49

ANTI-MONEY LAUNDERING PROGRAM                                                     49

FINANCIAL STATEMENTS                                                              50

Appendix A                                                                        A-1

Appendix B                                                                        B-1

*Table of Contents - Statement of Additional Information*

**THE TRUST**

The Trust is a Delaware statutory trust organized under the laws of the State of Delaware on August 28, 2003, and is registered with the U.S. Securities and Exchange Commission (the "SEC") as an open-end management investment company. Between August 28, 2003 and May 31, 2005 the Trust was named "Lotsoff Capital Management Equity Trust." Between June 1, 2005 and November 30, 2011 the Trust was named "Lotsoff Capital Management Investment Trust." Between December 1, 2011 and January 30, 2013 the Trust was named Ziegler Lotsoff Capital Management Investment Trust." Between January 31, 2013 and January 29, 2014 the Trust was named "Ziegler Capital Management Investment Trust."

The Trust's Agreement and Declaration of Trust (the "Declaration of Trust") permits the Trust's Board of Trustees (the "Board" or the "Trustees") to issue an unlimited number of full and fractional shares of beneficial interest, of no par value per share, which may be issued in any number of series. The Trust consists of various series that represent separate investment portfolios. The Board may from time to time issue other series, the assets and liabilities of which will be separate and distinct from any other series. This SAI relates only to the Infinity Q Diversified Alpha Fund.

Registration with the SEC does not involve supervision of the management or policies of the Fund. The Prospectus of the Fund and this SAI omit certain of the information contained in the Registration Statement filed with the SEC. Copies of such information may be obtained from the SEC upon payment of the prescribed fee or may be accessed free of charge at the SEC's website at www.sec.gov.

The Fund, as a series of the Trust, does not hold itself out as related to any other series of the Trust for purposes of investment and investor services, nor does it share the same investment adviser with any other series.

**INVESTMENT POLICIES**

The discussion below supplements information contained in the Fund's Prospectus as to the investment policies and risks of the Fund.

**Investment in the Subsidiary**

The Fund may invest up to 25% of its assets in a wholly-owned and controlled Cayman Islands subsidiary ("Subsidiary"). It is expected that the Subsidiary will invest primarily in commodity index swaps and other commodity-linked derivative instruments. In addition, the Subsidiary may also invest in financial futures, option and swap contracts, fixed income securities, structured notes, pooled investment vehicles, including those that are not registered pursuant to the Investment Company Act of 1940, as amended (the "1940 Act"), and other investments intended to serve as margin or collateral for the Subsidiary's derivatives positions. As a result, the Fund may be considered to be investing indirectly in these investments through its Subsidiary. For that reason, and for the sake of convenience, references in this SAI to the Fund may also include the Subsidiary. The Subsidiary's key financial information is presented with that of the Fund in the form of consolidated financial statements included in the Fund's annual and semi-annual reports to shareholders. Copies of the reports are provided without charge upon request.

The Subsidiary is a company organized under the laws of the Cayman Islands, whose registered office is located at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, Grand Cayman KY1-9005, Cayman Islands. The Subsidiary's affairs are overseen by its own board of directors consisting of three directors, one of which is not an interested person of the Subsidiary and the Fund, and therefore, is an independent director. The Subsidiary has entered into a separate contract with the Adviser for the management of the Subsidiary's portfolio pursuant to which the Subsidiary pays the Adviser a management fee for its services. The Adviser has contractually agreed to waive the management fee it receives from the Fund in an amount equal to the management fee paid to the Adviser by the Subsidiary. As a result, the Fund's investment in the Subsidiary will not result in the Fund paying duplicative management fees. The Subsidiary will bear the fees and expenses incurred in connection with the custody, transfer agency, and audit services that it receives, which are specific to the Subsidiary and its operations and not duplicative of services provided to the Fund. The Fund expects that the expenses borne by its Subsidiary will not be material in relation to the value of the Fund's assets. Please refer to the section in this SAI titled "Distributions and Tax Information - Tax Implications of Investment in the Subsidiary" for information about certain tax aspects of the Fund's investment in the Subsidiary.

The Subsidiary is not registered as an investment company under the 1940 Act, and as a result, the Fund, as the sole shareholder of the Subsidiary, will not have all of the protections offered to investors in registered investment companies. As noted elsewhere in this SAI, however, the Subsidiary has agreed to be subject to certain provisions of the 1940 Act that further investor protection. Most notably, the Fund, including those assets held through the Subsidiary, complies with the 1940 Act's restrictions under Section 18 related to leverage and borrowing. In addition, because the Fund wholly owns and controls the Subsidiary, and the Fund and the Subsidiary are each managed by the Adviser, it is unlikely that the Subsidiary will take action contrary to the interests of the Fund or the Fund's shareholders. The Board has oversight responsibility for the investment activities of the Fund, including its investment in the Subsidiary, and the Fund's role as the sole shareholder of the Subsidiary. Also, in managing the Subsidiary's portfolio, the Adviser will be subject to the same fundamental and certain other investment restrictions (except for the restriction on the purchase and sale of commodities and commodities contracts applicable to the Fund) and will follow substantially the same compliance policies and procedures as the Fund to the extent they are applicable to the activities of the Subsidiary.

The Commodity Futures Trading Commission ("CFTC") regulates the trading of commodity interests, including commodity futures contracts, options on commodity futures, and swaps (which includes cash-settled currency forwards and swaps). The Subsidiary and the Fund are considered commodity pools by the CFTC subject to compliance with applicable provisions of the Commodity Exchange Act and CFTC regulations, and the Adviser is subject to CFTC regulation as the commodity pool operator (the "CPO") of the Subsidiary and Fund. As a result, the Fund is subject to regulation by both the SEC and the CFTC, which could increase compliance costs of the Subsidiary and the Fund. Currently, pursuant to the recently adopted harmonization rules, the Adviser is able to rely on the "substituted compliance" regulatory scheme, whereby compliance with certain SEC rules will result in deemed compliance with certain CFTC rules with respect to disclosure and reporting requirements. As a result, the Adviser's, Fund's, and Subsidiary's newly required compliance with applicable CEA provisions and CFTC regulations has not, to date, materially adversely affected the operation or financial performance of the Fund and the Subsidiary. However, the CFTC's regulation of registered investment companies is still a developing area of regulation, and as such, the Fund is subject to the risk that new regulations adopted by the CFTC in the future may adversely affect the operations and financial performance of the Fund and the Subsidiary and ultimately, the ability of each to achieve their respective investment objectives. If the Fund or the Subsidiary was to experience difficulty in implementing their respective investment strategies or achieving their respective investment objectives, the Board may determine to reorganize or close the Fund and/or the Subsidiary or to materially change the Fund's investment objective and strategies.

Changes in the laws of the United States and/or the Cayman Islands, under which the Fund and the Subsidiary are organized, could result in the inability of the Fund and/or the Subsidiary to operate as described in this SAI and could negatively affect the Fund and their shareholders. For example, the Cayman Islands do not currently impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax on the Subsidiary. If Cayman Islands law changes such that the Subsidiary must pay Cayman Islands taxes, Fund shareholders would likely suffer decreased investment returns.

*Table of Contents - Statement of Additional Information*

2

**Diversification**

The Fund is diversified under applicable federal securities laws. This means that as to 75% of its total assets (1) no more than 5% may be invested in the securities of a single issuer, and (2) it may not hold more than 10% of the outstanding voting securities of a single issuer. However, the diversification of a mutual fund's holdings is measured at the time the fund purchases a security and if the Fund purchases a security and holds it for a period of time, the security may become a larger percentage of the Fund's total assets due to movements in the financial markets. If the market affects several securities held by the Fund, the Fund may have a greater percentage of its assets invested in securities of fewer issuers. Accordingly, the Fund is subject to the risk that its performance may be hurt disproportionately by the poor performance of relatively few securities despite qualifying as a diversified fund.

**Percentage Limitations**

Whenever an investment policy or limitation states a maximum percentage of the Fund's assets that may be invested in any security or other asset, or sets forth a policy regarding quality standards, such standard or percentage limitation will be determined immediately after and as a result of the Fund's acquisition or sale of such security or other asset. Accordingly, except with respect to borrowing and illiquid securities, any subsequent change in values, net assets or other circumstances will not be considered in determining whether an investment complies with the Fund's investment policies and limitations. In addition, if a bankruptcy or other extraordinary event occurs concerning a particular investment by the Fund, the Fund may receive stock, real estate or other investments that the Fund would not, or could not buy. If this happens the Fund would sell such investments as soon as practicable while trying to maximize the return to its shareholders.

**Arbitrage:** Employing arbitrage and alternative strategies has the risk that anticipated opportunities do not play out as planned, resulting in potentially reduced returns or losses to the Fund as it unwinds failed trades.

**Commodities:** Exposure to the commodities markets may subject the Fund to greater volatility than investments in traditional securities. The value of commodity-linked derivative investments may be affected by changes in overall market movements, commodity index volatility, changes in interest rates, or sectors affecting a particular industry or commodity, such as drought, floods, weather, embargoes, tariffs and international economic, political and regulatory developments.

**Convertible Securities:** The market value of a convertible security performs like that of a regular debt security; that is, if market interest rates rise, the value of a convertible security usually falls. In addition, convertible securities are subject to the risk that the issuer will not be able to pay interest or dividends when due, and their market value may change based on changes in the issuer's credit rating or the market's perception of the issuer's creditworthiness. Since it derives a portion of its value from the common stock into which it may be converted, a convertible security is also subject to the same types of market and issuer risks that apply to the underlying common stock.

**Counterparty:** The Fund will be subject to credit risk with respect to the counterparties to the derivative contracts (whether a clearing corporation in the case of exchange-traded instruments or another third party in the case of over-the-counter instruments) and other instruments entered into directly by the Fund or held by special purpose or structured vehicles in which the Fund invests. If a counterparty becomes bankrupt or insolvent or otherwise fails to perform its obligations to the Fund due to financial difficulties, the Fund may experience significant losses or delays in obtaining any recovery (including recovery of any collateral it has provided to the counterparty) in a dissolution, assignment for the benefit of creditors, liquidation, winding-up, bankruptcy or other analogous proceeding. In addition, in the event of the bankruptcy or insolvency of a counterparty to a derivative transaction, the derivative transaction would typically be terminated at its fair market value. If the Fund is owed this fair market value in the termination of the derivative transaction and its claim is unsecured, the Fund will likely be treated as a general creditor of such counterparty, and may not have any claim with respect to any underlying security or asset. The Fund may obtain only a limited recovery, or no recovery, in such circumstances. Counterparty risk with respect to certain exchange-traded and over-the-counter derivatives may be further complicated by U.S. financial reform legislation.

*Table of Contents - Statement of Additional Information*

3

**Credit:** Credit risk refers to the possibility that the issuer of a security or the issuer of the reference asset of a derivative instrument will not be able to make principal and interest payments when due. Changes in an issuer's credit rating or the market's perception of an issuer's creditworthiness may also affect the value of the Fund's investment in that issuer. Securities rated in the four highest categories by the rating agencies are considered investment grade but they may also have some speculative characteristics. Investment grade ratings do not guarantee that bonds will not lose value.

**Equity Securities:** All investments in equity securities are subject to market risks that may cause their prices to fluctuate over time. Historically, the equity markets have moved in cycles and the value of the securities in the Fund's portfolio may fluctuate substantially from day to day. Owning an equity security can also subject the Fund to the risk that the issuer may discontinue paying dividends.

*Common Stocks.* A common stock represents a proportionate share of the ownership of a company and its value is based on the success of the company's business, any income paid to stockholders, the value of its assets, and general market conditions. In addition to the general risks set forth above, investments in common stocks are subject to the risk that in the event a company in which the Fund invests is liquidated, the holders of preferred stock and creditors of that company will be paid in full before any payments are made to the Fund as a holder of common stock. It is possible that all assets of that company will be exhausted before any payments are made to the Fund.

*Convertible Securities.* The Fund may invest in convertible securities. Traditional convertible securities include corporate bonds, notes and preferred stocks that may be converted into or exchanged for common stock, and other securities that also provide an opportunity for equity participation. These securities are convertible either at a stated price or a stated rate (that is, for a specific number of shares of common stock or other security). As with other fixed income securities, the price of a convertible security generally varies inversely with interest rates. While providing a fixed income stream, a convertible security also affords the investor an opportunity, through its conversion feature, to participate in the capital appreciation of the common stock into which it is convertible. As the market price of the underlying common stock declines, convertible securities tend to trade increasingly on a yield basis and so may not experience market value declines to the same extent as the underlying common stock. When the market price of the underlying common stock increases, the price of a convertible security tends to rise as a reflection of higher yield or capital appreciation. In such situations, the Fund may have to pay more for a convertible security than the value of the underlying common stock.

*Initial Public Offerings.* The Fund may purchase shares in initial public offerings ("IPOs"). Because IPO shares frequently are volatile in price, the Fund may hold IPO shares for a very short period of time. This may increase the turnover of the Fund's portfolio and may lead to increased expenses to the Fund, such as brokerage commissions and transaction costs. By selling shares, the Fund may realize taxable capital gains that it will subsequently distribute to shareholders. Investing in IPOs increases risk because IPO shares are frequently volatile in price. As a result, their performance can be more volatile and they face greater risk of business failure, which could increase the volatility of the Fund's portfolio.

*Preferred Stock.* Preferred stocks are equity securities that often pay dividends at a specific rate and have a preference over common stocks in dividend payments and liquidation of assets. A preferred stock has a blend of the characteristics of a bond and common stock. It can offer the higher yield of a bond and has priority over common stock in equity ownership, but does not have the seniority of a bond and, unlike common stock, its participation in the issuer's growth may be limited. Although the dividend is set at a fixed annual rate, in some circumstances it can be changed or omitted by the issuer.

*Rights and Warrants.* The Fund may invest in rights and warrants. A right is a privilege granted to existing shareholders of a corporation to subscribe to shares of a new issue of common stock and it is issued at a predetermined price in proportion to the number of shares already owned. Rights normally have a short life, usually two to four weeks, are freely transferable and entitle the holder to buy the new common stock at a lower price than the current market. Warrants are options to purchase equity securities at a specific price for a specific period of time. They do not represent ownership of the securities, but only the right to buy them. Hence, warrants have no voting rights, pay no dividends and have no rights with respect to the assets of the corporation issuing them. The value of warrants is derived solely from capital appreciation of the underlying equity securities. Warrants differ from call options in that the underlying corporation issues warrants, whereas call options may be written by anyone.

*Table of Contents - Statement of Additional Information*

4

An investment in rights and warrants may entail greater risks than certain other types of investments. Generally, rights and warrants do not carry the right to receive dividends or exercise voting rights with respect to the underlying securities, and they do not represent any rights in the assets of the issuer. In addition, although their value is influenced by the value of the underlying security, their value does not necessarily change with the value of the underlying securities, and they cease to have value if they are not exercised on or before their expiration date. Investing in rights and warrants increases the potential profit or loss to be realized from the investment as compared with investing the same amount in the underlying securities.

**Exchange Traded Notes ("ETNs")**: The Fund may gain exposure to the commodities markets through investments in ETNs, the value of which may be influenced by, among other things, time to maturity, level of supply and demand for the ETN, volatility and lack of liquidity in underlying markets, the performance of the reference instrument, changes in the issuer's credit rating and economic, legal, political or geographic events that affect the reference instrument. An ETN that is tied to a reference instrument, such as a commodities based index, may not replicate the performance of the reference instrument.

**Foreign Securities:** Investments in foreign securities involve certain inherent risks, including the following:

*Political and Economic Factors.* Individual economies of certain countries may differ favorably or unfavorably from the United States' economy in such respects as growth of gross national product, rate of inflation, capital reinvestment, resource self-sufficiency, diversification and balance of payments position. The internal politics of certain foreign countries may not be as stable as those of the United States. Governments in certain foreign countries also continue to participate to a significant degree, through ownership interest or regulation, in their respective economies. Action by these governments could include restrictions on foreign investment, nationalization, expropriation of goods or imposition of taxes, and could have a significant effect on market prices of securities and payment of interest. The economies of many foreign countries are heavily dependent upon international trade and are accordingly affected by the trade policies and economic conditions of their trading partners. Enactment by these trading partners of protectionist trade legislation could have a significant adverse effect upon the securities markets of such countries.

*Legal and Regulatory Matters.* Certain foreign countries may have less supervision of securities markets, brokers and issuers of securities, and less financial information available to issuers, than is available in the United States.

*Currency Fluctuations.* A change in the value of any foreign currency against the U.S. dollar will result in a corresponding change in the U.S. dollar value of an ADR's underlying portfolio securities denominated in that currency. Such changes will affect the Fund to the extent that the Fund is invested in ADRs comprised of foreign securities.

*Foreign Taxes.* The interest and dividends payable to the Fund on certain of the Fund's foreign securities may be subject to foreign taxes or withholding, thus reducing the net amount of income available for distribution to Fund shareholders. The Fund may not be eligible to pass through to its shareholders any tax credits or deductions with respect to such foreign taxes or withholding.

In considering whether to invest in the securities of a non-U.S. company, the Adviser considers such factors as the characteristics of the particular company, differences between economic trends and the performance of securities markets within the U.S. and those within other countries, and also factors relating to the general economic, governmental and social conditions of the country or countries where the company is located. The extent to which the Fund will be invested in non-U.S. companies, foreign countries and depositary receipts will fluctuate from time to time within any limitations described in the Prospectus, depending on the Adviser's assessment of prevailing market, economic and other conditions.

**Hedging Transactions:** The Adviser, from time to time, employs various hedging techniques. The success of the Fund's hedging strategy will be subject to the Adviser's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged.

Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Adviser's ability to continually recalculate, readjust, and execute hedges in an efficient and timely manner. For a variety of reasons, the Adviser may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss. In addition, it is not possible to hedge fully or perfectly against any risk, and hedging entails its own costs.

**Private Investments**

*Private Placement and Restricted Securities.* The Fund may invest in securities that are purchased in private placements and, accordingly, are subject to restrictions on resale as a matter of contract or under federal securities laws. Because there may be relatively few potential purchasers for such investments, especially under adverse market or economic conditions or in the event of adverse changes in the financial condition of the issuer, the Fund could find it more difficult to sell such securities when the Adviser believes it advisable to do so or may be able to sell such securities only at prices lower than if such securities were more widely held. At times, it may also be more difficult to determine the fair value of such securities for purposes of computing the Fund's net asset value.

While such private placements may offer attractive opportunities for investment not otherwise available on the open market, the securities so purchased are often restricted securities, *i.e.*, securities which cannot be sold to the public without registration under the Securities Act or the availability of an exemption from registration (such as Rules 144 or 144A), or which are not readily marketable because they are subject to other legal or contractual delays in or restrictions on resale.

The absence of a trading market can make it difficult to ascertain a market value for illiquid investments. Disposing of illiquid investments may involve time-consuming negotiation and legal expenses, and it may be difficult or impossible for the Fund to sell them promptly at an acceptable price. The Fund may have to bear the extra expense of registering such securities for resale and the risk of substantial delay in effecting such registration. In addition, market quotations are less readily available. The judgment of the Adviser may at times play a greater role in valuing these securities than in the case of publicly traded securities.

Generally speaking, restricted securities may be sold only to qualified institutional buyers, or in a privately negotiated transaction to a limited number of purchasers, or in limited quantities after they have been held for a specified period of time and other conditions are met pursuant to an exemption from registration, or in a public offering for which a registration statement is in effect under the Securities Act. The Fund may be deemed to be an underwriter for purposes of the Securities Act when selling restricted securities to the public, and in such event the Fund may be liable to purchasers of such securities if the registration statement prepared by the issuer, or the Prospectuses forming a part of it, is materially inaccurate or misleading.

*Redeemable Securities.* Certain securities held by the Fund may permit the issuer at its option to call or redeem its securities. If an issuer were to redeem securities held by the Fund during a time of declining interest rates, the Fund may not be able to reinvest the proceeds in securities providing the same investment return as the securities redeemed.

*Table of Contents - Statement of Additional Information*

6

**Hybrid Securities:** The Fund may acquire hybrid securities. A third party may create a hybrid security by combining an income-producing debt security ("income producing component") and the right to receive payment based on the change in the price of an equity security ("equity component"). The income-producing component is achieved by investing in non-convertible, income-producing securities such as bonds, preferred stocks and money market instruments, which may be represented by derivative instruments. The equity component is achieved by investing in securities or instruments such as cash-settled warrants to receive a payment based on whether the price of a common stock surpasses a certain exercise price. A hybrid security comprises two or more separate securities, each with its own market value. Therefore, the market value of a hybrid security is the sum of the values of its income-producing component and its equity component.

*Structured Investments.* A structured investment is a security having a return tied to an underlying index or other security or asset class. Structured investments generally are individually negotiated agreements and may be traded over-the-counter. Structured investments are organized and operated to restructure the investment characteristics of the underlying security. This restructuring involves the deposit with or purchase by an entity, such as a corporation or trust, or specified instruments (such as commercial bank loans) and the issuance by that entity or one or more classes of securities ("structured securities") backed by, or representing interests in, the underlying instruments. The cash flow on the underlying instruments may be apportioned among the newly issued structured securities to create securities with different investment characteristics, such as varying maturities, payment priorities and interest rate provisions, and the extent of such payments made with respect to structured securities is dependent on the extent of the cash flow on the underlying instruments. Because structured securities typically involve no credit enhancement, their credit risk generally will be equivalent to that of the underlying instruments. Investments in structured securities are generally of a class of structured securities that is either subordinated or unsubordinated to the right of payment of another class. Subordinated structured securities typically have higher yields and present greater risks than unsubordinated structured securities. Structured securities are typically sold in private placement transactions, and there currently is no active trading market for structured securities. Investments in government and government-related and restructured debt instruments are subject to special risks, including the inability or unwillingness to repay principal and interest, requests to reschedule or restructure outstanding debt and requests to extend additional loan amounts.

**Investment in the Subsidiary**

The Fund may invest up to 25% of its assets in its respective Subsidiary. The Subsidiary is expected to invest primarily in commodity and financial futures, options and swap contracts, fixed income securities, pooled investment vehicles, including those that are not registered pursuant to the 1940 Act, and other investments intended to serve as margin or collateral for the Subsidiary's derivatives positions. The Subsidiary's key financial information is presented with that of its Fund in the form of consolidated financial statements included in the Fund's annual reports and semi-annual reports provided to shareholders. Copies of the reports are provided without charge upon request as indicated in the Prospectuses.

The Subsidiary is not registered as an investment company under the 1940 Act, and as a result, the Fund, as the sole shareholder of the Subsidiary, will not have all of the protections offered to investors in registered investment companies. As noted elsewhere in this SAI, however, the Subsidiary has agreed to be subject to certain provisions of the 1940 Act that further investor protection. Most notably, the Subsidiary has agreed to comply with the 1940 Act's restrictions under Section 18 related to leverage and borrowing. In addition, because the Fund wholly owns and controls its Subsidiary, and the Fund and the Subsidiary are each managed by the Advisor, it is unlikely that the Subsidiary will take action contrary to the interests of the Fund or the Fund's shareholders. The Board has oversight responsibility for the investment activities of the Fund, including its investment in its Subsidiary, and the Fund's role as the sole shareholder of its Subsidiary. Also, in managing the Subsidiary's portfolio, the Adviser will be subject to the same fundamental and certain other investment restrictions (except for the restriction on the purchase and sale of commodities and commodities contracts applicable to the Fund) and will follow substantially the same compliance policies and procedures as the Fund to the extent they are applicable to the activities of the Subsidiary.

*Table of Contents - Statement of Additional Information*

The Subsidiary and the Fund are considered commodity pools by the CFTC subject to compliance with applicable provisions of the CEA and CFTC regulations, and the Adviser is subject to CFTC regulation as the CPO of the Subsidiary and Fund. As a result, the Fund is subject to regulation by both the SEC and the CFTC, which could increase compliance costs of the Subsidiary and the Fund. Currently, pursuant to the recently adopted harmonization rules, the Adviser is able to rely on the "substituted compliance" regulatory scheme, whereby compliance with certain SEC rules will result in deemed compliance with certain CFTC rules with respect to disclosure and reporting requirements. As a result, the Advisor's, Fund's, and Subsidiary's newly required compliance with applicable CEA provisions and CFTC regulations has not, to date, materially adversely affected the operation or financial performance of the Fund and the Subsidiary. However, the CFTC's regulation of registered investment companies is still a developing area of regulation, and as such, the Fund is subject to the risk that new regulations adopted by the CFTC in the future may adversely affect the operations and financial performance of the Fund and the Subsidiary and ultimately, the ability of each to achieve their respective investment objectives. If the Fund or the Subsidiary was to experience difficulty in implementing their respective investment strategies or achieving their respective investment objectives, the Board may determine to reorganize or close the Fund and/or the Subsidiary or to materially change the Fund's investment objective and strategies.

Changes in the laws of the United States and/or the Cayman Islands, under which the Fund and the Subsidiary are organized, could result in the inability of the Fund and/or the Subsidiary to operate as described in this SAI and could negatively affect the Fund and their shareholders. For example, the Cayman Islands do not currently impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax on the Subsidiaries. If Cayman Islands law changes such that the Subsidiaries must pay Cayman Islands taxes, Fund shareholders would likely suffer decreased investment returns.

**Investment in Other Investment Companies:** As with other investments, investments in other investment companies, including exchange traded funds ("ETFs"), are subject to market and selection risk. In addition, if the Fund acquires shares of investment companies, shareholders bear both their proportionate share of expenses in the Fund (including management and advisory fees) and, indirectly, the expenses of the investment companies. ETFs are investment companies whose shares are bought and sold on a securities exchange. An ETF holds a portfolio of securities designed to track a particular market segment or index. The Fund could purchase an ETF to temporarily gain exposure to a portion of the U.S. or foreign market while awaiting an opportunity to purchase securities directly. The risks of owning an ETF generally reflect the risks of owning the underlying securities or commodities they are designed to track, although lack of liquidity in an ETF could result in it being more volatile than the underlying portfolio of securities or commodities and ETFs have management fees that increase their costs versus the costs of owning the underlying securities directly.

The Fund may also invest in money market mutual funds. An investment in a money market mutual fund is not insured or guaranteed by a Federal Deposit Insurance Corporation or any other government agency. Although such funds seek to preserve the value of the Fund's investment at $1.00 per share, it is possible to lose money by investing in a money market mutual fund.

**Management:** If the Fund's portfolio managers make poor investment decisions, it will negatively affect the Fund's investment performance.

**Momentum Style:** Investing in or having exposure to securities with positive momentum entails investing in securities that have had above-average recent returns. These securities may be more volatile than a broad cross-section of securities. In addition, there may be periods when the momentum style is out of favor, and during which the investment performance of a fund using a momentum strategy may suffer.

**Mortgaged-Backed Securities:** The Fund may invest in securities that directly or indirectly represent participations in, or are collateralized by, payable from, mortgage loans secured by real property ("Mortgage-Backed Securities").

Mortgage-Backed Securities represent pools of mortgage loans assembled for sale to investors by various governmental agencies such as the Government National Mortgage Association ("Ginnie Mae") and government-related organizations such as Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), as well as by nongovernmental issuers such as commercial banks, savings and loan institutions, mortgage bankers, and private mortgage insurance companies. Although certain Mortgage-Backed Securities are guaranteed by a third party or otherwise similarly secured, the market value of the security, which may fluctuate, is not so secured. If the Adviser purchases a Mortgage-Backed Security at a premium, that portion may be lost if there is a decline in the market value of the security whether resulting from changes in interest rates or prepayments in the underlying mortgage collateral. As with other interest-bearing securities, the prices of such securities are inversely affected by changes in interest rates. However, though the value of a Mortgage-Backed Security may decline when interest rates rise, the converse is not necessarily true since in periods of declining interest rates the mortgages underlying the securities are prone to prepayment. For this and other reasons, a Mortgage-Backed Security's stated maturity may be shortened by unscheduled prepayments on the underlying mortgages and, therefore, it is not possible to predict accurately the securities' return to the Fund. In addition, regular payments received in respect of Mortgage-Backed Securities include both interest and principal. No assurance can be given as to the return the Fund will receive when these amounts are reinvested.

There are a number of important differences among the agencies and instrumentalities of the U.S. government that issue Mortgage-Backed Securities and among the securities that they issue. Mortgage-Backed Securities issued by Ginnie Mae include Ginnie Mae Mortgage Pass-Through Certificates which are guaranteed as to the timely payment of principal and interest by Ginnie Mae. This guarantee is backed by the full faith and credit of the United States. Ginnie Mae is a wholly-owned U.S. Government Corporation within the Department of Housing and Urban Development. Ginnie Mae certificates also are supported by the authority of Ginnie Mae to borrow funds from the U.S. Treasury to make payments under its guarantee. Mortgage-Backed Securities issued by Fannie Mae include Fannie Mae Guaranteed Mortgage Pass-Through Certificates (also known as "Fannie Maes") which are guaranteed as to timely payment of the principal and interest by Fannie Mae. Fannie Maes are solely the obligations of Fannie Mae and are not backed by or entitled to the full faith and credit of the United States. Fannie Mae is a government sponsored organization owned entirely by private stockholders. Mortgage-Backed Securities issued by Freddie Mac include Freddie Mac Mortgage Participation Certificates (also known as "Freddie Mac PCs"). Freddie Mac is a corporate instrumentality of the United States, created pursuant to an Act of Congress, which is owned entirely by Federal Home Loan Banks. Freddie Macs are not guaranteed by the United States or by any Federal Home Loan Banks and do not constitute a debt or obligation of the United States or any Federal Home Loan Bank. Freddie Macs entitle the holder to timely payment of interest, which is guaranteed by Freddie Mac. Freddie Mac guarantees either ultimate collection or timely payment of all principal payments on the underlying mortgage loans. When Freddie Mac does not guarantee timely payment of principal, Freddie Mac may remit the amount due on account of its guarantee of ultimate payment of principal at any time after default on an underlying mortgage, but in no event later than one year after it becomes payable.

The Fund may also invest in Mortgage-Backed Securities which are collateralized mortgage obligations structured on pools of mortgage pass-through certificates or mortgage loans ("CFOs" and "REMICs") and derivative multiple-class mortgage-backed securities ("Stripped Mortgage-Backed Securities" or "SMBSs").

Recently, rating agencies have placed on credit watch or downgraded the ratings previously assigned to a large number of mortgage-related securities (which may include certain of the mortgage-related securities in which the Fund may in the future invest), and may continue to do so in the future. If a mortgage-related security in which the Fund is invested is placed on credit watch or downgraded, the value of the security may decline and the Fund may experience losses.

Further, the recent and unprecedented disruption in the residential mortgage-related securities market (and in particular, the "subprime" residential mortgage market), the broader mortgage-related securities market and the asset-backed securities market have resulted in downward price pressures and increasing foreclosures and defaults in residential and commercial real estate. Concerns over inflation, energy costs, geopolitical issues, the availability and cost of credit, the mortgage market and a declining real estate market have contributed to increased volatility and diminished expectations for the economy and markets going forward, and have contributed to dramatic declines in the housing market, with falling home prices and increasing foreclosures and unemployment, and significant asset write-downs by financial institutions. The continuation or worsening of this general economic downturn may lead to further declines in income from, or the value of, real estate, including the real estate which secures the mortgage-related securities held by the Fund. Additionally, a lack of credit liquidity and decreases in the value of real property have occurred and may continue to occur or worsen, and potentially prevent borrowers from refinancing their mortgages, which may increase the likelihood of default on their mortgage loans.

*Table of Contents - Statement of Additional Information*

9

These economic conditions may also adversely affect the amount of proceeds the holder of a mortgage loan or mortgage-related securities would realize in the event of a foreclosure or other exercise of remedies. Moreover, even if such mortgage-related securities are performing as anticipated, their value in the secondary market may fall or continue to fall as a result of deterioration in general market conditions for such securities or other asset-backed or structured products. Trading activity associated with market indices may also drive spreads on those indices wider than spreads on mortgage-related securities, thereby resulting in a decrease in the value of such mortgage-related securities. Mortgage loans backing non-agency mortgage-related securities are more sensitive to economic factors that could affect the ability of borrowers to pay their obligations under the mortgage loans backing these securities. These economic conditions may reduce the cash flow that the Fund investing in such mortgage-related securities receives from such securities and increase the incidence and severity of credit events and losses in respect of such securities. In addition, interest rate spreads for mortgage-backed securities have widened and are more volatile when compared to the recent past due to these adverse changes in market conditions. In the event that interest rate spreads for mortgage-related securities continue to widen following the purchase of such assets by the Fund, the market value of such securities is likely to decline and, in the case of a substantial spread widening, could decline by a substantial amount. Furthermore, these adverse changes in market conditions have resulted in a severe liquidity crisis in the market for mortgage-backed securities (including the mortgage-related securities in which certain of the Fund may invest) and increasing unwillingness by banks, financial institutions and investors to extend credit to servicers, originators and other participants in the mortgage-related securities market for these securities and other asset-backed securities. As a result, the liquidity and/or the market value of any mortgage-related securities that are owned by the Fund may experience further declines after they are purchased by the Fund. The recent rise in the rate of foreclosures of properties has resulted in legislative, regulatory and enforcement actions seeking to prevent or restrict foreclosures. Actions have also been brought against issuers and underwriters of residential mortgage-backed securities collateralized by such residential mortgage loans and investors in such residential mortgage-backed securities. Future legislative or regulatory initiatives by federal, state or local legislative bodies or administrative agencies, if enacted or adopted, could delay foreclosure or the exercise of other remedies, provide new defenses to foreclosure, or otherwise impair the ability of the loan servicer to foreclose or realize on a defaulted residential mortgage loan included in a pool of residential mortgage loans backing such residential mortgage-backed securities. The nature or extent of any future limitations on foreclosure or exercise of other remedies that may be enacted is uncertain. Governmental actions that interfere with the foreclosure process, for example, could increase the costs of such foreclosures or exercise of other remedies, delay the timing or reduce the amount of recoveries on defaulted residential mortgage loans and securities backed by such residential mortgage loans owned by the Fund, and could adversely affect the yields on the mortgage-related securities owned by the Fund and could have the effect of reducing returns to the Fund that has invested in mortgage-related securities collateralized by these residential mortgage loans.

In addition, the U.S. government, including the Federal Reserve, the Treasury, and other governmental and regulatory bodies have recently taken or are considering taking actions to address the financial crisis, including initiatives to limit large-scale losses associated with mortgage-related securities held on the books of certain U.S. financial institutions and to support the credit markets generally. The impact that such actions could have on any of the mortgage-related securities held by the Fund is unknown.

*Table of Contents - Statement of Additional Information*

**Municipal Securities:** The Fund may invest in municipal securities. Municipal securities are issued by the states, territories and possessions of the United States, their political subdivisions (such as cities, counties and towns) and various authorities (such as public housing or redevelopment authorities), instrumentalities, public corporations and special districts (such as water, sewer or sanitary districts) of the states, territories, and possessions of the United States or their political subdivisions. In addition, municipal securities include securities issued by or on behalf of public authorities to finance various privately operated facilities, such as industrial development bonds, that are backed only by the assets and revenues of the non-governmental user (such as hospitals and airports).

Municipal securities are issued to obtain funds for a variety of public purposes, including general financing for state and local governments, or financing for specific projects or public facilities. Municipal securities are classified as general obligation or revenue bonds or notes. General obligation securities are secured by the issuer's pledge of its full faith, credit and taxing power for the payment of principal and interest. Revenue securities are payable from revenue derived from a particular facility, class of facilities, or the proceeds of a special excise tax or other specific revenue source, but not from the issuer's general taxing power. Private activity bonds and industrial revenue bonds do not carry the pledge of the credit of the issuing municipality, but generally are guaranteed by the corporate entity on whose behalf they are issued.

Municipal leases are entered into by state and local governments and authorities to acquire equipment and facilities such as fire and sanitation vehicles, telecommunications equipment, and other assets. Municipal leases (which normally provide for title to the leased assets to pass eventually to the government issuer) have evolved as a means for governmental issuers to acquire property and equipment without meeting the constitutional and statutory requirements for the issuance of debt. The debt-issuance limitations of many state constitutions and statutes are deemed to be inapplicable because of the inclusion in many leases or contracts of "non-appropriation" clauses that provide that the governmental issuer has no obligation to make future payments under the lease or contract unless money is appropriated for such purpose by the appropriate legislative body on a yearly or other periodic basis.

Shareholders should note that, although interest paid on municipal securities is generally exempt from regular federal income tax, the Fund does not anticipate holding municipal securities or shares of other regulated investment companies in sufficient quantities to qualify to pay exempt-interest dividends. As a result, distributions by the Fund to its shareholders are expected to be treated for federal income tax purposes as ordinary dividends without regard to the character in the hands of the Fund of any interest that it receives on municipal securities.

**Short Sales:** The Fund enters into a short sale by selling a security it has borrowed (typically from a broker or other institution). If the market price of a security increases after the Fund borrows the security, the Fund will suffer a (potentially unlimited) loss when it replaces the borrowed security at the higher price. In certain cases, purchasing a security to cover a short position can itself cause the price of the security to rise further, thereby exacerbating the loss. In addition, the Fund may not always be able to borrow the security at a particular time or at an acceptable price. The Fund may also take a short position in a derivative instrument, such as a future, forward or swap. A short position in a derivative instrument involves the risk of a theoretically unlimited increase in the value of the underlying instrument. Short sales also involve transaction and other costs that will reduce potential Fund gains and increase potential Fund losses.

**Short-Term, Temporary, and Cash Investments:** The Fund may invest in any of the following securities and instruments:

*Bank Certificates of Deposit, Bankers' Acceptances and Time Deposits.* The Fund may acquire certificates of deposit, bankers' acceptances and time deposits. Certificates of deposit are negotiable certificates issued against funds deposited in a commercial bank for a definite period of time and earning a specified return. Bankers' acceptances are negotiable drafts or bills of exchange, normally drawn by an importer or exporter to pay for specific merchandise, which are "accepted" by a bank, meaning in effect that the bank unconditionally agrees to pay the face value of the instrument on maturity. Certificates of deposit and bankers' acceptances acquired by the Fund will be dollar denominated obligations of domestic or foreign banks or financial institutions which at the time of purchase have capital, surplus and undivided profits in excess of $100 million (including assets of both domestic and foreign branches), based on latest published reports, or less than $100 million if the principal amount of such bank obligations are fully insured by the U.S. Government. If the Fund holds instruments of foreign banks or financial institutions, it may be subject to additional investment risks that are different in some respects from those incurred by a fund that invests only in debt obligations of U.S. domestic issuers. See "Foreign Securities" above. Such risks include future political and economic developments, the possible imposition of withholding taxes by the particular country in which the issuer is located on interest income payable on the securities, the possible seizure or nationalization of foreign deposits, the possible establishment of exchange controls or the adoption of other foreign governmental restrictions which might adversely affect the payment of principal and interest on these securities.

*Table of Contents - Statement of Additional Information*

11

Domestic banks and foreign banks are subject to different governmental regulations with respect to the amount and types of loans which may be made and interest rates which may be charged. In addition, the profitability of the banking industry depends largely upon the availability and cost of funds for the purpose of financing lending operations under prevailing money market conditions. General economic conditions as well as exposure to credit losses arising from possible financial difficulties of borrowers play an important part in the operations of the banking industry.

As a result of federal and state laws and regulations, domestic banks are, among other things, required to maintain specified levels of reserves, limited in the amount which they can loan to a single borrower, and subject to other regulations designed to promote financial soundness. However, such laws and regulations do not necessarily apply to foreign bank obligations that the Fund may acquire.

In addition to purchasing certificates of deposit and bankers' acceptances, to the extent permitted under its investment objectives and policies stated above and in its Prospectus, the Fund may make interest bearing time or other interest bearing deposits in commercial or savings banks. Time deposits are non-negotiable deposits maintained at a banking institution for a specified period of time at a specified interest rate.

*Savings Association Obligations.* The Fund may invest in certificates of deposit (interest bearing time deposits) issued by savings banks or savings and loan associations that have capital, surplus and undivided profits in excess of $100 million, based on latest published reports, or less than $100 million if the principal amount of such obligations is fully insured by the U.S. Government.

*Commercial Paper, Short Term Notes and Other Corporate Obligations.* The Fund may invest a portion of its assets in commercial paper and short term notes. Commercial paper consists of unsecured promissory notes issued by corporations. Issues of commercial paper and short term notes will normally have maturities of less than nine months and fixed rates of return, although such instruments may have maturities of up to one year.

Commercial paper and short term notes will consist of issues rated at the time of purchase "A-2" or higher by Standard & Poor's ("S&P"), "Prime-1" by Moody's Investors Service, Inc. ("Moody's"), or similarly rated by another nationally recognized statistical rating organization or, if unrated, will be determined by the Adviser to be of comparable quality. These rating symbols are described in **Appendix A.**

**Sovereign Debt:** These investments are subject to the risk that a governmental entity may delay or refuse to pay interest or repay principal on its sovereign debt, due, for example, to cash flow problems, insufficient foreign currency reserves, political considerations, the relative size of the governmental entity's debt position in relation to the economy or the failure to put in place economic reforms required by the International Monetary Fund or other multilateral agencies. If a governmental entity defaults, it may ask for more time in which to pay or for further loans. There is no legal process for collecting sovereign debt that a government does not pay nor are there bankruptcy proceedings through which all or part of the sovereign debt that a governmental entity has not repaid may be collected.

**U.S. and Foreign Government Obligations**: The Fund may invest in U.S. Government obligations including Treasury bills, certificates of indebtedness, notes and bonds, and issues of such entities as the Government National Mortgage Association ("GNMA"), Export-Import Bank of the United States, Tennessee Valley Authority, Resolution Funding Corporation, Farmers Home Administration, Federal Home Loan Banks, Federal Intermediate Credit Banks, Federal Farm Credit Banks, Federal Land Banks, Federal Housing Administration, Federal National Mortgage Association ("FNMA"), Federal Home Loan Mortgage Corporation ("FHLMC"), and the Student Loan Marketing Association ("SLMA").

Some of these obligations, such as those of the GNMA, are supported by the full faith and credit of the U.S. Treasury; others, such as those of the Export-Import Bank of United States, are supported by the right of the issuer to borrow from the Treasury; others, such as those of the FNMA, are supported by the discretionary authority of the U.S. Government to purchase the agency's obligations; still others, such as those of the SLMA, are supported only by the credit of the instrumentality. No assurance can be given that the U.S. Government would provide financial support to U.S. Government-sponsored instrumentalities if it is not obligated to do so by law.

The Fund may invest in sovereign debt obligations of foreign countries. A sovereign debtor's willingness or ability to repay principal and interest in a timely manner may be affected by a number of factors, including its cash flow situation, the extent of its foreign reserves, the availability of sufficient foreign exchange on the date a payment is due, the relative size of the debt service burden to the economy as a whole, the sovereign debtor's policy toward principal international lenders and the political constraints to which it may be subject. A government could default on its sovereign debt obligations. This risk of default is higher in emerging markets. Such sovereign debtors also may be dependent on expected disbursements from foreign governments, multilateral agencies and other entities abroad to reduce principal and interest arrearages on their debt. The commitments on the part of these governments, agencies and others to make such disbursements may be conditioned on a sovereign debtor's implementation of economic reforms and/or economic performance and the timely service of such debtor's obligations. Failure to meet such conditions could result in the cancellation of such third parties' commitments to lend funds to the sovereign debtor, which may further impair such debtor's ability or willingness to service its debt in a timely manner.

**Risks Associated with Investing in U.S. Government Securities.** The U.S. government is considered to be the best credit-rated issuer in the debt markets. Since Treasury securities are direct obligations of the U.S. government, there is minimal credit risk. While most other government-sponsored securities are not direct obligations of the U.S. government (although some are guaranteed by the U.S. government), they also offer little credit risk.

However, another type of risk that may affect the Fund is market and/or interest rate risk. For example, debt securities with longer maturities tend to produce higher yields and are generally subject to potentially greater capital appreciation and depreciation than obligations with shorter maturities and lower yields. The market value of U.S. government securities generally varies inversely with changes in market interest rates. An increase in interest rates, therefore, would generally reduce the market value of any U.S. government security held by the Fund, while a decline in interest rates would generally increase the market value of such investment.

**Zero-Coupon and Payment-in-Kind Bonds**: The Fund may invest without limit in so-called zero-coupon bonds and payment-in-kind bonds. Zero-coupon bonds are issued at a significant discount from their principal amount in lieu of paying interest periodically. Payment-in-kind bonds allow the issuer, at its option, to make current interest payments on the bonds either in cash or in additional bonds. Because zero-coupon and payment-in-kind bonds do not pay current interest in cash, their value is subject to greater fluctuation in response to changes in market interest rates than bonds that pay interest currently. Both zero-coupon and payment-in-kind bonds allow an issuer to avoid the need to generate cash to meet current interest payments. Accordingly, such bonds may involve greater credit risks than bonds paying interest currently in cash. The Fund is required to accrue interest income on such investments and to distribute such amounts at least annually to shareholders even though the investments do not make any current interest payments. Thus, it may be necessary at times for the Fund to liquidate other investments in order to satisfy its distribution requirements under the Internal Revenue Code of 1986, as amended (the "Code").

*Table of Contents - Statement of Additional Information*

**Borrowing and Other Forms of Leverage:** The Fund has no present intent to do so, but may borrow money for investment purposes to the extent permitted by its investment policies and restrictions and applicable law. When the Fund borrows money or otherwise leverages its portfolio, the value of an investment in the Fund will be more volatile and other investment risks will tend to be compounded. This is because leverage tends to exaggerate the effect of any increase or decrease in the value of the Fund's holdings. In addition to borrowing money from banks, the Fund may engage in certain other investment transactions that may be viewed as forms of financial leverage – for example, entering into reverse repurchase agreement and dollar rolls, investing collateral from loans of portfolio securities, entering into when-issued, delayed-delivery, or forward commitment transactions, or using derivatives such as swaps, futures, and forwards.

The Fund may also borrow money for temporary emergency purposes.

The Fund may establish lines of credit with certain banks by which it may borrow funds for temporary or emergency purposes. The Fund may use lines of credit to meet large or unexpected redemptions that would otherwise force the Fund to liquidate securities under circumstances which are unfavorable to the Fund's remaining shareholders. The Fund may be required to pay fees to the banks to maintain the lined of credit; which would increase the cost of borrowing over the stated interest rate.

As required by the Investment Company Act of 1940 (the "1940 Act"), the Fund must maintain continuous asset coverage (total assets, including assets acquired with borrowed funds, less liabilities exclusive of borrowings) of 300% of all amounts borrowed. If, at any time, the value of the Fund's assets should fail to meet this 300% coverage test, the Fund, within three days (not including Sundays and holidays), will reduce the amount of its borrowings to the extent necessary to meet this 300% coverage requirement. Maintenance of this percentage limitation may result in the sale of portfolio securities at a time when investment considerations otherwise indicate that it would be disadvantageous to do so. In addition, the Fund is authorized to borrow money as a temporary measure for extraordinary or emergency purposes in amounts not in excess of 5% of the value of the Fund's total assets. Borrowings for extraordinary or emergency purposes are not subject to the foregoing 300% asset coverage requirement. While the Fund does not anticipate doing so, it is authorized to pledge (*i.e.*, transfer a security interest in) portfolio securities in an amount up to one-third of the value of its total assets in connection with any borrowing.

**Lending of Portfolio Securities**:  The Fund has no present intent to do so, but may lend portfolio securities to brokers, dealers and other financial organizations that meet capital and other credit requirements or other criteria established by the Fund's Board. These loans, if and when made, may not exceed 33 1/3% of the total asset value of the Fund (including the loan collateral). The Fund is not permitted to lend portfolio securities to the Adviser or its affiliates unless the Fund applies for and receive specific authority to do so from the SEC. Loans of portfolio securities will be fully collateralized by cash, letters of credit, or U.S. government securities and the collateral will be maintained in an amount equal to at least 100% of the current market value of the loaned securities by marking to market daily. Any gain or loss in the market price of the securities loaned that might occur during the term of the loan would be for the account of the Fund. The Fund may pay a part of the interest earned from the investment of collateral, or other fee, to an unaffiliated third party for acting as the Fund's securities lending agent. By lending its securities, the Fund may increase its income by receiving payments from the borrower that reflect the amount of any interest or any dividends payable on the loaned securities as well as by either investing cash collateral received from the borrower in short-term instruments or obtaining a fee from the borrower when U.S. government securities or letters of credit are used as collateral.

The Fund will adhere to the following conditions whenever its portfolio securities are loaned: (i) the Fund must receive at least 100% cash collateral or equivalent securities of the type discussed in the preceding paragraph from the borrower; (ii) the borrower must increase such collateral whenever the market value of the securities rises above the level of such collateral; (iii) the Fund must be able to terminate the loan on demand; (iv) the Fund must receive  reasonable interest on the loan, as well as any dividends, interest or other distributions on the loaned securities and any increase in market value; (v) the Fund may pay only reasonable fees in connection with the loan (which fees may include fees payable to the lending agent, the borrower, the Fund's administrator and the custodian); and (vi) voting rights on the loaned securities may pass to the borrower, provided, however, that if a material event adversely affecting the investment occurs, the Fund must terminate the loan and regain the right to vote the securities. Loan agreements involve certain risks in the event of default or insolvency of the borrower, including possible delays or restrictions upon the Fund's ability to recover the loaned securities or dispose of the collateral for the loan, which could give rise to loss because of adverse market action, expenses and/or delays in connection with the disposition of the underlying securities.

**Repurchase Agreements**:  The Fund may enter into repurchase agreements. The Fund may enter into reverse repurchase agreements, although it has no present intent to do so. Under such agreements, the seller of the security agrees to repurchase it at a mutually agreed upon time and price. The repurchase price may be higher than the purchase price, the difference being income to the Fund, or the purchase and repurchase prices may be the same, with interest at a stated rate due to the Fund together with the repurchase price on repurchase. In either case, the income to the Fund is unrelated to the interest rate on the security itself. The Fund will generally enter into repurchase agreements of short durations, from overnight to one week, although the underlying securities generally have longer maturities. The Fund may not enter into a repurchase agreement with more than seven days to maturity if, as a result, more than 15% of the value of its net assets would be invested in illiquid securities, including such repurchase agreements.

It is not clear whether a court would consider the security acquired by the Fund subject to a repurchase agreement as being owned by the Fund or as being collateral for a loan by the Fund to the seller. In the event of the commencement of bankruptcy or insolvency proceedings with respect to the seller of the security before its repurchase under a repurchase agreement, the Fund may encounter delays and incur costs before being able to sell the security. Delays may involve loss of interest or a decline in price of the security. If a court characterizes the transaction as a loan, and the Fund has not perfected a security interest in the security, the Fund may be required to return the security to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and income involved in the transaction. As with any unsecured debt instrument purchased for the Fund, the Adviser seeks to minimize the risk of loss through repurchase agreements by analyzing the creditworthiness of the other party, in this case the seller of the security.

Apart from the risk of bankruptcy or insolvency proceedings, there is also the risk that the seller may fail to repurchase the security. However, the Fund will always receive as collateral for any repurchase agreement to which it is a party securities acceptable to it, the market value of which is equal to at least 102% of the amount invested by the Fund plus accrued interest, and the Fund will make payment against such securities only upon physical delivery or evidence of book entry transfer to the account of its custodian. If the market value of the security subject to the repurchase agreement becomes less than the repurchase price (including interest), the Fund will direct the seller of the security to deliver additional securities so that the market value of all securities subject to the repurchase agreement will equal or exceed the repurchase price. It is possible that the Fund will be unsuccessful in seeking to impose on the seller a contractual obligation to deliver additional securities.

The acquisition of a repurchase agreement may be deemed to be an acquisition of the underlying securities as long as the obligation of the seller to repurchase the securities is collateralized fully, as such term is defined in the 1940 Act and the Rules thereunder.

A reverse repurchase agreement involves the sale of a portfolio-eligible security by the Fund to another party, such as a bank or broker-dealer, coupled with its agreement to repurchase the instrument at a specified time and price. Under a reverse repurchase agreement, the Fund continues to receive any principal and interest payments on the underlying security during the term of the agreement. The Fund typically will segregate or "earmark" assets determined to be liquid, equal (on a daily mark-to-market basis) to its obligations under reverse repurchase agreements. However, reverse repurchase agreements involve the risk that the market value of securities retained by the Fund may decline below the repurchase price of the securities sold by the Fund which it is obligated to repurchase. With respect to reverse repurchase agreements in which banks are counterparties, the Fund may treat such transactions as bank borrowings, which would be subject to the Fund's limitations on borrowings.

*Table of Contents - Statement of Additional Information*

**Derivatives:** Some of the instruments in which the Fund may invest may be referred to as "derivatives," because their value "derives" from the value of an underlying asset, reference rate or index. These instruments include futures contracts, forward interest rate contracts, swap agreements and similar instruments. The market value of derivative instruments and securities sometimes may be more volatile than those of other instruments and each type of derivative instrument may have its own special risks.

Some over-the-counter derivative instruments may expose the Fund to the credit risk of its counterparty. In the event the counterparty to such a derivative instrument becomes insolvent, the Fund potentially could lose all or a large portion of its investment in the derivative instrument.

Investing for hedging purposes or to increase the Fund's return may result in certain additional transaction costs that may reduce the Fund's performance. In addition, when used for hedging purposes, no assurance can be given that each derivative position will achieve a close correlation with the security or currency that is the subject of the hedge, or that a particular derivative position will be available when sought by the Adviser. While hedging strategies involving derivatives can reduce the risk of loss, they can also reduce the opportunity for gain or even result in losses by offsetting favorable price movements in other Fund investments. Use of derivatives and other forms of leverage by the Fund may require the Fund to liquidate portfolio positions when it may not be advantageous to do so to satisfy its obligations or to meet segregation requirements. Increases and decreases in the value of the Fund's portfolio may be magnified when the Fund uses leverage. Certain derivatives may create a risk of loss greater than the amount invested.

*Forward Contracts.* The Fund may invest in forward contracts for speculative or hedging purposes. A forward contract involves a negotiated obligation to purchase or sell a specific asset at a future date (with or without delivery required), which may be any fixed number of days from the date of the contract agreed upon by the parties, at a price set at the time of the contract. Risks associated with forwards include: (i) there may be an imperfect correlation between the movement in prices of forward contracts and the securities underlying them; (ii) there may not be a liquid market for forwards; and (iii) forwards may be difficult to accurately value. Forwards are also subject to credit risk, liquidity risk and leverage risk, each of which is further described elsewhere in this section.

The Fund may engage in non-deliverable forward transactions. A non-deliverable forward transaction is a transaction that represents an agreement between the Fund and a counterparty (usually a commercial bank) to buy or sell a specified (notional) amount of a particular currency at an agreed upon foreign exchange rate on an agreed upon future date. The non-deliverable forward transaction position is closed using a fixing rate, as defined by the central bank in the country of the currency being traded, that is generally publicly stated within one or two days prior to the settlement date. Unlike other currency transactions, there is no physical delivery of the currency on the settlement of a non-deliverable forward transaction. Rather, the Fund and the counterparty agree to net the settlement by making a payment in U.S. dollars or another fully convertible currency that represents any differential between the foreign exchange rate agreed upon at the inception of the non-deliverable forward agreement and the actual exchange rate on the agreed upon future date. Thus, the actual gain or loss of a given non-deliverable forward transaction is calculated by multiplying the transaction's notional amount by the difference between the agreed upon forward exchange rate and the actual exchange rate when the transaction is completed. Under definitions recently adopted by the CFTC and SEC, many non-deliverable foreign currency forwards will be considered swaps for certain purposes, including determination of whether such instruments need to be exchange-traded and centrally cleared. These changes are expected to reduce counterparty/credit risk as compared to bi-laterally negotiated contracts.

*Table of Contents - Statement of Additional Information*

16

Open positions in forwards will be covered by the segregation or "earmarking" of assets determined to be liquid, and are marked to market daily, if required by the 1940 Act.

*Futures Contracts*. The Fund may purchase interest rate and Treasury futures contracts ("financial futures"). Interest rate futures contracts obligate the long or short holder to take or make delivery of a specified quantity of a financial instrument during a specified future period at a specified price.

There are special risks associated with entering into financial futures contracts. The skills needed to use financial futures contracts effectively are different from those needed to select the Fund's fixed income investments. There may be an imperfect correlation between the price movements of financial futures contracts and the price movements of the securities in which the Fund invests. There is also a risk that the Fund will be unable to close a futures position when desired because there is no liquid secondary market for it.

The risk of loss in trading financial futures can be substantial due to the low margin deposits required and the extremely high degree of leverage involved in futures pricing. Relatively small price movements in a financial futures contract could have an immediate and substantial impact, which may be favorable or unfavorable to the Fund. It is possible for a price-related loss to exceed the amount of the Fund's margin deposit.

Although some financial futures contracts by their terms call for the actual delivery or acquisition of securities at expiration, in most cases the contractual commitment is closed out before expiration. The offsetting of a contractual obligation is accomplished by purchasing (or selling as the case may be) on a commodities or futures exchange an identical financial futures contract calling for delivery in the same month. Such a transaction, if effected through a member of an exchange, cancels the obligation to make or take delivery of the securities. The Fund will incur brokerage fees when it purchases or sells financial futures contracts, and will be required to maintain margin deposits. If a liquid secondary market does not exist when the Fund wishes to close out a financial futures contract, it will not be able to do so and will continue to be required to make daily cash payments of variation margin in the event of adverse price movements. There is no assurance that the Fund will be able to enter into closing transactions.

The Fund may enter into futures contracts on other underlying assets or indexes, including physical commodities and indexes of physical commodities.

At any time prior to expiration of a futures contract, the Fund may seek to close the position by taking an opposite position which would typically operate to terminate the Fund's position in the futures contract. A final determination of any variation margin is then made, additional cash is required to be paid by or released to the Fund and the Fund realizes a loss or gain.

When purchasing a futures contract, the Fund will maintain with its custodian (and mark-to-market on a daily basis) assets determined to be liquid that, when added to the amounts deposited with a futures commission merchant as margin, are equal to the market value of the futures contract. Alternatively, the Fund may "cover" its position by purchasing a put option on the same futures contract with a strike price as high or higher than the price of the contract held by the Fund. When selling a futures contract, the Fund will maintain with its custodian (and mark-to-market on a daily basis) assets determined to be liquid that are equal to the market value of the futures contract. Alternatively, the Fund may "cover" its position by owning the instruments underlying the futures contract (or, in the case of an index futures contract, a portfolio with a volatility substantially similar to that of the index on which the futures contract is based), or by holding a call option permitting the Fund to purchase the same futures contract at a price no higher than the price of the contract written by the Fund (or at a higher price if the difference is maintained in liquid assets with the custodian).

*Table of Contents - Statement of Additional Information*

17

With respect to futures contracts that are not legally required to "cash settle," the Fund may cover the open position by setting aside or "earmarking" liquid assets in an amount equal to the notional value of the futures contract. With respect to futures that are required to "cash settle," however, the Fund is permitted to set aside or "earmark" liquid assets in an amount equal to the Fund's daily marked-to-market (net) obligation, if any, rather than the notional value of the futures contract. By setting aside or "earmarking" assets equal to only its net obligation under cash-settled futures, the Fund will have the ability to utilize these contracts to a greater extent than if the Fund were required to segregate or "earmark" assets equal to the full notional value of the futures contract.

*Interest Rate or Financial Futures Contracts.* The Fund may invest in interest rate or financial futures contracts. Bond prices are established in both the cash market and the futures market. In the cash market, bonds are purchased and sold with payment for the full purchase price of the bond being made in cash, generally within five business days after the trade. In the futures market, a contract is made to purchase or sell a bond in the future for a set price on a certain date. Historically, the prices for bonds established in the futures markets have generally tended to move in the aggregate in concert with cash market prices, and the prices have maintained fairly predictable relationships.

The sale of an interest rate or financial futures contract by the Fund would create an obligation by the Fund, as seller, to deliver the specific type of financial instrument called for in the contract at a specific future time for a specified price. A futures contract purchased by the Fund would create an obligation by the Fund, as purchaser, to take delivery of the specific type of financial instrument at a specific future time at a specific price. The specific securities delivered or taken, respectively, at settlement date, would not be determined until at or near that date. The determination would be in accordance with the rules of the exchange on which the futures contract sale or purchase was made.

Although interest rate or financial futures contracts by their terms call for actual delivery or acceptance of securities, in most cases the contracts are closed out before the settlement date without delivery of securities. Closing out a futures contract sale is effected by the Fund's entering into a futures contract purchase for the same aggregate amount of the specific type of financial instrument and the same delivery date. If the price in the sale exceeds the price in the offsetting purchase, the Fund is paid the difference and thus realizes a gain. If the offsetting purchase price exceeds the sale price, the Fund pays the difference and realizes a loss. Similarly, the closing out of a futures contract purchase is effected by the Fund's entering into a futures contract sale. If the offsetting sale price exceeds the purchase price, the Fund realizes a gain, and if the purchase price exceeds the offsetting sale price, the Fund realizes a loss.

The exchange typically guarantees performance under contract provisions through a clearing corporation, a nonprofit organization managed by the exchange membership. Domestic interest rate futures contracts may be traded in an auction environment on the floor of an exchange, such as the Chicago Mercantile Exchange. A public market now exists in domestic futures contracts covering various financial instruments including long-term United States Treasury bonds and notes, GNMA modified pass-through mortgage-backed securities, three-month United States Treasury bills, and 90-day commercial paper. The Fund may trade in any futures contract for which there exists a public market, including, without limitation, the foregoing instruments. International interest rate futures contracts are traded on various international exchanges. Engaging in futures contracts on international exchanges may involve additional risks, including varying regulatory standards and supervision, fewer laws to protect investors, greater counterparty risk, greater transaction costs, greater volatility, and less liquidity, which could make it difficult for the fund to transact.

Interest Rate and Total Return Swap Agreements. The Fund may purchase interest rate swaps. The Fund may use interest rate swaps to increase or decrease exposure to a particular interest rate or rates, which may result in the Fund experiencing a gain or loss depending on whether the interest rates increased or decreased during the term of the agreement. The Fund may also engage in total return swaps, in which payments made by the Fund or the counterparty are based on the total return of a particular reference asset or assets (such as a fixed-income security, a combination of securities, or an index). The value of the Fund's swap positions would increase or decrease depending on the changes in value of the underlying rates, currency values, volatility or other indices or measures. Caps and floors have an effect similar to buying or writing options. Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Fund's investments and its share price. The Fund's ability to engage in certain swap transactions may be limited by tax considerations.

*Table of Contents - Statement of Additional Information*

18

The Fund's ability to realize a profit from such transactions will depend on the ability of the financial institutions with which it enters into the transactions to meet their obligations to the Fund. If a counterparty's creditworthiness declines, the value of the agreement would be likely to decline, potentially resulting in losses. If a default occurs by the other party to such transaction, the Fund will have contractual remedies pursuant to the agreements related to the transaction, which may be limited by applicable law in the case of a counterparty's insolvency. Under certain circumstances, suitable transactions may not be available to the Fund, or the Fund may be unable to close out its position under such transactions at the same time, or at the same price, as if it had purchased comparable publicly traded securities. Swaps carry counterparty risks that cannot be fully anticipated. Also, because, in some cases, swap transactions involve a contract between the two parties, such swap investments can be extremely illiquid, as it is uncertain as to whether another counterparty would wish to take assignment of the rights under the swap contract at a price acceptable to the Fund.

The Fund may enter into swap agreements that would calculate the obligations of the parties to the agreement on a "net basis." Consequently, the Fund's current obligations (or rights) under a swap agreement will generally be equal only to the net amount to be paid or received under the agreement based on the relative values of the positions held by each party to the agreement (the "net amount"). The Fund's current obligations under a swap agreement will be accrued daily (offset against any amounts owed to the Fund) and any accrued but unpaid net amounts owed to a swap counterparty will be covered by the segregation or "earmarking" of assets determined to be liquid.

Credit Default Swaps. The Fund may engage in credit default swaps. A credit default swap is an agreement between the Fund and a counterparty that enables the Fund to buy or sell protection against a credit event related to a particular issuer or basket of issuers. The protection buyer makes periodic payments, which may be based on a fixed or floating rate of interest, to the protection seller in exchange for a promise by the protection seller to make a payment to the protection buyer if a negative credit event (such as a delinquent payment or default) occurs with respect to the referenced bond or group of bonds. Credit default swaps may be customized with respect to the default event that triggers a payment obligation by the protection seller.

The Fund may enter into credit default swap contracts as protection buyer in order to hedge against the risk of default on the debt of a particular issuer or basket of issuers or attempt to profit from a deterioration or perceived deterioration in the creditworthiness of the particular issuer(s). The Fund may sell credit protection in order to take a synthetic long position in the underlying security or basket of securities and/or to earn additional income.

Credit default swaps involve a number of special risks. Each party to a credit default swap is subject to the credit risk of its counterparty (the risk that its counterparty may be unwilling or unable to perform its obligations on the swap as they come due). The value of the credit default swap to each party will change based on changes in the actual or perceived creditworthiness of the underlying issuer. Buying credit protection involves the risk that the investment may expire worthless and would only generate gain in the event of an actual default by the issuer(s) of the underlying obligation(s) (or, as applicable, a credit downgrade or other indication of financial instability. A protection seller may have to pay out amounts following a negative credit event greater than the value of the reference obligation delivered to it by its counterparty and the amount of periodic payments previously received by it from the counterparty. When the Fund acts as a seller of a credit default swap, it is exposed to, among other things, leverage risk because if an event of default occurs, the seller must pay the buyer the full notional value of the reference obligation. Engaging in credit default swaps involves costs, which will reduce the Fund's return.

*Table of Contents - Statement of Additional Information*

19

The Fund may seek to realize gains on its credit default swap positions, or limit losses on its positions, by selling those positions in the secondary market. There can be no assurance that a liquid secondary market will exist at any given time for any particular credit default swap or for credit default swaps generally.

The market for credit default swaps has become more volatile in recent years as the creditworthiness of certain counterparties has been questioned and/or downgraded. The parties to a credit default swap may be required to post collateral to each other. If the Fund posts initial or periodic collateral to its counterparty, it may not be able to recover that collateral from the counterparty in accordance with the terms of the swap. In addition, if the Fund receives collateral from its counterparty, it may be delayed or prevented from realizing on the collateral in the event of the insolvency or bankruptcy of the counterparty. The Fund may exit its obligations under a credit default swap only by terminating the contract and paying applicable breakage fees, or by entering into an offsetting credit default swap position, which may cause the Fund to incur more losses.

The Fund's obligations under a credit default swap agreement will be accrued daily (offset against any amounts owing to the Fund). In connection with credit default swaps in which the Fund is the buyer, the Fund will segregate or "earmark" cash or assets determined to be liquid, or enter into certain offsetting positions, with a value at least equal to the Fund's exposure (any accrued but unpaid net amounts owed by the Fund to any counterparty), on a marked-to-market basis. In connection with credit default swaps in which the Fund is the seller, the Fund will segregate or "earmark" cash or assets determined to be liquid, or enter into offsetting positions, with a value at least equal to the full notional amount of the swap (minus any amounts owed to the Fund). Such segregation or "earmarking" seeks to ensure that the Fund has assets available to satisfy its obligations with respect to the transaction and will limit any potential leveraging of the Fund's portfolio. However, such segregation or "earmarking" will not limit the Fund's exposure to loss.

**Temporary Defensive Investments:** The Fund may, from time to time, take temporary defensive positions that are inconsistent with the Fund's principal investment strategies in attempting to respond to adverse market, economic, political or other conditions. For example, during such periods, 100% of the Fund's assets may be invested in short-term, high-quality fixed income securities, cash or cash equivalents. In addition, during such periods, the Fund may invest up to 100% of its net assets in certain other derivatives, including forward contracts, interest rate swaps, total return swaps, and credit default swaps, measured at notional value. Temporary defensive positions may be initiated by the Adviser. When the Fund takes temporary defensive positions, it may not achieve its investment objective.

**Cyber Security Risk**. Investment companies, such as the Fund, and their service providers may be subject to operational and information security risks resulting from cyber-attacks. Cyber-attacks include, among other behaviors, stealing or corrupting data maintained online or digitally, denial of service attacks on websites, the unauthorized release of confidential information or various other forms of cyber security breaches. Cyber-attacks affecting the Fund or the Adviser, custodian, transfer agent, intermediaries and other third-party service providers may adversely impact the Fund. For instance, cyber-attacks may interfere with the processing of shareholder transactions, impact the Fund's ability to calculate its net asset value, cause the release of private shareholder information or confidential company information, impede trading, subject the Fund to regulatory fines or financial losses, and cause reputational damage. The Fund may also incur additional costs for cyber security risk management purposes. Similar types of cyber security risks are also present for issuers of securities in which the Fund invests, which could result in material adverse consequences for such issuers, and may cause the Fund's investment in such portfolio companies to lose value.

*Table of Contents - Statement of Additional Information*

**INVESTMENT RESTRICTIONS**

The Trust (on behalf of the Fund) has adopted the following restrictions as fundamental policies, which may not be changed without the affirmative vote of the holders of a "majority of the Fund's outstanding voting securities" as defined in the 1940 Act. Under the 1940 Act, the "vote of the holders of a majority of the outstanding voting securities" means the vote of the holders of the lesser of (i) 67% of the shares of the Fund represented at a meeting at which the holders of more than 50% of its outstanding shares are represented or (ii) more than 50% of the outstanding shares of the Fund.

The Fund may not:

1.  With respect to 75% of its total assets, invest more than 5% of its total assets in securities of a single issuer or hold more than 10% of the voting securities of such issuer. (Does not apply to investments in the securities of other investment companies or securities of the U.S. Government, its agencies or instrumentalities.)

2.  Borrow money, except as permitted under the 1940 Act.

3.  Issue senior securities, except as permitted under the 1940 Act.

4.  Engage in the business of underwriting securities, except to the extent that the Fund may be considered an underwriter within the meaning of the Securities Act of 1933 in the disposition of restricted securities.

5.  Invest more than 25% of the market value of its total assets in the securities of companies engaged in any one industry. (Does not apply to investments in the securities of other investment companies or securities of the U.S. Government, its agencies or instrumentalities.)

6.  Purchase or sell real estate, which term does not include securities of companies which deal in real estate and/or mortgages or investments secured by real estate, or interests therein, except that the Fund reserves freedom of action to hold and to sell real estate acquired as a result of the Fund's ownership of securities.

7.  Purchase or sell physical commodities or contracts relating to physical commodities, except in compliance with any applicable provisions of the federal securities or commodities laws.

8.  Make loans to others, except as permitted under the 1940 Act.

With respect to fundamental policy number 2, the 1940 Act permits the Fund to borrow money in amounts of up to one-third of the Fund's total assets from banks for any purpose. (The Fund's total assets include the amounts being borrowed.)  To limit the risks attendant to borrowing, the 1940 Act requires the Fund to maintain an "asset coverage" of at least 300% of the amount of its borrowings, provided that in the event that the Fund's asset coverage falls below 300%, the Fund is required to reduce the amount of its borrowings so that it meets the 300% asset coverage threshold within three days (not including Sundays and holidays). Certain trading practices and investments, such as reverse repurchase agreements, may be considered to be borrowings and thus subject to the 1940 Act restrictions. Short-term credits necessary for the settlement of securities transactions and arrangements with respect to securities lending will not be considered to be borrowings under the policy. Practices and investments that may involve leverage but are not considered to be borrowings are not subject to the policy.

With respect to fundamental policy number 3, "senior securities" are defined as Fund obligations that have a priority over the Fund's shares with respect to the payment of dividends or the distribution of Fund assets. The 1940 Act prohibits the Fund from issuing senior securities, except that the Fund may borrow money in amounts of up to one-third of the Fund's total assets from banks for any purpose. The policy above will be interpreted not to prevent collateral arrangements with respect to swaps, options, forward or futures contracts or other derivatives, or the posting of initial or variation margin.

With respect to fundamental policy number 8, the 1940 Act does not prohibit the Fund from making loans, however, SEC staff interpretations currently prohibit funds from lending more than one-third of their total assets including lending its securities except through the purchase of debt obligations or the use of repurchase agreements.

The Fund observes the following policies, which are not deemed fundamental and which may be changed without shareholder vote. The Fund may not:

1.  Invest in any issuer for purposes of exercising control or management.

2.  Hold, in the aggregate, more than 15% of its net assets in illiquid securities.

The Subsidiary will also follow the Fund's fundamental and non-fundamental investment restrictions, described above, except for those fundamental policies that would restrict a Subsidiary's investments in commodities (*e.g.*, the fundamental policy number 7).

## PORTFOLIO TURNOVER

Portfolio securities may be sold without regard to the length of time they have been held when, in the opinion of the Adviser, investment considerations warrant such action. Portfolio turnover rate is calculated by dividing (1) the lesser of purchases or sales of portfolio securities for the fiscal year by (2) the monthly average of the value of portfolio securities owned during the fiscal year. A 100% turnover rate would occur if all the securities in the Fund's portfolio, with the exception of securities whose maturities at the time of acquisition were one year or less, were sold and either repurchased or replaced within one year. A high rate of portfolio turnover (100% or more) generally leads to higher transaction costs and generally reflects a greater number of taxable transactions. High portfolio turnover may result in larger amounts of short-term capital gains which, when distributed to shareholders, are generally taxed at ordinary income tax rates. The Fund's investment strategies, including the use of derivative instruments, require frequent transactions that generate a portfolio turnover rate that is significantly higher than most equity funds. Higher portfolio turnover rates generate capital gains that must be distributed to shareholders and could increase brokerage commission costs. To the extent that the Fund experiences an increase in brokerage commissions due to a higher portfolio turnover rate, the performance of the Fund could be negatively impacted by the increased expenses incurred by the Fund. The value of long-term derivative and cash transactions are excluded from the portfolio turnover calculation. If they were included, the ratio would be significantly higher.

Following are the portfolio turnover rates for the fiscal periods indicated below:

| Fiscal year ended August 31, 2018 | Fiscal year ended August 31, 2017 |
|:---:|:---:|
| 8% | 65% |

## PORTFOLIO HOLDINGS POLICY

The Fund maintains portfolio holdings disclosure policies that govern the timing and circumstances of disclosure to shareholders and third parties of information regarding the portfolio investments held by the Fund. These portfolio holdings disclosure policies have been approved by the Board. Disclosure of the Fund's complete holdings is required to be made quarterly within 60 days of the end of each fiscal quarter in the annual report and semi-annual report to Fund shareholders and in the quarterly holdings report on Form N-Q. These reports are available, free of charge, on the EDGAR database on the SEC's website at www.sec.gov.

*Table of Contents - Statement of Additional Information*

22

Portfolio holdings information posted on the Fund's website may be provided separately to any person, commencing on the day after it is first published on the Fund's website. Shareholders can access the Fund's website at www.infinityqfunds.com for additional information about the Fund, including, without limitation, the periodic disclosure of its portfolio holdings.

Pursuant to the Trust's portfolio holdings disclosure policies, non-public information about the Fund's portfolio holdings generally is not distributed to any person, unless by explicit agreement or by virtue of their respective duties to the Fund, such persons are subject to a duty to maintain the confidentiality of the information disclosed, including a duty not to trade on non-public information. Examples of disclosure by the Trust include instances in which:

- The disclosure is required pursuant to a regulatory request, court order or is legally required in the context of other legal proceedings;
- The disclosure is made to a mutual fund rating and/or ranking organization, or person performing similar functions;
- The disclosure is made to internal parties involved in the investment process, administration, operation or custody of the Fund, including, but not limited to the Fund's administrator, U.S. Bancorp Fund Services, LLC, doing business as U.S. Bank Global Fund Services and the Trust's Board, attorneys, auditors or accountants;
- The disclosure is made: (a) in connection with a quarterly, semi-annual or annual report that is available to the public; or (b) relates to information that is otherwise available to the public; or
- The disclosure is made with the prior written approval of either the Trust's Chief Compliance Officer or his or her designee.

Certain of the persons listed above may receive information about the Fund's portfolio holdings on an ongoing basis without lag as part of the normal investment activities of the Fund. The Fund believes that these third parties have legitimate objectives in requesting such portfolio holdings information and operate in the best interest of the Fund's shareholders. These persons include internal parties involved in the investment process, administration, operation or custody of the Fund, specifically: U.S. Bank Global Fund Services; the Trust's Board; the Trust's legal counsel, and auditors and accountants, all of which typically receive such information after it is generated. In no event shall the Adviser, its affiliates or employees, the Fund, or any other party receive any direct or indirect compensation in connection with the disclosure of information about the Fund's holdings.

Portfolio holdings information posted on the Fund's website may be separately provided to any person, after it is first published on the Fund's website. Shareholders can access the Fund's website at www.infinityqfunds.com for additional information about the Fund, including, without limitation, the periodic disclosure of its portfolio holdings.

Any disclosures to additional parties not described above is made with the prior written approval of either the Trust's Chief Compliance Officer or his or her designee, pursuant to the Trust's Policy on Disclosure of Portfolio Holdings.

The Chief Compliance Officer or designated officer of the Trust will approve the furnishing of non-public portfolio holdings to a third party only if they consider the furnishing of such information to be in the best interest of the Fund and its shareholders and if no material conflict of interest exists regarding such disclosure between shareholders interest and those of the Adviser, Quasar Distributors, LLC (the "Distributor") or any affiliated person of the Fund. No consideration may be received by the Fund, the Adviser, any affiliate of the Adviser or their employees in connection with the disclosure of portfolio holdings information. The Board receives and reviews annually a list of the persons who receive non-public portfolio holdings information and the purpose for which it is furnished.

*Table of Contents - Statement of Additional Information*

## MANAGEMENT

The overall management of the Trust's business and affairs is invested with its Board. The Board approves all significant agreements between the Trust and persons or companies furnishing services to it, including the agreements with the Adviser, administrator, custodian and transfer agent, each as discussed below. The day-to-day operations of the Trust are delegated to its officers, subject to the Fund's investment objective, strategies and policies and to the general supervision of the Board. The Trustees and officers of the Trust, their ages, birth dates, and positions with the Trust, terms of office with the Trust and length of time served, their business addresses and principal occupations during the past five years and other directorships held are set forth in the table below.

| Name, Address and Age | Position(s) Held with Trust | Term of Office[1] and Length of Time Served | Principal Occupation(s) During Past 5 Years | Number of Portfolios in Fund Complex[2] Overseen by Trustee | Other Directorships[3] Held During Past 5 Years by Trustee |
|---|---|---|---|---|---|
| **Non-Interested Trustees[4]** | | | | | |
| John C. Chrystal<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1958 | Trustee | Since 2011 | Private Investor. Founder and Managing Partner of Bent Gate Advisors, LLC (2009 – 2012) | 1 | The Bancorp, Inc. (2013 to present) Javelin Mortgage Investments, Inc. (2012 – 2016) |
| Albert J. DiUlio, S.J.<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1943 | Trustee | Since 2011 | Treasurer, Midwest Province and Wisconsin Province of The Society of Jesus (2014 to present); President, Vatican Observatory Foundation (2011 – 2014) | 1 | None |
| Harry E. Resis<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1945 | Trustee | Since 2012 | Private investor. Previously served as Director of US Fixed Income for Henderson Global Investors | 1 | None |
| **Interested Trustee[5]** | | | | | |
| Christopher E. Kashmerick<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1974 | Trustee, Chairman, President and Principal Executive Officer | Trustee since 2018; Chairman since 2018; President and Principal Executive Officer since 2014 | Senior Vice President, U.S. Bancorp Fund Services, LLC (2011 – present) | 1 | None |

| Name, Address and Age | Position(s) Held with Trust | Term of Office[1] and Length of Time Served | Principal Occupation(s) During Past 5 Years |
|---|---|---|---|
| **Officers** | | | |
| Steven J. Jensen<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1957 | Vice President, Chief Compliance Officer and AML Officer | Since 2014 | Senior Vice President, U.S. Bancorp Fund Services, LLC (2011 to present) |
| Russell B. Simon<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1980 | Treasurer and Principal Financial Officer | Since 2014 | Vice President, U.S. Bancorp Fund Services, LLC (2011 – present) |
| Eric W. Pinciss, Esq.<br>615 E. Michigan Street<br>Milwaukee, WI 53202<br>Year of birth: 1975 | Secretary | Since 2015 | Vice President, U.S. Bancorp Fund Services, LLC (2012 to present) |

[1]   Each Trustee serves an indefinite term until the election of a successor. Each officer serves an indefinite term until the election of a     successor.

[2]   The Trust is comprised of numerous series managed by unaffiliated investment advisers. The term "Fund Complex" applies to the Fund. The Fund does not hold itself out as related to any other series within the Trust for purposes of investment and investor services, nor does it share the same investment advisor with any other series.

[3]   "Other Directorships Held" includes only directorships of companies required to register or file reports with the SEC under the     Securities Exchange Act of 1934, as amended, (that is, "public companies") or other investment companies registered under the 1940 Act.

[4]   The Trustees of the Trust who are not "interested persons" of the Trust as defined under the 1940 Act ("Independent Trustees").

[5]   Mr. Kashmerick is an "interested person" of the Trust as defined by the 1940 Act. Mr. Kashmerick is an interested Trustee of the Trust by virtue of the fact that he is an interested person of Quasar Distributors, LLC, the Trust's distributor.

### Additional Information Concerning Our Board of Trustees

**Board Leadership Structure**

The Board has general oversight responsibility with respect to the operation of the Trust and the Fund. The Board has engaged the Adviser to manage the Fund and is responsible for overseeing the Adviser and other service providers to the Trust and the Fund in accordance with the provisions of the 1940 Act and other applicable laws. The Board has established an Audit Committee to assist the Board in performing its oversight responsibilities.

Given the fact there is only a small number of funds in the Trust, the Trust does not have a lead disinterested trustee. The Chairman of the Board is an "interested person" of the Trust as defined by the 1940 Act. The Trust has determined that its leadership structure is appropriate in light of, among other factors, the asset size and nature of the Trust, the arrangements for the conduct of the Trust's operations, the number of Trustees, and the responsibilities of the Board.

**Board Oversight of Risk**

Through its direct oversight role, and indirectly through the Audit Committee, and officers of the Fund and service providers, the Board performs a risk oversight function for the Fund. To effectively perform its risk oversight function, the Board, among other things, performs the following activities: receives and reviews reports related to the performance and operations of the Fund; reviews and approves, as applicable, the compliance policies and procedures of the Fund; approves the Fund's principal investment policies; adopts policies and procedures designed to deter market timing; meets with representatives of various service providers, including the Adviser, to review and discuss the activities of the Fund and to provide direction with respect thereto; and appoints a chief compliance officer of the Fund who oversees the implementation and testing of the Fund's compliance program and reports to the Board regarding compliance matters for the Fund and its service providers.

The Trust has an Audit Committee, which plays a significant role in the risk oversight of the Fund as it meets periodically with the auditors of the Fund. The Board also meets quarterly with the Fund's chief compliance officer.

Not all risks that may affect the Fund can be identified nor can controls be developed to eliminate or mitigate their occurrence or effects. It may not be practical or cost effective to eliminate or mitigate certain risks, the processes and controls employed to address certain risks may be limited in their effectiveness, and some risks are simply beyond the reasonable control of the, the Adviser or other service providers. Moreover, it is necessary to bear certain risks (such as investment-related risks) to achieve the Fund's goals. As a result of the foregoing and other factors, the Fund's ability to manage risk is subject to substantial limitations.

**Trust Committees**

The Trust has three standing committees: the Nominating Committee, the Audit Committee, and the Valuation Committee.

The Board has created an audit committee, which also serves as the Qualified Legal Compliance Committee ("QLCC"). The members consist of Messrs. Chrystal, DiUlio, and Resis each of whom is an Independent Trustee. Mr. Chrystal is the Audit Committee Chairman. The primary functions of the audit committee are to select the independent registered public accounting firm to be retained to perform the annual audit of the Fund, to review the results of the audit, to review the Fund's internal controls, to approve in advance all permissible non-audit services performed by the independent auditors and to review certain other matters relating to the Fund's independent registered public accounting firm and financial records. The function of the QLCC is to receive reports from an attorney retained by the Trust of evidence of a material violation by the Trust or by any officer, director, employee or agent of the Trust. The Audit Committee met four times during the fiscal year ended August 31, 2018, with respect to the Fund.

The Nominating Committee, comprised entirely of the Independent Trustees, is responsible for seeking and reviewing candidates for consideration as nominees for Trustees and meets only as necessary. The Nominating Committee will consider nominees nominated by shareholders. Recommendations by shareholders for consideration by the Nominating Committee should be sent to the President of the Trust in writing together with the appropriate biographical information concerning each such proposed Nominee, and such recommendation must comply with the notice provisions set forth in the Trust By-Laws. In general, to comply with such procedures, such nominations, together with all required biographical and financial information, must be delivered to and received by the President of the Trust at the principal executive offices of the Trust not later than 120 days and no more than 150 days prior to the shareholder meeting at which any such nominee would be voted on. The Nominating Committee did not meet during the fiscal year ended August 31, 2018.

The Board has delegated day-to-day valuation matters to a Valuation Committee that is comprised of the Trust's President, Treasurer and Assistant Treasurer and is overseen by the Trustees. The function of the Valuation Committee is to review each Adviser's valuation of securities held by any series of the Trust for which current and reliable market quotations are not readily available. Such securities are valued at their respective fair values as determined in good faith by each Adviser, and the Valuation Committee gathers and reviews Fair Valuation Forms that are completed by an Adviser to support its determinations, and which are subsequently reviewed and ratified by the Board. The Valuation Committee meets as needed. The Valuation Committee met twelve times during the fiscal year ended August 31, 2018, with respect to the Fund.

*Table of Contents - Statement of Additional Information*

**Board Oversight of Risk Management**

As part of its oversight function, the Board receives and reviews various risk management reports and assessments and discusses these matters with appropriate management and other personnel. Because risk management is a broad concept comprised of many elements (such as, for example, investment risk, issuer and counterparty risk, compliance risk, operational risks, business continuity risks, etc.) the oversight of different types of risks is handled in different ways. For example, the Audit Committee meets regularly with the Chief Compliance Officer to discuss compliance and operational risks. The Audit Committee also meets with the Treasurer and the Trust's independent public accounting firm to discuss, among other things, the internal control structure of the Trust's financial reporting function. The full Board receives reports from the Adviser and portfolio managers as to investment risks as well as other risks that may be also discussed in Audit Committee.

**Information about Each Trustee's Qualification, Experience, Attributes or Skills**

In addition to the information provided in the table above, below is certain additional information concerning each particular Trustee and certain of their Trustee Attributes. The information provided below, and in the table above, is not all-inclusive. Many Trustee attributes involve intangible elements, such as intelligence, integrity, work ethic, the ability to work together, the ability to communicate effectively, the ability to exercise judgment, the ability to ask incisive questions, and commitment to shareholder interests. In conducting its annual self-assessment, the Board has determined that the Trustees have the appropriate attributes and experience to continue to serve effectively as Trustees of the Trust.

**Qualification of Trustees**

John Chrystal's experience as a partner of an investment management firm, and his experience as a partner of a consulting firm advising financial institutions, has provided him with an extensive knowledge of the highly regulated financial services industry, which knowledge he brings to the Board in a relatable, effective way.

Albert J. DiUlio, S.J.'s financing background, combined with his work experience, have provided him with a strong understanding of financial statements and experience addressing the complex issues that confront entities. As a trustee, Mr. DiUlio uses his financial background and experiences to enhance Board discussions with useful information and insights.

Harry Resis' background in fixed income securities analysis, with an emphasis on high yield securities, provides him with a practical knowledge of the underlying markets and strategies used by series in the Trust that will be useful to the Board in their analysis and oversight of the series.

Christopher E. Kashmerick has substantial mutual fund operations and shareholder servicing experience through his position as Senior Vice President of U.S. Bank Global Fund Services, and he brings more than 18 years of mutual fund and investment management experience, which makes him a valuable resource to the Board as they contemplate various fund and shareholder servicing needs.

Each of Messrs. Chrystal, DiUlio, Resis and Kashmerick takes a conservative and thoughtful approach to addressing issues facing the Fund. The combination of skills and attributes discussed above led to the conclusion that each of Messrs. Chrystal, DiUlio, Resis and Kashmerick should serve as a trustee.

**Trustee Ownership of Fund Shares and Other Interests**

No Trustee owned shares of the Fund as of the calendar year ended December 31, 2017.

As of December 31, 2017, neither the Independent Trustees nor members of their immediate family, own securities beneficially or of record in the Adviser, the Distributor, as defined below, or an affiliate of the Adviser or Distributor. Accordingly, neither the Independent Trustees nor members of their immediate family, have direct or indirect interest, the value of which exceeds $120,000, in the Adviser, the Distributor or any of their affiliates. In addition, during the  two most recently completed calendar years, neither the Independent Trustees nor members of their immediate families have conducted any transactions (or series of transactions) in which the amount involved exceeds $120,000 and to which the Adviser, the Distributor or any affiliate thereof was a party.

*Table of Contents - Statement of Additional Information*

27

## Compensation

Set forth below is the compensation received by the Independent Trustees from the Fund for the fiscal year ended August 31, 2018. The Independent Trustees receive an annual retainer of $43,000 per year and a fee of $1,000 for each meeting of the Board of Trustees attended, including special meetings allocated among each of the various portfolios comprising the Trust. The Trustees also receive reimbursement from the Trust for expenses incurred in connection with attendance at meetings. The Trust has no pension or retirement plan. No other entity affiliated with the Trust pays any compensation to the Trustees.

| | Aggregate Compensation from the Fund | Pension or Retirement Benefits Accrued as Part of Fund Expenses | Annual Benefits Upon Retirement | Total Compensation from Fund Complex Paid to Trustees[1] |
|---|---|---|---|---|
| **Name of Independent Trustee** | | | | |
| John Chrystal | $3,615 | None | None | $3,615 |
| Albert J. DiUlio, S.J. | $3,615 | None | None | $3,615 |
| Harry Resis | $3,615 | None | None | $3,615 |
| **Name of Interested Trustee** | | | | |
| Christopher E. Kashmerick | $0 | None | None | $0 |

[1] There are currently numerous portfolios comprising the Trust. The term "Fund Complex" applies only to the Fund. For the fiscal year ended August 31, 2018, Independent Trustees' fees were in the amount of $141,000.

## CODES OF ETHICS

The Trust, the Adviser and the Distributor, as defined below, have each adopted separate Codes of Ethics under Rule 17j-1 of the 1940 Act. These Codes permit, subject to certain conditions, access persons of the Adviser and Distributor to invest in securities that may be purchased or held by the Fund.

## PROXY VOTING POLICIES AND PROCEDURES

The Board has adopted Proxy Voting Policies and Procedures (the "Policies") on behalf of the Trust which delegate the responsibility for voting proxies to the Adviser, subject to the Board's continuing oversight. The Policies require that the Adviser vote proxies received in a manner consistent with the best interests of the Fund and its shareholders. The Policies also require the Adviser to present to the Board, at least annually, the Adviser's Policies and a record of each proxy voted by the Adviser on behalf of the Fund, including a report on the resolution of all proxies identified by the Adviser as involving a conflict of interest.

A copy of the Adviser's policies and procedures used to determine how to vote proxies related to portfolio securities can be found in Appendix B.

The Trust is required to file a Form N-PX, with the Fund's complete proxy voting record for the 12 months ended June 30, no later than August 31 of each year. The Fund's proxy voting record will be available without charge, upon request, by calling toll-free 1-844-IQFUND1 (473-8631) and on the SEC's website at www.sec.gov.

*Table of Contents - Statement of Additional Information*

**CONTROL PERSONS AND PRINCIPAL SHAREHOLDERS**

A principal shareholder is any person who owns of record or beneficially 5% or more of the outstanding shares of the Fund. A control person is one who owns beneficially or through controlled companies more than 25% of the voting securities of a company or acknowledges the existence of control. Shareholders with a controlling interest could affect the outcome of voting or the direction of management of the Fund. As of November 30, 2018, the following shareholders were considered to be either a control person or principal shareholder of the Fund

**Investor Class**

| Name and Address | Parent Company | Jurisdiction | % of Ownership | Type of Ownership |
|---|---|---|---|---|
| Charles Schwab & Co., Inc.<br>211 Main Street<br>San Francisco, CA 98672 | N/A | N/A | 71.18% | Record |
| National Financial Services LLC<br>499 Washington Blvd<br>Jersey City, NJ 07310-1995 | N/A | N/A | 23.75% | Record |

**Institutional Class**

| Name and Address | Parent Company | Jurisdiction | % of Ownership | Type of Ownership |
|---|---|---|---|---|
| Charles Schwab & Co., Inc.<br>211 Main Street<br>San Francisco, CA 98672 | N/A | N/A | 48.73% | Record |
| Infinity Q Capital Management, LLC<br>888 7th Avenue, Suite 3700<br>New York, NY 10106 | N/A | DE | 10.65% | Beneficial |
| National Financial Services LLC<br>499 Washington Blvd<br>Jersey City, NJ 07310-1995 | N/A | N/A | 8.78% | Record |
| Pershing LLC<br>PO Box 2052<br>Jersey City, NJ 07303-2052 | N/A | N/A | 8.39% | Record |
| TD Ameritrade Incorporated<br>PO Box 2226<br>Omaha, NE 68103-2226 | N/A | N/A | 6.86% | Record |

As of November 30, 2018, the Trustees and Officers of the Trust, as a group, beneficially owned less than 1% of the outstanding shares of any class of the Fund.

**THE FUND'S INVESTMENT ADVISER**

Infinity Q Capital Management, LLC, 888 7th Avenue, Suite 3700, New York, NY 10106, acts as investment adviser to the Fund pursuant to an investment advisory agreement (the "Advisory Agreement") with the Trust. Bonderman Family Limited Partnership and Infinity Q Management Equity each own more than 25% of the Adviser and each is therefore a control person of the Adviser.

*Table of Contents - Statement of Additional Information*

In consideration of the services to be provided by the Adviser pursuant to the Advisory Agreement, the Adviser is entitled to receive from the Fund an investment advisory fee computed daily and payable monthly, based on a rate equal to 1.70% of the Fund's average daily net assets.

After its initial two year term, the Advisory Agreement continues in effect for successive annual periods so long as such continuation is specifically approved at least annually by the vote of (1) the Board (or a majority of the outstanding shares of the Fund), and (2) a majority of the Trustees who are not interested persons of any party to the Advisory Agreement, in each case, cast in person at a meeting called for the purpose of voting on such approval. The Advisory Agreement may be terminated at any time, without penalty, by either party to the Advisory Agreement upon a 60-day written notice and is automatically terminated in the event of its "assignment," as defined in the 1940 Act.

A discussion regarding the basis for the Board's approval of the Advisory Agreement for the Fund is available in the Fund's annual report for the period ended August 31, 2018.

In addition to the management fees payable to the Adviser, the Fund is responsible for its own operating expenses, including: fees and expenses incurred in connection with the issuance, registration and transfer of its shares; brokerage and commission expenses; all expenses of transfer, receipt, safekeeping, servicing and accounting for the cash, securities and other property of the Trust for the benefit of the Fund including all fees and expenses of its custodian and accounting services agent; interest charges on any borrowings; costs and expenses of pricing and calculating its daily NAV per share and of maintaining its books of account required under the 1940 Act; taxes, if any; a pro rata portion of expenditures in connection with meetings of the Fund's shareholders and the Trust's Board that are properly payable by the Fund; salaries and expenses of officers and fees and expenses of members of the Board or members of any advisory board or committee who are not members of, affiliated with or interested persons of the Adviser or administrator; insurance premiums on property or personnel of the Fund which inure to their benefit, including liability and fidelity bond insurance; the cost of preparing and printing reports, proxy statements, prospectuses and the statement of additional information of the Fund or other communications for distribution to existing shareholders; legal counsel, auditing and accounting fees; trade association membership dues (including membership dues in the Investment Company Institute allocable to the Fund); fees and expenses (including legal fees) of registering and maintaining registration of its shares for sale under federal and applicable state and foreign securities laws; all expenses of maintaining shareholder accounts, including all charges for transfer, shareholder recordkeeping, dividend disbursing, redemption, and other agents for the benefit of the Fund, if any; and all other charges and costs of its operation plus any extraordinary and non-recurring expenses, except as otherwise prescribed in the Advisory Agreement.

Though the Fund is responsible for its own operating expenses, the Adviser has contractually agreed to waive a portion or all of the management fees payable to it by the Fund and/or to pay Fund operating expenses to the extent necessary to limit the Fund's aggregate annual operating expenses (excluding shareholder servicing fees, any front-end or contingent deferred loads, taxes, leverage interest, brokerage commissions, acquired fund fees and expenses, expenses incurred in connection with any merger or reorganization, portfolio transaction expenses, interest expense and dividends paid on short sales or extraordinary expenses) to the limits set forth in the Prospectus. Any such waivers made by the Adviser in its management fees or payment of expenses which are the Fund's obligation are subject to recoupment by the Adviser from the Fund, if so requested by the Adviser, in subsequent fiscal years if the aggregate amount actually paid by the Fund toward the operating expenses for such fiscal year (taking into account the recoupment) does not exceed the applicable limitation on Fund expenses. The Adviser is permitted to recoup only for management fee waivers and expense payments made in the previous three fiscal years. Any such recoupment is also contingent upon the Board's subsequent review and ratification of the recouped amounts. Such recoupment may not be paid prior to the Fund's payment of current ordinary operating expenses.

For the fiscal periods shown in the tables below, the Fund paid the following fees to the Adviser:

| Fiscal Year Ended | Advisory Fees Accrued | Fee Waiver and Expense Reimbursement | Net Advisory Fees Paid |
|---|---|---|---|
| August 31, 2018 | $3,442,731 | $(216,581) | $3,226,150 |
| August 31, 2017 | $2,620,001 | $(127,173) | $2,492,828 |
| August 31, 2016 | $1,866,032 | $(174,049) | $1,691,983 |

## PORTFOLIO MANAGERS

Leonard A. Potter, James Velissaris and Scott Lindell are the portfolio managers principally responsible for the day-to-day management of the Fund's portfolio. The following table shows the number of other accounts managed by each portfolio manager and the total assets in the accounts managed within various categories as of August 31, 2018.

**Leonard A. Potter**

| Type of Accounts | Number of Accounts | Total Assets | Number of Accounts with Advisory Fee based on Performance | Total Assets |
|---|---|---|---|---|
| Registered Investment Companies | 1 | $302 million | 0 | $0 |
| Other Pooled Investments | 12 | $2.4 billion | 12 | $2.4 billion |
| Other Accounts | 7 | $434 million | 7 | $434 million |

**James Velissaris**

| Type of Accounts | Number of Accounts | Total Assets | Number of Accounts with Advisory Fee based on Performance | Total Assets |
|---|---|---|---|---|
| Registered Investment Companies | 1 | $310 million | 0 | $0 |
| Other Pooled Investments | 1 | $145 million | 1 | $145 million |
| Other Accounts | 0 | $0 | 0 | $0 |

**Scott Lindell**

| Type of Accounts | Number of Accounts | Total Assets | Number of Accounts with Advisory Fee based on Performance | Total Assets |
|---|---|---|---|---|
| Registered Investment Companies | 1 | $310 million | 0 | $0 |
| Other Pooled Investments | 1 | $145 million | 1 | $145 million |
| Other Accounts | 0 | $0 | 0 | $0 |

*Material Conflicts of Interest.*

Advisory personnel of the Adviser may also provide advisory services to clients of Wildcat Capital Management, LLC ("Wildcat"), and officers of the Adviser may also be officers of Wildcat. Wildcat is a registered investment adviser that provides investment advisory services to a variety of different clients, including individuals, limited partnerships, limited liability companies, trusts, charitable organizations and other entities and accounts ("Wildcat Clients"). Advisory personnel of the Adviser may also provide advisory services to clients of Vida Ventures, LLC, a biotech-focused venture capital firm. Conflicts of interest may arise in allocating time, services or functions of these advisory personnel and officers.

*Table of Contents - Statement of Additional Information*

In addition, in some cases, the Fund and the Wildcat Clients will have similar investment objectives and strategies. From time to time, there may be situations that give rise to other conflicts of interest. For example, conflicts may arise when the Fund makes investments in conjunction with an investment being made by a Wildcat Client, or in a transaction where a Wildcat Client has already made an investment.

To address and manage these potential conflicts of interest, the Adviser has adopted compliance policies and procedures to allocate investment opportunities and to ensure that each of its clients is treated on a fair and equitable basis. Such policies and procedures include, but are not limited to, investment and trade aggregation and allocation policies and oversight by the Adviser's compliance team.

*Compensation.*
The portfolio managers have an ownership stake in Infinity Q Capital Management, LLC. The portfolio managers receive a base salary, but expect to receive the majority of their compensation based on the fee revenue generated by Infinity Q Capital Management. After accounting for fund and firm expenses, the fee revenue generated Infinity Q Capital Management, LLC, at the discretion of Len Potter and James Velissaris, may be distributed to the shareholders of Infinity Q Capital Management, LLC, which includes the portfolio managers.

Securities Owned in the Fund by the Portfolio Managers as of August 31, 2018.

| Name of Portfolio Manager | Dollar Range of Equity Securities Held in the Fund |
|---|---|
| Leonard A. Potter | $500,001 - $1,000,000 |
| James Velissaris | $500,001 - $1,000,000 |
| Scott Lindell | $100,001 - $500,000 |

## OTHER SERVICE PROVIDERS

### Fund Administrator, Transfer Agent and Fund Accountant
Pursuant to an administration agreement (the "Administration Agreement"), U.S. Bancorp Fund Services, LLC, doing business as U.S. Bank Global Fund Services ("Fund Services"), 615 East Michigan Street, Milwaukee, Wisconsin 53202, acts as the administrator and fund accountant to the Fund. Fund Services provides certain services to the Fund including, among other responsibilities, coordinating the negotiation of contracts and fees with, and the monitoring of performance and billing of, the Fund's independent contractors and agents; preparation for signature by an officer of the Trust of all documents required to be filed for compliance by the Trust and the Fund with applicable laws and regulations, excluding those of the securities laws of various states; arranging for the computation of performance data, including NAV per share and yield; responding to shareholder inquiries; and arranging for the maintenance of books and records of the Fund, and providing, at its own expense, office facilities, equipment and personnel necessary to carry out its duties. In this capacity, Fund Services does not have any responsibility or authority for the management of the Fund, the determination of investment policy, or for any matter pertaining to the distribution of Fund shares.

Pursuant to the Administration Agreement, as compensation for its fund administration and portfolio compliance services, Fund Services receives from the Fund, a fee based on the Fund's current average daily net assets. Fund Services also is entitled to certain out-of-pocket expenses.

The Fund paid the following amount to Fund Services pursuant to its Administration Agreement for the periods shown below:

*Table of Contents - Statement of Additional Information*

32

| Fiscal year ended | Administration Fees |
|---|---|
| August 31, 2018 | $209,947 |
| August 31, 2017 | $161,540 |
| August 31, 2016 | $129,021 |

Pursuant to the Administration Agreement, Fund Services will receive a portion of fees from the Fund as part of a bundled-fee agreement for services performed as administrator and fund accountant and separately as the transfer agent and dividend disbursing agent (the "Transfer Agent"). Additionally, Fund Services provides Chief Compliance Officer services to the Trust under a separate agreement. The cost for the Chief Compliance Officer's services is charged to the Fund and approved by the Board annually.

### Custodian
Pursuant to a Custody Agreement between the Trust and U.S. Bank National Association, located at 1555 North Rivercenter Drive, Suite 302, Milwaukee, Wisconsin 53212 (the "Custodian"), the Custodian serves as the custodian of the Fund's assets, holds the Fund's portfolio securities in safekeeping, and keeps all necessary records and documents relating to its duties. The Custodian is compensated with an asset-based fee plus transaction fees and is reimbursed for out-of-pocket expenses.

The Custodian and Fund Services do not participate in decisions relating to the purchase and sale of securities by the Fund. Fund Services, the Custodian and the Fund's Distributor are affiliated entities under the common control of U.S. Bancorp. The Custodian and its affiliates may participate in revenue sharing arrangements with the service providers of mutual funds in which the Fund may invest. The Subsidiary's custodian is the same as the Fund's custodian.

### Independent Registered Public Accounting Firm
EisnerAmper LLP, 750 Third Avenue, New York, New York 10017, is the independent registered public accounting firm for the Fund, whose services include auditing the Fund's consolidated financial statements and the performance of related tax services.

### Legal Counsel
Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue NW, Washington, DC 20004, serves as legal counsel to the Trust. Morgan, Lewis & Bockius LLP also serves as independent legal counsel to the Board of Trustees.

Walkers, 190 Elgin Avenue George Town, Grand Cayman KY1-9001, Cayman Islands, serves as legal counsel to the Subsidiary.

## EXECUTION OF PORTFOLIO TRANSACTIONS

Pursuant to the Advisory Agreement, the Adviser determines which securities are to be purchased and sold by the Fund and which broker-dealers are eligible to execute the Fund's portfolio transactions. Purchases and sales of securities in the over-the-counter market will generally be executed directly with a "market-maker" unless, in the opinion of the Adviser, a better price and execution can otherwise be obtained by using a broker for the transaction.

Purchases of portfolio securities for the Fund also may be made directly from issuers or from underwriters. Where possible, purchase and sale transactions will be effected through dealers (including banks) which specialize in the types of securities which the Fund will be holding, unless better executions are available elsewhere. Dealers and underwriters usually act as principal for their own accounts. Purchases from underwriters will include a concession paid by the issuer to the underwriter and purchases from dealers will include the spread between the bid and the asked price. If the execution and price offered by more than one dealer or underwriter are comparable, the order may be allocated to a dealer or underwriter that has provided research or other services as discussed below.

In placing portfolio transactions, the Adviser will seek best execution. The full range and quality of services available will be considered in making these determinations, such as the size of the order, the difficulty of execution, the operational facilities of the firm involved, the firm's risk in positioning a block of securities and other factors. In those instances where it is reasonably determined that more than one broker-dealer can offer the services needed to obtain the most favorable price and execution available, consideration may be given to those broker-dealers which furnish or supply research and statistical information to the Adviser that it may lawfully and appropriately use in its investment advisory capacities, as well as provide other services in addition to execution services. The Adviser considers such information, which is in addition to and not in lieu of the services required to be performed by it under its Agreement with the Fund, to be useful in varying degrees, but of indeterminable value. Portfolio transactions may be placed with broker-dealers who sell shares of the Fund subject to rules adopted by the Financial Industry Regulatory Authority, Inc. ("FINRA") and the SEC.

While it is the Fund's general policy to first seek to obtain the most favorable price and execution available in selecting a broker-dealer to execute portfolio transactions for the Fund, in accordance with Section 28(e) under the Securities and Exchange Act of 1934, when it is determined that more than one broker can deliver best execution, weight is also given to the ability of a broker-dealer to furnish brokerage and research services to the Fund or to the Adviser, even if the specific services are not directly useful to the Fund and may be useful to the Adviser in advising other clients. In negotiating commissions with a broker or evaluating the spread to be paid to a dealer, the Fund may therefore pay a higher commission or spread than would be the case if no weight were given to the furnishing of these supplemental services, provided that the amount of such commission or spread has been determined in good faith by the Adviser to be reasonable in relation to the value of the brokerage and/or research services provided by such broker-dealer.

Investment decisions for the Fund are made independently from those of other client accounts or mutual funds managed or advised by the Adviser. Nevertheless, it is possible that at times identical securities will be acceptable for both the Fund and one or more of such client accounts or mutual funds. In such event, the position of the Fund and such client account(s) or mutual funds in the same issuer may vary and the length of time that each may choose to hold its investment in the same issuer may likewise vary. However, to the extent any of these client accounts or mutual funds seek to acquire the same security as the Fund at the same time, the Fund may not be able to acquire as large a portion of such security as it desires, or it may have to pay a higher price or obtain a lower yield for such security. Similarly, the Fund may not be able to obtain as high a price for, or as large an execution of, an order to sell any particular security at the same time. The Adviser will generally combine orders for trades of the Fund and Wildcat Clients if it is consistent with the Adviser's duty of best execution. If the Adviser has determined to enter into a trade at the same time as Wildcat enters into a trade for a client, the Adviser and, if applicable, Wildcat shall ensure that combined orders for all clients are generally placed while assigning pre-order allocations. If an order for more than one client cannot be fully executed, the Adviser and Wildcat shall ensure that the investments are allocated on a fair and equitable basis, e.g., on a pro rata basis based on assets under management. It is recognized that in some cases this system could have a detrimental effect on the price or value of the security insofar as the Fund is concerned. In other cases, however, it is believed that the ability of the Fund to participate in volume transactions may produce better executions for the Fund.

For the fiscal periods shown in the table below, the Fund paid the following brokerage commissions:

| Fiscal year ended | Brokerage Commission |
| --- | --- |
| August 31, 2018 | $1,831,643 |
| August 31, 2017 | $1,347,389 |
| August 31, 2016 | $975,389 |

*Table of Contents - Statement of Additional Information*

## GENERAL INFORMATION

The Declaration of Trust permits the Trustees to issue an unlimited number of full and fractional shares of beneficial interest and to divide or combine the shares into a greater or lesser number of shares without thereby changing the proportionate beneficial interest in the Fund. Each share represents an interest in the Fund proportionately equal to the interest of each other share. Upon the Fund's liquidation, all shareholders would share pro rata in the net assets of the Fund available for distribution to shareholders.

With respect to the Fund, the Trust may offer more than one class of shares. The Trust reserves the right to create and issue additional series or classes. Each share of a series or class represents an equal proportionate interest in that series or class with each other share of that series or class. Currently, the Fund offers two share classes–Investor Class and Institutional Class shares.

The Trust is not required to hold annual meetings of shareholders but will hold special meetings of shareholders of a series or class when, in the judgment of the Trustees, it is necessary or desirable to submit matters for a shareholder vote. Shareholders have, under certain circumstances, the right to communicate with other shareholders in connection with requesting a meeting of shareholders for the purpose of removing one or more Trustees. Shareholders also have, in certain circumstances, the right to remove one or more Trustees without a meeting. No material amendment may be made to the Declaration of Trust without the affirmative vote of the holders of a majority of the outstanding shares of each portfolio affected by the amendment. The Declaration of Trust provides that, at any meeting of shareholders of the Trust or of any series or class, a Shareholder Servicing Agent may vote any shares as to which such Shareholder Servicing Agent is the agent of record and which are not represented in person or by proxy at the meeting, proportionately in accordance with the votes cast by holders of all shares of that portfolio otherwise represented at the meeting in person or by proxy as to which such Shareholder Servicing Agent is the agent of record. Any shares so voted by a Shareholder Servicing Agent will be deemed represented at the meeting for purposes of quorum requirements. Any series or class may be terminated (i) upon the merger or consolidation with, or the sale or disposition of all or substantially all of its assets to, another entity, if approved by the vote of the holders of two thirds of its outstanding shares, except that if the Board recommends such merger, consolidation or sale or disposition of assets, the approval by vote of the holders of a majority of the series' or class' outstanding shares will be sufficient, or (ii) by the vote of the holders of a majority of its outstanding shares, or (iii) by the Board by written notice to the series' or class' shareholders. Unless each series and class is so terminated, the Trust will continue indefinitely.

The Declaration of Trust also provides that the Trust shall maintain appropriate insurance (for example, fidelity bonding and errors and omissions insurance) for the protection of the Trust, its shareholders, Trustees, officers, employees and agents covering possible tort and other liabilities. Thus, the risk of a shareholder incurring financial loss on account of shareholder liability is limited to circumstances in which both inadequate insurance existed and the Trust itself was unable to meet its obligations.

The Declaration of Trust does not require the issuance of stock certificates. If stock certificates are issued, they must be returned by the registered owners prior to the transfer or redemption of shares represented by such certificates.

Rule 18f-2 under the 1940 Act provides that as to any investment company which has two or more series outstanding and as to any matter required to be submitted to shareholder vote, such matter is not deemed to have been effectively acted upon unless approved by the holders of a "majority" (as defined in the Rule) of the voting securities of each series affected by the matter. Such separate voting requirements do not apply to the election of Trustees or the ratification of the selection of accountants. The Rule contains special provisions for cases in which an advisory contract is approved by one or more, but not all, series. A change in investment policy may go into effect as to one or more series whose holders so approve the change even though the required vote is not obtained as to the holders of other affected series.

*Table of Contents - Statement of Additional Information*

## ADDITIONAL PURCHASE AND REDEMPTION INFORMATION

The information provided below supplements the information contained in the Prospectus regarding the purchase and redemption of Fund shares.

### How to Buy Shares

You may purchase shares of the Fund from securities brokers, dealers or financial intermediaries (collectively, "Financial Intermediaries"). Investors should contact their Financial Intermediary directly for appropriate instructions, as well as information pertaining to accounts and any service or transaction fees that may be charged. The Fund may enter into arrangements with certain Financial Intermediaries whereby such Financial Intermediaries are authorized to accept your order on behalf of the Fund. If you transmit your order to these Financial Intermediaries before the close of regular trading (generally 4:00 p.m., Eastern Time) on a day that the NYSE is open for business, shares will be purchased at the appropriate per share price next computed after it is received by the Financial Intermediary. Investors should check with their Financial Intermediary to determine if it participates in these arrangements.

The public offering price of Fund shares is the NAV per share. Shares are purchased at the public offering price next determined after the Transfer Agent receives your order in good order (as described previously in the Prospectus section, "How to Buy Shares"). In most cases, in order to receive that day's public offering price, the Transfer Agent must receive your order in good order before the close of regular trading on the New York Stock Exchange ("NYSE"), normally 4:00 p.m., Eastern Time.

The Trust reserves the right in its sole discretion (i) to suspend the continued offering of the Fund's shares and (ii) to reject purchase orders in whole or in part when in the judgment of the Adviser or the Distributor such rejection is in the best interest of the Fund. The Adviser has the right to reduce or waive the minimum for initial and subsequent investments for certain fiduciary accounts or under circumstances where certain economies can be achieved in sales of the Fund's shares.

In addition to cash purchases, Fund shares may be purchased by tendering payment in-kind in the form of shares of stock, bonds or other securities. Any securities used to buy Fund shares must be readily marketable, their acquisition consistent with the Fund's objective and otherwise acceptable to the Adviser and the Board.

### How to Sell Shares and Delivery of Redemption Proceeds

You can sell your Fund shares any day the NYSE is open for regular trading, either directly to the Fund or through your Financial Intermediary.

The Fund typically sends the redemption proceeds on the next business day (a day when the NYSE is open for normal business) after the redemption request is received in good order and prior to market close, regardless of whether the redemption proceeds are sent via check, wire, or ACH transfer. While not expected, payment of redemption proceeds may take up to seven days.  As authorized by SEC rules, the Fund may suspend the right of redemption or postpone the date of payment during any period when (a) trading on the NYSE is restricted as determined by the SEC or the NYSE is closed for other than weekends and holidays; (b) an emergency exists as determined by the SEC making disposal of portfolio securities or valuation of net assets of the Fund not reasonably practicable; or (c) for such other period as the SEC may permit for the protection of the Fund's shareholders.

The value of shares on redemption or repurchase may be more or less than the investor's cost, depending upon the market value of the Fund's portfolio securities at the time of redemption or repurchase.

### Telephone Redemptions

Shareholders with telephone transaction privileges established on their account may redeem Fund shares by telephone. Upon receipt of any instructions or inquiries by telephone from the shareholder, the Fund or its authorized agents may carry out the instructions and/or respond to the inquiry consistent with the shareholder's previously established account service options. For joint accounts, instructions or inquiries from either party will be carried out without prior notice to the other account owners. In acting upon telephone instructions, the Fund and its agents use procedures that are reasonably designed to ensure that such instructions are genuine. These include recording all telephone calls, requiring pertinent information about the account and sending written confirmation of each transaction to the registered owner.

*Table of Contents - Statement of Additional Information*

Fund Services will employ reasonable procedures to confirm that instructions communicated by telephone are genuine. If Fund Services fails to employ reasonable procedures, the Fund and Fund Services may be liable for any losses due to unauthorized or fraudulent instructions. If these procedures are followed, however, to the extent permitted by applicable law, neither the Fund nor its agents will be liable for any loss, liability, cost or expense arising out of any redemption request, including any fraudulent or unauthorized request. For additional information, contact Fund Services.

## DETERMINATION OF SHARE PRICE

The NAV of the Fund is determined as of the close of regular trading on the NYSE (generally 4:00 p.m., Eastern Time), each day the NYSE is open for trading. The NYSE annually announces the days on which it will not be open for trading. It is expected that the NYSE will not be open for trading on the following holidays:  New Year's Day, Martin Luther King, Jr. Day, Washington's Birthday/Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

NAV is calculated by adding the value of all securities and other assets attributable to the Fund (including interest and dividends accrued, but not yet received), then subtracting liabilities attributable to the Fund (including accrued expenses).

Generally, the Fund's investments are valued at market value or, in the absence of a market value, at fair value as determined in good faith by the Fund's Adviser with oversight by the Trust's Valuation Committee pursuant to procedures approved by or under the direction of the Board. Pursuant to those procedures, the Adviser considers, among other things:  (1) the last sales price on the securities exchange, if any, on which a security is primarily traded; (2) the mean between the bid and asked prices; (3) price quotations from an approved pricing service; and (4) other factors as necessary to determine a fair value under certain circumstances.

Securities primarily traded in the NASDAQ Global Market® for which market quotations are readily available shall be valued using the NASDAQ® Official Closing Price ("NOCP"). If the NOCP is not available, such securities shall be valued at the last sale price on the day of valuation, or if there has been no sale on such day, at the mean between the bid and asked prices. OTC securities which are not traded in the NASDAQ Global Market® shall be valued at the most recent sales price. Securities and assets for which market quotations are not readily available (including restricted securities which are subject to limitations as to their sale) are valued at fair value as determined in good faith under procedures approved by or under the direction of the Board.

Short-term debt obligations with remaining maturities in excess of 60 days are valued at current market prices, as discussed above.

The Fund's securities, including ADRs, EDRs and GDRs, which are traded on securities exchanges are valued at the last sale price on the exchange on which such securities are traded, as of the close of business on the day the securities are being valued or, lacking any reported sales, at the mean between the last available bid and asked price. Securities that are traded on more than one exchange are valued on the exchange determined by the Adviser to be the primary market.

*Table of Contents - Statement of Additional Information*

37

In the case of foreign securities, the occurrence of certain events after the close of foreign markets, but prior to the time the Fund's NAV is calculated (such as a significant surge or decline in the U.S. or other markets) often will result in an adjustment to the trading prices of foreign securities when foreign markets open on the following business day. If such events occur, the Fund will value foreign securities at fair value, taking into account such events, in calculating the NAV. In such cases, use of fair valuation can reduce an investor's ability to seek to profit by estimating the Fund's NAV in advance of the time the NAV is calculated. The Adviser anticipates that the Fund's portfolio holdings will be fair valued only if market quotations for those holdings are considered unreliable or are unavailable.

The Subsidiary offers to redeem all or a portion of its shares at the current net asset value per share every regular business day. The value of shares of the Subsidiary will fluctuate with the value of the Subsidiary's portfolio investments. The Subsidiary prices its portfolio investments pursuant to the same pricing and valuation methodologies and procedures used by the Fund, which require, among other things, that the Subsidiary's portfolio investments be marked-to-market (that is, the value on the Subsidiary's books changes) each business day to reflect changes in the market value of the investment.

An option that is written or purchased by the Fund shall be valued using composite pricing via the National Best Bid and Offer quotes. Composite pricing looks at the last trade on the exchange where the option is traded. If there are no trades for an option on a given business day, as of closing, the Fund will value the option at the mean of the highest bid price and lowest ask price across the exchanges where the option is traded. For options where market quotations are not readily available, fair value shall be determined by the Fund's Adviser with oversight by the Trust's Valuation Committee.

All other assets of the Fund are valued in such manner as the Board in good faith deems appropriate to reflect their fair value.

**Redemptions In-Kind**

The Fund has reserved the right to pay the redemption price of its shares in excess of the amounts specified by the rule, either totally or partially, by a distribution in-kind of portfolio securities (instead of cash). The securities so distributed would be valued at the same amount as that assigned to them in calculating the NAV per share for the shares being sold. If a shareholder receives a distribution in-kind, the shareholder could incur brokerage or other charges in converting the securities to cash.

The Fund does not intend to hold any significant percentage of its portfolio in illiquid securities, although the Fund, like virtually all mutual funds, may from time to time hold a small percentage of securities that are illiquid. In the unlikely event the Fund were to elect to make an in-kind redemption, the Fund expects that it would follow the normal protocol of making such distribution by way of a pro rata distribution based on its entire portfolio. If the Fund held illiquid securities, such distribution may contain a pro rata portion of such illiquid securities or the Fund may determine, based on a materiality assessment, not to include illiquid securities in the in-kind redemption. The Fund does not anticipate that it would ever selectively distribute a greater than pro rata portion of any illiquid securities to satisfy a redemption request. If such securities are included in the distribution, shareholders may not be able to liquidate such securities and may be required to hold such securities indefinitely. Shareholders' ability to liquidate such securities distributed in-kind may be restricted by resale limitations or substantial restrictions on transfer imposed by the issuers of the securities or by law. Shareholders may only be able to liquidate such securities distributed in-kind at a substantial discount from their value, and there may be higher brokerage costs associated with any subsequent disposition of these securities by the recipient.

*Table of Contents - Statement of Additional Information*

**DISTRIBUTIONS AND TAX INFORMATION**

**Distributions**

Dividends from net investment income and distributions from net profits from the sale of securities are generally made annually. Also, the Fund typically distributes any undistributed net investment income on or about December 31 of each year. Any net capital gains realized through the period ended October 31 of each year will also be distributed by December 31 of each year.

Each distribution by the Fund is accompanied by a brief explanation of the form and character of the distribution. In January of each year, the Fund will issue to each shareholder a statement of the amount and federal income tax status of all distributions.

**Tax Information**

The following is only a summary of certain additional U.S. federal income tax considerations generally affecting the Fund and its shareholders that is intended to supplement the discussion contained in the Fund's prospectus. No attempt is made to present a detailed explanation of the tax treatment of the Fund or its shareholders, and the discussion here and in the Fund's prospectus is not intended as a substitute for careful tax planning.

The Fund's shares held in a tax-qualified retirement account will generally not be subject to federal taxation on income and capital gains distributions from the Fund until a shareholder begins receiving payments from their retirement account. Because each shareholder's tax situation is different, shareholders should consult their tax advisors with specific reference to their own tax situations, including their state, local, and foreign tax liabilities.

The following general discussion of certain federal income tax consequences is based on the Code and the regulations issued thereunder as in effect on the date of this SAI. New legislation, as well as administrative changes or court decisions, may significantly change the conclusions expressed herein, and may have a retroactive effect with respect to the transactions contemplated herein.

The Tax Cuts and Jobs Act (the "Tax Act") makes significant changes to the U.S. federal income tax rules for taxation of individuals and corporations, generally effective for taxable years beginning after December 31, 2017.   Many of the changes applicable to individuals are temporary and would apply only to taxable years beginning after December 31, 2017 and before January 1, 2026. There are only minor changes with respect to the specific rules only applicable to a regulated investment company, such as the Fund. The Tax Act, however, makes numerous other changes to the tax rules that may affect shareholders and the Fund.  You are urged to consult with your own tax advisor regarding how the Tax Act affects your investment in the Fund.

**Qualification as a Regulated Investment Company ("RIC").** The Fund has elected, and intends to qualify each year, to be treated as a RIC under the Code. To qualify as a RIC, the Fund must, among other things: (a) derive at least 90% of its gross income in each taxable year from dividends, interest, payments with respect to certain securities loans, and gains from the sale or other disposition of stock or securities or foreign currencies, or other income (including, but not limited to, gains from options, futures or forward contracts) derived with respect to its business of investing in such stock, securities or currencies, and net income derived from interests in "qualified publicly traded partnerships" (*i.e.*, partnerships that are traded on an established securities market or tradable on a secondary market, other than partnerships that derive 90% of their income from interest, dividends, capital gains, and other traditionally permitted mutual fund income) (the "Qualifying Income Test"); and (b) diversify its holdings so that, at the end of each quarter of the Fund's taxable year, (i) at least 50% of the market value of the Fund's assets is represented by cash, securities of other regulated investment companies, U.S. government securities and other securities, with such other securities limited, in respect of any one issuer, to an amount not greater than 5% of the Fund's assets and not greater than 10% of the outstanding voting securities of such issuer and (ii) not more than 25% of the value of its assets is invested, including through corporations in which the Fund owns a 20% or more voting stock interest, in the securities (other than U.S. government securities or securities of other regulated investment companies) of any one issuer, in the securities (other than the securities of other regulated investment companies) of any two or more issuers that the Fund controls and that are determined to be engaged in the same or similar trades or businesses or related trades or businesses, or in the securities of one or more "qualified publicly traded partnerships (the "Asset Test").

*Table of Contents - Statement of Additional Information*

Generally, income from commodities is not permissible income for purposes of the 90% income test described in the preceding paragraph. Thus, the Fund's ability to invest in commodity-related investments (as well as other non-security based investments), and the means through which any such investments may be made, will be limited by tax considerations. The Fund intends to gain exposure to commodities and other non-security based investments by investing in the Subsidiary, which will be treated as a corporation for U.S. federal income tax purposes.  While the Fund believes that income from the Subsidiary will be qualifying income, the Fund has neither requested nor received an opinion of counsel confirming that the Subsidiary's operations and resulting distributions would produce qualifying income for the Fund.  In September 2016, the Internal Revenue Service ("IRS") issued proposed regulations that would effectively require the Fund's Subsidiary to distribute out of its earnings and profits amounts that are attributable to its "Subpart F" income (defined in Section 951 of the Code to include passive income such as income from commodity-linked derivatives) each year in order for a RIC to treat that income as qualifying income under the Qualifying Income Test. The Fund believes that income attributable to its investment in the Subsidiary will be qualifying income because it expects that the Subsidiary will make annual distributions of its earnings and profits in accordance with the proposed regulations. The Fund intends to conduct investments in the Subsidiary in a manner consistent with the applicable Code and regulations, and will monitor investments in the Subsidiary to ensure that no more than 25% of the Fund's assets are invested in the Subsidiary in accordance with the Asset Test.

As a RIC, the Fund will not be subject to U.S. federal income tax on the portion of its taxable investment income and capital gains that it timely distributes to its shareholders, provided that it satisfies a minimum distribution requirement. To satisfy the minimum distribution requirement, the Fund must distribute to its shareholders at least the sum of (i) 90% of its "investment company taxable income" (*i.e.*, generally, its taxable income other than its net capital gain, computed without regard to the dividends-paid deduction, plus or minus certain other adjustments), and (ii) 90% of its net tax-exempt income for the taxable year. The Fund will be subject to income tax at regular corporate tax rates on any taxable income or gains that it does not distribute to its shareholders. The Fund's policy is to distribute to its shareholders all of its investment company taxable income (computed without regard to the dividends-paid deduction) and any net realized long term capital gains for each fiscal year in a manner that complies with the distribution requirements of the Code, so that the Fund will not be subject to any federal income or excise taxes. However, the Fund can give no assurances that distributions will be sufficient to eliminate all taxes.

If, for any taxable year, the Fund were to fail to qualify as a RIC under the Code or were to fail to meet the distribution requirement, it would be taxed in the same manner as an ordinary corporation at the corporate tax rate (which the Tax Act reduced to 21%) and distributions to its shareholders would not be deductible by the Fund in computing its taxable income. In addition, in the event of a failure to qualify, the Fund's distributions, to the extent derived from the Fund's current and accumulated earnings and profits, including any distributions of net long-term capital gains, would be taxable to shareholders as ordinary dividend income for federal income tax purposes. However, such dividends would be eligible, subject to any generally applicable limitations, (i) to be treated as qualified dividend income in the case of shareholders taxed as individuals and (ii) for the dividends-received deduction in the case of corporate shareholders. Moreover, if the Fund were to fail to qualify as a RIC in any year, it would be required to pay out its earnings and profits accumulated in that year in order to qualify again as a RIC. Under certain circumstances, the Fund may cure a failure to qualify as a RIC, but in order to do so the Fund may incur significant Fund-level taxes and may be forced to dispose of certain assets. If the Fund failed to qualify as a RIC for a period greater than two taxable years, the Fund would generally be required to recognize, and would generally be subject to a corporate-level tax with respect to, any net built-in gains with respect to certain of its assets upon a disposition of such assets within five years of qualifying as a RIC in a subsequent year.

*Table of Contents - Statement of Additional Information*

40

**Federal Excise Tax.** The Fund will be subject to a nondeductible 4% federal excise tax to the extent it fails to distribute by the end of the calendar year at least 98% of its ordinary income and 98.2% of its capital gain net income (the excess of short- and long-term capital gains over short- and long-term capital losses) for the one-year period ending on October 31 of such year (including any retained amount from the prior calendar year on which the Fund paid no federal income tax.

The Fund may elect to treat part or all of any "qualified late year loss" as if it had been incurred in the succeeding taxable year in determining the Fund's taxable income, net capital gain, net short-term capital gain, and earnings and profits.  The effect of this election is to treat any such "qualified late year loss" as if it had been incurred in the succeeding taxable year in characterizing Fund distributions for any calendar year.  A "qualified late year loss" generally includes net capital loss, net long-term capital loss, or net short-term capital loss incurred after October 31 of the current taxable year (commonly referred to as "post-October losses") and certain other late-year losses.

If the Fund has a "net capital loss" (that is, capital losses in excess of capital gains) for a taxable year, the excess of the Fund's net short-term capital losses over its net long-term capital gains is treated as a short-term capital loss arising on the first day of the Fund's next taxable year, and the excess (if any) of the Fund's net long-term capital losses over its net short-term capital gains is treated as a long-term capital loss arising on the first day of the Fund's next taxable year. Those net capital losses can be carried forward indefinitely to offset capital gains, if any, in years following the year of the loss

**Distributions to Shareholders.** The Fund receives income generally in the form of dividends and interest on investments.  This income, plus net short-term capital gains, if any, less expenses incurred in the operation of the Fund, constitutes the Fund's net investment income from which dividends may be paid to you. Net realized capital gains for a fiscal period are computed by taking into account any capital loss carryforward of the Fund. Taxable dividends and distributions are subject to tax whether you receive them in cash or in additional shares.

Distributions of net investment income, including distributions of net short-term capital gains, may be taxable to shareholders as ordinary income or, for non-corporate shareholders, as qualified dividend income. Distributions from the Fund's net capital gain (*i.e.*, the excess of the Fund's net long-term capital gains over its net short-term capital losses) are taxable to shareholders as long-term capital gains regardless of the length of time Fund shares have been held.

In general, to the extent that the Fund receives qualified dividend income, the Fund may report a portion of the dividends it pays as qualified dividend income, which for non-corporate shareholders is subject to U.S. federal income tax rates of up to 20%. Qualified dividend income is, in general, dividend income from taxable domestic corporations and certain foreign corporations (*i.e.*, foreign corporations incorporated in a possession of the United States or in certain countries with a comprehensive tax treaty with the United States, and foreign corporations if the stock with respect to which the dividend was paid is readily tradable on an established securities market in the United States). A dividend will not be treated as qualified dividend income to the extent that (i) the shareholder has not held the shares on which the dividend was paid for more than 60 days during the 121-day period that begins on the date that is 60 days before the date on which the shares become "ex-dividend" with respect to such dividend, (ii) the shareholder is under an obligation (whether pursuant to a short sale or otherwise) to make related payments with respect to substantially similar or related property, or (iii) the shareholder elects to treat such dividend as investment income under section 163(d)(4)(B) of the Code. The holding period requirements described in this paragraph apply to shareholders' investments in the Fund and to the Fund's investments in underlying dividend-paying stocks. Distributions received by the Fund from another RIC will be treated as qualified dividend income only to the extent so reported by such other RIC. If 95% or more of the Fund's gross income (calculated without taking into account net capital gain derived from sales or other dispositions of stock or securities) consists of qualified dividend income, the Fund may report all distributions of such income as qualified dividend income.

*Table of Contents - Statement of Additional Information*

Dividends paid by the Fund that are attributable to dividends received by the Fund from domestic corporations may qualify for the dividends-received deduction for corporate shareholders of the Fund.

To the extent that the Fund makes a distribution of income received by the Fund in lieu of dividends (a "substitute payment") with respect to securities on loan pursuant to a securities lending transaction, such income will not constitute qualified dividend income to individual shareholders and will not be eligible for the dividends received deduction for corporate shareholders.

If the Fund's distributions exceed its earnings and profits, all or a portion of the distributions may be treated as a return of capital to shareholders. A return of capital distribution generally will not be taxable but will reduce each shareholder's tax basis, resulting in a higher capital gain or lower capital loss when the shares on which the distribution was received are sold. After a shareholder's tax basis in the shares has been reduced to zero, distributions in excess of earnings and profits will be treated as gain from the sale of the shareholder's shares.

Each shareholder who receives taxable distributions in the form of additional shares will be treated for U.S. federal income tax purposes as if receiving a distribution in an amount equal to the amount of money that the shareholder would have received if he or she had instead elected to receive cash distributions. The shareholder's aggregate tax basis in shares of the Fund will be increased by such amount.

A dividend or distribution received shortly after the purchase of shares reduces the net asset value of the shares by the amount of the dividend or distribution and, although in effect a return of capital, will be taxable to the shareholder. If the net asset value of shares were reduced below the shareholder's cost by dividends or distributions representing gains realized on sales of securities, such dividends or distributions would be a return of investment though taxable to the shareholder in the same manner as other dividends or distributions.

A dividend or other distribution by the Fund is generally treated under the Code as received by the shareholders at the time the dividend or distribution is made. However, distributions declared in October, November or December to shareholders of record on a date in such a month and paid the following January are taxable as if received on December 31. Distributions are includable in alternative minimum taxable income for non-corporate shareholders in computing such shareholder's liability for the alternative minimum tax. Shareholders should note that the Fund may make taxable distributions of income and capital gains even when share values have declined.

There is no requirement that the Fund take into consideration any tax implications when implementing its investment strategy. The Fund (or its administrative agent) will inform you of the amount of your ordinary income dividends, qualified dividend income and capital gain distributions, if any, and will advise you of their tax status for federal income tax purposes shortly after the close of each calendar year. If you have not held your shares for a full year, the Fund may designate and distribute to you, as ordinary income, qualified dividend income or capital gain, a percentage of income that is not equal to the actual amount of such income earned during the period of your investment in the Fund.

**Sales or Redemptions.** Any gain or loss recognized on a sale, or redemption of shares of the Fund by a shareholder who is not a dealer in securities will generally, for individual shareholders, be treated as a long-term capital gain or loss if the shares have been held for more than twelve months and otherwise will be treated as a short-term capital gain or loss. However, if shares on which a shareholder has received a net capital gain distribution are subsequently sold, exchanged, or redeemed and such shares have been held for six months or less, any loss recognized will be treated as a long-term capital loss to the extent of the net capital gain distribution. In addition, any loss realized upon a sale or other disposition of shares may be disallowed under the wash sales rule to the extent shares of the Fund are purchased (through reinvestment of distributions or otherwise) within 30 days before or after the redemption.

*Table of Contents - Statement of Additional Information*

42

A 3.8% Medicare contribution tax generally applies to all or a portion of the net investment income of a shareholder who is an individual and not a nonresident alien for federal income tax purposes and who has adjusted gross income (subject to certain adjustments) that exceeds a threshold amount ($250,000 if married filing jointly or if considered a "surviving spouse" for federal income tax purposes, $125,000 if married filing separately, and $200,000 in other cases). This 3.8% tax also applies to all or a portion of the undistributed net investment income of certain shareholders that are estates and trusts. For these purposes, dividends, interest and certain capital gains (among other categories of income) are generally taken into account in computing a shareholder's net investment income.

Under the Code, the Fund will be required to report to the IRS all distributions of taxable income and capital gains as well as gross proceeds from the redemption of Fund shares, except in the case of exempt shareholders, which includes most corporations. The Fund will also be required to report tax basis information for such shares and indicate whether these shares had a short-term or long-term holding period. If a shareholder has a different basis for different shares of the Fund in the same account (e.g., if a shareholder purchased shares in the same account at different times for different prices), the Fund calculates the basis of the shares sold using its default method unless the shareholder has properly elected to use a different method. The Fund's default method for calculating basis is first-in, first-out ("FIFO"). A shareholder may elect, on an account-by-account basis, to use a method other than FIFO by following procedures established by the Fund or its administrative agent. If such an election is made on or prior to the date of the first redemption of shares in the account and on or prior to the date that is one year after the shareholder receives notice of the Fund's default method, the new election will generally apply as if the FIFO method had never been in effect for such account. Shareholders should consult their tax advisers concerning the tax consequences of applying the Fund's default method or electing another method of basis calculation. Shareholders also should carefully review any cost basis information provided to them and make any additional basis, holding period or other adjustments that are required when reporting these amounts on their federal income tax returns.

**Tax Treatment of Complex Securities**. The Fund may invest in complex securities and these investments may be subject to numerous special and complex tax rules. These rules could affect the Fund's ability to qualify as a RIC, affect whether gains and losses recognized by the Fund are treated as ordinary income or capital gain, accelerate the recognition of income to the Fund and/or defer the Fund's ability to recognize losses, and, in limited cases, subject the Fund to U.S. federal income tax on income from certain of its foreign securities. In turn, these rules may affect the amount, timing or character of the income distributed to you by the Fund.

Certain derivative investment by the Fund, such as exchange-traded products and over-the-counter derivatives, may not produce qualifying income for purposes of the "Qualifying Income Test" described above, which must be met in order for the Fund to maintain its status as a RIC under the Code.  In addition, the determination of the value and the identity of the issuer of such derivative investments are often unclear for purposes of the "Asset Test" described above. The Fund intends to carefully monitor such investments to ensure that any non-qualifying income does not exceed permissible limits and to ensure that it is adequately diversified under the Asset Test. The Fund, however, may not be able to accurately predict the non-qualifying income from these investments and there are no assurances that the IRS will agree with the Fund's determination of the "Asset Test" with respect to such derivatives.

The Fund is required for federal income tax purposes to mark-to-market and recognize as income for each taxable year its net unrealized gains and losses on certain futures contracts as of the end of the year as well as those actually realized during the year. Gain or loss from futures and options contracts on broad-based indexes required to be marked to market will be 60% long-term and 40% short-term capital gain or loss. Application of this rule may alter the timing and character of distributions to shareholders. The Fund may be required to defer the recognition of losses on futures contracts, options contracts and swaps to the extent of any unrecognized gains on offsetting positions held by the Fund. These provisions may also require the Fund to mark-to-market certain types of positions in its portfolio (i.e., treat them as if they were closed out), which may cause the Fund to recognize income without receiving cash with which to make distributions in amounts necessary to satisfy the Distribution Requirement and for avoiding the excise tax discussed above. Accordingly, in order to avoid certain income and excise taxes, the Fund may be required to liquidate its investments at a time when the investment adviser might not otherwise have chosen to do so.

With respect to investments in STRIPS, Treasury Receipts, and other zero coupon securities which are sold at original issue discount and thus do not make periodic cash interest payments, the Fund will be required to include as part of its current income the imputed interest on such obligations even though the Fund has not received any interest payments on such obligations during that period. Because the Fund intends to distribute all of its net investment income to its shareholders, the Fund may have to sell Fund securities to distribute such imputed income which may occur at a time when the Adviser would not have chosen to sell such securities and which may result in taxable gain or loss.

Any market discount recognized on a bond is taxable as ordinary income. A market discount bond is a bond acquired in the secondary market at a price below redemption value or adjusted issue price if issued with original issue discount. Absent an election by the Fund to include the market discount in income as it accrues, gain on the Fund's disposition of such an obligation will be treated as ordinary income rather than capital gain to the extent of the accrued market discount.

The Fund may invest in, or hold, debt obligations that are in the lowest rating categories or that are unrated, including debt obligations of issuers not currently paying interest or that are in default. Investments in debt obligations that are at risk of or are in default present special tax issues for the Fund. Federal income tax rules are not entirely clear about issues such as when the Fund may cease to accrue interest, original issue discount or market discount, when and to what extent deductions may be taken for bad debts or worthless securities, how payments received on obligations in default should be allocated between principal and interest and whether certain exchanges of debt obligations in a workout context are taxable. These and other issues will be addressed by the Fund, in the event it invests in or holds such securities, in order to seek to ensure that it distributes sufficient income to preserve its status as a RIC and does not become subject to U.S. federal income or excise tax.

The Fund's transactions in foreign currencies and forward foreign currency contracts will generally be subject to special provisions of the Code that, among other things, may affect the character of gains and losses realized by the Fund (i.e., may affect whether gains or losses are ordinary or capital), accelerate recognition of income to the Fund and defer losses. These rules could therefore affect the character, amount and timing of distributions to shareholders. These provisions also may require the Fund to mark-to-market certain types of positions in its portfolio (i.e., treat them as if they were closed out) which may cause the Fund to recognize income without receiving cash with which to make distributions in amounts necessary to satisfy the Distribution Requirements and for avoiding the excise tax described above. The Fund intends to monitor its transactions, intends to make the appropriate tax elections, and intends to make the appropriate entries in its books and records when it acquires any foreign currency or forward foreign currency contract in order to mitigate the effect of these rules so as to prevent disqualification of the Fund as a RIC and minimize the imposition of income and excise taxes.

The U.S. Treasury Department has authority to issue regulations that would exclude foreign currency gains from the Qualifying Income Test described above if such gains are not directly related to the Fund's business of investing in stock or securities (or options and futures with respect to stock or securities). Accordingly, regulations may be issued in the future that could treat some or all of the Fund's non-U.S. currency gains as non-qualifying income, thereby potentially jeopardizing the Fund's status as a RIC for all years to which the regulations are applicable.

The treatment of foreign currencies and foreign currency derivative positions under the Asset Test is uncertain.  The Advisor will carefully monitor the Fund's investments to ensure compliance with the Asset Test's requirements.  In order to meet those requirements, the Fund may be forced to sell certain foreign currency positions at a time when the Advisor would not otherwise have chosen to sell such investments

*Table of Contents - Statement of Additional Information*

44

**Tax Shelter Reporting Regulations.** Under Treasury regulations, if a shareholder recognizes a loss with respect to the Fund's shares of $2 million or more for an individual shareholder, or $10 million or more for a corporate shareholder, in any single year (or certain greater amounts over a combination of years), the shareholder must file with the IRS a disclosure statement on IRS Form 8886. Direct shareholders of portfolio securities are in many cases excepted from this reporting requirement, but under current guidance, shareholders of a RIC are not excepted. A shareholder who fails to make the required disclosure to the IRS may be subject to adverse tax consequences, including substantial penalties. The fact that a loss is reportable under these regulations does not affect the legal determination of whether the taxpayer's treatment of the loss is proper. Shareholders should consult their tax advisors to determine the applicability of these regulations in light of their individual circumstances.

**Backup Withholding.** Pursuant to the backup withholding provisions of the Code, distributions of any taxable income and capital gains and proceeds from the redemption of Fund shares may be subject to withholding of federal income tax at the rate of 24% in the case of non-exempt shareholders who: (i) has provided the Fund either an incorrect tax identification number or no number at all; (ii) is subject to backup withholding by the IRS for failure to properly report payments of interest or dividends; (iii) has failed to certify to the Fund that such shareholder is not subject to backup withholding; or (iv) has failed to certify to the Fund that the shareholder is a U.S. person (including a resident alien). If the withholding provisions are applicable, any such distributions and proceeds, whether taken in cash or reinvested in additional shares, will be reduced by the amounts required to be withheld. Corporate and other exempt shareholders should provide the Fund with their taxpayer identification numbers or certify their exempt status in order to avoid possible erroneous application of backup withholding. Backup withholding is not an additional tax and any amounts withheld may be credited against a shareholder's ultimate federal income tax liability if proper documentation is provided. The Fund reserves the right to refuse to open an account for any person failing to provide a certified taxpayer identification number.

The foregoing discussion of U.S. federal income tax law relates solely to the application of that law to U.S. citizens or residents and U.S. domestic corporations, partnerships, trusts and estates.

**Non-U.S. Investors.** Any non-U.S. investors in the Fund may be subject to U.S. withholding and estate tax and are encouraged to consult their tax advisors prior to investing in the Fund. Foreign shareholders (*i.e.*, nonresident alien individuals and foreign corporations, partnerships, trusts and estates) are generally subject to U.S. withholding tax at the rate of 30% (or a lower tax treaty rate) on distributions derived from taxable ordinary income. The Fund may, under certain circumstances, report all or a portion of a dividend as an "interest-related dividend" or a "short-term capital gain dividend," which would generally be exempt from this 30% U.S. withholding tax, provided certain other requirements are met. Short-term capital gain dividends received by a nonresident alien individual who is present in the U.S. for a period or periods aggregating 183 days or more during the taxable year are not exempt from this 30% withholding tax. Gains realized by foreign shareholders from the sale or other disposition of shares of a Fund generally are not subject to U.S. taxation, unless the recipient is an individual who is physically present in the U.S. for 183 days or more per year. Foreign shareholders who fail to provide an applicable IRS form may be subject to backup withholding on certain payments from the Fund. Backup withholding will not be applied to payments that are subject to the 30% (or lower applicable treaty rate) withholding tax described in this paragraph. Different tax consequences may result if the foreign shareholder is engaged in a trade or business within the United States. In addition, the tax consequences to a foreign shareholder entitled to claim the benefits of a tax treaty may be different than those described above.

Under legislation generally known as "FATCA" (the Foreign Account Tax Compliance Act), the Fund is required to withhold 30% of certain ordinary dividends they pay, and, after December 31, 2018, 30% of the gross proceeds of share redemptions and certain Capital Gain Dividends they pay, to shareholders that fail to meet prescribed information reporting or certification requirements. In general, no such withholding will be required with respect to a U.S. person or non-U.S. individual that timely provides the certifications required by the Fund or its agent on a valid IRS Form W-9 or applicable IRS Form W-8, respectively. Shareholders potentially subject to withholding include foreign financial institutions ("FFIs"), such as non-U.S. investment funds, and non-financial foreign entities ("NFFEs"). To avoid withholding under FATCA, an FFI generally must enter into an information sharing agreement with the IRS in which it agrees to report certain identifying information (including name, address, and taxpayer identification number) with respect to its U.S. account holders (which, in the case of an entity shareholder, may include its direct and indirect U.S. owners), and an NFFE generally must identify and provide other required information to the fund or other withholding agent regarding its U.S. owners, if any. Such non-U.S. shareholders also may fall into certain exempt, excepted or deemed compliant categories as established by regulations and other guidance. A non-U.S. shareholder resident or doing business in a country that has entered into an intergovernmental agreement with the U.S. to implement FATCA will be exempt from FATCA withholding provided that the shareholder and the applicable foreign government comply with the terms of the agreement.

A non-U.S. entity that invests in the Fund will need to provide the Fund with documentation properly certifying the entity's status under FATCA in order to avoid FATCA withholding.  Non-U.S. investors in the Fund should consult their tax advisors in this regard.

**Foreign Taxes.** Dividends and interest received by the Fund may be subject to income, withholding or other taxes imposed by foreign countries and U.S. possessions that would reduce the yield on the Fund's stock or securities.  Tax conventions between certain countries and the U.S. may reduce or eliminate such taxes in some cases. Foreign countries generally do not impose taxes on capital gains with respect to investments by foreign investors.

The Fund intends to invest up to 25% of its assets in the Subsidiary, which is expected to provide the Fund with exposure to the commodities markets while allowing it to meet the requirements applicable to regulated investment companies under the Code. The Subsidiary is classified as a corporation for U.S. federal income tax purposes. A foreign corporation, such as the Subsidiary, will generally not be subject to U.S. federal income taxation unless it is deemed to be engaged in a U.S. trade or business. It is expected that the Subsidiary will conduct its activities in a manner so as to meet the requirements of a safe harbor under the Code pursuant to which a foreign corporation may, for its own account, engage in trading in stocks, securities and certain commodities without being deemed to be engaged in a U.S. trade or business. Thus, it is not expected that the Subsidiary's securities and commodities trading activities will constitute a U.S. trade or business. However, if certain of the Subsidiary's activities were determined not to be of the type described in that safe harbor or if the Subsidiary earns income attributable to investments in securities that constitute "United States real property interests" (which is not expected), then the activities of the Subsidiary may, in whole or in part, constitute a U.S. trade or business, or be taxed as such.

A foreign corporation, such as the Subsidiary, is generally not subject to U.S. federal income taxation on a net income basis unless it is deemed to be engaged in a U.S. trade or business. A foreign corporation generally will not be treated as engaged in a U.S. trade or business if it only trades in stocks, securities and certain commodities through a resident broker, commission agent, custodian or other independent agent. The Fund expects that the Subsidiary will fall within this exception and therefore will not be subject to tax on a net income basis in the U.S. If, however, the Subsidiary were to engage in activities outside of the exception, then the Subsidiary might be subject to tax on its net income that is effectively connected with the conduct of a trade or business in the U.S.

In general, a foreign corporation that is not deemed to be engaged in a U.S. trade or business is nonetheless subject to tax at a flat rate of 30 percent (or lower tax treaty rate), generally payable through withholding, on the gross amount of certain U.S.-source income that is not effectively connected with a U.S. trade or business. There is presently no tax treaty in force between the U.S. and the Cayman Islands that would reduce this rate of withholding tax. Income subject to this flat tax includes U.S.-source dividends and certain interest income, subject to certain exceptions.

The Subsidiary will be treated as a "controlled foreign corporation" under the Code, and the Fund will be treated as a "United States shareholder" of the Subsidiary. As a result, the Fund will be required to include in its gross income for U.S. federal income tax purposes all of the Subsidiary's "subpart F income," whether or not such income is distributed by the Subsidiary. It is expected that all of the Subsidiary's income will be subpart F income. In order to satisfy the Fund's distribution requirements with respect to this subpart F income and avoid a Fund-level tax while also maintaining the same level of investment in the Subsidiary, the Fund may be required to liquidate portfolio securities that it might otherwise have continued to hold (potentially resulting in the recognition of taxable gain or loss, and potentially under disadvantageous circumstances), or the Fund may be required to borrow cash. The Fund's inclusion of the Subsidiary's "subpart F income" will increase the Fund's tax basis in the Subsidiary. Distributions by the Subsidiary to the Fund will not be subject to tax, to the extent they consist of subpart F income that has already been taken into account by the Subsidiary. Subpart F income will generally be treated as ordinary income when included in the Fund's income, regardless of the character of the Subsidiary's underlying income.

If the Fund owns shares in certain foreign investment entities, referred to as "passive foreign investment companies" or "PFICs," the Fund will generally be subject to one of the following special tax regimes: (i) the Fund may be liable for U.S. federal income tax, and an additional interest charge, on a portion of any "excess distribution" from such foreign entity or any gain from the disposition of such shares, even if the entire distribution or gain is paid out by the Fund as a dividend to its shareholders; (ii) if the Fund were able and elected to treat a PFIC as a "qualified electing fund" or "QEF," the Fund would be required each year to include in income, and distribute to shareholders in accordance with the distribution requirements set forth above, the Fund's pro rata share of the ordinary earnings and net capital gains of the PFIC, whether or not such earnings or gains are distributed to the Fund; or (iii) the Fund may be entitled to mark-to-market annually shares of the PFIC, and in such event would be required to distribute to shareholders any such mark-to-market gains in accordance with the distribution requirements set forth above.  The Fund intends to make the appropriate tax elections, if possible, and take any additional steps that are necessary to mitigate the effect of these rules.

**Tax-Exempt Shareholders.** Certain tax-exempt shareholders, including qualified pension plans, individual retirement accounts, salary deferral arrangements, 401(k)s, and other tax-exempt entities, generally are exempt from federal income taxation except with respect to their unrelated business taxable income ("UBTI"). Under the Tax Act, tax-exempt entities are not permitted to offset losses from one trade or business against the income or gain of another trade or business.  Certain net losses incurred prior to January 1, 2018 are permitted to offset gain and income created by an unrelated trade or business, if otherwise available. Under current law, the Fund generally serves to block UBTI from being realized by its tax-exempt shareholders. However, notwithstanding the foregoing, a tax-exempt shareholder could realize UBTI by virtue of an investment in the Fund where, for example: (i) the Fund invests in residual interests of Real Estate Mortgage Investment Conduits ("REMICs"), (ii) the Fund invests in a REIT that is a taxable mortgage pool ("TMP") or that has a subsidiary that is a TMP or that invests in the residual interest of a REMIC, or (iii) shares in the Fund constitute debt-financed property in the hands of the tax-exempt shareholder within the meaning of section 514(b) of the Code. Charitable remainder trusts are subject to special rules and should consult their tax advisor. The IRS has issued guidance with respect to these issues and prospective shareholders, especially charitable remainder trusts, are strongly encouraged to consult their tax advisors regarding these issues.

This discussion and the related discussion in the Prospectus have been prepared by Fund management. The information above is only a summary of some of the tax considerations generally affecting the Fund and its shareholders. No attempt has been made to discuss individual tax consequences and this discussion should not be construed as applicable to all shareholders' tax situations. Investors should consult their own tax advisors to determine the suitability of the Fund and the applicability of any state, local or foreign taxation.

**DISTRIBUTION AGREEMENT**

The Trust has entered into a Distribution Agreement (the "Distribution Agreement") with Quasar Distributors, LLC, 777 East Wisconsin Avenue, 6th Floor, Milwaukee, Wisconsin 53202, pursuant to which the Distributor acts as the Fund's distributor, provides certain administration services and promotes and arranges for the sale of Fund shares. The offering of the Fund's shares is continuous. The Distributor, Fund Services, and Custodian are all affiliated companies. The Distributor is a registered broker-dealer and member of FINRA.

The Distribution Agreement has an initial term of up to two years and will continue in effect only if such continuance is specifically approved at least annually by the Board or by vote of a majority of the Fund's outstanding voting securities and, in either case, by a majority of the Trustees who are not parties to the Distribution Agreement or "interested persons" (as defined in the 1940 Act) of any such party. The Distribution Agreement is terminable without penalty by the Trust on behalf of the Fund on 60 days' written notice when authorized either by a majority vote of the Fund's shareholders or by vote of a majority of the Board, including a majority of the Trustees who are not "interested persons" (as defined in the 1940 Act) of the Trust, or by the Distributor on 60 days' written notice, and will automatically terminate in the event of its "assignment" (as defined in the 1940 Act).

## RULE 12b-1 DISTRIBUTION AND SERVICE PLAN

The Fund has adopted a Distribution Plan (the "Plan") pursuant to Rule 12b-1 under the 1940 Act under which the Fund's Investor Class shares pay the Distributor an amount which is accrued daily and paid quarterly, at an annual rate of up to 0.25% of the average daily net assets of the Fund's Investor Class shares. Amounts paid under the Plan, by the Fund, are paid to the Distributor to reimburse it for costs of the services it provides and the expenses it bears in the distribution of the Fund's shares, including overhead and telephone expenses; printing and distribution of prospectuses and reports used in connection with the offering of the Fund's shares to prospective investors; and preparation, printing and distribution of sales literature and advertising materials. Such fee is paid to the Distributor each year only to the extent of such costs and expenses of the Distributor under the Plan actually incurred in that year. In addition, payments to the Distributor under the Plan reimburse the Distributor for payments it makes to selected dealers and administrators which have entered into Service Agreements with the Distributor of periodic fees for services provided to shareholders of the Fund. The services provided by selected dealers pursuant to the Plan are primarily designed to promote the sale of shares of the Fund and include the furnishing of office space and equipment, telephone facilities, personnel and assistance to the Fund in servicing such shareholders. The services provided by the administrators pursuant to the Plan are designed to provide support services to the Fund and include establishing and maintaining shareholders' accounts and records, processing purchase and redemption transactions, answering routine client inquiries regarding the Fund and providing other services to the Fund as may be required.

Under the Plan, the Trustees will be furnished quarterly with information detailing the amount of expenses paid under the Plan and the purposes for which payments were made. The Plan may be terminated at any time by vote of a majority of the Trustees of the Trust who are not interested persons. Continuation of the Plan is considered by such Trustees no less frequently than annually. With the exception of the Distributor and the Adviser, in their capacities as the Fund's principal underwriter and distribution coordinator, respectively, no interested person has or had a direct or indirect financial interest in the Plan or any related agreement.

While there is no assurance that the expenditures of the Fund's assets to finance distribution of shares will have the anticipated results, the Board believes there is a reasonable likelihood that one or more of such benefits will result, and because the Board is in a position to monitor the distribution expenses, it is able to determine the benefit of such expenditures in deciding whether to continue the Plan.

Any material amendment to the Plan must be approved by the Board, including a majority of the Independent Trustees, or by a vote of a "majority" (as defined in the 1940 Act) of the outstanding voting securities of the applicable class or classes. The Plan may be terminated, with respect to a class or classes of the Fund, without penalty at any time: (1) by vote of a majority of the Board, including a majority of the Independent Trustees; or (2) by a vote of a "majority" (as defined in the 1940 Act) of the outstanding voting securities of the applicable class or classes.

The following table describes the allocation of Rule 12b-1 fees for Investor Class shares during the period indicated.

Fiscal year ended August 31, 2018

| Advertising | Printing /Mailing | Compensation to Distributor | Compensation to Dealers | Compensation to Sales Personnel | Interest, carrying, other financing | Total |
|---|---|---|---|---|---|---|
| $0 | $0 | $4,038 | $43,571 | $0 | $0 | $47,609 |

**Sub-Accounting Service Fees**

In addition to the fees that the Fund may pay to its Transfer Agent, the Board has authorized the Fund to pay service fees, at the annual rate of up to 0.15% of applicable average net assets or $20 per account, to intermediaries such as banks, broker-dealers, financial advisers or other financial institutions for sub-administration, sub-transfer agency, recordkeeping (collectively, "sub-accounting services") and other shareholder services associated with shareholders whose shares are held of record in omnibus, networked, or other group accounts or accounts traded through registered securities clearing agents. Unless the Fund has adopted a shareholder servicing plan that authorizes a specific services fee, any sub-accounting fee paid by the Fund is included in the total amount of "Other Expenses" listed in the Fund's Fees and Expenses table in the Prospectus.

**MARKETING AND SUPPORT PAYMENTS**

The Adviser, out of its own resources and without additional cost to the Fund or its shareholders, may provide additional cash payments or other compensation to certain financial intermediaries who sell shares of the Fund. Such payments may be divided into categories as follows:

*Support Payments.* Payments may be made by the Adviser to certain financial intermediaries in connection with the eligibility of the Fund to be offered in certain programs and/or in connection with meetings between the Fund's representatives and financial intermediaries and its sales representatives. Such meetings may be held for various purposes, including providing education and training about the Fund and other general financial topics to assist financial intermediaries' sales representatives in making informed recommendations to, and decisions on behalf of, their clients.

*Entertainment, Conferences and Events.* The Adviser also may pay cash or non-cash compensation to sales representatives of financial intermediaries in the form of (i) occasional gifts; (ii) occasional meals, tickets or other entertainments; and/or (iii) sponsorship support for the financial intermediary's client seminars and cooperative advertising. In addition, the Adviser pays for exhibit space or sponsorships at regional or national events of financial intermediaries.

The prospect of receiving, or the receipt of additional payments or other compensation as described above by financial intermediaries may provide such intermediaries and/or their salespersons with an incentive to favor sales of shares of the Fund, and other mutual funds whose affiliates make similar compensation available, over sale of shares of mutual funds (or non-mutual fund investments) not making such payments. You may wish to take such payment arrangements into account when considering and evaluating any recommendations relating to the Fund shares.

**ANTI-MONEY LAUNDERING PROGRAM**

The Trust has established an Anti-Money Laundering Program (the "Program") as required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"). In order to ensure compliance with this law, the Trust's Program provides for the development of internal practices, procedures and controls, designation of anti-money laundering compliance officers, an ongoing training program and an independent audit function to determine the effectiveness of the Program.

Procedures to implement the Program include, but are not limited to, determining that the Fund's Distributor and Transfer Agent have established proper anti-money laundering procedures, reporting suspicious and/or fraudulent activity, checking shareholder names against designated government lists, including Office of Foreign Asset Control ("OFAC"), and a complete and thorough review of all new opening account applications. The Trust will not transact business with any person or legal entity whose identity and beneficial owners, if applicable, cannot be adequately verified under the provisions of the USA PATRIOT Act.

## FINANCIAL STATEMENTS

The Fund's annual report to shareholders for the fiscal year ended August 31, 2018, is a separate document and the financial statements, accompanying notes and report of the independent registered public accounting firm appearing therein are incorporated by reference into this SAI.

*Table of Contents - Statement of Additional Information*

50

Appendix A

## DESCRIPTION OF SECURITIES RATINGS

<u>**Short-Term Credit Ratings**</u>

A ***Standard & Poor's*** short-term issue credit rating is a forward-looking opinion about the creditworthiness of an obligor with respect to a specific financial obligation having an original maturity of no more than 365 days. The following summarizes the rating categories used by Standard & Poor's for short-term issues:

"A-1" – A short-term obligation rated "A-1" is rated in the highest category and indicates that the obligor's capacity to meet its financial commitment on the obligation is strong. Within this category, certain obligations are designated with a plus sign (+). This indicates that the obligor's capacity to meet its financial commitment on these obligations is extremely strong.

"A-2" – A short-term obligation rated "A-2" is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher rating categories. However, the obligor's capacity to meet its financial commitment on the obligation is satisfactory.

"A-3" – A short-term obligation rated "A-3" exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation.

"B" – A short-term obligation rated "B" is regarded as vulnerable and has significant speculative characteristics. The obligor currently has the capacity to meet its financial commitments; however, it faces major ongoing uncertainties which could lead to the obligor's inadequate capacity to meet its financial commitments.

"C" – A short-term obligation rated "C" is currently vulnerable to nonpayment and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation.

"D" – A short-term obligation rated "D" is in default or in breach of an imputed promise. For non-hybrid capital instruments, the "D" rating category is used when payments on an obligation are not made on the date due, unless Standard & Poor's believes that such payments will be made within any stated grace period. However, any stated grace period longer than five business days will be treated as five business days. The "D" rating also will be used upon the filing of a bankruptcy petition or the taking of a similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions. An obligation's rating is lowered to "D" if it is subject to a distressed exchange offer.

Local Currency and Foreign Currency Risks – Standard & Poor's issuer credit ratings make a distinction between foreign currency ratings and local currency ratings. An issuer's foreign currency rating will differ from its local currency rating when the obligor has a different capacity to meet its obligations denominated in its local currency, vs. obligations denominated in a foreign currency.

*Table of Contents - Statement of Additional Information*

***Moody's Investors Service ("Moody's")*** short-term ratings are forward-looking opinions of the relative credit risks of financial obligations with an original maturity of thirteen months or less and reflect the likelihood of a default on contractually promised payments. Ratings may be assigned to issuers, short-term programs or to individual short-term debt instruments.

Moody's employs the following designations to indicate the relative repayment ability of rated issuers:

"P-1" – Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

"P-2" – Issuers (or supporting institutions) rated Prime-2 have a strong ability to repay short-term debt obligations.

"P-3" – Issuers (or supporting institutions) rated Prime-3 have an acceptable ability to repay short-term obligations.

"NP" – Issuers (or supporting institutions) rated Not Prime do not fall within any of the Prime rating categories.

***Fitch, Inc. / Fitch Ratings Ltd. ("Fitch")*** short-term issuer or obligation rating is based in all cases on the short-term vulnerability to default of the rated entity or security stream and relates to the capacity to meet financial obligations in accordance with the documentation governing the relevant obligation. Short-term ratings are assigned to obligations whose initial maturity is viewed as "short-term" based on market convention. Typically, this means up to 13 months for corporate, sovereign and structured obligations, and up to 36 months for obligations in U.S. public finance markets. The following summarizes the rating categories used by Fitch for short-term obligations:

"F1" – Securities possess the highest short-term credit quality. This designation indicates the strongest intrinsic capacity for timely payment of financial commitments; may have an added "+" to denote any exceptionally strong credit feature.

"F2" – Securities possess good short-term credit quality. This designation indicates good intrinsic capacity for timely payment of financial commitments.

"F3" – Securities possess fair short-term credit quality. This designation indicates that the intrinsic capacity for timely payment of financial commitments is adequate.

"B" – Securities possess speculative short-term credit quality. This designation indicates minimal capacity for timely payment of financial commitments, plus heightened vulnerability to near term adverse changes in financial and economic conditions.

"C" – Securities possess high short-term default risk. Default is a real possibility.

"RD" – Restricted default. Indicates an entity that has defaulted on one or more of its financial commitments, although it continues to meet other financial obligations. Typically applicable to entity ratings only.

"D" – Default. Indicates a broad-based default event for an entity, or the default of a short-term obligation.

*Table of Contents - Statement of Additional Information*

A-2

The **DBRS® Ratings Limited ("DBRS")** short-term debt rating scale provides an opinion on the risk that an issuer will not meet its short-term financial obligations in a timely manner. Ratings are based on quantitative and qualitative considerations relevant to the issuer and the relative ranking of claims. The R-1 and R-2 rating categories are further denoted by the sub-categories "(high)", "(middle)", and "(low)".

The following summarizes the ratings used by DBRS for commercial paper and short-term debt:

**"R-1 (high)"** - Short-term debt rated "R-1 (high)" is of the **highest credit quality. The capacity for the payment of short-term financial obligations** as they fall due is exceptionally high. Unlikely to be adversely affected by future events.

**"R-1 (middle)"** – Short-term debt rated "R-1 (middle)" is of superior credit quality. The capacity for the payment of short-term financial obligations as they fall due is very high. Differs from "R-1 (high)" by a relatively modest degree. Unlikely to be significantly vulnerable to future events.

**"R-1 (low)"** – Short-term debt rated "R-1 (low)" is of **good credit quality.** The capacity for the payment of short-term financial obligations as they fall due is substantial. Overall strength is not as favorable as higher rating categories. May be vulnerable to future events, but qualifying negative factors are considered manageable.

**"R-2 (high)" – Short-term debt rated "R-2 (high)" is considered to be at the upper end of adequate credit quality. The capacity for the payment of short-term financial obligations as they fall due is acceptable. May be vulnerable to future events.**

**"R-2 (middle)" – Short-term debt rated "R-2 (middle)" is considered to be of adequate credit quality. The capacity for the payment of short-term financial obligations as they fall due is acceptable. May be vulnerable to future events or may be exposed to other factors that could reduce credit quality.**

**"R-2 (low)" – Short-term debt rated "R-2 (low)" is considered to be at the lower end of adequate credit quality. The capacity for the payment of short-term financial obligations as they fall due is acceptable. May be vulnerable to future events. A number of challenges are present that could affect the issuer's ability to meet such obligations.**

**"R-3"** – Short-term debt rated "R-3" is considered to be at the lowest end of adequate credit quality. There is a capacity for the payment of short-term financial obligations as they fall due. May be vulnerable to future events and the certainty of meeting such obligations could be impacted by a variety of developments.

"R-4" – Short-term debt rated "R-4" is considered to be of speculative credit quality. The capacity for the payment of short-term financial obligations as they fall due is uncertain.

"R-5" – Short-term debt rated "R-5" is considered to be of highly speculative credit quality. There is a high level of uncertainty as to the capacity to meet short-term financial obligations as they fall due.

"D" – Short-term debt rated "D" is assigned when the issuer has filed under any applicable bankruptcy, insolvency or winding up statute or there is a failure to satisfy an obligation after the exhaustion of grace periods, a downgrade to "D" may occur. DBRS may also use "SD" (Selective Default) in cases where only some securities are impacted, such as the case of a "distressed exchange".

**Long-Term Credit Ratings**

The following summarizes the ratings used by ***Standard & Poor's*** for long-term issues:

"AAA" – An obligation rated "AAA" has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong.

"AA" – An obligation rated "AA" differs from the highest-rated obligations only to a small degree. The obligor's capacity to meet its financial commitment on the obligation is very strong.

"A" – An obligation rated "A" is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher-rated categories. However, the obligor's capacity to meet its financial commitment on the obligation is still strong.

"BBB" – An obligation rated "BBB" exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation.

"BB," "B," "CCC," "CC" and "C" – Obligations rated "BB," "B," "CCC," "CC" and "C" are regarded as having significant speculative characteristics. "BB" indicates the least degree of speculation and "C" the highest. While such obligations will likely have some quality and protective characteristics, these may be outweighed by large uncertainties or major exposures to adverse conditions.

"BB" – An obligation rated "BB" is less vulnerable to nonpayment than other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation.

"B" – An obligation rated "B" is more vulnerable to nonpayment than obligations rated "BB", but the obligor currently has the capacity to meet its financial commitment on the obligation. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitment on the obligation.

"CCC" – An obligation rated "CCC" is currently vulnerable to nonpayment, and is dependent upon favorable business, financial and economic conditions for the obligor to meet its financial commitment on the obligation. In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation.

"CC" – An obligation rated "CC" is currently highly vulnerable to nonpayment. The "CC" rating is used when a default has not yet occurred, but Standard & Poor's expects default to be a virtual certainty, regardless of the anticipated time to default.

"C" – An obligation rated "C" is currently highly vulnerable to nonpayment, and the obligation is expected to have lower relative seniority or lower ultimate recovery compared to obligations that are rated higher.

"D" – An obligation rated "D" is in default or in breach of an imputed promise. For non-hybrid capital instruments, the "D" rating category is used when payments on an obligation are not made on the date due, unless Standard & Poor's believes that such payments will be made within five business days in the absence of a stated grace period or within the earlier of the stated grace period or 30 calendar days. The "D" rating also will be used upon the filing of a bankruptcy petition or the taking of similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions. An obligation's rating is lowered to "D" if it is subject to a distressed exchange offer.

*Table of Contents - Statement of Additional Information*

A-4

Plus (+) or minus (-) – The ratings from "AA" to "CCC" may be modified by the addition of a plus (+) or minus (-) sign to show relative standing within the major rating categories.

"NR" – This indicates that no rating has been requested, or that there is insufficient information on which to base a rating, or that Standard & Poor's does not rate a particular obligation as a matter of policy.

Local Currency and Foreign Currency Risks - Standard & Poor's issuer credit ratings make a distinction between foreign currency ratings and local currency ratings. An issuer's foreign currency rating will differ from its local currency rating when the obligor has a different capacity to meet its obligations denominated in its local currency, vs. obligations denominated in a foreign currency.

***Moody's*** long-term ratings are forward-looking opinions of the relative credit risks of financial obligations with an original maturity of one year or more. Such ratings reflect both the likelihood of default on contractually promised payments and the expected financial loss suffered in the event of default. The following summarizes the ratings used by Moody's for long-term debt:

"Aaa" – Obligations rated "Aaa" are judged to be of the highest quality, subject to the lowest level of credit risk.

"Aa" – Obligations rated "Aa" are judged to be of high quality and are subject to very low credit risk.

"A" – Obligations rated "A" are judged to be upper-medium grade and are subject to low credit risk.

"Baa" – Obligations rated "Baa" are judged to be medium-grade and subject to moderate credit risk and as such may possess certain speculative characteristics.

"Ba" – Obligations rated "Ba" are judged to be speculative and are subject to substantial credit risk.

"B" – Obligations rated "B" are considered speculative and are subject to high credit risk.

"Caa" – Obligations rated "Caa" are judged to be speculative of poor standing and are subject to very high credit risk.

"Ca" – Obligations rated "Ca" are highly speculative and are likely in, or very near, default, with some prospect of recovery of principal and interest.

"C" – Obligations rated "C" are the lowest rated and are typically in default, with little prospect for recovery of principal or interest.

Note:  Moody's appends numerical modifiers 1, 2, and 3 to each generic rating classification from "Aa" through "Caa."  The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of that generic rating category.

*Table of Contents - Statement of Additional Information*

A-5

The following summarizes long-term ratings used by *Fitch*:

"AAA" – Securities considered to be of the highest credit quality. "AAA" ratings denote the lowest expectation of credit risk. They are assigned only in cases of exceptionally strong capacity for payment of financial commitments. This capacity is highly unlikely to be adversely affected by foreseeable events.

"AA" – Securities considered to be of very high credit quality. "AA" ratings denote expectations of very low credit risk. They indicate very strong capacity for payment of financial commitments. This capacity is not significantly vulnerable to foreseeable events.

"A" – Securities considered to be of high credit quality. "A" ratings denote expectations of low credit risk. The capacity for payment of financial commitments is considered strong. This capacity may, nevertheless, be more vulnerable to adverse business or economic conditions than is the case for higher ratings.

"BBB" – Securities considered to be of good credit quality. "BBB" ratings indicate that expectations of credit risk are currently low. The capacity for payment of financial commitments is considered adequate but adverse business or economic conditions are more likely to impair this capacity.

"BB" – Securities considered to be speculative. "BB" ratings indicate that there is an elevated vulnerability to credit risk, particularly in the event of adverse changes in business or economic conditions over time; however, business or financial alternatives may be available to allow financial commitments to be met.

"B" – Securities considered to be highly speculative. "B" ratings indicate that material credit risk is present.

"CCC" – A "CCC" rating indicates that substantial credit risk is present.

"CC" – A "CC" rating indicates very high levels of credit risk.

"C" – A "C" rating indicates exceptionally high levels of credit risk.

Defaulted obligations typically are not assigned "RD" or "D" ratings, but are instead rated in the "B" to "C" rating categories, depending upon their recovery prospects and other relevant characteristics. Fitch believes that this approach better aligns obligations that have comparable overall expected loss but varying vulnerability to default and loss.

Plus (+) or minus (-) may be appended to a rating to denote relative status within major rating categories. Such suffixes are not added to the "AAA" obligation rating category, or to corporate finance obligation ratings in the categories below "CCC".

The *DBRS* long-term rating scale provides an opinion on the risk of default. That is, the risk that an issuer will fail to satisfy its financial obligations in accordance with the terms under which an obligation has been issued. Ratings are based on quantitative and qualitative considerations relevant to the issuer, and the relative ranking of claims. All rating categories other than AAA and D also contain subcategories "(high)" and "(low)". The absence of either a "(high)" or "(low)" designation indicates the rating is in the middle of the category. The following summarizes the ratings used by DBRS for long-term debt:

**"AAA" -** Long-term debt rated "AAA" is of the **highest credit quality. The capacity for the payment of financial obligations is exceptionally high and unlikely to be adversely affected by future events.**

**"AA"** – Long-term debt rated "AA" is of **superior credit quality. The capacity for the payment of financial obligations is considered high. Credit quality differs from "AAA" only to a small degree. Unlikely to be significantly vulnerable to future events.**

**"A"** – Long-term debt rated "A" is of good **credit quality.** The capacity for the payment of financial obligations is substantial, but of lesser credit quality than "AA."  May be vulnerable to future events, but qualifying negative factors are considered manageable.

**"BBB"** – Long-term debt rated "BBB" is of **adequate credit quality. The capacity for the payment of financial obligations is considered acceptable. May be vulnerable to future events.**

**"BB"** – Long-term debt rated "BB" is of **speculative, non-investment grade credit quality. The capacity for the payment of financial obligations is uncertain. Vulnerable to future events.**

**"B"** – Long-term debt rated "B" is of **highly speculative credit quality. There is a high level of uncertainty as to the capacity to meet financial obligations.**

**"CCC", "CC" and "C"** – Long-term debt rated in any of these categories is of **very highly speculative credit quality.** In danger of defaulting on financial obligations. There is little difference between these three categories, although "CC" and "C" ratings are normally applied to obligations that are seen as highly likely to default, or subordinated to obligations rated in the "CCC" to "B" range. Obligations in respect of which default has not technically taken place but is considered inevitable may be rated in the "C" category.

**"D"** – A security rated "D" is assigned when the issuer has filed under any applicable bankruptcy, insolvency or winding up statute or there is a failure to satisfy an obligation after the exhaustion of grace periods, a downgrade to "D" may occur. DBRS may also use "SD" (Selective Default) in cases where only some securities are impacted, such as the case of a "distressed exchange".

## Municipal Note Ratings

A ***Standard & Poor's*** U.S. municipal note rating reflects Standard & Poor's opinion about the liquidity factors and market access risks unique to the notes. Notes due in three years or less will likely receive a note rating. Notes with an original maturity of more than three years will most likely receive a long-term debt rating. In determining which type of rating, if any, to assign, Standard & Poor's analysis will review the following considerations:

h       Amortization schedule - the larger the final maturity relative to other maturities, the more likely it will be treated as a note; and

h       Source of payment - the more dependent the issue is on the market for its refinancing, the more likely it will be treated as a note.

Municipal Short-Term Note rating symbols are as follows:

"SP-1" – A municipal note rated "SP-1" exhibits a strong capacity to pay principal and interest. An issue determined to possess a very strong capacity to pay debt service is given a plus (+) designation.

*Table of Contents - Statement of Additional Information*

A-7

"SP-2" – A municipal note rated "SP-2" exhibits a satisfactory capacity to pay principal and interest, with some vulnerability to adverse financial and economic changes over the term of the notes.

"SP-3" – A municipal note rated "SP-3" exhibits a speculative capacity to pay principal and interest.

**Moody's** uses the Municipal Investment Grade ("MIG") scale to rate U.S. municipal bond anticipation notes of up to three years maturity. Municipal notes rated on the MIG scale may be secured by either pledged revenues or proceeds of a take-out financing received prior to note maturity. MIG ratings expire at the maturity of the obligation, and the issuer's long-term rating is only one consideration in assigning the MIG rating. MIG ratings are divided into three levels – "MIG-1" through "MIG-3" while speculative grade short-term obligations are designated "SG". The following summarizes the ratings used by Moody's for short-term municipal obligations:

"MIG-1" – This designation denotes superior credit quality. Excellent protection is afforded by established cash flows, highly reliable liquidity support, or demonstrated broad-based access to the market for refinancing.

"MIG-2" – This designation denotes strong credit quality. Margins of protection are ample, although not as large as in the preceding group.

"MIG-3" – This designation denotes acceptable credit quality. Liquidity and cash-flow protection may be narrow, and market access for refinancing is likely to be less well-established.

"SG" – This designation denotes speculative-grade credit quality. Debt instruments in this category may lack sufficient margins of protection.

"NR" – Is assigned to an unrated obligation.

In the case of variable rate demand obligations ("VRDOs"), a two-component rating is assigned:  a long or short-term debt rating and a demand obligation rating. The first element represents Moody's evaluation of risk associated with scheduled principal and interest payments. The second element represents Moody's evaluation of risk associated with the ability to receive purchase price upon demand ("demand feature"). The second element uses a rating from a variation of the MIG rating scale called the Variable Municipal Investment Grade or "VMIG" scale. The rating transitions on the VMIG scale differ from those on the Prime scale to reflect the risk that external liquidity support generally will terminate if the issuer's long-term rating drops below investment grade.

VMIG rating expirations are a function of each issue's specific structural or credit features.

"VMIG-1" – This designation denotes superior credit quality. Excellent protection is afforded by the superior short-term credit strength of the liquidity provider and structural and legal protections that ensure the timely payment of purchase price upon demand.

"VMIG-2" – This designation denotes strong credit quality. Good protection is afforded by the strong short-term credit strength of the liquidity provider and structural and legal protections that ensure the timely payment of purchase price upon demand.

*Table of Contents - Statement of Additional Information*

A-8

"VMIG-3" – This designation denotes acceptable credit quality. Adequate protection is afforded by the satisfactory short-term credit strength of the liquidity provider and structural and legal protections that ensure the timely payment of purchase price upon demand.

"SG" – This designation denotes speculative-grade credit quality. Demand features rated in this category may be supported by a liquidity provider that does not have an investment grade short-term rating or may lack the structural and/or legal protections necessary to ensure the timely payment of purchase price upon demand.

"NR" – Is assigned to an unrated obligation.

## About Credit Ratings

A **Standard & Poor's** issue credit rating is a forward-looking opinion about the creditworthiness of an obligor with respect to a specific financial obligation, a specific class of financial obligations, or a specific financial program (including ratings on medium-term note programs and commercial paper programs). It takes into consideration the creditworthiness of guarantors, insurers, or other forms of credit enhancement on the obligation and takes into account the currency in which the obligation is denominated. The opinion reflects Standard & Poor's view of the obligor's capacity and willingness to meet its financial commitments as they come due, and may assess terms, such as collateral security and subordination, which could affect ultimate payment in the event of default.

**Moody's** credit ratings must be construed solely as statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities.

**Fitch's** credit ratings provide an opinion on the relative ability of an entity to meet financial commitments, such as interest, preferred dividends, repayment of principal, insurance claims or counterparty obligations. Fitch credit ratings are used by investors as indications of the likelihood of receiving the money owed to them in accordance with the terms on which they invested. Fitch's credit ratings cover the global spectrum of corporate, sovereign (including supranational and sub-national), financial, bank, insurance, municipal and other public finance entities and the securities or other obligations they issue, as well as structured finance securities backed by receivables or other financial assets.

**DBRS** credit ratings are opinions based on the quantitative and qualitative analysis of information sourced and received by DBRS, which information is not audited or verified by DBRS. Ratings are not buy, hold or sell recommendations and they do not address the market price of a security. Ratings may be upgraded, downgraded, placed under review, confirmed and discontinued.

*Table of Contents - Statement of Additional Information*

A-9

Appendix B

**Infinity Q Capital Management LLC**
**Proxy Voting Policy**

<u>**PURPOSE AND GENERAL STATEMENT**</u>

The purpose of these proxy voting policies and procedures is to set forth the principles and procedures by which Infinity Q votes or gives consents with respect to securities held on behalf of the Funds (each, a "<u>Proxy</u>" and collectively, the "<u>Proxies</u>"). These policies and procedures have been designed to help ensure that Proxies are voted in the best interests of the Funds in accordance with Infinity Q's fiduciary duties and Rule 206(4)-6 under the Advisers Act. Infinity Q's authority to vote the Proxies is established by investment management agreements or comparable documents with its Funds.

These proxy voting policies and procedures are available to the Funds upon request, subject to the provision that these policies and procedures are subject to change at any time without notice.

<u>**POLICY**</u>

When voting Proxies, Infinity Q votes in a manner that it believes is consistent with the best interests of the Funds. Infinity Q does not permit Proxy voting decisions to be influenced in any manner that is contrary to, or dilutive of, this guiding principle.

It is the general policy of Infinity Q to vote or give consent on all matters presented to security holders in any Proxy, and these policies and procedures have been designed with that in mind. However, Infinity Q reserves the right to abstain on any particular vote or otherwise withhold its vote or consent on any matter if, in the judgment of the CIO, the costs associated with voting such Proxy outweigh the benefits to the Funds or if the circumstances make such an abstention or withholding otherwise advisable and in the best interests of the Funds. In particular, Infinity Q typically does not submit proxy votes for positions that are smaller than 0.25% of portfolio NAV.

<u>**PROCEDURES**</u>

**Conflicts of Interest**

The CIO has the responsibility to monitor Proxy decisions for any conflicts of interest, regardless of whether they are actual or perceived. All Proxy decisions will require a mandatory conflicts of interest review by the CIO in accordance with these policies and procedures, which will include consideration of whether Infinity Q, any investment professional or other person recommending how to vote or Infinity Q's affiliates and their clients have an interest in how the Proxy is voted that may present a conflict of interest. Upon completion of such review, the CIO shall provide the CCO with information regarding any actual or perceived conflicts. All Infinity Q employees are expected to perform their tasks relating to the voting of Proxies in accordance with the principles set forth above, according the first priority to the best interest of the Funds. If at any time any Infinity Q employee becomes aware of any potential or actual conflict of interest or perceived conflict of interest regarding any particular Proxy voting decision, he or she should contact the CIO. The CIO will use his or her best judgment to address and resolve any such conflict of interest in a manner it believes is consistent with the best interests of the Funds and will consult with the CCO regarding the manner in which such potential, actual or perceived conflict of interest shall be resolved.

*Table of Contents - Statement of Additional Information*

When the CIO deems appropriate in his or her sole discretion, unaffiliated third parties may be used to help resolve conflicts. In this regard, the CIO shall have the power to retain independent fiduciaries, consultants or professionals to assist with Proxy voting decisions and/or to delegate voting or consent powers to such fiduciaries, consultants, or professionals.

**Proxy Voting**

All Infinity Q personnel are responsible for promptly forwarding all proxy materials, consent or voting requests or notices or materials related thereto to the CIO. The CIO shall be responsible for ensuring that each Proxy is voted in a timely manner and as otherwise required by the terms of such Proxy.

Infinity Q votes all Proxies in a manner that it believes is consistent with the best interests of the Funds, and ultimately all votes are cast on a case-by-case basis, taking into consideration the contractual obligations under the relevant advisory agreements or comparable documents, and all other relevant facts and circumstances at the time of the vote.

All Proxy voting decisions initially are referred to the CIO for a voting decision. In most cases, the CIO will make the decision as to the appropriate vote for any particular Proxy. If the position is smaller than 0.25% of portfolio NAV, Infinity Q typically will abstain from voting. In making such decision, he or she may rely on any of the information and/or research available to him or her.

**Proxy Voting Record Disclosure (Form N-PX)**

Rule 30b1-4 under the 1940 Act requires a registered investment company to file an annual report on Form N-PX no later than August 31 of each year that contains the registered investment company's proxy voting record for the most recent twelve-month period ended June 30.

The Fund's Administrator is responsible for preparing and filing the Infinity Q Diversified Alpha Fund's voting record annually on Form N-PX.  Infinity Q provides information related to the Fund's proxy voting record to the Fund's Administrator for preparation of Form N-PX and reviews the draft Form N-PX prior to filing.  The CCO provides final sign off to the Fund's Administrator on Form N-PX.

**Recordkeeping**

Infinity Q maintains records of all Proxies voted in accordance with Section 204-2 of the Advisers Act. As required and permitted by Rule 204-2(c) under the Advisers Act, the following records are maintained by the CFO:

- a copy of these policies and procedures;

- proxy statements or consent requests received regarding Fund securities, unless such proxy statements or consent requests are available on the SEC's EDGAR database, in which case Infinity Q relies on such electronic copies on EDGAR;

- a record of each vote cast or consent given;

- a copy of any document created by Infinity Q that was material to making a decision on how to vote Proxies; and

- each written client request for proxy voting records and Infinity Q's written response to any (written or oral) request for such records.

*Table of Contents - Statement of Additional Information*

B-2

## RESPONSIBILITY

The CIO shall be responsible for administering these procedures and the CCO shall be responsible for ensuring compliance with these procedures

**EFFECTIVE AS OF:**  May 6, 2014

**LAST UPDATED:**  November 2, 2018

Table of Contents - Statement of Additional Information

B-3

**PART C**

**OTHER INFORMATION**

**Item 28.**  <u>**Exhibits**</u>

(a)    (1)    *Certificate of Trust* dated August 28, 2003 was previously filed with the Registration Statement on Form N-1A on August 29, 2003 and is incorporated herein by reference.

(2)    *Certificate of Amendment to Certificate of Trust* dated June 1, 2005 was previously filed with the Registration Statement on Form N-1A on June 24, 2005 and is incorporated herein by reference.

(3)    *Certificate of Amendment to Certificate of Trust* dated December 1, 2011 was previously filed with the Registration Statement on Form N-1A on January 30, 2013 and is incorporated herein by reference.

(4)    *Certificate of Amendment to Certificate of Trust* dated January 31, 2013 was previously filed with the Registration Statement on Form N-1A on November 26, 2014 and is incorporated herein by reference.

(5)    *Certificate of Amendment to Certificate of Trust* dated January 13, 2014 was previously filed with the Registration Statement on Form N-1A on September 29, 2015 and is incorporated herein by reference.

(6)    *Agreement and Declaration of Trust* dated August 26, 2003 was previously filed with the Registration Statement on Form N-1A on August 29, 2003 and is incorporated herein by reference.

(7)    *Amendment to Agreement and Declaration of Trust* dated August 19, 2015 was previously filed with the Registration Statement on Form N-1A on September 29, 2015 and is incorporated herein by reference.

(b)    *Amended and Restated Bylaws* dated August 19, 2015 was previously filed with the Registration Statement on Form N-1A on September 29, 2015 and is incorporated herein by reference.

(c)    *Instruments Defining Rights of Security Holders* are incorporated by reference into the Trust's Agreement and Declaration of Trust and Amended and Restated Bylaws.

(d)    *Investment Advisory Agreement with Infinity Q Capital Management, LLC* dated September 23, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(e)    *Distribution Agreement Infinity Q Capital Management, LLC* dated September 21, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(f)    *Bonus or Profit Sharing Contracts* – not applicable.

(g)    *Custody Agreement* dated January 1, 2014 was previously filed with the Trust's Registration Statement on Form N-1A on January 14, 2014 and is incorporated herein by reference.

(1)  *Amendment to Custody Agreement for Infinity Q Diversified Alpha Fund* dated August 12, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(2)  *Private Investment Company Custodian Agreement* between Infinity Q Commodity Fund Ltd and U.S. Bank National Association dated September 12, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(h)  *Other Material Contracts*

(1)  *Fund Administration Servicing Agreement* dated January 1, 2014 was previously filed with the Trust's Registration Statement on Form N-1A on January 14, 2014 and is incorporated herein by reference.

   (i)  *Amendment to Fund Administration Servicing Agreement for Infinity Q Diversified Alpha Fund* dated August 12, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

   (ii)  *Addendum to Fund Administration Servicing Agreement between the Trust and each series* dated June 20, 2018 was previously filed with the Trust's Registration Statement on Form N-1A on July 31, 2018 and is incorporated herein by reference

(2)  *Fund Accounting Servicing Agreement* dated January 1, 2014 was previously filed with the Trust's Registration Statement on Form N-1A on January 14, 2014 and is incorporated herein by reference.

   (i)  *Amendment to Fund Accounting Servicing Agreement for Infinity Q Diversified Alpha Fund* dated August 12, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(3)  *Transfer Agent Servicing Agreement* dated January 1, 2014 was previously filed with the Trust's Registration Statement on Form N-1A on January 14, 2014 and is incorporated herein by reference.

   (i)  *Amendment to Transfer Agent Servicing Agreement for Infinity Q Diversified Alpha Fund* dated August 12, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(4)  *Shareholder Servicing Plan* – not applicable.

(5)  *Operating Expenses Limitation Agreement for Infinity Q Diversified Alpha Fund* dated September 23, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

   (i)  *Amendment to Operating Expenses Limitation Agreement for Infinity Q Diversified Alpha Fund* was previously filed with the Registration Statement on Form N-1A on December 21, 2016 and is incorporated herein by reference.

(6)  *Infinity Q Subsidiary Fee Waiver Agreement* dated September 23, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(7)     *Investment Management Agreement* between Infinity Q Commodity Fund Ltd and Infinity Q Capital Management, LLC dated September 23, 2014 was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(8)     *Power of Attorney* for John Chrystal, Albert J. DiUlio, S.J., Harry E. Resis and Christopher E. Kashmerick dated November 14, 2018 – filed herewith.

(i)     *Legal Opinion* dated December 29, 2015 was previously filed with the Trust's Registration Statement on Form N-1A on December 29, 2015 and is incorporated herein by reference.

(j)     *Consent of Independent Registered Public Accounting Firm* – filed herewith.

(k)     *Omitted Financial Statements* – not applicable.

(l)     *Form of Subscription Agreement* was previously filed with the Trust's Registration Statement on August 29, 2003 and is incorporated herein by reference.

(m)     *Rule 12b-1 Plan for Infinity Q Diversified Alpha Fund* was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(n)     *Rule 18f-3 Plan for Infinity Q Diversified Alpha Fund* was previously filed with the Registration Statement on Form N-1A on September 23, 2014 and is incorporated herein by reference.

(1)     *Amended Rule 18f-3 Plan for Infinity Q Diversified Alpha Fund* was previously filed with the Trust's Registration Statement on Form N-1A on December 29, 2015 and is incorporated herein by reference.

(o)     *Reserved.*

(p)     (1)     *Code of Ethics for the Registrant* dated February 2014, as amended February 2017, was previously filed with the Trust's Registration Statement on Form N-1A on March 20, 2017 and is incorporated herein by reference.

(2)     *Code of Ethics for Infinity Q Capital Management, LLC* dated February 7, 2017, was previously filed with the Trust's Registration Statement on Form N-1A on February 2, 2018 and is incorporated herein by reference.

(3)     *Code of Ethics for Access Persons of Quasar Distributors, LLC* was previously filed with the Trust's Registration Statement on Form N-1A on March 28, 2014 and is incorporated herein by reference.

---

**Item 29.     Persons Controlled by or under Common Control with Registrant**

As of the date of this Registration Statement, the Registrant, through the Infinity Q Diversified Alpha Fund, owned 100% of the Infinity Q Commodity Fund, Ltd.  The Infinity Q Commodity Fund, Ltd. is an exempted company organized under Cayman Islands law.

**Item 30.     Indemnification**

Reference is made to Article VI in the Registrant's Agreement and Declaration of Trust, which is incorporated by reference herein.

Pursuant to Rule 484 under the Securities Act of 1933, as amended (the "Securities Act"), the Registrant furnishes the following undertaking:  "Insofar as indemnification for liability arising under the Securities Act may be permitted to trustees, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that, in the opinion of the U.S. Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.  In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a trustee, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such trustee, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue."

With respect to the Registrant, the general effect of these provisions is to indemnify any person (Trustee, director, officer, employee or agent, among others) who was or is a party to any proceeding by reason of their actions performed in their official or duly authorized capacity on behalf of the Trust.  With respect to the distributor, the general effect of the relevant provisions is to indemnify those entities for claims arising out of any untrue statement or material fact contained in the Funds' Registration Statement, reports to shareholders or advertising and sales literature.

### Item 31.   Business and Other Connections of Investment Adviser

With respect to the Adviser, the response to this Item is incorporated by reference to the Adviser's Uniform Application for Investment Adviser Registration (Form ADV) on file with the U.S. Securities and Exchange Commission ("SEC") (File No. 801-74578), dated May 2, 2018.  The Adviser's Form ADV may be obtained, free of charge, at the SEC's website at www.adviserinfo.sec.gov.

### Item 32.   Principal Underwriters

(a)         Quasar Distributors, LLC, the Registrant's principal underwriter, acts as principal underwriter for the following investment companies:

| | |
|---|---|
| Advisors Series Trust | LoCorr Investment Trust |
| Aegis Funds | Lord Asset Management Trust |
| Allied Asset Advisors Funds | MainGate Trust |
| Alpha Architect ETF Trust | Managed Portfolio Series |
| Amplify ETF Trust | Manager Directed Portfolios |
| Angel Oak Funds Trust | Matrix Advisors Fund Trust |
| Barrett Opportunity Fund, Inc. | Matrix Advisors Value Fund, Inc. |
| Bridge Builder Trust | Merger Fund |
| Bridges Investment Fund, Inc. | Monetta Trust |
| Brookfield Investment Funds | Nicholas Equity Income Fund, Inc. |
| Brown Advisory Funds | Nicholas Family of Funds, Inc. |
| Buffalo Funds | Permanent Portfolio Family of Funds |
| CG Funds Trust | Perritt Funds, Inc. |
| DoubleLine Funds Trust | PRIMECAP Odyssey Funds |
| ETF Series Solutions | Professionally Managed Portfolios |

| | |
|---|---|
| Evermore Funds Trust | Prospector Funds, Inc. |
| First American Funds, Inc. | Provident Mutual Funds, Inc. |
| FundX Investment Trust | Rainier Investment Management Mutual Funds |
| Glenmede Fund, Inc. | RBB Fund, Inc. |
| Glenmede Portfolios | RBC Funds Trust |
| GoodHaven Funds Trust | Series Portfolio Trust |
| Greenspring Fund, Inc. | Sims Total Return Fund, Inc. |
| Harding Loevner Funds, Inc. | Thompson IM Funds, Inc. |
| Hennessy Funds Trust | TigerShares Trust |
| Horizon Funds | TrimTabs ETF Trust |
| Hotchkis & Wiley Funds | Trust for Professional Managers |
| Intrepid Capital Management Funds Trust | Trust for Advised Portfolios |
| IronBridge Funds, Inc. | USA Mutuals |
| Jacob Funds, Inc. | Wall Street EWM Funds Trust |
| Jensen Quality Growth Fund Inc. | Westchester Capital Funds |
| Kirr Marbach Partners Funds, Inc. | Wisconsin Capital Funds, Inc. |
| LKCM Funds | YCG Funds |

(b)      To the best of Registrant's knowledge, the directors and executive officers of Quasar Distributors, LLC are as follows:

| Name and Principal Business Address | Position and Offices with Quasar Distributors, LLC | Positions and Offices with Registrant |
|---|---|---|
| Teresa Cowan[1] | President, Board Member, Board Chairperson | None |
| Andrew M. Strnad[2] | Vice President, Secretary | None |
| Joseph C. Neuberger[1] | Board Member | None |
| Michael Peck[1] | Board Member | None |
| Susan LaFond[1] | Vice President, Treasurer, Co-Chief Compliance Officer | None |
| Peter A. Hovel[1] | Chief Financial Officer | None |
| Jennifer Brunner[1] | Vice President, Co-Chief Compliance Officer | None |
| Brett Scribner[3] | Assistant Treasurer | None |
| Thomas A. Wolden[3] | Assistant Treasurer | None |

[1]   This individual is located at 777 East Wisconsin Avenue, Milwaukee, Wisconsin, 53202.
[2]   This individual is located at 10 West Market Street, Suite 1150, Indianapolis, Indiana, 46204.
[3]   This individual is located at 800 Nicollet Mall, Minneapolis, Minnesota, 55402.

(c)      Not applicable.

**Item 33.**    <u>**Location of Accounts and Records**</u>

The books and records required to be maintained by Section 31(a) of the Investment Company Act of 1940, as amended (the "1940 Act"), are maintained at the following locations:

| Records Relating to: | Are located at: |
| --- | --- |
| Registrant's Fund Administrator, Fund Accountant and Transfer Agent | U.S. Bancorp Fund Services, LLC 615 East Michigan Street, 3rd Floor Milwaukee, WI  53202 |
| Registrant's Custodian | U.S. Bank National Association Custody Operations 1555 North Rivercenter Drive, Suite 302 Milwaukee, WI 53212 |
| Registrant's Investment Adviser | Infinity Q Capital Management, LLC 888 7th Avenue, Suite 3700 New York, NY 10106 |
| Registrant's Distributor | Quasar Distributors, LLC 777 East Wisconsin Avenue, 6th Floor Milwaukee, WI 53202 |

**Item 34.**    <u>**Management Services**</u>

Not applicable.

**Item 35.**    <u>**Undertakings**</u>

The Registrant undertakes that its subsidiary, Infinity Q Commodity Fund, LTD will submit to inspection by the SEC.

**SIGNATURES**

Pursuant to the requirements of the Securities Act and the 1940 Act, the Registrant certifies that this Post-Effective Amendment No. 147 to its Registration Statement meets all of the requirements for effectiveness under Rule 485(b) and has duly caused this Post-Effective Amendment No. 147 to its Registration Statement on Form N-1A to be signed on its behalf by the undersigned, duly authorized, in the City of Milwaukee and State of Wisconsin, on the 21st day of December, 2018.

Trust for Advised Portfolios

By: /s/ Christopher E. Kashmerick
Christopher E. Kashmerick
President and Principal Executive Officer

Pursuant to the requirements of the Securities Act, this Post-Effective Amendment No. 147 to its Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| John C. Chrystal*<br>John C. Chrystal | Trustee | December 21, 2018 |
| Albert J. DiUlio, S.J.*<br>Albert J. DiUlio, S.J. | Trustee | December 21, 2018 |
| Harry E. Resis*<br>Harry E. Resis | Trustee | December 21, 2018 |
| /s/ Christopher E. Kashmerick<br>Christopher E. Kashmerick | Trustee | December 21, 2018 |
| /s/ Christopher E. Kashmerick<br>Christopher E. Kashmerick | President and Principal Executive Officer | December 21, 2018 |
| /s/ Russell B. Simon<br>Russell B. Simon | Treasurer and Principal Financial Officer | December 21, 2018 |
| *By: /s/ Christopher E. Kashmerick<br>Christopher E. Kashmerick<br>Attorney-In Fact pursuant to<br>Power of Attorney | | December 21, 2018 |

C-7

**SIGNATURES**

Infinity Q Commodity Fund, LTD has duly caused this Registration Statement, with respect only to information that specifically relates to Infinity Q Commodity Fund, Ltd., to be signed on its behalf by the undersigned, duly authorized, in the City of New York and the State of New York, on the 21st day of December, 2018.

INFINITY Q COMMODITY FUND, LTD

By:   /s/ Leonard Potter
      Leonard Potter, Director

      /s/ James Velissaris
      James Velissaris, Director

      /s/ Neil Gray
      Neil Gray, Director

This Registration Statement, with respect only to information that specifically relates to Infinity Q Commodity Fund, LTD, has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Leonard Potter<br>Leonard Potter | Director | December 21, 2018 |
| /s/ James Velissaris<br>James Velissaris | Director | December 21, 2018 |
| /s/ Neil Gray<br>Neil Gray | Director | December 21, 2018 |

C-8

Index of Exhibits

| Exhibit | Exhibit No. |
|---|---|
| Power of Attorney | (h) (8) |
| Consent of Independent Registered Public Accounting Firm | (j) |

C-9