UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                       :

UNITED STATES OF AMERICA

                                       :

        - v. -

                                       :          22 Cr. 105 (DLC)

JAMES VELISSARIS,

                                       :

           Defendant.

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Margaret Graham
Assistant United States Attorney

     - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of defendant James Velissaris, which is scheduled for April 7, 2023, at 3 p.m.  On November 21, 2022, Velissaris pleaded guilty to one count of securities fraud, with a stipulated Guidelines range of 235 to 240 months' imprisonment.  On February 28, 2023, the United States Probation Office ("Probation") issued the Final Presentence Report ("PSR") in this case, which calculated the same applicable Guidelines range.

In his sentencing submission, Velissaris seeks a downward variance from 235 to 240 months to a non-incarceratory sentence, arguing principally that his history and characteristics weigh against a custodial sentence.  But while Velissaris had a difficult childhood, by the time he chose to commit this fraud, he was a Harvard graduate running two successful investment funds, supported by powerful backers.  At their height, Velissaris's funds managed billions of dollars of investor money.  From this privileged and influential position, one built on the trust of his investors, Velissaris chose to engage in years of calculated and deliberate fraud, grossly overinflating the valuations of the positions in his funds.  The fraud was painstakingly planned to evade the detection of investors, auditors, and Infinity Q's own employees.  And when any outsiders looked into Velissaris's valuations, Velissaris did whatever it took to throw them off his trail.  He sent his auditors false, altered term sheets.  He lied to the SEC about his valuation process.  He sent the SEC altered fund documents.  The fraud was nonetheless discovered after the dramatic market downturns of 2020, and brought to light through an extensive investigation and significant expenditure of resources by the SEC and the Government.

Given the seriousness of Velissaris's conduct and the need for general and individual deterrence, the Government respectfully submits that a substantial incarceratory sentence, albeit one below the Guidelines range of 235 to 240 months, would be sufficient but not greater than

necessary to achieve the goals of sentencing.

## I.  Offense Conduct

In 2014, James Velissaris founded the New York-based investment adviser, Infinity Q Capital Management ("Infinity Q").  Until its demise in February 2021, Velissaris was Infinity Q's chief investment officer and majority owner.  Infinity Q advised both a mutual fund (the "Diversified Alpha Fund" or the "Mutual Fund") and a hedge fund (the "Volatility Alpha Fund" or "Hedge Fund" and collectively with the Mutual Fund, the "Funds").  (PSR ¶ 14).  At its peak, Infinity Q purported to manage over $3 billion in investors' assets through the Funds.  (*Id.*).

From at least 2018 through February 2021, Velissaris perpetrated a major fraud on the Funds' investors.  Velissaris repeatedly lied to the Funds' investors and misrepresented the valuation of certain positions held by the Funds in two critical ways.  First, Velissaris falsely claimed that Infinity Q used an independent valuation service to compute the fair value of these positions when in reality Velissaris had the ability to, and regularly did, interfere with the valuation service in order to manipulate the valuations.  (*Id.* ¶ 15).  Second, Velissaris mismodeled numerous positions held by the Funds within the valuation service in order to artificially inflate the positions' values, sometimes fraudulently boosting the value of an individual position by millions of dollars in order to artificially inflate the apparent value of the Funds' holdings.  Inflating the Funds' values allowed Infinity Q to demonstrate impressive growth to the market and resulted in higher management fees and performance fees for Velissaris.

As part of their investment strategies, both the Mutual Fund and the Hedge Fund invested in volatility-based derivative swap contracts.  (Ind. ¶ 17).  These positions typically assumed the form of over-the-counter ("OTC") swap positions, which allowed Infinity Q to bet on the volatility, or the price movement, of an underlying asset or index.  (*Id.* ¶¶ 17-18).  These OTC positions were negotiated by Infinity Q directly with counterparties (typically large financial institutions) and

their values were not readily observable to the Funds' investors or the investing public on an intermediary platform, like an exchange. (*Id.* ¶ 17). While the final value of a position could be observed at settlement (namely, when the position expired and the long and short positions were settled based on realized volatility), the value prior to settlement needed to be calculated to determine what the position was worth at that time (*i.e.,* to "mark" the position). Accordingly, as part of its operations, Infinity Q was responsible for valuing these OTC volatility positions in order to provide the value of the Mutual Fund's and Hedge Fund's holdings (known as net asset value or "NAV") to their investors and the investing public. (*Id.* ¶¶ 19-20). As Infinity Q's chief investment officer, Velissaris was responsible for the valuation of these positions within Infinity Q. (*Id.* ¶ 24). The Mutual Fund's NAV was publicly reported daily as well as periodically through SEC filings, and the Hedge Fund's NAV was reported monthly to investors. (*Id.* ¶ 14).

Infinity Q routinely represented to its investors and the investing public that Infinity Q used an independent valuation service, namely Bloomberg Valuation Service ("BVAL"), to value these OTC swap positions. (*Id.* ¶ 21). This was partially true. Infinity Q did in fact have a contract to use BVAL. (*Id.* ¶ 24). Properly used, BVAL permitted a user (in this case, Velissaris) to enter into its model all of the inputs for a volatility-based OTC swap position (including, for example, the start date of the position, the expiration date, the strike price, the notional amount, an annualization factor, and, if applicable, a lower and upper corridor bound) and then BVAL would run a computer code to compute the fair value of the position on a given date. (*Id.* ¶ 22). The user would also be permitted to select from certain options for market assumptions to apply (such as the implied volatility) that would be used by BVAL to compute fair market value. (*Id.*). At all times, Velissaris understood that Infinity Q's statements that it relied on independent valuation were critical in order for investors to have confidence in the valuations assigned to otherwise-

opaque volatility-based positions held by the Funds.  Based on the Funds' holdings – and the impressive, purported growth of their portfolios – from 2018 through 2021, Velissaris personally earned tens of millions of dollars of performance and management fees.  (*Id.* ¶ 15).

Rather than honestly, and consistently with representations made to investors, use BVAL as an independent valuation service, however, Velissaris routinely manipulated the valuation of the Funds' volatility-based OTC swap positions in ways that fundamentally undermined the independence of BVAL's calculation and had the effect of substantially overstating the value of the Funds' holdings in BVAL.  (*Id.* ¶ 27).  Prior to February 2021, Velissaris was the only employee at Infinity Q who had access to input and model OTC swap positions within Infinity Q's BVAL portfolio.  (*Id.* ¶ 24).  As described in detail in the Indictment, Velissaris engaged in a variety of fraudulent practices when inputting OTC positions into BVAL in order to manipulate the resulting values that BVAL gave for those positions.  Sometimes, Velissaris would do this by entering the wrong inputs for a particular OTC position into BVAL when modeling the position.  For example, in a corridor variance swap, volatility is only realized when the price of the underlying asset is between a lower and upper bound, referred to as a corridor.  At times, Velissaris entered a number for the lower or upper bound of a corridor for a particular OTC position within BVAL that was different than the number set forth in the term sheet for that position, thus changing a critical term of the deal and thereby impacting the value that BVAL would compute for that position.  (*Id.* ¶ 29).  Indeed, Velissaris would sometimes change that number many times over the life of that OTC position (notwithstanding the fact that the term sheet between the parties never actually changed) in order to re-manipulate its value based on the amount of inflation Velissaris desired to achieve in the Funds' NAV at any given time.  This practice also allowed Velissaris to avoid detection by, for example, bringing the position's value back in line with its expected

settlement value shortly before its expiration.  Making sure that the reported value of a position was close to its settlement value at expiration would ward off potential questions by auditors, investors, and other market participants who could see the value of the position at settlement (but could not see Velissaris's models in BVAL).

On other occasions, Velissaris secretly altered the underlying code that BVAL ran to calculate the valuation for certain OTC swap positions.  (*Id.* ¶ 30).  For example, rather than permit BVAL to take account of a corridor in a corridor variance swap by  considering only volatility that was above a particular lower bound <u>and</u> below a particular upper bound, Velissaris changed that <u>and</u> to an <u>or</u> condition within BVAL's operational code, such that BVAL took volatility into account at every possible value, thereby effectively disregarding the corridor altogether and changing the fair value of the OTC position.  (*Id.* ¶ 31).  Velissaris's manipulations had the effect of undermining the purported independence of BVAL as well as artificially inflating the value of the Funds' NAV as computed by BVAL.  (*See, e.g.*, PSR ¶ 38 (describing position that Velissaris valued at $22, but that expired a few months later approximately 80% lower)).  Velissaris's fraudulent manipulations of the valuation code became so frequent and so unwieldy that on numerous occasions Infinity Q reported values for positions held by the Funds that were mathematically impossible or reported substantially different values for identical OTC positions held in both the Mutual Fund and the Hedge Fund.  (*Id.* ¶ 34).

Looking at just one altered position, BVAL Position XDAC9Y5A (the "9Y5A Position"), demonstrates Velissaris's changes and their effect.  Below is a table of Velissaris's alterations to the script of the 9Y5A Position.   The 9Y5A Position was purchased in February 2020, and settled in December 2020.  It had a lower corridor of 2985.82 and an upper corridor of 4478.74.  In BVAL, Velissaris altered the script that valued the 9Y5A Position to gradually expanded the lower

corridor, thereby increasing the valuation of the position – first by 350, then by 500, and finally by 2500 in June 2020 (almost entirely removing the corridor), before then backing out of these changes.  By December 3, 2020, just two weeks before settlement, he expanded the corridor by only 50, presumably to reduce the disparity between the 9Y5A Position's purported value on December 3 and its settlement value just two weeks later.

**Summary of Alterations to BVAL Position[1]**
**XDAC9Y5A**

| Date of Alteration | Alteration to BVAL Script |
| --- | --- |
| Start = 2/4/2020 | --- |
| 2/15/2020 | let corridor = (fix_i > corridor_low-350) |
| 3/10/2020 | let corridor = (fix_i > corridor_low-350) |
| 4/8/2020 | let corridor = (fix_i > corridor_low-500) |
| 5/1/2020 | let corridor = (fix_i > corridor_low-500) |
| 6/4/2020 | let corridor = (fix_i > corridor_low-2500) |
| 7/2/2020 | let corridor = (fix_i > corridor_low-500) |
| 8/1/2020 | let corridor = (fix_i > corridor_low-500) |
| 9/3/2020 | let corridor = (fix_i > corridor_low-500) |
| 10/1/2020 | let corridor = (fix_i > corridor_low-500) |
| 11/5/2020 | let corridor = (fix_i > corridor_low-300) |
| 12/3/2020 | let corridor = (fix_i > corridor_low-50) |
| 1/1/2021 | let corridor = (fix_i > corridor_low) |
| Expiry = 12/18/2020 | --- |

A chart comparing the valuation of the 9Y5A Position over its life with that of the identical position in the other Infinity Q Fund shows another aspect of Velissaris's fraud – that the exact same position could be valued differently between the two Funds, due to Velissaris's varying alterations.  The orange line below is the 9Y5A Position,  which was in the Mutual Fund.  The

---

[1] This table was produced to defense before the scheduled trial date as GX 1, and was created from data from GX 1244 to 1266.

green line is the exact same position in the Hedge Fund.  And the black line is the valuation the Government's expert obtained when it properly modelled the position in BVAL, as Velissaris had promised to investors.  *See* Exhibit A, NERA Report, at 14.[2]



Not only were Velissaris's alterations sophisticated and designed to evade detection, but Velissaris also engaged in additional deceptive and obstructive conduct.  First, in order to hide his fraud from Infinity Q's auditors, Velissaris brazenly provided the auditors with fabricated term sheets in which he had manually altered certain terms of volatility-based OTC positions in order to ensure that the auditor's computations of fair market value would be in line with those that Velissaris was generating through BVAL.  (PSR ¶¶ 37-39).  For instance, on occasions where Velissaris had improperly entered the terms of a corridor for a corridor variance swap within

---

[2] The curve of the orange line also shows the effect of the gradual increase, then decrease, of the magnitude of the alterations, as set forth in the table above.

BVAL, Velissaris manually changed the corridor on the term sheet for that position that he provided to the auditors, knowing that the auditors and/or their experts were going to independently value that position based on the term sheet.  (*Id.*).  As Velissaris well knew, if the auditors had been given the true term sheets, they would likely have arrived at values that substantially differed from those that Velissaris reported from BVAL, which would have been a glaring red flag for the auditors.

To continue our examination of the 9Y5A Position, in 2020 auditors asked Velissaris for the back-up data on the valuation of this position.  Rather than confessing to the BVAL script alterations detailed above, Velissaris instead provided the auditor with an altered term sheet, where he entered a completely fictitious lower corridor, which was 46 points below the true level.  On the left is the true term sheet for the 9Y5A Position.  On the right is the altered term sheet that was sent to the auditors.



Second, when the SEC began to investigate Infinity Q in May 2020, Velissaris submitted altered and fabricated documents in response to the SEC's document requests, to hide various aspects of Infinity Q's valuation process and create the appearance of far better policies and controls than those that actually existed at Infinity Q.  (*Id.* ¶¶ 40-43).

Ultimately, Velissaris's fraud was uncovered when the SEC gained access to Infinity Q's BVAL portfolio and began to observe the manipulations he was making within BVAL to volatility-based OTC positions.  (*Id.* ¶ 44).  As a result, Velissaris was removed from his position at Infinity Q, the Funds were immediately frozen and their operations ceased, and the Funds' volatility-based OTC positions were liquidated for substantially less than the values at which Velissaris had marked them, thereby resulting in substantial losses for the Funds' many investors.  (*Id.* ¶ 44).

## II.  Applicable Law

The Guidelines are no longer mandatory, but they continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 569, U.S. 530, 549 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section

3553(a)," and determine the sentence to impose. *Id.* at 113.  In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## III.  Discussion

The Government respectfully submits that a significant incarceratory sentence, albeit one below the stipulated Guidelines range of 235 to 240 months, is necessary to reflect the seriousness of Velissaris's offense conduct, provide just punishment, afford general deterrence, and promote respect for the law.

First, the nature and seriousness of the offense warrants a very substantial sentence. Velissaris lied to investors, overvaluing their investments by tens of millions of dollars.  He violated their trust, and the consequent harm was in the tens of millions of dollars – indeed, as detailed in the attached letter, the harm to the Mutual Fund alone was over $58 million.  *See* Exhibit B, March 30, 2023 letter from Special Litigation Committee.  In the meantime, Velissaris rewarded himself handsomely, over the course of the fraud receiving $22 million dollars of investor funds as fees – fees that he would not have received if he had valued the Funds' positions as promised. Indeed, although a sentence within the Guidelines may not be necessary here, the applicable offense level and Guidelines range make clear that a substantial sentence is necessary.  The reason that Velissaris faces such a lengthy term of incarceration under the Guidelines is that he caused enormous loss, victimized numerous individuals, used highly sophisticated means to accomplish his illegal ends, violated the securities laws while an investment adviser (a position of unusual trust and authority over other people's money), and willfully obstructed the administration of justice. (*See* PSR ¶¶ 51-58). Each of these characteristics of Velissaris's crime, and certainly all taken together, demand just punishment that can only be met by a substantial sentence.

11

Second, a very substantial term of incarceration is necessary to promote general deterrence and respect for the law. The valuation process for complex OTC derivatives is incredibly complex and opaque. Investors are unable to determine fair valuations for these positions themselves, and must rely entirely on the integrity of their investment fund's valuation process. This is precisely why investors cared so much about Velissaris's promise that Infinity Q relied solely on BVAL for independent valuations. And, particularly in light of the complexity of these financial products, Velissaris's scheme was on the very far end of the spectrum of fraudulent conduct in terms of sophistication and subtlety. It is incredibly hard to detect a fraud such as the one Velissaris perpetrated. It is therefore important to show investment professionals that when someone *is* caught committing such a fraud, the consequences are serious.

A non-incarceratory sentence, as Velissaris suggests, simply will not accomplish that goal. Rather, it will feed into Velissaris's effort to minimize this multi-year fraudulent scheme as a permissible attempt to arrive at fair valuations, as seen in his motion to withdraw his plea. A custodial sentence would serve as a powerful deterrent to other investment professionals who are considering engaging in similar conduct. In contrast, a non-custodial sentence could suggest to others that the benefits of such a fraud outweigh the consequences.

A significant incarceratory sentence will not create an unwarranted sentencing disparity between Velissaris and co-conspirator-1 ("CC-1"), who has entered into a non-prosecution agreement with the Government, because the two are not similarly situated. Velissaris alone was responsible for the BVAL mismarking, and CC-1 was not even aware that this was occurring. CC-1's misconduct is limited the help he gave to Velissaris, when Velissaris told CC-1 that they needed to provide altered documents to the Funds' auditor and the SEC. CC-1 has accepted responsibility for his actions, which are serious, but which were at Velissaris's direction and do not begin to

approach Velissaris's execution of a years-long, sophisticated fraud.  Sentencing Velissaris to a significant incarceratory sentence therefore will not create any unwarranted sentencing disparity – indeed, it will not create any sentencing disparity, because CC-1 was not found guilty of similar conduct.  To the contrary, such an unusually dramatic downward variance from 235-240 months' imprisonment to a non-custodial sentence for a scheme of this magnitude, replete with deceptive and obstructive conduct, would itself cause an unwarranted disparity with the custodial sentences routinely imposed upon those who defraud their clients.

Last, Velissaris's recent motion to withdraw his plea, in which he claims he is factually innocent of the conduct to which he pleaded guilty mere months ago, raises serious questions about his acceptance of responsibility.  The Government would be within its rights to seek denial of the adjustment for acceptance of responsibility, as Velissaris has failed "clearly to demonstrate acceptance of responsibility" through his "conduct prior to the imposition of sentence."  *See* November 20, 2022 Plea Agreement at 3.  From a Guidelines perspective, this is a somewhat academic question, as denying acceptance of responsibility points would only increase Velissaris's Guidelines from a range of 235 to 240 months to a single point of 240 months.[3]  The greater concern, therefore, is not the effect on the Guidelines, but rather Velissaris's failure to accept responsibility and show remorse for his crimes.  Velissaris is in a different posture today than he was on November 21, when he stood before the Court and acknowledged his misconduct under oath.  Today, he claims that he is not guilty, ignoring the mountain of evidence that proves otherwise and millions of dollars of damage for which he, and he alone, is responsible.  This

---

[3] Denying acceptance of responsibility points would place Velissaris's offense level at 41, resulting in a Guidelines range of 324 to 405 months, which would effectively be a Guidelines range of 240 months, given the 20-year statutory maximum.

concerning behavior weighs in favor of a significant incarceratory sentence to ensure individual deterrence.

Velissaris describes in his submission the adversity he has faced and overcome in his life and the good deeds he has accomplished.  These actions and the characteristics they suggest in Velissaris can and should, of course, be taken into account.  But these aspects of Velissaris's character simply cannot outweigh the harm he has caused and the sustained pattern of fraud and deceit he has shown.  Nor can they outweigh Velissaris's choice, once he was running his thriving business, to resort to fraud to secure wealth well beyond need.  These factors merit just punishment.

Finally, the Government wishes to clarify that at the April 7 sentencing, it will be seeking both restitution and forfeiture, which is contrary to the language in the PSR that says it will be seeking forfeiture alone.  The Government is currently seeking additional information about the proper restitution amount and will either submit additional details in advance of the April 7 sentencing, or will ask the Court to enter an order of restitution and determine the precise amount within the following 90 days, as provided by 18 U.S. Code § 3664(d)(5).

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose a significant sentence of incarceration on James Velissaris.

Dated: New York, New York
       March 31, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:      _____/s/_____

Margaret Graham
Assistant United States Attorney
(212) 637-2923

14

# EXHIBIT A





# *UNITED STATES OF AMERICA V. JAMES VELISSARIS*

DECEMBER 2022

**Faten Sabry, Ph.D.**



**SECURITIES AND FINANCE**
© NERA Economic Consulting

# Assignment



1.  Assess IQ's alterations and valuations

2.  Estimate but-for valuations

3.  Identify impossible IQ valuations

4.  Quantify impact on investors and fees

# Scope of Analysis



- Selected 62 positions to identify IQ's alterations and evaluate the impact of the alterations on the IQ valuations

- Analyzed 733 valuations based on Bloomberg's recorded data for IQ's valuations

# Derivative Instruments in the IQ Funds





## IQ Mutual Fund

$69 MM
14%

$117 MM
23%

$320 MM
63%

## IQ Hedge Fund

$30 MM
26%

$48 MM
41%

$39 MM
33%

■ Variance Swaps
■ Corridor Variance Swaps
■ Other Derviatives

# 1 | Assess IQ's Alterations and Valuations

# 93% of the 733 IQ Monthly Valuations Had Alterations





# IQ Altered Different Valuation Parameters



**NERA**
ECONOMIC CONSULTING

| Type of Alterations | Number of Valuations |
|---|---|
| • Strike Price | 470 (64%) |
| • Vega Notional | 146 (20%) |
| • Effective Date | 181 (25%) |
| • Maturity Date | 102 (14%) |
| • Corridors | 316 (43%) |
| • Annualization Factor | 39 (5%) |
| Valuations With Multiple Alterations | 463 (63%) |

# IQ's Alterations Led to Contradictory Valuations of Identical Positions

NERA ECONOMIC CONSULTING

Sources: GX-5000-5129





# IQ's Alterations Led to Contradictory Valuations of Identical Positions





# 2 | Estimate But-For Valuations

# Over $200 Million In Inflated IQ Valuations for 62 Positions





# IQ Inflated the Valuations for Identical Positions





# IQ Inflated the Valuations for Identical Positions





# IQ Inflated the Valuations for Identical Positions





# IQ's Variance Expectations Differed Between Its Long and Short Positions





Sources: GX301, GX-1301-1402, GX-5066-5101, GX-5112-5129, GX-8065, GX-8068, GX-9000-9506 DRAFT - Privileged and Confidential -- Preliminary and Unchecked

# IQ's Valuations Are Inflated By $2.9 Million On Average Relative to Close-Out Prices



## Comparison of Close-Out Prices to IQ and NERA Valuations *

|  | Average Difference | Median Difference |
|---|---|---|
| IQ Valuations in Prior Month | $2.9 MM | $2.6 MM |
| NERA Valuations in Prior Month | -$0.1 MM | -$0.1 MM |

\* For 31 closed positions as of January 2021

# 3 | Identify Impossible IQ Valuations

# IQ Valued a Variance Swap Above the Maximum Possible Value





**IQ Valuation as of Jan 2020 is $7.3 MM (XDACQ6H3)**

Maximum Possible Gain is $5.2 MM.

**All Mathematically Possible Values**

# IQ's Valuations Exceed the Maximum Possible Gain In Multiple Months





Sources: GX-5000-5129, GX-8021,
GX-8032, GX-8033

**19**

# Total Impact of IQ's Impossible Valuations



| Months With Impossible Valuations (12) | October 2019 to September 2020 |
|---|---|
| Count of Positions With Impossible Valuations | 7 |
| Number of Impossible Monthly Valuations | 30 |
| | |
| Sum of Infinity Q Valuations | -$94 MM |
| Sum of NERA Valuations | -$306 MM |
| **Total Inflation in Infinity Q Valuations** | **$212 MM** |

Sources: GX-300, GX-301, GX-1301-1402, GX-5000-5129, GX-8000-8068

DRAFT - Privileged and Confidential -- Preliminary and Unchecked

# 4 | Quantify Impact on Investors and Fees

# But-For NAV Using Counterparty Valuations







# Excess Investor Fees for the Hedge Fund Using Counterparty Valuations



Sources: GX-5000-5065, GX-5102-5111, GX-7200-7279, GX-9000-9506

23

# Excess Investor Fees for 27 Hedge Fund Positions





## QUALIFICATIONS, ASSUMPTIONS AND LIMITING CONDITIONS

This report is for the exclusive use of the NERA Economic Consulting client named herein. This report is not intended for general circulation or publication, nor is it to be reproduced, quoted or distributed for any purpose without the prior written permission of NERA Economic Consulting. There are no third party beneficiaries with respect to this report, and NERA Economic Consulting does not accept any liability to any third party.

Information furnished by others, upon which all or portions of this report are based, is believed to be reliable but has not been independently verified, unless otherwise expressly indicated. Public information and industry and statistical data are from sources we deem to be reliable; however, we make no representation as to the accuracy or completeness of such information. The findings contained in this report may contain predictions based on current data and historical trends. Any such predictions are subject to inherent risks and uncertainties. NERA Economic Consulting accepts no responsibility for actual results or future events.

The opinions expressed in this report are valid only for the purpose stated herein and as of the date of this report. No obligation is assumed to revise this report to reflect changes, events or conditions, which occur subsequent to the date hereof.

All decisions in connection with the implementation or use of advice or recommendations contained in this report are the sole responsibility of the client. This report does not represent investment advice nor does it provide an opinion regarding the fairness of any transaction to any and all parties. In addition, this report does not represent legal, medical, accounting, safety or other specialized advice. For any such advice, NERA Economic Consulting recommends seeking and obtaining advice from a qualified professional.



# EXHIBIT B



ATTORNEYS AT LAW

Daniel S. Noble
(203) 325-5090
dnoble@fdh.com

March 30, 2023

Margaret S. Graham, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of New York
1 Saint Andrew's Plaza
New York, NY 10007

Re:   *United States v. James Velissaris*, 22 Cr. 105 (DLC)

Dear AUSA Graham:

We represent the Special Litigation Committee ("SLC") of the Board of the Trust for Advised Portfolios ("TAP"), of which the Infinity Q Diversified Alpha Fund (the "Fund") is a series portfolio. On December 20, 2021, the Board of TAP approved the creation of the SLC to investigate and pursue on behalf of the Fund any potential claims against other parties arising from the massive valuation fraud perpetrated by defendant James Velissaris.[1] Any funds that are recovered through claims pursued by the SLC on behalf of the Fund will ultimately be distributed to the Fund's shareholders.

The Fund was a victim of the securities fraud offense to which Mr. Velissaris pled guilty in the above-captioned case. As a direct and proximate result of Mr. Velissaris' fraudulent mismarking scheme, the Fund incurred extensive pecuniary damages described below. The SLC, on behalf of the Fund, requests that the Government seek restitution to compensate the Fund for its losses when Mr. Velissaris is sentenced on April 7, 2023.

## Background

The Fund was formed in September 2014 as a series of TAP, a multiple series Delaware statutory trust structured as an open-end management investment company registered under the Investment Company Act of 1940. The Fund's portfolio consisted primarily of cash and a variety of equity and over-the counter ("OTC") derivative positions. From the Fund's inception, Infinity Q Capital Management, LLC ("IQCM"), a registered investment adviser based in New York, New York, advised and was principally responsible for the day-to-day management of the Fund. Mr. Velissaris was the founder and Chief Investment Officer ("CIO") of IQCM and exercised control over IQCM until he was removed on or about February 21, 2021. Under the Investment Advisory

---

[1] *See* TAP, *Special Litigation Committee Announcement* (Dec. 28, 2021), *available at:*
https://www.infinityqfundliquidation.com/cases/infinity%20q/2023.03.01%20slc%20announcement.pdf.

March 30, 2023
Page 2

Agreement between the Fund and IQCM dated September 23, 2014, the Fund was required to pay IQCM an annual management fee of 1.70% of the Fund's average daily net assets.

As alleged in the Indictment, and as Mr. Velissaris admitted at his guilty plea, between at least 2018 and February 2021, Mr. Velissaris engaged in a fraudulent scheme to mismark the value of the Fund's OTC derivative positions. *See* Indictment (ECF 1), at ¶¶ 1, 25-33; Plea Tr. (Nov. 21, 2022), at 13-15. Mr. Velissaris perpetrated the mismarking scheme in order to materially inflate the net asset value ("NAV") of the Fund as reported to investors, to attract and retain investments in the Fund, and to increase the management fees paid by the Fund to IQCM and, in turn, Mr. Velissaris' own compensation. *See* Indictment ¶ 1.

On February 18, 2021, based on information that the U.S. Securities and Exchange Commission ("SEC") shared with IQCM, IQCM informed the Fund that Mr. Velissaris had been manipulating certain parameters in the third-party pricing model used to value the Fund's assets, which had affected the value of the Fund's OTC derivatives.[2] The next day, IQCM informed the Fund that it was unable to verify the reasonableness of the previously reported value of the Fund's OTC positions and, therefore, was unable to calculate a current NAV for the Fund.[3]

On February 22, 2021, IQCM and TAP, on behalf of the Fund, filed an application, pursuant to Section 22(e) of the Investment Company Act, with the SEC to suspend shareholder redemptions in the Fund as of February 19, 2021.[4] The SEC approved the application the same day (the "SEC Order").[5] The SEC Order required the TAP Board to create a plan for an orderly liquidation of Fund assets and develop a distribution plan to make appropriate payments to shareholders.[6] Both plans were to be submitted to SEC staff and be implemented under the supervision of the SEC.[7] The SEC Order also required TAP, on the Fund's behalf, to engage an independent third party to assist in determining the fair value of the Fund's OTC positions, including re-evaluating the historical valuations of the Fund.[8]

Consistent with the SEC Order, the TAP Board retained Russell Investments Implementation Services, LLC ("RIIS"), a registered investment adviser, to assist in the liquidation

---

[2] *See* Application of Infinity Q Diversified Alpha Fund and Infinity Q Capital Management, LLC for an Order pursuant to Section 22(e)(3) of the Investment Company Act of 1940 (Feb. 22, 2021), *available at:* https://www.infinityqfundliquidation.com/cases/q%20proposal/sec%20application.pdf ("Section 22(e) Application"), at 3.

[3] *See id.*

[4] *See generally* Section 22(e) Application.

[5] *See* Notice of Application and a Temporary Order Under Section 22(e)(3) of the Investment Company Act of 1940 (Feb. 22, 2021), *available at:* https://www.infinityqfundliquidation.com/cases/q%20proposal/sec%20order.pdf.

[6] *See id.* at 5.

[7] *See id.* at 6.

[8] *See id.*

March 30, 2023
Page 3

of the assets held by the Fund that were not already in cash or cash equivalents at the time of the SEC Order.[9]  On or about March 19, 2021, the liquidation of the Fund's assets was completed, which resulted in the Fund holding cash or cash equivalent assets of approximately $1,249,395,877.[10]  In connection with the liquidation, the Fund paid RIIS approximately **$850,000** in fees.[11]

Pursuant to the SEC Order, the TAP Board retained Alvarez & Marsal Valuation Services, LLC ("A&M") to perform a re-evaluation of the Fund's February 18, 2021 NAV and the Fund's historical valuations.[12]  A&M's analysis was required by the SEC Order and necessary for the Fund to determine when and to what extent the Fund's NAV was overstated.  Based on its analysis, A&M determined that the Fund's OTC derivatives positions were overstated at each month-end date from February 2017 through January 31, 2021.  In connection with the re-evaluation of the Fund's NAVs, the Fund paid A&M approximately **$1,573,882** in fees.

As stated above, the SEC Order required the TAP Board to develop a plan of distribution to distribute the Fund's assets to shareholders under the supervision of the SEC (the "Distribution Plan").  In connection with the TAP Board's efforts to determine how much of the Fund's assets needed to be held in reserve to cover the Fund's own debts, obligations, and liabilities (the "Special Reserve"), the Fund's counsel retained Cornerstone Research ("Cornerstone") to develop reasonable estimates of the total amounts that the Fund may be liable to pay in damages to shareholders in pending securities class actions on account of transactions in the Fund's shares during the period in which the Fund's NAV was inflated.[13]

In November 2021, the TAP Board finalized the Distribution Plan, and the Fund made an interim distribution of approximately $500 million, or about 40% of the Fund's gross assets, on a

---

[9] *See* Infinity Q Diversified Alpha Fund Plan of Distribution of Assets (Nov. 8, 2021), *available at:* https://www.infinityqfundliquidation.com/cases/q%20proposal/infinity%20q%20-%20amended%20plan%20of%20distribution%20final%2011-4-2021.pdf ("Distribution Plan"), at 2.

[10] *Id.* at 3.  As of February 18, 2021, the last date on which the Fund calculated its NAV, the Fund's stated NAV based on valuations performed by Mr. Velissaris was $1,727,194,949.  As discussed herein, an independent third-party valuation consultant retained by the TAP Board calculated that the Fund's NAV as of February 18, 2021 should have been approximately $1,334,262,392.  Thus, while the Fund suffered a loss as a result of the liquidation of the Fund's assets—the difference between the as-liquidated value of the Fund's assets ($1,249,395,877) was approximately $84,866,515 *less* than the Fund's NAV on February 18, 2021 ($1,334,262,392) as calculated by the valuation consultant—the amount of such loss attributable to the liquidation cannot reasonably be quantified.  Although the Fund submits that Mr. Velissaris is responsible for such loss, because of the difficulty in quantifying the loss, the Fund is not seeking restitution on that basis.

[11] Although the Investment Advisory Agreement between IQCM and the Fund provides that IQCM is responsible for paying any costs of liquidating the Fund, IQCM rejected the Fund's demand that IQCM agree to pay the liquidation expenses.  *See* Distribution Plan at 4.

[12] *See id.* at 3.

[13] *See id.*

March 30, 2023
Page 4

pro rata basis to each shareholder as of February 18, 2021.[14]  The Fund used Cornerstone to calculate the amounts to be distributed to each shareholder (less an initial offset claim based on a shareholder's gain as a result of any redemptions of the Fund's shares at an inflated NAV).  The Fund also paid "Redemption Claims" in accordance with the Distribution Plan and used Cornerstone to calculate the amounts to be distributed to those shareholders that had previously redeemed their shares but had not been paid.  In April 2022, the TAP Board approved a second interim distribution of approximately $170 million to the Fund's current shareholders, and the Fund again used Cornerstone to calculate the amounts to be distributed to shareholders.  After making the second interim distributions, the Fund held approximately $570 million in the Special Reserve to satisfy the Fund's liabilities.[15]  To date, the Fund has paid Cornerstone approximately **$2,288,416** in fees in connection with the distribution of the Fund's assets.[16]

Separately, at the SLC's request, Cornerstone calculated the following based on A&M's re-evaluated historical NAVs for the Fund: (i) the net amount that the Fund overpaid former shareholders who fully redeemed their shares of the Fund at an inflated NAV (taking into account the amount the Fund received from those shareholders when they bought shares from the Fund at an inflated price); and (ii) the amount of management fees that the Fund overpaid to IQCM as a result of the inflated NAVs.  Based on Cornerstone's calculations, between February 2017 and February 2021, the Fund incurred a net inflation loss of approximately **$46,482,819** and paid approximately **$7,485,202** in excess management fees to IQCM.[17]

---

[14] *See* Shareholder Notice, *Infinity Q Diversified Alpha Fund Commences Interim Distribution of $500 Million* (Nov. 8, 2021), *available at:*
https://www.infinityqfundliquidation.com/cases/q%20proposal/infinity%20q%20-%20fund_%20shareholder%20notice%20-%20initial%20distribution%20%28final%2011-8-2021%29.pdf.

[15] *See* Shareholder Notice, *Infinity Q Diversified Alpha Fund Commences Second Distribution of $170 Million* (Apr. 15, 2022), *available at:*
https://www.infinityqfundliquidation.com/cases/q%20proposal/iq%20fund_%20shareholder%20notice%20-%20second%20interim%20distribution%20%28april%202022%29.pdf.

[16] On November 10, 2022, the SEC filed a settled civil action against the Fund that alleged that, as a result of Mr. Velissaris' mismarking of certain of the Fund's positions, the Fund violated Rule 22c-1 under the Investment Company Act of 1940, which governs the pricing of Fund shares.  The settlement enjoined the Fund from further violations of Rule 22c-1, but imposed no financial penalties.  As part of the settlement, the Fund consented to the appointment of a Special Master to, among other things, oversee the distribution of the Fund's remaining assets going forward.  *See* Final Judgment on Consent, *SEC v. Infinity Q. Diversified Alpha Fund*, No. 22 Civ. 9608 (PKC) (S.D.N.Y. Nov. 17, 2022) (ECF 8).  As contemplated by the settlement, on January 10, 2023, Judge Castel entered a consent order appointing a Special Master.  *See* Consented to Order Appointing Special Master, *SEC v. Infinity Q. Diversified Alpha Fund*, No. 22 Civ. 9608 (PKC) (S.D.N.Y. Jan. 10, 2023) (ECF 15).

[17]  Neither Mr. Velissaris nor IQCM has repaid the Fund for the excess management fees.

March 30, 2023
Page 5

On February 17, 2022, the Indictment in the above-captioned case was unsealed.[18]  Based on the fraudulent scheme to mismark the Fund's OTC derivative positions, the Indictment charged Mr. Velissaris with one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5; one count of investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and one count of wire fraud, in violation of 18 U.S.C. § 1343.[19]

On November 21, 2022, Mr. Velissaris pled guilty, pursuant to a plea agreement with the government, to Count One of the Indictment, which charged him with securities fraud.  In the plea agreement dated November 20, 2022, Mr. Velissaris "agree[d] to make restitution in an amount ordered by the Court, pursuant to Title 18, United States Code, Sections 3663, 3663A, and 3664."[20] At the change of plea hearing, Mr. Velissaris acknowledged that in addition to a term of imprisonment and other potential penalties that could result from his guilty plea, "there may also be requirements of forfeiture and restitution."[21]  Mr. Velissaris consented to entry of a Preliminary Order of Forfeiture in the amount of $22 million representing the proceeds traceable to the securities fraud offense that Mr. Velissaris personally obtained.[22]

## **Applicable Law**

Under the Victim and Witness Protection Act ("VWPA"), *see* 18 U.S.C. § 3663, a district court may—and under the Mandatory Victims Restitution Act ("MVRA"), *see* 18 U.S.C. § 3663A, a district court *must*—order restitution to victims who suffer a pecuniary harm as a result of certain offenses, including offenses against property committed by fraud or deceit.[23]  The VWPA also

---

[18] In connection with its participation in the government's investigation of Mr. Velissaris, the Fund incurred attorneys' fees paid to its outside counsel.  Because most, if not all, of the attorneys' fees incurred were in response to requests from the SEC, however, the Fund is not seeking restitution for those attorneys' fees in light of the Second Circuit's holding that only fees incurred in connection with the criminal investigation and prosecution of the defendant are eligible for restitution.  *See United States v. Afriyie*, 27 F.4th 161, 173-74 (2d Cir. 2022).

[19] The Indictment also charged Mr. Velissaris with making false statements to an accountant, in violation of 15 U.S.C. §§ 78ff, 80a-29, 7202 and 17 C.F.R. § 240.13b2-2; conspiracy to obstruct an SEC investigation, in violation of 18 U.S.C. § 371; and obstruction of an SEC investigation, in violation of 18 U.S.C. § 1519.

[20] Plea Agreement at 2.

[21] Plea Transcript, *United States v. Velissaris*, No. 22 Cr. 105 (DLC) (S.D.N.Y. Nov. 21, 2022), at 9.

[22] *Id.* at 16; *see also* Consent Preliminary Order of Forfeiture/Money Judgment, *United States v. Velissaris*, No. 22 Cr. 105 (DLC) (S.D.N.Y. Nov. 21, 2022) (ECF 66).

[23] It is an open question in the Second Circuit whether a district court can or must award restitution to victims where a defendant has been convicted solely of an offense under Title 15.  *See United States v. Afriyie*, 27 F.4th 161, 166 n.1 (2d Cir. 2022) (noting that "[t]here is some disagreement in the district courts about whether securities fraud is a covered offense" under the VWPA and MVRA, but stating that the court "need not resolve this debate …because the parties never raised it and because [the defendant] was also convicted of wire fraud").  Here, Mr. Velissaris, who was also charged with wire fraud, agreed in his plea agreement to pay restitution to victims in an amount to be determined by the district court, and

March 30, 2023
Page 6

provides that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3).

For purposes of restitution, a "victim" means "a person directly and proximately harmed as a result of the commission of an offense," including, in the case of an offense that involves as an element a "scheme" or "pattern of criminal activity," "any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . ." 18 U.S.C. § 3663(a)(2); *see also* 18 U.S.C. § 3663A(a)(2). The Second Circuit has found direct cause to be established where a defendant's action was the "but for" cause of the harm. *United States v. Marino*, 654 F.3d 310, 322–23 (2d Cir. 2011). As to proximate cause, a court must consider "whether the harm alleged has a sufficiently close connection to the conduct at issue," and the requirement may be satisfied where the harm was "foreseeable." *Robers v. United States*, 572 U.S. 639, 645 (2014) (internal quotation marks omitted); *accord United States v. Williams*, 811 F. App'x 690, 691 (2d Cir. 2020).

In the case of an offense resulting in loss of property, a victim is entitled to the return of the property or, if the return of the property is impossible, impractical, or inadequate, "an amount equal to the greater of (i) the value of the property on the date of the damage, loss, or destruction, or (ii) the value of the property on the date of sentencing, less the value . . . of any part of the property that is returned." 18 U.S.C. § 3663(b)(1); *see also* 18 U.S.C. § 3663A(b)(1). In addition, a defendant may be ordered to "reimburse the victim for lost income and necessary . . . other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663(b)(4); *see also* 18 U.S.C. § 3663A(b)(4); *United States v. Afriyie*, 27 F.4th 161, 173-74 (2d Cir. 2022) (holding that "other expenses" include "attorneys' fees [a victim] was required to incur to advance the investigation or prosecution of the offense" and "[t]he expenses a victim incurs while preparing for and participating in restitution proceedings").

## Discussion

The Fund was a victim of the years-long, massive valuation fraud that is the basis of Mr. Velissaris' securities fraud conviction and is, therefore, entitled to restitution under the MVRA, VWPA, and plea agreement.

Mr. Velissaris' fraud was the direct and proximate cause of the extensive pecuniary damages that the Fund has incurred, including: (i) a net inflation loss of **$46,482,819** as a result of having overpaid former shareholders who fully redeemed their shares in the Fund at inflated NAVs; (ii) the payment of **$7,485,202** in excess management fees to IQCM; and (iii) the Fund's payment of **$4,712,298** in fees to various service providers that the Fund had to retain in order to carry out, in accordance with the SEC Order, the liquidation of the Fund's assets (RIIS), re-evaluation of the Fund's historical NAVs (A&M), and distribution of the Fund's assets to

---

subsequently affirmed his understanding of his obligation to pay restitution to victims during his change of plea hearing.

March 30, 2023
Page 7

shareholders (Cornerstone).  Thus, the total amount of pecuniary damages incurred by the Fund is **$58,680,319**.

The Fund is entitled to restitution for these pecuniary damages because they would not have occurred "but for" Mr. Velissaris' fraudulent misvaluation of the Fund's OTC derivative positions.  *Marino*, 654 F.3d at 322–23.  Furthermore, Mr. Velissaris' fraud was the proximate cause of the Fund's pecuniary damages because they were the reasonably foreseeable result of Mr. Velissaris' scheme.  *Robers*, 572 U.S. at 645; *Williams*, 811 F. App'x at 691.  Mr. Velissaris knew, or reasonably should have known, that his massive mismarking scheme would cause the Fund to overpay both IQCM and redeeming shareholders, and that when the scheme was uncovered, such a massive fraud would necessarily cause the collapse and liquidation of the Fund.  All of the ensuing costs that the liquidation, re-evaluation of the Fund's NAVs, and distribution of the Fund's assets entailed were the natural and foreseeable result of Mr. Velissaris' fraud.

In addition to the pecuniary damages incurred by the Fund as a direct result of Mr. Velissaris' fraud, the Fund has also incurred attorneys' fees in connection with this restitution application for which it also seeks restitution.  The Fund will provide the amount of attorneys' fees incurred once that application has been decided.

## Conclusion

For the foregoing reasons, the Fund respectfully requests that the Government seek restitution on behalf of the Fund for pecuniary damages in the amount of **$58,680,319**, and attorneys' fees for the Fund's restitution application in an amount to be determined.  In addition, the Fund requests that the Government provide a copy of this letter to the Court as a Victim Impact Statement.  Should the government or the Court require documentation to support the amount of restitution sought herein, or any other information, the SLC, on behalf of the Fund, will provide it.

Sincerely,

Daniel S. Noble

Cc:    David Slovick, Esq. (by email)
       Erin Steele, Esq. (by email)
       Michael Battle, Esq. (by email)
       William Martin, Esq. (by email)

       *Attorneys for Defendant James Velissaris*