UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

UNITED STATES OF AMERICA
                              :

    - v. -
                              :      22 Cr. 105 (DLC)

JAMES VELISSARIS,
                              :

        Defendant.
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO WITHDRAW HIS PLEA


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Margaret Graham
Assistant United States Attorney

    - Of Counsel -

## PRELIMINARY STATEMENT

On November 21, 2022, the defendant pleaded guilty to securities fraud. He stated under oath that he lied to investors, that he did so to inflate the reported value of the hedge fund and mutual fund whose investments he managed, and that he knew that what he was doing was wrong and illegal at the time. (Plea T. 13-14). Today, the defendant claims that he is factually innocent and seeks permission to withdraw his plea. His motion to do so is meritless and should be denied.

## BACKGROUND

### I.  Offense Conduct[1]

In 2014, defendant James Velissaris founded the New York-based investment adviser Infinity Q Capital Management ("Infinity Q"). Until Infinity Q's demise in February 2021, the defendant was Infinity Q's chief investment officer and majority owner. Infinity Q advised both a mutual fund (the "Mutual Fund") and a hedge fund (the "Hedge Fund" and collectively with the Mutual Fund, the "Funds"). (PSR ¶ 14). At its peak, Infinity Q purported to manage over $3 billion in investors' assets through the Funds. (*Id.*).

From at least 2018 through February 2021, the defendant perpetrated a major fraud on the Funds' investors. The defendant repeatedly lied to the Funds' investors and misrepresented the valuation of certain positions held by the Funds in two critical ways. First, the defendant falsely claimed that Infinity Q used an independent valuation service to compute the fair value of these positions when in fact the defendant had the ability to, and regularly did, interfere with the valuation service in order to manipulate the valuations. (*Id.* ¶ 15). Second, the defendant

---

[1] The defendant's illegal conduct is set forth in the PSR, as well as in the Government's recently-filed sentencing submission. To avoid needless repetition, the Government offers only a brief summary of the fraud here, but incorporates the facts set forth in the sentencing submission and PSR by reference.

mismodeled numerous positions held by the Funds within the valuation service in order to artificially inflate the positions' values, sometimes fraudulently boosting the value of an individual position by millions of dollars in order to artificially inflate the apparent value of the Funds' holdings.  Inflating the Funds' values allowed Infinity Q to demonstrate impressive growth to the market and resulted in higher management fees and performance fees for the defendant.

## II.  The Defendant's Guilty Plea

Shortly before trial, then-counsel for the defendant contacted the Government and expressed the defendant's interest in resolving the case through a guilty plea.  On November 20, 2022, the defendant and his attorneys signed a written plea agreement with the Government.  Pursuant to the terms of that agreement, on November 21, 2022, the defendant entered a plea of guilty on the record in open court to Count One of the Indictment, which charged him with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17 Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

In his written plea agreement the defendant "acknowledge[d] that he ha[d] accepted this Agreement and decided to plead guilty because he [wa]s in fact guilty."  The defendant also "waive[d] any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement."

At the outset of the change-of-plea colloquy, the defendant swore an oath to be truthful and stated that he understood that he could be prosecuted for perjury if anything he said was not truthful.  (Plea Tr. 3).  The Court then carefully questioned the defendant regarding, among other

3

things, his history of depression and PTSD to ensure that the defendant was competent to knowingly and voluntarily waive his rights and enter a guilty plea. (*See* Plea Tr. 3-4). At the conclusion of that exchange, the defendant affirmed that his mind was clear and that he understood what was happening, the defendant's attorney confirmed that he had no doubt as to the defendant's competence, and the Court found the defendant competent. (Plea Tr. 4-5).

Also at the colloquy, the defendant confirmed that he understood that he would not be able to withdraw his guilty plea after it was entered, and that he had not been threatened or forced to enter his plea. (Plea Tr. 11). The Court then discussed with the defendant his plea agreement with the Government, and the defendant assured the Court that he had read the agreement with care and discussed it with his attorneys before signing it. (Plea Tr. 11-12). The Court then asked the defendant to explain "what you did that makes you believe you're guilty of the crime charged in Count One." (Plea Tr. 12). The defendant explained as follows:

> I made false statements of material fact to investors in the Infinity Q funds that I managed, and I did so knowingly, willfully, and with the intent to defraud. Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives. However, I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported. I knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place. Some of the communications with investors occurred over the phone and by email in the Southern District of New York. I acknowledge that my actions caused investors to lose money, and for this I am truly sorry.

(Plea Tr. 13). In response to further inquiry by the Court, the defendant confirmed that he knew what he was doing was wrong and against the law. (Plea Tr. 14).

4

# ARGUMENT

## I. Applicable Law

A guilty plea is a "grave and solemn act," not to be entered or withdrawn lightly. *United States v. Hyde*, 520 U.S. 670, 677 (1997). Allowing a defendant to "withdraw his guilty plea simply on a lark" serves to "debase[ ] the judicial proceeding at which a defendant pleads and the court accepts his plea" and "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." *Id.* at 676-77. Thus, "[t]he standard for withdrawing a guilty plea is stringent because society has a strong interest in the finality of guilty pleas," and "allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Rose*, 891 F.3d 82, 85 (2d Cir. 2018). Accordingly, prior to sentencing, a defendant may only withdraw a guilty plea if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "Where a motion to withdraw a plea is premised on involuntariness, the 'defendant must raise a significant question about the voluntariness of the original plea.'" *United States v. Doe*, 537 F.3d 204, 211 (2d Cir. 2008) (quoting *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997)).

The Second Circuit has directed district courts to consider the following factors to determine whether a defendant has provided a "fair and just reason" for withdrawing a guilty plea:

> (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea.

*Rose*, 891 F.3d at 85; *accord Doe*, 537 F.3d at 210-211.  Courts "may also look to whether the defendant has raised a significant question about the voluntariness of the original plea." *United States v. Rivernider*, 828 F.3d 91, 104 (2d Cir. 2016).

With respect to the first factor, "[s]olemn declarations in open court" during a plea allocution "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  Thus, "a defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." *Torres*, 129 F.3d at 715.  With respect to the second factor, "a long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses." *United States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992).  Finally, "prejudice" includes "depriving the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it, as well as the potential difficulty to the Government in securing evidence against the defendant that would have been easier to secure at an earlier moment in time." *United States v. Lopez*, 385 F.3d 245, 255 (2d Cir. 2004).

"The defendant has the burden of demonstrating valid grounds for withdrawal." *United States v. Gonzalez*, 647 F.3d 41, 56 (2d Cir. 2011).  "A defendant is not entitled to an evidentiary hearing as a matter of right whenever he seeks to withdraw his guilty plea." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992).  To justify an evidentiary hearing, "the defendant must present some significant questions concerning the voluntariness or general validity of the plea." *Id.*  A district court may deny a defendant's motion to withdraw a guilty plea without a hearing "where the defendant's allegations merely contradict the record, are inherently incredible, or are simply conclusory." *Torres*, 129 F.3d at 715.

The decision whether to allow a requested withdrawal of a guilty plea is committed to the sound discretion of the district court. *See, e.g.*, *Gonzalez*, 647 F.3d at 56. A district court's denial of a motion to withdraw a guilty plea is reviewed for abuse of discretion, and any findings of fact in connection with that decision are reviewed for clear error. *Rivernider*, 828 F.3d at 104.

## II. Discussion

The defendant has failed to "show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). None of the relevant considerations supported granting the defendant's motion. *See Rose*, 891 F.3d at 85; *Rivernider*, 828 F.3d at 104.

### A. The Defendant Is Not Innocent

The defendant claims that he is legally innocent of the charge to which he pleaded guilty just months ago. But this claim is conclusively refuted, not only by his plea allocution but also by the evidence. As an initial matter, the defendant's present claims of innocence are flatly contradicted by his acknowledgment – both in a written plea agreement and in open court – that he was guilty of the crime to which he pleaded, that he manipulated valuations, that he misled his investors, and that he knew he was acting both wrongfully and unlawfully. (Plea Tr. 13-14).

Further, the defendant's factual claims are not supported by the documents on which he relies. The defendant claims that he did not mislead investors regarding Infinity Q's use of BVAL as an independent valuation service, because his "authority to depart from BVAL valuations was expressly and repeatedly disclosed to investors in the funds' disclosure documents." (Def. Mot. 5). In support of this claim, the defendant cites various Fund documents. (*Id.* at 6-8).

The cited language does not make out a claim of legal innocence. The handful of cherry-picked quotations, which are general statements about the defendant's discretion to select a valuation process, ignore the defendant's <u>specific</u> promises about the actual valuation process that he put in place. For years, the defendant consistently told investors and stakeholders that Infinity

7

Q was using BVAL, an independent valuation process, to value the Funds' positions. He further informed them that BVAL was the best and most accurate service available for valuation.[2] The defendant's statements include:

- In an October 2016 email to Infinity Q's administrator: "We intentionally removed ourselves from the valuation of these securities to allow BVAL to remain independent. . . . We also gain comfort because [when using BVAL] there is no discretion taken."

- In an August 2016 email to Infinity Q's administrator and a member of Mutual Fund's valuation committee: "We provide the term sheet, and they created the pricing model. We have not had any input into their models, and they independently provide the values."

- In a May 2018 email to the trustee of the Mutual Fund and members of the Mutual Fund's valuation committee: after an analysis "of derivatives pricing services," the defendant "continue[d] to feel that Bloomberg is the best suited to price our portfolios."

- In a December 2020 meeting with Infinity Q's auditor, the defendant stated that Infinity Q "uses one of Bloomberg's services called Bloomberg Valuation Service ("BVAL") to value all swap contracts" and that "[w]ith the exception of implied

---

[2] In the instant motion, the defendant asserts that BVAL's valuation process had certain weaknesses. But BVAL's strengths or weaknesses are not relevant. BVAL was selected by the defendant himself, and the defendant promised his investors that he would be using BVAL as an independent third-party valuer of Infinity Q's positions.

Moreover, to the extent that flaws in BVAL could be relevant, they would only be relevant if the defendant was aware of these flaws at the time and based his actions on them. There is no basis for that notion.

correlation, all other inputs (start date, maturity date, strike %, vega notional, etc.) for the valuation of correlation swaps come directly from the term sheet with the counterparty."

These promises of an independent, third-party valuation system were critical to investors' decision to invest in such a complex and opaque trading strategy. But these promises were lies – as detailed above, the defendant was not using BVAL as an independent valuation service, but was instead corrupting BVAL's independence with his self-serving alterations, so that he could inflate the valuation of his Funds. The alterations subverted the independence of the BVAL valuation process, an independence that investors cared deeply about. As such, the alterations were a fraud, whatever the resulting valuations were.

The defendant knows that investors cared about his claims regarding BVAL's independence, and he knew it at the time of the fraud. This is why when the SEC questioned him about Infinity Q's valuation process in 2020, he lied. If the defendant's alterations had been permitted by the language the defendant now cites in his motion, then, when the SEC asked pointed questions about the Funds' valuation procedures, the defendant would have had no problem disclosing his alterations. But of course the defendant did not do so: he lied to the SEC, because he knew full well that these alterations were not permitted. These lies to the SEC are powerful evidence of consciousness of guilt.

The defendant's lies to the auditors similarly show that he knew his alterations were not permitted. If the alterations were permitted by Fund documents, as the defendant now claims, then there was no need to send altered term sheets to auditors. But again, as with the SEC, the defendant lied to his auditors, which is powerful consciousness of guilt.

The evidence thus conclusively proves that the defendant lied to investors about the valuation process's independence, and the defendant has not offered any basis to show legal innocence. The defendant's repeated and extensive interference in the functioning of BVAL despite his explicit claims to the contrary is alone sufficient to establish his guilt, whatever the alterations and whatever the resulting valuations.

But of course that is not the full extent of the fraud, because the resulting valuations were not "objectively reasonable," as the defendant now claims. (Def. Mot. 11).[3] As set forth in the voluminous prior motion practice, as well as the reports of the Government's expert, attached as Exhibits A and B, the defendant's alterations to BVAL were not designed to improve the accuracy of the valuation process. Their purpose was to unreasonably and deceptively inflate the value of the Funds' holdings, and therefore the defendant's compensation. Indeed, the defendant altered data in ways that cannot possibly be defended or described as efforts to increase the accuracy of valuations. These include (i) calculating values for positions that could only be true if volatility were negative, something that is impossible; (ii) valuing certain swaps above their maximum

---

[3] The defendant argues that the report of Dr. Atanu Saha supports his arguments about objective reasonableness. (Def. Mot. 11). But it does no such thing. As the Court noted during the final pretrial conference, "there is no defense presented in Dr. Saha's report of the accuracy or validity of the defendant's valuations. [Dr. Saha] does not undertake his own independent review of each of those positions and render an opinion that that was a more perfect valuation than any other number, much less the numbers reflected in Dr. Sabry's report, using the Bloomberg scripts as described in that report." (11/18/22 Final Pretrial Conf. T. 109).

The defendant also cites the annual audits of the Mutual Fund performed by Eisner Amper as evidence that his valuations and methodologies were objectively reasonable. (Def. Mot. 12). This claim is astonishing: these audits were conducted based on fabricated term sheets that the defendant provided to the auditors. The defendant gave the auditors terms sheets in which he had manually altered certain terms of volatility-based OTC positions, in order to ensure that the auditor's computations of fair market value would be in line with those that the defendant was generating through BVAL. (Ind. ¶¶ 35-36). As the defendant well knew, if the auditors had been given the true term sheets, they would likely have arrived at values that substantially differed from those that the defendant reported from BVAL, which would have been a glaring red flag for the auditors.

possible values; (iii) rewriting BVAL's script to ignore the corridors on corridor variance swaps; and (iv) rewriting BVAL's script to reflect an impossibly large annualization factor.[4] The defendant's alterations were so brazen that at times Infinity Q reported two different values for the exact same position, depending on whether the position was in the Mutual Fund or the Hedge Fund. There is no plausible explanation for why the exact same position should have been valued differently between the two Funds.

### B. The Passage of Time Supports Denial of the Defendant's Motion

The four months that have elapsed between the plea and the instant motion likewise weigh against the defendant's motion. The defendant pleaded guilty on November 21, 2022. He filed his motion to withdraw his guilty plea on March 24, 2023, more than four months later. While defense counsel alleges that during these four months, the defendant did "everything in his power" to withdraw his guilty plea, he offers no factual support for this bare allegation. Courts have routinely denied defendants' requests to withdraw their pleas based on substantially shorter delays. *See, e.g., United States v. Carr*, 740 F.2d 339, 345 (5th Cir. 1984) (22 days); *Nunez Cordero v. United States*, 533 F.2d 723, 726 (1st Cir. 1976) (two weeks); *United States v. Gonzalez-Mercado*, 808 F.2d 796, 801 (11th Cir. 1987) (27 days); *United States v. Navarro-Flores*, 628 F.2d 1178, 1178, 1183-84 (9th Cir. 1980) (39 days); *United States v. Spencer*, 836 F.2d 236, 237-39 (6th Cir. 1987) (five weeks); *United States v. Wilson*, 828 F. Supp. 2d 679, 685 (S.D.N.Y. 2011) (70 days), *aff'd*, 523 F. App'x 30, 31 (2d Cir. 2013); *United States v. Carraballo*, No. 98 Cr. 1316 (RWS), 2001 WL 111284, at *5 (S.D.N.Y. Feb. 13, 2001) (seven weeks). As the Fifth Circuit stated in *Carr*:

---

[4] The annualization factor reflects the number of trading days in a year, generally 252. The defendant at times used an annualization factor of 400 or more – more than the total number of days in a year, much less the number of <u>trading</u> days.

11

> The rationale for allowing a defendant to withdraw a guilty plea is to permit him to undo a plea that was unknowingly made at the time it was entered. The purpose is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.

740 F.2d at 345.

### C. Withdrawal of the Defendant's Plea Would Prejudice the Government

The Government would be seriously prejudiced by the withdrawal of the defendant's guilty plea. *See Rose*, 891 F.3d at 85. It is plain that permitting the defendant to withdraw his plea would deprive the Government "of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it." *Lopez*, 385 F.3d at 255. As with any case, preparing for a trial would require the Government to expend significant time and resources. This is especially true here. Since the defendant's plea, two of the three prosecutors handling the case have left the U.S. Attorney's Office, and would not be available to retry the case. New prosecutors would need to be assigned and spend months familiarizing themselves with the complex evidentiary record and sophisticated financial instruments at issue in this case.[5] Witnesses, who rearranged their schedules to travel to New York to testify at trial, only to have the defendant plead mere days before trial was to begin, would again have to reconfigure busy schedules and lives to testify. And because the Government provided the defendant with Jencks Act material one month before the original trial date, the defendant will have had months of additional time to tailor his cover story to the Government's evidence.

---

[5] The defendant asserts that the Government can simply "receive[] assistance from the SEC," which has an ongoing investigation. (Def. Mot. 17). But as the Court knows, the SEC conducted a parallel investigation, separate and apart from the criminal investigation. The status of the SEC's civil investigation would not relieve the burden on the U.S. Attorney's Office of preparing and trying its criminal case.

### D. The Defendant's Plea Was Knowing and Voluntary

The defendant claims that his plea was not intelligent and voluntary, because his "mental illnesses" plus "immense pressure" from prior defense counsel "made him unable to weigh his options rationally." (Def. Mot. 18). The defendant's unsworn self-serving allegations—with no detail or evidentiary support—are inadequate to raise a "significant question" about voluntariness, or to excuse the delay in making his motion. *Gonzalez*, 970 F.2d at 1099 (denying motion to withdraw guilty plea where defendant "provided no factual support" for his allegations of involuntariness). It is the defendant's burden to establish a "fair and just" reason for the withdrawal of his guilty plea under Rule 11, *see Doe*, 537 F.3d at 210, and the onus is therefore on him to submit evidence to support his claims, such as affidavits and documentary proof about his conversations with his attorneys before his guilty plea. The defendant has done nothing to meet this burden.[6] The defendant's "simply conclusory" allegations are not sufficient under the law to disturb the finality of a guilty plea. *Torres*, 129 F.3d at 715; *United States v. Polanco*, 367 F. App'x 226, 227 (2d Cir. 2010) (where a defendant "offer[s] nothing other than his" own statements that "contradict" his plea allocution, that is "not enough"). The defendant's failure to adduce anything to support his claims is particularly glaring given that, as described above and discussed further below, the very issues raised by the defendant were addressed on the record during his plea colloquy, before the Court found the defendant competent to enter a plea, and the defendant repeatedly confirmed that he understood what was happening and was not threatened or forced to plead guilty.

---

[6] In connection with his sentencing, the defendant submitted a psychological evaluation. Before creating this evaluation, the psychologist met with the defendant on multiple occasions, all of them after the defendant's plea. It is noteworthy that in the report's many pages, there is not a single mention of the defendant's desire to withdraw the plea or any of the mental agitation around the plea described in the defendant's motions.

13

The defendant has requested a hearing on the matter. But as in *Gonzalez*, the Court is not required "to hold an evidentiary hearing into the conclusory and unsupported allegations underlying [the defendant's] application to withdraw his plea." 970 F.3d at 1097, 1100-01 (concluding that the defendant's motion was "undercut by its timing, coming nearly seven months after the plea," and "contradicted [the defendant's] earlier statements made under oath at his plea allocution").

Further, any such hearing would be in vain, as the defendant knowingly, intelligently, and voluntarily pleaded guilty to his crimes on November 21, 2022. The defendant does not assert that the guilty plea proceeding was deficient in any way. Nor could he. The Court ensured that the defendant understood the nature of the charges, the maximum penalties he faced, and the trial rights he was giving up, as well as that he had reviewed his plea agreement, understood its terms, and was not pleading guilty on the basis of any other promises or threats. The defendant stated multiple times, under oath, that he was satisfied with his lawyers' representation. The defendant then gave a clear allocution, acknowledging: (i) that he "told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives"; (ii) that in fact "I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported"; (iii) that he knew "that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place"; and (iv) that while he was doing these actions, he understood that he was doing something wrong and violating the law. (Plea T. 13-14).

As in *Gonzalez*, at "the time the plea was entered," the Court was properly "satisfied that the plea was knowing and voluntary and not the result of force or any promises beyond those contained" in the Plea Agreement. 970 F.3d at 1099; *see also Ventura v. Meachum*, 957 F.2d

1048, 1056 (2d Cir. 1992) (in light of defendant's "emphatic statement" that he understood the plea agreement and that no other promises caused him to plead guilty, "it was not reasonable to infer that somehow" the defendant "was still relying" on conflicting prior representations by his counsel); *Polanco*, 367 F. App'x at 227 (district court properly denied motion to withdraw guilty plea without further factfinding, despite defendant's assertion that counsel pressured him to plead guilty, where defendant "failed to offer any objective evidence that would undermine his clearly articulated voluntary plea").

### E. The Defendant's *Brady* Claims Are Meritless

Last, the defendant alleges that he should be entitled to withdraw his plea due to the Government's alleged failure to disclose *Brady* evidence. This allegation is baseless and should be promptly rejected. First, the defendant alleges that "*Brady*-related issues have plagued" him "throughout this case." This is untrue. The two "*Brady*-related issues" that the defendant now cites were both rejected by the Court as meritless on previous occasions.

The defendant first cites his unsuccessful pretrial motion to require the Government to review the complete investigative files of the SEC, a separate and independent agency that is not part of the prosecution team, which the Court properly denied. The defendant next cites his unsuccessful motion to adjourn the trial based on the prompt disclosure of a small number of documents that were never in the Government's possession. The defendant requested these documents for the first time shortly before trial, and the Government sought them from the SEC and then promptly turned them over to the defendant. The Court is familiar with this issue, and the Government will not repeat its prior briefing here, though it is noteworthy that even now, months after the prompt production of the documents, the defendant has not identified a single document in that supplemental production that contains exculpatory material.

The third issue the defendant cites is a new one, and is as meritless as his other two arguments. The defendant claims that the Government committed a disclosure violation when it did not disclose to the defendant the existence of an SEC investigation into Bloomberg's disclosures around BVAL. (Def. Mot. 22). This argument is entirely without merit. As a preliminary matter, the defendant does not point to any information in the possession of the prosecution team that should have been, but was not, disclosed. Rather, he cites an investigation by the SEC, an independent and separate agency, that was publicly resolved only in January 2023, two months after his plea. Second, as noted above, any weaknesses in BVAL[7] do not exculpate the defendant. Whether BVAL was a good tool or not, it was the defendant who chose it, told investors he would use it as an independent valuation tool, and then failed to do so.

In any event, the defendant waived these claims in his plea agreement with the Government and by pleading guilty, and has offered no basis to suppose that that waiver was anything other than knowing and voluntary.

---

[7] Indeed, it is not clear that the settlement was due to any substantive weaknesses in BVAL, as opposed to Bloomberg's failure to disclose certain facts about the BVAL program to its users.

## CONCLUSION

The defendant has not shown that his plea was involuntary, and all of the factors set forth in *Rose* weigh in favor of denying the defendant's claim. The Court should therefore deny the defendant's motion to withdraw his guilty plea without an evidentiary hearing.

Dated: New York, New York
April 3, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:      /s/
Margaret Graham
Assistant United States Attorney
(212) 637-2923
