# EXHIBIT B

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                       :

UNITED STATES OF AMERICA         :

                                         :   22 Cr. 105 (DLC)

 – v. –                                  :

                                         :

JAMES VELISSARIS,                :

                                         :

 Defendant.                   :

                                         :

-------------------------------------------------------------------x

## REPORT OF FATEN SABRY, PH.D.

## September 12, 2022

# TABLE OF CONTENTS

Table of Contents .................................................................................................................. i

List of Exhibits .................................................................................................................... iii

I.      Assignment and Summary of Analyses ..................................................................... 1

II.     Qualifications and Materials Relied Upon ................................................................ 8
        A. Qualifications ...................................................................................................... 8
        B. Materials Relied Upon ......................................................................................... 9
        C. Remuneration ....................................................................................................... 9

III.    Background .................................................................................................................. 9
        A. Basic Concepts of Variance Swaps ...................................................................... 9
        B. Infinity Q's Diversified Alpha Fund and Volatility Alpha Fund ........................ 13
        C. Overview of Infinity Q Funds' Portfolio Holdings ............................................ 16

IV.     IQ's Alterations of the Terms of Securities Inflated the Reported Valuations ........ 21
        A. Bloomberg Valuation Tools that IQ Used in Managing the Funds ................... 22
        B. Analysis of Valuations of 62 OTC Positions in DAF and VAF ......................... 29
        C. Infinity Q's Alterations of the Contractual Terms of the Positions ................... 31
        D. Identical Positions in DAF and VAF with Conflicting IQ Valuations ............... 35
        E. IQ's Alterations Led to Inflated Valuations ...................................................... 38

V.      Certain IQ Valuations Are Mathematically Impossible and Inflated ..................... 47
        A. What is a Mathematically Impossible Valuation? .............................................. 49
        B. Examples of Impossible Valuations and the Impact of the Altered Contractual Terms
           of the Position ..................................................................................................... 50
        C. All Seven Variance Swaps with Bloomberg Scripts and IQ as Seller had Impossible
           Valuations reported by IQ ................................................................................... 57

VI.     Infinity Q's Alterations Depend on Whether It is Short or Long and Inflated Its
        Reported Valuations .................................................................................................. 59

VII.    The IQ Valuations Inflated the Net Asset Value, Management Fees, and Performance
        Allocations of the Funds .......................................................................................... 69
        A. Comparison of the Estimated Net Asset Value of Infinity Q Using Counterparty
           Valuations to the Reported Net Asset Value IQ's Reported NAV ..................... 70
        B. Comparison of Management Fees based on Historical and Counterparty Valuations ...... 73
        C. Comparison of Performance Allocation based on Historical and Counterparty
           Valuations ........................................................................................................... 74
        D. But-For NAV for VAF Using My Valuations For the 62 Positions with Bloomberg
           Scripts ................................................................................................................. 75

VIII.   Miscellaneous .......................................................................................................... 77

i

Appendix A: Description Of Types Of Securities In The Infinity Q Funds .................................78

Appendix B: List Of Positions With Bloomberg Scripts .............................................................84

Appendix C: Term Sheet Matching Process .................................................................................88

Appendix D: Valuation of the 62 Positions with Bloomberg Scripts ..........................................91

ii

## LIST OF EXHIBITS

Exhibit 1.    Curriculum Vitae ......................................................................................9

Exhibit 2.    Materials Relied Upon ...............................................................................9

Exhibit 3.    Diagram of the Payoff of a Variance Swap ...........................................10

Exhibit 4.    Example of a Term Sheet for a Variance Swap on the S&P 500 Index ...............11

Exhibit 5.    Composition of the Diversified Alpha Fund (DAF) Investments as of November 30, 2020......................................................................................17

Exhibit 6.    Composition of the Volatility Alpha Fund (VAF) Investments as of December 31, 2019......................................................................................19

Exhibit 7.    IQ Reported Quarterly Net Asset Value (NAV) of the Diversified Alpha Fund (DAF) from November 2014 Through November 2020.......................................20

Exhibit 8.    IQ Reported Monthly Net Asset Value (NAV) of the Volatility Alpha Fund (VAF) from February 2017 Through January 2021 ...............................21

Exhibit 9.    Screenshot of the Bloomberg OVME Valuation For Example 1 ..........................24

Exhibit 10.   Screenshot of the Bloomberg DLIB Valuation for Example 2.............................27

Exhibit 11.   Screenshot of Bloomberg Audit Trail Data ..........................................29

Exhibit 12.   Summary of Alterations Identified In the Bloomberg Scripts for the 62 Positions that IQ Valued Using DLIB, OVME, and OVML................................34

Exhibit 13.   Summary of Alterations Identified In the Bloomberg Scripts With Allowances in Differences to Term Sheet Values for the 62 Positions IQ Valued Using DLIB, OVME, and OVML......................................................34

Exhibit 14.   IQ Valuations for DAF and VAF in Example 3 ....................................36

Exhibit 15.   IQ Valuations for DAF and VAF in Example 4 ....................................38

Exhibit 16.   Comparison of IQ Reported Values and My Valuations With Term Sheet Values for Example 5...........................................................................40

Exhibit 17.   Comparison of IQ Reported Values and My Replication with Altered Terms for Example 5...........................................................................41

Exhibit 18.   Comparison of IQ Reported Values and My Valuations With Term Sheet Values for Example 6...........................................................................43

Exhibit 19.   Comparison of IQ Reported Values and My Replication with Altered Terms for Example 6 ...........................................................................................44

Exhibit 20.   Comparison of IQ Reported Values and My Valuations with Term Sheet Values for 62 OTC Positions ...................................................................45

Exhibit 21.   Comparison of My Valuations With Term Sheet Values to the Counterparties' Valuations for the 62 OTC Positions ........................................47

Exhibit 22.   IQ Reported Valuations and Impossible Valuations for Example 7 .....................52

Exhibit 23.   Altered Terms and Expected Variance for Impossible Valuations for Example 7...............................................................................................................53

Exhibit 24.   IQ Reported Valuations and Impossible Valuations for Example 8 .....................55

Exhibit 25.   Altered Terms and Expected Variance for Impossible Valuations for Example 8................................................................................................................56

Exhibit 26.   Summary of Impossible Valuations in IQ Reported Values.................................58

Exhibit 27.   Summary of Inflated Valuations for Impossible Valuations ................................59

Exhibit 28.   Expected Variance (VS Rate as Variance) as of April 30, 2020 for VAF Variance Swaps of Russell 2000 Index Maturing August 21, 2020 for Example 9 ........................................................................................................62

Exhibit 29.   Expected Variance (VS Rate as Variance) between April 30, 2020 and July 31, 2020 for VAF Variance Swaps of Russell 2000 Index Maturing On August 21, 2020 for Example 9 .........................................................................64

Exhibit 30.   Expected Variance (VS Rate as Variance) as of April 30, 2020 for DAF Variance Swaps of Russell 2000 Index Maturing August 21, 2020 for Example 10 ......................................................................................................67

Exhibit 31.   Expected Variance (VS Rate as Variance) Between April 30, 2020 and July 31, 2020 for DAF Variance Swaps of Russell 2000 Index Maturing August 21, 2020 for Example 10........................................................................68

Exhibit 32.   IQ's and Counterparty-Based NAVs for VAF Between February 2017 to January 2021 ...........................................................................................72

Exhibit 33.   Ratio of IQ's NAV to Counterparty-Based NAV for VAF Between February 2017 to January 2021 ...............................................................................73

Exhibit 34.   Management Fees for Infinity Q Volatility Alpha Fund between February 2017 to January 2021 ...........................................................................74

iv

**CONFIDENTIAL**

Exhibit 35.   Performance Allocation for Infinity Q Volatility Alpha Fund From February 2017 to January 2021 ................................................................................................75

Exhibit 36.   But-For NAV for Infinity Q Volatility Alpha Fund in 2020 and 2021 Based on Valuation Using Term Sheet Values for 27 VAF Positions ..................................76

Exhibit 37.   List of 62 Positions by Overlapping Positions in DAF and VAF..........................84

Exhibit 38.   List of Twenty Identical Positions in DAF and VAF With the Largest Differences in Valuation as of May 2020 ..............................................................85

Exhibit 39.   List of Twenty Positions With the Largest Number of UPDATE DEAL Actions in the Bloomberg Audit Trail Data............................................................86

Exhibit 40.   List of 62 Positions by Bloomberg Valuation Tool ................................................87

Exhibit 41.   List of Matched Term Sheets for the 62 Positions with Bloomberg Scripts .........90

Exhibit 42.   Screenshot of My Bloomberg Portfolio for the 62 Positions With Monthly Scripts .....................................................................................................................92

Exhibit 43.   Screenshot of Repricing the Bloomberg Portfolio................................................93

v

CONFIDENTIAL

# I.   ASSIGNMENT AND SUMMARY OF ANALYSES

1.      I have been retained by the Department of Justice ("DOJ") in connection with the prosecution of James Velissaris regarding his management of and financial reporting of a mutual fund and a hedge fund as Chief Investment Officer of Infinity Q Capital Management LLC ("Infinity Q" or "IQ") in *United States of America v. James Velissaris* (1:22-cr-00105, USDC SDNY). Infinity Q managed and ran two funds consisting of a mutual fund Diversified Alpha Fund ("DAF") with a reported net asset value ("NAV") of approximately $1.7 billion in February 2021 and a hedge fund Volatility Alpha Fund ("VAF") with a reported NAV of approximately $1.4 billion in February 2021.[1] I have been asked to analyze IQ's valuation of over-the-counter ("OTC") derivatives in DAF and VAF and review and assess the code, inputs and parameters that Infinity Q used in those valuations.

2.      I understand that the DOJ alleges that James Velissaris defrauded investors in DAF and VAF from at least 2018 through at least February 2021 by making false and misleading statements about Infinity Q's valuations of OTC derivative securities.[2] One of the allegations is that Mr. Velissaris made alterations to the contractual terms of OTC derivative securities in his valuations which led to allegedly inflated prices that did not reflect the fair value of the positions.[3] Infinity Q told investors that it reported the fair value of OTC derivatives using Bloomberg or other independent third-party providers.[4] I understand that while Mr. Velissaris used valuation software from Bloomberg for his valuation work, he altered the underlying inputs of certain OTC derivative securities and changed the code and parameters from what was reported in the term sheets as he valued the positions in the Infinity Q portfolios.[5] As a result of the inflated valuations, investors allegedly overpaid management fees and performance allocation.

---

[1] *United States of America v. James Velissaris*, Sealed Indictment, 1:22-cr-00105, USDC SDNY, p. 5.

[2] *United States of America v. James Velissaris*, Sealed Indictment, 1:22-cr-00105, USDC SDNY, pp. 1-3.

[3] *United States of America v. James Velissaris*, Sealed Indictment, 1:22-cr-00105, USDC SDNY, pp. 1-3.

[4] *United States of America v. James Velissaris*, Sealed Indictment, 1:22-cr-00105, USDC SDNY, pp. 1-3.

[5] *United States of America v. James Velissaris*, Sealed Indictment, 1:22-cr-00105, USDC SDNY, pp. 9-13.

1

CONFIDENTIAL

3.      The Infinity Q funds invested in several categories of securities, including OTC securities. OTC securities are bilateral trades between two parties, as opposed to trades that occur over an exchange. Each OTC security is governed by a document that is referred to as a term sheet, which includes the details of agreed-upon terms such as the size of the trade (notional amount or vega notional), start and end dates (effective date and maturity date), and calculations for the payment between the parties at the maturity date. OTC securities typically do not have readily available market prices and are generally less liquid than exchange-traded securities. OTC securities can have standard pricing models that market participants use to value the positions. OTC derivative securities are a type of OTC securities where the position value derives from the price of another asset or rate, such as the S&P 500 Index.

4.      Swaps contracts made up the majority of the investments by the Infinity Q funds in its OTC derivative positions. A swap is "an agreement between two companies to exchange cash flows in the future" based on the performance of an underlying reference asset, such as the S&P 500 Index, and notional principal amount.[6] Each cash flow is referred to as one leg of the swap. Generally, swaps involve a fixed leg, while the other is variable. The payoff of the swap is based on the performance of various reference rates or assets, such as interest rates, foreign exchange rates, returns of equities, or the volatility of equities.[7]

5.      The majority of the Infinity Q funds' investments in derivatives were swap contracts on the variance or volatility of certain assets. In finance, volatility is the degree of variation of the price of an asset over time.[8] For some positions, IQ would take a long position on the volatility of a given index. In that case, IQ would be the buyer of volatility and profit if volatility is high and lose if volatility is low. In other positions, IQ would be short volatility and would be the seller of volatility. In this case, IQ as a seller of volatility would profit from the swap if volatility is low and lose if volatility is high.

---

[6] Hull, John C. *Options, Futures, and Other Derivatives* (8th Ed.). Prentice Hall, Boston, 2012, p. 148.

[7] Volatility of the S&P 500 Index, for example, is the rate of change in the price of the index and can be thought of as the level of uncertainty in the value of the index.

[8] Generally, volatility is measured by the standard deviation of logarithmic returns. Variance is the square of volatility.

2

CONFIDENTIAL

6.      Variance and volatility swaps are zero-sum transactions where the short position pays the long position usually at maturity of the agreement if the volatility is higher than expected and the long position pays the short position if the volatility is lower than expected. In this type of swap, the parties would agree to a strike price which is the expected or benchmark volatility for the swap (for example, it could be 20%). That is, the terms of a swap agreement are typically set so that the two sides of the swap agreement have equal value at the start of the agreement.

7.      If the volatility of the S&P 500 Index between the start date (effective date) of the swap and the end date (maturity date) is above the strike price, then the seller would have to pay the buyer, and vice versa. The amount of the payment would depend on how far above or below the actual or final realized volatility during the life of the swap is compared to the strike price and also depends on the notional amount or size of the swap. The notional amount is the size of the transaction agreed upon by the parties and is the basis for calculating the payment obligations between the parties—for example, the notional amount could be $10K or $10 million.

8.      Infinity Q valued OTC derivative securities using Bloomberg valuation tools. IQ would enter the OTC derivative securities trades into the Bloomberg system and create the positions by inputting the trade terms. IQ could and did edit the positions in the Bloomberg system and altered the trade terms, such as changes in the strike price or notional amount to values that are different from the ones in the contractual terms. The Bloomberg system has an "audit trail" feature that recorded some but not all the changes made to the positions and simultaneously tracked the values of some of the parameters, including changes to effective date and changes to maturity date. In addition, the Bloomberg system kept records of IQ's historical valuations, including the code it used, the parameters, and the inputs ("Bloomberg scripts" or "scripts"). The DOJ provided me with Bloomberg files that document the changes that IQ made to the contractual terms of the positions.

9.      I examined various financial files related to the mutual and hedge funds including the margin reports which include the valuations of the counterparties, the valuations of the net asset values of the funds, the term sheets, among other documents. In addition, I examined 733 month-end valuations for 62 OTC derivative positions through January 2021. I selected the 62 positions using two criteria: (1) identical positions between DAF and VAF that had the largest

3

CONFIDENTIAL

differences in the valuations as of the month-end valuation in May 2020; or (2) positions with the largest number of updates, including the changes that IQ made to the contractual terms of the securities as documented by the Bloomberg audit trail records. Identical positions are defined as ones that are held in the hedge and mutual funds at the same time and had identical specifications according to the term sheets, including the strike price, effective and maturity dates, and notional amounts. Certain identical positions had conflicting IQ valuations across the DAF and VAF positions as of the same dates. The selection criteria of the 62 positions aims to identify positions with alterations to the contractual terms that IQ made at the time of the valuations. The goal is to evaluate the impact of the alterations on the valuations, if at all. The DOJ provided me with the Bloomberg documentation that I refer to as "scripts" for each of the 62 positions. The Bloomberg scripts recorded the terms that IQ used in its valuations. Using the monthly scripts and the Bloomberg valuation tools, I examined the impact of the alterations on the valuations.

10.     My findings can be summarized as follows:

   a.   I examined IQ's alterations to the contractual terms of the 62 OTC derivatives using the monthly Bloomberg scripts for 733 month-end valuations for these positions and IQ's valuations using the same Bloomberg valuation tools IQ used to value the positions. My analysis shows that IQ's alterations led to inflated valuations. The analysis of the 733 month-end valuations of the 62 positions that I examined show that: 1) 92.9% of the month-end valuations as reported by IQ for the 62 positions were generated with altered contractual terms as compared to the term sheets. Using a cutoff of 10.0% difference between the term sheets and IQ's valuation inputs as the definition of alterations, I find that 78.0% of the month-end valuations as reported by IQ for the 62 positions were generated with altered contractual terms as compared to the term sheets; 2) 42.3% of the month-end valuations of the 62 positions were generated with alterations to the strike prices that exceeded a 10.0% difference from the strike prices as reported in the term sheets. Also, 14.7% of the month-end valuations were generated with alterations to the notional amount that exceeded a difference of 10.0% from the contractual notional, among other

4

CONFIDENTIAL

alterations; 3) the discrepancies in the DAF and VAF valuations for identical positions can be explained by IQ's alterations to the contractual terms; 4) using altered terms, IQ reported a market value of the 62 positions with monthly scripts in March 2020 as $186.1 million. However, using the actual inputs from the term sheets, I estimate the market value of the positions to be negative $46.2 million in March 2020, a difference of $232.3 million; and 5) I identified that 33 out of the 62 positions had closed by January 2021 and IQ had changed the terms of the positions back towards the contractual terms at or near the maturity dates for 9 of them. IQ's changes back towards the contractual terms for the 9 positions resulted in IQ valuations that are more in line with the valuations of its counterparties. See Section IV.

b. Certain alterations that IQ made to the contractual terms of variance swaps with IQ as seller resulted in mathematically impossible estimates because of the alterations. The variance is the degree of dispersion of the prices of the reference assets and cannot be a negative number. The valuations were impossible because the IQ valuations implied that the future variability of the price of assets like the Russell 2000 Index underlying the positions would be negative, which cannot be the case. In cases where IQ is the seller of a variance swap, its position increases in value as the variance of the price of the underlying asset decreases and is low. The maximum gain to IQ as a seller in these cases would be if the variance falls to zero. However, IQ reported valuations for some of its variance swaps that exceeded the maximum possible values (which is assuming variance is zero) and implied negative future variances of the prices of the reference assets, which is mathematically impossible. Out of the 62 positions with Bloomberg scripts, there are seven variance swaps where IQ was the variance seller. Each of the seven positions had mathematically impossible valuations reported by IQ in one or more months. Overall, I identified 30 impossible month-end IQ valuations for the seven positions. IQ's alterations to the contractual terms inflated the 30 monthly valuations and

5

led to mathematically impossible values (using the correct terms of the positions). The total inflation in the IQ valuations for the 30 instances of impossible valuations is $211.8 million, which is the difference between the IQ valuations and my valuations according to the contractual terms of the positions. See Section V.

c.   To further assess possible inconsistencies in the IQ valuations due to the alterations in the contractual terms, I compared the variance rate or expected volatility of positions with the same reference asset and maturity date for positions where IQ was a buyer and a seller. When valuing a variance swap, the forecast of the degree of dispersion of the price of the reference asset should be consistent whether the position is long or short. This is not the case in IQ's valuations due to the alterations. IQ altered the terms of long and short variance swaps on the Russell 2000 Index, for example, which had the same maturity date in a way that inflated the valuations of both positions. In addition, the alterations implied that IQ had contradictory expectations about the future variance of the Russell 2000 Index over the same time period. By contrast, my valuations and the counterparties' valuations of the same set of positions demonstrate consistent expectations about the expected variance whether the IQ positions are long or short. This means that IQ used high estimates of the future variance of the price of the Russell 2000 Index when it was a buyer and low estimates of the future variance of the price of the Russell 2000 Index when it was a seller, resulting in inflated values for both short and long positions. While different market participants may have different views regarding expected or projected variance of the prices of the underlying assets, there are no parameters or features in the term sheets that would explain why the same person would have conflicting or inconsistent expected future variances of the price of the same asset over the same time period. IQ's valuations implied conflicting variance assumptions because of the alterations it made, leading to inflated valuations. See Section VI.

6

CONFIDENTIAL

d. The historical NAV based on IQ's valuations is overstated as compared to the NAV based on the valuations of the counterparties. Even if I focus on the valuations of the 62 positions only and recalculate the NAV of the hedge fund, my valuations show that IQ overstated the NAV of the fund. First, I recalculated the NAV of the hedge fund each month by replacing the historical IQ valuations with valuations from IQ's counterparties. The overstatements were largest in and after March 2020 following the COVID-19 crisis. The largest difference between the reported VAF NAV and the counterparties-based VAF NAV is in March 2020, with a difference in the NAV of about $617.7 million. In other words, the IQ reported a NAV for the hedge fund that was 223.4% larger than the NAV using the valuations of the counterparties. Given that the counterparties' estimates are usually lower than IQ's reported valuations, the management fees and performance allocation would have been lower under the NAV using the valuations from the counterparties than the fees and allocation that IQ actually charged its investors. Using IQ's valuations, lifetime management fees to Infinity Q in VAF totaled $24.4 million. Management fees would equal $16.1 million after correcting for the inflation in IQ's valuations using the valuations from its counterparties. The difference in management fees for VAF when using the counterparties' valuations is $8.4 million. The lifetime performance allocation to Infinity Q in VAF was $21.0 million, while it would have been $1.0 million using the valuations of the counterparties. As a result, Infinity Q was allocated $20.0 million in excess performance allocation. If I only considered the inflated valuations for the 27 VAF positions with Bloomberg scripts, then Infinity Q received $1.4 million in excess management fees and $8.5 million in excess performance allocation for the hedge fund. See Section VII.

11. I understand that the Defendant may advance analyses regarding the issues in this matter. If requested, I will respond to such analyses and findings in a rebuttal report.

7

## II.   QUALIFICATIONS AND MATERIALS RELIED UPON

### A.  Qualifications

12.    I am a Managing Director in the Securities and Finance Practice at NERA and the Chair of the Global Securities and Finance Practice. I have over twenty years of experience in economic and financial consulting in the valuation of fixed income securities, derivatives, illiquid assets, businesses and litigation settlements. I have consulted in disputes involving investment management firms, leveraged buyouts, distressed exchanges, options, swaps, and hedging strategies, among other issues. I have testified as an expert in State and Federal Courts.

13.    I have provided expert testimony on credit default swaps, collateralized debt obligations ("CDOs"), residential mortgage-backed securities ("RMBS"), and mortgage derivatives; deposition testimony on options trading in an SEC litigation against a hedge fund; and deposition testimony, trial testimony and expert reports on econometric analysis of materiality and damages, as well as class certification issues in various matters related to structured products and fixed income. I have analyzed the performance of hedge funds and mutual funds that invested in options and other derivatives positions, allocated settlements in two of the largest private residential mortgage-backed securities settlements in the "put-back" litigation. In addition, I have provided consulting analyses of trading data and trade allocation for various types of funds and analyzed risk management and hedging strategies of securities, including options and other derivatives, to assess losses and allegations of misrepresentations of the risks of the portfolios.

14.    I am the author of various articles on the credit crisis, mortgage defaults, credit default swaps, LIBOR transition, the impact of securitization on the cost and availability of credit to consumers, and claiming behavior. My research has been published as a chapter in *The Handbook of Mortgage-Backed Securities*, edited by Dr. Frank J. Fabozzi. I am also the lead author of an econometric study on the impact of securitization on the costs and availability of credit for consumers and liquidity. My research has also been published in the *Journal of Structured Finance*, *Journal of Real Estate Practice*, *Journal of Investment Compliance*, *Journal of Alternative Investments*, *Business Economics*, *International Trade Journal*, the *ABA Section of Litigation*, and other periodicals. I am a member of the American Finance Association and the American Statistics Association. I have been accredited as a professional statistician by the

8

American Statistics Association. I received my Ph.D. in Business from Stanford Business School and prior to joining NERA, I was a Post-Doctoral Fellow at the International Food Policy Research Institute and an assistant professor of economics at the American University in Cairo, where I taught graduate and undergraduate economic courses.

15.     My curriculum vitae, included as Exhibit 1, summarizes my qualifications and professional experience, testimony history, and publications I have authored.

> Exhibit 1.    *Curriculum Vitae*

### B. Materials Relied Upon

16.     The materials relied upon in the preparation of this report are listed in Exhibit 2.

> Exhibit 2.    *Materials Relied Upon*

### C. Remuneration

17.     NERA is being compensated for its time at standard billing rates and its out-of-pocket expenses at cost. The rates charged for the NERA personnel working on this matter range from $275 to $1,050 per hour. NERA's compensation is not contingent upon the nature of my findings or on the outcome of this matter.

## III.    BACKGROUND

### A. Basic Concepts of Variance Swaps

18.     A swap is a bilateral derivative contract to exchange cash flows at some point in the future based on the performance of a reference obligation and given a notional principal amount. Each cash flow is referred to as one leg of the swap. Generally, swaps involve a fixed leg, while the other is variable.

19.     Variance swaps are swaps that allow investors to gain exposure to the future realized variance of the price of an asset such as the S&P 500 Index. Variance measures the degree of variation of the price of the asset over time. Variance does not reflect the direction of the price movements but just the magnitude—i.e. variance would not be negative if the S&P 500 Index decreased in value during a month. Volatility is the square root of variance. A variance

9

swap is an agreement to exchange the difference between an agreed upon fixed variance set at the inception of the contract and the final realized variance over the period of the contract. A buyer is said to be long on the variance as it profits from higher levels of variance and loses as variance decreases. A seller is said to be short on variance as it profits from lower levels of variance and vice versa. See Exhibit 3.

Exhibit 3.   *Diagram of the Payoff of a Variance Swap*



20.     The calculation of the payoffs of a variance swap at maturity are documented in the term sheet or contract. The term sheet includes details about the start and end dates of the contract, the name of the counterparty, the size of the contract, the agreed upon fixed variance, the annualization factor, and the method used to calculate the final realized variance of the reference asset, among others.[9]

21.     Exhibit 4 presents an example of the term sheet of a variance swap where the underlying asset is the S&P 500 Index.[10] The size of the position or vega notional is $100K on the variance of the price of the S&P 500 Index and the strike price is 16%. A strike price of 16% represents an agreed upon fixed volatility of 16% and an agreed upon fixed variance of 256% (volatility squared or 16%^2). The strike price denotes the level of volatility bought or sold and is determined at the start of the transaction. The strike price is determined according to prevailing market levels so that the swap initially has a zero value.

---

[9] Broadie, Mark, and Ashish Jain. "The effect of jumps and discrete sampling on volatility and variance swaps." *International Journal of Theoretical and Applied Finance* 11, no. 08 (2008): 761-797.

[10] Bossu, Sebastien, Eva Strasser, and Regis Guichard. "Just what you need to know about variance swaps." *JPMorgan Equity Derivatives Report* 4 (2005).

CONFIDENTIAL

22.     In this example, the variance amount is $3,125 which is defined as the ratio between the $100K vega notional and twice the strike price of 16%. The notional of a variance swap is generally expressed as the "vega notional." The vega notional approximates the average profit or loss for a 1% (1 percentage point) change in volatility. A vega notional of $100K means that a 1% increase in volatility will represent a gain of approximately $100K for the variance buyer. The variance amount represents the profits and losses per squared percentage point difference between the strike price quoted or expressed as a variance and the realized variance.

Exhibit 4.   *Example of a Term Sheet for a Variance Swap on the S&P 500 Index*



| VARIANCE SWAP ON S&P500 | |
|---|---|
| **SPX INDICATIVE TERMS AND CONDITIONS** | |
| Instrument: | Swap |
| Trade Date: | TBD |
| Observation Start Date: | TBD |
| Observation End Date: | TBD |
| Variance Buyer: | TBD (e.g. JPMorganChase) |
| Variance Seller: | TBD (e.g. Investor) |
| Denominated Currency: | USD ("USD") |
| Vega Amount: | 100,000 |
| Variance Amount: | 3,125 ( determined as Vega Amount/(Strike*2) ) |
| Underlying: | S&P500 (Bloomberg Ticker: SPX Index) |
| **Strike Price:** | **16** |
| Currency: | USD |
| Equity Amount: | <u>T+3</u> after the Observation End Date, the Equity Amount will be calculated and paid in accordance with the following formula: <br><br> *Final Equity payment = Variance Amount \* (Final Realized Volatility$^2$ – Strike Price$^2$)* <br><br> If the Equity Amount is positive the Variance Seller will pay the Variance Buyer the Equity Amount. <br> If the Equity Amount is negative the Variance Buyer will pay the Variance Seller an amount equal to the absolute value of the Equity Amount. <br><br> where <br><br> *Final Realised Volatility* $= \sqrt{\dfrac{252 \times \sum\limits_{t=1}^{t=N}\left(\ln\dfrac{P_t}{P_{t-1}}\right)^2}{Expected\_N}} \times 100$ <br><br> ***Expected_N*** = [number of days], being the number of days which, as of the Trade Date, are expected to be Scheduled Trading Days in the Observation Period <br> $P_0$ = The Official Closing of the underlying at the Observation Start Date <br> $P_t$ = Either the Official Closing of the underlying in any observation date t or, at Observation End Date, the Official Settlement Price of the Exchange-Traded Contract |
| Calculation Agent: | JP Morgan Securities Ltd. |
| Documentation: | ISDA |

23.     At maturity, payoffs are determined as variance amount times the difference between the final realized variance (the square of the final realized volatility) and the agreed

CONFIDENTIAL

upon fixed variance (the square of the strike price). The final realized volatility is to be calculated according to the mathematical formula included in the term sheet.[11]

24.    In this example, if the final realized volatility is 20%, which is greater than the strike price of 16%, then the buyer who is long volatility receives a $450K payoff from the seller who is short volatility.[12] If the final realized volatility at maturity is 14%, which is less than the strike price of 16%, then the seller who is short volatility receives a $187.5K payoff from the buyer who is long volatility.[13]

25.    Unrealized gains or losses prior to maturity on a variance swap are calculated as the mark to market value of the swap. The value of the swap depends on the actual realized variance from the effective date to the valuation date, and the remaining expected variance between the valuation and the maturity date. It is a weighted average of the actual and future expected variance of the reference asset. The expected variance is commonly reported as a volatility (i.e., the square root of variance is volatility) and is referred to as the variance swap rate ("VS rate"). The expected variance is the only unobservable variable needed in the valuation of a variance swap and hence could be a source of discrepancy in the valuation of the swap.[14] The VS rate is the forecast for the expected volatility of an asset over the swap's remaining life.

26.    There are many types of variance swaps including volatility swaps, corridor swaps and other types that are discussed in more detail in Appendix A. Volatility swaps share the same key terms and valuation inputs as variance swaps, except that volatility swaps track the volatility instead of the variance of the price of the reference asset. For corridor variance swaps, the actual realized volatility is only used for computing payoffs when the price of the relevant

---

[11] From a mathematical standpoint, first the logarithmic returns of the S&P 500 Index are calculated for each observation date between the start or effective date and the end or maturity date. Next, the logarithmic returns are squared and added up. The result is then multiplied by the annualization factor that in this case is 252 and divided by the expected number of trading days between the effective and maturity dates. The final realized volatility is obtained after taking the square root of the result and multiplying it by 100.

[12] The payoff is calculated as the variance amount of 3,125 times the difference between the final realized variance of 400 (i.e. $20^2$) and the agreed upon fixed variance of 256 (i.e. $16^2$).

[13] The payoff is calculated as the variance amount of 3,125 times the difference between the final realized variance of 196 (i.e. $14^2$) and the agreed upon fixed variance of 256 (i.e. $16^2$).

[14] I obtained the discount factor from Bloomberg.

12

CONFIDENTIAL

asset is within a certain range. Price movements outside of the range may be discarded or counted as zero-variance movements depending on the contract terms.

## B. Infinity Q's Diversified Alpha Fund and Volatility Alpha Fund

27.      Infinity Q was the investment adviser of the Diversified Alpha Fund and the Volatility Alpha Fund. The DAF was a mutual fund available to the broader investing public. The VAF was a private hedge fund available to qualified investors.

28.      The DAF began operations in September 2014 and was registered as an open-end investment company.[15] DAF allowed investors to buy and hold mutual fund shares.[16] DAF would use the funds received from the shareholders to invest in variance swaps, corridor swaps, stocks and other securities. The mutual fund aimed to provide its shareholders with access to alternative investment strategies that would produce positive performance in both positive and negative environments for equities, fixed income, and credit markets.[17] Infinity Q Capital Management, LLC was the DAF's investment adviser and the fund paid the investment adviser a monthly management fee that was calculated at the annual rate of 1.70% of the fund's average daily net assets.[18]

29.      Purchases and redemptions requests by the shareholders were to be priced based on the NAV per share of the fund.[19] The NAV was determined as the value of the DAF's securities, cash and other assets minus expenses and liabilities.[20] When calculating the DAF's NAV the securities were to be valued using market data obtained from independent sources (observable inputs) and the fund's own market assumptions (unobservable inputs). If the security was listed on a securities exchange, then the security would be valued by Infinity Q using the last sale price on the exchange.[21] Equity securities are an example of securities that are actively traded in securities exchanges and for which Infinity Q would not apply valuation adjustments.

---

[15] USAO_SDNY_00006154-00006274.

[16] USAO_SDNY_00005585-00005651.

[17] USAO_SDNY_00006154-00006274.

[18] USAO_SDNY_00006154-00006274.

[19] USAO_SDNY_00006154-00006274.

[20] USAO_SDNY_00006154-00006274.

[21] USAO_SDNY_00005585-00005651.

13

CONFIDENTIAL

Similarly, short-term investments classified as money market instruments would be valued at net asset value price.[22] Money market instruments may include commercial paper and certificates of deposit. Equity securities and money market instruments are an example of securities valued by Infinity Q using quoted prices:

> Quoted Prices (Level 1) – "Quoted prices in active markets for identical securities. An active market for a security is a market in which transactions occur with sufficient frequency and volume to provide pricing information on an ongoing basis. A quoted price in an active market provides the most reliable evidence of fair value."[23]

30.     Other securities including derivatives such as options contracts and variance swap contracts derive their value from underlying asset prices, reference rates, and other inputs and were to be priced by Infinity Q using a model "tailored to the type of security held."[24] Currency options were to be valued using valuation models and available market data. Variance swaps and currency options are an example of securities to be valued by Infinity Q using models based on "significant observable inputs":

> Other Significant Observable Inputs (Level 2) – "Observable inputs other than quoted prices included in level 1 that are observable for the asset or liability either directly or indirectly. These inputs may include quoted prices for the identical instrument on an inactive market, prices for similar instruments, interest rates, prepayment speeds, credit risk, yield curves, default rates, and similar data."[25]

31.     I understand that Infinity Q represented that it used model pricing to calculate the "fair volatility level" for derivatives such as corridor variance swaps and dispersion trades.[26] Quotes from a pricing service and brokers would be used to estimate "implied volatility levels" as an input to the models used for these swaps.[27] According to Infinity Q, a "significant change in implied volatility could have a significant impact on the value of a position."[28] Corridor

---

[22] USAO_SDNY_00005585-00005651.

[23] USAO_SDNY_00006541-00006575.

[24] USAO_SDNY_00005585-00005651.

[25] USAO_SDNY_00006541-00006575.

[26] USAO_SDNY_00005585-00005651.

[27] USAO_SDNY_00005585-00005651.

[28] USAO_SDNY_00005585-00005651.

14

CONFIDENTIAL

variance swaps are an example of securities valued by Infinity Q using models based on "significant unobservable inputs":

> Significant Unobservable Inputs (Level 3) – "Significant unobservable inputs, including the Fund's own assumptions in determining fair value of investments."[29]

32.     The VAF was structured as a partnership. The General Partner ("GP") and adviser to the fund was Infinity Q, and the Limited Partners ("LP") were the investors. VAF began operations in February 2017. The VAF private placement memorandum stated that the fund aimed to generate positive returns though volatility-based strategies that provided exposure to a diversified portfolio of derivatives.[30] The derivatives based their value on the performance of an underlying security or index and included options, variance swaps, correlation swaps, dispersion swaps, credit default swaps, swaptions and total return swaps.[31] The Limited Partners paid management fees as a percentage of their ownership interest in the VAF to the General Partner.[32] The General Partner could also receive at the end of each fiscal year a fraction of the share of the Limited Partner in the VAF equal to 15 percent of the return earned on their capital invested.[33]

33.     I understand that Infinity Q represented it would rely upon independent pricing services to help provide valuations for the portfolio underlying VAF.[34] VAF had similar representations to DAF regarding the valuation procedures for securities in its portfolio. Options that were listed in a securities exchange were to be valued at their mid-price as quoted by the market exchange or a pricing service. Over-the-counter options that were settled based on the settlement price of similar exchange-traded options would be priced following the procedure used for listed options. If there were no similar exchange-traded options, then the option would be priced using models on Bloomberg. Bloomberg or other recognized pricing sources would be used to value other OTC derivatives including variance swaps, volatility swaps, and foreign exchange options. The valuation of these derivatives would require the calculation of realized

---

[29] USAO_SDNY_00006541-00006575.

[30] SEC-SDNY-EPROD-003725092.

[31] SEC-SDNY-EPROD-003725092.

[32] SEC-SDNY-EPROD-003725092.

[33] SEC-SDNY-EPROD-003725092.

[34] SEC-SDNY-EPROD-003725092.

15

CONFIDENTIAL

volatility which would be "readily observable" and "implied volatility" which "may be less observable for certain markets."[35]

## C. Overview of Infinity Q Funds' Portfolio Holdings

34.     The Infinity Q funds invested in several categories of securities, including exchanged-traded securities and over-the-counter securities. The securities included derivatives that derived their value from the price of one or more other securities. Derivatives include exchange-traded options, such as equity index options, and over-the-counter options, such as FX options. These positions are liquid in that transaction prices are available for many of them. In addition, the IQ funds held other types of derivatives including variance swaps, correlation swaps, and credit default swaps, which are less liquid due to the general lack of transaction prices and the parties involved usually rely on standard valuation models to mark the positions.

35.     Exhibit 5 presents the composition of the DAF investments and summarizes the types of securities held in the mutual fund by type of valuation as of November 30, 2020—the valuation date in the last DAF SEC filing. As of November 30, 2020, the mutual fund reported investments of $1,502.3 million. Of the $1,502.3 million, the net market value of common stocks, short-term investments and securities sold short was $996.8 million or 66.3%. These securities were valued by Infinity Q using quoted prices.

36.     Of the $1,502.3 million, the net market value of the derivative positions was $505.5 million or 33.7%. Vanilla variance swaps, credit default swaps, dividend swaps and options made up the majority of those investments. These securities represented $373.2 million or 73.8% of the derivative positions market value and were valued by Infinity Q using "significant observable" inputs.[36] Total return swaps, correlation swaps, dispersion swaps and corridor swaps represented $132.3 million or 26.2% of the derivative positions market value and were valued by Infinity Q using "significant unobservable" inputs.[37]

---

[35] SEC-SDNY-EPROD-003725092.

[36] USAO_SDNY_00006541-00006575.

[37] USAO_SDNY_00006541-00006575.

16

CONFIDENTIAL

Exhibit 5.   *Composition of the Diversified Alpha Fund (DAF) Investments as of November 30, 2020*

| Category | Quoted Prices (Level 1) | Other Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) =(2)+(3)+(4) |
| | | ----------------------------------- $ MM ----------------------------------- | | |
| **Investments** | | | | |
| Common Stocks | $     17.2 | $          0.0 | $          0.0 | $        17.2 |
| Short-Term Investments | 979.6 | 0.0 | 0.0 | 979.6 |
| Securities Sold Short | (0.0) | 0.0 | 0.0 | (0.0) |
| **Subtotal** | **$   996.8** | **$          0.0** | **$          0.0** | **$      996.8** |
| **Derivative Instruments** | | | | |
| Written Options | $      0.0 | $        (63.0) | $          0.0 | $      (63.0) |
| Credit Default Swap Contracts | 0.0 | (0.3) | 0.0 | (0.3) |
| Dividend Swap Contracts | 0.0 | 0.7 | 0.0 | 0.7 |
| Vanilla Variance Swap Contracts [1] | 0.0 | 319.6 | 0.0 | 319.6 |
| Options Purchased | 0.0 | 116.2 | 3.6 | 119.8 |
| Total Return Swap Contracts | 0.0 | 0.0 | 5.8 | 5.8 |
| Correlation Swap Contracts | 0.0 | 0.0 | 34.2 | 34.2 |
| Dispersion Swap Contracts | 0.0 | 0.0 | 19.3 | 19.3 |
| Corridor Variance Swap Contracts [1] | 0.0 | 0.0 | 69.3 | 69.3 |
| **Subtotal** | **$      0.0** | **$       373.2** | **$      132.3** | **$      505.5** |
| **Total** | **$   996.8** | **$       373.2** | **$      132.3** | **$    1,502.3** |

**Notes and Sources:**
- USAO_SDNY_00006541-00006575.

[1] "The Adviser deems vanilla volatility and variance swaps as Level 2 positions, and corridor variance swaps as Level 3 positions in the fair value hierarchy."

37.    Exhibit 6 presents the composition of the VAF investments and summarizes the types of securities held in the hedge fund by type of valuation as of December 31, 2019—the valuation date in the last VAF audited financial report. As of December 31, 2019, the hedge fund reported investments of $125.9 million. Of the $125.9 million, the net market value of exchange-traded funds, mutual funds, equity options, index options and index futures was $8.3 million or 6.6%. These securities were represented by Infinity Q to be valued using publicly available quoted prices.

17

38.     Of the $125.9 million, the net market value of the derivative positions was $117.5 million or 93.4%. Corridor variance swaps, correlation swaps, dispersion swaps and dispersion options made up the majority of those investments. These securities represented $68.4 million or 58.2% of the derivative positions market value and were valued by Infinity Q using "significant unobservable" inputs.[38] Variance and volatility swaps, credit default swaps, total return swaps, foreign exchange options, and over-the-counter index options represented $49.1 or 41.8% of the market value of the derivative positions and were valued by Infinity Q using "significant observable" inputs.[39]

---

[38] SEC-SDNY-EPROD-003725092.

[39] SEC-SDNY-EPROD-003725092.

CONFIDENTIAL

Exhibit 6.   *Composition of the Volatility Alpha Fund (VAF) Investments as of December 31, 2019*

| Category (1) | Quoted Prices (Level 1) (2) | | Other Significant Observable Inputs (Level 2) (3) | | Significant Unobservable Inputs (Level 3) (4) | | Total (5) =(2)+(3)+(4) | |
|---|---|---|---|---|---|---|---|---|
| **Investments** | | | | | | | | |
| Exchange-Traded Funds | $ | (3.5) | $ | 0.0 | $ | 0.0 | $ | (3.5) |
| Mutual Fund | | 15.9 | | 0.0 | | 0.0 | | 15.9 |
| Equity Options | | (0.1) | | 0.0 | | 0.0 | | (0.1) |
| Index Options | | (3.9) | | 0.0 | | 0.0 | | (3.9) |
| Index Future | | (0.0) | | 0.0 | | 0.0 | | (0.0) |
| Options on Futures | | 0.0 | | 0.0 | | 0.0 | | 0.0 |
| **Subtotal** | $ | **8.3** | $ | **0.0** | $ | **0.0** | $ | **8.3** |
| **Derivative Instruments** | | | | | | | | |
| Total Return Swaps | $ | 0.0 | $ | (0.2) | $ | 0.0 | $ | (0.2) |
| Credit Default Swaps | | 0.0 | | (0.0) | | 0.0 | | (0.0) |
| FX Options | | 0.0 | | 4.5 | | 0.0 | | 4.5 |
| Volatility Swaps | | 0.0 | | 3.0 | | 0.0 | | 3.0 |
| OTC Index Options | | 0.0 | | 2.5 | | 0.0 | | 2.5 |
| Vanilla Variance Swaps [1] | | 0.0 | | 39.3 | | 0.0 | | 39.3 |
| Corridor Variance Swaps [1] | | 0.0 | | 0.0 | | 30.3 | | 30.3 |
| Dispersion Options | | 0.0 | | 0.0 | | 0.5 | | 0.5 |
| Correlation Swaps | | 0.0 | | 0.0 | | 35.2 | | 35.2 |
| Dispersion Swaps | | 0.0 | | 0.0 | | 2.4 | | 2.4 |
| **Subtotal** | $ | **0.0** | $ | **49.1** | $ | **68.4** | $ | **117.5** |
| **Total** | $ | **8.3** | $ | **49.1** | $ | **68.4** | $ | **125.9** |

**Notes and Sources:**
- Data are from IQCM-SEC-00601685.

[1] "The Adviser deems vanilla volatility and variance swaps as Level 2 positions and corridor variance swaps as Level 3 positions in the fair value hierarchy."

39.     Exhibit 7 below presents the quarter-end NAV of the mutual fund over time since its inception in September 2014 through November 2020. At the end of the first quarter of November 2014, the mutual fund had a NAV of $50.2 million. The NAV increased steadily over 2015 and 2016 and in two years, as of November 2016, the mutual fund NAV was at $150.9 million. By November 2018, the DAF NAV was at $346.6 million, increasing to $755.3 million

19

as of November 2019 and, as of November 2020, the mutual fund had a reported NAV of $1.7 billion.

Exhibit 7.   *IQ Reported Quarterly Net Asset Value (NAV) of the Diversified Alpha Fund (DAF) from November 2014 Through November 2020*



**Notes and Sources:**
- Data are from Infinity Q Diversified Alpha Fund SEC filings between November 30, 2014 (USAO_SDNY_00004615) and November 30, 2020 (USAO_SDNY_00006541).

    40.    Exhibit 8 below shows the NAV of the hedge fund over time since its inception in February 2017 through January 2021. As of the end of February 2017, the hedge fund had a NAV of $6.8 million. The NAV increased steadily during 2017 and in one year's time, the hedge fund NAV stood at $36.2 million as of February 2018. By May 2020, the VAF NAV was $988.3 million and as of January 2021, the hedge fund had a reported NAV of $1.2 billion.

Exhibit 8.   *IQ Reported Monthly Net Asset Value (NAV) of the Volatility Alpha Fund (VAF) from February 2017 Through January 2021*



**Notes and Sources:**
- Data are from Infinity Q Volatility Alpha Fund, USBank Statement of Net Assets between February 2017 (SEC-SDNY-EPROD-002877984) and January 2021 (SEC-SDNY-EPROD-003426868).

## IV.   IQ's Alterations of the Terms of Securities Inflated the Reported Valuations

41.     This section evaluates the alterations that IQ made to the contractual terms of the positions and demonstrates how the alterations inflated its valuations by increasing gains and underestimating losses of its positions. The analysis shows that: 1) IQ valued identical positions in the hedge fund and mutual fund differently as it changed or altered the terms of the positions in one or both funds; 2) IQ made numerous changes to the terms of its OTC positions which significantly changed the valuations relative to the ones using the actual contractual terms; and 3) the alterations have consistently inflated its portfolio by overestimating its gains and underestimating its losses. In addition, I document numerous instances where IQ changed the terms of the positions back to be closer to the actual terms as the positions neared maturity, which resulted in consistent valuations with the counterparties near the maturity of the positions.

21

42.     Using the Bloomberg valuation tools, I prepared 733 month-end valuations for the 62 OTC positions. I relied on the actual contractual terms of each position and accounted for changes in the notional amount since inception, if any.

43.     The DOJ provided me with the Bloomberg monthly scripts for each of the 62 positions which recorded changes that IQ made to the terms of the securities at the time of its valuations. I then assessed the impact of the recorded alterations on the valuations as documented in the Bloomberg monthly scripts.

### A.  Bloomberg Valuation Tools that IQ Used in Managing the Funds

44.     Infinity Q relied on Bloomberg to model and value the derivatives securities. Infinity Q created and maintained files which included the details of its DAF and VAF derivative positions in the Bloomberg system. I understand that Infinity Q had control of the parameters and specifications of each of its derivative valuations in the Bloomberg system and could edit or alter them <u>effectively</u> in any way and without much limitation.

45.     Unlike publicly traded equities such as Apple for example, there are usually no transaction prices for the OTC positions that Infinity Q held. Infinity Q relied on several valuation tools within the Bloomberg system including two tools titled OVME and DLIB to value its OTC positions. OVME is a Bloomberg valuation tool that can be used to value derivatives including variance and volatility swaps. OVME is usually used to price OTC derivatives on equity and interest rate reference assets. Bloomberg has a similar tool for OTC derivatives on foreign exchange rates and commodities which is called OVML. OVME provides a template where the user would input information such as strike price and notional amount of each position. The DOJ provided me with Bloomberg scripts that document the inputs that IQ used to value positions using OVME templates.

### Example 1: Long Corridor Variance Swap on the EURO STOXX 50 Index in the Hedge Fund (VAF)

46.     OVME is a Bloomberg valuation platform that is intended to value variance swaps and does not have functionality to value corridor variance swaps because the OVME template does not allow for inputting information on upper and lower bounds which is a key

CONFIDENTIAL

feature that distinguishes corridor swaps. I present an example of the OVME template and then show how IQ altered the valuation of a corridor variance swap and how valuing it using OVME led to inflated values. In effect, IQ valued this corridor swap as if it was a variance swap without bounds, which inflated the valuations. Exhibit 9 presents a screenshot of an OVME template that is intended to value variance swaps, yet IQ used it to value a corridor variance swap. The template allows the user to input the necessary features for valuation including the underlying reference asset, the type of derivative, the direction of the trade for IQ (whether IQ was buyer or seller), the strike price, the notional, the start date, the end date, the valuation date, and the currency, among other inputs. This screenshot is for IQ's valuation using OVME of a corridor variance swap with the following attributes: the reference asset is the EURO STOXX 50 Index (SX5E Index), the strike price is 15.05%, the vega notional is €550K, the trade date and effective date are February 4, 2020, the maturity date is December 18, 2020, and the lower and upper corridors were set at 80% and 120% of the reference asset price as of the trade date, respectively.[40]

---

[40] VAF: IS8379140 [IQCM-SEC-00581895]. IQ altered the vega notional in its valuation and the actual term sheet value is €500K.

Exhibit 9.   *Screenshot of the Bloomberg OVME Valuation For Example 1*



47.     IQ was long the corridor variance swap which means that IQ makes money if the variance of the SX5E Index is above the strike price, or in other words, IQ gains if the variation in the price of the SX5E index increases during the time of the contract. But, since it is a corridor variance swap, the variance would only be counted as part of the payoff if the SX5E Index is between the upper and lower corridors. In other words, if the index is greater than 120% of its price at inception of the trade, or is below 80% of its price at inception, then IQ would not contractually benefit because the variance would not be counted in the valuation. However, the Bloomberg scripts document that IQ valued the position as if it was a variance swap without accounting for the upper and lower corridors in the term sheets, thereby inflating the value of the position.

24

CONFIDENTIAL

48.     Because IQ used OVME as the valuation tool for this corridor variance swap, IQ ignored the corridors and valued this corridor variance swap as a vanilla variance swap.[41] The lower corridor is 2,985.824 and the SX5E Index decreased below the lower corridor soon after the February 4, 2020 effective date. The SX5E Index was below the lower corridor for most of March to May 2020, reaching a low of 2,385.82 which is 600 points (20%) below the lower corridor, and experienced a high amount of volatility, as did most indices, during the COVID-19 crisis. With the corridors in place, the corridor variance swap would not have included this volatile period in the market for the valuation. However, IQ's decision to value this position as if it was a vanilla variance swap meant that the variance when the SX5E Index is below the lower corridor, would be included in the valuation. IQ's decision to ignore the corridors of the position as stated in the contract benefits IQ as it is long the position and led to inflated valuation.[42] For example, as of August 31, 2020, IQ valued this position in VAF as a variance swap without corridors using OVME at $22.8 million, whereas using the same Bloomberg valuation tools as IQ used, I valued the position as a corridor variance swap as stated in the term sheet at $4.5 million and the counterparty of IQ (Société Générale) reported a valuation of $4.6 million for the same month. The position closed in December 2020 with a realized price of $4.7 million, and my valuation of the position in November was $4.9 million, the counterparty valuation was $5.0 million and IQ valued the position at $11.2 million.

49.     DLIB is another Bloomberg valuation tool that allows users much more flexibility to manually specify the terms of each position for valuation and is usually used to value complex derivatives such as corridor and correlation swaps. Users of DLIB can rely on built-in templates and enter the parameters in the templates to value different types of securities. These templates are referred to as "BLT Templates." Alternatively, a user of DLIB can use a script mode within DLIB which allows the user complete discretion in customizing the inputs, assumptions, and

---

[41] IQ valued the following additional variance swaps with corridors as vanilla variance swaps in OVME: DAF: IS8507821 [TAP_SDNY_001909], VAF: IS8379143 [IQCM-SEC-00539564], VAF: IS8438749 [IQCM-SEC-00036938], VAF: IS8438801 [IQCM-SEC-00037093], and VAF: IS8300389 [IQCM-SEC-00539799].

[42] In my review of the Bloomberg scripts, I document that IQ also altered the variance amount, sometimes above the value in the term sheet and sometimes below the value in the term sheet. IQ's inflated valuation is driven by the alteration to value the position as a vanilla variance swap while the alteration of the variance amount is a factor that scales the inflated valuations.

25

models used in pricing. The script mode in DLIB is referred to as "BLAN scripts." IQ used both modes of DLIB, and OVME in pricing the IQ portfolio.

50.     When using a BLAN script to value an OTC position, one can input the accurate strike price for the position, and then add a command to increase/decrease the strike price by a certain amount or percentage at valuation, which means that the valuation will be conducted using a different strike price than the contractual one. This level of discretion is only available in the BLAN script and not the OVME or DLIB template. Bloomberg's backup files allow me to identify the positions that IQ valued using BLAN scripts, DLIB templates, or other Bloomberg pricing tools. The Bloomberg backup files for the BLAN scripts allow me to identify and document many of the alterations that IQ made to the terms of each position.

### Example 2: Long Corridor Variance Swap on the EURO STOXX 50 Index in the Hedge Fund (VAF)

51.     Using the Bloomberg script, I document how IQ changed the script in DLIB in its valuation of another corridor variance swap to price it as if it was a variance swap (without corridors), leading to inflated valuations.[43] Exhibit 10 is a screenshot of the Bloomberg BLAN script for a corridor variance swap with the following attributes: the reference asset is the EURO STOXX 50 Index (SX5E Index), the strike price is 17%, the vega notional is $600K, the trade date is May 14, 2019, the effective date is December 18, 2020, the maturity date is December 16, 2022, and the corridors were set at 70% and 110% of the reference asset price as of the trade date. IQ was long the corridor variance swap which means IQ makes money if the variance of the SX5E Index is above the strike price. Similar to Example 1 above, the variance would not count as part of the valuation if the price of the SX5E Index is greater than 110% or lower than 70% of its level as of the inception of the trade, per the term sheet.

52.     In Exhibit 10, the left-hand side panel is similar to the OVME template in that it allows users to input various metrics like underlying asset, notional, strike, etc. The right-hand side is unique to the Bloomberg DLIB valuation tool as it allows a user to edit the code used to

---

[43] VAF: XDACVX5D [IQCM-SEC-00582356].

26

value the position. The BLAN code (shown on the right-hand side of Exhibit 10 below) can be edited and allows a user to customize the code and not just the inputs used in the valuation.

Exhibit 10. *Screenshot of the Bloomberg DLIB Valuation for Example 2*



53.     The BLAN code for a corridor variance swap accounts for lower and upper bounds as stated in the term sheet. In other words, the BLAN code would check if the historical prices of the reference index up to the time of the valuations have met the conditions of the upper *and* lower corridors as well as consider if future potential prices would meet the conditions of the upper *and* lower corridors. In this specific example, starting with the November 2020 month-end valuation, IQ effectively removed the corridors by changing one word in the code of the valuation from "and" to "or." By making this one change to the code, IQ instructed the DLIB valuation tool to price this position as a vanilla variance swap and not a corridor variance swap.[44] IQ altered the BLAN code used to check if the price of the reference index prices would meet the

---

[44] IQ valued the following additional variance swaps with corridors as vanilla variance swaps as a result of this "and" to "or" alteration in the BLAN code during certain months: DAF: XDACRN7H [TAP_SDNY_000902], DAF: XDACUIB5 [TAP_SDNY_000044], DAF: XDACVLWK [TAP_SDNY_000154], DAF: XDADBIOT [TAP_SDNY_000580], and DAF: XDADBIRG [TAP_SDNY_000500]. IQ's alterations led to inflated valuations almost all the time for month-end valuations of these positions.

27

conditions of the upper corridor **or** the lower corridor, but not necessarily both. The change of the code to "or" meant removing the corridors altogether because the SX5E index will always be either above the lower corridor level or below the upper corridor level. By changing one word in the code of the valuation from "and" to "or," IQ instructed the DLIB valuation tool to price this position as a vanilla variance swap and not as a corridor variance swap. See line 23 of the BLAN code on the right-hand side panel in Exhibit 10: "let corridor = (fix_i > corridor_low) **or** (fix_i < corridor_high) in [emphasis added]". Line 23 in the scripts prior to the November 2020 month-end valuation used an "and."[45]

54.    IQ's change that removed the corridors inflated the valuation especially as the level of the reference index was getting close to the upper corridor. The effective date, or start date, of the position is December 18, 2020 and the prior closing price of the SX5E Index of 3,560.87 was approximately 100 points (3%) below the upper corridor of 3,667.40 (the lower corridor is 2,333.80). With the corridors in place, the variance would not accrue if the price of the reference index price goes above 3,667.40 and this would limit the amount of variance and gain to IQ and be a detriment to IQ as the buyer (long). By removing the corridors, the variance swap is unrestricted and can accrue variance and benefits IQ as a buyer of the position, if the reference index moves higher. With this alteration, IQ reported a valuation of this corridor variance swap (without corridors) at $8.8 million as of December 31, 2020, while I valued the position, using the same Bloomberg valuation tools used by Infinity Q, as a corridor variance swap at $2.5 million.[46]

55.    A user of the BLAN script can change the terms of a corridor swap, for example by changing one word in the editor of the BLAN code (right-hand panel of Exhibit 10) from an "and" to an "or" such that the swap will be valued without consideration for upper and lower corridors. This one change in the script would cause the Bloomberg valuation tool to value the position not as a corridor swap but as a vanilla variance swap. In addition, the user can change the code in the editor to override terms such as the maturity date of the position even if it was entered correctly in the parameters on the left-hand panel in Exhibit 10.

---

[45] For example, USAO_SDNY_00006763.

[46] The counterparty (Morgan Stanley) did not report a valuation for this position as a stand-alone value but combined with a paired position.

28

CONFIDENTIAL

56.    In addition to the scripts, the Bloomberg system keeps an audit trail of some, but not all, of the changes that users make when using its valuation tools. The audit trail is a record of different types of actions by users of the valuation tools for each position including the date and time the changes were made and the user's Bloomberg ID. Exhibit 11 is a screenshot of the audit trail data export provided by the DOJ.[47] For example, in row 5 of Exhibit 11, the audit trail shows that IQ added a deal (see column I) or a new position. Row 7 shows that IQ updated the deal on February 16, 2021 at 9:03 PM as documented in column I by "UPDATE DEAL." In communications with Bloomberg, the company has explained that an "UPDATE DEAL" action will be triggered whenever a user updates the "pricers screens UI [user interface]," including the user screen in the OVME and DLIB valuation tools, or saves the valuation template for a position that exists in the Bloomberg system.[48]

Exhibit 11.  *Screenshot of Bloomberg Audit Trail Data*



### B.  Analysis of Valuations of 62 OTC Positions in DAF and VAF

57.    To examine the alterations of the contract terms that IQ made, I selected 62 OTC positions that were held by DAF and VAF using two criteria. First, I identified twenty identical positions which were held by both DAF and VAF that had the largest differences in valuations between DAF and VAF as of May 2020. For example, DAF and VAF both entered into identical long corridor variance swaps where IQ valued the DAF position at $2.2 million as of May 2020 and the VAF position at $19.6 million, a difference of $17.4 million.[49] Second, I identified the twenty positions with the largest number of "UPDATE DEAL" actions according to the Bloomberg audit trail data, and I also included the pair positions from the sister fund. For

---

[47] USAO_SDNY_00000001.

[48] USAO_SDNY_00000010-00000017.

[49] DAF: XDADACKX [TAP_SDNY_001457] and VAF: IS8379143 [IQCM-SEC-00539564].

3527-055
NERA
Page 35 of 158

example, one of the top twenty positions with the largest number of UPDATE DEAL actions is a DAF OTC security that had 69 UPDATE DEAL actions recorded in the Bloomberg system and there is a pair position in VAF (that does not fall within the list of top twenty positions with the largest number of UPDATE DEAL actions).[50] There is some overlap between the positions identified by these two methods resulting in a total selection of 62 OTC positions – 35 positions in DAF and 27 positions in VAF. To evaluate the impact of the alterations on the valuations, if any, I first identified positions where IQ altered the contractual terms used at the time of the valuations. The selection criteria of the 62 positions aims to identify a subset of such positions. See Appendix B for a list of these 62 positions and the selection methods.

58.    Of these 62 positions, IQ valued 50 positions using DLIB scripts and templates and valued the remaining 12 positions using OVME or OVML. For the 50 positions that IQ valued using DLIB, the DOJ provided electronic files with monthly scripts and parameters for the period from June 2018 through May 2021.[51] For each month from June 2018 through May 2021, the DOJ provided two files, one file with the scripts and parameters for the outstanding positions and one file with timing information of the scripts and updates. The files with the scripts were named with the "as of" date for the scripts. For example, the June 1, 2018 file has the scripts as of June 1, 2018.[52] The files with the timing information have fields with the update date for the script, which is the date the script was last updated. For example, the timing information file could tell you that the June 1, 2018 script for a position was last updated on May 30, 2018.[53] I used the as of date and update timing date to verify if a script would have been used in the month-end valuations for the 50 positions IQ valued in DLIB. For example, a script as of June 1, 2018 that was last updated on May 30, 2018 would have been the one that IQ used for the May 31, 2018 month-end valuation since the May 31, 2018 valuation date is between the update

---

[50] DAF: XDAC1O00 [TAP_SDNY_001058] and VAF: XDAC112G [IQCM-SEC-00539070].

[51] USAO_SDNY_00006705 to USAO_SDNY_00006776.

[52] USAO_SDNY_00006705.

[53] USAO_SDNY_00006706. DAF: XDAB22MA [TAP_SDNY_001485].

30

date and the as of date for the script. For these 50 positions that IQ valued in DLIB, I reviewed 607 month-end valuations and the Bloomberg scripts for alterations.[54]

59.    For the 12 positions that IQ valued using OVME and OVML, the DOJ provided the full historical scripts data and valuation parameters.[55] Since OVME and OVML valuations do not use DLIB codes or BLT templates, the DOJ provided a record from the Bloomberg system of each time that IQ changed and updated the valuation terms for a position. For these 12 positions, I reviewed 126 month-end valuations and the Bloomberg scripts for alterations.

60.    In total, I assessed 733 month-end valuations for the 62 positions and reviewed the Bloomberg data that recorded the changes that IQ made to the terms of the securities.

## C. Infinity Q's Alterations of the Contractual Terms of the Positions

61.    For each of the 733 month-end valuations for the 62 positions with Bloomberg scripts, I compared the inputs that IQ used in the valuation to the terms as documented in the term sheets for each position. I also accounted for any changes in the notional amounts over time. The comparison of the term sheets and the Bloomberg scripts of IQ valuations shows 92.9% of the 733 month-end valuations for the 62 positions were generated by IQ with alterations including changes in strike prices, notional amounts, effective and maturity dates, exclusion or changes of corridors (upper and lower bounds) of certain swaps, and technical details used in valuation such as the number of days used to annualize daily volatility, among other changes.

62.    I started with electronic files that the DOJ provided which mapped the term sheets to the unique identifiers for each position. I then conducted a manual review of the term sheets for the positions to verify the term sheet for each security. See Appendix C for a description of

---

[54] For the 50 positions IQ valued using DLIB, there are 725 month-end valuations. However, 118 out of the 725 month-end valuations did not have the parameter values and code as of the month-end valuation date from the Bloomberg data and as a result, I did not include them in my analysis. These were the instances when the last update to the script in the Bloomberg data occurred after the valuation date and hence I would not be able to determine the parameter values and code for the valuation date from the Bloomberg script data I received. I reviewed the remaining 607 month-end valuations using DLIB.

[55] USAO_SDNY_00004287 and USAO_SDNY_00004288.

31

CONFIDENTIAL

the matching process of the term sheets to the positions and a list of the matched term sheets for the 62 positions with Bloomberg scripts.

63.     Before documenting the alterations, I briefly explain the relevance of each of the inputs that IQ altered to the valuations. The impact of increasing or decreasing any of the valuation inputs depends on whether IQ was long or short and other factors.

- **Strike Price.** Alterations to the strike price change the economics of a position and affect the threshold in the calculations of gains and losses – whether the realized and future expected volatility at maturity is above or below the strike price. All else equal, using a higher strike price for short positions (when IQ is seller of the swap) and a lower strike price for long positions (when IQ is the buyer of the swap) would result in inflated valuations. For example, IQ used a higher strike price than the contractual strike price in the term sheet when valuing a short position in a variance swap on a MSCI World Index (MXWO).[56] In the month-end valuation for January 2020, IQ used a strike price of 26.3% whereas the agreed-upon contractual value in the term sheet was 17.3%. All else equal, the valuation of the position at the true strike of 17.3% would have been $0.6 million, whereas IQ reported a valuation of $3.7 million using a strike price of 26.3%. In another example, IQ used a lower strike price than the contractual strike price in the term sheet when valuing a long position in a forward-start variance swap on the KOSPI 200 Index.[57] For example, in the month-end valuation for May 2020, IQ inflated the valuation by using a strike price of 7.6% as IQ was long, while the agreed-upon and contractual strike price in the term sheet was 18.6%.

- **Notional Amount.** Alterations to the notional amount act as a scaler for the gains and losses of a position. A long position would record a gain if the realized and expected volatility are higher than the strike price and a loss if the realized and expected volatility are lower than the strike price. The opposite would be true for a short position – there would be a gain if the realized and expected volatility are lower than the strike price and a loss if the realized and expected volatility are higher than the strike price. Since the

---

[56] DAF: XDACQ9DO [IQCM-SEC-00601321].

[57] DAF: XDACXGV8 [TAP_SDNY_000637].

notional amount is the base for the gains and losses calculations, using a larger notional amount would amplify gains and losses and using a smaller notional amount would diminish gains and losses. For example, IQ used a larger notional amount than the contractual notional amount in the term sheet when valuing a long position in an up barrier variance swap on the EURO STOXX 50 Index where IQ recorded a gain.[58] In the month-end valuation for June 2020, IQ inflated the valuation by using a notional amount of €400K when the agreed-upon and contractual value in the term sheet was €250K.

- **Corridors and Barriers.** Alterations to the corridors and barriers change the economics of a position and affect the calculation of realized variance and volatility. In some corridor variance swaps, IQ effectively removed the lower bound by changing the value of the lower bound to 1 and effectively removed the upper bound by changing the value to 10 million, for example.[59] For other corridor variance swaps, IQ valued the positions as vanilla variance swaps in OVME, which cannot account for corridors.[60] In other instances, IQ also changed the programming in the Bloomberg script to disregard the corridors and value the corridor variance swaps as vanilla variance swaps.[61]

64.    For the 733 month-end valuations that IQ valued using DLIB, OVME, and OVML, I compared the contractual terms of each security against the terms used in the valuation as documented in the monthly Bloomberg scripts. I find that 92.9% of the IQ month-end valuations that I examined are based on altered terms. Exhibit 12 summarizes the findings for the 733 month-end valuations. I examined a total of 733 monthly scripts for 62 positions and find that 92.9% have alterations in the terms of the positions used in the IQ valuations.

---

[58] DAF: XDACRN7H [TAP_SDNY_000902].

[59] For example, DAF: XDACUIB5 [TAP_SDNY_000044].

[60] For example, VAF: IS8379140 [IQCM-SEC-00581895].

[61] For example, VAF: XDACVX5D [IQCM-SEC-00582356].

33

Exhibit 12. *Summary of Alterations Identified In the Bloomberg Scripts for the 62 Positions that IQ Valued Using DLIB, OVME, and OVML*

| No. of Positions | Total No. of Monthly Scripts | No. of Scripts with Alterations | Percent |
|---|---|---|---|
| (1) | (2) | (3) | (4) = (3) / (2) |
| 62 | 733 | 681 | 92.9 % |

65.     Next, I use conservative criteria to estimate the percentage of the scripts with alterations and estimate that 78.0% of the valuation scripts have alterations. See Exhibit 13. I classify a strike price as altered if the difference between the strike price of a position as in the term sheet and the strike price used in the IQ valuation based on the Bloomberg scripts is greater than 10%. For example, the Bloomberg scripts show that IQ altered the strike price in its valuations by more than 10.0% of the strike price in the term sheets for 42.3% of the month-end valuations for the 62 positions with Bloomberg scripts. I apply the same criteria for all quantitative variables such as notional. For example, the Bloomberg scripts also show that IQ altered the vega notional in its valuations by more than 10.0% of the notional amount in the term sheets for 14.7% of the month-end valuations for the 62 positions with Bloomberg scripts. For dates such as effective and maturity dates, I classify a date as altered if there is a difference of 7 days between the dates stated in the terms sheet contracts and the ones used in the scripts. Applying these conservative criteria to classify alterations, the percentage of scripts with alterations is 78.0%. This means that IQ altered the terms for nearly three out of four valuations based on the 733 month-end valuations that I examined for DAF and VAF, after applying the conditions discussed above for defining alterations.

Exhibit 13. *Summary of Alterations Identified In the Bloomberg Scripts With Allowances in Differences to Term Sheet Values for the 62 Positions IQ Valued Using DLIB, OVME, and OVML*

| No. of Positions | Total No. of Monthly Scripts | No. of Scripts with Alterations | Percent |
|---|---|---|---|
| (1) | (2) | (3) | (4) = (3) / (2) |
| 62 | 733 | 572 | 78.0 % |

34

## D. Identical Positions in DAF and VAF with Conflicting IQ Valuations

66.     Within the 62 positions with Bloomberg scripts, there are positions in DAF and VAF that were identical in all contract terms including the agreed-upon price (strike price), the notional amount, the effective date, and maturity date. I confirmed that the positions are identical through a manual review of the term sheets.

67.     I examined the IQ reported valuations for the overlapping positions in DAF and VAF and find that positions in DAF had different valuations compared to identical positions in VAF. There are no parameters or features in the term sheets that would explain why identical positions would have different valuations when valued by the same person as of the same date. The discrepancies in the valuations can be explained by IQ's alterations to the contractual terms in the term sheets as I demonstrate below. In addition, IQ made inconsistent alterations to the identical positions in DAF and VAF resulting in conflicting valuations for identical positions. Below I describe several examples of the changes IQ made and how the alterations inflated the valuations of the positions.

### Example 3: Short Variance Swaps on the Russell 2000 Index in the Mutual and Hedge Funds (DAF and VAF)

68.     For example, DAF and VAF each sold the same variance swap to Merrill Lynch as the counterparty on the variance of the Russell 2000 Index as the reference asset on January 7, 2020.[62] Each swap contract was for $340K notional, the strike price in each contract was 20%, the effective date was January 7, 2020, and the maturity date was September 18, 2020. Since the IQ funds were sellers (short positions), they would report gains if the variance on the Russell 2000 Index was low and below the strike price of 20%. Given that the COVID-19 crisis occurred during the life of these variance swaps and market volatility was high, IQ would be experiencing losses on these positions. Exhibit 14 below shows the conflicting IQ reported month-end valuations for this position in DAF and VAF from January 2020 to August 2020. As demonstrated in Exhibit 14 below, IQ marked this variance swap in DAF at negative $12.0 million and the identical VAF position at negative $8.1 million as of May 29, 2020. There are no parameters or features in the term sheets that would explain why the valuations by the same

---

[62] DAF: XDAC8QB4 [TAP_SDNY_001716] and VAF: XDAC98HE [IQCM-SEC-00538550].

person for identical positions with the same counterparty should differ, and the IQ valuations do not match closely in any month between March 2020 and August 2020.

69.     The Bloomberg scripts are a record of IQ's alterations to the contractual terms of the DAF and VAF positions and the inconsistent alterations for the two positions. According to the Bloomberg scripts, IQ changed the notional amount for the DAF position from $340K as stated in the term sheet to $220K in March 2020, then it reduced the notional further in June 2020 to $180K, and then finally in August 2020, it changed the notional in the other direction to $310K and closer to the term sheet value. According to the Bloomberg scripts, IQ changed the notional of the swap held in VAF to $350K by February 2020, then changed the notional to $150K in April 2020, and finally by the time of its maturity in September 2020, it changed the notional in the other direction to $300K and closer to the term sheet value.

Exhibit 14. *IQ Valuations for DAF and VAF in Example 3*



70.     The changes that IQ made to the notional of these two swaps away from the contract explain the differences in the valuations between these two identical positions in DAF and VAF. In addition, IQ's changes to the notional to be lower than the term sheet values inflated the IQ valuations by lowering the reported losses. For example, IQ reduced the notional amount of the DAF variance swap position in June 2020 from $220K to $180K, leading to a reduction in the reported loss on the position (smaller losses). IQ marked the DAF position in June 2020 at negative $10.3 million whereas the mark for the DAF position in June 2020 should

have been negative $20.0 million if it had used the correct notional amount of $340K and using the same Bloomberg valuation tools.

### Example 4: Long Corridor Variance Swaps on the FTSE 100 Index in the Mutual and Hedge Funds (DAF and VAF)

71.     Another example is a corridor variance swap. DAF and VAF both purchased the same corridor variance swap with Société Générale as the counterparty and the FTSE 100 Index as the reference asset.[63] The FTSE 100 Index is an index of the 100 largest companies, by market capitalization, on the London Stock Exchange. The swaps were for £200K notional each, the strike price was 13.65%, the trade date and effective date were February 10, 2020, and the maturity date was December 18, 2020. The IQ funds would report gains if the variance on the FTSE 100 Index was high and above the strike price of 13.65%. Given that the COVID-19 crisis occurred during the life of these variance swaps and market volatility was high, IQ would be experiencing gains on these positions. Exhibit 15 below shows the month-end valuations for this identical position in DAF and VAF for February 2020 to November 2020 and how the valuations diverge in most months. There are no parameters or features in the term sheets that would explain why the valuations by the same person for identical positions with the same counterparty should differ, and the IQ valuations do not match except in November 2020. The valuation differences between the identical positions in DAF and VAF reached $19.2 million in April 2020, and the valuations sometimes moved in opposite directions for multiple months. As demonstrated in Exhibit 15, IQ marked the DAF position in July 2020 at $9.2 million and increased it to $10.6 million in August (an increase in the valuation of $1.4 million). By contrast, IQ marked the same exact position in VAF at $18.6 million in July 2020 and decreased it to $8.9 million in August (a decrease in the valuation of $9.6 million).

---

[63] DAF: XDADACKX [TAP_SDNY_001457] and VAF: IS8379143 [IQCM-SEC-00539564].

Exhibit 15.  *IQ Valuations for DAF and VAF in Example 4*



72.    These are examples of identical positions between DAF and VAF with conflicting valuations. IQ altered the terms when valuing these positions, at times inconsistently for identical positions in DAF and VAF, leading to an inflation in the reported valuations.

### E.  IQ's Alterations Led to Inflated Valuations

73.    Using the Bloomberg valuation tools and scripts described above, I prepared 733 month-end valuations for the 62 positions that I examined using the actual terms of each position according to the term sheets and the Bloomberg valuation tools. I assessed the impact of the alterations on the valuations using the Bloomberg monthly scripts. In general, the alterations that IQ made to the terms of the positions inflated its valuations – by increasing its gains and reducing the losses of its positions. I find that IQ inflated its valuations for approximately 96.0% of the month-end valuations with altered terms when compared to my valuations and allowing for a $10K difference in valuations. Appendix D describes the process for generating my valuations for the 62 positions using the same Bloomberg valuation tools that IQ used.

**CONFIDENTIAL**

## **Example 5: Short Variance Swap on the Russell 2000 Index in the Mutual Fund (DAF)**

74.     As an example, Exhibit 16 below shows the IQ reported valuations of a short variance swap on the Russell 2000 Index with a strike price of 20%, notional of $340K, trade date and effective date of January 7, 2020, and maturity date of September 18, 2020 held by DAF.[64] IQ would report a gain if the volatility of the Russell 2000 Index was low and below the strike price of 20% and would report a loss if the volatility was above the strike price of 20%. This position was outstanding during the COVID-19 crisis and period of high market volatility and my valuations show that this short position experienced a loss on a monthly basis.

75.     The black line shows the IQ monthly valuations using the altered terms and the orange line shows my valuations using the actual terms according to the term sheet of the position. IQ altered the notional for this position by using a notional lower than the term sheet value, which scales down the reported valuation and in this case, inflates the valuation by reporting a smaller loss than expected. In March 2020, IQ changed the notional of the position to $220K and reported a valuation of negative $11.6 million. IQ's change in the notional artificially reduces the exposure of IQ to losses due to this position and given that the position was losing money in March, this one alteration underestimated the losses of IQ's by 43.1%. My valuations are consistent with the ones by the counterparty included in the blue line.

---

[64] DAF: XDAC8QB4 [TAP_SDNY_001716].

Exhibit 16. *Comparison of IQ Reported Values and My Valuations With Term Sheet Values for Example 5*



76.    As demonstrated in Exhibit 16, IQ changed the notional to $310K in August 2020, a month before the maturity of the position. As a result, its valuation in August became much closer to my valuation and the counterparty's valuation. The position closed in September with a realized price of negative $17.2 million, and my valuation of the position in August was negative $17.3 million.

77.    The main reason behind the discrepancy between IQ and my valuations using the contractual terms is IQ's use of altered terms. Specifically, IQ's use of altered terms explains between 81.8% to 97.8% of the discrepancy between IQ and my valuations depending on the valuation month. Differences in the selection of the valuation model and time of the valuation explain the remaining difference.[65]

---

[65] IQ valued the variance swap using the Local Volatility model in January and switched to the Black Scholes model between February and August 2020. IQ valued the swap as of New York 2 pm between January and February and as of New York 10 am between March and August. Instead, I used the Bloomberg Local Volatility model and valued the swap as of 4 pm New York time across all months.

78.     I was able to replicate the IQ valuations using the same Bloomberg tools and the terms that IQ altered as documented in the Bloomberg scripts. See Exhibit 17 for my replication of IQ's reported valuations for the variance swap on the Russell 2000 Index discussed above.

Exhibit 17.  *Comparison of IQ Reported Values and My Replication with Altered Terms for Example 5*



Example 6: Long Corridor Variance Swap on the Nikkei 225 Index in the Mutual Fund (DAF)

79.     As another example, Exhibit 18 below shows the IQ reported valuations of a long corridor variance (up barrier) swap on the Nikkei 225 Index held by DAF with a strike price of 18.3%, notional of ¥53.75 million, trade date and effective date of June 26, 2019, maturity date of December 11, 2020, and lower barrier at 70% of the reference index level at the inception of

41

CONFIDENTIAL

the trade.[66] IQ would report a gain if the volatility of the Nikkei 225 Index was high and above the strike price of 18.3% and would report a loss if the volatility was below the strike price of 18.3%. For this position, I document that the Bloomberg scripts show that IQ altered the strike price to use a value lower than the term sheet value in its valuations, which is beneficial to IQ's position as a buyer and inflates IQ's valuations.[67]

80.     The black line shows the IQ monthly valuations using the altered terms and the orange line shows my valuations using the actual terms according to the term sheet of the position. IQ altered the strike price from at least the month-end valuation in August 2019, using 15.3% in place of the actual term sheet value of 18.3%, and used a lower strike price up until November 2020, the last month-end valuation before the maturity of the swap. Using a lower strike price inflated IQ's valuations since DAF was the buyer. My valuations are consistent with the ones by the counterparty included in the blue line.

---

[66] DAF: XDACXGU2 [TAP_SDNY_000402].

[67] IQ made an additional alteration starting in April 2020 to remove the lower barrier at 14,776 on the Nikkei 225 Index. The Nikkei 225 Index was always above the lower barrier since the June 26, 2019 effective date and through the December 11, 2020 maturity date.

42

Exhibit 18. *Comparison of IQ Reported Values and My Valuations With Term Sheet Values for Example 6*



81.    As demonstrated in Exhibit 18, IQ changed the strike price to a lower value of 6.3% and also removed the lower barrier as of April 2020. This means that IQ valued the position as a vanilla variance swap and not a corridor variance swap. Starting in August 2020, IQ used strike prices closer to the 18.3% value in the term sheets as the position neared maturity in December 2020. As a result, its valuations moved closer to my valuations and to the valuation of the counterparty. For example, IQ reported a valuation of $4.8 million in August 2020 and my valuation is $3.5 million, while the counterparty also marked the position at $3.5 million. For the November 2020 valuation, IQ undid the strike price alteration and used the actual strike price in the term sheet, kept the alteration to remove the lower barrier, and made a new alteration to the annualization factor. The position closed in December with a realized price of $2.4 million, and my valuation of the position in November was $2.5 million while IQ valued the position at $6.2 million.

43

CONFIDENTIAL

82.    I was able to replicate the IQ valuations using the same Bloomberg tools and the terms that IQ altered as documented in the Bloomberg scripts. Note that IQ's alterations account for 90.6% to 100% of the difference between its valuations and my valuations—depending on the valuation month. The remainder is accounted by the selection of the valuation model and/or volatility surface (technical inputs in the valuation).

Exhibit 19.  *Comparison of IQ Reported Values and My Replication with Altered Terms for Example 6*



83.    Exhibit 20 compares the IQ reported valuations for the 62 positions to my valuations using the agreed-upon inputs from the term sheets. Using IQ's altered terms, the net market value of the positions outstanding as of March 2020 was $186.1 million, whereas the valuation using the actual terms according to the term sheets is negative $46.2 million. The market value of the outstanding positions in April 2020 was $368.0 million according to IQ, but using the actual term sheets, I estimate the market value for the positions to be negative $16.0 million. Similarly, the market value of the outstanding positions in May 2020 was $275.6

44

million, whereas the valuation of the positions using the actual term sheets is negative $26.0 million. Overall, the market value of the 62 positions in 2020 was between $20.8 million and $394.0 million, however, using the actual inputs from the term sheets, I estimate the market value of the 62 positions to be between negative $46.2 million to $89.0 million.

Exhibit 20. *Comparison of IQ Reported Values and My Valuations with Term Sheet Values for 62 OTC Positions*



84.    I document that IQ used altered terms in 92.9% of the month-end valuations for the 62 positions with Bloomberg scripts. When IQ altered the contractual terms in valuing the 62 positions with Bloomberg scripts, IQ inflated the valuations for 96.0% of these month-end valuations based on altered terms as compared to my valuations using the actual inputs from in the term sheets and allowing for a $10K difference in valuations. IQ nearly always altered the terms when valuing the 62 positions with Bloomberg scripts, and when it did, IQ nearly always inflated its valuations.

85.    In addition, 33 of the 62 positions with Bloomberg scripts closed on or before January 2021. For 9 out of these 33 positions, IQ changed the terms used in the month-end

45

CONFIDENTIAL

valuations back towards the contractual terms at or near the maturity dates and as a result, the IQ valuation became more in line with my valuations and the valuations from the counterparties.

86.     Exhibit 21 compares my valuations using the agreed-upon terms of the term sheets for the 62 positions to the valuations from the counterparties.[68] My valuations, generated in Bloomberg using the valuation tools that IQ used to value its OTC positions, are consistent with the counterparties' valuations. For example, my valuations for March 2020 are negative $51.7 million and the counterparties reported a total valuation of negative $52.9 million, my valuations for April 2020 are negative $23.7 million and the counterparties reported a total valuation of negative $24.6 million, and my valuations for May 2020 are negative $35.2 million and the counterparties reported a total valuation of negative $30.4 million.

---

[68] I compared the valuations for 57 of the 62 positions with Bloomberg scripts. There are 5 positions where the counterparty reported combined valuations for multiple positions instead of individual valuations. When this occurs, I was unable to disaggregate the combined valuations from the counterparties to the individual valuations to compare to my valuations.

46

Exhibit 21. *Comparison of My Valuations With Term Sheet Values to the Counterparties' Valuations for the 62 OTC Positions*



## V.   CERTAIN IQ VALUATIONS ARE MATHEMATICALLY IMPOSSIBLE AND INFLATED

87.     This section documents that certain alterations that IQ made to the contractual terms led to inflated valuations that are mathematically impossible if one were to use the accurate terms of the positions. The contractual terms of the variance swaps with IQ as a seller of variance swaps create a cap or a maximum valuation for each of these positions but IQ reported values that exceeded these caps. When IQ is a seller of a variance swap, for example on the S&P 500 Index, IQ benefits if the volatility of the price of the S&P 500 Index decreases and the maximum valuation that IQ could possibly gain from a such a position occurs if the volatility decreases all the way to zero. IQ reported valuations for such positions where its valuation exceeded the maximum possible gain in the case of zero volatility. Out of the 62 positions with monthly scripts, there are seven variance swaps where IQ is variance seller. All of the seven positions had mathematically impossible valuations reported by IQ, in at least one month due to the alterations.

47

CONFIDENTIAL

88.     As an example to explain what IQ did, imagine a scenario where you have five $100 wagers with a friend. You have already lost three of them, i.e. you already lost $300 dollars, and there are two wagers left. At this point, the best-case scenario is owing your friend $100 if you win the last two bets—this is your cap on the upper bound result or valuation of your position (so you win the last two bets for $200, already lost $300, and on net you would lose $100 in the best-case scenario). As is, it would be mathematically impossible, and it would not make sense to think of this situation as being even or in your favor.

89.     Yet, in similar circumstances, IQ reported valuations for variance swaps where it would report a higher value than is mathematically possible based on the actual realized variance up to that point and the actual contractual terms of the swap. This would happen precisely because of the alterations that IQ made to the terms of these swaps. The alterations led to inflated valuations that were mathematically impossible (under the actual terms) because IQ reported values that were better than the maximum possible valuation, such as reporting a gain on a position that could not possibly have ended in IQ's favor. I explain the intuition using the valuation of an actual variance swap in the portfolio and then document various instances of inflated valuation positions.

90.     At any time before maturity, the value of a variance swap is based on the weighted average of the actual realized variance and the expected future variance for the remaining time until maturity. This means that if one knows the valuation of a variance swap at a given point in time, the actual realized volatility, the size of the position and strike price, one can then infer the expected future volatility that is implied by the valuation. The expected future volatility is the only unobservable variable in the valuation of a variance swap and hence could be a source of discrepancy in the valuation of the swap.

91.     I use IQ's monthly valuations for each position to estimate IQ's expected variance. Next, I use the terms of the variance swap, including effective date, maturity date and strike as reported in the term sheet for each position. As of each valuation date, I calculate the realized volatility of the referenced index between the effective date and the valuation date.[69]

---

[69] Some positions may close partially which would reduce the size (vega notional) of the position, and in that case, I rely on the outstanding notional as of the valuation date.

48

Finally, using the contractual terms of the position and actual historical volatility as of the valuation date, I calculate the expected volatility for each position which is the expected volatility between the valuation date and the maturity date. Given that IQ changed the contractual terms of positions in its portfolio, some of its valuations based on altered terms would imply a negative variance which is mathematically impossible as discussed below and demonstrate the impact of the alterations on inflating the valuation of the positions.

## A.  What is a Mathematically Impossible Valuation?

92.     The range of values for variance and volatility is zero or positive values. Variance and volatility would be zero if the price of the reference index, such as the S&P 500 Index, did not move at all during the measurement period (i.e., the same value every day), such as a month. If the S&P 500 Index had any variability during the time period in question, by increasing or decreasing by the end of the month, then variance and volatility of the price of the S&P 500 Index would be positive values that measure how much the index moved during the month. Variance and volatility do not capture the direction of the price movements but just the magnitude of them. From a mathematical standpoint, final realized volatility is based on the square of logarithmic returns. As such, it cannot be a negative number. It can only be zero or positive. Variance is simply the square of the volatility and also cannot be a negative number.

93.     Suppose IQ is a seller of a six-month variance swap on the S&P 500 Index with a strike price of 20%, expressed in volatility. This means that IQ would pay the counterparty at the end of the contract (in six months) if the volatility of the S&P 500 Index is above the strike price. IQ is effectively making a bet that the volatility of the price of the S&P 500 Index would remain low in the next months. The payment that IQ would have to make to its counterparty would be based on how much higher the actual volatility over the life of the swap would be relative to the agreed-upon volatility at the start of the swap (the strike price of 20%). Conversely, as a seller of the swap, the maximum payment from the counterparty to IQ would occur if actual volatility of the S&P 500 Index ends up being zero, which is highly unlikely. In this case, the payment to IQ would be the difference between the strike price of 20% and the actual volatility of 0%.

94.     When valuing this variance swap on the S&P 500 Index after three months of its initiation, the valuation is based on a weighted average of actual historical variance during the

49

CONFIDENTIAL

first three months and the expected future variance over the remaining life of the swap. If one knows the valuation that IQ assigned to this swap and the actual historical volatility for the first three months in the life of the swap, then one can back out the expected future volatility that is implicit in the IQ valuation (assuming one also knows the size and strike price of the position). I back out the future volatility that is implicit in IQ's valuations using the strike and notional as reported in the term sheet.

95.     Out of the 62 positions with Bloomberg scripts that I examined, there are seven variance swaps with IQ as seller. The contractual terms of the variance swaps with IQ as variance seller create a cap or a maximum valuation of each of these positions. However, IQ reported valuations that are greater than the maximum valuations in at least one month for all seven variance swaps with IQ as seller due to the alterations. These IQ valuations are inflated and impossible because the valuation estimates could only be possible if the future variance or rate of change of the price of the underlying reference asset is negative. I also demonstrate below that it was the alterations that IQ made to the contractual terms that led to the mathematically impossible valuations.

96.     Below, I present examples of these impossible valuations from the IQ portfolio. I then discuss the seven variance swaps with Bloomberg scripts and IQ as seller. I demonstrate that they all had mathematically impossible valuations in at least one month.

## B. Examples of Impossible Valuations and the Impact of the Altered Contractual Terms of the Position

### Example 7: Short Variance Swap on the Russell 2000 Index in the Mutual Fund (DAF)

97.     IQ sold a swap to Merrill Lynch on the variance of the Russell 2000 Index and the start date of the contract was January 7, 2020, and the maturity date was September 18, 2020 (variance swap on the Russell 2000 Index).[70] The notional amount of the variance swap was $340K and the agreed-upon strike price was 20%.[71] This means that if the final realized volatility

---

[70] DAF: XDAC8QB4 [TAP_SDNY_001716].

[71] TAP_SDNY_001716.

50

CONFIDENTIAL

on the Russell 2000 Index at maturity turned out to be less than 20%, then Merrill would pay IQ the difference between the final realized variance and the agreed upon variance (400 which represents the square of the strike price of 20) times the notional. Conversely, if the actual volatility on the Russell 2000 Index at maturity turned out to be greater than 20%, then IQ would pay Merrill the difference. So, IQ would benefit if the rate of change or volatility of the Russell 2000 Index is low and the maximum benefit to IQ would be if the volatility turns out to be zero, which is highly unlikely.

98.     For this variance swap, I calculated the maximum theoretical valuation each month for IQ by assuming that the future expected volatility is zero between the month-end valuation date and maturity of the swap. As of July 31, 2020, the actual realized volatility or the actual rate of the change of the Russell 2000 Index between January 7, 2020 and July 31, 2020 was 54.2%. If I assume that the expected future volatility is 0% from that point until the maturity on September 18, 2020, the best-case scenario for IQ at this point would be a valuation of negative $16.6 million. The negative $16.6 million valuation is calculated as the notional amount in variance terms multiplied by the difference in the term sheet strike price in variance and the weighted average variance = [($340K notional / (2 * 20 strike price)) * (20^2 strike price in variance – 49^2 weighted average variance)]. In other words, if I assume that the Russell 2000 Index was going to stay constant and not move up or down at all from August through September 2020, then the value of this position would be a loss of $16.6 million. Instead, IQ reported a valuation of negative $9.5 million, which is more favorable to IQ than a loss of $16.6 million. Even if volatility was 0% over the remaining life of the swap, IQ's best-case scenario would have been a loss in excess of $16.6 million per my calculations and could not have been a loss of $9.5 million. IQ's valuation of negative $9.5 million as of July 31, 2020 is inflated and would imply an impossible expected future volatility of the Russell 2000 Index. The reason IQ's valuation was reported as negative $9.5 million is that IQ reduced the notional amount of the position from its contractual value of $340K to $180K as of July 31, 2020, based on the Bloomberg scripts.

99.     In addition, I examined IQ's month-end valuations from January through August of 2020 for the same position and found that five out of the eight months were impossible

51

CONFIDENTIAL

valuations because the IQ valuations would imply negative expected variance for the Russell 2000 Index which is mathematically impossible. See Exhibit 22.

Exhibit 22. *IQ Reported Valuations and Impossible Valuations for Example 7*

| Valuation Date | Infinity Q Valuation | Maximum Theoretical Valuation | Realized Volatility | Impossible Valuation |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| ----------- $MM ----------- | | | | |
| 1/31/2020 | $    0.3 | $    3.2 | 11.1% | No |
| 2/28/2020 | (1.8) | 2.6 | 20.5 | No |
| 3/31/2020 | (11.6) | (9.3) | 68.0 | No |
| 4/30/2020 | (11.8) | (12.7) | 65.2 | Yes |
| 5/29/2020 | (12.0) | (14.3) | 61.3 | Yes |
| 6/30/2020 | (10.3) | (16.1) | 58.1 | Yes |
| 7/31/2020 | (9.5) | (16.6) | 54.2 | Yes |
| 8/31/2020 | (15.7) | (16.8) | 50.8 | Yes |

**% of monthly valuations that are impossible = 5/8 = 62.5%**

100.    I identified alterations to the notional amount of this variance swap on the Russell 2000 Index based on the Bloomberg scripts for the months of March through August 2020. In March 2020, IQ reduced the notional amount used for valuing the position from the agreed upon level in the contract/term sheet of $340K to $220K which would reduce the losses that IQ had to report. The notional amount remained at $220K for the IQ valuations in April and May and then IQ reduced it again in June to $180K. The notional in July still did not match the term sheet and remained at $180K and then IQ increased the notional amount to $310K in August, as the position neared maturity, which is also inconsistent but much closer to the actual notional of $340K in the term sheet. In the five months where there was an impossible valuation, IQ had altered the terms in Bloomberg to value this position in each of the five months. See Exhibit 23.

52

Exhibit 23. *Altered Terms and Expected Variance for Impossible Valuations for Example 7*

| Valuation Date | Infinity Q | | Impossible Valuation | Script Alterations [1] | NERA (Term Sheet Values) | |
|---|---|---|---|---|---|---|
| | Valuation | Expected Variance [2] | | Notional Amount | Valuation | Expected Variance |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | --- $MM --- | | | | --- $MM --- | |
| | | | | Term Sheet: -$340k | | |
| 1/31/2020 | $ 0.3 | 387 | No | $ (340,000) | $ 0.3 | 384 |
| 2/28/2020 | (1.8) | 665 | No | (340,000) | (3.2) | 865 |
| 3/31/2020 | (11.6) | 408 | No | (220,000) | (20.5) | 1,953 |
| 4/30/2020 | (11.8) | (199) | Yes | (220,000) | (19.8) | 1,497 |
| 5/29/2020 | (12.0) | (603) | Yes | (220,000) | (19.5) | 1,379 |
| 6/30/2020 | (10.3) | (2,157) | Yes | (180,000) | (20.0) | 1,458 |
| 7/31/2020 | (9.5) | (4,359) | Yes | (180,000) | (18.5) | 1,164 |
| 8/31/2020 | (15.7) | (1,878) | Yes | (310,000) | (17.3) | 728 |

**Notes and Sources:**
[1] Monthly scripts are received from counsel and values are highlighted in red if different from term sheet values.
[2] Infinity Q expected variance is calculated using term sheet values and Infinity Q reported valuations.

## Example 8: Short Variance Swap on the MSCI World Index in the Mutual Fund (DAF)

101.    Another example of an inflated valuation that implies a negative expected future variance estimate for the reference index is a variance swap that IQ sold to Deutsche Bank on the variance of a MSCI World Index (MXWO) held by DAF. The start date of the contract was on March 15, 2019 and the maturity date was December 17, 2021.[72] The notional amount of the variance swap was $600K and the agreed-upon volatility (strike price) was 17.3%.[73] This means that if the actual volatility on the MXWO Index at maturity turned out to be less than 17.3%, then Deutsche Bank would pay IQ the difference between the final realized variance and the agreed upon variance (based on a strike price of 17.3%) times the notional. Conversely, if the actual volatility on the MXWO Index at maturity turned out to be greater than 17.3%, then IQ would pay Deutsche Bank the difference. So, IQ would benefit if the rate of change or volatility of the MXWO Index is low and the maximum benefit to IQ would be if the volatility is zero.

102.    For this variance swap, I calculated the maximum theoretical valuation each month by assuming that the future expected volatility is going to be zero from each month-end

---

[72] DAF: XDACQ6H3 [IQCM-SEC-00601353].

[73] IQCM-SEC-00601353.

valuation date until the maturity of the swap. As of November 29, 2019, the actual realized volatility or the actual rate of the change of the MXWO Index between March 15, 2019 and November 29, 2019 was 10.2%. If I assume that the expected future volatility is 0% until the maturity on December 17, 2021, the best-case scenario for IQ would be a gain of $4.6 million. The $4.6 million valuation is calculated as the notional amount in variance terms multiplied by the difference in the term sheet strike price in variance and the weighted average variance = [($600K notional / (2 * 17.3 strike price)) * (17.3^2 strike price in variance – 5^2 weighted average variance)]. In other words, if I assume that the MXWO Index was going to stay constant and not move up or down at all from December 2019 through December 2021, then the value of this position would be a gain of $4.6 million. Instead, IQ reported a valuation of $5.9 million, which is notably more favorable to IQ than a gain of $4.6 million. Even if volatility was 0% over the remaining life of the swap, IQ's best-case scenario would have been a gain of $4.6 million per my calculations. IQ's valuation of $5.9 million as of November 29, 2019 is inflated and would imply an impossible negative expected future volatility of the MXWO Index. The reason for the impossible valuation by IQ is that IQ changed the contractual terms of this position as documented by the Bloomberg scripts.

103.   In addition, I examined IQ's month-end valuation from March 2019 through January 2021 and found that five out of the twenty-three months were impossible valuations because the IQ valuations would imply negative expected variance for the MXWO Index which is mathematically impossible. See Exhibit 24.

54

Exhibit 24. *IQ Reported Valuations and Impossible Valuations for Example 8*

| Valuation Date | Infinity Q Valuation | Maximum Theoretical Valuation | Realized Volatility | Impossible Valuation |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| | ----------- $MM ----------- | | | |
| 3/29/2019 | $    0.4 | $    4.8 | 10.9% | No |
| 4/30/2019 | 1.5 | 4.8 | 7.8 | No |
| 5/31/2019 | 2.2 | 4.7 | 9.6 | No |
| 6/28/2019 | 3.5 | 4.7 | 9.8 | No |
| 7/31/2019 | 4.0 | 4.7 | 9.1 | No |
| 8/30/2019 | 1.6 | 4.6 | 11.1 | No |
| 9/30/2019 | 3.5 | 4.6 | 10.6 | No |
| 10/31/2019 | 5.7 | 4.6 | 10.7 | Yes |
| 11/29/2019 | 5.9 | 4.6 | 10.2 | Yes |
| 12/31/2019 | 7.0 | 4.6 | 9.9 | Yes |
| 1/31/2020 | 7.3 | 4.5 | 9.7 | Yes |
| 2/28/2020 | 5.7 | 4.3 | 11.2 | Yes |
| 3/31/2020 | (7.3) | 1.2 | 24.7 | No |
| 4/30/2020 | (4.9) | 0.6 | 25.5 | No |
| 5/29/2020 | (4.9) | 0.4 | 25.2 | No |
| 6/30/2020 | (4.1) | 0.1 | 25.2 | No |
| 7/31/2020 | (3.4) | (0.0) | 24.5 | No |
| 8/31/2020 | (4.1) | (0.1) | 23.9 | No |
| 9/30/2020 | (4.8) | (0.3) | 23.7 | No |
| 10/30/2020 | (4.7) | (0.4) | 23.4 | No |
| 11/30/2020 | (3.8) | (0.5) | 23.1 | No |
| 12/31/2020 | (3.7) | (0.6) | 22.6 | No |
| 1/29/2021 | (4.3) | (0.7) | 22.3 | No |

**% of monthly valuations that are impossible = 5/23 = 21.7%**

104.     I identified alterations to the strike price of this variance swap on the MXWO Index based on the Bloomberg scripts for the months of November 2019 and January 2020 where IQ reported impossible valuations. In November 2019, IQ used a strike price of 25.3% that is higher than the contractual strike price of 17.3% in the term sheet. By increasing the strike price, IQ made an alteration that benefits the IQ fund as the seller of this position because it gives the seller more room to be profitable. The realized volatility now needs to be higher for IQ to experience a loss since IQ used a strike price of 25.3% instead of the contractual strike price of 17.3%—now any realized variance under 25.3% will be a gain for IQ. IQ used a higher strike price in January 2020 of 26.3%. See Exhibit 25.

55

Exhibit 25. *Altered Terms and Expected Variance for Impossible Valuations for Example 8*

| Valuation Date | Infinity Q | | Impossible Valuation | Script Alterations [1] | | NERA (Term Sheet Values) | |
|---|---|---|---|---|---|---|---|
| | Valuation | Expected Variance [2] | | Strike | Corridor Low | Valuation | Expected Variance |
| (1) | (2)<br>--- $MM --- | (3) | (4) | (5) | (6) | (7)<br>--- $MM --- | (8) |
| | | | | *Term Sheet: 0.173* | *Term Sheet: None* | | |
| 3/29/2019 | $    0.4 | 276 | No | 0.183 | 1 | $    0.1 | 294 |
| 4/30/2019 | 1.5 | 211 | No | n.a. | n.a. | 0.7 | 267 |
| 5/31/2019 | 2.2 | 170 | No | 0.203 | 1 | 0.6 | 278 |
| 6/28/2019 | 3.5 | 85 | No | 0.213 | 1 | 1.1 | 250 |
| 7/31/2019 | 4.0 | 52 | No | 0.218 | 1 | 1.2 | 246 |
| 8/30/2019 | 1.6 | 221 | No | n.a. | n.a. | 0.0 | 334 |
| 9/30/2019 | 3.5 | 80 | No | n.a. | n.a. | 0.5 | 307 |
| 10/31/2019 | 5.7 | (90) | Yes | n.a. | n.a. | 1.0 | 277 |
| 11/29/2019 | 5.9 | (106) | Yes | 0.253 | 1 | 0.7 | 313 |
| 12/31/2019 | 7.0 | (207) | Yes | n.a. | n.a. | 1.0 | 294 |
| 1/31/2020 | 7.3 | (244) | Yes | 0.263 | 1 | 1.1 | 297 |
| 2/28/2020 | 5.7 | (126) | Yes | n.a. | n.a. | (6.7) | 998 |
| 3/31/2020 | (7.3) | 790 | No | 0.193 | 1,200 | (8.7) | 921 |
| 4/30/2020 | (4.9) | 536 | No | 0.213 | 1,000 | (7.0) | 739 |
| 5/29/2020 | (4.9) | 546 | No | 0.213 | 800 | (5.7) | 628 |
| 6/30/2020 | (4.1) | 455 | No | 0.203 | 1 | (6.0) | 666 |
| 7/31/2020 | (3.4) | 396 | No | 0.193 | 1 | (6.3) | 725 |
| 8/31/2020 | (4.1) | 496 | No | 0.183 | 1 | (4.9) | 602 |
| 9/30/2020 | (4.8) | 597 | No | 0.183 | 1 | (5.7) | 716 |
| 10/30/2020 | (4.7) | 606 | No | 0.183 | 1 | (5.8) | 758 |
| 11/30/2020 | (3.8) | 497 | No | 0.173 | 1 | (3.7) | 490 |
| 12/31/2020 | (3.7) | 517 | No | 0.173 | 1 | (3.7) | 525 |
| 1/29/2021 | (4.3) | 656 | No | 0.173 | 1 | (4.2) | 643 |

**Notes and Sources:**

[1] Monthly scripts are received from counsel and values are highlighted in red if different from term sheet values. "n.a." indicates that the corresponding monthly scripts has an update date after the valuation date and could not be used to confirm the exact parameters used by IQ.

[2] Infinity Q expected variance is calculated using term sheet values and Infinity Q reported valuations.

105.    In addition to identifying inflated and impossible IQ valuations for October 2019 to February 2020 using the actual realized volatility, I find that these same valuations violate the absolute maximum valuation possible on this position. If realized volatility was 0% during the life of the swap, which maximizes the value for IQ as the seller, the counterparty would need to pay IQ $5.2 million.[74] IQ reported valuations that were mathematically impossible for October 2019 to February 2020 because it implies a negative variance. Also, the IQ reported valuations could never be reached at all for this position, given the contractual terms of the position. The

---

[74] The $5.2 million maximum payoff to IQ is calculated using 0% realized volatility during the life of the swap = [($600K notional / (2 * 17.3 strike price)) * (17.3^2 strike price in variance – 0^2 weighted average variance)].

56

CONFIDENTIAL

maximum gain for IQ from this position would have been $5.2 million and it is not possible for IQ to have had a greater gain than that.

### C. All Seven Variance Swaps with Bloomberg Scripts and IQ as Seller had Impossible Valuations reported by IQ

106.    In total, out of the seven variance swaps with Bloomberg scripts where IQ was a seller, all had impossible valuations reported by IQ for some months.[75] Each of the seven securities had at least one impossible month-end valuation, that is, IQ's valuation implied a negative variance which is mathematically impossible. For these seven securities, there are a total of 30 impossible month-end valuations by IQ as the valuations imply negative expected future variance in each case. For each of the 30 impossible month-end valuations, IQ used altered contractual terms as verified by my review of the Bloomberg scripts and the term sheets for the positions. As a result of the alterations, IQ's reported inflated valuations by either overstating gains or understating losses for the 30 month-end valuations.

107.    Exhibit 26, below, presents the seven securities and 30 months where IQ's valuations for the positions are deemed impossible as they imply a negative expected future variance.

---

[75] The seven variance swaps are not a complete list of all impossible valuations in the IQ's portfolio. There are additional instances of impossible valuations for variance swaps with IQ as seller that are not part of the 62 positions with available monthly Bloomberg scripts.

57

CONFIDENTIAL

Exhibit 26. *Summary of Impossible Valuations in IQ Reported Values*

| No.<br>(1) | Month<br>(2) | Infinity Q<br>Valuation<br>(3) | Implied<br>Variance<br>(4) |
|---|---|---|---|
| | | ---- $ MM ---- | |
| **MXWO Variance Swap @ 17.3 12/17/21 (XDACQ6H3 in DAF)** | | | |
| 1. | Oct-19 | $    5.7 | (90) |
| 2. | Nov-19 | 5.9 | (106) |
| 3. | Dec-19 | 7.0 | (207) |
| 4. | Jan-20 | 7.3 | (244) |
| 5. | Feb-20 | 5.7 | (126) |
| **MXWO Variance Swap @ 17.3 12/17/21 (XDACQ9DO in DAF)** | | | |
| 6. | Oct-19 | $    2.9 | (90) |
| 7. | Nov-19 | 2.9 | (106) |
| 8. | Dec-19 | 3.5 | (206) |
| 9. | Jan-20 | 3.7 | (244) |
| 10. | Feb-20 | 2.8 | (125) |
| **MXWO Variance Swap @ 17.3 12/17/21 (XDAC2G26 in VAF)** | | | |
| 11. | Mar-20 | $    9.7 | (785) |
| 12. | Apr-20 | 3.7 | (303) |
| **RTY Variance 8/21/20 @ 18.75 (XDAC8ZIA in DAF)** | | | |
| 13. | Mar-20 | $   (4.2) | (547) |
| 14. | Apr-20 | (1.2) | (3,002) |
| 15. | May-20 | (4.3) | (2,604) |
| **RTY Variance 8/21/20 @ 18.75 (XDAC98J6 in VAF)** | | | |
| 16. | Apr-20 | $   (7.2) | (190) |
| 17. | May-20 | (7.6) | (558) |
| 18. | Jun-20 | (8.2) | (1,339) |
| 19. | Jul-20 | (7.4) | (5,842) |
| **RTY Variance 9/18/20 20% (XDAC8QB4 in DAF)** | | | |
| 20. | Apr-20 | $  (11.8) | (199) |
| 21. | May-20 | (12.0) | (603) |
| 22. | Jun-20 | (10.3) | (2,157) |
| 23. | Jul-20 | (9.5) | (4,359) |
| 24. | Aug-20 | (15.7) | (1,878) |
| **RTY Variance 9/18/20 20% (XDAC98HE in VAF)** | | | |
| 25. | Mar-20 | $   (7.8) | (257) |
| 26. | Apr-20 | (7.8) | (1,047) |
| 27. | May-20 | (8.1) | (1,651) |
| 28. | Jun-20 | (8.6) | (2,782) |
| 29. | Jul-20 | (7.9) | (5,325) |
| 30. | Aug-20 | (15.1) | (2,797) |

CONFIDENTIAL

108.    The 30 impossible valuations occurred during the period of October 2019 to August 2020 across DAF and VAF. Exhibit 27 shows that IQ reported at least two impossible valuations during each of these months and inflated the valuations by at least $3.8 million. Between February and July 2020, IQ inflated the valuations between $18.5 and $43.8 million in each of those months. For example, in April 2020, IQ reported five impossible valuations and marked those five positions at a loss of negative $24.3 million. These April 2020 valuations were inflated by $43.8 million and using the same Bloomberg valuation tools as Infinity Q used, I estimate that these positions should have been marked at negative $68.1 million. IQ altered the terms in valuing these five positions as of the end of April 2020 and the alterations resulted in inflated and impossible valuations. Overall, IQ's alterations inflated the 30 monthly valuations with mathematically impossible values by $211.8 million. There are no parameters or features in the term sheets that would explain IQ reporting impossible valuations.

Exhibit 27.  *Summary of Inflated Valuations for Impossible Valuations*

| Month (1) | No. of Securities with Impossible Valuation (2) | Total Valuatiom | | Difference | |
|---|---|---|---|---|---|
| | | Infinity Q (3) | NERA (4) | Amount (5) =(3) - (4) | Average (6) =(5)/(2) |
| | | -------------------- $ MM -------------------- | | | |
| Oct-19 | 2 | $ 8.6 | $ 1.5 | $ 7.1 | $ 3.5 |
| Nov-19 | 2 | 8.8 | 1.0 | 7.8 | 3.9 |
| Dec-19 | 2 | 10.6 | 1.6 | 9.0 | 4.5 |
| Jan-20 | 2 | 11.0 | 1.7 | 9.3 | 4.6 |
| Feb-20 | 2 | 8.5 | (10.0) | 18.5 | 9.3 |
| Mar-20 | 3 | (2.3) | (40.3) | 38.0 | 12.7 |
| Apr-20 | 5 | (24.3) | (68.1) | 43.8 | 8.8 |
| May-20 | 4 | (32.1) | (60.2) | 28.1 | 7.0 |
| Jun-20 | 3 | (27.1) | (51.0) | 23.8 | 7.9 |
| Jul-20 | 3 | (24.9) | (47.3) | 22.4 | 7.5 |
| Aug-20 | 2 | (30.8) | (34.6) | 3.8 | 1.9 |
| **Overall** | **30** | **$ (93.9)** | **$ (305.7)** | **$ 211.8** | **$ 7.1** |

## VI.   INFINITY Q'S ALTERATIONS DEPEND ON WHETHER IT IS SHORT OR LONG AND INFLATED ITS REPORTED VALUATIONS

109.    This section demonstrates that IQ used inconsistent expectations about the future variability of the price of the underlying assets which inflated the valuations. IQ effectively used different expected variability of the price of the reference assets depending on whether IQ was

CONFIDENTIAL

long or short, for the same underlying reference assets and over the same time period. By contrast, my valuations and the counterparties' valuations are consistent in terms of the expectations of future variability of the price of the underlying asset regardless of whether the position is short or long.

110.    A key variable in valuing a variance swap on an underlying asset such as the S&P 500 Index or the Russell 2000 Index is the expectation of the uncertainty in the price of the asset over the remaining life of the swap. When valuing a swap, the forecast of the degree of dispersion of the price of reference asset should not change whether one is long or short on a position. For example, if I expect the price of S&P 500 Index to be highly uncertain over the next few months, then I would use a forecast of future variance that reflects a high degree of dispersion of the S&P 500 Index price regardless of whether the position is short or long. This is not the case in IQ's valuations.

111.    The value of a variance swap depends on the actual realized variance from the effective date to the valuation date, as well as the expectation of the variance of the price of the reference asset over the remaining life of the swap between the valuation date and the termination date. The expected variance is the only unobservable variable needed in the valuation and hence could be a source of discrepancy in the valuation of the swap. Similarly, the variance swap rate or VS rate is the forecast for the expected volatility of an asset over its remaining life. Using the valuation of the swap at a given date, the actual realized variance, and other inputs, one can back out the expected variance that is implied by the valuation.

112.    I identified four positions within the 62 discussed above that were variance swaps with the same underlying reference asset—which is the Russell 2000 Index—and termination date and with IQ as a seller in one and a buyer in another.[76] The expected variance of the price of the Russell 2000 Index over the remaining life of the swap should be consistent whether IQ was a buyer or a seller. This is not the case in IQ's valuations. This inconsistency is caused by IQ's

---

[76] The four positions are the only ones within the 62 positions with monthly scripts that satisfy the following criteria: the positions are variance or volatility swaps, the positions have the same underlying index, the positions have the same termination date and IQ is buyer and seller.

60

alterations and there are no parameters or features in the term sheets that would explain this inconsistency.

### Example 9: Long and Short Variance Swaps on the Russell 2000 Index in the Hedge Fund (VAF)

113.    I discuss below the valuation of two VAF variance swaps as of April 30, 2020, one where IQ was a buyer and another where IQ was a seller. In both positions, the underlying asset is the Russell 2000 Index and both positions have the same maturity date on August 21, 2020.[77] I calculated three sets of estimates of the expected variance, i.e., the expected degree of variation in the price of the Russell 2000 Index for the time period between the end of April 2020 and the maturity of the swaps. I first backed out the expected variance using IQ's valuations which are based on IQ's altered terms, then I calculated the expected variance using the valuations of the counterparties and my valuations.

114.    Exhibit 28 presents the expected variance of the price of the Russell 2000 Index for the two positions, one with IQ as a seller and the other as a buyer, implied by the valuation of IQ, the counterparties and my valuations as of April 30, 2020. The expected variance implied by the valuations of the two positions is consistent in my valuations and the counterparties' estimates, but not in IQ's valuations. IQ's expected variance is notably greater than my estimates and the counterparty's estimates for the position where IQ is the buyer and would benefit if the expected variance is higher. On the other hand, for the position where IQ is a seller, IQ's expected variance is lower compared to my estimates and the counterparty's estimates and even negative, which also inflates the valuation. A negative expected variance is another instance of IQ's flawed valuation as it is mathematically impossible for the variance to be negative and is a result of its alterations of the contractual terms of the position, as I explain in detail below.

---

[77] VAF: XDAC98J6 [IQCM-SEC-00539173]. This position has an effective date of January 13, 2020 and a strike price of 18.75% with IQ as the seller.
VAF: IS8495499 [IQCM-SEC-00539411]. This position has an effective date of April 1, 2020 and a strike price of 54.80% with IQ as the buyer.

61



Exhibit 28. *Expected Variance (VS Rate as Variance) as of April 30, 2020 for VAF Variance Swaps of Russell 2000 Index Maturing August 21, 2020 for Example 9*



115.     The IQ valuation implied an expected variance of the price of the Russell 2000 Index of -190 between April 30, 2020 and August 21, 2020, where IQ was a variance seller. However, its valuation of the position where IQ is a variance buyer implied an expected variance of the Russell 2000 Index over the exact time period of 2,547. While different market participants may have different views regarding expected or projected variance, there are no parameters or features in the term sheets that would explain why the same person would have conflicting or inconsistent expectations regarding the future variance of the price of the same asset at the same point in time. IQ's valuations imply inconsistent inputs about the variance of the underlying asset, which depends on whether IQ is a buyer or a seller and inflates the valuations.

62

116.     The two positions in Exhibit 28 had different counterparties. Merrill Lynch/Bank of America was the counterparty to IQ in the swap where IQ was the seller and Barclays was the counterparty to IQ in the swap where IQ was buyer. The valuation of Merrill Lynch/Bank of America implied an expected variance of the price of Russell 2000 Index between April 30, 2020 and August 21, 2020 of 1,687 and Barclays predicted it to be at 1,588. My valuation of the two swaps is consistent with an expected variance of 1,504 to 1,513 which is consistent with the counterparties and quite different from the IQ valuation.

117.     The findings hold when I analyze the valuations in the remaining months prior to maturity for the two swaps. Exhibit 29 below presents the comparison of the expected variance of the price of Russell 2000 Index using the valuations of IQ, the counterparties and my valuations between April 2020 (as depicted before) and July 2020.

118.     The IQ valuations implied an expected variance for the price of the Russell 2000 Index that is increasingly inconsistent. The expected variance implied by the April 2020 valuation where IQ as buyer was 2,547 and -190 for the position where it was the seller, as of the same date, for the same reference asset. The difference was 2,737 in April 2020. Similarly, the difference between its expected variance increased to 3,326 in May 2020 to 4,776 in June 2020 and to 13,613 in July 2020. The forecasted variance of the price of the Russell 2000 Index as indicated by the valuations of Merrill Lynch/Bank of America, Barclays and my valuations each month remained consistent with each other whether IQ was seller or buyer. The position with IQ as buyer closed in August with a realized price of negative $3.6 million, my valuation of the position in July was negative $3.3 million, the counterparty valued the position at negative $3.3 million whereas IQ valued the position at negative $1.0 million. The position with IQ as seller closed in August with a realized price of negative $9.9 million, my valuation of the position in July was negative $10.2 million, the counterparty valued the position at negative $10.2 million whereas IQ valued the position at negative $7.4 million.

Exhibit 29.  *Expected Variance (VS Rate as Variance) between April 30, 2020 and July 31, 2020 for VAF Variance Swaps of Russell 2000 Index Maturing On August 21, 2020 for Example 9*



■ IQ as Seller of Russell 2000 Variance Swap @ 18.75 Expiring 8/21/20 (XDAC98J6)
■ IQ as Buyer of Russell 2000 Variance Swap @ 54.80 Expiring 8/21/20 (IS8495499)

119.    The inconsistencies in the IQ valuations are due to the alterations that IQ made to the contractual terms of the positions. The alterations depended on whether IQ was a buyer or seller and inflated the valuations for each of those positions. For the position where IQ was a seller (short the variance), IQ changed the maturity date of the swap in February 2020 from its contractual date of August 21, 2020 to December 18, 2020. The alteration had the effect of artificially reducing the weight of the actual realized volatility between the effective date and the valuation date and hence underestimated the projected losses associated with the position where IQ was a seller. By altering the contractual terms and inflating the valuation, IQ's valuation

effectively resulted in negative expected variance which is a serious flaw as the variance cannot possibly have a negative value. It is mathematically impossible for the variance to be a negative number.

120.    For the variance swap on the Russell 2000 Index where IQ was buyer (long variance), IQ lowered the notional in April 2020 to $100K instead of its contractual notional of $250K and changed the maturity date to July 17, 2020 instead of August 21, 2020 as in the term sheet. By reducing the notional, IQ scaled down the loss it was projecting for this position. This position would record a loss upon maturity if the final realized volatility was below the 54.8% strike price.

### Example 10: Long and Short Variance Swaps on the Russell 2000 Index in the Mutual Fund (DAF)

121.    Here is the other example of IQ's inconsistent valuations for swaps on the same reference asset depending on whether IQ was a buyer or a seller. IQ held the same two positions in DAF but made different alterations which resulted in even more inconsistencies in its valuations and associated expectation of the variance of the price of the Russell 2000 Index. In addition, IQ made no alterations for the DAF position where IQ was the buyer (long) which resulted in valuations that are consistent with my valuations and the counterparties' valuations. Similarly, because there were no alterations in IQ's DAF position as a buyer, its projected variance of the price of the Russell 2000 Index is in line with the counterparties and with my valuations. This is another empirical analysis that shows that the inconsistencies in IQ's valuations and expected variance are associated with the alterations in the contractual terms leading to inflated valuations.

122.    The two variance swaps in the DAF portfolio are identical to the ones in the VAF portfolio discussed above, one where IQ is a buyer and another where IQ is a seller. In both

65

CONFIDENTIAL

positions, the underlying asset is the Russell 2000 Index and both positions have the same maturity date of August 21, 2020.[78]

123.    IQ did not alter the contract terms for the DAF position where IQ was long. As a result, its valuation of that position indicates an expected variance which is consistent with my and the counterparties' valuations. By contrast, for the position where IQ was short, IQ changed the effective date of the swap in March 2020 from its contractual date of January 13, 2020 to April 17, 2020. This alteration effectively removed the high values for actual realized variance between January and April 2020 from the valuation of the swap. IQ was seller and would benefit if the expected variance was lower. The IQ alterations implied a negative expected variance which is mathematically impossible and made IQ's expected variance notably lower than my and the counterparties'. IQ also changed the notional to $55K in April 2020 instead of its true notional of $155.5K. By reducing the notional, IQ further underestimated its projected losses.

124.    Exhibit 30 presents the expected variance based on the valuations of IQ, the counterparties and my valuations as of April 30, 2020. The expected variance implied by the IQ valuation for the position with IQ as buyer is consistent with the estimates based on my and the counterparties' valuations. IQ did not make any alterations to this position. By contrast, IQ's expected variance is notably lower—and negative—where IQ is the seller. This is the position where IQ changed the contract terms. The IQ valuation implied an expected variance of the Russell 2000 Index between April 30, 2020 and August 21, 2020 of negative 3,002 when valuing the variance swap as a seller. IQ predicted the expected variance of the Russell 2000 Index over the same time period to be 1,637 when valuing the variance swap with IQ as variance buyer.

---

[78] DAF: XDAC8ZIA [TAP_SDNY_001703]. This position has an effective date of January 13, 2020 and a strike price of 18.75% with IQ as seller.

DAF: IS8434001 [TAP_SDNY_001928]. This position has an effective date of April 1, 2020 and a strike price of 54.80% with IQ as buyer.

66

CONFIDENTIAL



Exhibit 30. *Expected Variance (VS Rate as Variance) as of April 30, 2020 for DAF Variance Swaps of Russell 2000 Index Maturing August 21, 2020 for Example 10*

125. Finally, IQ reversed some of the alterations to the contractual terms as the positions neared maturity, which is an additional signal that the alterations led to inconsistent valuations. The discrepancy in the expected variance of IQ's valuations diminished over time as IQ reversed some of the alterations for the short position. Exhibit 31 presents the comparison of the expected variance of the Russell 2000 Index using the valuations of IQ, the counterparties and my valuations between April 2020 (as depicted before) and July 2020. The difference in IQ's expected variance between its buy and sell positions decreased from 4,639 in April 2020 to 4,188 in May 2020 when IQ changed the effective date in the short position from April 17, 2020 to February 17, 2020—i.e. closer to the contractual date of January 13, 2020. The difference in IQ's expected variance of the buy and sell positions further decreased to 111 in June 2020 when IQ reversed the notional amount in the short position from $55K to $135K—i.e. closer to the

67

contractual amount of $155K. The position with IQ as buyer closed in August with a realized price of negative $3.6 million, my valuation of the position in July was negative $3.3 million, the counterparty valued the position at negative $3.3 million whereas IQ valued the position at negative $3.2 million. The position with IQ as seller closed in August with a realized price of negative $9.9 million, my valuation of the position in July was negative $10.2 million, the counterparty valued the position at negative $10.2 million whereas IQ valued the position at negative $10.4 million.

Exhibit 31.  *Expected Variance (VS Rate as Variance) Between April 30, 2020 and July 31, 2020 for DAF Variance Swaps of Russell 2000 Index Maturing August 21, 2020 for Example 10*



126. In summary, I examined four variance swap positions on the Russell 2000 Index, a set of buy and sell positions in VAF, and a set of buy and sell positions in DAF that demonstrate IQ's inconsistent valuations depending on whether it is short or long. My findings are: 1) the IQ valuations indicate conflicting expected variance of the price of the Russell 2000 Index (the same reference asset in the example) depending on whether IQ was a buyer or a seller; 2) the conflicting valuations are associated with the IQ alterations of the contractual terms; 3) IQ's expected variance was consistent with my calculations and the counterparties' for the one position where IQ did not make any alterations; and 4) IQ reversed some of these alterations as the positions neared maturity and, as a result, some of the inconsistencies implied by its valuations decreased as the positions neared maturity.

## VII. THE IQ VALUATIONS INFLATED THE NET ASSET VALUE, MANAGEMENT FEES, AND PERFORMANCE ALLOCATIONS OF THE FUNDS

127. IQ's alterations of the contractual terms inflated the valuation of many OTC derivative securities and overstated the reported NAV of the Infinity Q funds. The NAV equals the value of all underlying securities and cash. In the previous sections, I have verified that my valuations are consistent with the valuations of the counterparties as compared to the valuations of IQ for the OTC positions. This section demonstrates the amount and impact of IQ's inflated valuations for the OTC positions by comparing the VAF NAV using the counterparties' valuations as compared to IQ's reported NAV. I recalculated the management and performance fees based on the counterparty valuations. In addition, I estimated the but-for NAV for VAF using my valuations for the VAF positions in the list of 62 positions with Bloomberg scripts.[79]

128. Each month the counterparties to Infinity Q provided their estimates of market value for open positions.[80] I recalculated the VAF's NAV each month by replacing the historical IQ valuations with valuations from its counterparties. IQ's overstatements of the VAF NAV were largest in and after March 2020 following the COVID-19 crisis. The largest difference

---

[79] Similar analyses can be applied to DAF which would include management fees but not a performance allocation component.

[80] For example, IQCM-SEC-00585972 is a Barclays report for January 2020 which shows Barclay's valuations as the counterparty for the positions.

69

between the reported VAF NAV and the counterparty-based NAV is in March 2020, with a difference in the NAV of about $617.7 million or 223.4%.[81]

129.    Given that the counterparty estimates are usually lower than IQ's reported valuations, the management fees using the counterparty valuations are lower after correcting for the inflation in IQ's valuations. Management fees to Infinity Q were $24.4 million, while they would have been $16.1 million using the counterparty valuations. Accordingly, Infinity Q was allocated $8.4 million in excess management fees.

130.    Similarly, I recalculated the performance allocations from the Limited Partners share in the fund to the General Partner based on the counterparty valuations. Because gains that are reported in the IQ's valuations typically are replaced by losses based on the counterparty valuations, the performance allocation to Infinity Q will either be zero or lower than reported using the counterparties' valuations. The performance allocation to Infinity Q was reported as $21.0 million, while it would have been $1.0 million using the counterparty valuations between the inception of the fund in February 2017 to January 2021. Infinity Q was then allocated $20.0 million in excess performance allocation.

131.    Moreover, if I calculate the NAV of the hedge fund assuming that IQ only made alterations to the 27 VAF positions out of the 62 positions that I examined in the earlier sections, then IQ inflated the NAV for the hedge fund by a range of $3.6 million to $148.4 million between January 2020 and January 2021, resulting in $1.4 million in excess management fees and $8.5 million in excess performance allocation.

### A.  Comparison of the Estimated Net Asset Value of Infinity Q Using Counterparty Valuations to the Reported Net Asset Value IQ's Reported NAV

132.    I recalculated the hedge fund's NAV each month between February 2017 and January 2021 by replacing IQ's historical valuations of the open positions with valuations from

---

[81] The DAF NAV would also be overstated as the alterations of contract terms and inflation of IQ's valuations were not restricted to VAF, as discussed in prior sections. The overstatement in the DAF NAV means that excess management fees had been paid by DAF investors.

70

CONFIDENTIAL

the counterparties. The recalculated NAVs result in lower management fees based on the lower balance of the Limited Partners using counterparty valuations.

133.   First, I replicated the historical end-of-month NAVs using IQ's valuations. I started with the end-of-month NAV as of the prior month. Next, I added month-start contributions and subtracted month-start withdrawals to compute the monthly beginning balance of the fund. The VAF's monthly beginning balance is the basis for calculating management fees.[82] Then, I subtracted management fees paid to Infinity Q. Next, I added historical monthly gains and losses and subtracted end-of-month withdrawals. The resulting VAF's balance matches the reported end-of-month NAV of the fund per IQ's valuations.

134.   Next, I calculated the NAV using the counterparties' valuations by replacing the hedge fund's historical unrealized gains and losses as reported by IQ with gains and losses based on the valuations from the counterparty and the resulting management fees. To recalculate the gains and losses at the fund level using counterparty valuations, I identified open positions and the historical market values as well as the counterparty estimates from the margin reports, when available. I calculated the difference between the market value as estimated by IQ and the market value as estimated by each counterparty and adjusted the unrealized gains and losses accordingly. The resulting VAF's balance after adjusting the gains and losses and management fees is the NAV based on the counterparty valuations.[83]

135.   Exhibit 32 presents the historical and the counterparty-based NAVs over time. The counterparty-based NAV is lower than the historical NAV for every month between December 2017 (the first month with available counterparty reports) through January 2021. The difference between the reported NAVs and the adjusted NAVs increased over time, from roughly $3.2 million in 2017 to $491.5 million in January 2021. The largest difference between the reported NAV and the counterparty-based NAV is in March 2020, with a difference in the NAV of about $617.7 million.

---

[82] Management fees are equal to 12.5 basis points multiplied by the VAF Adjusted Capital after excluding the General Partner interest in the fund.

[83] I considered all Limited Partners investors as one in my analysis.

71

Exhibit 32. *IQ's and Counterparty-Based NAVs for VAF Between February 2017 to January 2021*



136.    The difference between the historical and counterparty-based NAVs increased notably following the declaration of COVID-19 as a global pandemic on March 11, 2020. Exhibit 33 presents the ratio of IQ NAV to the adjusted NAV (based on counterparty values) over time. The IQ NAV was higher and remained within 35 percent of the counterparty-adjusted NAV until March 2020. Between March 2020 and January 2021, the difference between IQ's NAV and the NAV using the counterparties' valuations is between 63.7% and 223.4% higher than the counterparty-based NAV.

3527-055
NERA
Page 78 of 158

CONFIDENTIAL

Exhibit 33.  *Ratio of IQ's NAV to Counterparty-Based NAV for VAF Between February 2017 to January 2021*



Historical NAV / Counterparty Based NAV

## B. Comparison of Management Fees based on Historical and Counterparty Valuations

137.    Management fees of the VAF is equal to 12.5 basis points multiplied by the aggregate balance of the fund balance after excluding the General Partner's interest. Because the counterparty-based NAV is usually lower than the NAV per IQ's valuations, the aggregate balance for the Limited Partners and hence management fees are lower for all months under the counterparties' valuations.

138.    Exhibit 34 presents management fees for the VAF as reported by IQ and as recalculated using counterparty valuations. Using IQ's reported valuations, management fees to Infinity Q General Partner from February 2017 through January 2021 totaled $24.4 million. Using the counterparty valuations, the recalculated management fees totaled $16.1 million. The overall difference in management fees using the counterparty's valuations is about $8.4 million.

CONFIDENTIAL

Exhibit 34. *Management Fees for Infinity Q Volatility Alpha Fund between February 2017 to January 2021*

| | | Management Fees | | |
|---|---|---|---|---|
| Year | Infinity Q Valuation | Counterparty Valuation | | Difference |
| (1) | (2) | (3) | | (4) =(2) - (3) |
| | ------------------------ $ MM ------------------------ | | | |
| 2017 [1] | $ 0.3 | $ | 0.3 | $ 0.0 |
| 2018 | 1.4 | | 1.3 | 0.2 |
| 2019 | 5.8 | | 4.9 | 0.9 |
| 2020 | 15.4 | | 8.6 | 6.7 |
| 2021 [2] | 1.5 | | 1.0 | 0.5 |
| Total | $ 24.4 | $ | 16.1 | $ 8.4 |

Notes and Sources:

[1] 2017 management fees are for February through December.

[2] 2021 management fees are as of January 2021.

## C. Comparison of Performance Allocation based on Historical and Counterparty Valuations

139.    I also recalculated the performance allocation to the General Partner between February 2017 and January 2021 using the counterparty valuations instead of the reported ones. The performance allocation is a transfer of the Limited Partners share in the fund to the General Partner. The performance allocation reduces the interest of the Limited Partners in the fund and increases the General Partner interest by the same exact amount.

140.    The performance allocation is equal to 15 percent of the return to investors net of previous losses that were not offset by subsequent gains.[84] In other words, the performance allocation may be zero even if the return to the Limited Partners is positive for the fiscal year if prior losses to investors were not completely recovered. Because gains based on the IQ NAVs are typically replaced by losses based on the counterparty-based NAV, the performance allocation to the GP are often zero using the counterparty-based NAV.

---

[84] SEC-SDNY-EPROD-003725092.

74

141.    Exhibit 35 presents the performance allocation for the VAF using IQ's and counterparty valuations. Using IQ's valuations, the total performance allocation to the Infinity Q General Partner was $21.0 million, while the allocation would have been $1.0 million using counterparty valuations. Under the counterparty valuations there would be little to no performance allocation to the GP and as a result, the Infinity Q General Partner received approximately $20.0 million in excess performance allocation.

Exhibit 35.  *Performance Allocation for Infinity Q Volatility Alpha Fund From February 2017 to January 2021*

| | Performance Allocation | | |
| Year (1) | Infinity Q Valuation (2) | Counterparty Valuation (3) | Difference (4) =(2) - (3) |
|---|---|---|---|
| | ------------------------- $ MM ------------------------- | | |
| 2017 | $    0.7 | $    0.2 | $    0.5 |
| 2018 | 3.8 | 0.0 | 3.8 |
| 2019 | 8.3 | 0.5 | 7.7 |
| 2020 | 8.2 | 0.2 | 8.0 |
| 2021 [1] | 0.0 | 0.0 | 0.0 |
| **Total** | **$   21.0** | **$    1.0** | **$   20.0** |

**Notes and Sources:**
- Performance fees due to withdrawal are assumed to be unchanged under NERA valuation.

[1] 2021 performance allocation is as of January 2021.

### D. But-For NAV for VAF Using My Valuations For the 62 Positions with Bloomberg Scripts

142.    I estimated the net asset value for VAF using my valuations for the 27 VAF positions out of the 62 position with Bloomberg scripts. Using the same methodology as outlined in the prior section, I revalued the NAV by replacing the IQ valuations with my valuations for the 27 VAF positions, keeping all other IQ valuations the same. This resulted in notably lower NAV for VAF especially in 2020. Exhibit 36 presents the but-for NAV using my valuations for 2020 and 2021. Infinity Q inflated the NAV by $3.6 million to $148.4 million between January 2020 to January 2021. Infinity Q inflated the NAV by $141.1 million in March 2020, $148.4 million in April 2020 and $130.7 million in May 2020.

75

CONFIDENTIAL

Exhibit 36.  *But-For NAV for Infinity Q Volatility Alpha Fund in 2020 and 2021 Based on Valuation Using Term Sheet Values for 27 VAF Positions*

| Date | Infinity Q NAV | But-For NAV using NERA Valuation for 27 VAF Positions | Difference |
|---|---|---|---|
| (1) | (2) | (3) | (4) =(2)-(3) |
| ---------------------- $ MM ---------------------- | | | |
| Jan-20 | $ 753.8 | $ 750.2 | $ 3.6 |
| Feb-20 | 820.6 | 801.2 | 19.4 |
| Mar-20 | 894.1 | 753.1 | 141.1 |
| Apr-20 | 977.4 | 828.9 | 148.4 |
| May-20 | 988.3 | 857.7 | 130.7 |
| Jun-20 | 1,088.3 | 960.4 | 127.9 |
| Jul-20 | 1,118.5 | 991.1 | 127.3 |
| Aug-20 | 1,117.2 | 1,019.7 | 97.6 |
| Sep-20 | 1,136.1 | 1,036.9 | 99.2 |
| Oct-20 | 1,141.1 | 1,032.5 | 108.6 |
| Nov-20 | 1,134.9 | 1,051.3 | 83.6 |
| Dec-20 | 1,183.7 | 1,126.7 | 57.1 |
| Jan-21 | 1,224.8 | 1,171.1 | 53.6 |

143.    The inflated NAV also resulted in inflated management fees and inflated performance allocation. In total, between the inception of the fund in February 2017 through January 2021, based on the inflated valuations of just the 27 VAF positions, Infinity Q charged investors $1.4 million in excess management fees and $8.5 million in excess performance allocation.

76

CONFIDENTIAL

## VIII.   MISCELLANEOUS

144.    My work is ongoing, and my analyses are subject to revision based on new information (including documentation, reports or testimony from the Defendant), which subsequently may be provided to, or obtained by, me. In this regard, I will separately respond to any economic analysis that Mr. Velissaris may advance in a rebuttal report or otherwise.

By: _____

Faten Sabry, Ph.D.

77

## APPENDIX A: DESCRIPTION OF TYPES OF SECURITIES IN THE INFINITY Q FUNDS

1.      This appendix provides a brief description of some of the of OTC derivative securities underlying Infinity Q's DAF and VAF portfolio other than variance swaps.

Corridor Variance Swaps

2.      A variant of a vanilla variance swap is a corridor variance swap. For corridor variance swaps, the swap only accrues volatility when the price of the reference asset is within the lower and upper corridors stated in the term sheet. In other words, if the price of the reference asset is below the lower corridor or above the upper corridor at the end of a day, the swap does not include that day when calculating the realized volatility. Alternative variants of the corridor variance swap are up barrier variance swaps and down barrier variance swaps. In an up barrier variance swap, the swap only accrues volatility when the price of the reference asset is above the barrier. In a down barrier variance swap, the swap only accrued volatility when the price of the reference asset is below the barrier.

Dispersion Swaps

3.      Another variant of a variance swap is a dispersion swap. In one form of a dispersion swap, there can be two legs where one leg is based on the variance of an equity index and the other leg is based on the variance of the components of the same equity index (index constituents). This type of dispersion swap is designed to capture the differential in the variance of the index as compared to the variance of the components of the index. The buyer of the variance of the index gains if the realized volatility of the index is greater than the realized volatility of the components of the index. The buyer of the variance of the components of the index gains if the realized volatility of the components of the index is greater than the volatility of the index.

4.      For example, the diagram below presents the dispersion swap where the first leg is the Nasdaq 100 (NDX) index and the second leg is 20 of the stocks in the NDX index. Person A (green) is a buyer of the variance of the index and seller of the variance of the components of the index and Person B (red) is a buyer of the variance of the components of the index and seller of the variance of the index. If the variance of the index is greater than the index of the

components of the index over the life of the dispersion swap, then Person B would pay Person A based on the differential in the realized variances, and vice versa.



## Volatility Swaps

5.    Volatility swaps share the same key term and valuation inputs as variance swaps, with the exception of volatility swaps tracking the volatility of the price of a reference asset, instead of the variance. Volatility swaps are also over-the-counter positions and are popular in foreign exchange markets.[85]

## Correlation Swaps

6.    Correlation and covariance swaps are over-the-counter contracts where the parties exchange cash flows based on the realized correlation between several assets and a strike price.[86] They are similar to variance swaps in terms of the payoff structure. One party is a buyer of or in a long position on the correlation of returns of two reference assets, such as two different stocks, and gains if the correlation exceeds an agreed-upon strike price. A correlation swap can extend to

---

[85] Carr, Peter and Roger Lee. Robust Replication of Volatility Derivatives. May 31, 2009, p. 3.

[86] Dresdner Kleinwort. A New Approach for Modeling and Pricing Correlation Swaps. May 9, 2007, p. 2.

79

CONFIDENTIAL

a basket or portfolio of reference assets, such as the 30 stocks in the Dow Jones Industrial Index.[87]

## Options

7.      Options are contractual agreements in which the buyer of an option has the right, although not the obligation, to purchase or sell a reference asset at a specified price from the seller of the option. The features of an option contract include the strike price, the reference asset, expiry date, premium, and contract size. European Options can only be exercised at expiration while American Options can be exercised at any time prior to expiration.

8.      An option which grants the buyer the right to purchase the reference asset is referred to as a call option while an option that grants the buyer the right to sell the reference asset is referred to as a put option. The strike price of an option is the price at which the buyer can purchase or sell the reference asset. The buyer of a call option has the right to purchase the reference asset at the strike price from the option seller, regardless of the current price of the reference asset. The buyer of a put option has the right to sell the reference asset at the strike price to the option seller, regardless of the current price of the reference asset.

9.      For this right, and not obligation, the option buyer pays the option seller a premium at the time of executing the trade.[88] The amount of the premium will depend on how close or far away the strike price is to the current price of the reference asset. The premium for a call option will be higher if the call option strike price is below or close to the current price. The premium for a put option will be higher if the put option strike price is above or close to the current price. All else equal, the lower the strike price for a call option, the higher the premium, and the higher the strike price for a put option, the higher the premium.

For an options trade, the premium needs to be accounted for when calculating gains and losses on the position. For an option buyer, the premium is a cost and will go to offset a gain. For an option seller, the premium is a profit and will go to offset a loss. Generally, a call option will

---

[87] For example, see a term sheet for a correlation swap on the USDKRW and EURKRW currency pairs (TAP_SDNY_001013).

[88] Hull, John C. *Options, Futures, and Other Derivatives* (8th Ed.). Prentice Hall, Boston, 2012, p. 8.

80

CONFIDENTIAL

increase in value if the price of the reference asset moves up and a put option will increase in value if the price of the reference asset moves down. At expiration, the buyer of a call option will have a positive payoff if the current price of the reference asset is above the strike price since the buyer of the call option can buy the reference asset from the option seller at below the market price. Similarly, at expiration, the buyer of a put option will have a positive payoff if the current price of the reference asset is below the strike price since the buyer of the put option can sell the reference asset to the option seller at above the market price. If the current price is below the strike price for a call option at expiration, the option will expire worthless, and if the current price is above the strike price for a put option at expiration, the option will also expire worthless.

10.     Options can be classified based on the nature of the reference asset. An equity option refers to an option in which the reference asset is the stock of a company. An index option refers to an option in which the reference asset is a market index such as the S&P 500 Index or Russell 2000 Index. A foreign exchange is an option in which the reference asset is a currency and it grants the buyer the right to purchase or sell a currency at a contractually specified exchange rate (strike price).

Credit Default Swaps

11.     A credit default swap ("CDS") is a contract between two parties in which the buyer makes periodic payments, or CDS spread, to the seller for protection against a default or credit event on a reference entity, such as a public company or a fixed income security. A CDS contract is commonly compared to an insurance policy on the reference entity. A CDS contract specifies the reference entity, a list of credit events, the delivery obligations, the premium payments, the expiration date, and other details.

12.     The diagram below is an example of the periodic cash flows between the buyer and seller of a credit default swap.[89] The buyer is the default protection buyer (left-hand side) and agrees to pay the seller, or default protection seller (right-hand side), a rate of 90 basis points on a notional amount. In return, the seller agrees to pay the buyer if there is a default or credit event by the reference entity.

---

[89] Hull, John C. *Options, Futures, and Other Derivatives* (8th Ed.). Prentice Hall, Boston, 2012, p. 549.

81



13.     If the reference entity experiences a credit event, such as a company filing for bankruptcy or a default on a fixed income security, the CDS seller would make a substantial payment to the CDS buyer. For example, "[t]he buyer of the insurance obtains the right to sell bonds issued by the company for their face value when a credit event occurs and the seller of the insurance agrees to buy the bonds for their face value when a credit event occurs."[90] In this instance, the CDS buyer receives a payment for the full face value of the defaulted bond and delivers the defaulted bond, with an impaired value, to the CDS seller.

Total Return Swaps

14.     A total return swap ("TRS") is a contract to exchange cash flows based on the realized returns on a reference asset at future dates. The TRS buyer is entering into a long position on the return of the reference asset while the swap seller is in a short position. The TRS buyer receives the realized returns on a reference asset while paying the seller a contractual rate, such as an interest rate with a spread. The TRS buyer profits when the realized returns on the reference asset exceed the contractual rate and losses when the realized returns are below the contractual rate. Total return swaps provide the buyer exposure to the returns of the reference asset without having to own the reference asset directly. The buyer instead faces counterparty/default risk and interest rate risk.

15.     The diagram below is an example of the periodic cash flows between the buyer and seller of a total return swap on a bond.[91] The buyer is the total return receiver (right-hand side) and agrees to pay the seller, or total return payer (left-hand side), a rate of LIBOR plus 25 basis points on a notional amount. In return, the seller (total return payer) agrees to pay the buyer

---

[90] Hull, John C. *Options, Futures, and Other Derivatives* (8th Ed.). Prentice Hall, Boston, 2012, p. 548.

[91] Hull, John C. *Options, Futures, and Other Derivatives* (8th Ed.). Prentice Hall, Boston, 2012, p. 558.

82

(total return receiver) the total return on the bond.



# APPENDIX B: LIST OF POSITIONS WITH BLOOMBERG SCRIPTS

1.    Exhibit 37 presents the list of 62 positions by overlapping pairs, if available, in DAF and VAF.

Exhibit 37. *List of 62 Positions by Overlapping Positions in DAF and VAF*

| No. | DAF BVAL ID | VAF BVAL ID |
|-----|-------------|-------------|
| (1) | (2) | (3) |
| 1. | XDADACKX | IS8379143 |
| 2. | XDAC8QBZ | XDADAACM |
| 3. | XDAC0FNA | IS8104550 |
| 4. | XDACVLWK | XDACVX6P |
| 5. | XDADBKKY | XDADLDCT |
| 6. | XDACRN7H | XDACSKXN |
| 7. | XDADBIOT | IS8438749 |
| 8. | XDADCSI5 | IS8438801 |
| 9. | XDADBIGC | XDADDD1A |
| 10. | XDADBIRG | XDADDD00 |
| 11. | XDAC9TW8 | XDAC99TB |
| 12. | XDACOURG | XDACQZY7 |
| 13. | XDAC9RM2 | XDAC99UP |
| 14. | XDAC7E7L | IS7988117 |
| 15. | XDAC8ZIA | XDAC98J6 |
| 16. | OPWJW544 | OPWKZYMD |
| 17. | XDAC8QB4 | XDAC98HE |
| 18. | IS8507821 | XDADFZWK |
| 19. | IS8434001 | IS8495499 |
| 20. | XDAC9Y5A | IS8379140 |
| 21. | XDAC1O00 | XDAC112G |
| 22. | XDACUIB5 | XDACVX5D |
| 23. | XDAC55AZ | IS8300389 |
| 24. | XDACY8G9 | XDAC113A |
| 25. | XDACY8HF | XDAC113A |
| 26. | XDACQ6H3 | XDAC2G26 |
| 27. | XDACQ9DO | XDAC2G26 |
| 28. | XDAB25EH | XDACMDBT / XDACMDBN |
| 29. | XDAB22MA | XDACMDBT / XDACMDBN |
| 30. | XDACXGU2 | N/A |
| 31. | XDACXGV8 | N/A |
| 32. | XDACXGVW | N/A |
| 33. | XDAA9CVG | N/A |
| 34. | XDAC9VWB | N/A |
| 35. | XDAC9VWJ | N/A |

84

2.    Exhibit 38 presents the list of twenty identical positions which were held by both DAF and VAF with the largest differences in valuations between DAF and VAF as of May 2020. I verified that the overlapping positions are identical by reviewing the term sheets of the positions.

Exhibit 38.  *List of Twenty Identical Positions in DAF and VAF With the Largest Differences in Valuation as of May 2020*

| | | | Infinity Q Valuation | | |
| No. | DAF BVAL ID | VAF BVAL ID | DAF | VAF | Difference |
| (1) | (2) | (3) | (4) | (5) | (6) =abs[(4) - (5)] |
| 1. | XDADACKX | IS8379143 | $    2,206,396 | $   19,603,395 | $   17,396,999 |
| 2. | XDAC0FNA | IS8104550 | 15,298,088 | 4,733,462 | 10,564,626 |
| 3. | XDACVLWK | XDACVX6P | 17,075,622 | 6,926,809 | 10,148,813 |
| 4. | XDAC8QBZ | XDADAACM | 6,399,868 | 14,231,002 | 7,831,134 |
| 5. | XDAC9TW8 | XDAC99TB | 11,913,762 | 4,095,422 | 7,818,340 |
| 6. | XDAC9RM2 | XDAC99UP | (1,061,083) | (8,356,741) | 7,295,658 |
| 7. | XDACRN7H | XDACSKXN | 10,434,879 | 3,634,504 | 6,800,375 |
| 8. | XDADBIGC | XDADDD1A | 10,306,113 | 4,610,918 | 5,695,195 |
| 9. | XDADBIOT | IS8438749 | 7,199,371 | 11,966,426 | 4,767,055 |
| 10. | XDADBKKY | XDADLDCT | 9,344,282 | 4,636,657 | 4,707,625 |
| 11. | XDADCSI5 | IS8438801 | 6,579,073 | 1,971,732 | 4,607,341 |
| 12. | XDACQ6H3 | XDAC2G26 | (4,896,877) | (767,740) | 4,129,137 |
| 13. | XDAC8QB4 | XDAC98HE | (12,045,292) | (8,120,253) | 3,925,039 |
| 14. | XDAC9Y5A | IS8379140 | 21,712,092 | 25,170,860 | 3,458,768 |
| 15. | XDACOURG | XDACQZY7 | 8,853,644 | 5,484,674 | 3,368,970 |
| 16. | XDAC8ZIA | XDAC98J6 | (4,326,618) | (7,576,046) | 3,249,428 |
| 17. | XDADBIRG | XDADDD00 | 3,936,108 | 1,148,045 | 2,788,063 |
| 18. | IS8507821 | XDADFZWK | 1,930,698 | 256,287 | 1,674,411 |
| 19. | IS8434001 | IS8495499 | (2,603,345) | (994,576) | 1,608,769 |
| 20. | OPWJW544 | OPWKZYMD | (1,624,600) | (22,349) | 1,602,251 |

85

3.      Exhibit 39 presents the list of twenty positions with the largest number of UPDATE DEAL actions according to the Bloomberg audit trail data.

Exhibit 39.  *List of Twenty Positions With the Largest Number of UPDATE DEAL Actions in the Bloomberg Audit Trail Data*

| No. | BVAL ID | Fund | Number of UPDATE DEAL Actions |
|-----|---------|------|-------------------------------|
| (1) | (2) | (3) | (4) |
| 1. | XDAB25EH | DAF | 341 |
| 2. | XDACY8G9 | DAF | 265 |
| 3. | XDACY8HF | DAF | 249 |
| 4. | XDACQ9DO | DAF | 168 |
| 5. | XDACQ6H3 | DAF | 162 |
| 6. | XDACUIB5 | DAF | 105 |
| 7. | XDACXGU2 | DAF | 77 |
| 8. | XDAA9CVG | DAF | 73 |
| 9. | XDACXGV8 | DAF | 69 |
| 10. | XDAC1O00 | DAF | 69 |
| 11. | XDAC7E7L | DAF | 68 |
| 12. | XDACXGVW | DAF | 68 |
| 13. | XDAC9Y5A | DAF | 68 |
| 14. | XDACVLWK | DAF | 65 |
| 15. | XDAC9VWJ | DAF | 64 |
| 16. | XDAC0FNA | DAF | 61 |
| 17. | XDAC9VWB | DAF | 60 |
| 18. | XDAB22MA | DAF | 60 |
| 19. | XDACOURG | DAF | 49 |
| 20. | XDAC55AZ | DAF | 47 |

4.      Exhibit 40 presents the list of the 62 positions based on the Bloomberg valuation tool that IQ used for each position. As noted earlier, IQ used OVME to value corridor variance swaps as documented in the Bloomberg system while OVME is not designed to value corridor swaps according to Bloomberg. IQ would value these corridor variance swaps as variance swaps and without upper or lower bounds in OVME.

86

Exhibit 40. *List of 62 Positions by Bloomberg Valuation Tool*

| No. (1) | BVAL ID (2) | Fund (3) | Bloomberg Valuation Tool (4) |
|---|---|---|---|
| 1. | XDAA9CVG | DAF | DLIB |
| 2. | XDAB22MA | DAF | DLIB |
| 3. | XDAB25EH | DAF | DLIB |
| 4. | XDAC0FNA | DAF | DLIB |
| 5. | XDAC1O00 | DAF | DLIB |
| 6. | XDAC55AZ | DAF | DLIB |
| 7. | XDAC7E7L | DAF | DLIB |
| 8. | XDAC8QB4 | DAF | DLIB |
| 9. | XDAC8QBZ | DAF | DLIB |
| 10. | XDAC8ZIA | DAF | DLIB |
| 11. | XDAC9RM2 | DAF | DLIB |
| 12. | XDAC9TW8 | DAF | DLIB |
| 13. | XDAC9VWB | DAF | DLIB |
| 14. | XDAC9VWJ | DAF | DLIB |
| 15. | XDAC9Y5A | DAF | DLIB |
| 16. | XDACOURG | DAF | DLIB |
| 17. | XDACQ6H3 | DAF | DLIB |
| 18. | XDACQ9DO | DAF | DLIB |
| 19. | XDACRN7H | DAF | DLIB |
| 20. | XDACUIB5 | DAF | DLIB |
| 21. | XDACVLWK | DAF | DLIB |
| 22. | XDACXGU2 | DAF | DLIB |
| 23. | XDACXGV8 | DAF | DLIB |
| 24. | XDACXGVW | DAF | DLIB |
| 25. | XDACY8G9 | DAF | DLIB |
| 26. | XDACY8HF | DAF | DLIB |
| 27. | XDADACKX | DAF | DLIB |
| 28. | XDADBIGC | DAF | DLIB |
| 29. | XDADBIOT | DAF | DLIB |
| 30. | XDADBIRG | DAF | DLIB |
| 31. | XDADBKKY | DAF | DLIB |
| 32. | XDADCSI5 | DAF | DLIB |
| 33. | XDAC112G | VAF | DLIB |
| 34. | XDAC113A | VAF | DLIB |
| 35. | XDAC2G26 | VAF | DLIB |
| 36. | XDAC98HE | VAF | DLIB |
| 37. | XDAC98J6 | VAF | DLIB |
| 38. | XDAC99TB | VAF | DLIB |
| 39. | XDAC99UP | VAF | DLIB |
| 40. | XDACMDBN | VAF | DLIB |
| 41. | XDACMDBT | VAF | DLIB |
| 42. | XDACQZY7 | VAF | DLIB |
| 43. | XDACSKXN | VAF | DLIB |
| 44. | XDACVX5D | VAF | DLIB |
| 45. | XDACVX6P | VAF | DLIB |
| 46. | XDADAACM | VAF | DLIB |
| 47. | XDADDD00 | VAF | DLIB |
| 48. | XDADDD1A | VAF | DLIB |
| 49. | XDADFZWK | VAF | DLIB |
| 50. | XDADLDCT | VAF | DLIB |
| 51. | IS8434001 | DAF | OVME |
| 52. | IS8507821 | DAF | OVME |
| 53. | IS7988117 | VAF | OVME |
| 54. | IS8104550 | VAF | OVME |
| 55. | IS8300389 | VAF | OVME |
| 56. | IS8379140 | VAF | OVME |
| 57. | IS8379143 | VAF | OVME |
| 58. | IS8438749 | VAF | OVME |
| 59. | IS8438801 | VAF | OVME |
| 60. | IS8495499 | VAF | OVME |
| 61. | OPWJW544 | DAF | OVML |
| 62. | OPWKZYMD | VAF | OVML |

87

## APPENDIX C: TERM SHEET MATCHING PROCESS

1.      The purpose of this appendix is to document the process that I used to confirm the term sheets for each of the 62 positions with Bloomberg scripts. I relied on electronic files from the DOJ which mapped the term sheets to the unique identifiers for each position. I then conducted a manual review of the term sheets for the 62 positions with monthly scripts for verification.

2.      The first step was to identify the term sheets by using the mapping files provided by the DOJ and to extract information from the term sheets. The mapping files are listed in Exhibit 2. I received the term sheets in different electronic formats including PDF files, Excel files, text files, and emails. There is no standardized format or document for the term sheets. The term sheets generally come from the counterparty and include details on the derivative, such as the type of position, strike price, notional amount and currency, corridors and barriers, trade date, start date, and end date, and details on the calculations for the payoff, such as how to calculate volatility and the payoff amount.

3.      The second step was to identify a match between the historical valuations run and stored in the Bloomberg system associated with each of the 62 positions with Bloomberg scripts and the historical valuations reported by IQ in its monthly VAF US Bank profit and loss reports or the quarterly DAF SEC filings. Matching historical valuations stored in the Bloomberg system with historical valuations in reports and filings by IQ allowed me to obtain identifying information for the position associated with the Bloomberg script. For example, the historical valuations stored in the Bloomberg system for XDAC98JW matched the historical valuations in the VAF US Bank profit and loss reports for the US Bank ID position "VAF_011020_SG_VARSWP_2."[92]

4.      The third step was to compare whether the parameters in the term sheet matched the label and description for the position with matched historical valuations in the VAF US Bank profit and loss reports or the quarterly DAF SEC filings. For example, the US Bank ID position "VAF_011020_SG_VARSWP_2" is described in the US Bank profit and loss report as "SX5E

---

[92] VAF: XDAC98JW [IQCM-SEC-00583216].

70/110% 12/17/21 16.85%". The US Bank report identifies that this position is in the VAF, the trade date is January 10, 2020, the counterparty is Société Générale, and that it is a type of swap. The US Bank description provides more details, including that the reference index is the SX5E Index (EURO STOXX 50 Index), that this is a corridor variance swap with corridors at 70% and 110% of the reference index level at the inception of the trade, that the maturity date is December 17, 2021, and that the strike price is 16.85%. I checked and verified these details against the term sheet. Another source was the DAF SEC filings that included descriptions of the positions in a similar format.

5.      Exhibit 41 is a list of the matched term sheets for the 62 positions with Bloomberg scripts.

Exhibit 41.  *List of Matched Term Sheets for the 62 Positions with Bloomberg Scripts*

| No. | BVAL ID | Fund | Term Sheet |
|-----|---------|------|------------|
| (1) | (2) | (3) | (4) |
| 1. | IS7988117 | VAF | IQCM-SEC-00105017 |
| 2. | IS8104550 | VAF | IQCM-SEC-00110010 |
| 3. | IS8300389 | VAF | IQCM-SEC-00539799 |
| 4. | IS379140 | VAF | IQCM-SEC-00581895 |
| 5. | IS379143 | VAF | IQCM-SEC-00539564 |
| 6. | IS434001 | DAF | TAP_SDNY_001928 |
| 7. | IS8438749 | VAF | IQCM-SEC-00036938 |
| 8. | IS8438801 | VAF | IQCM-SEC-00037093 |
| 9. | IS8495499 | VAF | IQCM-SEC-00539411 |
| 10. | IS8507821 | DAF | TAP_SDNY_001909 |
| 11. | OPWJW544 | VAF | TAP_SDNY_001570 |
| 12. | OPWKZYMD | VAF | IQCM-SEC-00537878 |
| 13. | XDAA9CVG | DAF | TAP_SDNY_000592 |
| 14. | XDAB22MA | DAF | TAP_SDNY_001485 |
| 15. | XDAB25EH | DAF | TAP_SDNY_001485 |
| 16. | XDAC0FNA | DAF | TAP_SDNY_000791 |
| 17. | XDAC112G | VAF | IQCM-SEC-00539070 |
| 18. | XDAC113A | VAF | IQCM-SEC-00601434 |
| | | | IQCM-SEC-00582265 |
| 19. | XDAC1O00 | DAF | TAP_SDNY_001058 |
| 20. | XDAC2G26 | VAF | IQCM-SEC-00601414 |
| | | | IQCM-SEC-00582276 |
| 21. | XDAC55AZ | DAF | TAP_SDNY_001055 |
| 22. | XDAC7E7L | DAF | TAP_SDNY_000550 |
| 23. | XDAC8QB4 | DAF | TAP_SDNY_001716 |
| 24. | XDAC8QBZ | DAF | TAP_SDNY_000316 |
| 25. | XDAC8ZIA | DAF | TAP_SDNY_001703 |
| 26. | XDAC98HE | VAF | IQCM-SEC-00538550 |
| 27. | XDAC98J6 | VAF | IQCM-SEC-00539173 |
| 28. | XDAC99TB | VAF | IQCM-SEC-00539364 |
| 29. | XDAC99UP | VAF | IQCM-SEC-00540190 |
| 30. | XDAC9RM2 | DAF | TAP_SDNY_001559 |
| 31. | XDAC9TW8 | DAF | TAP_SDNY_000657 |
| 32. | XDAC9VWB | DAF | TAP_SDNY_000517 |
| 33. | XDAC9VWJ | DAF | TAP_SDNY_000387 |
| 34. | XDAC9Y5A | DAF | TAP_SDNY_000740 |
| 35. | XDACMDBN | VAF | IQCM-SEC-00538695 |
| 36. | XDACMDBT | VAF | IQCM-SEC-00538695 |
| 37. | XDACOURG | DAF | TAP_SDNY_000521 |
| 38. | XDACQ6H3 | DAF | IQCM-SEC-00601353 |
| 39. | XDACQ9DO | DAF | IQCM-SEC-00601321 |
| 40. | XDACQZY7 | VAF | IQCM-SEC-00601446 |
| 41. | XDACRN7H | DAF | TAP_SDNY_000902 |
| 42. | XDACSKXN | VAF | IQCM-SEC-00601310 |
| 43. | XDACUIB5 | DAF | TAP_SDNY_000044 |
| 44. | XDACVLWK | DAF | TAP_SDNY_000154 |
| 45. | XDACVX5D | VAF | IQCM-SEC-00582356 |
| 46. | XDACVX6P | DAF | IQCM-SEC-00601292 |
| 47. | XDACXGU2 | DAF | TAP_SDNY_000402 |
| 48. | XDACXGV8 | DAF | TAP_SDNY_000637 |
| 49. | XDACXGVW | DAF | TAP_SDNY_000282 |
| 50. | XDACY8G9 | DAF | IQCM-SEC-00601342 |
| 51. | XDACY8HF | DAF | IQCM-SEC-00601331 |
| 52. | XDADAACM | VAF | IQCM-SEC-00539290 |
| 53. | XDADACKX | DAF | TAP_SDNY_001457 |
| 54. | XDADBIGC | DAF | TAP_SDNY_000665 |
| 55. | XDADBIOT | DAF | TAP_SDNY_000580 |
| 56. | XDADBIRG | DAF | TAP_SDNY_000500 |
| 57. | XDADBKKY | DAF | TAP_SDNY_000209 |
| 58. | XDADCSI5 | DAF | TAP_SDNY_000888 |
| 59. | XDADDD00 | VAF | IQCM-SEC-00582239 |
| 60. | XDADDD1A | VAF | IQCM-SEC-00582228 |
| 61. | XDADFZWK | VAF | IQCM-SEC-00601278 |
| 62. | XDADLDCT | VAF | IQCM-SEC-00304040 |

90

## APPENDIX D: VALUATION OF THE 62 POSITIONS WITH BLOOMBERG SCRIPTS

1.      For my valuations of the 62 positions with Bloomberg scripts, I relied on the Bloomberg valuation tools that IQ used. The 62 positions include vanilla variance swaps, corridor variance swaps, and foreign exchange options. I valued the variance swaps using DLIB and the foreign exchange options using OVML

2.      The DOJ provided electronic files called CSV uploader files. These files included a form for the inputs to enter all the relevant attributes of each of the positions in the Bloomberg system. The CSV uploader files can be used to prepare multiple positions at a time, in lieu of entering each position manually through the DLIB or OVME functions. I filled in the uploader files using the parameters from the term sheets, such as the effective date, maturity date, strike price, reference index or indices, notional, currency, whether IQ was long or short, and any barriers or corridors.[93] There is an uploader file for each security type and for the DLIB valuations, Bloomberg identified the BLT template to use for each security type. For example, Bloomberg selected BLT template 601 for vanilla variance swaps and BLT template 598 for corridor variance swaps. For certain positions, Bloomberg provided custom templates to account for unique features, such as 0% strike prices.[94] I did not use any Bloomberg BLAN scripts, where the code is accessible and editable, for my valuations.

3.      For variance swaps, I used the Bloomberg Local Volatility model as recommended by Bloomberg. Bloomberg's DLIB valuations support using different volatility models such as, the Black-Scholes model, Heston model, Local Volatility model, as well as hybrid models.[95] It is well-known that the Black-Scholes model may fail to reflect certain features of the financial markets due to certain unrealistic assumptions, such as the constant volatility assumption. Constant volatility is a critical determinate of the value of the Black-Scholes model. DLIB also supports the valuation of variance swaps under alternative models that

---

[93] There were two positions where IQ had a partial close-out during the life of the swaps and I accounted for the decrease in the notional during the life of the swaps. The starting notional was $311K for both positions (January 13, 2020) and there was a partial close-out for half of the positions of $155.5K each prior to the March 2020 month-end valuations. See DAF: XDAC8ZIA [TAP_SDNY_001251], VAF: XDAC98J6 [IQCM-SEC-00585941], DAF: [TAP_SDNY_001127] and VAF: [IQCM-SEC-00585930].

[94] DAF: XDAB25EH and XDAB22MA and VAF: XDACMDBT and XDACMDBN.

[95] Bloomberg. Variance Swap Pricing in DLIB. September 14, 2017.

CONFIDENTIAL

do not assume that volatility is constant as in the Black-Scholes model. In the Heston model, the variance follows a mean reverting process that allows for correlation between volatility and the asset price level.[96] Local Volatility models consider volatility to be a function of the asset price and time.[97] Lastly, I run the valuations as of market close in New York (4PM ET).

4. After completing the forms in the uploader files, I submitted the files to the Bloomberg system to generate the DLIB and OVML positions in my Bloomberg portfolio in the BVPM (Derivative Valuations Portfolio Manager) function. See Exhibit 42 for a screenshot of the uploaded positions in my Bloomberg portfolio for the 62 positions with monthly scripts. From the BVPM function, I can review the positions and verify that they were uploaded correctly and with the valuation parameters I entered based on the term sheets as well as the volatility model selection.

Exhibit 42. *Screenshot of My Bloomberg Portfolio for the 62 Positions With Monthly Scripts*



---

[96] Heston, S. (1993), 'A closed form solution of options with stochastic volatility with applications to bond and currency options', *The Review of Financial Studies* 6(2), 327–343.

[97] Derman, E., Kani, I. and Zou, J. Z. (1996), 'The local volatility surface unlocking the information in index option prices', *Financial Analysts Journal* 52(4), 25–36.

3527-055
NERA
Page 98 of 158

5.        Using the BVPM function, I generated monthly valuations by updating the "as of"
date to be the month-end dates from the trade date and up to the maturity date for the 62
positions. See Exhibit 43. I then exported the valuations for each month-end date for the 62
positions. The monthly valuations are generated in the local currency based on the term sheets. I
relied on the foreign exchange rate from Bloomberg as of the month-end dates to convert any
non-US dollars valuations to valuations in US dollars.

Exhibit 43.  *Screenshot of Repricing the Bloomberg Portfolio*



6.        In addition to my own valuations, I used the Bloomberg valuation tools to
replicate the IQ valuations. The DOJ provided a copy of the IQ portfolios for DAF and VAF
through BVPM with the Golden Copy data that recorded the contemporaneous market data at the
time of the IQ valuations. I used the same valuation model that IQ used for each position,
whether it was OVME for a corridor variance swap or DLIB and BLAN code for a vanilla
variance swap. I relied on the monthly Bloomberg scripts for the parameters and BLAN code
that IQ used in its valuations and entered IQ's valuation terms, including any alterations. In
addition, I used historical Bloomberg data in BVPM to identify the timing of valuations, such as
New York 4 pm, as well as the VS rates that IQ used in valuing positions in OVME.

CONFIDENTIAL

7.       The Bloomberg data for the IQ portfolios do not identify the volatility model used for the IQ valuations. For completeness, I ran the IQ valuations for each position under the Local Volatility model, Black-Scholes model, and Heston model and compared my replicated valuations to the IQ valuations to identify the best fitting volatility model. There are instances when IQ would switch the timing of the valuation of a position during the life of a position, such as from New York 4 pm to London 4 pm, and then the best fitting volatility model would change, such as from the Black-Scholes model to the Heston model.

94



**Faten Sabry, Ph.D.**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
24th Floor
New York, NY 10036
+1 212 345 3285
faten.sabry@nera.com

# EXHIBIT 1

# FATEN SABRY
## MANAGING DIRECTOR
## CHAIR OF GLOBAL SECURITIES & FINANCE PRACTICE

I am a Managing Director in the Securities and Finance Practice at National Economic Research Associates, Inc. ("NERA") and Chair of the Global Securities and Finance Practice. I have over twenty years of experience in economic and financial consulting in the valuation of fixed income securities, derivatives, illiquid assets, businesses and litigation settlements. I have consulted in disputes involving investment management firms, solvency, leveraged buyouts, distressed exchanges, options, swaps, and hedging strategies, among other issues. I have testified as an expert in State and Federal Courts.

I have provided expert testimony on credit default swaps, collateralized debt obligations ("CDOs"), residential mortgage-backed securities ("RMBS"), and mortgage derivatives; deposition testimony on options trading in an SEC litigation against a hedge fund; and deposition testimony, trial testimony and expert reports on econometric analysis of materiality and damages, as well as class certification issues in various matters related to structured products and fixed income. I have analyzed the performance of hedge funds and mutual funds that invested in options and other derivative positions, allocated settlements in two of the largest private residential mortgage-backed securities settlements in the "put-back" litigation. In addition, I have provided consulting analyses of trading data and trade allocation for various types of funds; and analyzed risk management and hedging strategies of securities, including options and other derivatives, to assess losses and allegations of misrepresentations of the risks of the portfolios.

I am the author of various articles on the credit crisis, mortgage defaults, credit default swaps, LIBOR transition, the impact of securitization on the cost and availability of credit to consumers, and claiming behavior. My research has been published as a chapter in *The Handbook of Mortgage-Backed Securities*, edited by Dr. Frank J. Fabozzi. I am also the lead author of an econometric study on the impact of securitization on the costs and availability of credit for consumers and liquidity. My research has also been published in the *Journal of Structured Finance*, *Journal of Real Estate Practice*, *Journal of Investment Compliance*, *Journal of Alternative Investments, Business Economics, International Trade Journal*, and other periodicals. I am a member of the American Finance Association and the American Statistics Association. I have been accredited as a professional statistician by the American Statistics Association. I received my Ph.D. in Business from Stanford Business School and prior to joining NERA, I was a Post-Doctoral Fellow at the International Food Policy Research Institute and an assistant professor of economics at the American University in Cairo, where I taught graduate and undergraduate economic courses.

**Faten Sabry, Ph.D.**

## Education

| | |
|---|---|
| **1996** | **Stanford University, Graduate School of Business** |
| | Ph.D., Business |
| **1991** | **American University in Cairo, Egypt** |
| | M.A., *magna cum laude*, Economics |
| **1988** | **American University in Cairo, Egypt** |
| | B.A., *GPA 4.0*, Economics |

## Professional Experience

|  | **NERA Economic Consulting** |
|---|---|
| **2010 -** | *Managing Director* |
| 2002 – 2010 | *Vice President* |
| 2000 – 2002 | *Senior Consultant* |
| 1998 – 2000 | *Consultant* |

**1997 - 1998**  **American University in Cairo**
*Assistant Professor of Economics*
Taught graduate and undergraduate macroeconomics, economic development, and project valuation courses.

**1997 - 1998**  **International Food Policy Research Institute**
*Post-Doctoral Fellow*
Developed and estimated econometric almost ideal demand systems (AIDS) models for the demand for food commodities using a national survey data. Prepared a report on the subsidy system based on the results of the econometric analysis.

**1991 - 1996**  **Stanford University, Graduate School of Business**
*Research and Teaching Assistant*
Conducted statistical analysis for stochastic models of multi-party decision making. Designed a survey assessing moral responsibility of providing public goods in organizations. Developed case studies on the trade dispute between Fuji and Eastman Kodak. Also worked as a teaching assistant for graduate courses on negotiation and conflict resolution.

## Honors and Professional Activities

Post-Doctoral Fellow, International Food Policy Research, 1997.

J. M. Olin Research Fellowship, Stanford Law School, 1995.

Stanford University Graduate School of Business Fellowship, 1991-1996.

Ford Foundation Scholarship, 1990-1991.

## Expert Reports, Deposition and Testimony

Direct and Rebuttal Trial Testimony, before the Supreme Court of the State of New York for the County of New York, in *Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce / Canadian Imperial Bank of Commerce v. Securitized Asset Funding 2011-2, Ltd. and Securitized Asset Funding 2009-1, Ltd., Promontoria Europe Investments XXIII LDC, and CSMC 2012-8R, Ltd,* on economic analysis of damages involving credit default swaps, 2022.

Deposition Testimony, Affirmative Report and Expert Rebuttal Report, before the Supreme Court of the State of New York for the County of New York, in *Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce / Canadian Imperial Bank of Commerce v. Securitized Asset Funding 2011-2, Ltd. and Securitized Asset Funding 2009-1, Ltd., Promontoria Europe Investments XXIII LDC, and CSMC 2012-8R, Ltd,* on economic analysis of damages involving credit default swaps, 2021.

Expert Rebuttal Report, in the Superior Court of Justice (Commercial List) for the Province of Ontario, in *The Mangrove Partners Master Fund, Ltd. V. TransAlta Corporation, Brookfield BRP Holdings (Canada) Inc., Rona H. Ambrose, John P. Dielwart, Timothy W. Faithfull, Dawn L. Farrell, Alan J. Forrer, Gordon D. Griffin, Yakout Mansour, Georgia Nelson, Beverlee F. Park and Bryan D. Pinney*, on rebuttal analysis of damages related to a financial transaction with the option to convert debt to minority equity interest in hydro assets, 2021.

Trial Testimony, in the Superior Court of Justice (Commercial List) for the Province of Ontario, in *Duo Bank of Canada v. Fairstone Financial Holdings Inc., J.C. Flowers IV Coinvest Canada L.P., J.C. Flowers IV L.P. and VP Canada Acquisition, LP* and *Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, LP v. Duo Bank of Canada*, on economic analysis of roll rate models, loan loss reserves and amortization events for consumer loans collateral in asset-backed securities, 2020.

Rebuttal Report, Expert Report, in the Superior Court of Justice (Commercial List) for the Province of Ontario, in *Duo Bank of Canada v. Fairstone Financial Holdings Inc., J.C. Flowers IV Coinvest Canada L.P., J.C. Flowers IV L.P. and VP Canada Acquisition, LP / Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, LP v. Duo Bank of Canada*, on projections of losses on consumer loans and impact of macroeconomic factors, 2020.

Deposition Testimony, Expert Rebuttal Report, in the United States District Court for the Southern District of New York, in *Pacific Life Insurance Company et al v. The Bank of New York Mellon*, on alleged damages in a mortgage-backed securities case, 2020.

Declaration, in the United States District Court for the Southern District of New York, in *Phoenix Light SF Limited, et. al. v. the Bank of New York Mellon*, on alleged damages in a mortgage-backed securities case, 2019.

Deposition, Expert Rebuttal Report and Expert report, in the United States District Court for the District Court of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico As A Representative of The Commonwealth of Puerto Rico, et al. Debtor and The Financial*

**Faten Sabry, Ph.D.**

*Oversight and Management Board for Puerto Rico As A Representative of The Employees Retirement System of The Government of Puerto Rico, Debtor,* on evaluation of PR bonds, 2019.

Deposition, in the United States District Court for the Southern District of New York, in *Phoenix Light SF Limited, et. al. v. the Bank of New York Mellon*, on alleged damages in a mortgage-backed securities case, 2019.

Expert Rebuttal Report, in the US District Court for the Southern District of New York, in *Phoenix Light SF Limited, et al. v The Bank of New York Mellon*, on causation and damages, 2018.

Trial Testimony, in the U.S. District Court for the Southern District of New York, in *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, related to the net benefits to bondholders from the debt exchanges and the impact of the exchanges on Windstream's leverage, 2018.

Affidavit, in the US District Court for the Southern District of New York, in *U.S. Bank National Association v. Windstream Services, LLC V. Aurelius Capital Master, Ltd.*, on the estimated net benefits provided to bondholders in a debt exchanged offered by the company, 2018.

Deposition, in the US District Court for the Southern District of New York, in *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, related to the net benefits to bondholders from the debt exchanges, 2018.

Expert Report and Rebuttal Expert Report, In the United States District Court for the Southern District of New York in *U.S. Bank National Association v. Windstream Services, LLC, v. Aurelius Capital Master, Ltd.* on the economic analysis of the net benefits received by Windstream bondholders in a purported debt exchange offered by the company, 2018.

Expert Report, In the United States District Court for the Southern District of New York, in *Phoenix Light SF Limited, et al. v. The Bank of New York Mellon*, on a statistical analysis of the performance of mortgage-backed securities, 2018.

Report, "Final Expert Calculation of Settlement Payment Pursuant to Settlement Agreement dated November 15, 2013," prepared on behalf of *U.S. Bank National Association, Bank of New York Mellon, Wilmington Trust, Wells Fargo, HSBC and Deutsche Bank as Trustees*, 2017.

Rebuttal Expert Report, Deposition Testimony and Rebuttal Expert Report, In the United States District Court for the Southern District of New York in *Royal Park Investments SA/NV, et al. v. The Bank of New York Mellon, as Trustee* on economic analysis of class certification issues, 2016-2017.

Expert Report, In the State of Minnesota District Court for the County of Hennepin, Fourth Judicial District in *Connie L. Gretsch, et al. v. CitiMortgage, Inc.* on the economic analysis of class certification in a consumer finance litigation, 2017.

**Faten Sabry, Ph.D.**

Testimony and Expert Report, In the United States Bankruptcy Court for the District of Maryland – Baltimore Division, *In re: Novation Companies, Inc., et al. (Debtors)* on the valuation of subprime RMBS overcollateralization and excess interest certificates with and without the exercise of optional termination, 2017.

Affidavit, In the Supreme Court of the State of New York for the County of New York in *Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce / Canadian Imperial Bank of Commerce v. Securitized Asset Funding 2011-2, Ltd. and Securitized Asset Funding 2009-1, Ltd., Promontoria Europe Investments XXIII LDC, and CSMC 2012-8R, Ltd.* on economic analysis of damages involving credit default swaps, 2017.

Expert Reports, In the Superior Court of Justice for the Province of Ontario in *John M. McIntosh v. Takata Corporation, TK Holdings Inc., Toyota Motor Corporation, Toyota Motor Manufacturing Canada Inc. and Toyota Motor Manufacturing, Indiana, Inc. / Rick A. Des-Rosiers and Stephen Kominar v. Takata Corporation, TK Holdings Inc., Honda Motor Co., Ltd., Honda of America Manufacturing, Inc. and Honda Canada* on economic analysis of class certification issues, 2016.

Deposition Testimony and Rebuttal Expert Report, In the United States District Court for the Southern District of New York in *Fixed Income Shares: Series M, et al. v. Citibank N.A.* on estimation of damages in an RMBS matter, 2016.

Declaration, In the United States District Court for the Southern District of New York in *The State of New York and The City of New York v. United Parcel Service, Inc.* on statistical analysis and estimation of damages, 2016.

Expert Report, In the United States District Court for the Southern District of New York in *The State of New York and The City of New York v. United Parcel Service, Inc.*, 2016.

Report regarding the allocable shares of the settlement trusts pursuant to the Settlement Agreement between The Bank of New York as Trustee for 530 Countrywide Mortgage-backed Securities Trusts, on the one hand, and Bank of America Corporation, Countrywide Home Loans and Bank of America on the other, prepared on behalf of The Bank of New York, January 2016.

Deposition Testimony, Rebuttal Report and Expert Report, In the Superior Court of the State of California In and For the City and County of San Francisco in *Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities Inc., et al. / Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et al.*, on a statistical analysis of the performance of mortgage backed certificates, July-October-December 2015.

Testimony, Rebuttal Expert Report and Expert Report, In the Matter of the Arbitration Before JAMS in *Sonova Holding AG, et al. v. Alfred E. Mann, individually, on behalf of the Mann Trust, and as Seller Representative, et al.*, on estimation of damages in an acquisition dispute, August-September-November 2015.

**Faten Sabry, Ph.D.**

Affidavit, In the United States Bankruptcy Court for the District of Delaware, *In re: AgFeed USA, LLC, et al. (Debtors)* on the structure of the proposed settlement allocation, October 2014.

Report, "Economic Analysis of the Impact of the Amendments to Rule G-23 on the Municipal Securities Market" on the impact of the amendments to Rule G-23 which prevents financial advisors from switching roles in competitive municipal sales on the cost of borrowing for municipal issues, with special emphasis on small issuers, September 2014.

Expert Report, *In re: Proposed RMBS Settlement Agreement – November 15, 2013* on analysis of reasonableness of the RMBS settlement for Rep and Warranty breaches involving 330 JP Morgan Trusts, July 2014.

Deposition Testimony and Report (with Chudozie Okongwu), In the United States Bankruptcy Court for the Middle District of Florida – Orlando Division, *In re: Sherwood Investments Overseas Limited, Inc. (Debtor) / Sherwood Investments Overseas Limited, Inc. v. The Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank, N.V.* on alleged causation and damages with regard to investments in certain equity derivative products, May-June 2014.

Deposition Testimony and Expert Report, In the United States District Court for the Western District of Wisconsin in *CMFG Life Insurance Company, CUMIS Insurance Society, Inc. and Members Life Insurance Company v. RBS Securities Inc.* on statistical analysis of materiality of alleged breaches in representations and warranties of several RMBS trusts in a repurchase litigation, November 2013 & March 2014.

Deposition Testimony and Declaration, In the United States District Court for the Central District of California in *Securities and Exchange Commission v. Aletheia Research and Management, Inc., and Peter J. Eichler, Jr.*, on analysis of options trading, damages and disgorgement, February 2014.

Testimony, in the Supreme Court of the State of New York, County of New York in *The Bank of New York Mellon, et al. v. Walnut Place LLC, et al.* on a proposed RMBS settlement by Bank of America, September 2013.

Declaration, In the United States District Court for the Central District of California, Western Division, *In Re: CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litigation* on economic analysis of class certification in the MDL litigation involving mortgage borrowers who applied for the HAMP modification program, August 2013.

Deposition Testimony, In the United States District Court for the Central District of California, Western Division, *In Re: CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litigation* on economic analysis of class certification in the MDL litigation involving mortgage borrowers who applied for the HAMP modification program, June 2013.

Expert Report, In the United States District Court for the Central District of California, Western Division, *In Re: CitiMortgage, Inc. Home Affordable Modification Program ("HAMP")*

**Faten Sabry, Ph.D.**

*Litigation* on economic analysis of class certification in the MDL litigation involving mortgage borrowers who applied for the HAMP modification program, May 2013.

Expert Report, In the Superior Court of Justice for the Province of Ontario in *Edward Selmani, et al. v. Toyota Canada Inc. and Toyota Motor Corporation, et al.* on economic analysis of class certification and analysis of diminution of value in Toyota's product recall litigation, May 2013.

Affidavit and Declaration, in the matter of *Michael Melley v. Toyota Canada Inc. and Toyota Motor Corporation*, Superior Court of the Province of Québec, District of Montréal, on economic analysis of diminution of value and class certification issues, April 2013.

Testimony, in the Supreme Court of the State of New York, County of New York in *IDX Capital, LLC, et al. v. Phoenix Partners Group LLC, et al.* on the fair market value of a CDS inter-dealer broker firm, December 2012.

Deposition Testimony, in the Supreme Court of the State of New York, County of New York in *The Bank of New York Mellon, et al. v. Walnut Place LLC, et al.* on a proposed RMBS settlement by Bank of America, December 2012.

Testimony in a FINRA Disciplinary Proceeding, *Department of Enforcement v. Brookstone Securities, Inc., et al.*, regarding collateralized mortgage obligations, including inverse floating-rate and interest-only tranches, and the impact of changes in the yield curve during the period 2004 to 2007 on the value of the securities, February 2012.

Expert Report, in the matter of *Ryan Schachter v. Toyota Canada Inc. and Toyota Motor Corporation*, Superior Court of the Province of Québec, District of Montréal, on economic analysis of class certification, October 2011.

Trial Testimony in the Supreme Court of the State of New York, County of New York, in *Jet Acceptance Corporation v. Quest Mexicana, S.A. de C.V. and Lomas Group S.A. de C.V.*, on the estimation of damages and the use of discount rates, September 2011.

Rebuttal Affidavit on behalf of defendants, I*DX Capital LLC, et al. v. Phoenix Partners Group LLC, et al.* Index No. 102806-07 (Supreme Court of the State of New York). The rebuttal affidavit analyzed the revenue projections of a credit default swaps inter-dealer broker (IDB), January 2011.

Expert Report in a FINRA Disciplinary Proceeding, *Department of Enforcement v. Brookstone Securities, Inc., et al.*, on representations made to customers regarding CMOs, inverse floaters and IOs and examined the impact of changes in the interest rates environment and other market factors during the period 2004 to 2007, January 2011.

## Publications

**Faten Sabry, Ph.D.**

"How Will the LIBOR Transition Affect Mortgage Consumers?" (with Ignacio Franceschelli and Ramisa Roya), NERA Working Paper, August 2022.

"The Role of Punitive Damages in Asbestos Litigation" (with Ignacio Franceschelli and Sungi Lee), *ABA Section of Litigation, Mass Torts Litigation newsletter*, April 22, 2021.

"Hey Google: When Did People Stop Going to Work?" (co-authored with Linh Nguyen, and Aakash Bhalothia), NERA Working Paper, May 2020.

"Manufactured Defaults and the Use of Credit Default Swaps," (co-authored with Ignacio Franceschelli and David Cen), NERA Working Paper, December 2019.

"What Does the CFPB Complaints Database Tell Us About the Quality of Servicing of Student Loans?" (with Ignacio Franceschelli and David Cen), NERA Working Paper, December 2017.

"Not All MBS Settlements Are Equal," (with Sungi Lee and Linh Nguyen), *NERA Insights: Subprime Lending Series, Part XII*, June 2017 (Republished in *Law360* as "Trends In Credit Crisis Settlements," September 18, 2017).

"Home Equity, Home Value, and Determinants of Mortgage Defaults During the Credit Crisis," (with Drew Claxton and Ignacio Franceschelli), *Journal of Real Estate Practice and Education*, Vol. 19, No. 2, 2016.

"Mortgage Defaults, Foreclosures and Modifications," (with Drew Claxton and Ignacio Franceschelli), in the *Handbook of Mortgage-Backed Securities, 7th Edition*, Frank J. Fabozzi (ed.), Oxford University Press, 2016.

"What do the new risk retention requirements of the Dodd-Frank Act mean for securitization?," *Financial Regulation International*, Issue 18.5, June 2015.

"Credit Crisis Litigation Update: Significant Settlement Activity in 2014 and New Cases against RMBS Trustees and Mortgage Lenders," (with Sungi Lee, Joseph Mani and Linh Nguyen), NERA Working Paper, February 2015.

"An Economist's View of Market Evidence in Valuation and Bankruptcy Litigation," (with William Hrycay), NERA Working Paper, May 2014 (Republished in *Law360* as "Market Evidence In Solvency Disputes–An Economist's View," July 1, 2014, and republished by Harvard Law School Forum on Corporate Governance and Financial Regulation; website link http://blogs.law.harvard.edu/corpgov/).

"The Use of ABX in Credit Crisis Litigation," *Journal of Structured Finance*, Vol. 19, No. 4, Winter 2014.

"Credit Crisis Litigation Update: It is Settlement Time," (with Eric Wang and Joseph Mani), NERA Working Paper, October 2013. (Republished by Harvard Law School Forum on

**Faten Sabry, Ph.D.**

Corporate Governance and Financial Regulation; website link
http://blogs.law.harvard.edu/corpgov/).

"Comcast and Economic Analysis of Class Certification Issues," (with Drew Claxton), NERA Working Paper, July 2013.

"The Use of ABX Derivatives in the Credit Crisis Litigation," (with Ethan Cohen-Cole) *NERA Insights: Subprime Lending Series*, January 2012.

"What Do the New Risk Retention Requirements of the Dodd-Frank Act Mean for Securitization?" *NERA Insights: Impact of the New Financial Regulations Series, Part III*, December 2010.

"Credit Crisis Litigation Revisited: Litigating the Alphabet of Structured Products," (with Anmol Sinha, Jesse Mark, and Sungi Lee) *NERA Insights: Subprime Lending Series, Part VII*, June 2010.

"An Update on the Credit Crisis Litigation: A Turn Towards Structured Products and Asset Management Firms," (with Anmol Sinha and Sungi Lee) *NERA Insights: Subprime Lending Series, Part VI*, June 2009.

"How Did We Get Here? The Story of the Credit Crisis," (with Chudozie Okongwu), *Journal of Structured Finance*, Spring 2009.

"The Use of Economic Analysis in Predatory Lending Cases: Application to Subprime Loans," (with Denise Martin and Stephanie Plancich) *NERA Insights: Subprime Lending Series, Part IV*, June 2009.

"Trends in the Subprime Securities Litigation," (with Anmol Sinha and Sungi Lee), *Journal of Alternative Investments*, Fall 2008.

"Subprime Securities Litigation: Key Players, Rising Stakes, and Emerging Trends," (with Anmol Sinha and Sungi Lee), *NERA Insights: Subprime Lending Series, Part III*, July 2008.

"The Subprime Meltdown: A Primer," (with Tom Schopflocher), *US Subprime Market: Evolution, Growth and Crisis*, Icfai University Press, July 2008.

"When Do Breakpoints Give Mutual Fund Investors a Break?" (with Winai Wongsurawat), *Journal of Investment Compliance*, Volume 9, Issue 2, April 2008.

"Subprime Litigation: The Opening Salvo," (with Anmol Sinha and Sungi Lee), *Tort Source*, Vol. 10 Issue No. 3, Spring 2008.

"The Subprime Meltdown: Not Again!" (with Tom Schopflocher), *American Bankruptcy Institute Journal*, Vol. XXVI, No. 7, September 2007.

"The Propensity to Sue: Why Do People Seek Legal Actions?" (with SEC Economic Fellow Fred Dunbar), *Business Economics*, April 2007.

"The Subprime Meltdown: A Primer," (with Tom Schopflocher), *NERA Insights: Subprime Lending Series, Part I*, June 2007.

"Forecasting Claims in an Era of Tort Reform," (with SEC Economic Fellow Fred Dunbar), *LNJ's Product Liability Newsletter*, November/December 2004.

"The Development and Effectiveness of the WTO's Dispute Settlement Body," *MSU-Journal of International Law*, Volume 10, Issue #3, Fall 2001.

"An Analysis of the Decision to File, the Dumping Margin and the Outcome of Antidumping Petitions," *The International Trade Journal*, Volume XIV, No. 2, Summer 2000.

## Recent Presentations

"Two Sides of the Coin: Future Cryptocurrency Regulatory and Litigation Risks," panel discussion, NERA Insights Webinar, March 2021.

"A View of Bankruptcies on Both Sides of the Atlantic," panel discussion, NERA Insights Webinar, December 2020.

"Use of Credit Default Swaps in Valuation Disputes," presented at *American Bankruptcy Institute Conference*, New York, NY, May 2019.

"How Do Market Efficiency and Market Evidence Factor in Valuation Disputes?," presented at *VALCON 2019*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, February 2019.

"2018 Claim Trends and NERA Capabilities," presentation hosted by *FINPRO Global Advisory Board*, New York, NY, February 2019.

"Navigating Issues in Fraudulent Transfers," presented at *VALCON 2018: Cutting Edge Valuation Solutions*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, May 2018.

"Puerto Rico Restructuring Crisis as Compared to Detroit," ABA Section of Litigation Roundtable Webinar (moderator), November 2017.

"Economic Analysis of Plan Feasibility and Capital Adequacy," presented on Bankruptcy Litigation panel at *American Bankruptcy Institute New York City Bankruptcy Conference 2017*, New York, NY, May 2017.

"Shorting Credit Default Swaps," *NERA's 16th Securities & Finance Summer Seminar*, Park City, UT, July 2016.

"Use of Derivatives and Probabilistic Methods in Bankruptcy, Workouts and Insolvency Matters," presented at *VALCON 2016: Emerging Valuation Issues in Bankruptcy and Beyond*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, March 2016.

"Valuation Adjustment – The Economics of the Cost of Capital for Distressed Companies," *VALCON 2015: Emerging Valuation Issues in Bankruptcy and Beyond*, hosted by the American Bankruptcy Institute (ABI): Las Vegas, NV, February 2015.

"Economic Analysis of Risk Retention Under Dodd Frank," webcast hosted by *The Knowledge Group*, October 2014.

"Argentina Debt Litigation: Sovereign Debt Restructuring Going Forward," webcast hosted by Thomson Reuters, September 2014.

"Hot Topics in Bankruptcy Litigation," webcast hosted by West LegalEdcenter in conjunction with NERA Economic Consulting, April 2013.

"Valuation Issues in Bankruptcy Litigation," presented at the Practising Law Institute's Webcast on Valuation and Bankruptcy Litigation, New York, NY, December 2012.

"Asset-backed Securitizations–What Happened?," presented at *Understanding Mortgage-Backed Securities*, hosted by the Southern District of New York Chapter and Securities Law Section of the Federal Bar Association: New York, NY, March 2012.

"Mortgage-backed Securities Litigation," Strafford Webinar, January 5, 2012.

"The Economics of CDO Litigation," presented at *NERA's Financial Litigation, Disputes, and Enforcement Seminar*, London, United Kingdom, October 2011.

"The Impact of the New Risk Retention Rules on Securitization: Examining Economic Issues in Financial Regulation under Dodd-Frank," presented at the SEC Historical Society, July 2011.

"Mortgage-Backed Securities Litigation: Leveraging Latest Developments," a web seminar presented by Strafford Publishing, New York, NY, March 2011.

"Trends in the Credit Crisis Litigation," presented at *New York University Roundtable on the Securities Litigation in the Aftermath of the Crisis: What Happened in 2010 and What Lies Ahead?* Hosted by the New York University Vincent C. Ross Institute of Accounting Research and NERA: New York, NY, February 2011.

"The Causes and Effects of the Financial Crisis in the Context of the U.S. and Canadian Experience," presented at the Association of Canadian General Counsel, *2010 Fall Conference*, Chicago, IL, September 2010.

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

<u>**Case Filings:**</u>
- United States of America v. James Velissaris, Sealed Indictment, 1:22-cr-00105, USDC SDNY

<u>**Data**</u>
- Bloomberg and communications with Bloomberg
- FactSet

<u>**Documents Produced in Litigation**</u>
- IQCM-SEC-00036938
- IQCM-SEC-00037093
- IQCM-SEC-00105017
- IQCM-SEC-00110010
- IQCM-SEC-00112415
- IQCM-SEC-00112416
- IQCM-SEC-00113198
- IQCM-SEC-00113199
- IQCM-SEC-00113330
- IQCM-SEC-00113331
- IQCM-SEC-00116164
- IQCM-SEC-00116165
- IQCM-SEC-00116289
- IQCM-SEC-00116371
- IQCM-SEC-00116727
- IQCM-SEC-00116728
- IQCM-SEC-00116739
- IQCM-SEC-00116740
- IQCM-SEC-00116898
- IQCM-SEC-00116899
- IQCM-SEC-00117113
- IQCM-SEC-00117114
- IQCM-SEC-00117173
- IQCM-SEC-00117174
- IQCM-SEC-00301175
- IQCM-SEC-00304040
- IQCM-SEC-00316949
- IQCM-SEC-00316950
- IQCM-SEC-00334454
- IQCM-SEC-00334455
- IQCM-SEC-00337710
- IQCM-SEC-00337711
- IQCM-SEC-00537878
- IQCM-SEC-00538550
- IQCM-SEC-00538695
- IQCM-SEC-00538695

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00539070
- IQCM-SEC-00539173
- IQCM-SEC-00539290
- IQCM-SEC-00539364
- IQCM-SEC-00539411
- IQCM-SEC-00539564
- IQCM-SEC-00539799
- IQCM-SEC-00540190
- IQCM-SEC-00579478
- IQCM-SEC-00580860
- IQCM-SEC-00580882
- IQCM-SEC-00580903
- IQCM-SEC-00580922
- IQCM-SEC-00580923
- IQCM-SEC-00580945
- IQCM-SEC-00580965
- IQCM-SEC-00580986
- IQCM-SEC-00581008
- IQCM-SEC-00581028
- IQCM-SEC-00581051
- IQCM-SEC-00581071
- IQCM-SEC-00581092
- IQCM-SEC-00581113
- IQCM-SEC-00581135
- IQCM-SEC-00581154
- IQCM-SEC-00581174
- IQCM-SEC-00581196
- IQCM-SEC-00581218
- IQCM-SEC-00581240
- IQCM-SEC-00581261
- IQCM-SEC-00581281
- IQCM-SEC-00581303
- IQCM-SEC-00581324
- IQCM-SEC-00581343
- IQCM-SEC-00581895
- IQCM-SEC-00582228
- IQCM-SEC-00582239
- IQCM-SEC-00582265
- IQCM-SEC-00582276
- IQCM-SEC-00582356
- IQCM-SEC-00585910
- IQCM-SEC-00585911
- IQCM-SEC-00585912
- IQCM-SEC-00585913

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00585914
- IQCM-SEC-00585915
- IQCM-SEC-00585916
- IQCM-SEC-00585917
- IQCM-SEC-00585918
- IQCM-SEC-00585919
- IQCM-SEC-00585920
- IQCM-SEC-00585921
- IQCM-SEC-00585922
- IQCM-SEC-00585923
- IQCM-SEC-00585924
- IQCM-SEC-00585925
- IQCM-SEC-00585926
- IQCM-SEC-00585927
- IQCM-SEC-00585928
- IQCM-SEC-00585929
- IQCM-SEC-00585930
- IQCM-SEC-00585931
- IQCM-SEC-00585932
- IQCM-SEC-00585933
- IQCM-SEC-00585934
- IQCM-SEC-00585935
- IQCM-SEC-00585936
- IQCM-SEC-00585937
- IQCM-SEC-00585938
- IQCM-SEC-00585939
- IQCM-SEC-00585940
- IQCM-SEC-00585941
- IQCM-SEC-00585942
- IQCM-SEC-00585943
- IQCM-SEC-00585944
- IQCM-SEC-00585945
- IQCM-SEC-00585946
- IQCM-SEC-00585947
- IQCM-SEC-00585948
- IQCM-SEC-00585949
- IQCM-SEC-00585950
- IQCM-SEC-00585951
- IQCM-SEC-00585952
- IQCM-SEC-00585953
- IQCM-SEC-00585954
- IQCM-SEC-00585955
- IQCM-SEC-00585956
- IQCM-SEC-00585957

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00585958
- IQCM-SEC-00585959
- IQCM-SEC-00585960
- IQCM-SEC-00585961
- IQCM-SEC-00585962
- IQCM-SEC-00585963
- IQCM-SEC-00585964
- IQCM-SEC-00585965
- IQCM-SEC-00585966
- IQCM-SEC-00585967
- IQCM-SEC-00585968
- IQCM-SEC-00585969
- IQCM-SEC-00585970
- IQCM-SEC-00585971
- IQCM-SEC-00585972
- IQCM-SEC-00585973
- IQCM-SEC-00585974
- IQCM-SEC-00585975
- IQCM-SEC-00585976
- IQCM-SEC-00585977
- IQCM-SEC-00585978
- IQCM-SEC-00585979
- IQCM-SEC-00585980
- IQCM-SEC-00585981
- IQCM-SEC-00585982
- IQCM-SEC-00585983
- IQCM-SEC-00585984
- IQCM-SEC-00585985
- IQCM-SEC-00585986
- IQCM-SEC-00585987
- IQCM-SEC-00585988
- IQCM-SEC-00585989
- IQCM-SEC-00585990
- IQCM-SEC-00585991
- IQCM-SEC-00585992
- IQCM-SEC-00585993
- IQCM-SEC-00585994
- IQCM-SEC-00585995
- IQCM-SEC-00585996
- IQCM-SEC-00585997
- IQCM-SEC-00585998
- IQCM-SEC-00585999
- IQCM-SEC-00586000
- IQCM-SEC-00586001

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586002
- IQCM-SEC-00586003
- IQCM-SEC-00586004
- IQCM-SEC-00586005
- IQCM-SEC-00586006
- IQCM-SEC-00586007
- IQCM-SEC-00586008
- IQCM-SEC-00586009
- IQCM-SEC-00586010
- IQCM-SEC-00586011
- IQCM-SEC-00586012
- IQCM-SEC-00586013
- IQCM-SEC-00586014
- IQCM-SEC-00586015
- IQCM-SEC-00586016
- IQCM-SEC-00586017
- IQCM-SEC-00586018
- IQCM-SEC-00586019
- IQCM-SEC-00586020
- IQCM-SEC-00586021
- IQCM-SEC-00586022
- IQCM-SEC-00586023
- IQCM-SEC-00586024
- IQCM-SEC-00586025
- IQCM-SEC-00586026
- IQCM-SEC-00586027
- IQCM-SEC-00586028
- IQCM-SEC-00586029
- IQCM-SEC-00586030
- IQCM-SEC-00586031
- IQCM-SEC-00586032
- IQCM-SEC-00586033
- IQCM-SEC-00586034
- IQCM-SEC-00586035
- IQCM-SEC-00586036
- IQCM-SEC-00586037
- IQCM-SEC-00586038
- IQCM-SEC-00586039
- IQCM-SEC-00586040
- IQCM-SEC-00586041
- IQCM-SEC-00586042
- IQCM-SEC-00586043
- IQCM-SEC-00586044
- IQCM-SEC-00586045

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586046
- IQCM-SEC-00586047
- IQCM-SEC-00586048
- IQCM-SEC-00586049
- IQCM-SEC-00586050
- IQCM-SEC-00586051
- IQCM-SEC-00586052
- IQCM-SEC-00586053
- IQCM-SEC-00586054
- IQCM-SEC-00586055
- IQCM-SEC-00586056
- IQCM-SEC-00586057
- IQCM-SEC-00586058
- IQCM-SEC-00586059
- IQCM-SEC-00586060
- IQCM-SEC-00586061
- IQCM-SEC-00586062
- IQCM-SEC-00586063
- IQCM-SEC-00586064
- IQCM-SEC-00586065
- IQCM-SEC-00586066
- IQCM-SEC-00586067
- IQCM-SEC-00586068
- IQCM-SEC-00586069
- IQCM-SEC-00586070
- IQCM-SEC-00586071
- IQCM-SEC-00586072
- IQCM-SEC-00586073
- IQCM-SEC-00586074
- IQCM-SEC-00586075
- IQCM-SEC-00586076
- IQCM-SEC-00586077
- IQCM-SEC-00586078
- IQCM-SEC-00586079
- IQCM-SEC-00586080
- IQCM-SEC-00586081
- IQCM-SEC-00586082
- IQCM-SEC-00586083
- IQCM-SEC-00586084
- IQCM-SEC-00586085
- IQCM-SEC-00586086
- IQCM-SEC-00586087
- IQCM-SEC-00586088
- IQCM-SEC-00586089

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586090
- IQCM-SEC-00586091
- IQCM-SEC-00586092
- IQCM-SEC-00586093
- IQCM-SEC-00586094
- IQCM-SEC-00586095
- IQCM-SEC-00586096
- IQCM-SEC-00586097
- IQCM-SEC-00586098
- IQCM-SEC-00586099
- IQCM-SEC-00586100
- IQCM-SEC-00586101
- IQCM-SEC-00586102
- IQCM-SEC-00586103
- IQCM-SEC-00586104
- IQCM-SEC-00586105
- IQCM-SEC-00586106
- IQCM-SEC-00586107
- IQCM-SEC-00586108
- IQCM-SEC-00586109
- IQCM-SEC-00586110
- IQCM-SEC-00586111
- IQCM-SEC-00586112
- IQCM-SEC-00586113
- IQCM-SEC-00586114
- IQCM-SEC-00586115
- IQCM-SEC-00586116
- IQCM-SEC-00586117
- IQCM-SEC-00586118
- IQCM-SEC-00586119
- IQCM-SEC-00586120
- IQCM-SEC-00586121
- IQCM-SEC-00586122
- IQCM-SEC-00586123
- IQCM-SEC-00586124
- IQCM-SEC-00586125
- IQCM-SEC-00586126
- IQCM-SEC-00586127
- IQCM-SEC-00586128
- IQCM-SEC-00586129
- IQCM-SEC-00586130
- IQCM-SEC-00586131
- IQCM-SEC-00586132
- IQCM-SEC-00586133

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586134
- IQCM-SEC-00586135
- IQCM-SEC-00586136
- IQCM-SEC-00586137
- IQCM-SEC-00586138
- IQCM-SEC-00586139
- IQCM-SEC-00586140
- IQCM-SEC-00586141
- IQCM-SEC-00586142
- IQCM-SEC-00586143
- IQCM-SEC-00586144
- IQCM-SEC-00586145
- IQCM-SEC-00586146
- IQCM-SEC-00586147
- IQCM-SEC-00586148
- IQCM-SEC-00586149
- IQCM-SEC-00586150
- IQCM-SEC-00586151
- IQCM-SEC-00586152
- IQCM-SEC-00586153
- IQCM-SEC-00586154
- IQCM-SEC-00586155
- IQCM-SEC-00586156
- IQCM-SEC-00586159
- IQCM-SEC-00586160
- IQCM-SEC-00586161
- IQCM-SEC-00586162
- IQCM-SEC-00586163
- IQCM-SEC-00586164
- IQCM-SEC-00586165
- IQCM-SEC-00586166
- IQCM-SEC-00586167
- IQCM-SEC-00586168
- IQCM-SEC-00586169
- IQCM-SEC-00586170
- IQCM-SEC-00586171
- IQCM-SEC-00586172
- IQCM-SEC-00586173
- IQCM-SEC-00586174
- IQCM-SEC-00586175
- IQCM-SEC-00586176
- IQCM-SEC-00586177
- IQCM-SEC-00586178
- IQCM-SEC-00586179

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586180
- IQCM-SEC-00586181
- IQCM-SEC-00586182
- IQCM-SEC-00586183
- IQCM-SEC-00586184
- IQCM-SEC-00586185
- IQCM-SEC-00586186
- IQCM-SEC-00586187
- IQCM-SEC-00586188
- IQCM-SEC-00586189
- IQCM-SEC-00586190
- IQCM-SEC-00586191
- IQCM-SEC-00586194
- IQCM-SEC-00586195
- IQCM-SEC-00586196
- IQCM-SEC-00586197
- IQCM-SEC-00586198
- IQCM-SEC-00586199
- IQCM-SEC-00586200
- IQCM-SEC-00586201
- IQCM-SEC-00586202
- IQCM-SEC-00586203
- IQCM-SEC-00586204
- IQCM-SEC-00586205
- IQCM-SEC-00586206
- IQCM-SEC-00586207
- IQCM-SEC-00586208
- IQCM-SEC-00586209
- IQCM-SEC-00586210
- IQCM-SEC-00586211
- IQCM-SEC-00586212
- IQCM-SEC-00586213
- IQCM-SEC-00586214
- IQCM-SEC-00586215
- IQCM-SEC-00586216
- IQCM-SEC-00586217
- IQCM-SEC-00586218
- IQCM-SEC-00586219
- IQCM-SEC-00586220
- IQCM-SEC-00586221
- IQCM-SEC-00586222
- IQCM-SEC-00586223
- IQCM-SEC-00586224
- IQCM-SEC-00586225

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586226
- IQCM-SEC-00586227
- IQCM-SEC-00586228
- IQCM-SEC-00586229
- IQCM-SEC-00586230
- IQCM-SEC-00586231
- IQCM-SEC-00586232
- IQCM-SEC-00586233
- IQCM-SEC-00586234
- IQCM-SEC-00586235
- IQCM-SEC-00586236
- IQCM-SEC-00586237
- IQCM-SEC-00586238
- IQCM-SEC-00586239
- IQCM-SEC-00586240
- IQCM-SEC-00586241
- IQCM-SEC-00586242
- IQCM-SEC-00586243
- IQCM-SEC-00586244
- IQCM-SEC-00586245
- IQCM-SEC-00586246
- IQCM-SEC-00586247
- IQCM-SEC-00586248
- IQCM-SEC-00586249
- IQCM-SEC-00586250
- IQCM-SEC-00586251
- IQCM-SEC-00586252
- IQCM-SEC-00586253
- IQCM-SEC-00586254
- IQCM-SEC-00586255
- IQCM-SEC-00586256
- IQCM-SEC-00586257
- IQCM-SEC-00586258
- IQCM-SEC-00586259
- IQCM-SEC-00586260
- IQCM-SEC-00586261
- IQCM-SEC-00586262
- IQCM-SEC-00586263
- IQCM-SEC-00586264
- IQCM-SEC-00586265
- IQCM-SEC-00586266
- IQCM-SEC-00586267
- IQCM-SEC-00586268
- IQCM-SEC-00586269

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586270
- IQCM-SEC-00586271
- IQCM-SEC-00586272
- IQCM-SEC-00586273
- IQCM-SEC-00586274
- IQCM-SEC-00586275
- IQCM-SEC-00586276
- IQCM-SEC-00586277
- IQCM-SEC-00586278
- IQCM-SEC-00586279
- IQCM-SEC-00586280
- IQCM-SEC-00586281
- IQCM-SEC-00586282
- IQCM-SEC-00586283
- IQCM-SEC-00586284
- IQCM-SEC-00586285
- IQCM-SEC-00586286
- IQCM-SEC-00586287
- IQCM-SEC-00586288
- IQCM-SEC-00586289
- IQCM-SEC-00586290
- IQCM-SEC-00586291
- IQCM-SEC-00586292
- IQCM-SEC-00586293
- IQCM-SEC-00586294
- IQCM-SEC-00586295
- IQCM-SEC-00586296
- IQCM-SEC-00586297
- IQCM-SEC-00586298
- IQCM-SEC-00586299
- IQCM-SEC-00586300
- IQCM-SEC-00586301
- IQCM-SEC-00586302
- IQCM-SEC-00586303
- IQCM-SEC-00586304
- IQCM-SEC-00586305
- IQCM-SEC-00586306
- IQCM-SEC-00586307
- IQCM-SEC-00586308
- IQCM-SEC-00586309
- IQCM-SEC-00586310
- IQCM-SEC-00586311
- IQCM-SEC-00586312
- IQCM-SEC-00586313

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586314
- IQCM-SEC-00586315
- IQCM-SEC-00586316
- IQCM-SEC-00586317
- IQCM-SEC-00586318
- IQCM-SEC-00586319
- IQCM-SEC-00586320
- IQCM-SEC-00586321
- IQCM-SEC-00586322
- IQCM-SEC-00586323
- IQCM-SEC-00586324
- IQCM-SEC-00586325
- IQCM-SEC-00586326
- IQCM-SEC-00586327
- IQCM-SEC-00586328
- IQCM-SEC-00586329
- IQCM-SEC-00586330
- IQCM-SEC-00586331
- IQCM-SEC-00586332
- IQCM-SEC-00586333
- IQCM-SEC-00586334
- IQCM-SEC-00586335
- IQCM-SEC-00586336
- IQCM-SEC-00586337
- IQCM-SEC-00586338
- IQCM-SEC-00586339
- IQCM-SEC-00586340
- IQCM-SEC-00586341
- IQCM-SEC-00586342
- IQCM-SEC-00586343
- IQCM-SEC-00586344
- IQCM-SEC-00586345
- IQCM-SEC-00586346
- IQCM-SEC-00586347
- IQCM-SEC-00586348
- IQCM-SEC-00586349
- IQCM-SEC-00586350
- IQCM-SEC-00586351
- IQCM-SEC-00586352
- IQCM-SEC-00586353
- IQCM-SEC-00586354
- IQCM-SEC-00586355
- IQCM-SEC-00586356
- IQCM-SEC-00586357

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586358
- IQCM-SEC-00586359
- IQCM-SEC-00586360
- IQCM-SEC-00586361
- IQCM-SEC-00586362
- IQCM-SEC-00586363
- IQCM-SEC-00586364
- IQCM-SEC-00586365
- IQCM-SEC-00586372
- IQCM-SEC-00586379
- IQCM-SEC-00586386
- IQCM-SEC-00586393
- IQCM-SEC-00586400
- IQCM-SEC-00586407
- IQCM-SEC-00586413
- IQCM-SEC-00586419
- IQCM-SEC-00586425
- IQCM-SEC-00586431
- IQCM-SEC-00586437
- IQCM-SEC-00586443
- IQCM-SEC-00586449
- IQCM-SEC-00586455
- IQCM-SEC-00586461
- IQCM-SEC-00586467
- IQCM-SEC-00586473
- IQCM-SEC-00586479
- IQCM-SEC-00586485
- IQCM-SEC-00586491
- IQCM-SEC-00586499
- IQCM-SEC-00586507
- IQCM-SEC-00586515
- IQCM-SEC-00586523
- IQCM-SEC-00586531
- IQCM-SEC-00586539
- IQCM-SEC-00586545
- IQCM-SEC-00586551
- IQCM-SEC-00586557
- IQCM-SEC-00586563
- IQCM-SEC-00586569
- IQCM-SEC-00586575
- IQCM-SEC-00586581
- IQCM-SEC-00586587
- IQCM-SEC-00586593
- IQCM-SEC-00586599

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586605
- IQCM-SEC-00586611
- IQCM-SEC-00586617
- IQCM-SEC-00586623
- IQCM-SEC-00586624
- IQCM-SEC-00586625
- IQCM-SEC-00586626
- IQCM-SEC-00586627
- IQCM-SEC-00586628
- IQCM-SEC-00586629
- IQCM-SEC-00586630
- IQCM-SEC-00586631
- IQCM-SEC-00586632
- IQCM-SEC-00586633
- IQCM-SEC-00586634
- IQCM-SEC-00586635
- IQCM-SEC-00586636
- IQCM-SEC-00586637
- IQCM-SEC-00586638
- IQCM-SEC-00586639
- IQCM-SEC-00586640
- IQCM-SEC-00586641
- IQCM-SEC-00586642
- IQCM-SEC-00586643
- IQCM-SEC-00586644
- IQCM-SEC-00586645
- IQCM-SEC-00586646
- IQCM-SEC-00586647
- IQCM-SEC-00586648
- IQCM-SEC-00586649
- IQCM-SEC-00586650
- IQCM-SEC-00586651
- IQCM-SEC-00586652
- IQCM-SEC-00586653
- IQCM-SEC-00586654
- IQCM-SEC-00586655
- IQCM-SEC-00586656
- IQCM-SEC-00586657
- IQCM-SEC-00586658
- IQCM-SEC-00586659
- IQCM-SEC-00586660
- IQCM-SEC-00586661
- IQCM-SEC-00586662
- IQCM-SEC-00586663

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586664
- IQCM-SEC-00586665
- IQCM-SEC-00586666
- IQCM-SEC-00586667
- IQCM-SEC-00586668
- IQCM-SEC-00586669
- IQCM-SEC-00586670
- IQCM-SEC-00586671
- IQCM-SEC-00586672
- IQCM-SEC-00586673
- IQCM-SEC-00586674
- IQCM-SEC-00586675
- IQCM-SEC-00586676
- IQCM-SEC-00586677
- IQCM-SEC-00586678
- IQCM-SEC-00586679
- IQCM-SEC-00586680
- IQCM-SEC-00586681
- IQCM-SEC-00586682
- IQCM-SEC-00586683
- IQCM-SEC-00586684
- IQCM-SEC-00586685
- IQCM-SEC-00586686
- IQCM-SEC-00586687
- IQCM-SEC-00586688
- IQCM-SEC-00586689
- IQCM-SEC-00586690
- IQCM-SEC-00586691
- IQCM-SEC-00586692
- IQCM-SEC-00586693
- IQCM-SEC-00586694
- IQCM-SEC-00586695
- IQCM-SEC-00586696
- IQCM-SEC-00586697
- IQCM-SEC-00586698
- IQCM-SEC-00586699
- IQCM-SEC-00586707
- IQCM-SEC-00586715
- IQCM-SEC-00586723
- IQCM-SEC-00586731
- IQCM-SEC-00586739
- IQCM-SEC-00586747
- IQCM-SEC-00586753
- IQCM-SEC-00586759

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586765
- IQCM-SEC-00586771
- IQCM-SEC-00586777
- IQCM-SEC-00586783
- IQCM-SEC-00586789
- IQCM-SEC-00586795
- IQCM-SEC-00586801
- IQCM-SEC-00586807
- IQCM-SEC-00586813
- IQCM-SEC-00586819
- IQCM-SEC-00586825
- IQCM-SEC-00586832
- IQCM-SEC-00586837
- IQCM-SEC-00586842
- IQCM-SEC-00586847
- IQCM-SEC-00586853
- IQCM-SEC-00586859
- IQCM-SEC-00586865
- IQCM-SEC-00586871
- IQCM-SEC-00586877
- IQCM-SEC-00586883
- IQCM-SEC-00586889
- IQCM-SEC-00586895
- IQCM-SEC-00586901
- IQCM-SEC-00586907
- IQCM-SEC-00586913
- IQCM-SEC-00586919
- IQCM-SEC-00586925
- IQCM-SEC-00586931
- IQCM-SEC-00586937
- IQCM-SEC-00586944
- IQCM-SEC-00586945
- IQCM-SEC-00586946
- IQCM-SEC-00586947
- IQCM-SEC-00586948
- IQCM-SEC-00586949
- IQCM-SEC-00586950
- IQCM-SEC-00586951
- IQCM-SEC-00586952
- IQCM-SEC-00586953
- IQCM-SEC-00586954
- IQCM-SEC-00586955
- IQCM-SEC-00586956
- IQCM-SEC-00586957

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00586958
- IQCM-SEC-00586959
- IQCM-SEC-00586960
- IQCM-SEC-00586961
- IQCM-SEC-00586962
- IQCM-SEC-00586963
- IQCM-SEC-00586964
- IQCM-SEC-00586965
- IQCM-SEC-00586966
- IQCM-SEC-00586967
- IQCM-SEC-00586968
- IQCM-SEC-00586969
- IQCM-SEC-00586970
- IQCM-SEC-00586971
- IQCM-SEC-00586972
- IQCM-SEC-00586973
- IQCM-SEC-00586974
- IQCM-SEC-00586975
- IQCM-SEC-00586976
- IQCM-SEC-00586977
- IQCM-SEC-00586978
- IQCM-SEC-00586979
- IQCM-SEC-00586980
- IQCM-SEC-00586981
- IQCM-SEC-00586982
- IQCM-SEC-00586983
- IQCM-SEC-00586984
- IQCM-SEC-00586985
- IQCM-SEC-00586986
- IQCM-SEC-00586987
- IQCM-SEC-00586988
- IQCM-SEC-00586989
- IQCM-SEC-00586990
- IQCM-SEC-00586991
- IQCM-SEC-00586992
- IQCM-SEC-00586993
- IQCM-SEC-00586994
- IQCM-SEC-00586995
- IQCM-SEC-00586996
- IQCM-SEC-00586997
- IQCM-SEC-00586998
- IQCM-SEC-00586999
- IQCM-SEC-00587000
- IQCM-SEC-00587001

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587002
- IQCM-SEC-00587003
- IQCM-SEC-00587004
- IQCM-SEC-00587005
- IQCM-SEC-00587006
- IQCM-SEC-00587007
- IQCM-SEC-00587008
- IQCM-SEC-00587009
- IQCM-SEC-00587010
- IQCM-SEC-00587011
- IQCM-SEC-00587012
- IQCM-SEC-00587013
- IQCM-SEC-00587014
- IQCM-SEC-00587015
- IQCM-SEC-00587016
- IQCM-SEC-00587017
- IQCM-SEC-00587018
- IQCM-SEC-00587019
- IQCM-SEC-00587020
- IQCM-SEC-00587021
- IQCM-SEC-00587022
- IQCM-SEC-00587023
- IQCM-SEC-00587024
- IQCM-SEC-00587025
- IQCM-SEC-00587026
- IQCM-SEC-00587027
- IQCM-SEC-00587028
- IQCM-SEC-00587029
- IQCM-SEC-00587030
- IQCM-SEC-00587031
- IQCM-SEC-00587032
- IQCM-SEC-00587033
- IQCM-SEC-00587034
- IQCM-SEC-00587035
- IQCM-SEC-00587036
- IQCM-SEC-00587037
- IQCM-SEC-00587038
- IQCM-SEC-00587039
- IQCM-SEC-00587040
- IQCM-SEC-00587041
- IQCM-SEC-00587042
- IQCM-SEC-00587043
- IQCM-SEC-00587044
- IQCM-SEC-00587045

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587046
- IQCM-SEC-00587047
- IQCM-SEC-00587048
- IQCM-SEC-00587049
- IQCM-SEC-00587050
- IQCM-SEC-00587051
- IQCM-SEC-00587052
- IQCM-SEC-00587053
- IQCM-SEC-00587054
- IQCM-SEC-00587055
- IQCM-SEC-00587056
- IQCM-SEC-00587057
- IQCM-SEC-00587058
- IQCM-SEC-00587059
- IQCM-SEC-00587060
- IQCM-SEC-00587061
- IQCM-SEC-00587062
- IQCM-SEC-00587063
- IQCM-SEC-00587064
- IQCM-SEC-00587065
- IQCM-SEC-00587066
- IQCM-SEC-00587067
- IQCM-SEC-00587068
- IQCM-SEC-00587069
- IQCM-SEC-00587070
- IQCM-SEC-00587071
- IQCM-SEC-00587072
- IQCM-SEC-00587073
- IQCM-SEC-00587074
- IQCM-SEC-00587075
- IQCM-SEC-00587076
- IQCM-SEC-00587077
- IQCM-SEC-00587078
- IQCM-SEC-00587079
- IQCM-SEC-00587080
- IQCM-SEC-00587081
- IQCM-SEC-00587082
- IQCM-SEC-00587083
- IQCM-SEC-00587084
- IQCM-SEC-00587085
- IQCM-SEC-00587086
- IQCM-SEC-00587087
- IQCM-SEC-00587088
- IQCM-SEC-00587089

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587090
- IQCM-SEC-00587091
- IQCM-SEC-00587092
- IQCM-SEC-00587093
- IQCM-SEC-00587094
- IQCM-SEC-00587095
- IQCM-SEC-00587096
- IQCM-SEC-00587097
- IQCM-SEC-00587098
- IQCM-SEC-00587099
- IQCM-SEC-00587100
- IQCM-SEC-00587101
- IQCM-SEC-00587102
- IQCM-SEC-00587103
- IQCM-SEC-00587104
- IQCM-SEC-00587105
- IQCM-SEC-00587106
- IQCM-SEC-00587107
- IQCM-SEC-00587108
- IQCM-SEC-00587109
- IQCM-SEC-00587110
- IQCM-SEC-00587111
- IQCM-SEC-00587112
- IQCM-SEC-00587117
- IQCM-SEC-00587122
- IQCM-SEC-00587127
- IQCM-SEC-00587132
- IQCM-SEC-00587137
- IQCM-SEC-00587142
- IQCM-SEC-00587147
- IQCM-SEC-00587153
- IQCM-SEC-00587158
- IQCM-SEC-00587163
- IQCM-SEC-00587167
- IQCM-SEC-00587172
- IQCM-SEC-00587178
- IQCM-SEC-00587184
- IQCM-SEC-00587190
- IQCM-SEC-00587196
- IQCM-SEC-00587203
- IQCM-SEC-00587210
- IQCM-SEC-00587216
- IQCM-SEC-00587217
- IQCM-SEC-00587218

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587225
- IQCM-SEC-00587231
- IQCM-SEC-00587232
- IQCM-SEC-00587233
- IQCM-SEC-00587241
- IQCM-SEC-00587246
- IQCM-SEC-00587247
- IQCM-SEC-00587248
- IQCM-SEC-00587257
- IQCM-SEC-00587265
- IQCM-SEC-00587266
- IQCM-SEC-00587267
- IQCM-SEC-00587276
- IQCM-SEC-00587284
- IQCM-SEC-00587285
- IQCM-SEC-00587286
- IQCM-SEC-00587296
- IQCM-SEC-00587303
- IQCM-SEC-00587304
- IQCM-SEC-00587305
- IQCM-SEC-00587319
- IQCM-SEC-00587329
- IQCM-SEC-00587330
- IQCM-SEC-00587331
- IQCM-SEC-00587343
- IQCM-SEC-00587351
- IQCM-SEC-00587352
- IQCM-SEC-00587353
- IQCM-SEC-00587362
- IQCM-SEC-00587367
- IQCM-SEC-00587368
- IQCM-SEC-00587369
- IQCM-SEC-00587379
- IQCM-SEC-00587385
- IQCM-SEC-00587386
- IQCM-SEC-00587387
- IQCM-SEC-00587397
- IQCM-SEC-00587403
- IQCM-SEC-00587404
- IQCM-SEC-00587405
- IQCM-SEC-00587415
- IQCM-SEC-00587421
- IQCM-SEC-00587422
- IQCM-SEC-00587423

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587433
- IQCM-SEC-00587439
- IQCM-SEC-00587440
- IQCM-SEC-00587441
- IQCM-SEC-00587454
- IQCM-SEC-00587459
- IQCM-SEC-00587460
- IQCM-SEC-00587461
- IQCM-SEC-00587473
- IQCM-SEC-00587478
- IQCM-SEC-00587479
- IQCM-SEC-00587480
- IQCM-SEC-00587495
- IQCM-SEC-00587502
- IQCM-SEC-00587503
- IQCM-SEC-00587504
- IQCM-SEC-00587518
- IQCM-SEC-00587523
- IQCM-SEC-00587524
- IQCM-SEC-00587525
- IQCM-SEC-00587539
- IQCM-SEC-00587545
- IQCM-SEC-00587546
- IQCM-SEC-00587547
- IQCM-SEC-00587561
- IQCM-SEC-00587567
- IQCM-SEC-00587568
- IQCM-SEC-00587569
- IQCM-SEC-00587582
- IQCM-SEC-00587588
- IQCM-SEC-00587589
- IQCM-SEC-00587590
- IQCM-SEC-00587591
- IQCM-SEC-00587592
- IQCM-SEC-00587593
- IQCM-SEC-00587594
- IQCM-SEC-00587595
- IQCM-SEC-00587596
- IQCM-SEC-00587597
- IQCM-SEC-00587598
- IQCM-SEC-00587599
- IQCM-SEC-00587600
- IQCM-SEC-00587601
- IQCM-SEC-00587602

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587603
- IQCM-SEC-00587604
- IQCM-SEC-00587605
- IQCM-SEC-00587606
- IQCM-SEC-00587607
- IQCM-SEC-00587608
- IQCM-SEC-00587609
- IQCM-SEC-00587610
- IQCM-SEC-00587611
- IQCM-SEC-00587612
- IQCM-SEC-00587613
- IQCM-SEC-00587614
- IQCM-SEC-00587615
- IQCM-SEC-00587616
- IQCM-SEC-00587617
- IQCM-SEC-00587618
- IQCM-SEC-00587619
- IQCM-SEC-00587620
- IQCM-SEC-00587621
- IQCM-SEC-00587622
- IQCM-SEC-00587623
- IQCM-SEC-00587624
- IQCM-SEC-00587625
- IQCM-SEC-00587626
- IQCM-SEC-00587627
- IQCM-SEC-00587628
- IQCM-SEC-00587629
- IQCM-SEC-00587630
- IQCM-SEC-00587631
- IQCM-SEC-00587632
- IQCM-SEC-00587633
- IQCM-SEC-00587634
- IQCM-SEC-00587635
- IQCM-SEC-00587636
- IQCM-SEC-00587637
- IQCM-SEC-00587638
- IQCM-SEC-00587639
- IQCM-SEC-00587640
- IQCM-SEC-00587641
- IQCM-SEC-00587642
- IQCM-SEC-00587643
- IQCM-SEC-00587644
- IQCM-SEC-00587645
- IQCM-SEC-00587646

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587647
- IQCM-SEC-00587648
- IQCM-SEC-00587649
- IQCM-SEC-00587650
- IQCM-SEC-00587651
- IQCM-SEC-00587661
- IQCM-SEC-00587669
- IQCM-SEC-00587683
- IQCM-SEC-00587684
- IQCM-SEC-00587685
- IQCM-SEC-00587686
- IQCM-SEC-00587693
- IQCM-SEC-00587698
- IQCM-SEC-00587708
- IQCM-SEC-00587709
- IQCM-SEC-00587710
- IQCM-SEC-00587711
- IQCM-SEC-00587718
- IQCM-SEC-00587719
- IQCM-SEC-00587725
- IQCM-SEC-00587726
- IQCM-SEC-00587738
- IQCM-SEC-00587747
- IQCM-SEC-00587748
- IQCM-SEC-00587749
- IQCM-SEC-00587757
- IQCM-SEC-00587765
- IQCM-SEC-00587766
- IQCM-SEC-00587767
- IQCM-SEC-00587776
- IQCM-SEC-00587777
- IQCM-SEC-00587785
- IQCM-SEC-00587786
- IQCM-SEC-00587796
- IQCM-SEC-00587797
- IQCM-SEC-00587803
- IQCM-SEC-00587804
- IQCM-SEC-00587818
- IQCM-SEC-00587831
- IQCM-SEC-00587832
- IQCM-SEC-00587833
- IQCM-SEC-00587839
- IQCM-SEC-00587844
- IQCM-SEC-00587845

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00587846
- IQCM-SEC-00587855
- IQCM-SEC-00587856
- IQCM-SEC-00587861
- IQCM-SEC-00587862
- IQCM-SEC-00587872
- IQCM-SEC-00587873
- IQCM-SEC-00587879
- IQCM-SEC-00587880
- IQCM-SEC-00587894
- IQCM-SEC-00587895
- IQCM-SEC-00587900
- IQCM-SEC-00587901
- IQCM-SEC-00587911
- IQCM-SEC-00587912
- IQCM-SEC-00587918
- IQCM-SEC-00587919
- IQCM-SEC-00587934
- IQCM-SEC-00587935
- IQCM-SEC-00587942
- IQCM-SEC-00587943
- IQCM-SEC-00587953
- IQCM-SEC-00587954
- IQCM-SEC-00587960
- IQCM-SEC-00587961
- IQCM-SEC-00587973
- IQCM-SEC-00587974
- IQCM-SEC-00587979
- IQCM-SEC-00587980
- IQCM-SEC-00587994
- IQCM-SEC-00587995
- IQCM-SEC-00588001
- IQCM-SEC-00588002
- IQCM-SEC-00588015
- IQCM-SEC-00588016
- IQCM-SEC-00588022
- IQCM-SEC-00601278
- IQCM-SEC-00601292
- IQCM-SEC-00601310
- IQCM-SEC-00601321
- IQCM-SEC-00601331
- IQCM-SEC-00601342
- IQCM-SEC-00601353
- IQCM-SEC-00601414

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00601434
- IQCM-SEC-00601446
- IQCM-SEC-00601484
- IQCM-SEC-00601485
- IQCM-SEC-00601486
- IQCM-SEC-00601487
- IQCM-SEC-00601488
- IQCM-SEC-00601489
- IQCM-SEC-00601490
- IQCM-SEC-00601491
- IQCM-SEC-00601492
- IQCM-SEC-00601493
- IQCM-SEC-00601494
- IQCM-SEC-00601495
- IQCM-SEC-00601496
- IQCM-SEC-00601497
- IQCM-SEC-00601498
- IQCM-SEC-00601499
- IQCM-SEC-00601500
- IQCM-SEC-00601501
- IQCM-SEC-00601502
- IQCM-SEC-00601503
- IQCM-SEC-00601504
- IQCM-SEC-00601505
- IQCM-SEC-00601506
- IQCM-SEC-00601507
- IQCM-SEC-00601508
- IQCM-SEC-00601509
- IQCM-SEC-00601510
- IQCM-SEC-00601511
- IQCM-SEC-00601512
- IQCM-SEC-00601513
- IQCM-SEC-00601514
- IQCM-SEC-00601515
- IQCM-SEC-00601516
- IQCM-SEC-00601517
- IQCM-SEC-00601518
- IQCM-SEC-00601519
- IQCM-SEC-00601520
- IQCM-SEC-00601521
- IQCM-SEC-00601522
- IQCM-SEC-00601523
- IQCM-SEC-00601524
- IQCM-SEC-00601525

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00601526
- IQCM-SEC-00601527
- IQCM-SEC-00601528
- IQCM-SEC-00601529
- IQCM-SEC-00601530
- IQCM-SEC-00601531
- IQCM-SEC-00601533
- IQCM-SEC-00601534
- IQCM-SEC-00601535
- IQCM-SEC-00601536
- IQCM-SEC-00601537
- IQCM-SEC-00601538
- IQCM-SEC-00601539
- IQCM-SEC-00601540
- IQCM-SEC-00601541
- IQCM-SEC-00601542
- IQCM-SEC-00601543
- IQCM-SEC-00601544
- IQCM-SEC-00601545
- IQCM-SEC-00601546
- IQCM-SEC-00601547
- IQCM-SEC-00601548
- IQCM-SEC-00601549
- IQCM-SEC-00601550
- IQCM-SEC-00601551
- IQCM-SEC-00601552
- IQCM-SEC-00601553
- IQCM-SEC-00601554
- IQCM-SEC-00601555
- IQCM-SEC-00601556
- IQCM-SEC-00601557
- IQCM-SEC-00601558
- IQCM-SEC-00601559
- IQCM-SEC-00601560
- IQCM-SEC-00601561
- IQCM-SEC-00601562
- IQCM-SEC-00601563
- IQCM-SEC-00601568
- IQCM-SEC-00601569
- IQCM-SEC-00601571
- IQCM-SEC-00601572
- IQCM-SEC-00601574
- IQCM-SEC-00601575
- IQCM-SEC-00601577

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- IQCM-SEC-00601578
- IQCM-SEC-00601591
- IQCM-SEC-00601592
- IQCM-SEC-00601601
- IQCM-SEC-00601603
- IQCM-SEC-00601604
- IQCM-SEC-00601609
- IQCM-SEC-00601618
- IQCM-SEC-00601623
- IQCM-SEC-00601635
- IQCM-SEC-00601638
- IQCM-SEC-00601639
- IQCM-SEC-00601641
- IQCM-SEC-00601647
- IQCM-SEC-00601651
- IQCM-SEC-00601653
- IQCM-SEC-00601658
- IQCM-SEC-00601685
- SEC-SDNY-EPROD-000000202
- SEC-SDNY-EPROD-000000238
- SEC-SDNY-EPROD-000000250
- SEC-SDNY-EPROD-000000262
- SEC-SDNY-EPROD-000000273
- SEC-SDNY-EPROD-000000284
- SEC-SDNY-EPROD-000000295
- SEC-SDNY-EPROD-000000306
- SEC-SDNY-EPROD-000000317
- SEC-SDNY-EPROD-000000328
- SEC-SDNY-EPROD-000000339
- SEC-SDNY-EPROD-000000351
- SEC-SDNY-EPROD-000000375
- SEC-SDNY-EPROD-000000387
- SEC-SDNY-EPROD-000000399
- SEC-SDNY-EPROD-000000411
- SEC-SDNY-EPROD-000000423
- SEC-SDNY-EPROD-000000436
- SEC-SDNY-EPROD-002877984
- SEC-SDNY-EPROD-003246606
- SEC-SDNY-EPROD-003246739
- SEC-SDNY-EPROD-003343799
- SEC-SDNY-EPROD-003383668
- SEC-SDNY-EPROD-003383671
- SEC-SDNY-EPROD-003383695
- SEC-SDNY-EPROD-003383732

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- SEC-SDNY-EPROD-003383866
- SEC-SDNY-EPROD-003383913
- SEC-SDNY-EPROD-003383941
- SEC-SDNY-EPROD-003383955
- SEC-SDNY-EPROD-003384111
- SEC-SDNY-EPROD-003384200
- SEC-SDNY-EPROD-003384232
- SEC-SDNY-EPROD-003384286
- SEC-SDNY-EPROD-003384349
- SEC-SDNY-EPROD-003384392
- SEC-SDNY-EPROD-003384465
- SEC-SDNY-EPROD-003384498
- SEC-SDNY-EPROD-003384629
- SEC-SDNY-EPROD-003384653
- SEC-SDNY-EPROD-003384673
- SEC-SDNY-EPROD-003384726
- SEC-SDNY-EPROD-003384879
- SEC-SDNY-EPROD-003384920
- SEC-SDNY-EPROD-003385105
- SEC-SDNY-EPROD-003385120
- SEC-SDNY-EPROD-003385242
- SEC-SDNY-EPROD-003385342
- SEC-SDNY-EPROD-003385442
- SEC-SDNY-EPROD-003385480
- SEC-SDNY-EPROD-003385609
- SEC-SDNY-EPROD-003385632
- SEC-SDNY-EPROD-003385756
- SEC-SDNY-EPROD-003385771
- SEC-SDNY-EPROD-003385803
- SEC-SDNY-EPROD-003385830
- SEC-SDNY-EPROD-003385835
- SEC-SDNY-EPROD-003385835
- SEC-SDNY-EPROD-003385835
- SEC-SDNY-EPROD-003385844
- SEC-SDNY-EPROD-003385898
- SEC-SDNY-EPROD-003385898
- SEC-SDNY-EPROD-003385898
- SEC-SDNY-EPROD-003385982
- SEC-SDNY-EPROD-003386002
- SEC-SDNY-EPROD-003386015
- SEC-SDNY-EPROD-003386025
- SEC-SDNY-EPROD-003386039
- SEC-SDNY-EPROD-003386099
- SEC-SDNY-EPROD-003386136

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- SEC-SDNY-EPROD-003386154
- SEC-SDNY-EPROD-003386282
- SEC-SDNY-EPROD-003386337
- SEC-SDNY-EPROD-003386364
- SEC-SDNY-EPROD-003386644
- SEC-SDNY-EPROD-003386672
- SEC-SDNY-EPROD-003386768
- SEC-SDNY-EPROD-003386796
- SEC-SDNY-EPROD-003386813
- SEC-SDNY-EPROD-003386956
- SEC-SDNY-EPROD-003387015
- SEC-SDNY-EPROD-003387033
- SEC-SDNY-EPROD-003387041
- SEC-SDNY-EPROD-003387097
- SEC-SDNY-EPROD-003387129
- SEC-SDNY-EPROD-003387133
- SEC-SDNY-EPROD-003387233
- SEC-SDNY-EPROD-003387233
- SEC-SDNY-EPROD-003387233
- SEC-SDNY-EPROD-003387245
- SEC-SDNY-EPROD-003387376
- SEC-SDNY-EPROD-003387465
- SEC-SDNY-EPROD-003387471
- SEC-SDNY-EPROD-003387517
- SEC-SDNY-EPROD-003387574
- SEC-SDNY-EPROD-003387587
- SEC-SDNY-EPROD-003387630
- SEC-SDNY-EPROD-003387689
- SEC-SDNY-EPROD-003387734
- SEC-SDNY-EPROD-003387748
- SEC-SDNY-EPROD-003387975
- SEC-SDNY-EPROD-003387991
- SEC-SDNY-EPROD-003388012
- SEC-SDNY-EPROD-003388022
- SEC-SDNY-EPROD-003388057
- SEC-SDNY-EPROD-003388159
- SEC-SDNY-EPROD-003388179
- SEC-SDNY-EPROD-003388206
- SEC-SDNY-EPROD-003388240
- SEC-SDNY-EPROD-003388277
- SEC-SDNY-EPROD-003388298
- SEC-SDNY-EPROD-003388358
- SEC-SDNY-EPROD-003388400
- SEC-SDNY-EPROD-003388483

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- SEC-SDNY-EPROD-003388495
- SEC-SDNY-EPROD-003388520
- SEC-SDNY-EPROD-003388630
- SEC-SDNY-EPROD-003388648
- SEC-SDNY-EPROD-003388682
- SEC-SDNY-EPROD-003388686
- SEC-SDNY-EPROD-003388695
- SEC-SDNY-EPROD-003388711
- SEC-SDNY-EPROD-003388748
- SEC-SDNY-EPROD-003388886
- SEC-SDNY-EPROD-003388941
- SEC-SDNY-EPROD-003388944
- SEC-SDNY-EPROD-003388957
- SEC-SDNY-EPROD-003388983
- SEC-SDNY-EPROD-003389030
- SEC-SDNY-EPROD-003389037
- SEC-SDNY-EPROD-003389057
- SEC-SDNY-EPROD-003389080
- SEC-SDNY-EPROD-003389173
- SEC-SDNY-EPROD-003389273
- SEC-SDNY-EPROD-003389443
- SEC-SDNY-EPROD-003389470
- SEC-SDNY-EPROD-003389484
- SEC-SDNY-EPROD-003389515
- SEC-SDNY-EPROD-003389526
- SEC-SDNY-EPROD-003389562
- SEC-SDNY-EPROD-003389606
- SEC-SDNY-EPROD-003389663
- SEC-SDNY-EPROD-003389823
- SEC-SDNY-EPROD-003389860
- SEC-SDNY-EPROD-003389873
- SEC-SDNY-EPROD-003389962
- SEC-SDNY-EPROD-003389983
- SEC-SDNY-EPROD-003390017
- SEC-SDNY-EPROD-003390017
- SEC-SDNY-EPROD-003390017
- SEC-SDNY-EPROD-003390025
- SEC-SDNY-EPROD-003390101
- SEC-SDNY-EPROD-003390302
- SEC-SDNY-EPROD-003390315
- SEC-SDNY-EPROD-003390379
- SEC-SDNY-EPROD-003390544
- SEC-SDNY-EPROD-003390569
- SEC-SDNY-EPROD-003390607

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- SEC-SDNY-EPROD-003390615
- SEC-SDNY-EPROD-003390911
- SEC-SDNY-EPROD-003391175
- SEC-SDNY-EPROD-003391213
- SEC-SDNY-EPROD-003391221
- SEC-SDNY-EPROD-003391221
- SEC-SDNY-EPROD-003391221
- SEC-SDNY-EPROD-003391262
- SEC-SDNY-EPROD-003391279
- SEC-SDNY-EPROD-003391322
- SEC-SDNY-EPROD-003391433
- SEC-SDNY-EPROD-003391452
- SEC-SDNY-EPROD-003391485
- SEC-SDNY-EPROD-003391523
- SEC-SDNY-EPROD-003391544
- SEC-SDNY-EPROD-003391566
- SEC-SDNY-EPROD-003391612
- SEC-SDNY-EPROD-003391793
- SEC-SDNY-EPROD-003391825
- SEC-SDNY-EPROD-003391855
- SEC-SDNY-EPROD-003391920
- SEC-SDNY-EPROD-003391950
- SEC-SDNY-EPROD-003391984
- SEC-SDNY-EPROD-003392157
- SEC-SDNY-EPROD-003392208
- SEC-SDNY-EPROD-003392216
- SEC-SDNY-EPROD-003392222
- SEC-SDNY-EPROD-003392239
- SEC-SDNY-EPROD-003392353
- SEC-SDNY-EPROD-003392375
- SEC-SDNY-EPROD-003392385
- SEC-SDNY-EPROD-003392396
- SEC-SDNY-EPROD-003392443
- SEC-SDNY-EPROD-003392443
- SEC-SDNY-EPROD-003392443
- SEC-SDNY-EPROD-003392487
- SEC-SDNY-EPROD-003392496
- SEC-SDNY-EPROD-003392543
- SEC-SDNY-EPROD-003392590
- SEC-SDNY-EPROD-003392596
- SEC-SDNY-EPROD-003392739
- SEC-SDNY-EPROD-003392741
- SEC-SDNY-EPROD-003392757
- SEC-SDNY-EPROD-003392765

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- SEC-SDNY-EPROD-003392784
- SEC-SDNY-EPROD-003392819
- SEC-SDNY-EPROD-003392852
- SEC-SDNY-EPROD-003392856
- SEC-SDNY-EPROD-003392874
- SEC-SDNY-EPROD-003392926
- SEC-SDNY-EPROD-003392958
- SEC-SDNY-EPROD-003392964
- SEC-SDNY-EPROD-003392972
- SEC-SDNY-EPROD-003393032
- SEC-SDNY-EPROD-003393049
- SEC-SDNY-EPROD-003393053
- SEC-SDNY-EPROD-003393134
- SEC-SDNY-EPROD-003393142
- SEC-SDNY-EPROD-003393163
- SEC-SDNY-EPROD-003393185
- SEC-SDNY-EPROD-003393221
- SEC-SDNY-EPROD-003393309
- SEC-SDNY-EPROD-003393503
- SEC-SDNY-EPROD-003393509
- SEC-SDNY-EPROD-003393565
- SEC-SDNY-EPROD-003393579
- SEC-SDNY-EPROD-003393608
- SEC-SDNY-EPROD-003393623
- SEC-SDNY-EPROD-003393633
- SEC-SDNY-EPROD-003393648
- SEC-SDNY-EPROD-003393720
- SEC-SDNY-EPROD-003393743
- SEC-SDNY-EPROD-003393788
- SEC-SDNY-EPROD-003423277
- SEC-SDNY-EPROD-003425660
- SEC-SDNY-EPROD-003426868
- SEC-SDNY-EPROD-003430597
- SEC-SDNY-EPROD-003434919
- SEC-SDNY-EPROD-003506067
- SEC-SDNY-EPROD-003506519
- SEC-SDNY-EPROD-003506667
- SEC-SDNY-EPROD-003507387
- SEC-SDNY-EPROD-003551197
- SEC-SDNY-EPROD-003552658
- SEC-SDNY-EPROD-003725092
- SEC-SDNY-EPROD-004024108
- SEC-SDNY-EPROD-004024111
- SEC-SDNY-EPROD-004024112

**Exhibit 2**
**Materials Relied Upon**

- SEC-SDNY-EPROD-004024115
- SEC-SDNY-EPROD-004024117
- SEC-SDNY-EPROD-004024119
- SEC-SDNY-EPROD-004024120
- SEC-SDNY-EPROD-004024124
- SEC-SDNY-EPROD-004024125
- SEC-SDNY-EPROD-004024128
- SEC-SDNY-EPROD-004024129
- SEC-SDNY-EPROD-004024131
- SEC-SDNY-EPROD-004024132
- SEC-SDNY-EPROD-004024136
- SEC-SDNY-EPROD-004024137
- SEC-SDNY-EPROD-004024139
- SEC-SDNY-EPROD-004024140
- SEC-SDNY-EPROD-004024144
- SEC-SDNY-EPROD-004024145
- SEC-SDNY-EPROD-004024148
- SEC-SDNY-EPROD-004024149
- SEC-SDNY-EPROD-004024151
- SEC-SDNY-EPROD-004024152
- TAP_SDNY_000044
- TAP_SDNY_000154
- TAP_SDNY_000209
- TAP_SDNY_000282
- TAP_SDNY_000316
- TAP_SDNY_000387
- TAP_SDNY_000402
- TAP_SDNY_000500
- TAP_SDNY_000517
- TAP_SDNY_000521
- TAP_SDNY_000550
- TAP_SDNY_000580
- TAP_SDNY_000592
- TAP_SDNY_000637
- TAP_SDNY_000657
- TAP_SDNY_000665
- TAP_SDNY_000740
- TAP_SDNY_000791
- TAP_SDNY_000888
- TAP_SDNY_000902
- TAP_SDNY_001055
- TAP_SDNY_001058
- TAP_SDNY_001084
- TAP_SDNY_001120

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- TAP_SDNY_001123
- TAP_SDNY_001124
- TAP_SDNY_001125
- TAP_SDNY_001127
- TAP_SDNY_001128
- TAP_SDNY_001130
- TAP_SDNY_001131
- TAP_SDNY_001132
- TAP_SDNY_001134
- TAP_SDNY_001135
- TAP_SDNY_001136
- TAP_SDNY_001139
- TAP_SDNY_001141
- TAP_SDNY_001142
- TAP_SDNY_001143
- TAP_SDNY_001145
- TAP_SDNY_001146
- TAP_SDNY_001148
- TAP_SDNY_001149
- TAP_SDNY_001150
- TAP_SDNY_001153
- TAP_SDNY_001154
- TAP_SDNY_001156
- TAP_SDNY_001157
- TAP_SDNY_001158
- TAP_SDNY_001159
- TAP_SDNY_001160
- TAP_SDNY_001161
- TAP_SDNY_001163
- TAP_SDNY_001165
- TAP_SDNY_001166
- TAP_SDNY_001168
- TAP_SDNY_001170
- TAP_SDNY_001173
- TAP_SDNY_001175
- TAP_SDNY_001176
- TAP_SDNY_001177
- TAP_SDNY_001178
- TAP_SDNY_001180
- TAP_SDNY_001182
- TAP_SDNY_001183
- TAP_SDNY_001185
- TAP_SDNY_001186
- TAP_SDNY_001188

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- TAP_SDNY_001190
- TAP_SDNY_001191
- TAP_SDNY_001192
- TAP_SDNY_001199
- TAP_SDNY_001201
- TAP_SDNY_001202
- TAP_SDNY_001204
- TAP_SDNY_001209
- TAP_SDNY_001211
- TAP_SDNY_001212
- TAP_SDNY_001215
- TAP_SDNY_001218
- TAP_SDNY_001222
- TAP_SDNY_001224
- TAP_SDNY_001228
- TAP_SDNY_001229
- TAP_SDNY_001231
- TAP_SDNY_001235
- TAP_SDNY_001237
- TAP_SDNY_001240
- TAP_SDNY_001241
- TAP_SDNY_001242
- TAP_SDNY_001243
- TAP_SDNY_001244
- TAP_SDNY_001250
- TAP_SDNY_001251
- TAP_SDNY_001254
- TAP_SDNY_001256
- TAP_SDNY_001258
- TAP_SDNY_001259
- TAP_SDNY_001260
- TAP_SDNY_001263
- TAP_SDNY_001265
- TAP_SDNY_001457
- TAP_SDNY_001485
- TAP_SDNY_001485
- TAP_SDNY_001559
- TAP_SDNY_001570
- TAP_SDNY_001703
- TAP_SDNY_001716
- TAP_SDNY_001909
- TAP_SDNY_001928
- USAO_SDNY_00000001
- USAO_SDNY_00000010-00000017

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USAO_SDNY_00000022
- USAO_SDNY_00002277-00002338
- USAO_SDNY_00003523-00003618
- USAO_SDNY_00004280
- USAO_SDNY_00004287
- USAO_SDNY_00004288
- USAO_SDNY_00004289-00004294
- USAO_SDNY_00004615-00004629
- USAO_SDNY_00004630-00004674
- USAO_SDNY_00004675-00004691
- USAO_SDNY_00004696-00004748
- USAO_SDNY_00004749-00004764
- USAO_SDNY_00004886-00004926
- USAO_SDNY_00004950-00004967
- USAO_SDNY_00004968-00005029
- USAO_SDNY_00005030-00005044
- USAO_SDNY_00005187-00005235
- USAO_SDNY_00005236-00005251
- USAO_SDNY_00005252-00005288
- USAO_SDNY_00005290-00005355
- USAO_SDNY_00005554-00005583
- USAO_SDNY_00005585-00005651
- USAO_SDNY_00005670-00005692
- USAO_SDNY_00005832-00005890
- USAO_SDNY_00005891-00005920
- USAO_SDNY_00005969-00006040
- USAO_SDNY_00006117-00006152
- USAO_SDNY_00006154-00006274
- USAO_SDNY_00006291-00006317
- USAO_SDNY_00006541-00006575
- USAO_SDNY_00006705
- USAO_SDNY_00006706
- USAO_SDNY_00006707
- USAO_SDNY_00006708
- USAO_SDNY_00006709
- USAO_SDNY_00006710
- USAO_SDNY_00006711
- USAO_SDNY_00006712
- USAO_SDNY_00006713
- USAO_SDNY_00006714
- USAO_SDNY_00006715
- USAO_SDNY_00006716
- USAO_SDNY_00006717
- USAO_SDNY_00006718

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USAO_SDNY_00006719
- USAO_SDNY_00006720
- USAO_SDNY_00006721
- USAO_SDNY_00006722
- USAO_SDNY_00006723
- USAO_SDNY_00006724
- USAO_SDNY_00006725
- USAO_SDNY_00006726
- USAO_SDNY_00006727
- USAO_SDNY_00006728
- USAO_SDNY_00006729
- USAO_SDNY_00006730
- USAO_SDNY_00006731
- USAO_SDNY_00006732
- USAO_SDNY_00006733
- USAO_SDNY_00006734
- USAO_SDNY_00006735
- USAO_SDNY_00006736
- USAO_SDNY_00006737
- USAO_SDNY_00006738
- USAO_SDNY_00006739
- USAO_SDNY_00006740
- USAO_SDNY_00006741
- USAO_SDNY_00006742
- USAO_SDNY_00006743
- USAO_SDNY_00006744
- USAO_SDNY_00006745
- USAO_SDNY_00006746
- USAO_SDNY_00006747
- USAO_SDNY_00006748
- USAO_SDNY_00006749
- USAO_SDNY_00006750
- USAO_SDNY_00006751
- USAO_SDNY_00006752
- USAO_SDNY_00006753
- USAO_SDNY_00006754
- USAO_SDNY_00006755
- USAO_SDNY_00006756
- USAO_SDNY_00006757
- USAO_SDNY_00006758
- USAO_SDNY_00006759
- USAO_SDNY_00006760
- USAO_SDNY_00006761
- USAO_SDNY_00006762

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USAO_SDNY_00006763
- USAO_SDNY_00006764
- USAO_SDNY_00006765
- USAO_SDNY_00006766
- USAO_SDNY_00006767
- USAO_SDNY_00006768
- USAO_SDNY_00006769
- USAO_SDNY_00006770
- USAO_SDNY_00006771
- USAO_SDNY_00006772
- USAO_SDNY_00006773
- USAO_SDNY_00006774
- USAO_SDNY_00006775
- USAO_SDNY_00006776
- USAO_SDNY_00006826
- USAO_SDNY_00006827
- USAO_SDNY_00007003-00007003
- USAO_SDNY_00007004-00007006
- USAO_SDNY_00007007-00007009
- USBGFS_SEC_0047111
- USBGFS_SEC_0047112
- USBGFS_SEC_0047113
- USBGFS_SEC_0047114
- USBGFS_SEC_0047115
- USBGFS_SEC_0047116
- USBGFS_SEC_0047117
- USBGFS_SEC_0047118
- USBGFS_SEC_0047119
- USBGFS_SEC_0047120
- USBGFS_SEC_0047121
- USBGFS_SEC_0047122
- USBGFS_SEC_0047123
- USBGFS_SEC_0047124
- USBGFS_SEC_0047125
- USBGFS_SEC_0047126
- USBGFS_SEC_0047127
- USBGFS_SEC_0047128
- USBGFS_SEC_0047129
- USBGFS_SEC_0047130
- USBGFS_SEC_0047131
- USBGFS_SEC_0047132
- USBGFS_SEC_0047133
- USBGFS_SEC_0047134
- USBGFS_SEC_0047135

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047136
- USBGFS_SEC_0047137
- USBGFS_SEC_0047138
- USBGFS_SEC_0047139
- USBGFS_SEC_0047140
- USBGFS_SEC_0047141
- USBGFS_SEC_0047142
- USBGFS_SEC_0047143
- USBGFS_SEC_0047144
- USBGFS_SEC_0047145
- USBGFS_SEC_0047146
- USBGFS_SEC_0047147
- USBGFS_SEC_0047148
- USBGFS_SEC_0047149
- USBGFS_SEC_0047150
- USBGFS_SEC_0047151
- USBGFS_SEC_0047152
- USBGFS_SEC_0047153
- USBGFS_SEC_0047154
- USBGFS_SEC_0047155
- USBGFS_SEC_0047156
- USBGFS_SEC_0047157
- USBGFS_SEC_0047158
- USBGFS_SEC_0047159
- USBGFS_SEC_0047160
- USBGFS_SEC_0047161
- USBGFS_SEC_0047162
- USBGFS_SEC_0047163
- USBGFS_SEC_0047164
- USBGFS_SEC_0047165
- USBGFS_SEC_0047166
- USBGFS_SEC_0047167
- USBGFS_SEC_0047168
- USBGFS_SEC_0047169
- USBGFS_SEC_0047170
- USBGFS_SEC_0047171
- USBGFS_SEC_0047172
- USBGFS_SEC_0047173
- USBGFS_SEC_0047174
- USBGFS_SEC_0047175
- USBGFS_SEC_0047176
- USBGFS_SEC_0047177
- USBGFS_SEC_0047178
- USBGFS_SEC_0047179

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047180
- USBGFS_SEC_0047181
- USBGFS_SEC_0047182
- USBGFS_SEC_0047183
- USBGFS_SEC_0047184
- USBGFS_SEC_0047185
- USBGFS_SEC_0047186
- USBGFS_SEC_0047187
- USBGFS_SEC_0047188
- USBGFS_SEC_0047189
- USBGFS_SEC_0047190
- USBGFS_SEC_0047191
- USBGFS_SEC_0047192
- USBGFS_SEC_0047193
- USBGFS_SEC_0047194
- USBGFS_SEC_0047195
- USBGFS_SEC_0047196
- USBGFS_SEC_0047197
- USBGFS_SEC_0047198
- USBGFS_SEC_0047199
- USBGFS_SEC_0047200
- USBGFS_SEC_0047201
- USBGFS_SEC_0047202
- USBGFS_SEC_0047203
- USBGFS_SEC_0047204
- USBGFS_SEC_0047205
- USBGFS_SEC_0047206
- USBGFS_SEC_0047207
- USBGFS_SEC_0047208
- USBGFS_SEC_0047209
- USBGFS_SEC_0047210
- USBGFS_SEC_0047211
- USBGFS_SEC_0047212
- USBGFS_SEC_0047213
- USBGFS_SEC_0047214
- USBGFS_SEC_0047215
- USBGFS_SEC_0047216
- USBGFS_SEC_0047217
- USBGFS_SEC_0047218
- USBGFS_SEC_0047219
- USBGFS_SEC_0047220
- USBGFS_SEC_0047221
- USBGFS_SEC_0047222
- USBGFS_SEC_0047223

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047224
- USBGFS_SEC_0047225
- USBGFS_SEC_0047226
- USBGFS_SEC_0047227
- USBGFS_SEC_0047228
- USBGFS_SEC_0047229
- USBGFS_SEC_0047230
- USBGFS_SEC_0047231
- USBGFS_SEC_0047232
- USBGFS_SEC_0047233
- USBGFS_SEC_0047234
- USBGFS_SEC_0047235
- USBGFS_SEC_0047236
- USBGFS_SEC_0047237
- USBGFS_SEC_0047238
- USBGFS_SEC_0047239
- USBGFS_SEC_0047240
- USBGFS_SEC_0047241
- USBGFS_SEC_0047242
- USBGFS_SEC_0047243
- USBGFS_SEC_0047244
- USBGFS_SEC_0047245
- USBGFS_SEC_0047246
- USBGFS_SEC_0047247
- USBGFS_SEC_0047248
- USBGFS_SEC_0047249
- USBGFS_SEC_0047250
- USBGFS_SEC_0047251
- USBGFS_SEC_0047252
- USBGFS_SEC_0047253
- USBGFS_SEC_0047254
- USBGFS_SEC_0047255
- USBGFS_SEC_0047256
- USBGFS_SEC_0047257
- USBGFS_SEC_0047258
- USBGFS_SEC_0047259
- USBGFS_SEC_0047260
- USBGFS_SEC_0047261
- USBGFS_SEC_0047262
- USBGFS_SEC_0047263
- USBGFS_SEC_0047264
- USBGFS_SEC_0047265
- USBGFS_SEC_0047266
- USBGFS_SEC_0047267

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047268
- USBGFS_SEC_0047269
- USBGFS_SEC_0047270
- USBGFS_SEC_0047271
- USBGFS_SEC_0047272
- USBGFS_SEC_0047273
- USBGFS_SEC_0047274
- USBGFS_SEC_0047275
- USBGFS_SEC_0047276
- USBGFS_SEC_0047277
- USBGFS_SEC_0047278
- USBGFS_SEC_0047279
- USBGFS_SEC_0047280
- USBGFS_SEC_0047281
- USBGFS_SEC_0047282
- USBGFS_SEC_0047283
- USBGFS_SEC_0047284
- USBGFS_SEC_0047285
- USBGFS_SEC_0047286
- USBGFS_SEC_0047287
- USBGFS_SEC_0047288
- USBGFS_SEC_0047289
- USBGFS_SEC_0047290
- USBGFS_SEC_0047291
- USBGFS_SEC_0047292
- USBGFS_SEC_0047293
- USBGFS_SEC_0047294
- USBGFS_SEC_0047295
- USBGFS_SEC_0047296
- USBGFS_SEC_0047297
- USBGFS_SEC_0047298
- USBGFS_SEC_0047299
- USBGFS_SEC_0047300
- USBGFS_SEC_0047301
- USBGFS_SEC_0047302
- USBGFS_SEC_0047303
- USBGFS_SEC_0047304
- USBGFS_SEC_0047305
- USBGFS_SEC_0047306
- USBGFS_SEC_0047307
- USBGFS_SEC_0047308
- USBGFS_SEC_0047309
- USBGFS_SEC_0047310
- USBGFS_SEC_0047311

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047312
- USBGFS_SEC_0047313
- USBGFS_SEC_0047314
- USBGFS_SEC_0047315
- USBGFS_SEC_0047316
- USBGFS_SEC_0047317
- USBGFS_SEC_0047318
- USBGFS_SEC_0047319
- USBGFS_SEC_0047320
- USBGFS_SEC_0047321
- USBGFS_SEC_0047322
- USBGFS_SEC_0047323
- USBGFS_SEC_0047324
- USBGFS_SEC_0047325
- USBGFS_SEC_0047326
- USBGFS_SEC_0047327
- USBGFS_SEC_0047328
- USBGFS_SEC_0047329
- USBGFS_SEC_0047330
- USBGFS_SEC_0047331
- USBGFS_SEC_0047332
- USBGFS_SEC_0047333
- USBGFS_SEC_0047334
- USBGFS_SEC_0047335
- USBGFS_SEC_0047336
- USBGFS_SEC_0047337
- USBGFS_SEC_0047338
- USBGFS_SEC_0047339
- USBGFS_SEC_0047340
- USBGFS_SEC_0047341
- USBGFS_SEC_0047342
- USBGFS_SEC_0047343
- USBGFS_SEC_0047344
- USBGFS_SEC_0047345
- USBGFS_SEC_0047346
- USBGFS_SEC_0047347
- USBGFS_SEC_0047348
- USBGFS_SEC_0047349
- USBGFS_SEC_0047350
- USBGFS_SEC_0047351
- USBGFS_SEC_0047352
- USBGFS_SEC_0047353
- USBGFS_SEC_0047354
- USBGFS_SEC_0047355

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047356
- USBGFS_SEC_0047357
- USBGFS_SEC_0047358
- USBGFS_SEC_0047359
- USBGFS_SEC_0047360
- USBGFS_SEC_0047361
- USBGFS_SEC_0047362
- USBGFS_SEC_0047363
- USBGFS_SEC_0047364
- USBGFS_SEC_0047365
- USBGFS_SEC_0047366
- USBGFS_SEC_0047367
- USBGFS_SEC_0047368
- USBGFS_SEC_0047369
- USBGFS_SEC_0047370
- USBGFS_SEC_0047371
- USBGFS_SEC_0047372
- USBGFS_SEC_0047373
- USBGFS_SEC_0047374
- USBGFS_SEC_0047375
- USBGFS_SEC_0047376
- USBGFS_SEC_0047377
- USBGFS_SEC_0047378
- USBGFS_SEC_0047379
- USBGFS_SEC_0047380
- USBGFS_SEC_0047381
- USBGFS_SEC_0047382
- USBGFS_SEC_0047383
- USBGFS_SEC_0047384
- USBGFS_SEC_0047385
- USBGFS_SEC_0047386
- USBGFS_SEC_0047387
- USBGFS_SEC_0047388
- USBGFS_SEC_0047389
- USBGFS_SEC_0047390
- USBGFS_SEC_0047391
- USBGFS_SEC_0047392
- USBGFS_SEC_0047393
- USBGFS_SEC_0047394
- USBGFS_SEC_0047395
- USBGFS_SEC_0047396
- USBGFS_SEC_0047397
- USBGFS_SEC_0047398
- USBGFS_SEC_0047399

CONFIDENTIAL

**Exhibit 2**
**Materials Relied Upon**

- USBGFS_SEC_0047400
- USBGFS_SEC_0047401
- USBGFS_SEC_0047402
- USBGFS_SEC_0047403
- USBGFS_SEC_0047404
- USBGFS_SEC_0047405
- USBGFS_SEC_0047406
- USBGFS_SEC_0047407
- USBGFS_SEC_0047408
- USBGFS_SEC_0047409
- USBGFS_SEC_0047410
- USBGFS_SEC_0047411
- USBGFS_SEC_0047412
- USBGFS_SEC_0047413
- USBGFS_SEC_0047414
- USBGFS_SEC_0047415
- USBGFS_SEC_0047416
- USBGFS_SEC_0047417
- USBGFS_SEC_0047418
- USBGFS_SEC_0047419
- USBGFS_SEC_0047420
- USBGFS_SEC_0047421
- USBGFS_SEC_0047422
- USBGFS_SEC_0047423
- USBGFS_SEC_0047424
- USBGFS_SEC_0047425
- USBGFS_SEC_0047426
- USBGFS_SEC_0047427
- USBGFS_SEC_0047428
- USBGFS_SEC_0047429
- USBGFS_SEC_0047430
- USBGFS_SEC_0047431
- USBGFS_SEC_0047432
- USBGFS_SEC_0047433
- USBGFS_SEC_0047434
- USBGFS_SEC_0047435
- USBGFS_SEC_0047436
- USBGFS_SEC_0047437
- USBGFS_SEC_0047438
- USBGFS_SEC_0047439

**Academic and Industry Literature**
- Bossu, Sebastien, Eva Strasser, and Regis Guichard. (2005), 'Just what you need to know about variance swap', JPMorgan

CONFIDENTIAL

# Exhibit 2
# Materials Relied Upon

- Broadie, Mark, and Ashish Jain. "The effect of jumps and discrete sampling on volatility and variance swaps." International Journal of Theoretical and Applied Finance 11, no. 08 (2008)
- Carr, Peter and Roger Lee. Robust Replication of Volatility Derivatives. May 31, 2009
- Derman, E., Kani, I. and Zou, J. Z. (1996), 'The local volatility surface unlocking the information in index option prices', Financial Analysts Journal 52(4)
- Dresdner Kleinwort. A New Approach for Modeling and Pricing Correlation Swaps. May 9, 2007
- Heston, S. (1993), 'A closed form solution of options with stochastic volatility with applications to bond and currency options', The Review of Financial Studies 6(2)
- Hull, John C. Options, Futures, and Other Derivatives (8th Ed.). Prentice Hall, Boston, 2012