Michael A. Battle
William R. Martin (admitted *pro hac vice*)
Michelle N. Bradford (admitted *pro hac vice*)
David S. Slovick
Erin C. Steele (admitted *pro hac vice*)
BARNES & THORNBURG LLP
555 12th Street NW, Suite 1200
Washington, DC 20004
mbattle@btlaw.com
(202) 371-6350
billy.martin@btlaw.com
(202) 371-6363
mbradford@btlaw.com
(202) 408-6922
dslovick@btlaw.com
(646) 746-2019
esteele@btlaw.com
(202) 408-6932

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAMES VELISSARIS,**<br><br>                    **Defendant.** | No. 1:22-cr-00105-DLC<br><br>Hon. Denise L. Cote<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEA** |

Pursuant to Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure, Defendant James Velissaris submits this Reply Memorandum of Law as further support for his Motion to Withdraw his Guilty Plea in the above-captioned matter. For the reasons discussed below and in his previously-filed Memorandum of Law in Support of Defendant's Motion to Withdraw his Guilty Plea (Dkt. No. 95), Mr. Velissaris respectfully requests that the Court grant him leave to withdraw his plea.

## PRELIMINARY STATEMENT

In response to Mr. Velissaris' Motion to Withdraw, the government attempts to gloss over the most important factor for consideration by this Court: Mr. Velissaris is innocent of the crime to which he pled guilty. As it did in the Indictment, the government ignores the six distinct disclosures in the documents provided to fund investors which expressly and repeatedly disclosed that Infinity Q retained broad discretion to depart from prices provided by third-party pricing services when, in Infinity Q's judgment, those prices did not represent fair value. In addition, the government abandons its claim that Mr. Velissaris fraudulently mismarked the funds' securities to inflate their value, instead arguing that the securities were merely "mismodeled," a term that appears nowhere in the Indictment.

Under Federal Rule of Criminal Procedure 11(b)(3), the Court must satisfy itself that there is an adequate factual basis for Mr. Velissaris' guilty plea. In his Motion to Withdraw, however, Mr. Velissaris presents undisputed facts that refute the government's allegations of securities fraud. The exhibits attached to the Motion to Withdraw show that there is no factual basis for that claim, and Rule 11(b)(3)'s requirement is therefore not met in this case. For these and other reasons discussed below, Mr. Velissaris respectfully requests that the Court grant his Motion to Withdraw.

**ARGUMENT**

**I. THERE IS NOT A SUFFICIENT FACTUAL BASIS TO ACCEPT MR. VELISSARIS' GUILTY PLEA UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 11(b)(3).**

Federal Rule of Criminal Procedure 11(b)(3) requires a sentencing court to "assure itself . . . that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *United States v. Culbertson*, 670 F.3d 183, 191 (2d Cir. 2012) (quoting *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997)). In other words, the rule "requires a district court taking a guilty plea to make certain that the factual conduct admitted by the defendant is sufficient as a matter of law to establish a violation of the statute to which he entered his plea." *United States v. Rodriguez*, 501 F. App'x 86, 90 (2d Cir. 2012) (quoting *United States v. Trejo*, 610 F.3d 308, 313 (5th Cir. 2010)). Rule 11(b)(3) is meant to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge, but without realizing that his conduct does not actually fall within the charge." Fed. R. Crim. P. 11, advisory committee's note to 1966 amendment. "A lack of a factual basis for a plea is a substantial defect calling into question the validity of the plea. Such defects . . . cast serious doubt on the voluntariness of the plea." *United States v. Murphy*, 942 F.3d 73, 85 (2d Cir. 2019) (citation omitted).

While "[i]t is true that, to establish the factual basis required by Rule 11, the district court may rely on representations of 'the defendant, of the attorneys for the government and the defense, [or] of the presentence report when one is available,' and indeed may use 'whatever means is appropriate for a specific case' . . . ***it is error for the court to find that a factual basis exists when the defendant actively contests a fact constituting an element of the offense in the absence of circumstances warranting the conclusion that the defendant's protestations are 'unworthy of belief.'*** " *Culbertson*, 670 F.3d at 190 (quoting *Maher*, 108 F.3d at 1524) (emphasis added).

3

As explained in his Motion to Withdraw, Mr. Velissaris actively contests the elements of the offense of securities fraud. Specifically, Mr. Velissaris cannot be guilty of securities fraud based on alleged misrepresentations or misleading statements because his authority to depart from BVAL valuations was expressly and repeatedly disclosed to investors in the funds' disclosure documents (Mem. in Supp. at 4-10)—a fact the government does not dispute in its Opposition. Mr. Velissaris is also innocent of mismarking the values of the funds' derivative securities because the securities were valued in accordance with the funds' internal risk models, which were objectively consistent with the market conditions that prevailed during the relevant period. (*Id*. at 10-13.) These arguments are not bald assertions; they are supported by evidence. Mr. Velissaris attached multiple exhibits to the Memorandum in Support of his Motion that demonstrate his innocence, including copies of the funds' disclosure documents from the relevant period (Mem. in Supp. Exhibits A-F), a declaration by Dr. Atanu Saha who opined that Infinity Q's valuations were consistent with market conditions and Infinity Q's risk models (*id*. Exhibit H), and even an email written by the SEC's own expert stating that the valuation strategy Infinity Q was using was "believable," and "could deliver this type of return, which is not exactly outlandish." (*Id*. Exhibit G.) Mr. Velissaris' active denial of the government's allegations—which are central to the elements of the offense to which he pled guilty—is objectively credible, and it would be error for the Court to find that his plea has an adequate factual basis under Rule 11 in the face of the significant evidence to the contrary.

**II. THE GOVERNMENT CONCEDES THAT INFINITY Q REPEATEDLY DISCLOSED TO INVESTORS THAT THE FUNDS WOULD DEPART FROM BVAL VALUATIONS.**

In his Memorandum in Support of his Motion to Withdraw, Mr. Velissaris cited six distinct statements in various Infinity Q fund documents which expressly disclosed to investors that

4

Infinity Q retained broad discretion to depart from prices provided by third-party pricing services when, in Infinity Q's judgment, those prices did not represent fair value. (Mem. in Supp. at 6-9 and Exhibits A-F thereto.) In its Opposition, the government does not dispute the existence or content of these disclosures, nor does it dispute that the disclosures were repeatedly provided to investors in both the Mutual Fund and the Private Fund. Instead, the government ignores the disclosures, as it did in its Indictment. (Opp. at 7-11.) The government has therefore conceded Mr. Velissaris' factual showing on these points. *See, e.g.*, *United States v. Madrid*, 916 F. Supp. 2d 730, 736 (W.D. Tex. 2012) (federal government waived its argument in response to defendant's motion to suppress where the government failed to raise it in its opposition); *Felske v. Hirschmann*, No. 10 Civ. 8899 (RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them").

      The government also fails to acknowledge, much less refute, the case law cited in Mr. Velissaris' Memorandum in Support which establishes that the government cannot—as a matter of law—sustain a claim for securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5 if the facts the government alleges were concealed from investors were actually disclosed in investor prospectuses. (Mem. in Supp. at 5.) In fact, the government does not cite a single case in its Opposition addressing the legal standard applicable to disclosure fraud claims in the Second Circuit—or, for that matter, any case law at all, from any court, addressing any point of securities law. By failing to respond to Mr. Velissaris' statement of the applicable legal standard the government has, again, conceded that argument. *Madrid*, 916 F. Supp. 2d at 736; *Felske*, 2012 WL 716632 at *3.

      Instead of citing case law or Infinity Q fund disclosure documents, the government relies on four allegedly false statements contained in emails or comments made in in-person meetings

5

between Mr. Velissaris and Infinity Q's "administrator," "trustee" or "auditor" that, according to the government, substantiate its disclosure fraud claims. (Opp. at 8.) Two of these communications are wholly irrelevant to any part of the government's case because they occurred in 2016, **two years before** the government alleges Mr. Velissaris began his scheme. (*See, e.g.*, Indictment ¶ 1 ("From at least in or about 2018 through at least in or about February 2021, JAMES VELISSARIS, the defendant, engaged in a scheme to defraud current and potential investors . . . ."), ¶ 4 ("JAMES VELISSARIS, the defendant, began this scheme at least as early as 2018.").) Statements made in 2016 about how Infinity Q valued the funds at the time prove nothing about how Infinity Q valued the funds in or after 2018, as the quotes reproduced in the government's Opposition themselves make clear: each quote is phrased in the present or past tense, and none contains predictions or promises about what Infinity Q would be doing two years or more in the future. (Opp. at 8.)

More to the point, in relying on these communications the government either misunderstands or misstates the legal standard applicable to disclosure fraud cases brought under Exchange Act Section 10(b). In all such cases, the relevant inquiry is whether a defendant makes false or misleading statements **to investors**. *See, e.g.*, *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir. 1991) ("The central inquiry in determining whether a prospectus is materially misleading under . . . Section 10(b) . . . is therefore 'whether defendants' representations, taken together and in context, would have [misled] a reasonable *investor*' about the nature of the investment.") (brackets in original, emphasis added, quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *La Pietra v. RREEF America, LLC*, 738 F. Supp. 2d 432, 440 (S.D.N.Y. 2010) ("In determining whether an allegedly false statement or omission of fact is material [for purposes of Section 10(b)], the Court looks at whether there is a substantial likelihood that a statement or omission significantly altered

the total mix of information made available, as viewed by the reasonable *investor*.") (emphasis added, internal citations and quotations omitted).[1] This investor requirement is built into the text of the Securities Exchange Act itself: as the government's Indictment makes plain, an indispensable element of any Section 10(b) claim is the existence of "the purchase [or] sale of securities," acts that can only be performed by investors. (Indictment ¶ 43); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.[2] So while the government repeatedly represents to the Court that Mr. Velissaris "misled his investors" (Opp. at 7), it fails to cite a single statement Mr. Velissaris made *to investors* in support of that allegation. As noted above, the government instead relies entirely on statements made to Infinity Q's "administrator," "trustee" or "auditor" rather than investors. (Opp. at 8.) Statements made to these parties cannot by themselves substantiate a securities fraud claim under Exchange Act Section 10(b) or Rule 10b-5.

### III. THE GOVERNMENT HAS ABANDONED ITS MISPRICING THEORY.

In his Memorandum in Support, Mr. Valessaris demonstrated that the government's "fraudulent mismarking" claim is entirely dependent on the assumption that *any* price assigned to a security that was not taken directly from BVAL was "mismarked," and therefore if the government is wrong about its disclosure fraud claims, it cannot be right about its price mismarking claims. (Mem. in Supp. at 10-11.) As with Mr. Velissaris' arguments concerning Infinity Q's disclosures and the governing case law, the government fails to respond to this argument in its

---

[1] Like other federal circuit and district courts, the Second Circuit and district courts within it look to civil case law to adjudicate claims of criminal violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5. *See, e.g.*, *United States v. Finnerty*, 533 F.3d 143, 148-50 (2d Cir. 2008); *United States v. Chestman*, 947 F.2d 551, 565-67 (2d Cir. 1991).

[2] The government's Indictment misstates, likely on accident, the relevant language of Section 10(b) and Rule 10b-5. Both require, as a perquisite to liability, the purchase "or" sale of a security, not the purchase "and" sale of a security, as the government has it. (Indictment ¶ 43); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Opposition, and has therefore conceded it. *Madrid*, 916 F. Supp. 2d at 736; *Felske*, 2012 WL 716632 at *3. In fact, the government's Opposition abandons the mispricing claim altogether. Instead of defending its repeated allegation that the securities in Infinity Q's funds were fraudulently "mismarked" (*e.g.*, Indictment ¶¶ 1, 25), the government substitutes in the benign claim that the funds' positions were merely "mismodeled" (Opp. at 3)—a term that appears nowhere in the Indictment—and rests its fraud claim entirely on disclosures related to Mr. Velissaris' alterations to BVAL, "***whatever the resulting valuations were***." (*Id*. at 9, emphasis added; *see also id*. at 10 ("The defendant's repeated and extensive interference in the functioning of BVAL . . . is alone sufficient to establish his guilt, whatever the alterations ***and whatever the resulting valuations***"), emphasis added.) In abandoning its mispricing claim the government tacitly concedes that the claim does not support the securities fraud charge to which Mr. Velissaris pled guilty.[3]

As for its novel "mismodeling" theory, the government cannot sustain a securities fraud claim based on the erroneous "modeling" of securities values.[4] The use of economic models and

---

[3] This is as it should be, since, as Mr. Velissaris explained in his Memorandum in Support, the government's disclosure fraud claim and its mispricing claim are really one and the same. (Mem. in Supp. at 10-11 ("[T]he government has made its price manipulation allegations coterminous with its disclosure fraud theory—and the two therefore rise or fall together. If, as Mr. Velissaris has demonstrated above, Infinity Q was authorized by the funds' public disclosure documents to depart from BVAL valuations when in Infinity Q's judgment the prices did not represent fair value, then those prices could not have been 'mismarked' merely because they deviated from BVAL. In that case, the government would have to establish by some other means that the values Mr. Velissaris assigned to the funds' securities were 'mismarked,' but it has not even attempted to make such alternative allegations.").)

[4] The government does not dispute that an investment advisor's reliance on internal economic modeling is perfectly normal—and perfectly non-nefarious. Nor does the government dispute that such internal models are not required to strictly adhere to "the agreed upon terms of the deal," but can permissibly be built on an advisor's "assumptions" about future market conditions. (Indictment ¶ 16 ("Investment funds and financial institutions that trade in these kinds of OTC derivative positions need to calculate the fair value of their holdings in order to report their assets to investors and other stakeholders. Prior to the settlement of these OTC derivative positions, ***the positions are often valued using models*** that take into account both the agreed upon terms of the deal ***as well as certain assumptions based on anticipated market conditions***."), emphasis added.)

data that, in hindsight, turn out to be incorrect, which is all the government's new theory alleges, is simply not fraud. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 154 (2d Cir. 2013) (rejecting plaintiff's Section 10(b) disclosure fraud claim and holding that plaintiff "may take issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement"); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (rejecting plaintiff's Section 10(b) disclosure fraud claim because "[m]anagement's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud" and citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977) for the proposition that allegations of corporate mismanagement are not actionable under Rule 10b-5). In other words, even assuming the government could prove that Infinity Q's internal models were incorrect, without the additional showing that the values that resulted from the models were wrong, the government cannot establish that the publicly disclosed valuations for the funds' securities were wrong—much less intentionally misstated. In short, because the government has abandoned its mispricing claim, it cannot state a claim based on "mismodeling," and has failed to meaningfully defend its disclosure fraud claim, it has failed to establish that Mr. Velissaris is guilty of securities fraud under Exchange Act Section 10(b) and Rule 10b-5.[5]

---

[5] In its Opposition the government misrepresents Mr. Velissaris' arguments concerning the "reasonableness" of Infinity Q's valuation model. In his Memorandum in Support, Mr. Velissaris explained that "the **method** Mr. Velissaris employed to value the funds' illiquid securities was ***objectively reasonable***." (Mem. in Supp. at 11, emphasis added.) The government edits—and mischaracterizes—this statement to read, "the resulting ***valuations*** were not '***objectively reasonable***,' as the defendant now claims." (Opp. at 10.) The government makes the same misrepresentations when discussing the conclusions of Dr. Atanu Saha, who submitted a Declaration in support of Mr. Velissaris' Motion to Withdraw his Guilty Plea. The government cites this Court's statement that "there is no defense presented in Dr. Saha's report of the ***accuracy or validity*** of the defendant's ***valuations***." But that is not what Dr. Saha's Declaration says; he concluded only that Infinity Q's alterations to BVAL "generate[d] valuations ***consistent with objective market conditions*** and the ***outputs of its own risk models***." (Mem. in Supp. at 11-12 and Exhibit H thereto, ¶ 4h, emphasis added.) In other words, Dr. Saha confirmed that Infinity Q's "analysis or interpretation of data" was reasonable—and therefore non-fraudulent. *Kleinman*, 706 F.3d at 154.

Finally, the government cites Mr. Velissaris' alleged "lies to the SEC" and "lies to the auditors" as further support for its securities fraud claims. (Opp. at 9.) These allegations, however, are irrelevant to the Court's adjudication of Mr. Velissaris' Motion to Withdraw. Mr. Velissaris pled to Count One of the Indictment only, which is limited to Exchange Act Section 10(b) and Rule 10b-5; it says nothing at all about alleged "lies" to the SEC or auditors. (*See* Nov. 20, 2022 Letter from M. Graham to P. Fishman at 1, a copy of which is attached hereto as Exhibit A.) Stated differently, even if the government were able to prove that Mr. Velissaris lied to the SEC or Infinity Q's auditors, such conduct by itself would not suffice to satisfy the elements of the violation to which Mr. Velissaris pled guilty. It therefore has no bearing on Mr. Velissaris' actual innocence of the charge contained in Count One of the Indictment.

### IV. THE MOTION TO WITHDRAW MR. VELISSARIS' GUILTY PLEA IS TIMELY AND ANY DELAY SHOULD NOT COUNT AGAINST HIM.

In its Opposition, the government completely ignores Mr. Velissaris' showing that he was required to spend a substantial amount of time finding, engaging, and educating his new counsel in order to file his Motion to Withdraw. These facts are further supported by Mr. Velissaris' Declaration, which is submitted with this memorandum as Exhibit B, and the psychological evaluation of Mr. Velissaris previously submitted to the Court by Dr. Robyn Landow. Mr. Velissaris' Declaration also demonstrates that before, during, and after his guilty plea, he believed that he was innocent of securities fraud, and pled guilty only because in his mind he truly believed there was no other option and that he was powerless to push back on his counsel any more than he already had. (*See* Exhibit B.) In light of these facts, and because "timeliness is only one of several factors that a district court should consider in evaluating a motion to withdraw a guilty plea," *United States v. Lam Peralta*, 792 F. App'x 68, 70 (2d Cir. 2019), the four-month period between

Mr. Velissaris' plea and the filing of his Motion to Withdraw his Guilty Plea should not count against him.

### V. THE GOVERNMENT WILL NOT BE PREJUDICED BY THE WITHDRAWAL OF MR. VELISSARIS' PLEA.

In its Opposition, the government posits that it would be "seriously" prejudiced were the Court to grant Mr. Velissaris' Motion to Withdraw. (Opp. at 12.) The government sets forth the prejudice that would befall them in this case as:

1) That the government would be deprived of the benefit of the bargain by having the burden of trial preparation thrust upon it, citing *United States v. Lopez*, 385 F.3d at 245, 255 (2d Cir. 2004). (Opp. at 12.)

2) That since Defendant's plea entry two of the three prosecutors handling the case have left the U.S. Attorney's Office and would not be available to try the case. (*Id*.)

3) Witnesses who rearranged their schedules to travel to New York to testify at trial would have to reconfigure their busy schedules and lives to come back and do it all again. (*Id*.)

4) Because the government provided Defendant with Jencks Act material one month before the original trial date, an extended trial date will provide Defendant more time to prepare. (*Id*.)

The role and responsibility of federal prosecutors—who wield broad power and vast resources—is to obtain justice. Further, that justice is to be the sole beneficiary. While prejudice to the government is a factor for consideration towards the resolution of a motion to withdraw a plea, it must be weighed against a claim of actual innocence, such as the one Mr. Velissaris makes here.

Federal prosecutors are tasked with working with a vast array of agents and agencies to determine whether a matter deserves the attention of a U.S. Grand Jury, and once the Grand Jury speaks, they have their marching orders. A federal prosecutor's central task includes the hard work of preparing for and trying cases to a just resolution. It is what they get paid to do day in and day out. The United States Attorney's Office in the Southern District of New York is one of the few

Districts that regularly investigates and tries complex financial criminal activity, likely because of its location in what is arguably the financial center of the world, New York City. The Southern District of New York is one of the most populated U.S. Attorney's offices with hundreds of Assistant United States Attorneys, dozens of whom are tasked with fighting against financial criminal activity and whom can step in on short notice.

Given these facts, the government's Opposition sets forth nothing more than inconvenience masquerading as prejudice, and it should be unavailing, particularly when the granting of the current motion would require the government to get ready again for a matter which concluded just four months ago, the sentencing of which is still ongoing, and all issues related to the case are still fresh in the minds of all parties. Additionally, there is no claim that any proposed government witnesses are deceased or otherwise unavailable, simply that they would have to make updated visitor and travel plans to again visit New York.

It is further of concern that the government would have a quarrel with Mr. Velissaris having more time to prepare for a new trial this time for more than one month since receiving Jencks Act material from the government, as such relates to the government having developed, massaged, and prepared this case for several months—and possibly years—before Mr. Velissaris could even begin to defend himself. For all of these reasons, the government has failed to establish that it would be prejudiced if the Court granted Mr. Velissaris leave to withdraw his plea.

## CONCLUSION

For the foregoing reasons and the reasons set forth in his previously-filed Memorandum of Law in Support of Defendant's Motion to Withdraw his Guilty Plea, Mr. Velissaris respectfully requests that the Court grant his Motion to Withdraw his Guilty Plea in its entirety.

Dated: New York, New York    Respectfully submitted,
April 5, 2023

/s/ Michael A. Battle

BARNES & THORNBURG LLP
555 12th Street N.W., Suite 1200
Washington, DC 20004
Michael A. Battle (SDNY Bar Code No. MB9289)
William R. Martin (admitted *pro hac vice*)
Michelle N. Bradford (admitted *pro hac vice*)
Erin C. Steele (admitted *pro hac vice*)
BARNES & THORNBURG LLP
555 12th Street NW, Suite 1200
Washington, DC 20004
mbattle@btlaw.com
(202) 371-6350
billy.martin@btlaw.com
(202) 371-6363
mbradford@btlaw.com
(202) 408-6922
esteele@btlaw.com
(202) 408-6932

- and -

/s/ David Slovick

David Slovick
BARNES & THORNBURG LLP
390 Madison Ave.
12th Floor
New York, NY 10017
david.slovick@btlaw.com
(646) 746-2019

*Attorneys for Defendant James Velissaris*