```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
 UNITED STATES OF AMERICA,              :
                                        :
             -v-                        :      22cr105 (DLC)
                                        :
 JAMES VELISSARIS,                      :      OPINION AND
                                        :          ORDER
                        Defendant.      :
                                        :
--------------------------------------- X
```

APPEARANCES:

For the United States of America:
Margaret Graham
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007

For the defendant:
Michael A. Battle
William R. Martin
Michelle N. Bradford
David S. Slovick
Erin C. Steele
Barnes & Thornburg LLP
555 12th Street NW
Suite 1200
Washington, DC 20004

## <u>Table of Contents</u>

Background ...................................................... 3

  I.   Allegations in the Indictment ............................ 3

    A.   Background on Infinity Q and Securities Valuation ..... 4

    B.   Velissaris's Scheme to Defraud ....................... 5

  II.  Initial Conference and Pretrial Motions ................. 8

  III. The Final Pretrial Conference .......................... 11

  IV.  Change of Plea .......................................... 19

  V.   Subsequent Proceedings ................................. 26

Discussion ..................................................... 28

  I.   Brady .................................................... 29

  II.  Fair and Just Reason for Withdrawal ..................... 36

    A.   Voluntariness ........................................ 37

    B.   Claim of Innocence ................................... 43

    C.   Delay ................................................ 54

    D.   Prejudice ............................................ 55

    E.   Balancing of Factors ................................. 58

Conclusion ..................................................... 58

DENISE COTE, District Judge:

On November 21, 2022, seven days before his trial was set to commence, the defendant James Velissaris pled guilty to one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.  On March 24, 2023, represented by new counsel, the defendant filed his sentencing submission and simultaneously moved to withdraw his plea of guilty.  The motion to withdraw the plea was denied, and the defendant was sentenced on April 7, 2023.  This Opinion sets forth the reasons for the denial of the motion to withdraw the plea.

## Background

Velissaris's motion to withdraw raises essentially five arguments.  Before addressing each of them, this Opinion will describe the charges for which Velissaris was indicted, the pretrial proceedings, his plea allocution, and the circumstances surrounding his retention of new counsel and the filing of this motion.

I.   Allegations in the Indictment

On February 16, 2022, Velissaris was charged in a six-count Indictment with fraud and obstruction.  According to the Indictment, Velissaris engaged in an ongoing scheme between 2018 and 2021 to defraud investors while working as the Chief

3

Investment Officer at Infinity Q Capital Management LLC

("Infinity Q"), an investment adviser.  The Indictment alleges

as follows.

A.   Background on Infinity Q and Securities Valuation

Velissaris was the majority owner of Infinity Q.  Infinity

Q managed a registered mutual fund (the "Mutual Fund") and a

private fund (the "Hedge Fund") (together, the "Funds").

Infinity Q earned money through management fees from both Funds

and performance-based fees from the Hedge Fund.

Part of Infinity Q's investment strategy involved trading

in over-the-counter ("OTC") derivative positions.  OTC

derivative positions are contracts between two counterparties.

OTC derivative positions are not traded on an exchange.

Infinity Q traded in several kinds of OTC derivative

positions, including volatility swaps, variance swaps, and

corridor variance swaps.  As relevant here, in a volatility or

variance swap, an investor takes a position on the expected

volatility of an asset over a certain period.  When a volatility

or variance swap takes account of volatility regardless of the

value of the underlying asset, it is called a "plain vanilla"

swap.  By contrast, a corridor swap takes account of volatility

only at times when the asset's value falls within certain upper

and lower bounds, i.e., a corridor.

Because OTC derivative positions are not traded on an exchange, the value of the positions is determined through models that use the agreed-upon terms of the deal and assumptions about market conditions. The agreed-upon terms are set out in written agreements between the parties to the deal and may include terms such as the strike price or the notional amount of the swap.

To calculate the value of the OTC derivative positions held by the Funds, Infinity Q represented that it used a third-party service called the Bloomberg Valuation Service ("BVAL"), which allows users to model various types of financial instruments using standardized templates. A BVAL user can model an OTC derivative position by selecting the appropriate template, entering the agreed-upon terms of the deal, applying any necessary market assumptions, and running a program to determine the position's value. Some of the BVAL templates at the time also allowed users to edit the underlying code of the program. Velissaris, as Chief Investment Officer, was responsible for valuing the Funds' positions and was the only Infinity Q employee with access to input or edit the positions in BVAL.

B.   Velissaris's Scheme to Defraud

Infinity Q represented to investors and other stakeholders that, to maintain an independent valuation process, Infinity Q

used BVAL to value OTC derivative positions, rather than valuing
those positions itself.  For example, on one occasion, the
defendant told Infinity Q's administrator that Infinity Q was
working with BVAL "as an independent valuation for our OTC
derivatives. . . .  We intentionally removed ourselves from the
valuation of these securities to remain independent."  Later, he
represented to Infinity Q's auditor that, with respect to
valuing volatility and variance swaps, Infinity Q did "not
provide any unobservable inputs (ex: implied volatility) to
BVAL."  With respect to correlation swaps, the defendant
represented to the auditor that "[w]ith the exception of implied
correlation, all other inputs (start date, maturity date, strike
%, vega notional, etc.) for the valuation of correlation swaps
come directly from the term sheet with the counterparty."

Although Infinity Q and Velissaris represented to investors
and others that the OTC derivative positions held by the Funds
were valued using BVAL without any substantive input from
Infinity Q, Velissaris was, in fact, altering the positions in
BVAL to inflate artificially their value.  For example, as
explained above, in a corridor swap, volatility is accounted for
only when the value of the underlying asset falls within a
certain corridor defined by an upper and lower boundary.  But
for positions held by the Funds where the Funds benefitted from

higher volatility, Velissaris reprogrammed BVAL's model to ignore or expand the corridor.  This ensured that the model did not properly account for the possible limiting effect of the corridor on the positions' values.  By contrast, for positions where the Funds benefitted from less volatility, Velissaris typically left the corridors intact.  As another example, Velissari would, at times, input terms into the BVAL model that differed from the agreed-upon terms in the term sheet.

Through these and other manipulations, Velissaris valued certain positions held by the Funds in ways that were strikingly unusual or even impossible.  As one example, certain identical positions that were held by the both the Mutual Fund and the Hedge Fund were valued at substantially different amounts.  As another example, certain positions were valued at amounts that, under the actual agreed-upon terms of the deals, could be correct only if volatility were negative, which is mathematically impossible.

The Indictment alleges that this scheme was fraudulent in at least two ways.  First, contrary to his representations concerning the independence of the process for valuing Infinity Q's derivative positions, Velissaris repeatedly altered the BVAL models and input into BVAL terms that differed from the term sheets for positions.  And second, Velissaris's alterations were

done in order to inflate artificially the value of the positions.  Velissaris benefitted from the scheme because the artificially inflated values of the OTC derivatives increased the overall net asset value ("NAV") of the Funds, which allowed Velissaris, as the majority owner of Infinity Q, to reap larger management and performance fees.

Finally, the Indictment alleges that Velissaris attempted to hide his scheme in a variety of ways.  On multiple occasions, he provided Infinity Q's auditor with falsified term sheets for certain positions.  Velissaris also provided falsified documents to the Securities and Exchange Commission ("SEC") in connection with its investigation of Infinity Q.  When the SEC eventually gained access to Infinity Q's BVAL portfolio, it was able to review some of the alterations Velissaris made.  After others at Infinity Q discovered the alterations, the Funds were liquidated, and the OTC derivative positions were sold for substantially less than the inflated values at which they had been marked.

II.  Initial Conference and Pretrial Motions

A grand jury returned an Indictment on February 16, 2022, charging Velissaris with securities fraud, investment adviser fraud, wire fraud, false statements to an accountant, conspiracy to obstruct an SEC investigation, and obstruction of an SEC

investigation.  Velissaris was arraigned on February 25, and entered a plea of not guilty.  At the arraignment, a trial date of November 28 was set, with trial expected to last at least two weeks.  The parties were cautioned that the trial date was unlikely to change.  The Court separately repeated to Velissaris personally that "this trial date is as firm as I can make it" and explained that "if you want to change counsel again which is entirely your right . . . you must make that decision sooner rather than later because new counsel needs an opportunity to prepare for the trial."[1]  Velissaris responded that he understood.

On June 24, the defendant filed a motion requesting a bill of particulars, a six-month adjournment of the trial date, and an order compelling the Government to produce additional discovery pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Rule 16, Fed. R. Crim. P.[2]  The requests for an adjournment and a bill of particulars were denied on July 2. The following day, an Opinion was issued denying the request for

---

[1] At the time of this conference, Velissaris had already changed counsel once, retaining a different major law firm to represent him in the criminal proceedings than had represented him during the parallel SEC investigation.

[2] The defendant made no motion to dismiss the Indictment.

additional discovery.  United States v. Velissaris, 22cr105
(DLC), 2022 WL 2392360 (S.D.N.Y. July 3, 2022).  After these
pretrial motions were denied, a schedule was set for the
remainder of the case, including a deadline for motions in
limine of November 8 and a November 18 final pretrial
conference.  The Government's disclosures pursuant to Giglio and
the Jencks Act, 18 U.S.C. § 3500, were provided to the defendant
on October 7, over seven weeks before trial.[3]

On October 19, the defendant filed a motion to preclude the
testimony of one of the Government's witnesses and requested an
expedited briefing schedule for the motion.  On November 8, the
Government and the defendant each filed four more motions in
limine, along with proposed voir dire questions and jury
charges.  Opposing papers were filed on November 15.

Also on November 15, the defendant sought an adjournment of
the trial date because the Government had, on November 7,
produced to the defendant a copy of a laptop from Infinity Q's
auditor that the Government had received from the SEC days
earlier.  A letter of November 16 from the Government opposed
the adjournment request, noting that: the laptop primarily

---

[3] As explained to the Court in later briefing, the Government
agreed to the early disclosure of this material on the express
understanding that the defendant would not make a further
request for an adjournment of the trial.

contained documents that were already produced to the defendant;
there were roughly 500 new documents of minimal significance;
even of these documents, many had already been produced to the
defendant in other productions; and the defendant (who was
represented by a large international law firm) received the
laptop three weeks before trial, with plenty of time to review
the documents and prepare for trial. Finally, also on November
17, the defendant filed an additional motion in limine.

III. The Final Pretrial Conference

On November 18, a final pretrial conference lasting over
four hours was held, and all of the then-outstanding motions
were addressed. Each of the motions was competently argued at
length by both parties. Veronica Callahan argued the majority
of the motions in limine for the defendant, and Paul Fishman
argued the motion to adjourn. For the Government, Daniel Tracer
argued the motion to adjourn, and he and Margaret Graham argued
the motions in limine. After hearing argument on each motion,
the Court delivered its rulings.

The motion to adjourn the trial, which the parties
estimated would consume approximately three weeks, was denied.
As stated at the conference, this motion was denied because

> [t]here's been no showing of prejudice [based on the
> Government's production of the laptop]. There's been
> no showing of discovery of a smoking gun or something
> materially important to the defendant that [he] didn't

11

already have.  There's been no argument that it will
impede the defense with respect to the obstruction
count that's most at issue here or any other count.

I find that this kind of request on the eve of
trial . . . is not well-supported and would indeed
place a hardship not only on the government and the
public, but indeed on the defendant, who's been
working very hard to prepare for trial and is entitled
to a speedy trial. . . .  [O]bviously if I felt there
was a need to adjourn the trial to protect the
defendant's rights, I would do that.  But I have no
showing that would support that here.

The defendant's motions in limine were largely denied, and
the Government's were largely granted.[4]  The Court deferred
issuing a final ruling on certain of the motions in limine,
however, until the trial provided clearer context for the
evidence at issue.

The motions to preclude the testimony of two of the
parties' witnesses -- Dr. Faten Sabry for the Government and Dr.
Atanu Saha for the defendant -- are particularly relevant to
this motion to withdraw the defendant's plea of guilty.  The
Government intended to introduce Dr. Sabry largely as a summary
witness to describe the work done by the National Economic
Research Associates ("NERA") as part of the Government's
investigation into Velissaris.  Dr. Sabry, working with NERA,

---

[4] An Opinion issued earlier in the day on November 18 set out the
legal standards used for evaluating the motions in limine at the
conference.  United States v. Velissaris, 22cr105 (DLC), 2022 WL
17076747.

12

examined hundreds of Infinity Q's alterations to the positions
in BVAL and revalued those positions using BVAL tools to
determine the value that BVAL would have produced without
alterations.  The evidence she was prepared to present would
have revealed substantial alterations by Velissaris, including
numerous instances where the alterations yielded mathematically
impossible valuations and valuations where identical positions
were valued differently in the two Funds.

That evidence also would have helped the Government
demonstrate the extent to which Velissaris attempted to hide his
actions.  Specifically, NERA's work showed that as the
manipulated positions neared the end of their terms, Velissaris
made corrective adjustments so that Infinity Q's valuations of
the positions aligned more closely with the valuations that BVAL
would have produced absent alterations.  Thus, when these
positions were settled with the counterparties, the valuations
were less likely to be detected by the counterparties as
overstated.  As an illustration, the following chart from the
NERA report shows how, as certain positions neared expiration,
the differences between BVAL's valuation (as reproduced by NERA)
and Infinity Q's valuation narrowed:



Exhibit 20. *Comparison of IQ Reported Values and My Valuations with Term Sheet Values for 62 OTC Positions*

The defendant moved to preclude Dr. Sabry's testimony on several grounds including, primarily, that she was purportedly offering expert testimony about the actual fair value of the positions, without independently verifying the validity of the BVAL tools. At the final pretrial conference, the motion to preclude Dr. Sabry's testimony was denied.

The Court noted, <u>inter alia</u>, that

> the points that the defendant wants to make about the limitations in what she can shed light on for the jury [are] points they can make in cross-examination and certainly in closing argument . . . . I didn't think from reading her report . . . that she was recreating any "true value" in a historic sense. . . .
>
> I don't think there is any serious risk of the jury being misled about the significance of the tasks that

Dr. Sabry performed.  It seemed to be clearly stated in her report and, therefore, I expect it to be clearly stated in her direct testimony.  But to the extent that there is any potential for confusion, she'll be subject to cross-examination [on] the limitations on the tasks she performed and the weight to be given from the figures she arrived at.  That's classic cross-examination.  And the parties will be able to address that.

For his part, the defendant proffered Dr. Saha as an expert witness.  Dr. Saha intended to opine at trial that there was an "unprecedented level of market volatility in 2020," which "markedly impacted the value of variance swaps."  He also planned to opine that, because Infinity Q was a "net buyer of volatility," its portfolio of variance swaps would have been expected to increase in value during that time, but BVAL, due to problems with its modeling programs, systematically undervalued variance swaps.  As a result, changing the parameters of the swaps was a "practical way" for Infinity Q to "address the undervaluation problem."  Dr. Saha also examined risk models created by Infinity Q's risk management team.  These models "monitor[ed] the changes in the value of [Infinity Q's] holdings."  According to Dr. Saha, using the risk models to estimate changes in valuations of individual securities the risk models "yielded outputs regarding valuations changes that were directionally consistent with" market conditions.  In addition to these opinions, Dr. Saha purported to offer a critique of Dr.

Sabry's work.  The critique included proposed testimony noting that there were "wide disparities" between the valuations produced by the current version of BVAL and valuations by counterparties to the deals.

The Government moved to preclude Dr. Saha's testimony largely on the grounds that it was unhelpful to the jury and unduly prejudicial.  The Government noted, for example, that whether BVAL was accurate or not was irrelevant because Infinity Q chose to use BVAL and represented to investors that it had no substantive input in the valuations produced by BVAL.  It also contended that Dr. Saha's generalized analysis about volatility trends in 2020 was insufficiently tethered to any of the positions actually altered by Velissaris, which posed a significant risk of confusion for the jury.  As to the risk model analysis, the Government noted that the risk models were irrelevant because risk modelling was a completely separate process from valuation, done by a separate unit within Infinity Q, and because for much of the relevant time, the risk modelling did not account for corridors in corridor swaps.  (Corridor swaps constituted the majority of the positions that Dr. Sabry had analyzed.)

At the final pretrial conference, the Court provided initial views on Dr. Saha's expert report before hearing oral

argument on the motion.  In introducing the report, the Court

explained:

> Reading the defendant's submission [including Dr.
> Saha's report and the briefing on the motion], it
> appeared that the defense in this case is not that the
> valuations were [not] manipulated in the way that the
> government is going to try to show through witnesses,
> but that there was a good reason for the defendant to
> do that; and that he did not intend to engage in
> fraud; that his personal intent was to try to capture
> more accurately the valuation of the particular
> security at that moment in time.  So that, of course,
> is not something Dr. Saha can address, that is, the
> defendant's intent.  And if the defendant testifies,
> it's conceivable that some part of Dr. Saha's
> testimony may become more relevant than otherwise.

The Court also noted that "there is no defense presented in Dr.

Saha's report of the accuracy or validity of the defendant's

valuations."

The Government's motion to preclude Dr. Saha's testimony

was largely granted, but the defendant was told that the Court

would consider revisiting the issue depending on the evidence

presented at trial.  Specifically, the Court noted

> obviously things may shift by the time we get to the
> defense case.  And if the defendant takes the stand,
> it may be that parts of Dr. Saha's report become
> admissible.  I am not going to make a final decision
> about the exclusion of Dr. Saha's report because I
> don't need to right now.  I want to hear opening
> statements; I want to get familiar with the kinds of
> issues raised during the defendant's cross of the
> government witnesses.
>
> But right now, I am going to exclude Dr. Saha's
> testimony, except for the testimony about the
> counterparty comparison value discrepancies.  I think,

17

because Dr. Saha's analysis is not tethered to the
actual positions, it really poses an enormous problem
under [Federal Rule of Evidence] 403 of misleading the
jury, creating confusion, and not being probative and
creating unfair prejudice as a result.

So, again, I want the defendant to feel free closer to
the time the government rests to address some of these
issues.  And if [the defendant] feels it's
appropriate, to reapply for the admission of Dr.
Saha's testimony more broadly beyond the one issue I'm
going to permit him to testify about.  I find it
highly unlikely that his general description of how
swaps function and what swaps are will be helpful to
the jury at that point.  But the whole analysis or all
the opinions about 2020 and about BVAL more generally
I think are flawed for the reasons stated in the
government's [briefing], and reasons I've put on the
record.

Finally, at the final pretrial conference, the parties also

provided an update on the status of plea negotiations.  The

parties had engaged in preliminary plea discussions in late

August and early September, but they were not fruitful.  The

parties renewed their discussions around November 12, at which

time, the Government extended an informal plea offer whereby the

defendant would plead guilty to only the securities fraud count,

which carried a statutory maximum penalty of twenty years'

imprisonment.  The Government proposed, as part of that plea

offer, a sentencing guidelines range of 188 to 235 months.  The

defendant rejected the offer in writing on November 13.  The

defendant personally confirmed to the Court that these plea

negotiations had been communicated to him and that he had rejected the Government's offer.

The Government also explained the defendant's sentencing exposure in the event he was convicted of every count in the Indictment.  The Government noted that the statutory maximum penalty would be 90 years' imprisonment.  It also indicated that the Government's sentencing guidelines calculation for the defendant, should he be convicted on all six counts, would be life imprisonment.  Defense counsel explained that they had discussed the statutory maximum penalty with the defendant, but that they had not discussed the Government's life-imprisonment guidelines calculation.  Defense counsel confirmed that they would discuss those numbers with Velissaris.  Later, when reviewing the motions in limine, the Court reminded counsel and the defendant that

> a defendant's decision to take the stand, just like a
> defendant's decision to go to trial, is a decision
> only the defendant can make for himself.  Obviously,
> defendant should consult with competent counsel, which
> he has, and listen carefully to their advice.  But
> it's a decision for him, and him alone.

IV.  Change of Plea

On Sunday, two days following the final pretrial conference, the parties indicated to the Court that Velissaris intended to change his plea.  A change of plea was scheduled for Monday, November 21, one week prior to the trial date.

Prior to the change of plea, the parties submitted a plea agreement (the "Plea Agreement"), executed by the defendant, one of his attorneys, Paul Fishman, and representatives of the Government on November 20.  The Plea Agreement provided that Velissaris would plead guilty to the securities fraud count in the Indictment, and the Government would not further prosecute him in connection with the scheme to defraud investors in the Funds from 2018 through 2021.  The Plea Agreement also provided that

> [t]he defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty.  By entering this plea of guilty, the defendant waives any right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant agreed to forfeit $22 million, and agreed that the loss from his crime exceeded $65 million.  He also agreed that his Sentencing Guidelines range was 235 to 240 months' imprisonment.

Finally, in the Plea Agreement, the defendant and the Government stipulated that the defendant had

willfully obstructed or impeded, or attempted to
obstruct or impede, the administration of justice with
respect to the investigation of the instant offense of
conviction and the obstructive conduct related to the
defendant's offense of conviction.

The plea allocution was held on November 21.  At the start,

the defendant, who was represented at the allocution primarily

by Paul Fishman, was told

[b]efore accepting your plea, I'm going to ask you
certain questions to establish to my satisfaction that
you are pleading guilty because you are guilty and not
for some other reason.  If at any time you do not
understand my questions, or if you wish for a further
opportunity to consult with your lawyers, will you let
me know?

The defendant responded that he would.  He was then placed under

oath and cautioned that "if you answer any of my questions

falsely, you can be prosecuted for perjury," which he

acknowledged that he understood.

The Court then inquired into the defendant's background.

During this colloquy, the defendant noted that he had been

"[t]reated but not hospitalized" for depression and post-

traumatic stress disorder ("PTSD").  He noted that he had never

taken any medications for either condition.  He also affirmed

that he had not consumed any drugs or alcohol in the past 24

hours, that his mind was clear, and that he understood what was

happening at the time.  After counsel for the defense and the

Government agreed that the defendant was competent, the Court

found, based on the defendant's demeanor and answers to
questions, that he was competent to enter a plea of guilty.

Next, the Court confirmed that Velissaris had discussed his
case with his lawyers and that he was satisfied with the
representation his lawyers had provided to him.  The Court
explained in detail the constitutional rights that the defendant
would give up by entering a guilty plea.

The Court reviewed with the defendant the charge to which
he planned to plead guilty.  The Court stated

> Count One charges you with a crime of securities
> fraud.  It charges you with engaging in a scheme
> between 2018 and February of 2021. . . .
>
> It charges that you willingly and willfully and
> knowingly used means of interstate commerce . . . and
> in doing so engaged in manipulative and deceptive
> devices that violated the law.
>
> It charges that you did so by employing schemes to
> defraud, also by engaging in acts or courses of
> business which operated as a fraud and deceit upon
> various persons.
>
> And, finally, that you made untrue statements of
> material fact or omitted to state material facts that
> were necessary to be stated in order to make other
> statements truthful and not misleading in light of all
> the circumstances.
>
> And what this specifically refers to, everything I've
> just described, is that you made fraudulent
> misrepresentations to others, including investors, in
> the funds of Infinity Q concerning the process by
> which the investment fund's over-the-counter
> derivative positions were marked, falsely representing
> that they were marked at fair value, and also that you
> mismarked the value of over-the-counter derivative

positions held by those investment funds in order to
fraudulently inflate their value.

The Court then reviewed the possible penalties that the
defendant might face if he entered a plea of guilty.  The Court
explained that "if your attorney or anyone else has attempted to
predict to you what your sentence will be," their prediction
could be wrong.  The Court continued

> No one -- not your lawyer, not the government's
> lawyer, no one -- can give you any assurance of what
> your sentence will be because I'm going to decide your
> sentence, but I'm not going to do it now.  I'm going
> to wait.  I'm going to wait until I get a presentence
> report prepared by the probation department.  I'll do
> my own independent calculation of your sentencing
> guideline range, decide whether I should depart up or
> down from that range.  I'll look at all the
> information that's been presented to me.  I'll
> consider the factors set forth in a section of the law
> we call Section 3553(a).  And only then, after that
> whole process, will I decide what a reasonable
> sentence is for you. . . .
>
> Even if your sentence is different from what your
> attorney or anyone else has told you it might be, even
> if it's different from what's calculated in a written
> plea agreement you have with the government, you are
> still going to be bound by your plea of guilty and
> cannot withdraw your plea of guilty.

The defendant responded to these explanations, noting that he
understood.  The Court also asked the defendant if "anyone
threatened you or anyone else or forced you to plead guilty,"
which he denied.

The Court then reviewed the Plea Agreement with the
defendant.  The defendant was asked if his signature appeared on

the last page of the agreement, and he confirmed that it did and

that it was dated November 20, 2022.  He was also asked if,

before signing the document, he (1) read it with care, (2)

discussed it with his lawyers, and (3) thought that he had a

good understanding of its terms.  The defendant responded

affirmatively to each of these questions.

Finally, the defendant was asked to explain, in his own

words, what he did that made him believe that he was guilty of

the securities fraud count in the Indictment.  The following

exchange occurred:

> THE DEFENDANT:  May I read a statement, your Honor?
>
> THE COURT:  Yes.  Before you do so, did you prepare
> that statement with the assistance of counsel?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:  And then did you read it with care to make
> sure that every statement in it is accurate?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:  You may read.
>
> THE DEFENDANT:  Between 2018 and February 2021, I
> made . . . false statements of material fact to
> investors in the Infinity Q funds that I managed, and
> I did so knowingly, willfully, and with the intent to
> defraud.  Specifically, I told investors that I was
> using an independent Bloomberg system to value the
> fund's over-the-counter derivatives.  However, I was
> making manual adjustments in the system which
> increased the value of the over-the-counter derivative
> positions that were reported.  I knew that if I
> disclosed what I was doing, investors might have
> decided to redeem their investments or maybe would not
> have made the investments in the first place.  Some of

24

the communications with investors occurred over the
phone and by email in the Southern District of New
York.  I acknowledge that my actions caused investors
to lose money, and for this I am truly sorry.

THE COURT:  And those manual adjustments, they were
made with the purpose of doing what?

THE DEFENDANT:  To increase the value of the
securities being held by the fund.

THE COURT:  When you did what you described to me, did
you understand that you were doing something wrong?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Did you understand that you were violating
the law?

THE DEFENDANT:  Yes, your Honor.

After this exchange,[5] counsel for the Government and the defense

agreed that there was a sufficient factual predicate for the

plea, and defense counsel stated that he knew of no reason why

the plea should not be accepted.

Thus, based on the entirety of the defendant's statements

and demeanor, the Court announced that it accepted his plea of

guilty as entered knowingly and voluntarily.  Sentencing was set

for March 3, 2023.

---

[5] The Court also briefly discussed with the defendant the
connection of the scheme to the securities laws.  That portion
of the questioning is not relevant to the instant motion and is
not included here.

V.   Subsequent Proceedings

On February 8, 2023, the parties submitted a letter jointly requesting an adjournment of the sentencing date because the presentence report was delayed and because two of the three prosecutors handling the case were leaving the U.S. Attorney's Office and the third was expected to be on trial beginning February 21 for two to three weeks.  The sentencing was thus adjourned to March 17.

On February 20, the remaining prosecutor in the case requested, with defense counsel's consent, another one-week adjournment of the sentencing because the trial on which she was working had been adjourned for one week.  This request was granted, and the sentence set for March 24.

On March 8, defense counsel submitted a letter stating that the defendant wanted new counsel to represent him for any further proceedings in the case.  A conference was held on March 10 to discuss the proposed substitution of counsel.  At this conference, defendant's new counsel proposed a 60-day extension of the sentencing.  Based on this proposed schedule, the Court denied the application to substitute counsel.  After the denial, defendant's new counsel proposed a shorter extension, at which point the defendant's request to substitute his counsel was granted.  In light of the revised extension request, the

sentencing was adjourned to April 7, with the defendant's
sentencing submissions due March 24.  At the end of the
conference, the Court commented that prior counsel's
representation of the defendant had been "excellent":

> They worked very hard.  The plea was entered on the
> eve of trial, as we all remember, just before
> Thanksgiving last year after the longest discussion of
> motions in limine in my experience before any criminal
> trial.
>
> The issues were complex and sophisticated, and I want
> to thank counsel from [the prior firm] for their
> professional representation of the defendant.  But of
> course, he is entitled to counsel of his choice at the
> time of sentence.  And I'm happy to welcome counsel
> from [the new firm] . . . .

Neither the defendant's newly retained counsel, nor his prior
counsel, indicated at the conference any intent to bring a
motion to withdraw the plea.

On March 24, the defendant filed his sentencing
submissions, along with the instant motion to withdraw his plea
of guilty.  On March 31, the Government filed its sentencing
submissions.  The Government opposed the motion to withdraw the
guilty plea on April 3, and the defendant replied on April 5.
Along with his reply, the defendant submitted for the first
time, a declaration outlining his view of the circumstances
leading up to his guilty plea.[6]

---

[6] The defendant did not file the declaration on April 5 or
provide it to the Court.  Instead, the defendant requested that

On the evening of April 6, the defendant submitted two
letters.  One requested a hearing pursuant to United States v.
Fatico, 603 F.2 1053 (2d Cir. 1979), to present evidence
regarding the loss calculation under the Sentencing Guidelines,
as well as a two-week adjournment of the sentencing.  Later that
evening, the defendant also submitted a letter contending that
one member of the defendant's prior defense team may have had a
conflict of interest.  This letter did not make any specific
motion related to that purported conflict.

Oral argument was held on April 7.  The Court denied the
motion to withdraw the plea, as well as the motion for a Fatico
hearing.  The Court also addressed the conflict issue.  After
these rulings, Velissaris was sentenced.  The Court imposed a
sentence principally of 180 months' imprisonment.

## Discussion

The defendant moves to withdraw his guilty plea because:
(1) the Government failed to provide evidence that it was
obligated to produce under Brady v. Maryland, 373 U.S. 83
(1963), and (2) there is other "fair and just reason for

---

the Court allow the declaration to be filed under seal because
it contained "highly sensitive information."  The Court required
the defendant to provide it with a copy of the declaration and,
after reviewing the declaration, filed it in the public record
on April 6.

requesting the withdrawal," as required by Rule 11(d)(2) of the Federal Rules of Criminal Procedure).[7]  The defendant's principal argument in support of his motion to withdraw his plea is that he is innocent of the crime charged in Count One of the Indictment.  This Opinion addresses each of his arguments, however, even those he did not discuss in his reply memorandum.[8] The Brady argument is addressed first.

## I.   Brady

The defendant seeks to withdraw his plea of guilty because the Government violated its obligations under Brady. "Generally, to establish that a Brady violation has occurred before a guilty plea, a defendant must show that (1) the government failed to disclose exculpatory evidence, and (2) the evidence was material."  United States v. Overton, 24 F.4th 870,

---

[7] The defendant's motion characterizes his Brady argument as merely "another factor supporting [his] motion to withdraw," rather than as a discrete basis for withdrawal.  But the Second Circuit has instructed that the "fair and just reason" framework does not apply to a motion to withdraw a plea based on a Brady violation because a district court would have no discretion to deny such a motion upon finding that a Brady violation occurred. United States v. Avellino, 136 F.3d 249, 261-62 (2d Cir. 1998). Thus, courts analyze whether a Brady violation occurred before proceeding to the discretionary factors typically considered on a Rule 11(d)(2) motion.  United States v. Overton, 24 F.4th 870, 878 (2d Cir. 2022).

[8] The reply memorandum did not discuss the Brady argument or present any developed argument on the voluntariness of the plea.

878 (2d Cir. 2022).  Whether evidence is material in the context
of a plea turns on "whether there is a reasonable probability
that but for the failure to produce such information the
defendant would not have entered the plea but instead would have
insisted on going to trial."  Id. (citation omitted).  The
question of materiality is an "objective inquiry that asks not
what a particular defendant would do but rather what is the
likely persuasiveness of the withheld information."  United
States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998) (citation
omitted).

The defendant argues that the Government did not fulfill
its Brady obligations in two ways -- first, that the Government
did not search for and provide evidence from the SEC's
investigative file to Velissaris, and second, that the
Government did not disclose to the defendant that the SEC had,
in January 2023, settled separate litigation with Bloomberg
regarding inaccurate valuations produced by BVAL.  Neither
argument prevails.

Before addressing the defendant's two arguments, it must be
noted that in his Plea Agreement the defendant expressly waived
his right to withdraw the plea on the ground that the Government
failed to produce Brady material that had not already been
produced as of the date of the signing of the Agreement, other

30

than information establishing his factual innocence.  The
defendant does not acknowledge this waiver in his motion or
present any argument why it should not be binding on him now.
Nor does he suggest that either category of evidence establishes
his factual innocence.

The defendant's contentions about the SEC's investigative
file have already been addressed in this litigation.  The
defendant points out that the Government did not search the
SEC's complete investigative file for potential Brady evidence.
But as explained in a prior Opinion in this case, the SEC was
not part of the prosecution team and the defendant failed then
(as now) to show why the Government was required to search the
SEC's file.  Velissaris, 2022 WL 2392360, at *2-3.  The
Government provided to the defendant all the documents that the
SEC had obtained from third parties.

Similarly, the defendant contends that the Government
belatedly disclosed to the defendant a copy of a laptop from
Infinity Q's auditor that was in the SEC's possession.  The
documents on this laptop pertain most directly to a count to
which Velissaris did not plead guilty, the count charging him
with false statements to an accountant, which was his Funds'
auditor.  The argument about the auditor's laptop was already
addressed during the November 18 final pretrial conference.  At

that conference, defense counsel at the time, a large, international firm, had a possessed a copy of the laptop in question for almost two weeks.  The laptop contained mostly documents that had already been produced to the defendant as part of the auditor's production to the SEC, with only about 500 new documents of minimal relevance.  Even as to those documents, many had already been produced to the defendant through other productions.  At the final pretrial conference, defense counsel was unable to identify any document suggesting that the defendant was prejudiced by the Government's November 7 production.  Now, the defendant has had access to the laptop for five months and, represented by a second large law firm, still cannot identify a single document that would have had a material effect on his defense much less establish actual innocence.[9] Thus, he has not shown that the Government failed timely to produce material exculpatory information.

The defendant's second theory -- that the Government failed to disclose evidence relating to the SEC's January 23, 2023 settlement with Bloomberg -- also fails.  The argument is based

---

[9] The defendant argues that the laptop "almost certainly" includes communications between Infinity Q's auditor and potential trial witnesses.  But, setting aside that he does not actually identify any such communications, the defendant does not present any developed argument about why such communications would be favorable to him, much less have led to a reasonable probability that he would have insisted on going to trial.

on a fine that the SEC levied on Bloomberg for failing to disclose that "the use of [Bloomberg's Evaluator Input Tool ("EIT")] could, in certain circumstances," result in a valuation based on a "single data point" when pricing "fixed income securities."  Order, In the Matter of Bloomberg Finance L.P. ("SEC Release"), Securities Act Release No. 11150, 2023 WL 369464, at *3 (Jan. 23, 2023).  At the outset, the Brady obligation extends only to evidence "that is known to the prosecutor."  Avellino, 136 F.3d at 255.  As noted above, the Government was not required under Brady to search all the SEC's files in the SEC's parallel investigation of Velissaris. Velissaris, 2022 WL 2392360, at *3.  The defendant presents no argument now as to why information that the SEC had in a separate investigation of a different company should be imputed to the Government in this case.

As significantly, the limitations in Bloomberg's disclosures concerning its valuation tools were limitations in the disclosures about EIT, which is used for valuations of fixed income securities.  The tools used to value the securities at issue in the case against Velissaris were Bloomberg's "OVME" and "DLIB" tools.  No evidence submitted to the Court in Velissaris's case even references EIT.  Thus, the SEC settlement

did not even appear to implicate the relevant valuation tools in this case.

Moreover, the SEC's settlement with Bloomberg concerned Bloomberg's disclosures about the methodology used by EIT, not about the tool's accuracy. Specifically, the SEC found Bloomberg's disclosures about EIT materially misleading because they conveyed that the prices of fixed income securities "were based on value relative to comparable securities," when in fact certain prices were instead "based on a single broker quote." SEC Release, 2023 WL 369464, at *3. Notably, the settlement states:

> Although there is no evidence that BVAL's prices [as valued through EIT] were erroneous or not reflective of the market during the Relevant Period, there are instances in which Bloomberg delivered valuations that were not derived in accordance with disclosed methodologies and for which market participants may have contemporaneously transacted at that exact BVAL valuation.

Id. (emphasis added). Thus, the SEC settlement does not help Velissaris show that any Bloomberg tools were flawed, let alone the specific BVAL tools at issue in Velissaris's case.

And even if the settlement did show that the BVAL tools used by Infinity Q were imperfect, Velissaris has not shown why that is sufficiently relevant to his defense. Infinity Q assured investors that it would rely on Bloomberg valuation tools to give investors confidence that Infinity Q's valuations

34

would be taken from an independent source and would not be subject to manipulation.  In his plea allocution, Velissaris explained, "Specifically, I told investors that I was using an independent Bloomberg system to value the [Funds'] over-the-counter derivatives."  Therefore, even if Velissaris had testified at trial that he considered the Bloomberg tools inadequate or flawed, he would have been confronted with the fact that they were the tools on which he told investors he would rely.  Notably, Velissaris provided no expert testimony to suggest that the specific alterations he made to BVAL or the inputs into BVAL achieved a better approximation of the fair market value of a security than the valuations that would have been achieved through an appropriate use of BVAL.  The Government's summary witness, by contrast, demonstrated from several perspectives that the Infinity Q valuations were manipulated to achieve an inflated NAV for the Funds.

In summary, Velissaris's Brady argument about the SEC settlement is riddled with problems.  He makes no attempt to explain why the settlement was known to the Government.  But even assuming that it was known to the Government, the settlement concerns an entirely different tool than the tools used to value the OTC derivative positions at issue.  Assuming even further that the tools were the same or relevantly similar,

the settlement made no determination about the accuracy of the tool, instead charging Bloomberg with inaccurately disclosing how the tool operated.  And finally, setting aside all these problems, Velissaris fails to show that the accuracy of the tools is sufficiently relevant to his defense.  Thus, defendant's Brady arguments fail.

## II.  Fair and Just Reason for Withdrawal

In analyzing whether there is fair and just reason for requesting the withdrawal of a guilty plea, courts in the Second Circuit consider whether the defendant "has raised a significant question about the voluntariness of the original plea."  United States v. Albarran, 943 F.3d 106, 117 (2d Cir. 2019) (citation omitted).  They may also consider other factors including

> (1) whether the defendant asserted his legal innocence
> in his motion to withdraw; (2) the amount of time
> between the plea and the motion to withdraw; and (3)
> whether the government would be prejudiced by
> withdrawal of the plea.

Overton, 24 F.4th at 879.  "The defendant bears the burden of showing that there are valid grounds for withdrawal."  United States v. Rivernider, 828 F.3d 91, 104 (2d Cir. 2016) (citation omitted).

A plea of guilty is a "grave and solemn act, which is accepted only with care and discernment."  United States v. Hyde, 520 U.S. 670, 677 (1997) (citation omitted).  Allowing a

36

withdrawal of a guilty plea "simply on a lark" would "debase[]
the judicial proceeding at which a defendant pleads and the
court accepts his plea" and would "degrade the otherwise serious
act of pleading guilty into something more akin to a move in a
game of chess." Id. at 676-77. A withdrawal "not only
undermines confidence in the integrity of our judicial
procedures, but also increases the volume of judicial work, and
delays and impairs the orderly administration of justice."
United States v. Rose, 891 F.3d 82, 85 (2d Cir. 2018) (citation
omitted). Accordingly, and "because society has a strong
interest in the finality of guilty pleas," a defendant seeking
to withdraw a plea is held to a "stringent" standard. Id.
(citation omitted).

    A.   Voluntariness

    "Where a motion to withdraw a plea argues involuntariness,
the defendant must raise a significant question about the
voluntariness of the original plea." Albarran, 943 F.3d at 124
(citation omitted). A plea is deemed involuntary "if it is the
product of actual or threatened physical harm, mental coercion
overbearing the defendant's will, or the defendant's sheer
inability to weigh his options rationally." United States v.
Roque, 421 F.3d 118, 122 (2d Cir. 2005) (citation omitted).

The defendant has failed to show that his plea was not made voluntarily.  At the allocution itself, there was no indication that the defendant had been subjected to or was undergoing actual or threatened physical harm or mental coercion.  Counsel for the Government and the defendant assured the Court that the defendant was competent to enter a plea of guilty and the Court, based on the defendant's responses to questions and overall demeanor, agreed.  Further, during the allocution, the Court repeatedly reminded the defendant of his rights, including his right to proceed to trial.

The Court observed the defendant with care throughout the plea proceeding.  He spoke forthrightly and without hesitation. There was no indication that the plea was anything but knowing and voluntary.  Thus, at the end of the proceeding, the Court accepted the plea after finding that Velissaris knew of his rights, including the sentence that may be imposed, and that he was "voluntarily pleading guilty."

The opening memorandum in support of this motion contends that Velissaris was unable to weigh his options rationally due to his depression, PTSD, alcohol use disorder, and social anxiety disorder.  This argument fails.  It is noteworthy that the defendant's declaration, submitted with the reply memorandum, makes only a single, conclusory reference to his

mental difficulties because of his depression and PTSD.  In any event, at the outset of the allocution, in response to the Court's questioning, the defendant acknowledged his struggles with mental illness but nonetheless stated under oath that his mind was clear and that he understood the nature of the proceedings that day.  A criminal defendant's sworn statements during a plea allocution "carry a strong presumption of verity . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them."  Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999) (citation omitted); see also Rivernider, 828 F.3d at 105.  Accordingly, his contention now that his mental illnesses prevented him from weighing his options rationally is unavailing.[10]

Defendant argues that his counsel at the time was not receptive to his claims of innocence and pressured him to plead guilty.  In his declaration, he notes that he maintained his

---

[10] With his sentencing submission, the defendant submitted a psychological evaluation.  Notably, even though the psychologist met with the defendant over the course of five weeks in January and February this year through a secure video-conferencing platform, and for a total of twelve hours, there is no mention in her fifteen-page evaluation of any mental difficulty the defendant experienced surrounding the entry of the plea or any doubts that he was harboring regarding his guilt.  On April 6, after filing his reply, the defendant submitted a supplemental psychological report, which states that he felt powerless in the days leading up to the plea.  This supplemental report does not change the analysis or raise a substantial question as to the voluntariness of the plea.

innocence but that his counsel told him he "should plead guilty and try to get a much shorter prison sentence." He asserts that one of his attorneys told him that he might be facing a term of imprisonment of up to 30 years, but with a plea he might be sentenced to as low as six years' imprisonment. But the Court explained at length during Velissaris's plea allocution that any representations his attorneys had made about his sentence could be incorrect and that, even if his sentence was different from what his attorneys told him, he would be bound by the plea of guilty. Velissaris replied that he understood.

Moreover, the conversations that Velissaris describes in his declaration as having had with one of his attorneys -- he identifies four attorneys as principally responsible for his defense -- about his legal options were not inappropriate. After all, the Sixth Amendment requires criminal defense counsel to share with her client her evaluation of the strengths and weaknesses of the Government's case and any evidence in the defendant's favor and to share a recommendation as to a plea offer. See, e.g., Fulton v. Graham, 802 F.3d 257, 265 (2d Cir. 2015). While it remains the defendant's decision whether to plead guilty or proceed to trial, counsel should not remain silent. Thus, "blunt rendering of an honest but negative assessment" of a defendant's chances at trial, "combined with

40

advice to enter the plea, does not constitute improper behavior
or coercion that would suffice to invalidate a plea." Albarran,
943 F.3d at 124 (citation omitted).

Further, defendant's counsel was fully prepared to proceed
to trial.  Among other things, defense counsel tenaciously
argued nine motions in limine at the pretrial conference.  There
is no indication from this record that defense counsel was
pressuring Velissaris to plead guilty.  Moreover, although his
current counsel now suggests that his prior counsel overpowered
the defendant's mental faculties and that Velissaris took a
"passive, submissive stance when dealing with" them, this seems
unlikely.  Notably, the defendant has multiple degrees from
revered universities and served as the Chief Investment Officer
of a firm that managed billions of dollars in assets.  He has
managed to thrive in challenging environments in the face of
mental illness in the past.  He has not shown why he lacked the
ability to assert his interests to his own lawyers, to weigh his
options rationally before pleading guilty, or to advise the
Court at the plea allocution of any difficulty he was having
with his counsel.  To the contrary, he assured the Court at the
plea allocution that he was satisfied with the representation
that his attorneys had given him.  Even his decision to change
attorneys once when indicted and again when facing sentence are

evidence that he exercises judgment about the adequacy of his counsel's representation and, more generally, that he can weigh his options rationally.[11]

And, indeed, Velissaris's actions leading up to the plea were perfectly rational.  Velissaris waited until the eve of trial to enter his plea of guilty.  At the conference, it became clear that substantial evidence of the defendant's guilt would be admitted and some of the defendant's proffered evidence would not.  Thus, the defendant's decision shortly after the final conference to accept a plea agreement that allowed him to plead to a single count carrying a maximum term of imprisonment of twenty years makes rational sense.  Accordingly, the defendant has failed to show that there is a substantial question regarding the voluntariness of his plea.[12]

---

[11] At sentence, Velissaris spoke coherently and at length in his defense, exhibiting once more his intelligence and command.

[12] In a joint letter of March 28, 2023, the defendant requested "a hearing" on the motion to withdraw his plea.  As noted above, oral argument was held on April 7, 2023.  To the extent that the defendant requests an evidentiary hearing regarding the voluntariness of his plea (or any other issue), the request is denied.  "A motion to withdraw a guilty plea may be denied without a hearing where the defendant's allegations merely contradict the record, are inherently incredible, or are simply conclusory."  United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997) (citation omitted).  Here, the defendant's allegations merely contradicted the record and were inherently incredible under the circumstances.  He failed to identify a specific issue requiring a hearing.  Therefore, an evidentiary hearing was not warranted.

B.   Claim of Innocence

In evaluating whether there is fair and just reason for requesting a withdrawal of a guilty plea, courts also consider whether the motion is made based on a claim of innocence. Importantly, while a "claim of innocence can be a basis for withdrawing a guilty plea," the claim "must be supported by evidence." Overton, 24 F.4th at 879.  Statements that simply contradict those made in a plea allocution "are not sufficient grounds to withdraw the guilty plea." Id. (citation omitted).

Here, the defendant has not sought to contradict or explain his statements in his allocution.  In that allocution, he freely admitted that he acted with intent to defraud investors.  He acknowledged making manual adjustments to increase the values of the OTC derivative positions in the Funds, even though he had told investors he would use "an independent Bloomberg system" to value the derivatives.  To support this motion, Velissaris ignores his allocution and tries to redefine the nature of the crimes with which he was indicted.

Moreover, while the memorandum prepared by defense counsel argues that there is evidence of actual innocence, Velissaris has submitted no declaration with this motion declaring his innocence.  The declaration he submitted with his counsel's reply memorandum entirely ignores his statements during his

43

allocation.  He proclaims in that declaration that he maintained his innocence to prior counsel and that their draft of the sentencing memorandum contained factually incorrect statements, but he does not explain why he is innocent or address his statements under oath during the plea allocution that he had acted with intent to defraud.  Nonetheless, this Opinion will address defense counsel's arguments on innocence.

The Indictment articulated two theories for its securities fraud charge against Velissaris.  According to the first, Velissaris's conduct constituted securities fraud because he represented to investors that Infinity Q valued its OTC derivative positions using BVAL, an independent valuation service, without substantive input from Infinity Q, when, in fact, Velissaris altered the positions within the BVAL system to manipulate the valuations (the "Disclosure Theory").  According to the second, Velissaris's alterations improperly inflated the value of the positions in question to inflate the apparent value of the Funds' holdings (the "Mismarking Theory").  The defendant's arguments with respect to both theories lack merit.

1.   The Disclosure Theory

The defendant argues that he cannot be guilty of securities fraud under the first theory of the case.  He contends, based on a handful of documents, that Infinity Q disclosed to investors

44

that it retained discretion to adjust valuations determined by pricing services to ensure that those valuations tracked the fair value of the relevant positions.  As a result, he argues, he cannot be liable for his representations about Infinity Q's use of BVAL.  This argument fails.

At the outset, it is noteworthy that the defendant had all the information on which he now relies when he pled guilty to the securities fraud charge.  At the final pretrial conference, for example, defense counsel referenced "documents that clearly disclosed" to investors that "Infinity Q retained its right and discretion to make modifications to values of their assets" when "they thought the pricing services was inaccurate."  Thus, the defendant, represented by highly competent counsel, admitted his guilt even though aware of the documents that he now claims prove his innocence.  This alone renders the argument about the documents futile.

In any event, the documents that the defendant references provide him little comfort.  The disclosures that the defendant references state, at a high level, that Infinity Q retained discretion to adjust valuations from pricing services to align those valuations with "fair value."  As an illustration, one investor disclosure reads:

> In circumstances where an exchange, a pricing service,
> or where one or more quotes are not available for a

> Position, or <u>where</u> such exchange, <u>pricing service</u>, quote or quotes <u>may not provide a reliable indication of fair value</u>, <u>Infinity Q will value each such Position based on relevant information</u>, including, without limitation: (i) an internally or externally developed memo/model, including inputs and assumptions (e.g., comparing market values for similar companies/instruments); and/or (ii) such other factors as may be deemed appropriate.

(Emphases added.)  That is, Infinity Q represented only that it retained discretion to ensure that valuations aligned with fair value.

These generalized disclosures are not inconsistent with the Government's theory of securities fraud.  To begin with, as Velissaris admitted at his plea allocution, Infinity Q told its investors that the valuation system that Infinity Q selected was BVAL.  But, Velissaris testified at his plea allocution that he misrepresented his use of BVAL "to investors" when he "told investors"[13] that he was using BVAL to value the OTC derivatives,

---

[13] Given Velissaris's admission that he made misrepresentations to investors, defense counsel's objections to representations cited by the Government in its brief opposing this motion, primarily because they were statements made to Infinity Q's trustee, administrator, and auditors, are hard to understand. The distinction between misrepresentations to individuals in these roles and misrepresentations to the Infinity Q investors, who were largely if not exclusively financial institutions, is tenuous at best, given the reliance placed on such individuals by those investors.

when, in fact, he was manipulating the valuations produced by
BVAL.[14]

Moreover, the Government's case did not depend on the jury
disregarding the documents that defense counsel cites in this
motion.  The Government's theory was that the defendant did not
disclose that, despite specific representations to the contrary,
he manipulated BVAL's valuations to inflate artificially the
value of Infinity Q's assets.  The defendant's position that the
existence of these disclosures exonerates him is inconsistent
with his sworn testimony that he manipulated the positions "with
the intent to defraud" and "[t]o increase the value of the
securities being held by the fund."[15]

---

[14] Because of this, Velissaris's cited cases are inapposite.  In
I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co. Inc., 936
F.2d 759 (2d Cir. 1991), for example, the plaintiff complained
of a misleading prospectus.  But the Second Circuit noted that,
in a different section of the same prospectus than the section
complained of by plaintiff, "the prospectus states exactly the
'fact' that [plaintiff] contends has been covered up."  Id. at
762 (emphasis added).  Here, by contrast, Infinity Q's prior
generalized statements about pricing services do not absolve him
of the misleading and inaccurate statements he made in different
settings about BVAL specifically or of the evidence that he
altered BVAL valuations to improperly inflate NAV.

[15] Further, the disclosures on which the defendant now relies
represented that Infinity Q's valuation committee would meet to
approve any changes in valuations produced by pricing services.
Velissaris offers no evidence, however, that the valuation
committee approved the alterations he made to BVAL or the inputs
to BVAL.  And, during the SEC's investigation of Velissaris, he
provided the SEC with falsified minutes of meetings of the
valuation committee to hide his fraudulent use of BVAL.

Velissaris's plea aligns with the compelling and unrefuted evidence that Velissaris acted with consciousness of his own guilt. When the valuations were reviewed by Infinity Q's auditors and the SEC, Velissaris provided both with falsified documents to obscure the alterations he had made when using BVAL. As the Government points out, were the defendant's alterations made to align valuations with his assessment of "fair value," there would have been no reason to conceal them and deceive the auditors and the SEC.[16]

Finally, and as significantly, none of the expert testimony the defendant sought to offer at trial presented any analysis purporting to show that the specific adjustments Velissaris made with BVAL brought valuations closer to fair market value. And, the analysis in the report prepared by the Government's summary witness was compelling proof to the contrary. For instance, Velissaris gave the same positions held in the two Funds different valuations. Other Velissaris valuations were mathematically impossible.

---

[16] The defendant does not dispute that he lied to the SEC and auditors. In fact, the defendant stipulated to a sentencing adjustment because he agreed that he "willfully obstructed or impeded, or attempted to obstruct or impede," the investigation. While the defendant asked on the eve of sentencing for a Fatico hearing on the loss amount component of the Sentencing Guideline calculation, he did not seek a hearing on the obstruction enhancement.

2.    The Mismarking Theory

The defendant's arguments regarding the Government's second theory[17] -- that Velissaris's alterations improperly inflated the value of the positions in question to inflate the apparent value of the Funds' holdings -- also lack merit.[18]  The overarching problem for the defendant now, as during the motions in limine, is that the Government need not prove that BVAL is the best tool or even a reliable tool for valuing OTC derivative positions. To be sure, different analysts and different valuation tools may reach a different view of the fair market value of a given security at a particular point in time.  But that is largely immaterial to this case.  The crucial point is that Infinity Q held BVAL out as the independent method it would use to determine fair market value.  Velissaris then took BVAL calculations -- objectively correct or not -- and inflated them when he chose, not to make them more accurate, but to increase

---

[17] The defendant argues that the Government has abandoned the Mismarking Theory because the Government used the word "mismodeled" in its opposition papers, rather than "mismarked." There is no fair basis to conclude the Government has abandoned any component of the Indictment's charges.

[18] Because the defendant has not put forth sufficient evidence to suggest that he was innocent under the Government's first theory of securities fraud, that theory alone is sufficient to support his guilty plea.  For the sake of completeness, however, his arguments regarding the second theory are also addressed.

artificially the value of the positions held by the Funds and thereby inflate NAV.

Moreover, the three categories of evidence cited in this section of the defendant's memorandum are not evidence of innocence.  If anything, these citations reflect the lengths to which the defendant has gone to find evidence that may be helpful to him.

The defendant cites an October 15, 2020 email from an SEC employee, David Stevens, who worked on the investigation of the defendant.  In the email, Stevens states that the returns Infinity Q disclosed to the public at the relevant time were "believable" and "not exactly outlandish."  But the email comes from early in Stevens's work on the investigation of Infinity Q, before Stevens had participated in interviews of Velissaris or examined Infinity Q's BVAL portfolio.  After receiving access to this portfolio in early 2021 and reviewing several of the relevant positions, Stevens came to understand what Velissaris had done -- he had an "ah ha" moment -- and concluded that Velissaris had manipulated the BVAL valuations.  Seeking to avoid evidence of Stevens's ultimate assessment, the defendant moved to preclude him from testifying at trial.  Thus, an email from Stevens, sent early in the SEC investigation, is not evidence of Velissaris's innocence.

The defendant next points to testimony from his proffered expert, Dr. Saha, opining that Infinity Q's risk models aligned with market conditions at the time.  According to Dr. Saha, Infinity Q's risk models were intended "to monitor changes in the value of its holdings."  Dr. Saha opined that outputs from the risk models were "directionally consistent" with changes in the Infinity Q valuations and with market conditions at the time.  But the risk models were created by others at Infinity Q as part of a process that was entirely distinct from the valuation process.  These individuals had no access to Velissaris's valuation process and were among those Velissaris deceived.  The risk models for much of the relevant time did not even account for the corridors in Infinity Q's corridor swaps. Moreover, as noted above and as explained at the final pretrial conference, Dr. Saha offered no analysis regarding how any of the specific alterations Velissaris made in BVAL brought the valuations of individual positions closer to fair market value.[19]

---

[19] In response to the Government rightly noting that Dr. Saha never opined on whether defendant's alterations brought the valuations closer to fair market value, defendant argues bizarrely that Dr. Saha never purported to offer such an opinion.  But that oversight is precisely the point.  If the defendant could offer a defense that his alterations to BVAL and to the inputs into BVAL brought his valuations closer to fair value, expert testimony that the alterations did, in fact, bring them closer to fair value would have been helpful to him.  He had no such expert testimony.

Thus, again, the evidence regarding Infinity Q's risk models does not show that Velissaris is innocent of the crime to which he pleaded guilty and that he did not act, as he previously stated under oath, with the intent to defraud.

Finally, the defendant points to statements made by Infinity Q's auditor suggesting that it agreed with Infinity Q's methods of determining fair value.  This reference in the defendant's memorandum is particularly troubling.  Velissaris does not dispute that he provided falsified documents to Infinity Q's auditor to hide his manipulations.  It was the subject of one of the Indictment's counts against him. Statements by the auditor that are based on fraudulent documents created by Velissaris himself are of no use to Velissaris now.

   3.   Summary

In summary, the evidence to which the defendant points does not suggest that he is innocent under either of Count One's theories of securities fraud.  Looking at that evidence and at the statements made at his plea allocution (which have not been contested here), the following picture emerges.  Infinity Q represented to investors that, in general, it retained the right to adjust valuations produced by its use of pricing services to align the valuations more closely with fair market value.

Velissaris identified BVAL as the specific pricing service he would use as an independent source of valuation.

Contrary to his representations, Velissaris altered BVAL's valuations of certain OTC derivative positions.  And, the alterations Velissaris made were not intended to align the valuations more closely with fair market value.  Instead, they were made to increase the Funds' NAV and to defraud.  Thus, Velissaris made misleading misrepresentations about Infinity Q's use of BVAL and mismarked the value of the positions that he altered.  He has not now put forth evidence of innocence to weigh in his favor on his motion to withdraw his plea of guilty.[20]

---

[20] One final argument bears mentioning.  Velissaris cites United States v. Culbertson, 670 F.3d 183, 191 (2d Cir. 2012), for the proposition that "it is error for the court to find that a factual basis [for a guilty plea] exists when the defendant actively contests a fact constituting an element of the offense in the absence of circumstances warranting the conclusion that the defendant's protestations are unworthy of belief." Culbertson concerns the propriety of a district court's acceptance of a plea of guilty, not the standard for withdrawing a plea after it has been accepted.  Id. at 186.  At his allocution, far from contesting any element of the charge, Velissaris eloquently testified to facts establishing all its essential elements.  He does not dispute that sworn statements he made at that allocution establish each of the elements of the crime charged in Count One.  Thus, to the extent that he attempts to suggest with his cite to Culbertson that it would be error to deny his application to withdraw his plea because his attorneys' memorandum in support of this motion argues that he is innocent, that attempt fails.

C.   Delay

In evaluating whether there is fair and just reason for a withdrawal of a guilty plea, courts also consider the delay between the defendant's plea and the motion to withdraw. "Whereas a swift change of heart may indicate a plea made in haste or confusion," a defendant waiting months to file a motion to withdraw a plea of guilty suggests that his plea was entered into voluntarily.  See United States v. Doe, 537 F.3d 204, 213 (2d Cir. 2008).  Thus, courts have held that a delay of four or five months weighs against granting a motion to withdraw a plea. See, e.g., Overton, 24 F.4th at 879-80 (five months); Albarran, 943 F.3d at 123 (four months).

Here, the defendant entered his guilty plea on November 21, 2022.  On March 24, just days before his sentencing and roughly four months after his plea, he sought to withdraw the plea.[21] This delay weighs against granting his motion.

The defendant argues that the delay should not weigh against him because he worked with his current and prior counsel to withdraw his plea while managing mental illness.  As addressed above, the defendant has not shown that he was incapable of taking significant actions if that was his desire.

---

[21] It is likely that the delay would have been even longer but for the Court denying the request by the defendant's current counsel for a 60-day extension of the sentencing.

Between these criminal proceedings and the related SEC investigation, Velissaris has been represented by three major law firms.  He has demonstrated the ability to retain new counsel if dissatisfied with counsel's performance.  Indeed, in his declaration, he notes that, after he reviewed his prior counsel's draft sentencing memorandum and noted "a number of factually incorrect statements," he "immediately" retained a new legal team.  He has not sufficiently explained why he could not have had his prior or current counsel file the motion before the date on which his sentencing submission was due.  Accordingly, the delay weighs strongly against his motion to withdraw.

D.   Prejudice

Finally, courts evaluating whether there is a fair and just reason for withdrawing a plea consider prejudice to the Government from the withdrawal.  The Government already prepared for trial once in this case.  The plea was entered the Monday of Thanksgiving week; the trial was set to begin the following Monday.  The Government's need to prepare for trial again, having already done so once, weighs against withdrawal.  See Albarran, 943 F.3d at 123.  Likewise, changed circumstances meaningfully affecting trial preparations can weigh against withdrawal.  See id.

The prejudice to the Government in this case weighs strongly against granting the withdrawal.  The Government was prepared to proceed to a trial expected to last two to three weeks between Thanksgiving and the winter holidays.  Now, two of the three prosecutors who worked on the case have left the U.S. Attorney's Office.  The remaining prosecutor is working on multiple matters.  She was recently on trial and has another trial upcoming soon.  Thus, granting the motion to withdraw the plea would deprive "the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it."  United States v. Lopez, 385 F.3d 245, 254 (2d Cir. 2004).[22]

Further, the defendant brought this eleventh-hour motion with no prior notice to the Government or the Court.  It remains a mystery why no defense counsel, either his outgoing or incoming, advised the Court at their appearance on March 10 of the defendant's desire to withdraw his plea.  This late disclosure forced the Government to scramble to prepare its

---

[22] The defendant argues, without any meaningful evidence, that the Government will receive assistance from the SEC in preparing again for trial.  But, as the Court has now explained repeatedly, the SEC is not part of the prosecution team in this case and has not conducted a joint investigation into Velissaris with the Government.  Thus, there is no indication that the SEC would assist the Government or relieve it of the prejudice of having to prepare for trial again.

opposition to the motion while simultaneously preparing its sentencing submission.

Finally, Velissaris's tactic of trying to delay the proceedings at the expense of the Government and the public has been a theme of this litigation. Even though the parties were cautioned in February that the trial date was firm, Velissaris brought a motion seeking to adjourn the November trial date in June 2022. Then, days before the trial, and after having had the benefit of a very early disclosure of the Government's 3500 material, he sought another adjournment. After retaining new counsel, Velissaris sought a last-minute substantial extension of his sentencing. And, in connection with the instant motion, he made additional requests that would have delayed resolution of the motion until at least May.

The defendant does not meaningfully argue that the Government would not be prejudiced by granting the withdrawal except to say that he disagrees with the Government (and apparently Second Circuit precedent) that the relevant circumstances create prejudice. Although the defendant characterizes the circumstances as no more than an "inconvenience" for the Government, they are prejudicial. See, e.g., Albarran, 943 F.3d at 123; Lopez, 385 F.3d at 254.

E.   Balancing of Factors

Weighing all the above factors, Velissaris has shown no violation of his Brady rights and has not shown a fair and just reason for a withdrawal of his plea of guilty.  He has not shown either that his plea was involuntary or that his claim of innocence is well-founded.  The remaining factors also weigh strongly against his motion.

## Conclusion

For these reasons and as explained on April 7, the defendant's March 24, 2023 motion to withdraw his plea of guilty has been denied.

Dated:    New York, New York
          April 10, 2023

                                  _____
                                  DENISE COTE
                          United States District Judge