UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
              -v-                       :        22cr105 (DLC)
                                        :
JAMES VELISSARIS,                       :        OPINION AND
                                        :           ORDER
                      Defendant.        :
                                        :
--------------------------------------- X

APPEARANCES:

For the United States of America:
Margaret Graham
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007

For the defendant:
Michelle N. Bradford
Michael A. Battle
William R. Martin
David S. Slovick
Erin C. Steele
Barnes & Thornburg LLP
555 12th Street NW
Suite 1200
Washington, DC 20004

DENISE COTE, District Judge:

     On November 21, 2022, the defendant pled guilty to one

count of securities fraud in violation of 15 U.S.C. §§ 78j(b)

and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  On April 7,

2023, the defendant was sentenced principally to a term of 180

months' imprisonment.  That same day, the Court ordered the

defendant to pay restitution, but deferred until a later date the final determination of the appropriate restitution amount.

Two victims of the defendant's fraudulent scheme seek restitution -- the Diversified Alpha Fund ("DAF") in the amount of $59,152,245.00 and the Volatility Alpha Fund ("VAF") in the amount of $67,129,126.02.  The defendant opposes the entry of restitution.  This Opinion addresses the defendant's objection to the award of restitution with one exception.  A separate order will address any objection that may by made to the reasonableness of the amount of attorneys' fees that may be awarded to the two victims.

### Background

The Court presumes familiarity with the prior Opinions issued in this case.  United States v. Velissaris, 22cr105 (DLC), 2023 WL 3018513 (S.D.N.Y. Apr. 20, 2023); United States v. Velissaris, 22cr105 (DLC), 2023 WL 2875487 (S.D.N.Y. Apr. 10, 2023); United States v. Velissaris, 22cr105 (DLC), 2022 WL 17076747 (S.D.N.Y. Nov. 18, 2022); United States v. Velissaris, 22cr105 (DLC), 2022 WL 2392360 (S.D.N.Y. July 3, 2022).  Only those facts relevant to the issue of restitution are summarized below.

On February 16, 2022, James Velissaris was charged in a six-count Indictment with securities fraud and obstruction of an

SEC investigation.  According to the Indictment, Velissaris engaged in an ongoing scheme to defraud investors while working as the Chief Investment Officer of Infinity Q Capital Management LLC ("Infinity Q"), an investment adviser.

Velissaris's scheme can be summarized as follows.  During the relevant time, Infinity Q managed the DAF and the VAF (together, the "Funds").  The Funds' portfolios included over-the-counter ("OTC") derivatives.  Infinity Q and Velissaris represented to investors that Infinity Q used an independent service called the Bloomberg Valuation Service ("BVAL") to value the OTC derivative positions held by the Funds, without any substantive input from Infinity Q.  Contrary to these representations, however, Velissaris manipulated the BVAL calculations to inflate the values of the derivative positions. His alterations included inputting into BVAL terms for certain positions that differed from the agreed-upon terms in their term sheets and altering the parameters of the BVAL tools so that the tools would return inflated values for the positions. Velissaris's alterations resulted in an increased overall net asset value ("NAV") for the Funds and thus larger management and performance fees for Velissaris.

I.   Procedural History

A grand jury returned an Indictment on February 16, 2022, charging Velissaris with securities fraud, investment adviser fraud, wire fraud, false statements to an accountant, conspiracy to obstruct an SEC investigation, and obstruction of an SEC investigation.  On February 25, Velissaris entered a plea of not guilty, and trial was set for November 28.

On November 21, three days after the final pretrial conference and one week before trial was set to commence, the defendant pled guilty to the securities fraud count in the Indictment.  One day before the defendant changed his plea, the parties submitted a plea agreement executed by the defendant, one of his attorneys, and representatives of the Government (the "Plea Agreement").  The Plea Agreement provides in pertinent part that Velissaris

> agrees to make restitution in an amount ordered by the Court, pursuant to Title 18, United States Code, Sections 3663, 3663A, and 3664.  The parties agree, however, that the existence of a payment plan set by the Court will not bar Governmental collection efforts against any of the defendant's available assets.

(Emphases supplied.)

In light of this portion of the Plea Agreement, the Court, during the defendant's change of plea proceeding on November 21, asked the defendant if he understood that "there may . . . be requirements of forfeiture and restitution" in connection with

4

his plea.  The defendant acknowledged that he understood.  After determining that there was a sufficient factual predicate for the defendant's plea of guilty and that he was entering the plea knowingly and voluntarily, the Court accepted the plea of guilty to the securities fraud count of the Indictment.  Sentencing was set for March 3, 2023.

On February 8, 2023, the parties submitted a joint request to adjourn the sentencing date in part because the presentence report was delayed.  Based on this and other requests for adjournments, the sentencing was ultimately adjourned to April 7.

The Probation Department's final presentence report (the "PSR") was filed on February 28.  The PSR acknowledged that, in the Plea Agreement, "the defendant agreed to make restitution in an amount ordered by . . . the Court."  It nonetheless stated that

> [a]lthough restitution should be ordered in this case
> under Title 18, the Government advised that they will
> not be seeking restitution.  According to the
> Government, the offense involved dozens of investors
> in the Hedge fund and likely thousands in the Mutual
> fund, and it would be impractical to seek restitution
> in light of the parallel liquidation of funds being
> overseen by the SEC and other entities.  Further, the
> Government informed that seeking restitution could
> create inconsistencies with the liquidation
> proceedings.  Pursuant to 18 U.S.C. § 3663A(c)(3)(B),
> restitution shall not apply if the Court finds that
> determining complex issues of fact related to the
> cause or amount of the victims' losses would

complicate or prolong the sentencing process to a
degree that the need to provide restitution to any
victim is outweighed by the burden of the sentencing
process.

On March 24, 2023, the defendant, having retained new

counsel, filed his sentencing submissions, and also moved to

withdraw his guilty plea.  In a letter to the Government dated

March 30, the Special Litigation Committee ("SLC") of the Board

of the Trust for Advised Portfolios ("TAP"), of which the DAF is

a series portfolio, requested that the Government seek

restitution on behalf of the DAF.[1]  The Government filed its

sentencing submissions the following day.  The Government's

sentencing memorandum explained that

> the Government wishes to clarify that at the April 7
> sentencing, it will be seeking both restitution and
> forfeiture, which is contrary to the language in the
> PSR that says it will be seeking forfeiture alone.
> The Government is currently seeking additional
> information about the proper restitution amount and
> will either submit additional details in advance of
> the April 7 sentencing, or will ask the Court to enter
> an order of restitution and determine the precise
> amount within the following 90 days, as provided by 18
> U.S. Code § 3664(d)(5).

(Emphases supplied.)

---

[1] The SLC of TAP submitted a supplementary letter on behalf of
the DAF to the Government on April 6.  Later, on May 30,
Infinity Q submitted a letter to the Government requesting
restitution on behalf of the VAF.  The contents of each of these
letters, which outline the losses incurred by the DAF and the
VAF, are described in the following section.

On April 7, the defendant's motion to withdraw his guilty plea was denied.  After this motion was denied, the Court sentenced the defendant.  During the sentencing proceeding, the Court noted that "[a]t one point, there was some discussion . . . of restitution" and asked to hear from the Government on the issue.  The Government responded:

> Your Honor, yes, there was an initial letter from the TAP.  We have since received an additional letter yesterday that we have not shared with the Court, because we would ask the Court to simply enter restitution as part of today's judgment, but pursuant to 18 U.S.C. 3664(d)(5) defer a final determination of victims' losses for a period of no more than 90 days, and we intend to submit further information on the proper amount.

Additionally, during the sentencing proceeding, defense counsel asked the Court to impose a sentence of home confinement or, at most, only a short period of incarceration.  As part of defense counsel's argument, defense counsel stated:

> In the financial fraud context in particular, as your Honor knows, a severe or substantial period of incarceration is not needed to promote general deterrence.  Here, there is a $22 million forfeiture order and there will likely be millions of dollars in restitution that Mr. Velissaris will have to comply with.  This forfeiture amount alone serves as a general deterrent to anyone considering this type of activity that it's not worth it, as any alleged ill-gotten gains will be taken away.

(Emphasis supplied.)  The Court sentenced the defendant principally to a term of 180 months' imprisonment.[2]  The Court also ordered the parties to submit a letter by June 2 indicating whether they had agreed on the appropriate restitution amount and, if not, proposing a schedule for resolving any disputes with respect to the amount.

The parties did not agree on the amount of restitution. Instead, the Government submitted a letter on June 13 in support of DAF's and VAF's proposed restitution amounts, and on June 20 the defendant submitted a response objecting to restitution.

On June 27, the Court ordered that restitution would be entered in this case, with the final amount of restitution to be determined at a later date.  The issue of the proper amount of restitution will be fully briefed on July 28.

II.  The Victims' Losses

The Government seeks restitution on behalf of two victims of Velissaris's scheme, the DAF and the VAF.  The SLC of TAP submitted two letters, dated March 30 and April 6, in support of restitution for the DAF.  Infinity Q submitted a letter, dated May 30, in support of restitution for the VAF.  This section

---

[2] The applicable sentencing guidelines range for the defendant was 324 to 405 months' imprisonment, and the statutory maximum was 240 months' imprisonment.

describes the two Funds and their losses, as articulated in these three letters.

A.    DAF

The DAF was formed in September 2014 as a series of TAP. Infinity Q advised the DAF and was principally responsible for its day-to-day management during the relevant period.  The DAF paid Infinity Q an annual management fee equivalent to 1.70% of the DAF's average daily net assets.

In late February of 2021, Infinity Q informed the DAF that Velissaris had mismarked the value of several of the Fund's OTC derivative positions and that, as a result, Infinity Q could not verify the reasonableness of the previously reported value of those positions, nor could it calculate a current NAV for the Fund.  On February 22, Infinity Q and TAP filed an application with the SEC to suspend shareholder redemptions in the DAF as of February 19.  The application was granted the same day.  See Notice of Application and Temporary Order, Investment Company Act Release No. 34,198, 86 Fed. Reg. 11,815 (Feb. 22, 2021) (the "SEC Order").

The SEC Order required TAP to create a plan for liquidating the DAF's assets (the "Liquidation Plan") and a plan for making payments to current and former DAF shareholders (the "Distribution Plan").  Id. at 11,816.  The Liquidation Plan and

the Distribution Plan were both to be submitted to and executed under the supervision of the SEC.  Id.  The SEC Order also required TAP, on behalf of the DAF, to "engage an independent third party to assist in determining the fair value of" the DAF's OTC positions "and any other Fund holdings for which current and reliable market quotations are not readily available, including re-evaluating the historical valuations of the Fund."  Id.

Consistent with the SEC Order, the TAP Board retained Russell Investments Implementation Services, LLC ("RIIS") to assist in the liquidation of assets held by the DAF that were not already in cash or cash equivalents as of the entry of the SEC Order.  DAF paid RIIS roughly $850,000 in fees for its liquidation services.

The Board also retained Alvarez & Marsal Valuation Services, LLC ("A&M") to reevaluate the DAF's February 18, 2021 NAV and historical valuations, again consistent with the SEC Order.  A&M's analysis revealed that the DAF's OTC derivative positions were overstated at each month-end date from February 2017 to January 31, 2021.  The DAF paid A&M about $1,573,882 in fees for its reevaluation services.  It also paid $450,000 for a license to the BVAL tools used by A&M in its reevaluation.

Finally, in connection with the TAP Board's efforts to create the Distribution Plan as required by the SEC Order, the Board engaged Cornerstone Research ("Cornerstone").  Cornerstone developed estimates of the amounts that the DAF may be liable to pay in damages in pending securities class actions.  It also calculated the pro rata amounts that needed to be distributed to each shareholder as part of the Distribution Plan.  In November 2021, the DAF finalized the Distribution Plan and distributed roughly $500 million to shareholders.  In April 2022, the DAF distributed roughly $170 million more.  After these two distributions, the DAF held about $570 million to satisfy its liabilities.  The DAF paid Cornerstone approximately $2,288,416 in connection with its services relating to the distribution of the DAF's assets.

Although Velissaris's conduct caused substantial losses to a significant number of investors and ultimately forced the DAF into liquidation, certain shareholders who had fully redeemed their shares at inflated NAVs were overpaid by the DAF.  Using A&M's reevaluated NAVs for the DAF, Cornerstone calculated the DAF's overpayments to such shareholders, as well as overpayments the DAF made to Infinity Q in management fees.  Cornerstone determined that the DAF overpaid by $46,482,819 those shareholders who had fully redeemed their shares at inflated

NAVs, and paid $7,485,202 in excess management fees to Infinity Q.

Based on the above, the DAF seeks restitution to cover: (1) $46,482,819 in overpayments to former shareholders, (2) $7,485,202 in excess management fees paid to Infinity Q, (3) $850,000 in payments to RIIS in connection with their liquidation services, (4) $1,573,882 in payments to A&M for their reevaluation services, (5) $2,288,416 in payments to Cornerstone in connection with the distribution of the DAF's assets, and (6) $450,000 for the BVAL license used by A&M in the reevaluation.  The DAF also seeks $21,926 in attorneys' fees related to their restitution application.[3]  In total, the DAF seeks $59,152,245.00.

    B.  VAF

The VAF was another Fund managed by Infinity Q.  Like the DAF, the VAF paid management fees to Infinity Q.  It also paid additional amounts based on performance of the VAF.

The losses claimed by the VAF are similar to those claimed by the DAF.  Like the DAF, the VAF retained an independent valuation expert, IHS Markit ("Markit"), to revalue the OTC

---

[3] In its April 6 letter, the DAF originally calculated attorneys' fees at $18,874.  It later provided invoices to the Government indicating that the correct amount of its requested attorneys' fees was $21,926.

derivative positions held by the VAF in the relevant time.  It used NERA Economic Consulting ("NERA") to revalue the entire VAF portfolio on a monthly basis and recalculate the management fees, performance allocations, and other fees and expenses based on Markit's revised NAV.  As noted above, even though Velissaris's conduct caused significant losses to many investors, certain Limited Partners in the VAF were overpaid due to inflated valuations.  Based on the calculations by Markit and NERA, the VAF determined that it overpaid these investors $18,880,319.12,[4] and that it overpaid Infinity Q $26,576,945.89 in various fees.  The VAF seeks these amounts in restitution and also seeks $844,067.05 in fees paid to Markit.

Finally, the VAF seeks certain legal expenses. Specifically, it seeks: $20,235,496.29 in legal fees, which the VAF was required to advance, for Velissaris's criminal defense; $514,315 in legal fees for Government witness Scott Lindell, which were incurred due to Lindell's participation in the prosecution; and $79,182.67 in legal fees for other Infinity Q employees who were interviewed by the Government and prepared to testify against Velissaris.

---

[4] The VAF noted in its May 30 letter that an SEC action against Infinity Q will designate a monitor for Infinity Q to develop a plan for distributing the VAF's assets.  This plan may allow the VAF to reduce distributions to certain investors to offset the overpayments.

In summary, the VAF seeks restitution to cover:
(1) $26,573,945.89 in excess fees paid to Infinity Q,
(2) $18,880,319.12 in overpayments to Limited Partners,
(3) $20,235,496.29 in Velissaris's legal fees, (4) $514,315.00
in Lindell's legal fees, (5) $79,182.67 in legal fees for other
Infinity Q employees interviewed by the Government, and
(6) $844,067.05 in payments to Markit.  In total, the VAF seeks
$67,129,126.02.

## **Discussion**

For the reasons that follow, restitution to the DAF and to
the VAF is appropriate.  This section addresses two threshold
issues -- whether the Court has authority to order restitution
and whether restitution is impracticable in this case -- before
proceeding to consider the appropriate amount of restitution.

I.   Authority to Order Restitution

The Court has authority under 18 U.S.C. § 3663(a)(3) and
the Plea Agreement to order Velissaris to pay restitution.
"[F]ederal courts have no inherent power to order restitution
but only such authority as is conferred by Congress through
statute."  United States v. Pescatore, 637 F.3d 128, 139 (2d
Cir. 2011) (citation omitted).  One such statute, the Victim and
Witness Protection Act ("VWPA"), provides in pertinent part that
a federal court may "order restitution in any criminal case to

the extent agreed to by the parties in a plea agreement."  18
U.S.C. § 3663(a)(3).  Likewise, the Mandatory Victims
Restitution Act ("MVRA") allows parties to stipulate to
restitution in a plea agreement in at least some circumstances.
See 18 U.S.C. § 3663A(a)(3), (c)(2).

Plea agreements, however, "are construed strictly against
the government."  United States v. Gottesman, 122 F.3d 150, 152
(2d Cir. 1997).  Thus, when a court orders restitution based on
a plea agreement, "the court can order restitution only in an
amount not to exceed that agreed upon by the parties" and "can
order restitution only if the parties agreed that a court may do
so."  Id.

The Court has authority to order restitution here.
Velissaris, in his Plea Agreement, agreed "to make restitution
in an amount ordered by the Court, pursuant to Title 18, United
States Code, Sections 3663, 3663A, and 3664" and acknowledged
that a payment plan for such restitution would be "set by the
Court."  Thus, it is clear that the parties agreed that (1) the
amount of restitution would be set by the Court using the
guidelines and procedures set by 18 U.S.C. §§ 3663, 3663A, and
3664, and (2) that this Court could order restitution.  Indeed,
Velissaris's own counsel acknowledged this agreement when,
during the sentencing proceeding, defense counsel relied on

Velissaris's expected restitution to argue that a lower period of incarceration was warranted.

The defendant relies heavily on the Second Circuit's unpublished opinion in United States v. Rendon-Reyes, No. 20-446, 2023 WL 3332553 (2d Cir. May 10, 2023), to argue that the Court lacks authority to order restitution.[5]  But Rendon-Reyes does not mandate a different result.  In that case, "[t]he district court and both parties believed that restitution was mandatory under" either the MVRA or another statute.  Id. at *1 (emphasis added).  Additionally, although the Rendon-Reyes Court noted that the MVRA allows parties to stipulate to restitution in a plea agreement, it was "undisputed that Rendon-Reyes's plea agreement included no such provision."  Id. at *2.  Thus, the lower court imposed restitution not because the defendant agreed to it in his plea agreement, but because that court and the parties were under the mistaken impression that restitution was legally mandated.  Here, by contrast, there is no such confusion.  Regardless of the specific crimes otherwise covered by the MVRA or the VWPA,[6] restitution is proper because the

---

[5] Under the Second Circuit's Local Rule 32.1.1(a), "[r]ulings by summary order do not have precedential effect."

[6] Because the parties agreed in the Plea Agreement that the defendant would make restitution, it is unnecessary to decide if the Court independently has authority to order restitution under

defendant "agree[d] to make restitution in an amount ordered by the Court."

II.  Impracticability

The defendant also contends that awarding restitution in this case is excessively impracticable.  It is not.

The MVRA provides in relevant part that, for at least certain offenses, restitution is inapplicable if the court finds that "the number of identifiable victims is so large as to make restitution impracticable" or that "determining complex issues of fact related to the cause or amount of the victim's losses will complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3).  Granting restitution is not impracticable in this case.

First, there are not too many identifiable victims to make restitution impracticable -- indeed, there are only two seeking restitution.  Second, there are no complex issues of fact relating to the cause or amount of these two victims' losses. Most of the claimed losses reflect overpayments to shareholders and Infinity Q due to Velissaris's manipulations of the BVAL

---

the VWPA or the MVRA based on the crime to which Velissaris pled guilty.

17

tools.  The VAF and the DAF each engaged independent valuation experts to calculate the extent of these overpayments.  The remainder of the claimed losses simply reflect expenses paid to various service providers.  Thus, determining the extent of these losses does not embroil the Court in complex factual questions, and ordering restitution is not impracticable.

To argue otherwise, the defendant relies on the statements in the PSR explaining that because "the offense involved dozens of investors in the Hedge fund and likely thousands in Mutual fund," the Government originally found that "it would be impractical to seek restitution in light of the parallel liquidation of funds being overseen by the SEC and other entities," and that "seeking restitution could create inconsistencies with the liquidation proceedings."  But after the PSR was created, the Government received the first letter from the DAF and decided to seek restitution on its (and later the VAF's) behalf.  Seeking restitution on behalf of the two Funds (instead of on behalf of individual investors) solves the problems of impracticability identified in the PSR.  Rather than seek restitution on behalf of thousands of investors -- which could create complexities and inconsistencies with parallel liquidation proceedings -- the Government seeks restitution for

the Funds themselves, which, in turn, can reimburse individual investors.

III. Restitution Amounts

Having resolved the threshold questions about the propriety of ordering restitution in this case, it is appropriate to identify the victims to which the defendant must make restitution and the amount of such restitution.  Restitution is appropriate for any "victim" of the defendant's offense of conviction.  18 U.S.C. §§ 3663(a)(1)(A); 3663A(a)(1).  For the purposes of restitution, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  Id. at §§ 3663(2); 3663A(2).  This language imposes cause-in-fact and proximate cause requirements.  United States v. Goodrich, 12 F.4th 219, 229 (2d Cir. 2021).  To satisfy the cause-in-fact requirement, "the defendant's conduct must have been a necessary factor in bringing about the victim's harm."  Id.  Regarding proximate cause, "[t]he basic question . . . is whether the harm alleged has a sufficiently close connection to the conduct," which courts evaluate based on whether the harm was "foreseeable" to a defendant.  Id. (citation omitted).

For offenses "resulting in damage to or loss or destruction of property of a victim," a court may require that the defendant

"return the property" taken or its value and "reimburse the victim for . . . other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. §§ 3663(b)(1), (4); 3663A(b)(1), (4).  Such "other expenses" may include attorneys' fees that a victim was "required to incur to advance the investigation or prosecution of the offense," but "only criminal investigations -- not private investigations, and not civil enforcement investigations -- qualify."  United States v. Afriyie, 27 F.4th 161, 173 (2d Cir. 2022).

"[R]estitution may be awarded only in the amount of losses directly and proximately caused by the defendant's conduct." United States v. Gushlak, 728 F.3d 184, 194-95 (2d Cir. 2013) (emphasis omitted).  A district court need make only a "reasonable approximation" of the amount of loss suffered by a victim.  Id. at 195-96.  "Any dispute as to the proper amount or type of restitution shall be resolved by the district court by the preponderance of the evidence."  Afriyie, 27 F.4th at 165-66 (citation omitted).  The Government bears the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664.

The DAF and the VAF are both "victims" of Velissaris's conduct.  Due to Velissaris's conduct, both Funds overpaid

20

shareholders for certain OTC derivative positions that were
marked at an artificially inflated value.  Similarly, because
Velissaris's alterations inflated the Funds' NAV, both Funds
paid excessive fees to Infinity Q.  And, both Funds needed to
enlist the help of various third-party service providers to
unwind the damage done by Velissaris's actions and to spend
certain amounts in legal fees in connection with Velissaris's
criminal prosecution.  Accordingly, the Funds were both directly
and proximately harmed by Velissaris's conduct and are therefore
victims for the purposes of restitution.  Indeed, Velissaris
does not argue otherwise.

Because Velissaris's scheme involved the loss of property
to the Funds, it is appropriate to order Velissaris to return
the value of the Funds' losses and to reimburse the Funds for
necessary expenses incurred during the Funds' participation in
the criminal investigation and prosecution of Velissaris.  The
Funds' claims for restitution may be sorted into three major
groups -- overpayments to shareholders and Infinity Q, fees for
third-party service providers, and legal fees.  Each of these
categories is addressed below.

A.   Overpayments to Shareholders and Infinity Q

The bulk of the victims' requested restitution consists of
overpayments that the Funds made to Infinity Q and to certain

shareholders who, unlike many others, redeemed their shares at inflated valuations.  Specifically, the DAF seeks $46,482,819 in overpayments to certain former shareholders and $7,485,202 in excess management fees to Infinity Q; the VAF seeks $18,880,319.12 in overpayments made to certain former shareholders and $26,573,945.89 in excess management fees and performance allocations to Infinity Q.  To arrive at these amounts, the DAF used A&M to reevaluate the DAF's historic NAVs using BVAL and then relied on Cornerstone to calculate overpayments to shareholders and Infinity Q based on A&M's reevaluations.  The VAF relied on Markit to reevaluate its NAVs and on NERA to calculate its overpayments.  Each of these entities is a reputable, independent third party, and the results they obtained reasonably approximate the Funds' losses. Accordingly, the defendant shall return these amounts to the Funds.

    To argue that he should not be liable for these amounts, the defendant largely rehashes an argument that he has made throughout this case, namely, that the loss calculations rely in part on BVAL, and BVAL is an unreliable valuation tool.  But for the reasons explained repeatedly in various Opinions in this litigation, whether BVAL is a reliable tool is largely immaterial.  The defendant chose to value the OTC derivative

positions using BVAL and represented to investors that he would
do so without substantive input from Infinity Q.  Secretly,
however, he manipulated the inputs to BVAL to inflate the value
of certain securities with the intent to defraud investors.
Thus, revaluing the securities by using BVAL without fraudulent
alterations is a reasonable method of approximating the losses
caused by the defendant's fraud.

The defendant also argues that the VAF's loss calculations
are not the same as those of the Government's proffered trial
witness, Dr. Faten Sabry of NERA, and are therefore unreliable.
This argument misunderstands the nature of Dr. Sabry's work.
She did not address the amount owed in restitution.  The
Government retained Dr. Sabry to catalogue and quantify "certain
aspects of the fraud" and to use BVAL in order to present "two
forms of 'but-for' testimony."  It expected that the testimony
would help the jury understand how events "would have played out
had the defendant followed his representations and not engaged
in fraud."  Dr. Sabry was guided by specific instructions from
the Government concerning the tasks to undertake and on what
documents she could rely.  Additionally, Dr. Sabry's report
stressed that the work she performed used "conservative
criteria."  Thus, there is no inconsistency between Dr. Sabry's
calculations, meant to illustrate the defendant's fraudulent

23

behavior for a jury, and the VAF's calculations of its actual losses.  Nothing in the law requires a court to limit the amount of restitution to what was established through evidence submitted at trial, or prepared for that purpose.

B.   Third-Party Service Provider Fees

The next category of expenses consists of fees the Funds paid to third-party service providers to remedy the damages caused by the defendant's fraudulent conduct.  Specifically, the DAF seeks $850,000 in payments to RIIS, $1,573,882 in payments to A&M, $2,228,416 in payments to Cornerstone, and $450,000 in payments to Bloomberg; the VAF seeks $844,067.05 in payments to Markit.

Restitution in these amounts is proper.  Each of these amounts was directly and proximately caused by the defendant's conduct.  Because of the defendant's fraudulent scheme, the Funds' NAVs were overstated.  As a result, the DAF and the VAF needed to engage third-party service providers to assist with various remedial measures including reevaluating historical NAVs and (for the DAF) distributing assets in liquidation.  These remedial measures were necessary only because of Velissaris's scheme.  And, that the Funds would need to take such remedial measures once the scheme was uncovered was entirely foreseeable for Velissaris.  Accordingly, the losses incurred in engaging

these third-party service providers are properly included in the restitution amount.

The defendant challenges the inclusion of these amounts. He contends that these losses could be part of the restitution award only if they were "other expenses" incurred in connection with the criminal investigation or prosecution.  He continues that since these losses were not incurred as part of the investigation or prosecution, they are not compensable.  The defendant notes that many of the fees paid by the DAF were made in connection with the SEC Order.

These arguments fail.  The fees paid to service providers in connection with reevaluating the Funds' assets and liquidating the DAF's assets are losses flowing directly and proximately from the defendant's conduct.  That is, the fees are not merely expenses associated with a criminal proceeding; they are part of the losses caused by Velissaris's scheme. Accordingly, it is irrelevant whether they were incurred in connection with the investigation or prosecution of Velissaris.

C.   Attorneys' Fees

The final amounts sought by the Funds consist of attorneys' fees paid in connection with the criminal prosecution. Specifically, the DAF seeks $21,926.00 in legal fees incurred in the restitution application; the VAF seeks $20,235,496.29 in

25

legal fees for Velissaris's criminal defense through his guilty plea and sentencing, $514,315 in legal fees for Scott Lindell (a Government witness), and $79,182.67 in legal fees for other Infinity Q employees who were interviewed by the Government and prepared to testify against Velissaris.

These amounts are appropriately included in a restitution order.  Attorneys' fees incurred in connection with a criminal investigation or prosecution may be included in a restitution order as necessary expenses.  Afriyie, 27 F.4th at 173.  This includes fees that were incurred "during the post-verdict restitution proceedings."  Id.  Contrary to the defendant's argument, it also includes fees for private counsel's preparation of prosecution witnesses.  Id.  The fees requested here were necessary expenses.  The DAF needed to incur legal fees during the restitution proceedings to ensure it received the restitution to which it was entitled, and the VAF's legal fees were required under the VAF's Limited Partnership Agreement.  Accordingly, these fees are appropriately included in the total restitution amount.

The defendant contends that some of the requested fees are excessive.  The objections to the amount of the fees will be addressed in a separate order.

D.   Offsets for Civil Settlements

Finally, the defendant notes that at least some of the investors in the DAF and the VAF are the same as those in one of the civil cases filed against Velissaris, in which a settlement-in-principle has been reached.  He contends that these investors should not be entitled to double recovery.

At this stage, this argument is mere speculation and is not a reason to reduce the restitution amount.  Indeed, "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."  18 U.S.C. § 3664(f)(1)(B).  Of course, "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in a civil proceeding.  Id. § 3664(j)(2).  But the defendant has not shown that either of the Funds has yet recovered its losses through a civil proceeding.  He also points to no authority suggesting that it is appropriate to reduce a restitution order preemptively for amounts that a victim may one day recover.

## Conclusion

The defendant shall pay restitution to the DAF and to the VAF as set forth above.  The defendant's objections regarding

the amount of attorneys' fees owed to these two victims will be addressed in a separate order.


Dated:      New York, New York
            July 24, 2023

                                    _____
                                          DENISE COTE
                                  United States District Judge