The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Regarding: US vs. Velissaris



Second Circuit District Court,

This letter is from James Velissaris the defendant in these proceedings. This case began in March 2021 when the FBI stormed into my house at 5:59 AM. The FBI used a battering ram to bust through my door, and entered my home with 12 agents holding assault rifles. The incursion was the scariest moment of my life and was extremely confusing. My legal team had already imaged my personal laptop and cell phone and provided those images to the prosecution. Yet, the FBI assaulted my home with the fury of a military attack. I was held at gun point against the wall while one agent held an elbow to my chest. My elderly mother was staying in my home and was injured so badly in the melee that she could not walk for the next two weeks. My family sat quietly and prayed to God as the FBI agents rummaged through my home despite immediately being presented with the requested electronic items.

Despite reviewing millions of emails, documents and text messages, the government has produced zero examples of the defendant making a material mis-statement about the valuation process to an investor. The indictment has zero examples of mis-statements made to investors. The examples cited in the indictment are an email from the defendant to the fund administrator in 2016, just two months after Infinity Q started using Bloomberg as one of its valuation tools. The fund had valued a total of 8 securities in the tool at this point and the defendant nor anyone else on the team had made any adjustments to the tool. As a result, the statement in the indictment was 100% accurate when it was made in 2016, and as Infinity Q used the tool for additional securities, our knowledge and experience of the tool's benefits and limitations improved.

The securities in question were modeled in Bloomberg's Derivatives Library system and once a security is modeled it was uploaded to the BVAL database. For clarity, BVAL is a database of securities modeled by a firm it is not a modeling tool. Bloomberg's Derivatives Library was initially offered in the beginning of 2016, so Infinity Q was one of its earlies users. As with any software tool, there were functions that worked very well and functions that worked very poorly. Bloomberg touted the customization that was available in the tool to Bloomberg users which allowed users to select and use parameters that were tailored to their own specifications.

One main advantage of the tool was the simplicaton of communication. DLIB allowed users to share the exact security with all of its modeling assumptions with other users through the terminal. The publicly available Bloomberg DLIB brochure states, "Both sides view the same deal on their Bloomberg Terminals, so no confusion arises about the terms such as "inputs," "life-cycle events" and "cash flows." The Bloomberg brochure goes on to state, "use DLIB to share deals with the buyer right on the Terminal and demonstrate how the price was reached in an efficient and transparent manner." In fact, US Bank, the Trust for Advised Portfolios, and Infinity Q's auditors all were given access direct access to every position modeled through their Bloomberg Terminals with over 15 external individuals having daily access. They had the ability to analyze and review exactly how the securities in question were being modeled every day during the period in question. This alleviated any potential disputes about how the securities were being modeled because it was disclosed to these third parties for review every day.

This oversight was important to US Bank and TAP and they addressed it specifically in an email on 11/23/2016 that stated: "Jim [audit partner] had a suggestion to the Audit Committee that we attempt to independently validate any modelled prices on a regular basis. He shared the work they did for the audit, and I believe we can handle most of this on our own." US Bank and TAP was confirming to Infinity Q that they will provide substantial oversight of all positions modeled in Bloomberg on a "regular basis." The specific oversight was mentioned again by US Bank/TAP on 7/29/2017: "My thought is that we could collect Bloomberg screen shots/data or any other modeling, quotes, etc.. that are used in the valuation process on a given day (ideally we could repeat this process on at least a quarterly basis)."

Additionally, Infinity Q relied on Scott Lindell as the Chief Compliance Officer and Chief Operating Officer to review and approve the valuations for each security in the Bloomberg system each day. Scott Lindell sent over 200 emails and Bloomberg messages to the defendant requesting updates to the valuations as part of Mr.. Lindell's review process. As Mr. Lindell was also responsible for overseeing the counterparty margin process, he was uniquely positioned to know and understand both counterparty valuations and Infinity Q's valuations. An email approving the valuations was sent by Scott Lindell or his team prior to each fund pricing its NAV. Scott Lindell also copied the TAP Valuation Committee on this approval process.

A major part of modeling Exotic Over-the-Counter Derivatives, are the assumptions made by the professional who is modeling the security. The attached DLIB brochure highlights the flexibility of this functionality and how important it is in the valuation

process. The government's "but-for" claim on its own is flawed for the previously mentioned blatant issues that Dr. Saha, the SEC and the defendant all raised with the accuracy and reliability of Bloomberg's valuations of OTC derivatives. However, even focusing on the "but-for" claim on its own still raises significant issues for any professional with knowledge of these securities.

Based on the emails and Bloomberg messages between Dr. Sabry's team and the Bloomberg engineer randomly assigned to help her team, a number of subjective decisions were made that significantly impact the valuations of these securities. For example, Dr. Sabry relied on the Bloomberg engineer to select the volatility surface for security and each date that it was modeled. The defendant presented data to the SEC showing examples of the volatility surface causing as much as a 200% deviation in valuations depending on which surface was selected.

Similarly, Dr. Sabry relied on Bloomberg to select the time of day the securities were priced for both funds. The default time chosen was 4 pm EST, which, as it turns out was an impossible valuation time for the mutual fund. US Bank needed to have access to the updated valuations on their terminal by 4:45 pm EST. A 4 pm price time would not be ready until 5:30 pm EST based on the lag that existed in the system. As a result, every single security priced by Dr. Sabry in the mutual fund had the wrong price because it was literally impossible for the fund to use that price time. To avoid this issue the fund typically priced the portfolio at 11 am EST to allow 2 hours for the prices to appear in the portfolio and for Scott Lindell (Chief Compliance Officer/Chief Operating Officer) to review and approve the valuations. These incorrect time specifications could impact the valuations by as much as 50% on a given day.

Dr. Sabry also allowed the Bloomberg engineer to select the model to be used: Black Scholes, Local Volatility, Stochastic Local Volatility, or Heston. This model selection process can impact the valuations by as much as 30% on a given day during the period in question.

Dr. Sabry also allowed the Bloomberg engineer to select the dividend and interest rate assumptions which could impact the market value of these securities by as much as 20% on a given day.

For corridor variance swaps the variance notional needs to be used to price the security not the vega notional. Unfortunately, Dr. Sabry's team used the vega notional for these securities and in numerous cases arrived at an estimated valuation that was too low as a result of this mis-modeling. These deviations could cause as much as a 20% difference on a given day.

Adding all of these potential discrepancies together, Dr. Sabry's "but-for" analysis could deviate by as much as 320% on a given day during the period in question. This makes the purported "but-for" analysis a complete fallacy because it was the Bloomberg engineer's opinion to use the parameters selected. A reasonable professional could have chosen completely different parameters and arrived at a completely different valuation. In fact, there are over 100 emails and Bloomberg messages from Bloomberg engineers to the defendant that provide completely different instructions on how to price these securities than the instructions Dr. Sabry's team received.

These parameters are selected during the modeling process in the Derivatives Library before the security is added to Bloomberg. In 2018, the defendant was instructed by Bloomberg by email to model the securities in question himself in the Derivatives Library because the Bloomberg support team could not model these exotic derivative securities fast enough to price within a reasonable time frame for the mutual fund's daily pricing requirement. In many cases, the Bloomberg team took 7-10 days to price the securities.

Another major issue with the "but-for" analysis was the sample selection bias. Dr. Saha selected a separate small sample of short volatility securities held by Infinity Q that all had similar manual updates made by the defendant and found that for at least 17 of these securities Infinity Q used a LOWER value than Bloomberg. The average value was $1.1 million LOWER than Bloomberg. This indicates the sample selection bias in Dr. Sabry's analysis could potentially account for the entirety of the deviation between her team's Bloomberg calculations and Infinity Q's calculations.

These examples clearly outlay that the "but-for" analysis conducted by the prosecution illustrates a complete lack of understanding of the nuances and complexities of these securities. The prosecution began the arraignment in March 2022 by calling its own expert a "quasi" expert, and the "but-for" analysis is an indicatation of this knowledge gap.

These issues are further compounded by Bloomberg's BVAL manual, which clearly states, "the notion of an official price does not exist for derivatives." The Bloomberg manual also states, "valuation poses unique modeling risks, because valuations are highly sensitive to models and inputs." Bloomberg stated there is no official price, and promoted the customization and flexibility of its modeling software, yet the government is imposing the prices Dr. Sabry's team obtained by blindly following the modeling opinion of one Bloomberg engineer. The engineer stated multiple times to Dr. Sabry's team that typically these selections are "made by the client" or these selections are "at the client's discretion."

This is not in alignment with the Generally Acceptable Accounting Principles (GAAP) and it is not in alignment with securities laws. Infinity Q did not have the option to blindly follow one Bloomberg engineer to price its portfolio. Infinity Q was required to use its best judgement to price the portfolio and if Infinity Q disagreed with a valuation tool (including Bloomberg) it was legally required to use its judgement to price the portfolio. This was not a discretionary option, it was a fiduciary requirement. The Bloomberg tool did not accurately price these securities, and it was the defendant's and Scott Lindell's duty to subjectively price the portfolio.

As a result, the prosecution is promoting a narrative that the defendant should have committed securities fraud by knowingly using incorrect prices. The court stated, "it is largely immaterial" whether the defendant's valuations were "objectively correct or not." The defendant did not have a legal duty to use Bloomberg in the exact manner that the government has randomly decided is the "appropriate" way to use the tool. Bloomberg was one of the tools Infinity Q used to value its positions, it was never supposed to be a silver bullet.

In fact, the defendant received over 10,000 market price quotations over email and Bloomberg Messenger on similar securities to those in question from 2018-2021. These quotes consistently confirmed that Bloomberg's prices were inaccurate. The defendant raised the existence of these quotes and the differences between Bloomberg and these quotes to the SEC in November of 2020 and then again to the prosecution in January 2022. Yet, the government ignored this important exculpatory evidence.

Infinity Q's prospectus, PPM disclosures, valuation policy, and disclosures in the audited financial statements all had language that clearly disclosed the need for the funds to use subjective judgement when valuing securities that did not have a publicly available price. These disclosures were provided over one thousand times to investors and they repeatedly stated the need for Infinity Q to use its judgement when pricing securities. A sample of the language is: "where a pricing service, quote or quotes may not provide a reliable indication of fair value, Infinity Q will value each such position based on relevant information including without limitation (i) an internally developed memo/model...and/or (ii) such other factors as may be deemed appropriate." The other factor that was used by Infinity Q were the aforementioned market price quotations that were ignored by the government.

The foundation of Infinity Q's investment platform was combining quantitative models and subjective human insight. The defendant typically recited a quote to investors from Columbia University Professor, Emmanuel Derman, "all models are wrong; some models are useful." This was the core ethos of Infinity Q's platform, and blindly following an incorrect model goes against the fundamental purpose of the Infinity Q investment platform.

In closing, I would like to thank the Honorable Judge for her tremendous years of service to our country. I have read about all of the good you have done throughout your career and undoubtedly will continue to do in the future. Since my incarceration began, I have had the opportunity to travel to 6 Bureau of Prisons facilities in the Northeast, Midwest and Southeast regions. I have started what I call the Veritas Project, which focuses on justice impacted individuals choosing a life of honest living by changing the objective function they use to make decisions in their lives. There are numerous men who have reframed their

circumstantial programming and chosen to live honestly as a result of our interactions and I will continue to fight the good fight no matter where I reside in the future.

Sincerely,

James Velissaris
Registration #: 86813-509
Work Assignment: Education
Jesup Federal Satellite Low

James Velasquez
Reg #: 30513-509
Jesup FCI
2680 S US Highway 301
Jesup, GA 31599



The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

JACKSONVILLE FL 320
2 AUG 2023 PM 1 L



10007-131608